## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Southern Division)

FTI CONSULTING, INC.
16701 Melford Blvd., Suite 200
Bowie, MD 20715

          Plaintiff,

    v.                          Case No. 8:23-cv-03200-PJM

JONATHAN ORSZAG,
660 Club View Drive,
Los Angeles, CA 90024

          Defendant.

### SECOND AMENDED COMPLAINT

Plaintiff FTI Consulting, Inc. ("FTI"), on its own behalf and as assignee by and through its undersigned counsel, brings this Complaint against Defendant Jonathan Orszag ("Mr. Orszag") and alleges as follows:

### NATURE OF THE CASE

1.      FTI, one of the largest consulting firms in the world, seeks to prevent a now-former senior executive of its economic consulting business, Mr. Orszag, from following through on his explicitly-threatened plans to (1) compete with and (2) raid other senior professionals and employees from that business, and (3) harm FTI's ability to conduct that business going forward. Mr. Orszag threatened and initiated his plans while serving as a central manager of FTI's Compass Lexecon business segment, in direct violation of his fiduciary duties to FTI and its wholly-owned subsidiary, Compass Lexecon LLC ("Compass Lexecon"), and specific agreements not to take such actions.

2.      This dispute arises from Mr. Orszag's breach of his fiduciary duty of loyalty to FTI and Compass Lexecon and breach of the restrictive covenants under his employment agreement. Ex. A (as described below, the "Employment Agreement").  The Employment Agreement was terminated effective as of November 20, 2023.  Ex. B ("Notice of Termination for Cause").[1]

3.      Under the Employment Agreement, Mr. Orszag agreed to abide by covenants not to compete with FTI or Compass Lexecon and not to solicit FTI's or Compass Lexecon's employees or clients during his employment and continuing for one year after termination (the "Restrictive Covenants").[2]  *See* Employment Agreement §§ 9, 11, 17(c), 17(d).  In addition, by virtue of his status as a high-ranking employee of Compass Lexecon, Mr. Orszag owed a fiduciary duty of loyalty to FTI and Compass Lexecon, which also precluded him from taking the many actions he has taken to undermine FTI's Compass Lexecon business.  Mr. Orszag, in fact, recommitted to his fiduciary duties and these specific obligations to FTI and Compass Lexecon in 2023 in the latest iteration of his Employment Agreement.  And in return and reliance upon these duties and obligations of Mr. Orszag, FTI awarded substantial compensation to Mr. Orszag over the course of his 17-year employment with FTI.

4.      In spite of these clear commitments, Mr. Orszag has repeatedly threatened to start a competing firm immediately upon his departure, solicited other senior professionals and employees of Compass Lexecon to leave with him to start such a competing firm, disparaged FTI, and threatened to harm FTI's economic consulting business unless it met his every demand. Immediately prior to his termination and the filing of this lawsuit, Mr. Orszag's latest demands to

---

[1] Contemporaneously with filing this Second Amended Complaint, FTI is filing a motion for leave to file a complete, unredacted copy of the Employment Agreement and its attachments (Ex. A), as well as the Notice of Termination for Cause (Ex. B) under seal.

[2] Capitalized terms not defined herein have the meaning provided for in the Employment Agreement.

keep him from carrying out these threats were that FTI either (1) relinquish control of Compass Lexecon, or (2) sell the entire Compass Lexecon business for a fraction of what it is worth.

5.    Recognizing the true value of the building blocks of its business—its employees and clients—FTI has been left with no meaningful choice other than to protect its business, employees, and clients by seeking to stop Mr. Orszag's plan.

6.    With Mr. Orszag's employment now at an end, FTI may face substantial harm to its business and client relationships if Mr. Orszag were to follow through on his plans.  Protecting employees and avoiding disruption to client interests are FTI's top priority.

7.    FTI therefore brings this action seeking injunctive and legal relief for Mr. Orszag's contractual and fiduciary breaches, and further threatened breaches, including declarations that the Restrictive Covenants are valid and enforceable.

## THE PARTIES

8.    Plaintiff FTI is a Maryland corporation with its principal place of business located at 16701 Melford Blvd., Suite 200, Bowie, MD 20715.  FTI is a global business advisory firm.

9.    Compass Lexecon is a wholly-owned subsidiary of FTI and is a Maryland limited liability company with a local business address at 555 12th Street NW, Suite 501, Washington, DC, 20004.  FTI is the sole member of Compass Lexecon.  On December 1, 2023, Compass Lexecon assigned all of its rights, interests, duties and obligations under the Employment Agreement to FTI pursuant to Section 20(a) of the Employment Agreement.

10.    Defendant Mr. Orszag is an individual who resides in Los Angeles, California. Mr. Orszag was employed by Compass Lexecon as a Senior Managing Director, and his Employment Agreement was entered into with Compass Lexecon and FTI.

## JURISDICTION AND VENUE

11.     Mr. Orszag removed this action based on diversity jurisdiction and FTI agrees that this Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1).

12.     The Parties expressly consented to the jurisdiction of this Court in the Employment Agreement, which contains a valid and enforceable forum selection clause, stating:

> The internal laws of the State of Maryland (other than its conflict of laws provisions) shall exclusively govern this Agreement. Regardless of any present or future residence, domicile or place of business of the parties, each party hereby irrevocably consents and agrees that any claims and disputes between or among the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement and not governed by Section 27 of this Agreement be brought in any state or federal court located in the State of Maryland.  By execution and delivery of this Agreement, each party submits and consents in advance to such jurisdiction in any action or suit commenced in any such court.  Each party hereby waives any objection which it may have based on forum non conveniens and hereby consents to the granting of such legal or equitable relie[f] as deemed appropriate by such court.

Employment Agreement § 24.

13.     Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 6-103, this Court may also exercise personal jurisdiction over Mr. Orszag because he transacted business in Maryland by virtue of his Employment Agreement with FTI and Compass Lexecon.

14.     Venue is proper in this Court pursuant to the Employment Agreement and 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to FTI's claims occurred in Maryland.

## FACTUAL BACKGROUND

### A.     Compass Lexecon is FTI's Global, Renowned Economic Consulting Business

15.     FTI is a global business advisory firm dedicated to helping organizations manage change, mitigate risk, and resolve disputes related to a variety of complex issues, including

financial, legal, operational, political and regulatory, reputational, and transactional issues. Its clients include the world's leading law firms, financial institutions, and Fortune 100 companies, and, with 40 years of experience, FTI has become a market leading firm and a trusted advisor to clients in various industries. FTI's practices include (i) corporate finance & restructuring, (ii) economic consulting, (iii) forensic and litigation consulting, (iv) strategic communications, and (v) technology.

16.     Compass Lexecon is a wholly-owned subsidiary of FTI and is the primary provider of services within FTI's economic consulting segment. Compass Lexecon provides critical insight in legal and regulatory proceedings, strategic decisions, and public policy debates. The firm delivers a wide range of services that center around its three core offerings: Antitrust & Competition Economics, Financial Economics, and International Arbitration.

17.     Compass Lexecon has over 20 offices and over 800 employees worldwide.

**B.      FTI Employs Highly-Esteemed Consultants at Compass Lexecon**

18.     FTI has invested significant resources in recruiting and retaining Compass Lexecon's leaders, senior professionals, and staff. To protect its substantial investment in the Compass Lexecon business, and the interests of its clients and hundreds of employees, FTI has entered into competitive, confidential compensation and employment packages in order to retain Compass Lexecon's senior professionals.

**C.      Mr. Orszag's History at Compass Lexecon**

19.     Mr. Orszag joined FTI in 2006 upon FTI's acquisition of Competition Policy Associates, Inc. ("COMPASS"), of which Mr. Orszag was affiliated, and which was comprised of some of the leading competition economists in the world. At the time of this acquisition, Mr. Orszag was a junior partner of COMPASS.

20.     Prior to his termination, Mr. Orszag worked in the area of economic and financial consulting with expertise on complex issues of antitrust, regulatory, policy, and litigation matters. He was responsible for maintaining relationships with FTI's current and previous clients, and with securing new business.

21.     Mr. Orszag's first employment agreement with FTI was entered into as of January 1, 2006, under which he agreed to serve as a Senior Managing Director, report to the practice leader of FTI's economic consulting practice group, and have joint responsibility for the day-to-day operations of COMPASS.

22.     COMPASS and another economic consulting firm owned by FTI, Lexecon LLC ("Lexecon"), operated as separate units under FTI's economic consulting business segment until November 2007.  At that time, FTI combined the COMPASS and Lexecon businesses under the name "Compass Lexecon" for marketing and promotional purposes and to join the units' operational and financial management via a Joint Operations Agreement (the "JOA"), which was entered into on November 28, 2007.

23.     After the formation of Compass Lexecon in 2007, Mr. Orszag gradually became responsible for the day-to-day management of the combined firm.

24.     By virtue of his position within Compass Lexecon, Mr. Orszag had extensive access to FTI's and Compass Lexecon's confidential information, including information about Compass Lexecon's financial performance, revenue generation, client lists, billing rates, employee compensation, overhead expenses, operations, and business strategies and plans.

25.     Nonetheless, Mr. Orszag's ambition was to become—as he claims that he is now— "the most important person in economic consulting."

26.     In 2013, Mr. Orszag entered into a third amendment to his employment agreement under which FTI agreed to continue to employ Mr. Orszag as a Senior Managing Director of FTI and Compass Lexecon through January 1, 2024 (the "2013 Employment Agreement"). Concurrently, the parties agreed to an amended JOA (the "Second JOA"), which, subject to certain letter agreement amendments thereafter, was the operative JOA until January 2023.

27.     Between 2011 and his termination, Mr. Orszag's compensation increased nearly four-fold.  The net effect was that Mr. Orszag became one of the most highly-paid professionals in the consulting industry.

28.     Although Mr. Orszag's compensation became drastically skewed, FTI's senior management always insisted that Mr. Orszag—given his role at Compass Lexecon—be bound by robust post-employment restrictions to protect Compass Lexecon should he ever decide to leave the firm.

29.     Each time that he agreed to a new employment contract, Mr. Orszag agreed to be bound by such restrictions.  In his employment agreement entered into in 2012, FTI requested, and Mr. Orszag agreed to, a series of robust noncompetition and nonsolicitation protections.  These included a contractual provision that, if Mr. Orszag left FTI, he agreed not to compete with FTI or Compass Lexecon for a period of one to two years, depending on how his employment was terminated and his post-termination compensation.  The same restriction carried over into the 2013 Employment Agreement.

30.     As the expiration of his 2013 Employment Agreement drew near, beginning in or around April 2021, Mr. Orszag made repeated demands to perpetuate his control over and compensation from FTI stemming from the Compass Lexecon business.  For its part, FTI believed

7

it was important to rebalance Mr. Orszag's compensation and power in order to retain talent and continue the long-term growth of the Compass Lexecon business.

31.     After extensive negotiations, in 2023, the parties agreed to a new employment arrangement.  Mr. Orszag reluctantly agreed to enter into a new Employment Agreement and other governance changes that gave him less personal compensation and management authority over Compass Lexecon than he would have liked.  Nonetheless, FTI paid him substantial compensation but only on the condition that Mr. Orszag recommit to restrictions and his duty of loyalty to FTI and Compass Lexecon in order to preclude him from undermining the Compass Lexecon business.

32.     As described in more detail below, and as is now clear in hindsight from his negotiations, Mr. Orszag had no intention of living up to his duties to FTI and Compass Lexecon and the restrictions to which he explicitly agreed earlier this year.

**D.    During 2022 Employment Negotiations, Mr. Orszag Threatened to Leave Compass Lexecon to Start a Competing Firm and Take Senior Professionals with Him**

33.     In or around June 2022, while Mr. Orszag and FTI were in heated negotiations to extend Mr. Orszag's employment, Mr. Orszag explicitly set out his intention to incite a mass resignation of key staff that would collapse Compass Lexecon if FTI refused to give in to his demands.

34.     Mr. Orszag presented to FTI's Board of Directors in or around June 2022 a PowerPoint slide deck titled, "A Going-Forward Compensation Proposal" (the "June 2022 Presentation").

35.     In the part of the June 2022 Presentation authored by Mr. Orszag, he presented his supposed best and final offer for a new management and payment structure for Compass Lexecon and threatened why FTI must accept his offer.  He also threatened significant consequences for

not accepting his offer.  Certain of Mr. Orszag's explicit threats, made as part of the June 2022 Presentation (and at other times) are described below.

      1.     *By the Summer of 2022, Mr. Orszag Made Clear he would Solicit Compass Lexecon Senior Professionals and Employees in Anticipation of Competing with FTI Post-Employment*

36.     At least as early as 2022, if not long before, Mr. Orszag made clear that he was intent on soliciting Compass Lexecon senior professionals to leave with him upon his departure from Compass Lexecon.  These senior professionals represent Compass Lexecon's highest performers in light of their specialized knowledge in the industry and provision of services to some of FTI's most highly-valued clients.  Mr. Orszag asserted in the June 2022 Presentation that, in the event there was "no deal" between him and FTI, he and other senior professionals would leave FTI together, which he said would significantly reduce any profit margins from the Compass Lexecon business.

37.     The June 2022 Presentation further stated that Mr. Orszag and other senior professionals would "be competing in the market," and that "FTI should expect key staff to depart with [senior professionals] or to competitors – or FTI will have to pay existing staff substantially more to retain them, thus lowering margins further."

38.     Mr. Orszag stated in the June 2022 Presentation that Compass Lexecon's senior professionals "are each recognized in the marketplace as among the top few economic consultants in the world," and "[a]ny of them could support an entire consulting firm."  As a result, Mr. Orszag threatened, "There [would be] no reasonable chance that FTI could recreate earnings . . . without [him and the senior professionals] – especially with some of those leaders competing in the marketplace."

39.     Mr. Orszag further predicted that the day he and other senior professionals "open a new firm they will be viewed by the industry as the #1 economic consulting firm in the world."

He described his plan that they could "fund any start-up with their own money and would likely be able to create a firm with a market cap of $2-$3 billion." With this earning potential in hand, Mr. Orszag stated, the senior professionals could then "recruit critical staff."

**2.    *Mr. Orszag Explicitly Threatened FTI with Substantial Harm***

40.     Mr. Orszag's plan to steal Compass Lexecon's senior professionals to join his own firm is not intended merely to compete with Compass Lexecon, but represents his intention to cause substantial harm to FTI's economic consulting business.

41.     In the June 2022 Presentation, Mr. Orszag explicitly threatened that, unless FTI agreed to a new deal that was to Mr. Orszag's liking, FTI's revenues and profits from its Compass Lexecon business may decline significantly. Moreover, Mr. Orszag threatened, the departure of senior professionals could "create uncertainty about the future of the business, which will mean [Compass Lexecon] will be unable to recruit and retain critical staff."

42.     Mr. Orszag expected that the departure of Compass Lexecon's senior professionals may further cause FTI's earnings from its Compass Lexecon business to be "substantially lower" in the years that followed. Mr. Orszag further expected the long-term revenue impact to FTI from its Compass Lexecon business to be impacted, since he and other senior professionals "will be competing in the market."

43.     In addition, Mr. Orszag predicted that Compass Lexecon may face issues involving the collection of substantial accounts receivable because of the uncertainty that Mr. Orszag could create around Compass Lexecon's future.

**E.**     **Mr. Orszag Pretended to Change Course and Recommitted to his Duty of Loyalty to FTI and Compass Lexecon by Entering into the Employment Agreement and Governance Agreement**

44.     After months of heated negotiations, toward the end of 2022, FTI and Mr. Orszag finally reached a resolution, at least on paper, on the terms of Mr. Orszag's employment and the governance structure of Compass Lexecon.

45.     Mr. Orszag's operative Employment Agreement was entered into between Mr. Orszag, Compass Lexecon, and FTI on January 15, 2023, effective as of January 1, 2023. *See* Ex. A.  The Employment Agreement was part of a larger deal under which Mr. Orszag, FTI, and others agreed to a new internal governance structure for Compass Lexecon on January 1, 2023, pursuant to an agreement (the "Governance Agreement"), which replaced and superseded the Second JOA.

46.     Mr. Orszag was represented by sophisticated legal counsel during the negotiation and drafting of his Employment Agreement and Governance Agreement.

47.     Under the Governance Agreement, Mr. Orszag continued to serve on the executive committee of Compass Lexecon (the "Executive Committee"), but this time with three other members.  FTI maintains exclusive management authority and control over Compass Lexecon but has delegated to the Executive Committee responsibility for managing certain day-to-day internal operations of Compass Lexecon.  By entering into the Governance Agreement, the parties appeared to agree to redistribute some of Mr. Orszag's power to other senior members of Compass Lexecon.

48.     Under the Employment Agreement, Mr. Orszag continued to be employed as a Senior Managing Director of Compass Lexecon, and Mr. Orszag was still projected to receive substantial annual personal compensation.

49.     In order to protect the significant investment it made by retaining Mr. Orszag as an employee, FTI again had Mr. Orszag promise in return for this significant compensation to abide by the Restrictive Covenants, including a non-competition covenant (the "Non-Compete Covenant") and a non-solicitation covenant (the "Non-Solicit Covenant").

### 1.     *Non-Compete Covenant*

50.     The Non-Compete Covenant, customary in the consulting industry, is detailed and narrow.

51.     Under Section 9 of the Employment Agreement (the "Non-Competition Provisions"), Mr. Orszag agreed:

> . . . that, during the Non-Compete Period (as defined below), Employee will not, without Company's prior written consent, directly or indirectly on Employee's own behalf or on behalf of any other person, firm or entity other than the FTI Group (A) engage in; (B) own or control any interest in (except as a passive investor of less than five percent (5%) of the publicly traded stock of a publicly held company); (C) act as a director, officer, manager, member, employee, trustee, agent, partner, joint venture, participant, consultant of or be obligated to, or be connected in any advisory, business or ownership capacity (except as a passive investor of less than five percent (5%) of the publicly traded stock of a publicly held company) with; (D) lend credit or money for the purpose of the establishing or operating; or (E) allow Employee's name or reputation to be used by, any firm, corporation, partnership, trust or other business enterprise directly or indirectly engaged in, any Competing Business in the Market Area . . . .

Employment Agreement § 9(a).

52.     Section 9, however, also included the following carveout:

> The parties agree that the foregoing shall not prevent Employee from working for or performing services on behalf of a Competing Business if such Competing Business is also engaged in other lines of business and if Employee's employment or services are restricted to such other lines of business, and Employee will not be providing direct or indirect support, advice, instruction, direction or other guidance in a Comparable Position to lines of business that constitute the Competing Business.

*Id.*

53.    "Competing Business" as defined in the Employment Agreement means:

> (i) economic, financial, regulatory, corporate and litigation consulting services, including those provided to law firms, corporations and governmental bodies in connection with legal or regulatory proceedings, strategic decision making and/or public policy debates or matters (collectively, "Consulting Services"), and (ii) any other business which is competitive with any business of the FTI Group that (A) involves Employee, (B) is conducted during the term of this Agreement, and (C) Employee was actively involved with or had knowledge of during his employment with the Company.

*Id.* § 17(a).

54.    "Market Area" is defined in the Employment Agreement in the following provision:

> The parties acknowledge and agree that the Company's business is national in scope and character and that, as a result, it is reasonable and appropriate that the term "Market Area" for purposes of this Agreement means (i) the United States of America, the United Kingdom, continental Europe (including, without limitation, the Scandinavian peninsula), Israel, China, Singapore, Chile and Argentina, and (ii) any other location in which the FTI Group has an office or in which the FTI Group offers or provides Consulting Services to clients in the ordinary course of its business.

*Id.* § 17(b).

55.    The Non-Compete Covenant is limited in scope and duration.  By the terms of his Employment Agreement, Mr. Orszag has agreed not to compete with FTI for one year after his termination.  *Id.* § 17(c).  Mr. Orszag agreed that the rights and obligations set forth in the Non-Compete Provisions would survive termination of the Employment Agreement and Mr. Orszag's employment with Compass Lexecon.  *Id.* § 9(f).  Mr. Orszag further specifically acknowledged "that every effort has been made to limit the restrictions placed upon [Mr. Orszag] to those that are reasonable and necessary to protect the FTI Group's legitimate interests," and that the Non-Compete Provisions would not prevent him from earning a livelihood.  *Id.* § 9(b).

### 2.    *Non-Solicit Covenant*

56.    The Non-Solicit Covenant, also customary in the consulting industry, is detailed, narrow, and contained in a specific "Non-Solicitation Covenants" section of the Employment Agreement.

57.    Under Section 11 of the Employment Agreement (the "Non-Solicitation Provisions"), Mr. Orszag agreed not to, "directly or indirectly, whether for Employee or for any other individual or entity (other than Company)," take any of the following actions during a defined restricted period:

> (i) solicit business regarding any case or matter upon which Employee worked on behalf of Company;
>
> (ii) solicit any person or entity (A) who is or was a client of the business of FTI Group and (B) which Employee directly or indirectly provided any services for (including, without limitation, in a management, supervisory or oversight role), solicited business from, or otherwise had contact with (either directly or through any direct or indirect reports) during the term of his employment with the Company (1) to terminate, reduce or otherwise modify their business with the FTI Group or (2) otherwise for the purposes of Employee directly or indirectly engaging in any Competing Business in the Market Area; or
>
> (iii) solicit, induce or otherwise attempt to influence any person whom the FTI Group employs or otherwise engages to perform services (including, but not limited to, any independent consultants, engineers or sales representatives) or any contractor, subcontractor, supplier, or vendor of the FTI Group, to leave the employ of or engagement with, or discontinue providing services to, the FTI Group, or reduce the amounts or level of service they provide to the FTI Group, or otherwise interfere with or disrupt the FTI Group's relationship with these individuals or entities, provided, however, that this restriction will not apply in the case of any clerical employee of the FTI Group or in the case of any other employee whose employment with the FTI Group has been terminated for at least one year.

*Id.* § 11(a).

58.     The Non-Solicit Covenant is limited in scope and duration.  Mr. Orszag agreed to abide by the Non-Solicit Covenant during the "Non-Solicit Period," defined as "the period beginning on the Effective Date and ending on the first anniversary of the Termination Date."  *Id.* §§ 11(a), 17(d).  Mr. Orszag agreed that the rights and obligations set forth in the Non-Solicit Provisions would survive termination of the Employment Agreement and Mr. Orszag's employment with Compass Lexecon.  *Id.* § 11(e).  Mr. Orszag further specifically "acknowledge[d] that every effort has been made to limit the restrictions placed upon [Mr. Orszag] under this Section to those that are reasonable and necessary to protect the legitimate interests of the FTI Group."  *Id.* § 11(b).

59.     The Non-Solicit Covenant was further reasonably limited to "affirmative solicitation."  That is, Mr. Orszag was not precluded from:

> (i) responding to and acting upon any communication that is initiated solely by any client or employee (and without any prior breach of this Agreement by Employee) or

> (ii) generally announcing through a communication (including without limitation to clients and employees), upon termination of employment, his future plans following such termination (as long as such announcement does not invite or otherwise solicit any client of the business of FTI Group or person whom the FTI Group employs or otherwise engages to perform services or any contractor, subcontractor, supplier, or vendor of the FTI Group to join, provide services to, or otherwise become engaged by Employee, whether directly or indirectly, in any new business endeavor) . . . .

*Id.* § 11(b).

60.     But Mr. Orszag agreed he could do so, "provided that no such response, action or announcement is permitted to the extent it otherwise violates (or would reasonably be expected to result in violation of) Section 9, 11 or 12, as applicable."  *Id.*

61.     Under the terms of the Employment Agreement, Mr. Orszag agreed that any breach or threatened breach of the Non-Compete Covenant or the Non-Solicit Covenant would cause

substantial and irrevocable harm to FTI and Compass Lexecon and that FTI and Compass Lexecon would accordingly be entitled to injunctive relief to enforce their rights under the Employment Agreement. *See Id.* §§ 9(d), 11(d), 19.

62.     As stated above, Mr. Orszag further agreed under Section 24 of the Employment Agreement that the "internal laws of the State of Maryland (other than its conflict of laws provisions) shall exclusively govern" the Employment Agreement, and he agreed to submit to the jurisdiction of the state and federal courts in Maryland with respect to the present dispute. *Id.* § 24.

**F.     When Entering into the Employment Agreement, Mr. Orszag Never Intended to Comply with his Fiduciary Duties or Obligations to FTI and Compass Lexecon**

63.     Prior to entering into the 2023 Employment Agreement, Mr. Orszag made it clear that he had no intention of honoring any duty or obligation that would prevent him from stealing Compass Lexecon's business.  For example, in the June 2022 Presentation, Mr. Orszag clearly stated his intention to seek to invalidate the non-compete and non-solicit covenants applicable under his 2013 Employment Agreement (the "2013 Restrictive Covenants") in California.

64.     In other words, despite agreeing to a robust set of post-employment restrictions since his employment with FTI began, Mr. Orszag admitted that he intended to breach those obligations and compete against Compass Lexecon the moment that he left the firm.

65.     In addition, Mr. Orszag's own personal counsel stated, if there came a point at which FTI decided the restrictive covenants were enforceable against Mr. Orszag, Mr. Orszag intended to file a declaratory relief action in California to invalidate the restrictive covenants.  Mr. Orszag repeatedly made it clear that at any time he could bring such an action and that a California court would invalidate any restrictive covenants.

66.     In entering into the 2023 Employment Agreement, the parties appeared to have resolved these issues by Mr. Orszag agreeing not only to his Non-Compete and Non-Solicit Covenants but also to Maryland governing law, jurisdiction, and venue provisions.  As Mr. Orszag knows, the Non-Compete and Non-Solicit Covenants Mr. Orszag agreed to, in exchange for substantial compensation and benefits from FTI, and his fiduciary duties, are fully valid and enforceable.

67.     Virtually immediately after entering into the 2023 Employment Agreement, however, Mr. Orszag made clear that he would not abide by the terms to which he agreed.  Over the course of 2023, Mr. Orszag continued to threaten to incite a mass resignation of Compass Lexecon employees and to start a competing firm if things did not go his way.

68.     In July 2023, for example, Mr. Orszag approached FTI senior leadership and announced his plan to call a meeting of Compass Lexecon senior staff so that he could describe supposed "negative synergies" between FTI and Compass Lexecon.  Of note, Mr. Orszag presented draft "scripts" to FTI of the speech he planned to give to Compass Lexecon's senior staff.  His intent in these scripts was clear—to sow seeds of discontent toward FTI among Compass Lexecon staff in order to create a fault line from which Mr. Orszag could engineer a clean split of Compass Lexecon from FTI.

69.     Mr. Orszag, for instance, planned to tell the staff that there had been "a more significant rift between FTI and [Compass Lexecon]."  He cited various "negative synergies" that he believed were causing "trust issues."

70.     Mr. Orszag also wrote in one such draft that he planned to tell the staff, "I personally took a worse deal for myself in the last negotiation last year to get the larger deal done and ensure we stayed together."

71.    Further, to entice Compass Lexecon staff to depart FTI with him, Mr. Orszag planned to say:

> Let me end by saying this in the strongest possible way.  The future for us is bright and strong and solid.  The best strategy for each of you is to focus on your work and let the negotiations with FTI play themselves out.  There is most certainly no need to 'polish' your CV – indeed, you should have no concerns about your futures at all.

72.    Mr. Orszag threatened on a call with FTI leadership and directors around the same time that if FTI were to terminate Mr. Orszag for his planned speech, 800 employees would leave the next day, causing significant harm to Compass Lexecon within a week or two.

73.    Thus, just six months after Mr. Orszag entered into the Employment Agreement with FTI and Compass Lexecon, with an ongoing duty of loyalty, Mr. Orszag reneged on his agreement.  His plan to compete with FTI and his threats to orchestrate a mass resignation remain locked and loaded.

74.    It was only as a result of extensive efforts by FTI's senior management that Mr. Orszag agreed to give a less bombastic speech.  Nonetheless, in the speech Mr. Orszag ultimately gave to Compass Lexecon staff, he made clear that his demands to FTI must be met or resignations would follow.

75.    During the same time period, Mr. Orszag undertook a series of actions in furtherance of his plans and threats to compete against FTI, including but not limited to the following.  Mr. Orszag began formulating plans to establish a new company ("NewCo") to compete against FTI by taking all or substantially all of Compass Lexecon's then-existing business and personnel.  Mr. Orszag's plans are evident in a recently uncovered investor presentation, which

he transmitted using his Compass Lexecon email.[3]  In the investor presentation, Mr. Orszag stated that he "wish[ed] to pursue an independent firm to eliminate negative synergies [with FTI] and free up opportunities [for Mr. Orzsag and other senior leaders of Compass Lexecon] presently limited by governance and conflict issues with their existing corporate parent."  The presentation indicated that planning for the new company was at an advanced stage.

76.     The investor presentation went far beyond personal efforts by Mr. Orszag to earn a living through consulting work for his own clients: It made clear that Mr. Orszag aspired to appropriate the *entire* Compass Lexecon business and operation away from FTI's control and inject it into a new corporate entity under his ownership and control.  For example, in a slide titled "Financing Needs for 'NewCo,'" Mr. Orszag explicitly pegged his estimate of financing needs for the new company to a scenario in which *all* Compass Lexecon experts moved to the new firm. And a slide titled "Financial Proposal" included a tranche of equity capital that would be committed by initial investors in case of "a scenario that *all or virtually all of Compass Lexecon* moved to 'NewCo.'"  (emphasis added).  In addition, the presentation stated Mr. Orszag's hope that the new company's professional staff would be populated by "[t]he current team within Compass Lexecon," which "ha[d] shown loyalty to NewCo's leadership."  In a series of slides estimating the "Valuation of NewCo," Mr. Orszag equated the "value of NewCo" with the *entire* "Estimated Value of Compass Lexecon," including calculations based on Compass Lexecon's *entire* employee population.  The presentation acknowledged that the new company's valuation could be lower than Compass Lexecon's if Mr. Orszag was not able to appropriate *all* of Compass

---

[3] At all relevant times, FTI's Policy on Acceptable Use of Technology Resources—which Mr. Orszag explicitly acknowledged in January 2023—forbade employees from using their work email "to conduct outside business" or in any manner that "could otherwise harm [FTI]."  The Policy also emphasized the need for employees to "safeguard confidential Company and client information at all times."

Lexecon's business, but Mr. Orszag's estimated valuation of the new company made clear that taking all or substantially all the business was his intention and the subject of specific actions he took while still employed at Compass Lexecon.

77.    Mr. Orszag took additional acts in furtherance of his plan to take Compass Lexecon's entire business away from FTI, including his engagement of tax planning professionals to develop an efficient tax structure for NewCo, taking into account the international nature of Compass Lexecon's then-existing business.

78.    To implement his plan to appropriate the business of Compass Lexecon from FTI, Mr. Orszag used his ongoing negotiations with FTI to hide his true intention of leaving to start NewCo in March 2024.  In retrospect, it is now clear that Mr. Orszag's negotiating positions up through his termination did not reflect good faith efforts to reach a long-term resolution with FTI, but rather were designed to buy time as he prepared to take Compass Lexecon's business away from FTI and set up his own company.  This course of bad faith negotiating included making FTI an offer to acquire the Compass Lexecon business that was vastly lower than his own estimates of Compass Lexecon's true value as estimated in the investor presentation that he prepared.

79.    In planning to create a competing company, Mr. Orszag used FTI's and Compass Lexecon's confidential information as part of his efforts to solicit investors.  For example, the investor presentation included confidential information regarding: (1) Compass Lexecon's estimated revenue[4]; (2) Compass Lexecon's overhead expenses as a share of its revenue; (3) the total revenue generated directly by Compass Lexecon's senior professionals; (3) the amount of

---

[4] FTI publicly reports revenue from its Economic Consulting segment, which includes Compass Lexecon, but not from Compass Lexecon alone.

bonus compensation paid to Compass Lexecon's senior professionals; and (4) the amount of outstanding unforgiven loans that FTI had made to its Compass Lexecon employees.

80.    In June 2023, in advance of a meeting among senior Compass Lexecon professionals and FTI management, Mr. Orszag suggested that Compass Lexecon employees should raise questions why Compass Lexecon employees should stay with the firm since many of them were, in Mr. Orszag's view, not bound by non-competition covenants.  Mr. Orszag asked that he not be identified as the source for these questions.

### G.    Mr. Orszag's Unreasonable Demands to FTI in October and November 2023

81.    The tipping point with Mr. Orszag came in October and November 2023, when Mr. Orszag expressed a total lack of commitment to live up to his end of the bargains under his Employment Agreement and Governance Agreement.

82.    In October 2023, Mr. Orszag met with an executive of FTI.  During that meeting and in email correspondence that followed, Mr. Orszag presented yet another plan to overhaul the Compass Lexecon business in order to reapportion wealth and control to himself.  Apparently not having intended to live up to his Employment Agreement or the new structure under the Governance Agreement at all, Mr. Orszag proposed a "new arrangement" to address his perceived issues with the relationship between FTI and Compass Lexecon.  Mr. Orszag proposed that there be "significant changes to the control and governance of Compass Lexecon" and stated, "control changes are necessary to chart a path forward."

83.    Mr. Orszag further demanded that FTI sell the Compass Lexecon business for a fraction of its true value.

84.    This time, Mr. Orszag made clear that the only "resolution" he would accept was as follows, which he presented as a "choice" for FTI:  Either (1) cede control of Compass Lexecon, or (2) he will "depart and start a new firm."

85.    Just a few weeks later in November, Mr. Orszag had another meeting with FTI executives, during which he reiterated his demands.  He gave FTI until November 27, 2023 to decide which option it would choose.

**H.    Mr. Orszag's Termination for Cause**

86.    Mr. Orszag's employment was terminated for cause on November 20, 2023.  That day, FTI transmitted to Mr. Orszag a Notice of Termination for Cause that specified the acts that formed the basis for FTI's decision to terminate him and the provisions of the Employment Agreement under which Cause for termination existed.  Ex. B.  The Notice of Termination for Cause also advised Mr. Orszag of FTI's determination that the Cause for termination was uncurable, explaining the grounds for that determination.  *Id.*  Mr. Orszag's termination was effective immediately.

**I.    Mr. Orszag's Post-Termination Consulting Agreement**

87.    On November 22, 2023, in order to avoid or minimize any interruption in services to clients, Compass Lexecon entered into a consulting agreement with Mr. Orszag, effective as of November 20, 2023 (the "Consulting Agreement").  The Consulting Agreement enables Mr. Orszag to continue to provide consulting services to current Compass Lexecon clients, including serving as an expert, and provides that Mr. Orszag will receive significant compensation for these services.

88.    Given the terms of the Consulting Agreement, Mr. Orszag will have the opportunity over the coming year to earn substantial compensation; he will not be precluded from earning a living during the period of his agreement not to compete with FTI.

**J.    Mr. Orszag's Refusal to Repay Loans from FTI**

89.    In the Employment Agreement, Mr. Orszag acknowledged that FTI had made him an interest-bearing loan pursuant to a promissory note, which was attached as Exhibit B to the

Employment Agreement.  *See* Employment Agreement § 4(c)(i) (referencing the "2013 Loan" and the "2013 Promissory Note").

90.    Mr. Orszag also acknowledged that FTI had made him another interest-bearing loan pursuant to a second promissory note, which was attached as Exhibit C to the Employment Agreement.  *See* Employment Agreement § 4(c)(ii) (referencing the "2015 Loan" and the "2015 Promissory Note").

91.    In the Employment Agreement, Mr. Orszag agreed to abide by the terms of the 2013 Promissory Note and the 2015 Promissory Note.

92.    Under the terms of each promissory note, if the Employment Agreement were to be terminated by FTI for Cause, then all unpaid principal and accrued interest, not including amounts previously forgiven, would become due and payable immediately, and Mr. Orszag would be required to make full payment within 10 days (in the case of the 2013 Loan) or 10 business days (in the case of the 2015 Loan).[5]

93.    Under the terms of each promissory note, the entire amount of unpaid principal and accrued interest on the 2013 Loan and the 2015 Loan became due and payable on November 20, 2023, when Mr. Orszag was terminated for Cause.

94.    On December 12, 2023, FTI wrote to Mr. Orszag specifying these amounts and advising him of his obligation to pay them pursuant to the terms of the 2013 Promissory Note and 2015 Promissory Note.  FTI requested that Mr. Orszag make these payments immediately and advised him that he would be in default if he did not do so.

---

[5] The 2013 and 2015 Promissory Notes are included as Exhibits B and C to the unredacted version of the Employment Agreement, which has been filed under seal at Mr. Orszag's request.

95.    On December 20, 2023, Mr. Orszag replied to FTI, expressly refusing to pay the outstanding principal and accrued interest on the 2013 and 2015 Promissory Notes.

## COUNT I: DECLARATORY JUDGMENT THAT THE NON-COMPETE PROVISIONS ARE VALID AND ENFORCEABLE

96.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as if set forth herein.

97.    Mr. Orszag, FTI, and Compass Lexecon executed the Employment Agreement effective as of January 1, 2023.

98.    The Non-Compete Provisions explicitly prohibit Mr. Orszag from competing with the Compass Lexecon business for one year following Mr. Orszag's termination of employment with Compass Lexecon.

99.    Rather than complying with the terms of his Employment Agreement, Mr. Orszag has taken steps in anticipation of competing with the Compass Lexecon business on information and belief, in blatant breach of his obligations under the Non-Compete Provisions.

100.    The Non-Compete Provisions were executed for a simple reason: to ensure that FTI's business was protected from precisely the conduct in which Mr. Orszag has engaged.  Under applicable law, the Non-Compete Provisions are more than reasonable in geographic scope, duration, and content.

101.    FTI has a legally protected interest in its clients' goodwill and its relationships with its clients and employees.

102.    FTI and Compass Lexecon performed all material terms and conditions of the Employment Agreement, except to the extent that their performance was waived, prevented, or excused by the acts, conduct, or omissions of Mr. Orszag.

103.    Enforcing the Non-Compete Provisions will not cause undue hardship for Mr. Orszag because FTI has paid him significantly, including compensation due upon his termination, and the parameters of his Non-Compete Provisions still permit him to earn a livelihood, subject to the restrictions therein.

104.    The Non-Compete Provisions do not violate public policy.

105.    As the facts above illustrate, Mr. Orszag is intent on stealing the Compass Lexecon business in order to preserve the compensation and control that he lost when he agreed to the new Employment Agreement in 2023.

106.    The injuries to FTI resulting from Mr. Orszag's breaches of his Restrictive Covenants and duty of loyalty may be substantial.

107.    In light of Mr. Orszag's open and continuing violation of the Non-Compete Provisions, his assertion that he would seek to invalidate the Restrictive Covenants in California and thereafter compete with FTI and Compass Lexecon upon his departure, and given his terminated employment with Compass Lexecon, there now exists an actual, justiciable controversy between the Parties over their respective rights and obligations under the Employment Agreement, which controversy may be determined by a judgment of this Court.

108.    WHEREFORE, Plaintiff requests that this Court:

    a.  Declare that the Non-Compete Provisions are valid and enforceable against Mr. Orszag as a matter of law;

    b.  Declare that, pursuant to the Non-Compete Provisions, Mr. Orszag may not compete with FTI or Compass Lexecon for a period of one year from the date of his termination, thus until November 20, 2024; and

    c.  Award all further relief the Court deems just and appropriate.

109.    A judicial declaration to terminate this controversy is necessary and appropriate so that the Parties may ascertain their respective rights with regard to the matters alleged above.

## COUNT II: DECLARATORY JUDGMENT THAT THE NON-SOLICIT PROVISIONS ARE VALID AND ENFORCEABLE

110.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as if set forth herein.

111.    Mr. Orszag, FTI, and Compass Lexecon executed the Employment Agreement effective as of January 1, 2023.

112.    The Non-Solicit Provisions explicitly prohibit Mr. Orszag from soliciting FTI or Compass Lexecon clients or employees under certain circumstances for one year following Mr. Orszag's termination of employment with Compass Lexecon.

113.    Rather than complying with the terms of his Employment Agreement, Mr. Orszag has engaged in a deliberate scheme to solicit FTI's and Compass Lexecon's employees, in blatant breach of his obligations under the Non-Solicit Provisions.

114.    The Non-Solicit Provisions were executed for a simple reason:  to ensure that FTI's business was protected from precisely the conduct in which Mr. Orszag has engaged.  Under applicable law, the Non-Solicit Provisions are more than reasonable in geographic scope, duration, and content.

115.    FTI has a legally protected interest in its clients' goodwill and in its relationships with its clients and key employees.

116.    FTI and Compass Lexecon performed all material terms and conditions of the Employment Agreement, except to the extent that their performance was waived, prevented, or excused by the acts, conduct, or omissions of Mr. Orszag.

117.    Enforcing the Non-Solicit Provisions will not cause undue hardship for Mr. Orszag.

118.    The Non-Solicit Provisions do not violate public policy.

119.    As the facts above illustrate, Mr. Orszag is intent on soliciting Compass Lexecon senior professionals and employees to a business intended to compete with FTI and Compass Lexecon.

120.    The injuries to FTI resulting from Mr. Orszag's breaches of his Restrictive Covenants and duty of loyalty may be substantial.

121.    In light of Mr. Orszag's open and continuing violation of the Non-Solicit Provisions, his assertion that he would seek to invalidate the Restrictive Covenants in California and thereafter compete with FTI and Compass Lexecon upon his departure, given his terminated employment with Compass Lexecon, there now exists an actual, justiciable controversy between the Parties over their respective rights and obligations under the Employment Agreement, which controversy may be determined by a judgment of this Court.

122.    WHEREFORE, Plaintiff requests that this Court:

      a.  Declare that the Non-Solicit Provisions are valid and enforceable against Mr. Orszag as a matter of law;

      b.  Declare that, pursuant to the Non-Solicit Provisions, Mr. Orszag may not solicit FTI or Compass Lexecon employees or clients for a period of one year from the date of his termination, thus until November 20, 2024; and

      c.  Award all further relief the Court deems just and appropriate.

123.    A judicial declaration to terminate this controversy is necessary and appropriate so that the Parties may ascertain their respective rights with regard to the matters alleged above.

## COUNT III: BREACH OF CONTRACT (NON-SOLICIT PROVISIONS)

124.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as set forth herein.

125.    Mr. Orszag entered into a binding contract with FTI and Compass Lexecon effective January 1, 2023 when he executed the Employment Agreement.  Under the Employment Agreement, Mr. Orszag agreed to be bound by the Non-Solicit Provisions, which explicitly prohibit Mr. Orszag from soliciting FTI and Compass Lexecon clients or employees under certain circumstances during his employment and for one year following his termination from Compass Lexecon.

126.    Mr. Orszag breached the Non-Solicit Provisions by soliciting, inducing, or attempting to influence senior professionals and employees at Compass Lexecon to leave FTI in the event he leaves.  Mr. Orszag has specifically sought to coordinate the mass departure of Compass Lexecon's highest performing and top-ranking employees.  Mr. Orszag has also threatened the departure of other key staff members in the event he leaves Compass Lexecon.  By these actions, at a minimum, Mr. Orszag has disrupted or attempted to disrupt the relationships between FTI and Compass Lexecon and their clients, prospective clients, and key employees.

127.    FTI and Compass Lexecon have fully performed their obligations under the Employment Agreement.

128.    As a direct result of Mr. Orszag's breach of his Non-Solicitation Provisions, FTI may suffer substantial damages, including lost revenues and employees.

129.    WHEREFORE, Plaintiff requests that this Court:

> a. Order permanent injunctive relief, pursuant to the Non-Solicit Provisions, prohibiting Mr. Orszag from soliciting FTI and Compass

Lexecon employees and clients for one year from the date of his termination, thus until November 20, 2024;

b.   Enter judgment in favor of FTI and against Mr. Orszag for damages in excess of $75,000;

c.   Award to FTI all of its reasonable attorneys' fees, plus costs and interest; and

d.   Award all further relief the Court deems just and appropriate.

### COUNT IV: BREACH OR ANTICIPATORY BREACH OF CONTRACT (NON-COMPETE PROVISIONS)

130.   Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as set forth therein.

131.   Mr. Orszag entered into a binding contract with FTI and Compass Lexecon effective January 1, 2023 when he executed the Employment Agreement.  Under the Employment Agreement, Mr. Orszag agreed to be bound by the Non-Compete Provisions, which explicitly prohibit Mr. Orszag from competing with the Compass Lexecon business for one year following Mr. Orszag's termination from Compass Lexecon.

132.   The Non-Compete Provisions are valid and enforceable, and apply in full force even if Mr. Orszag is no longer employed by FTI.

133.   By the actions described above, namely Mr. Orszag's plan to invalidate his Restrictive Covenants in California, his intent to continue soliciting FTI and Compass Lexecon employees upon his departure from FTI, his plan to set up his own firm post-employment, and his various actions in furtherance of those plans, Mr. Orszag has breached or unequivocally repudiated or renounced the Non-Compete Provisions and anticipates taking action to breach them.

134.     As a result of Mr. Orszag's breach or anticipatory breach, FTI may be substantially damaged and harmed by the impending loss of some of Compass Lexecon's senior professionals and key staff, as well as clients, and may further endure damage to its business, goodwill, and reputation.

135.     WHEREFORE, Plaintiff requests that this Court:

      a.   Order permanent injunctive relief, pursuant to the Non-Compete Provisions, prohibiting Mr. Orszag from competing with FTI and Compass Lexecon for one year from the date of his termination, thus until November 20, 2024;

      b.   Enter judgment in favor of FTI and award compensatory damages in an amount to be determined at trial;

      c.   Award to FTI its attorneys' fees, plus costs and interest; and

      d.   Award all further relief the Court deems just and appropriate.

## COUNT V: ANTICIPATORY BREACH OF CONTRACT (NON-SOLICIT PROVISIONS)

136.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as set forth therein.

137.     Mr. Orszag entered into a binding contract with FTI and Compass Lexecon effective January 1, 2023 when he executed the Employment Agreement.  Under the Employment Agreement, Mr. Orszag agreed to be bound by the Non-Solicit Provisions, which explicitly prohibit Mr. Orszag from soliciting FTI and Compass Lexecon employees and clients for one year following Mr. Orszag's termination from Compass Lexecon.

138.     The Non-Solicit Provisions are valid and enforceable, and apply in full force even if Mr. Orszag is no longer employed by FTI.

30

139.    By the actions described above, namely Mr. Orszag's plan to invalidate his Restrictive Covenants in California, his intent to continue soliciting FTI and Compass Lexecon employees upon his departure from FTI, and his plan to set up his own firm post-employment, Mr. Orszag has unequivocally repudiated or renounced the Non-Solicit Provisions and anticipates taking action to breach them.

140.    As a result of Mr. Orszag's anticipatory breach, FTI may be substantially damaged and harmed by the impending loss of some of Compass Lexecon's senior professionals and key staff and may further endure damage to its business, goodwill, and reputation.

141.    WHEREFORE, Plaintiff requests that this Court:

        a.    Order permanent injunctive relief, pursuant to the Non-Solicit Provisions, prohibiting Mr. Orszag from soliciting FTI and Compass Lexecon employees and clients for one year from the date of his termination, thus until November 20, 2024;

        b.    Enter judgment in favor of FTI and award compensatory damages in an amount to be determined at trial;

        c.    Award to FTI its attorneys' fees, plus costs and interest; and

        d.    Award all further relief the Court deems just and appropriate.

## COUNT VI: BREACH OF FIDUCIARY DUTY OF LOYALTY

142.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as if set forth herein.

143.    Mr. Orszag, as a Senior Managing Director of Compass Lexecon subject to his Employment Agreement with FTI and Compass Lexecon, owed a fiduciary duty of loyalty to FTI and Compass Lexecon.  This duty required Mr. Orszag to, among other things, act solely for the

benefit of FTI and Compass Lexecon in all matters within the scope of his employment and to avoid all conflicts between his duty to FTI and Compass Lexecon and his self-interest.

144.    By the course of conduct alleged herein, Mr. Orszag breached or willfully breached his fiduciary obligations to FTI and Compass Lexecon.  While employed by FTI and Compass Lexecon, Mr. Orszag acted self-interestedly and in breach of his duties to FTI and Compass Lexecon, which obligated him to deliver his best efforts to FTI and Compass Lexecon and avoid disruption to FTI's and Compass Lexecon's business during his employment.  Mr. Orszag's actions in breach of his duty of loyalty included: (i) soliciting Compass Lexecon's senior professionals and employees and otherwise seeking to organize a mass resignation from FTI; (ii) threatening to create a competing business and to appropriate the Compass Lexecon business; (iii)  taking advanced steps toward creating a competing business with the aspiration of taking the entire Compass Lexecon business; and (iv) using FTI's and Compass Lexecon's confidential information and resources to facilitate Mr. Orszag's efforts to establish a competing business.

145.    As a direct result of Mr. Orszag's breach of his fiduciary obligations, FTI may suffer substantial financial damages and other losses.

146.    WHEREFORE, Plaintiff requests that this Court:

   a.  Order permanent injunctive relief, consistent with the Non-Compete Provisions, prohibiting Mr. Orszag from competing with FTI and Compass Lexecon for one year from the date of his termination, thus until November 20, 2024;

   b.  Order permanent injunctive relief, consistent with the Non-Solicit Provisions, prohibiting Mr. Orszag from soliciting FTI and Compass

Lexecon employees and clients for one year from the date of his termination, thus until November 20, 2024;

c.  Enter judgment in favor of FTI and against Mr. Orszag for damages in excess of $75,000;

d.  Award to FTI all of its reasonable attorneys' fees, plus costs and interest; and

e.  Award all further relief the Court deems just and appropriate.

### COUNT VII: BREACH OF CONTRACT (2013 PROMISSORY NOTE)

147.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as if set forth herein.

148.    Mr. Orszag entered into a binding contract with FTI when he agreed to the 2013 Promissory Note.  Under the terms of the 2013 Promissory Note, in the event that Mr. Orszag's Employment Agreement was terminated for Cause prior to January 1, 2024, any unpaid principal and accrued interest, not including amounts previously forgiven, would become due and payable immediately, and Mr. Orszag would be required to make full payment within 10 days.

149.    Mr. Orszag breached his repayment obligation under the 2013 Promissory Note when he failed to repay the outstanding principal and accrued interest within 10 days of his termination for Cause on November 20, 2023.  On December 20, 2023, in response to FTI's request after the deadline had passed that Mr. Orszag make full payment immediately or be in default, Mr. Orszag explicitly disavowed any payment obligation under the 2013 Promissory Note.

150.    As a direct result of Mr. Orszag's breach of his repayment obligation under the 2013 Promissory Note, FTI has suffered damages—specifically, loss of the unpaid principal and accrued interest that Mr. Orszag was obligated to repay.

151.    WHEREFORE, Plaintiff requests that this Court:

33

     a.   Enter judgment in favor of FTI and against Mr. Orszag for damages in an amount to be proven at trial;

     b.   Award to FTI all of its reasonable attorneys' fees, plus costs and interest; and

     c.   Award all further relief the Court deems just and appropriate.

## COUNT VIII: BREACH OF CONTRACT (2015 PROMISSORY NOTE)

152.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as if set forth herein.

153.    Mr. Orszag entered into a binding contract with FTI when he agreed to the 2015 Promissory Note.  Under the terms of the 2015 Promissory Note, in the event that Mr. Orszag's Employment Agreement was terminated for Cause prior to January 1, 2024, any unpaid principal and accrued interest, not including amounts previously forgiven, would become due and payable immediately, and Mr. Orszag would be required to make full payment within 10 business days.

154.    Mr. Orszag breached his repayment obligation under the 2015 Promissory Note when he failed to repay the outstanding principal and accrued interest within 10 business days of his termination for Cause on November 20, 2023.  On December 20, 2023, in response to FTI's request after the deadline had passed that Mr. Orszag make full payment immediately or be in default, Mr. Orszag explicitly disavowed any payment obligation under the 2015 Promissory Note.

155.    As a direct result of Mr. Orszag's breach of his repayment obligation under the 2015 Promissory Note, FTI has suffered damages—specifically, loss of the unpaid principal and accrued interest that Mr. Orszag was obligated to repay.

156.    WHEREFORE, Plaintiff requests that this Court:

     a.   Enter judgment in favor of FTI and against Mr. Orszag for damages in an amount to be proven at trial;

b. Award to FTI all of its reasonable attorneys' fees, plus costs and interest; and

c. Award all further relief the Court deems just and appropriate.

**ZUCKERMAN SPAEDER LLP**

___/s/ William J. Murphy_____

William J. Murphy (Fed. Bar No. 00497)
Daniel P. Moylan (Fed. Bar No. 26476)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
(410) 949-1146 (office)
(410) 659-0436 (fax)
wmurphy@zuckerman.com
dmoylan@zuckerman.com

Caroline Judge Mehta (admitted *pro hac vice*)
Ezra B. Marcus (admitted *pro hac vice*)
1800 M Street NW, Suite 1000
Washington, DC 20036
(202) 778-1800 (office)
(202) 822-8106 (fax)
cmehta@zuckerman.com
emarcus@zuckerman.com

**WILKINSON STEKLOFF LLP**

___/s/ Brian L. Stekloff_____

Brian L. Stekloff (Fed. Bar No. 26835)
2001 M Street NW, 10th Floor
Washington, DC 20036
(202) 847-4000 (office)
(202) 847-4005 (fax)
bstekloff@wilkinsonstekloff.com

*Counsel for Plaintiff*