# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| FTI CONSULTING, INC., | |
| *Plaintiff*, | |
| v. | Civil Action No.: 8:23-cv-03200-PJM |
| JONATHAN M. ORSZAG, | |
| *Defendant*. | |

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL TEXT MESSAGES AVAILABLE FROM ITS EMPLOYEES

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

ARGUMENT ......................................................................................................... 10

I.  FTI's Motion For Post-Complaint Discovery Should Be Denied ........................ 10

    A.  There Is No Good Cause to Modify the Court's Order And Allow
         Discovery Into Irrelevant Post-Termination Conduct At This Time ........ 10

    B.  FTI's Motion Is Untimely ........................................................................ 12

    C.  FTI's Motion Violates the Conferral Requirements In Local
         Rules 104.7 and 104.8 ............................................................................ 14

II.  FTI's Untimely Motion Seeking Burdensome Production of
     Text Messages With Dr. Israel and Dr. Padilla That Are Already
     Under FTI's Possession Or Control Should Be Denied....................................... 14

    A.  Production of The Requested Communications Would Be Unduly
         Burdensome And Disproportionate to the Needs of the Case ................. 14

    B.  FTI's Motion Is Untimely ........................................................................ 18

CONCLUSION....................................................................................................... 18

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Blind Indus. & Servs. of Md. v. Route 40 Paintball Park*,
2012 WL 4470273 (D. Md. Sept. 26, 2012).................................................................14

*Briggs v. T & D Plumbing & Heating Co.*,
2011 WL 2970845 (D. Md. July 19, 2011)..................................................................11

*Carnegie Int'l Corp. Sec. Litig., In re*
107 F. Supp. 2d 676 (D. Md. 2000)............................................................................11

*Clark v. Council of Unit Owners of 100 Harborview Drive Condo. Ass'n*,
2024 WL 2155021 (D. Md. May 13, 2024)................................................................17

*Crumb v. McDonald's Corp.*,
2017 WL 1508755 (D. Md. Apr. 27, 2017),
*aff'd*, 854 F. App'x 547 (4th Cir. 2021)....................................................................11

*Ethypharm S.A. France v. Abbott Lab'ys*,
271 F.R.D. 82 (D. Del. 2010).....................................................................................17

*Evenson v. Johnson Bros. Liquor Co*.,
2020 WL 12948540 (D. Minn. May 19, 2020)...........................................................17

*Garcia v. Almieda*,
2006 WL 3001171 (E.D. Cal. Oct. 20, 2006).............................................................17

*Geller v. von Hagens*,
2011 WL 13305172 (M.D. Fla. Dec. 23, 2011)..........................................................17

*Induction Therapies, LLC v. Ingenes, LLC*,
2023 WL 3848370 (D. Md. Mar. 21, 2023) ...............................................................13

*Jarvis v. Enter. Fleet Servs.*,
2009 WL 10708892 (D. Md. Feb. 17, 2009) ..................................................... 14-15, 17

*Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*,
79 F.3d 496 (6th Cir. 1996) .......................................................................................11

*Livanos v. Livanos*,
2010 WL 917198 (D. Md. Mar. 10, 2010)...................................................................11

*Madison v. Harford County, Md.*,
    268 F.R.D. 563 (D. Md. 2010)..........................................................................11

*Maryland Metals, Inc. v. Metzner*,
    382 A.2d 564 (Md. 1978) ...........................................................................10

*Mitchell v. U.S. Bank Nat'l Ass'n*,
    2021 WL 6120105 (D. Md. Jan. 11, 2021)..................................................17

*Mod. Remodeling, Inc. v. Tripod Holdings, LLC*,
    2020 WL 1984338 (D. Md. Jan. 31, 2020)..................................................12

*Palmer v. Kirkland*,
    2020 WL 4432562 (D. Md. July 31, 2020)..................................................13

*Schaeffer v. Baltimore City Fire Dep't*,
    2023 WL 8478905 (D. Md. Dec. 7, 2023)...................................................14

*Solomon v. Fordham Univ.*,
    2024 WL 3273112 (S.D.N.Y. July 2, 2024).................................................17

*St. Frances Acad. v. Gilman Sch., Inc.*,
    2022 WL 833371 (Md. Ct. Spec. App. Mar. 21, 2022).................................17

*State Farm Mut. Auto. Ins. Co. v. Angelo*,
    2020 WL 7021695 (E.D. Mich. Nov. 30, 2020)..........................................18

*Wheeler v. Giant of Md. LLC*,
    2024 WL 4171199 (D. Md. Sept. 11, 2024).................................................11

*Wheelz Up, LLC v. Cordero*,
    2024 WL 3877627 (D. Md. Aug. 20, 2024) ................................................11

**RULES**

Fed. R. Civ. P. 26(b)(2)(C) .............................................................................14, 17

Local Rules

    104.7.........................................................................................................14

    104.8.........................................................................................................14

    104.8(a) ....................................................................................................13

## INTRODUCTION

The Court authorized "limited" pre-answer party discovery, to be completed by August 17, 2024, directed to the issue of defendant's conduct prior to November 20, 2023.  Order at 2, ECF No. 47 (June 18, 2024) ("June 18 Order").  FTI now seeks to go beyond what the Court authorized well after the period of limited discovery has ended and before the Court has even ruled on the pending motion to dismiss FTI's Second Amended Complaint ("SAC").  FTI demands that Mr. Orszag personally[1] search through thousands of text messages with two senior Compass Lexecon professionals.  *All* of those messages are already available to FTI, because it has possession, custody and control of its employees' communications.  And FTI seeks texts created after November 20, 2023, which are beyond what the Court ordered.  This appears to be a patent attempt to gain information about Mr. Orszag's future plans so that it can interfere with them (as it has already sought to do), as well as an improper effort go beyond the deficient SAC with new claims about purported facts alleged nowhere in that pleading.  ██████████████ ███████████████ – and that is FTI's transparent strategy here.  Ex. 1, Fischel Dep. Tr. at 46:13-47:10.

The additional discovery that will be appropriate in this case, if any, can best be assessed *after* the Court has decided the pending motion to dismiss.  FTI has no argument that it will be prejudiced by waiting.

***FTI Has No Grounds to Expand Discovery to Post-Termination Documents and its Motion is Untimely***:  The Court's June 18 Order authorized limited discovery into the issue of

---

[1] Only Mr. Orszag can search his text messages, because his messages with his colleagues discuss confidential information governed by confidentiality agreements and protective orders entered by other courts that prohibit disclosure of information outside of a specific set of individuals that does not include his litigation counsel.  *See infra* pp. 7-8.

1

Cause for Mr. Orszag's termination on November 20, 2023.  The SAC does not allege *any*

conduct after that date.  FTI's demand to root around in defendant's communications *after* it

fired him and commenced this litigation is nothing more than a classic "fishing expedition" that

cannot, as a matter of law or logic, provide any information relevant to the Cause (or lack of

Cause) for Mr. Orszag's ambush termination.  *See* Opp. to Mot. to Amend at 17, ECF No. 30

(Jan. 19, 2024) (collecting cases for the proposition that information learned after termination

cannot be a basis of for Cause termination).  FTI does, however, seek competitive intelligence as

to Mr. Orszag's future plans, which it is not entitled to.  FTI itself has not produced a single

document created after November 2023 (and has not produced a single text message from a

single one of its custodians).  FTI cannot legitimately request discovery that it has failed to

provide itself.  *See* Ex. 2, Hr'g Tr. Vol. II at 45:2-46:6 (June 13, 2024) (indicating discovery

would be mutual).

       FTI's motion to expand the limited discovery also flouts the Local Rules.  It is untimely

under Local Rule 104.8(a), because FTI did not timely file its motion within 30 days after Mr.

Orszag served discovery responses objecting to producing post-November 20 documents.  FTI

did not contest Mr. Orszag's positions until it served the instant motion – some 38 days after the

close of initial discovery on August 17 and more than a month after the Local Rule 104.8

deadline.  FTI thereby waived any objection.  And FTI's motion also violates the requirements

for conferral under Local Rule 104.7.  FTI did not confer with defendant's counsel relating to its

untimely request for post-termination discovery.  For all these reasons, the motion should be

denied.

       ***The Text Messages Are Already in FTI's Possession; Under the Relevant Protective***

***Orders, it Would be Unduly Burdensome for Defendant to Produce Them***:  FTI demands that

Mr. Orszag review and produce text messages with two current senior FTI employees – Dr. Mark Israel and Dr. Jorge Padilla.[2]  Both of these employees' files, including their text messages, are fully available to FTI and it cannot and does not claim otherwise.  It has no need to obtain any such communications from Mr. Orszag.  But FTI has inexplicably not even attempted to collect the messages from its own employees.

FTI would rather burden Mr. Orszag, and improperly so.  Defendant is bound by stringent protective orders regarding case-specific materials included in his text messages with these two colleagues.  His search of thousands of messages, and necessary redaction or exclusion of confidential material, could take a full week – and at a time when he is serving as an expert witness in many cases (and generating very substantial revenues for Compass Lexecon and FTI in the process).  Compass Lexecon's Chairman has therefore directed defendant – who has continued to work full time as an independent contractor for Compass Lexecon since November 20, 2023 – to focus on his client work and *not* get taken away from that work by the demands of FTI.  Seeking to shunt the burden of reviewing FTI's own documents onto defendant is inappropriate.  FTI has no argument that Mr. Orszag has text messages that FTI itself does not already have.

In addition, as noted above, FTI did not even seek to compel production from defendant until after the limited discovery period ended, and more than 30 days after Mr. Orszag set forth his position in the objections to FTI's request for production served on July 22, 2024, in violation

---

[2] Mr. Orszag has produced all other responsive text messages, including those with numerous Compass Lexecon and FTI employees and with non-parties.  His texts with Dr. Israel and Dr. Padilla, however, create unique issues as explained herein.  FTI, by contrast, has not produced a single text message from a single one of its custodians, just as it has not produced a single communication that post-dates November 2023.  *See* Ex. 2, Hr'g Tr. Vol. II at 45:2-46:6 (indicating discovery would be mutual).

of Local Rule 104.8.  The motion, even as to pre-November 20 text messages, is therefore

untimely and should be denied on that ground alone.

     ***FTI's Motives for Seeking the Instant Expanded Discovery Are Suspect***:  If the case

proceeds, FTI will be entitled to whatever discovery the Court finds appropriate.  FTI does not

even argue that there is a compelling need to conduct additional discovery before the sufficiency

of the complaint has been determined.  But FTI undoubtedly wishes to learn about Mr. Orszag's

plans for a future business (the document requests make that clear) so it can better attempt to

thwart them.  And the motion itself seeks to argue the merits of FTI's claims based on the

claimed discovery produced to date.  FTI's misleading claims about that discovery are addressed

below.  But more fundamentally, the sufficiency of the SAC must be assessed based on the

factual allegations contained therein, and not on assertions that FTI supposedly now has

additional information that might support those claims.  If FTI, recognizing the insufficiency of

the SAC, now wishes to amend (yet again) it can seek to do so pursuant to Federal Rule of Civil

Procedure 15.  It has not done so.  Accordingly, any argument about additional facts that could

be alleged must be disregarded as an improper effort to bolster FTI's third attempt to state a

claim, which remains deficient as the pending motion to dismiss demonstrates.

**BACKGROUND**

     On December 21, 2023, Mr. Orszag moved to dismiss FTI's First Amended Complaint

on a number of grounds, including FTI's failure to plausibly allege Cause for termination.  *See*

Mot. to Dismiss at 10-11, ECF No. 18-1 (Dec. 21, 2023); Opp. to Mot. to Amend at 15-18, ECF

No. 30.  This was a threshold issue to resolve, including because without actual Cause, there is

no post-termination non-compete under the Employment Agreement.  *See* Mot. to Dismiss at 10-

11, ECF No. 18-1; Opp. to Mot. to Amend at 15-18, ECF No. 30.  During the June 13 hearing on

4

defendant's motion to dismiss, at FTI's request, the Court granted limited discovery into whether there was "[C]ause" for Mr. Orszag's termination.  *See* Ex. 2, Hr'g Tr. Vol. II at 42:8-11  (stating that the parties could conduct discovery into whether "there is something that you say goes to the issue of for cause"); June 18 Order at 2 (limiting discovery into "alleged inappropriate conduct"). The Court explained it was authorizing discovery on that subject since it was a "preliminary issue[]," *see* Ex. 2, Hr'g Tr. Vol. II at 43:7-9, and because the case could be rendered moot by the November 20, 2024 expiration of the one-year non-compete and non-solicitation provisions that FTI sought to enforce, *see id.* at 43:7-24.  It noted that it envisioned limited document discovery and depositions of a few individuals.  *See id.* at 45:11-46:6.  It ordered a 60-day limited discovery period, ending on August 17, 2024, and encompassing only party discovery. *See* June 18 Order at 2.

Mr. Orszag moved to dismiss the Second Amended Complaint on July 3, 2024.  After full briefing, the Court set a hearing for December 17, 2024.  The Court recently entered an Order indicating it "expresses no view with respect to Orszag's currently pending renewed Motion to Dismiss." Mem. at 1, ECF No. 63 (Sept. 24, 2024).

Shortly after the Court's June 18 Order, the Parties commenced limited discovery.  Mr. Orszag served discovery requests on June 18, 2024, while FTI served document requests and interrogatories on June 21, 2024.  On July 22, 2024, Mr. Orszag provided his Responses and Objections to FTI's Requests For Production and Interrogatories, complying with the requests while repeatedly stating that the productions and responses would be limited to the pre-complaint time period, consistent with the Court's order authorizing limited discovery.  *See*, *e.g.*, Ex. 3, Orszag's Objs. & Resps. to FTI Consulting, Inc.'s First Set of Reqs. for Produc. at 4 (July 22, 2024).  At no point after receiving Mr. Orszag's responses and objections did FTI ever object to

that date limitation.

Mr. Orszag's objections to FTI's document requests also stated that Mr. Orszag will not produce text "Communications that FTI already possesses." *See*, *e.g.*, *id.* at 2. He elaborated in detail: "Because Mr. Orszag has texted with Compass Lexecon personnel about expert work that is subject to confidentiality agreements between Compass Lexecon and its clients and/or protective orders entered by state and federal courts, and those Compass Lexecon personnel have copies of their Communications via text, such Communications are in FTI's possession, custody, and control and FTI should access those texts directly." *See id.* at 2-3.[3] On August 16, 2024 (still 39 days before FTI filed its motion), Mr. Orszag's counsel reiterated that Mr. Orszag would not be able to produce the text communications with Dr. Israel and Dr. Padilla due to the significant burden involved with processing so many text messages that have confidential information covered under various agreements and protective orders. *See* Ex. 4, Aug. 6-Sept. 4, 2024 emails between D. Moylan and D. Schwarz. Instead, Mr. Orszag's counsel explained, FTI should collect the business phones from those two FTI employees (as they are in its possession, custody, or control) and, after obtaining appropriate permission from relevant clients, conduct the review itself. *See id.*[4]

In the interest of compromise, Mr. Orszag agreed at that time to produce (and has produced) his text messages with all Compass Lexecon and FTI employees other than Dr. Israel and Dr. Padilla that were responsive to FTI's requests. Mr. Orszag agreed to conduct that review

---

[3] *See also id.* at 7 (incorporating this objection into the Response to Request For Production No. 5).

[4] In all correspondence to date, FTI has never denied that the two employees' business phones containing the text messages FTI seeks are in its possession, custody, or control, nor has it ever stated that it took any steps to attempt to retrieve those messages from its own employees.

because the volume of texts with those individuals was smaller by orders of magnitude, and because his communications with certain employees did not touch upon confidential client information and therefore could be accessed by his counsel.  As a result, they could be reviewed and produced with comparatively less burden.



. *See* Decl. of Jonathan M. Orszag at ¶ 13 (Oct. 15, 2024) ("Orszag Decl.").

. *See id.* ¶¶ 5, 9, 14

(

).

*Id.* ¶ 10.  In light of these restrictions, Mr. Orszag cannot provide these communications to his personal counsel for responsiveness review without violating client confidentiality agreements and court-ordered protective orders.  *See id.* ¶ 12; *see also id.* ¶¶ 6-7 (

).[5]

---

[5] Mr. Orszag is also not permitted to disclose those communications to individuals that FTI had proposed to conduct the review, as

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

Since receiving FTI's discovery requests, Mr. Orszag has been extremely busy generating

revenue for FTI's benefit, ████████████████████████████████████

████.  Indeed, during the third quarter of 2024, ████████████████████████

████████████████████████████████████████████████

████████████████████████  Over the next the next two-and-a-half months, ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████  Given these competing obligations, it is currently impractical for Mr.

Orszag to conduct the requested review of the text messages at issue, ██████████████

████████████████████████████████████████████████

████████████████████████████

FTI served this motion on September 24, 38 days after the close of limited discovery

authorized by the Court.  FTI uses its motion to paint a misleading picture of what the discovery

---

████████████████████████████████  Mr. Orszag repeatedly advised FTI that it could seek waivers or
client consent – as it (unlike he) possesses the confidentiality agreements and client contracts –
but FTI has refused to take any action to secure such authorization.  FTI knows what matters Mr.
Orszag overlapped on with Dr. Padilla and Dr. Israel, as the company sends the bills to their
shared clients.

has yielded.  There is no evidence that Mr. Orszag engaged in any misconduct, much less misconduct that would rise to the level of "Cause" for termination.  The Chairman of Compass Lexecon, which employed Mr. Orszag, testified that "there was no basis to suggest that [Mr. Orszag] ever engaged in any wrongdoing . . . of any kind, let alone wrongdoing that would justify litigation."  Ex. 1, Fischel Dep. Tr. at 47:11-48:1.  He also testified that "I always felt what [Mr. Orszag] was doing was trying to further the best interests of Compass Lexecon in a way that was perfectly appropriate."  *Id.* at 43:4-7.  FTI's CEO, in turn, testified that Mr. Orszag had "every right under his contract to walk across the street to a competitor firm or to start his own firm," Ex. 5, Gunby Dep. Tr. at 449:10-15.  FTI's CEO also admitted that he was "███████

████████████████████████████████████████████████████████

█████████████", *id.* at 471:1-13, and that none of the conduct specified in the November 20, 2023 Termination Letter amounted to Cause.  *See*, *e.g.*, *id.* at 516:5-12 (alleged demand of restructuring of Governance agreement did not amount to Cause); *id.* at 516:13-517:7 (alleged demand to sale Compass Lexecon at low value is not Cause for termination); *id.* at 518:19-519:7 (alleged threat to resign and subsequently compete is not Cause for termination).

FTI (at 1-2) reiterates its allegations in its SAC that Mr. Orszag engaged in the perfectly appropriate conduct of exploring options to start his own firm after leaving Compass Lexecon, which its Chairman and CEO have both testified Mr. Orszag was entitled to do under his Employment Agreement.  And (at 1) it reiterates the allegations in the SAC that Mr. Orszag prepared a presentation that included certain Compass Lexecon information supposedly "maintained as confidential by FTI."  But it neglects to mention that the Chairman of Compass Lexecon testified that the information FTI highlights *was not confidential*, but information that is routinely shared in the industry (including whenever FTI hires a professional away from a

9

competing economic consulting company).  *See* Ex. 1, Fischel Dep. Tr. 39:9-40:16.  Then (at 2)

FTI adds the assertion that a major investment bank "committed" to "invest in his NewCo

venture."  That uncited assertion is false.  When Mr. Orszag pointed out to FTI's counsel that the

same statement was false in a draft of another FTI motion, FTI corrected it to note that Mr.

Orszag had only received a generic "non-binding term sheet."[6]  *See* Mot. to Conduct Third-Party

Disc. at 1, ECF No. 64-1 (Sept. 30, 2024).  And more fundamentally, the Chairman of FTI's

Board of Directors – the purported body that determined Mr. Orszag should be fired – conceded

that he has no knowledge of Mr. Orszag ever soliciting anyone or engaging in any competition

against the company, *see* Ex. 6, Holthaus Dep. Tr. 75:13-79:6, and that Mr. Orszag has instead

spent the last ten months generating extraordinary amounts of revenue to FTI's great benefit.

*See id.* at 91:15-92:14.

## ARGUMENT

**I.     FTI's Motion For Post-Complaint Discovery Should Be Denied**

### A.     There Is No Good Cause to Modify the Court's Order And Allow Discovery Into Irrelevant Post-Termination Conduct At This Time

During the June 13 hearing on defendant's motion to dismiss, at FTI's request, the Court

granted limited discovery into whether there was "[C]ause" for Mr. Orszag's termination.  *See*

Ex. 2, Hr'g Tr. Vol. II at 42:8-11 (stating that the parties could conduct discovery into whether

"there is something that you say goes to the issue of for cause"); June 18 Order at 2 (limiting

discovery into "alleged inappropriate conduct").  Because FTI could not have terminated Mr.

---

[6] That is entirely appropriate under settled Maryland law.  *See Maryland Metals, Inc. v. Metzner*, 382 A.2d 564, 568-70 (Md. 1978) (Under Maryland law, employees may "prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty" and thus receiving approval of a "loan" from a "prospective investor" does not breach any duty of loyalty).

Orszag for conduct that occurred after his termination,[7] and because none of FTI's three

successive complaints alleged any post-complaint conduct (much less inappropriate conduct),

discovery into events that post-dated Mr. Orszag's termination was not authorized by the Court's

limited discovery Order.  What FTI really wants is competitive intelligence on Mr. Orszag's

future plans, so that it can attempt to interfere with them.  It has no right to that.

FTI provides nothing close to the "good cause" required to modify the Court's existing

order.  *See Crumb v. McDonald's Corp.*, 2017 WL 1508755, at *4 (D. Md. Apr. 27, 2017), *aff'd*,

854 F. App'x 547 (4th Cir. 2021) (moving party must "demonstrate good cause.").  Mr. Orszag's

Motion to Dismiss is pending, and a ruling on that motion could obviate the need for any of the

discovery FTI seeks.  Courts in this district routinely deny discovery in such circumstances as

"premature" since it requires the parties to "bear the costs of investigating issues that may be

rendered moot by the decision on the motion to dismiss."  *Briggs v. T & D Plumbing & Heating

Co.*, 2011 WL 2970845, at *2 (D. Md. July 19, 2011).[8]  FTI already has received far more

discovery than most Plaintiffs, and it has no cogent argument for why additional discovery has to

be conducted *now*, contrary to the Local Rules and before the Court has determined the

---

[7] *See* Opp. to Mot. to Amend at 17, ECF No. 30 (Jan. 19, 2024) (collecting cases); *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 509 (6th Cir. 1996) ("newly discovered information" cannot retroactively justify conduct "on a ground that is different from that which was proffered at the time of [a] decision to terminate Life Care's services.").

[8] *Livanos v. Livanos*, 2010 WL 917198, at *2 (D. Md. Mar. 10, 2010) ("[T]he clear and unmistakable language of Local Rule 104.4 is that no discovery should take place until all questions as to the sufficiency of the Complaint have been resolved and the case is at issue."); *Wheelz Up, LLC v. Cordero*, 2024 WL 3877627, at *2 (D. Md. Aug. 20, 2024) (denying request for limited discovery during the pendency of motion to dismiss); *Wheeler v. Giant of Md. LLC*, 2024 WL 4171199, at *1 n.2 (D. Md. Sept. 11, 2024) (similar); *In re Carnegie Int'l Corp. Sec. Litig.*, 107 F. Supp. 2d 676, 684 (D. Md. 2000) (similar); *Briggs*, 2011 WL 2970845, at *2 (similar); *Madison v. Harford County, Md.*, 268 F.R.D. 563, 565 (D. Md. 2010) (similar).

sufficiency of FTI's third attempt at stating a claim. It would be especially unreasonable to do so here when FTI's SAC does not allege any post-termination wrongful conduct, when FTI's Chairman and CEO have conceded that Mr. Orszag has not competed against Compass Lexecon, and no client or professional has left the firm. *See* Ex. 6, Holthaus Dep. Tr. at 75:13-79:6 (conceding no basis to contend that Mr. Orszag solicited any clients or employees, or that he has competed against the company, or that any clients or employees have left as a result of his conduct); Ex. 5, Gunby Dep. Tr. at 337:13-338:10 (conceding no one has left based on Mr. Orszag's conduct).[9] As FTI well knows, Mr. Orszag has spent the past year working as an independent contractor for Compass Lexecon, and is on track to generate more than $70 million in revenue for Compass Lexecon in 2024, all to FTI's benefit.

### B. FTI's Motion Is Untimely

Even if the Court's June 18 Order could conceivably be construed to authorize discovery into post-complaint conduct (it cannot), FTI's motion is untimely and should be denied for violating the Court's Local Rules.

Mr. Orszag stated in his July 22, 2024 Responses and Objections to FTI's Request For Production and Interrogatories that his productions and responses would be limited to the pre-complaint time period, consistent with the Court's order authorizing limited discovery. *See, e.g.*, Ex. 3, Orszag's Objs. & Resps. to FTI Consulting, Inc.'s First Set of Reqs. for Produc. at 4.

---

[9] Review and production of the text messages would also be unduly burdensome for the reasons set forth in *infra* Part II, and imposing that burden for a period post-dating any claims in the SAC would be especially disproportionate to the needs of the case. Indeed, even in the one case cited by FTI (at 6-7), the Court concluded that requiring production of text messages post-dating "the date litigation commenced" would be "unduly burdensome," *Mod. Remodeling, Inc. v. Tripod Holdings, LLC*, 2020 WL 1984338, at *1 (D. Md. Jan. 31, 2020) and that case was in the posture of *full* discovery, not limited discovery prior to a ruling on a motion to dismiss, and did not involve any of unique burdens with the production of texts at issue here.

Accordingly, Mr. Orszag and his counsel collected, reviewed, and produced documents, and provided Interrogatory responses, subject to this cut-off.  After receiving Mr. Orszag's objections, FTI neither expressed any objection to that cut-off nor even raised the issue at all before serving its September 24, 2024 motion to compel, more than two months later.

Under Local Rule 104.8(a), if FTI believed Mr. Orszag's July 22, 2024 responses to be deficient, it had an affirmative obligation to serve a motion to compel within 30 days.  *See Induction Therapies, LLC v. Ingenes, LLC*, 2023 WL 3848370, at *2 (D. Md. Mar. 21, 2023) ("Motions to compel are generally required to be served within 30 days of the moving party's receipt of deficient discovery responses.").  FTI not only failed to comply with this obligation, it failed even to raise the issue during any of the parties' multiple meet and confers addressing discovery issues, and it limited its own production of documents to November 2023.[10]  It waited 64 days after receiving Mr. Orszag's responses to file this motion, and 38 days after the close of limited discovery authorized by the Court.[11]  FTI thus "waived [its] opportunity to file a motion to compel for the Court to resolve by failing to file one timely within thirty days."  *Palmer v. Kirkland*, 2020 WL 4432562, at *4 (D. Md. July 31, 2020).  Courts regularly deny motions to

---

[10] The parties met and conferred to discuss disputed issues and deficiencies in FTI's discovery and interrogatory responses no fewer than four times.  And FTI was undoubtedly aware of its obligations under Local Rule 104.8 because Mr. Orszag served it with a motion to compel on August 19, *i.e.*, within the 30 days provided for under the Local Rules.

[11] Due to scheduling issues – including trials, witness travel, and medical issues, the parties agreed to conduct certain depositions after August 17.  The parties did not agree to extend any deadlines for moving to compel.

compel that fail to comply with Local Rule 104.8(a),[12] and it should do so here.[13]

### C.    FTI's Motion Violates the Conferral Requirements In Local Rules 104.7 and 104.8

Under Local Rules 104.7 and 104.8, FTI is required to confer with Mr. Orszag over the subject matter of the dispute prior to seeking relief from the Court.  Here, FTI did not confer with Mr. Orszag relating to its request for post-termination discovery even though Mr. Orszag set forth his position in his responses and objections months ago.  *See supra* pp. 5-6; *see* FTI's Certificate of Compliance with Local R. 104.8(b) (Sept. 24, 2024) (not stating that FTI had conferred with Mr. Orszag relating its request for post-termination documents, as no such conference occurred).  FTI's motion should be denied on that basis as well.

## II.    FTI's Untimely Motion Seeking Burdensome Production of Text Messages With Dr. Israel and Dr. Padilla That Are Already Under FTI's Possession Or Control Should Be Denied

### A.    Production of The Requested Communications Would Be Unduly Burdensome And Disproportionate to the Needs of the Case

A Court should deny requested discovery when the "the burden or expense of the proposed discovery outweighs its likely benefit," or the "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive."  *Jarvis v. Enter. Fleet Servs.*, 2009 WL 10708892, at *2-3 (D. Md. Feb. 17, 2009) (citing Fed. R. Civ. P. 26(b)(2)(C)) (denying motion to compel where defendant represented securing documents would take at least two to eight hours, since "[t]his

---

[12] *See id.*; *see also Schaeffer v. Baltimore City Fire Dep't*, 2023 WL 8478905, at *2 (D. Md. Dec. 7, 2023) (same); *Blind Indus. & Servs. of Md. v. Route 40 Paintball Park*, 2012 WL 4470273, at *1-2 (D. Md. Sept. 26, 2012) (same).

[13] Nor is there any risk of prejudice from enforcing the Local Rules.  Should any part of the case survive after argument on Mr. Orszag's Motion to Dismiss the Second Amended Complaint, FTI can pursue discovery tailored to such claims at that point in time.

lengthy and costly process is unduly burdensome in light of the fact that it is likely to produce little if any, information which is not already in Plaintiff's possession").

Here, the text messages FTI seeks from Mr. Orszag would be incredibly burdensome for him to produce. *See generally* Orszag Decl. Given the confidential information covered by protective orders and confidentiality agreements, it would require a tedious, time-consuming process that he estimates would take up to 40 hours for him to complete, *id* ¶ 14, and which would then be followed by counsel's review of the thousands of communications for responsiveness.[14] That process is simply impractical right now given Mr. Orszag's obligations to his clients over the next two-and-a-half months, which involve overseeing at least 20 active matters for Compass Lexecon, with obligations including trial testimony, expert reports in three matters, multiple depositions, and other critical projects. *See id.* ¶ 17.[15]

In contrast to the undue burden FTI seeks to impose on Mr. Orszag, a single individual, it would be far less burdensome for FTI to identify any relevant information it seeks from the same text communications that are already in its possession, custody and control (through its employees).[16] FTI has effectively unlimited resources at its disposal, and has relationships with

---

[14] FTI's statement (at 5 n.4) that it does not think "third party client consents or waivers are necessary under the circumstances presented" reflects a shockingly cavalier attitude that threatens to put Mr. Orszag in contempt of court for violating the express terms of protective orders entered by state and federal courts throughout the country. It is even more remarkable because FTI has not lifted a finger to secure client consent to such review, even though it possesses the relevant confidentiality agreements and client relationships.

[15] Given his exceptionally busy schedule, the Chairman of Compass Lexecon (Dan Fischel), who Mr. Orszag reports to, has instructed Mr. Orszag to prioritize this client work over the time-intensive text reviews. *See id.* ¶ 18. FTI refuses to countermand this instruction because it prefers to benefit from the revenue Mr. Orszag generates, and because it does not want to pick and choose which client(s) should suffer as a result of its litigation demands.

[16] While FTI now half-heartedly tries to distance itself from Compass Lexecon, at the hearing on Mr. Orszag's Motion to Dismiss its counsel repeatedly emphasized that FTI owns

the clients whose confidential information is covered by the texts, and therefore it can obtain the

necessary permissions.[17]  And there is no dispute that FTI already has possession, custody, and

control of Dr. Padilla's and Dr. Israel's communications with Mr. Orszag.[18]  For that reason, in

response to Mr. Orszag's party discovery requests, FTI produced emails exchanged between Mr.

Orszag and those individuals.  Text messages are no different, as confirmed by FTI's corporate

Policy on Acceptable Use of Technology Resources ("Policy").[19]  And many courts have

---

Compass Lexecon and is its sole member.  *See* Ex. 7, Hr'g Tr. Vol. I at 56:8-10 (June 13, 2024).
FTI cannot feign distance from its wholly-owned subsidiary now that it is convenient to do so.
Additionally, unlike Mr. Orszag, FTI has access to all of the relevant confidentiality agreements
and therefore could seek client consent to any review.  And far from recognizing a distinction
with Compass Lexecon, FTI has accessed and produced numerous communications between
Compass Lexecon professionals, including Dr. Israel and Dr. Padilla.

[17] More fundamentally, if FTI is interested in the nature of Mr. Orszag's communications
with two of the most senior executives at the company FTI owns, FTI could ask those employees
about the nature of those communications.  The Court should also reject FTI's argument (at 2)
that the text messages sought are relevant to FTI's solicitation claim, because Mr. Orszag served
FTI Requests for Production seeking all documents supporting FTI's solicitation claim, and FTI
did not even propose Dr. Israel and Dr. Padilla as custodians.  And if FTI really thought there
was evidence in support of its unsubstantiated claims on the phones of its employees, it would
have reviewed them months ago.

[18] During the parties' meet and confers on this issue, FTI has never denied that it has
possession, custody or control over the cell phones of its employees and senior executives.  In
fact, FTI agreed to produce text messages from the cell phones of its Chairman and its CEO,
although it has failed to actually do so to date.  FTI has merely asserted that it would prefer not
to ask Dr. Israel and Dr. Padilla.

[19] The Policy is issued to all employees of FTI and its subsidiaries (including Compass
Lexecon).  Under the Policy, FTI has the right to "access, monitor, block, and act upon any
message or communication or data created or viewed using any FTI Consulting technology
resource at any time, including incoming and outgoing mail, Internet usage, telephone calls, and
technical data and content" in order "to investigate misconduct, to locate information, or for any
other business purpose[.]"  Ex. 8, Policy at 3.  Moreover, the policy reflects control by FTI over
the personal devices of employees used for conducting business.  *See id.* at 8-9 (setting security
requirements, update requirements, and operating system requirements, for both "corporate-
owned and personally-owned mobile devices").

repeatedly confirmed that employers have control of documents in this situation.[20]

In this circumstance, FTI, as the party seeking text messages, should "first attempt to retrieve those text messages from its own employees" before seeking them elsewhere. *St. Frances Acad. v. Gilman Sch., Inc.*, 2022 WL 833371, at *4 (Md. Ct. Spec. App. Mar. 21, 2022); *Jarvis*, 2009 WL 10708892, at *2-3 (citing Fed. R. Civ. P. 26(b)(2)(C)) (denying motion to compel where this "[t]his lengthy and costly process is unduly burdensome in light of the fact that it is likely to produce little if any, information which is not already in Plaintiff's possession").[21]  Requiring Mr. Orszag to engage in the incredibly burdensome collection practice

---

[20] "Numerous courts have found that corporations have control over their officers and employees and that corporations may be required to produce documents in their possession." *Clark v. Council of Unit Owners of 100 Harborview Drive Condo. Ass'n*, 2024 WL 2155021, at *7 (D. Md. May 13, 2024) (citation omitted).  For that reason, it is appropriate for a Court to "direct[ ] employer to ask current employees to search for and provide for production of all relevant emails and text messages in their personal email and cell phone accounts that are responsive." *Id.* at *6; *see also Evenson v. Johnson Bros. Liquor Co.*, 2020 WL 12948540, at *8 (D. Minn. May 19, 2020) (collecting cases finding that employer had control over "its employee's work-related text messages stored on that employee's personal cell phone"); *Ethypharm S.A. France v. Abbott Lab'ys*, 271 F.R.D. 82, 94 (D. Del. 2010) ("[n]umerous courts have concluded that a parent corporation has a sufficient degree of ownership and control over a wholly-owned subsidiary that it must be deemed to have control over documents located with that subsidiary") (citation omitted).

[21] Courts recognize that whether a party should be required to produce documents in possession of the party seeking those documents is a fact-specific inquiry, and not one that requires a party served with requests to necessarily incur an inordinate burden.  *See Geller v. von Hagens,* 2011 WL 13305172, at *5 (M.D. Fla. Dec. 23, 2011) (finding request for communications with the other party to be unduly burdensome and duplicative because "these documents should already be in the Plaintiffs' possession."); *Mitchell v. U.S. Bank Nat'l Ass'n*, 2021 WL 6120105, at *3 (D. Md. Jan. 11, 2021) (denying Plaintiff's motion to compel in part because "Plaintiff is already in possession of the discovery that she needs"); *Solomon v. Fordham Univ.*, 2024 WL 3273112, at *10 (S.D.N.Y. July 2, 2024) (holding that employee did not have to search his work email address for responsive documents, because employer was already in possession of those emails); *Garcia v. Almieda*, 2006 WL 3001171, at *2 (E.D. Cal. Oct. 20, 2006) ("Plaintiff is likewise incorrect that defendant is required to turn over all non-confidential documents requested, regardless of plaintiff's ability to get them himself. . . . The court is not going to order defendant to produce documents that are equally available to

17

would be especially unreasonable here, where Mr. Orszag's motion to dismiss is pending, the utility of any discovery could be obviated by a decision on the motion, and the Chairman of Compass Lexecon – who reports directly to FTI's CEO – has instructed Mr. Orszag to fulfill his ongoing commitments to Compass Lexecon's clients rather than devote a week of time to reviewing and redacting text messages. *See* Orszag Decl. ¶ 18.[22]

**B.    FTI's Motion Is Untimely**

Like FTI's motion for post-termination discovery, FTI's motion for production of text messages between Mr. Orszag and Dr. Padilla and Dr. Israel is untimely.  Mr. Orszag stated in his objections on July 22, 2024, that he would not be producing the communications at issue. *See supra* pp. 5-6, 12-13.  Yet, FTI did not file this motion to compel until 64 days after receiving Mr. Orszag's responses, 34 days after the deadline under Local Rule 104.8(a), and 38 days after the close of limited discovery authorized by the Court.  The motion is untimely and should be denied for the same reason set forth in Part I.B, *supra*.

**CONCLUSION**

For the reasons stated herein, FTI's motion should be denied.

---

plaintiff."); *State Farm Mut. Auto. Ins. Co. v. Angelo*, 2020 WL 7021695, at *1 (E.D. Mich. Nov. 30, 2020) ("There is no explanation for why Plaintiff must undertake additional investigations and disclosures, consuming time and resources, when Defendants already have in their possession the allegedly important documents.").

[22] Here, FTI has always had control over the text messages it seeks – from before it initiated this action up to the present.  It could have – and indeed should have – secured those text communications even before it launched this action if it was going to accuse Mr. Orszag of engaging in wrongful conduct.

DATED:  October 15, 2024                    Respectfully submitted,

By:  */s/ Mark. C. Hansen*
      Mark C. Hansen (State Bar No. 12266)
      James M. Webster, III (State Bar No. 23376)
      David L. Schwarz (admitted *pro hac vice*)
      Kevin D. Horvitz (admitted *pro hac vice*)
      Rachel T. Anderson (admitted *pro hac vice*)
      KELLOGG, HANSEN, TODD,
        FIGEL & FREDERICK, P.L.L.C.
      1615 M Street, N.W., Suite 400
      Washington, D.C. 20036
      Tel.:  (202) 326-7900
      Fax:  (202) 326-7999
      Email:  mhansen@kellogghansen.com
      Email:  jwebster@kellogghansen.com
      Email:  dschwarz@kellogghansen.com
      Email:  khorvitz@kellogghansen.com
      Email:  randerson@kellogghansen.com

      *Counsel for Defendant Jonathan M. Orszag*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on October 15, 2024, the foregoing document was served on the

following counsel for FTI via email:


William J. Murphy
Daniel P. Moylan
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Tel: (410) 949-1146
Fax: (420) 659-0436
wmurphy@zuckerman.com
dmoylan@zuckerman.com

Caroline Judge Mehta
Ezra B. Marcus
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
cmehta@zuckerman.com
emarcus@zuckerman.com

Brian L. Stekloff
WILKINSON STEKLOFF
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Tel: (202) 847-4000
Fax: (202) 847-4005
bstekloff@wilkinsonstekloff.com

*Counsel for Plaintiff FTI Consulting, Inc.*

                                        */s/ Kevin D. Horvitz*
                                        Kevin D. Horvitz

                                        KELLOGG, HANSEN, TODD,
                                          FIGEL & FREDERICK, P.L.L.C.


                                        *Counsel for Defendant Jonathan M. Orszag*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| FTI CONSULTING, INC., | |
| *Plaintiff*, | Civil Action No.: 8:23-cv-03200-PJM |
| v. | |
| JONATHAN M. ORSZAG, | |
| *Defendant*. | |

## **[PROPOSED] ORDER DENYING MOTION TO COMPEL DISCOVERY**

THIS COURT, upon consideration of Plaintiff's Motion to Compel Discovery,

Defendant's opposition, and any reply thereto and the record in this case, it is **HEREBY**

**ORDERED** that the Motion to Compel Discovery is **DENIED**.

DATED: _____        _____
                                          Hon. Peter J. Messitte, U.S.D.J.

# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

_____

FTI CONSULTING, INC.,          )

                               )

          Plaintiff,           )

                               )

vs.                            )  No. 8:23-cv-03200-PJM

                               )

JONATHAN M. ORSZAG,            )

                               )

          Defendant.           )

_____)

          Deposition of DANIEL FISCHEL, taken at

          332 South Michigan Avenue, Chicago, Illinois,

          before Donna M. Kazaitis, IL-CSR, commencing

          at the hour of 9:58 a.m. on Monday,

          September 16, 2024.

_____

                    DIGITAL EVIDENCE GROUP

               1730 M Street, NW, Suite 812

                  Washington, D.C. 20036

                     (202) 232-0646

9/16/2024          FTI Consulting, Inc. v. Jonathan M. Orszag          Daniel Fischel

Page 2

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4

 5        ZUCKERMAN SPAEDER LLP

 6        BY:  WILLIAM J. MURPHY, ESQ.

 7             100 East Pratt Street, Suite 2440

 8             Baltimore, Maryland 21202-1031

 9             410.949.1146

10             wmurphy@zuckerman.com

11

12

13   ON BEHALF OF THE DEFENDANT:

14

15        KELLOGG HANSEN TODD FIGEL & FREDERICK, PLLC

16        BY:  MARK C. HANSEN, ESQ.

17             RACHEL T. ANDERSON, ESQ.

18             1615 M Street NW, Suite 400

19             Washington, DC 20036

20             202.326.7900

21             mhansen@kellogghansen.com

22             randerson@kellogghansen.com
```

Page 39

1    of consequence, I discussed it with Jon and we

2    were both extremely enthusiastic about the

3    possibility of his joining us.

4            Q.    And you'll see in your email

5    ████████████████████████████████████████

6    ██████████████████████████████████████████████

7    ████████████████████████████

8            A.    Yes, I see that.

9            Q.    Is it common in recruitment to have

10   that information?

11           A.    Well, it's a question, you know,

12   particularly for senior people that either they

13   would represent it to you or you would ask them

14   for the information or you'd have some sense in

15   some other way.  But it's certainly common to be

16   aware of that information in terms of current or

17   prospective income-generating ability when making

18   an offer and deciding how much to pay.

19           Q.    Would you ever make an offer to a

20   professional without having some information about

21   the professional's revenue generation?

22           A.    I would say at a senior level, no,

Page 40

1    either again current or what you think potential

2    is going forward.  But in addition to a fit in

3    terms of skill set, culture, it's probably the

4    most important consideration.

5          Q.   Do senior professionals routinely

6    provide that information in the recruitment

7    process?

8          A.   If they're interested in moving, yes,

9    they do.

10         Q.   Do you think there's anything

11   inappropriate in receiving that information as

12   part of the recruitment process?

13         A.   No, because it's at a level of

14   generality without disclosing any confidential

15   information about any particular case or

16   proprietary information of a firm.  It's just

17   generally either what they claim they can bring or

18   what you ask them of information which leads them

19   to provide information as to what they can bring

20   or what they can bring in the future in light of

21   your assessment of how credible the information is

22   in light of the relevant facts and circumstances

Page 43

1   speak to what I have personal knowledge of, but I

2   always thought Jon was, as I said, in our division

3   of labor he had really the role of dealing with

4   FTI for the most part, and I always felt what he

5   was doing was trying to further the best interests

6   of Compass Lexecon in a way that was perfectly

7   appropriate.

8   BY MR. HANSEN:

9        Q.   Did the CEO of FTI from time to time

10  make disparaging remarks about Mr. Orszag?

11            MR. MURPHY:  Objection, but go ahead.

12            THE WITNESS:  I would say he made

13  remarks both disparaging and also complimentary.

14  It wasn't all in one direction.

15  BY MR. HANSEN:

16       Q.   What were some of the complimentary

17  remarks?

18       A.   I think he talked about how much he

19  respected Jon's business acumen role as a leader

20  of Compass Lexecon.

21            As I said, one of the things that,

22  notwithstanding situations like █████, but one

Page 46

1                THE WITNESS:  You know, I got the

2     sense of what I said, that there was this sort of

3     schizophrenic reaction of really high respect for

4     Jon and also a kind of hostile reaction to him.

5     BY MR. HANSEN:

6          Q.    Let's take a look at another document,

7     please, which will be Exhibit 5.

8                     (Deposition Exhibit 5 was marked

9                      for identification and tendered to

10                     the witness.)

11    BY MR. HANSEN:

12         Q.    ████████████████████████████████

13    ████████████████████████████████████████

14    ████████████████████████████████████████

15    ████████████████████████████████████████

16    ████████████████████████████████████████

17         A.    ███████████████████████

18         Q.    How did that come up?

19         A.    I actually don't remember exactly how

20    it came up other than -- again, this was I would

21    say more of a theme that came up more than once.

22    Exactly how it came up at this particular time, I

Page 47

 1   don't remember.

 2        Q.   A theme that Mr. Gunby would bury

 3   Mr. Orszag in litigation if he ever left?

 4        A.   That FTI would do everything to

 5   protect its interests against Mr. Orszag if he

 6   ever left, and against others.

 7             I think FTI has had that pattern of

 8   either initiating litigation or threatening

 9   litigation with respect to individuals in other

10   parts of FTI that have left.

11        Q.   Had Mr. Orszag done anything that

12   would warrant being buried in litigation at the

13   time you heard this?

14             MR. MURPHY:  Objection.

15             THE WITNESS:  Again, I can only

16   comment what I have personal knowledge of.  But

17   from my perspective, absolutely not.  I think Jon

18   has been a great partner, great asset, for Compass

19   Lexecon and FTI.  He continues to this day to have

20   that role.  From my perspective, there was no

21   basis to suggest that Jon ever engaged in any

22   wrongdoing that I'm aware of of any kind, let

Page 48

1   alone wrongdoing that would justify litigation.

2   BY MR. HANSEN:

3        Q.   Did Mr. Gunby say why he thought he

4   could bury Mr. Orszag in litigation, what grounds

5   he would have to do that?

6        A.   Really just more of the same of what

7   I've already described.

8             And once the actual litigation

9   started, what Mr. Gunby always says he's not going

10  to discuss his litigation strategy or anything

11  about the litigation with me and I tell him I

12  don't want to know anyway.  I don't know what the

13  basis is for the claims that exist, currently

14  exist.

15       Q.   And you didn't get any information

16  from Mr. Gunby as about his quote, "litigation

17  strategy" as to how he was going to bury

18  Mr. Orszag if he ever left?

19       A.   No, there was no detail to the

20  conversation.  It was just FTI would protect its

21  interest in litigation if Mr. Orszag left.

22       Q.   Well, it can't protect its interest if

# Exhibit 2

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE DISTRICT OF MARYLAND

 3                        SOUTHERN DIVISION

 4  FTI CONSULTING, INC.,          ) CIVIL ACTION
                                   ) NO. PJM-23-3200
 5            Plaintiff,           )
                                   )
 6  v.                             )
                                   )
 7  JONATHAN M. ORSZAG,            )
                                   )
 8            Defendant.           )

 9       TRANSCRIPT OF CONTINUED MOTIONS PROCEEDINGS -
                       VOLUME II of II
10          BEFORE THE HONORABLE PETER J. MESSITTE
                  UNITED STATES DISTRICT JUDGE
11           THURSDAY, JUNE 13, 2024; 1:46 P.M.
                     GREENBELT, MARYLAND
12  APPEARANCES:

13  FOR THE PLAINTIFF:

14            ZUCKERMAN SPAEDER LLP
              BY:  WILLIAM J. MURPHY, ESQUIRE
15            BY:  DANIEL P. MOYLAN, ESQUIRE
              100 East Pratt Street, Suite 2240
16            Baltimore, Maryland  21202-1031
              (410) 783-7000
17
    FOR THE DEFENDANT:
18
              KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC
19            BY:  MARK C. HANSEN, ESQUIRE
              1615 M Street NW, Suite 400
20            Washington, DC  20036
              (202) 326-7900
21
    Also Present: David Schwartz, Esquire, Rachel Anderson,
22  Jonathan Orszag

23            Renee A. Ewing, RMR, CRR - (301) 344-3227
                   Federal Official Court Reporter
24              6500 Cherrywood Lane, Suite 200
                    Greenbelt, Maryland  20770
25
        ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***
```

1          (Call to order of the Court.)

2               THE COURT:  Please be seated, folks.

3          My law clerk pointed out to me, Counsel, that the

4     contract itself does provide for blue penciling in the event

5     that the -- this is paragraph 18.  If any provisions are deemed

6     to exceed the geographic area, limitations will be reduced to

7     the maximum permissible.  The Court may --

8               THE COURT REPORTER:  I'm sorry, Judge.  I couldn't

9     hear you.

10              THE COURT:  I will start again.  There is a blue

11    penciling -- I am getting an echoing, though, Renee.  I'm not

12    sure why.

13              THE COURT REPORTER:  Yes, Your Honor.  I hear that.

14              THE COURT:  Paragraph 18 does provide for blue

15    penciling not only as to geographic but presumably for activity

16    limitations.  Interesting proposition.  It's something I guess

17    the parties will have to confirm.

18         And maybe we should, at this point, address the issue of

19    geographic limitations and the extent to which that would be an

20    issue.  And it does -- let me start by saying, the way I read

21    this email, I am not sure where it doesn't apply.  And I am not

22    familiar with worldwide geographic injunctions.

23         And that said, it might be helpful for me to understand a

24    little more what -- what it is that Mr. Orszag does that

25    somehow it had implications beyond a -- a more limited area.

1    Perhaps I will start with you, Mr. Murphy.

2        What -- what is it that he does that has implications for

3    Singapore.  Is that one of the places he's not supposed to be?

4            MR. MURPHY:  Well, certainly, Your Honor, given his

5    role with Compass Lexecon as one of the four senior executives

6    that really ran that business on a day-to-day basis, he had

7    direct and indirect contacts with all of the professional

8    employees of the company, and those professional employees

9    provided services certainly throughout the United States,

10   probably in certain parts of Europe as well.  There is a whole

11   European division run by one of the four executives.

12           THE COURT:  Where are they located?  What's the

13   European --

14           MR. MURPHY:  I don't have all the details of where

15   all the offices are.  So, one of the principal officers is

16   headquartered in Portugal.  But the -- the point here is that

17   he is -- he, Mr. Orszag, is -- is an economic consultant.  He

18   does consulting work.  But he also was a leader of this whole

19   group of employees.

20       And so when he was -- for example, there was a reference

21   in the complaint to the PowerPoint that he developed for

22   investors in the summer of 2023 before he was terminated.  The

23   PowerPoint implies that he is planning to start a new company,

24   he plans to start in the spring of 2024, and he intends, if he

25   can, to have everybody at Compass Lexecon come and join him in

1   this new company.

2        And it's -- he's really saying, I want to take Compass

3   Lexecon, which belongs to FTI, I want to resign, and my hope is

4   that everyone will come with me.

5             THE COURT:  Okay.

6             MR. MURPHY:  So that's a worldwide --

7             THE COURT:  They are interrelated, though.  One is

8   geographic; the other is activity?

9             MR. MURPHY:  Right.

10            THE COURT:  Individuals or entities or something like

11  that.  I was really talking -- maybe we should talk geographic

12  first.  Is he actually involved himself in all these geographic

13  locations?

14            MR. MURPHY:  I don't think it's -- I don't think we

15  can say that -- that I have information at this point that he

16  was involved in that.

17       What I am saying is that other employees of Compass

18  Lexecon who he attempted to have them come with him or who he

19  intended to have come with him had relationships with foreign

20  entities and in matters involving, for example, antitrust cases

21  in the European courts, so that the group, the Compass Lexecon

22  group, was certainly broader than just the United States.

23       And there are -- there are cases in Maryland which have

24  upheld worldwide jurisdiction in non-competition agreements

25  where the company is a company that engaged in activities

1  worldwide.  So it's -- the -- the case that we cited for that

2  -- for that proposition is *Medispec, Ltd. vs. Chouinard*, if I

3  am pronouncing it correctly.  It's a District of Maryland

4  decision from 2015.  It's cited on pages 16 and 17 of our

5  opposition brief.

6      So it's not -- it's not unheard of for a global

7  geographic limitation to be upheld where the company is engaged

8  in worldwide activities and where, particularly in a case where

9  the employee is someone who is in a senior management role and

10  had relationships with employees not just in California but

11  throughout the United States and in -- and -- and throughout

12  Europe as well.  So that's --

13      THE COURT:  Well, if the Court were to decide that

14  it's too broad, I mean, would you be prepared to propose a blue

15  pencil limitation geographically?

16      MR. MURPHY:  Yes.  Consistent with the paragraph in

17  the complaint that you just read.

18      THE COURT:  Well, that would give the authority, but

19  maybe it's a matter of where, in fact, the principle locus of

20  his activity might be.  Maybe the United States and maybe some

21  center in Europe beyond that.  That might take some convincing.

22      Let me hear from Mr. Hansen on that.

23      MR. MURPHY:  Okay.  Thank you, Your Honor.

24      MR. HANSEN:  Your Honor, the legal principle is the

25  geographic limitation needs to be where Mr. Orszag developed

1    goodwill for his employer.  Mr. Orszag, not somebody who worked

2    three levels down from him.

3        And there are multiple cases that we have cited, frankly,

4    including *Medispec*, that refused to enforce this clause.  And

5    in *Medispec*, the Court said, Yeah, it's not per se wrong if

6    it's global, but it's only -- you can only do that where it's

7    very narrow, the activities involved.  Here, the activities are

8    everything.  So there is nothing in the record before the Court

9    that would suggest where Mr. Orszag created goodwill for FTI.

10        And, again, I don't want to argue with the Court about

11   blue pencilling, but to blue pencil, you would need a lot more

12   information than you have and --

13            THE COURT:  Well, I think you are right.  There is no

14   question.  Here is the -- I am thinking of a timeline now, and

15   looking at November when -- when the world explodes, I guess,

16   would it make sense -- maybe you are arguing against yourself,

17   Mr. Murphy -- to suggest what the -- what the blue pencil might

18   be now because you are going to have to wait for the Court to

19   decide that issue, and then we will be that much further along,

20   and with good possibility, and I won't say certainty, but with

21   a good possibility that I would be cutting him back?  Where do

22   we go?  I mean, is it for the Court to decide, or is it for the

23   party who is proposing the geographic limitation to say, Well,

24   this is what we could live with?

25        I mean, you need to think about that, and whether, again,

1  with the timeline in mind, whether it makes sense for you to

2  wait until their opposition comes in or come up sooner and make

3  a proposal about how a fallback position might be that would

4  get us closer to a decision on that.  I just pose that to you

5  now.

6          But go ahead, Mr. Hansen.

7          MR. HANSEN:  Your Honor, I don't mean to argue with

8  the Court, but those complexities, we would urge on the Court,

9  are the reason why at least seven Courts in this district have

10 said the solution is to throw the clause out, not to try and go

11 through a process of redoing it.  And that's *Allied Fire*,

12 *Bindagraphics* -- all of these are in the pleadings, Your

13 Honor -- *Seneca One* --

14         THE COURT:  Before you cite cases, what's the

15 principle that says to throw it all out?

16         MR. HANSEN:  It says it's overbroad --

17         THE COURT:  I mean, there are worldwide entities that

18 do seek maximally expansive geographic restrictions.

19         MR. HANSEN:  Both -- both -- no.  Both geographic and

20 activity restrictions, overbroad --

21         THE COURT:  Well, they are, to some extent, related;

22 to some extent, separable.

23         MR. HANSEN:  They are, Your Honor, in which case we

24 have both independently.

25         THE COURT:  Right.

1          MR. HANSEN:   In other words, it's overbroad as to the

2    activities because it prevents him from working anywhere, as

3    Your Honor already observed.  Geographically, it's overbroad

4    because it's all over the world.  And, again, Your Honor has

5    told us that you have blue penciled, and we obviously credit

6    that, but it's a big job, and we think where it's a big job,

7    it's really not for the Court to redo the parties' agreements.

8          The better course is to say, You should have -- you

9    should have been more narrow in the first place.  This is not a

10   -- a word or two here or there or a little bit of a fix.  This

11   is a wholesale reordering of both the activity and the

12   geography, and we respectfully suggest that the appropriate

13   result there is dismissal of the complaint on that basis.

14          THE COURT:  Well, just to sort of know my thinking, I

15   am not going to throw out an effort to blue pencil.  I mean, I

16   am not going to say these clauses are out now as a matter of

17   law and you may not go any further on that point, that's off

18   the table for -- I will not take that position.  I do not take

19   that position.

20          I see the contract clause, I know common law of Maryland

21   at least as to geographic limitations, but maybe this contract

22   clause applies to activity limitations as well.  And then the

23   question would be:  How do we get there?  In other words, do we

24   wait until you file an opposition to the first amended --

25   second amended complaint -- I am trying to keep this right --

1    or do they -- should they file something right away now in a

2    very short order indicating what the fallback position might be

3    as to geographic and activity limitation?  Again, we are

4    staring at no members here.  We keep doing this down the road,

5    we will, you know, be here today and gone tomorrow.  You know,

6    it's going to be over.  So what are we -- we are spending a lot

7    of time and effort.

8           But I need to say to you, No.  The idea of throwing out

9    the concept of blue pencilling, no, I am not going to do that.

10   I am telling you that now.

11          Now, there is a good possibility, both with respect to

12   geographic and activity limitations, that there would be some

13   blue pencilling.  And, again, we are only at the pleadings

14   stage right now.  I am not deciding that they have a cause of

15   action that can be sustained.  They are only trying to get

16   injunctive relief which they believe they are entitled to.  And

17   they have to show, through all the preliminaries, that they

18   would have fired him -- whatever the provision is, they will

19   have to argue that as a matter of proof somewhere along the

20   way.

21          But, I mean, right now, there is no injunction in effect.

22   There wouldn't even be until I see what the final pleading

23   looks like for possibility of an injunction which may be in

24   effect for two or three months.

25               MR. HANSEN:  With all respect, Your Honor, nobody has

1    sought an injunction.  There is no sought injunction in this

2    case.  There is only a request for declaration --

3          THE COURT:  Well, I guess -- declaration is the same,

4    I guess, as an injunction if I declare they can ask me to

5    enforce it, I suppose, but I declare it -- I am not sure what I

6    am being asked to -- what kind of relief I am being asked to

7    give here, frankly.  This one, I could only enjoin it, I

8    suppose, or if there were actual breaches shown through a

9    valid, limited restriction, I suppose there could be a claim

10   for actual damages, which, indeed, may be off the table because

11   Mr. Orszag is not doing any of these things.  So --

12         MR. HANSEN:  Well, to that last point, Your Honor,

13   not only is that the case, they have pleaded in their

14   pleadings, both the original, the first amended complaint and

15   the second amended complaint, that they don't have damages.

16   130 and 145 say, We may have damages in the future.  And

17   Mr. Orszag is still working there.  And they have made

18   securities filings.  No class have been lost.  No employees

19   have been lost.  So there are no damages here.  There is no

20   harm.  And you are right --

21         THE COURT:  Won't discovery tell us that?

22         MR. HANSEN:  Well, Your Honor, that's what every

23   plaintiff says in a case where they haven't alleged a cause of

24   action, saying, Well, maybe we will get one after discovery.

25       The question is:  Have they pleaded facts that would

1  allow them to get discovery on some of these claims? and we are

2  saying no.

3       THE COURT:  Well, it's not quite the same as a

4  fishing expedition in the sense that if they are right, that

5  Mr. Orszag was out there promoting a plan to set up his

6  business somewhere, doing the same kinds of things that should

7  legitimately be limited, that maybe there are damages.  And I

8  wouldn't say that because that's the prospect, that the case is

9  out of court.  I don't see -- I don't see a non-suit there.

10 They may not be able to prove it in the end.  I mean, that's

11 what we are dealing with.  We are still at a motion to dismiss

12 phase.

13      MR. HANSEN:  Exactly, Your Honor.  You have put your

14 finger right on it.  So let's go to that very claim.

15      They have not alleged Mr. Orszag is out in the world

16 doing something to compete.  That is expressly what they have

17 not alleged.  They have alleged -- and, again, we can put up

18 all the paragraphs of the amended complaint and show Your

19 Honor -- they have alleged that Mr. Orszag made threats to go

20 compete at a time when he was fully free to do so.  They have

21 alleged that within the confines, while he was still working,

22 he worked on plans to compete.  And that's perfectly fine.

23 They have not alleged he was outside, as the defendants were in

24 the cases cited, *Aarow*, *Strang*.

25      Again, it's not a matter of, well, maybe they will find

1    something in discovery, Your Honor.  To get to discovery, they

2    need -- after *Twombly* and after, you know, other cases in this

3    Court, they need facts, not conclusions, that say they have got

4    a plausible claim that Mr. Orszag breached the duty of loyalty.

5         Your Honor, that claim, under Maryland law, particularly

6    *Plank*, but also *Maryland Metals*, has two necessary elements.

7    The first one, harm.  They have to plead -- it's not about what

8    they can prove at trial.  They have to plead facts establishing

9    harm, a plausible claim they have been harmed.  And they say

10   the exact opposite.  They haven't been harmed.  They think it

11   might happen in the future.  That is case dispositive.  They

12   don't get to go past motion to dismiss.

13        Second, they need to say that Mr. Orszag did something,

14   facts that amount to competition while employed.  Look at what

15   happened in *Aarow*.  The employees there, while employed, took

16   confidential information, sent it to the competitor they were

17   going to go work for, and they jointly worked on bid documents

18   using the confidential information that they then used at the

19   competitor to take business away from the employer, and that

20   was a breach of loyalty duty.

21        Here, there isn't a single fact pleaded that Mr. Orszag

22   did anything outside of Compass Lexecon; not one fact.  He's --

23   the only allegations in the proposed second amended complaint

24   are that he made a lot of noise about wanting to do a separate

25   business, which he was entitled to do --

```
1            THE COURT:  In a declaratory judgment action, do you

2    have to allege actual damages or imminent damages?

3            MR. HANSEN:  Your Honor, that's not a declaratory

4    judgment claim.  The two declaratory judgment claims are one

5    and two.  That's as to the non-compete and the non-solicit.

6            THE COURT:  Right.

7            MR. HANSEN:  We have talked about those.  They are

8    overbroad, and the Court has recognized they can't be enforced

9    as written.

10           THE COURT:  Well, assuming that they could be blue

11   penciled -- I am trying to point out to you where the Court is

12   likely to go.  I don't want you to skid your wheels.  But go

13   ahead.

14           MR. HANSEN:  Okay.  So, I am not going to skid

15   anymore, but I am going to move to, now, the other counts of

16   the complaint.  And there is a subsequent count.  There are two

17   counts for supposed actual damages, actual damages claims

18   having nothing do with declaratory relief.  One is breach of

19   loyalty; in other words, he did things while working that

20   constituted a breach of his duty to FTI; and the second is they

21   say he solicited Compass Lexecon employees.  I will take them

22   in that order.

23           As to the breach of loyalty claim -- I will get the slide

24   up so we can show you -- the only claims they make as to this

25   damages claim, this common law damages claim, are, Well, he
```

1   gave a speech -- this is at paragraph 74 -- and he said, Well,

2   if my demands aren't met, people are going to leave.  That's

3   not solicitation.  That's not solicitation at all.  That's not

4   plausibly alleged to solicitation if that is the only

5   thing that Mr. Orszag supposedly said to Compass Lexecon

6   employees.

7            THE COURT:  Well, isn't there an issue about a plan,

8   though, with some investors?

9            MR. HANSEN:  But that's a plan -- that's a separate

10  thing that he developed, and there is no allegation he sent it

11  to anyone other than himself, so it's not that he sent it to

12  Compass Lexecon employees.

13           THE COURT:  How do I know all this until we see the

14  proof?

15           MR. HANSEN:  Well, it's -- it's in the complaint.  We

16  can talk about it.  The complaint says, very carefully, as to

17  your question, he prepared this PowerPoint and transmitted it,

18  but they don't say he transmitted it to anybody other than

19  himself.  It's his own work.  It's his own planning for

20  possible competitive business, which he had every right to do.

21  And as Mr. Murphy is correct, he certainly hoped that if he

22  started a competitive business, people would follow.  That's

23  not evidence of anything improper.  It isn't.

24       As a matter of fact, if -- if they were right and he

25  solicited people and it was successful, that investor

1    presentation would say, And the following people are going to

2    come join me.  They don't say that.  They simply say he hoped

3    people would come.  So that goes to the investor presentation.

4         The only other thing they say which could possibly be

5    solicitation is they say in June, which is long before the

6    90-day period began, in June of last year, he communicated with

7    someone, they don't identify the someone, but we can tell it's

8    Mr. Fischel, who is the chairman of Compass Lexecon, and there

9    is no allegation he was soliciting Mr. Fischel.

10        According to what the complaint alleges, he says to

11   Mr. Fischel, People here should question FTI as to why they

12   should stay.  That's not soliciting anybody.  And there is no

13   allegation that people did ask questions.  That's a perfectly

14   harmless comment.  It can't possibly be shoehorned into a

15   solicitation claim.

16        And the Court -- another judge of this Court in *Smith*

17   said as much in saying, Even when 13 employees actually walked

18   out the door together to a competitor, there was no basis for

19   claiming solicitation without who was solicited, when were they

20   solicited, what was the solicitation?  So the solicitation

21   claim, Your Honor, it's not for a trial, it's not for down the

22   road, it's for resolution now because the facts aren't pleaded.

23             THE COURT:  All right.

24             MR. HANSEN:  So, that's that.

25        Now the breach of loyalty.

```
1          THE COURT:  Well, all right.  Go ahead as long as you
2    are on it.
3          MR. HANSEN:  No.  No.  I don't want to --
4          THE COURT:  No.  Go ahead, I mean, if you are putting
5    it all together.  Breach of fiduciary duty, breach of -- I am
6    not sure duty of loyalty/fiduciary duty is too different from
7    one another.
8          MR. HANSEN:  No.  They are essentially the same, Your
9    Honor.  But they -- they have these two elements.  The employer
10   has to have suffered harm and the employee has to have competed
11   --
12         THE COURT:  Well, could there be nominal damages?
13         MR. HANSEN:  That's what they argue.  But there
14   couldn't be, Your Honor, for two reasons.  Reason one is
15   nominal damages is a concept.  You can get nominal damages
16   where you don't have real damages, just nominal damages.  There
17   is no case they have cited or we have found that applies
18   nominal damages in a tort context.
19         But even so, the very concept of nominal damages is wrong
20   for here because nominal damages don't address whether FTI has
21   been harmed.  And the harm that would matter here, Your Honor,
22   it's very common sense, did people leave?  Did clients stop
23   using FTI?  They don't allege that because they can't allege
24   it.  And nominal damages is -- is essentially when you don't
25   have harm.
```

1          They have -- and this is not me guessing or me arguing

2    facts that aren't before the Court because in paragraph 130 of

3    the original first amended complaint, plus 145 of the proposed

4    second amended complaint, they said there may be harm in the

5    future, meaning they haven't been harmed now.  That is case

6    dispositive.

7          Second, Your Honor, under cases like -- we have cited

8    *Maryland Metals* being one of the main ones, it is perfectly

9    fine to prepare to compete.  There is nothing wrong with an

10   employee putting together ideas for what he might do in a

11   competing business.

12         In *Maryland Metals*, by contrast to nothing that was done

13   here, the employees solicited an investor for their new

14   business while employed.  They took out a loan while employed.

15   They used what they knew about the Maryland Metals business to

16   go over to Germany and buy a machine they were going to use as

17   a competing car shredding business.

18         All of that dramatically more than sitting in your office

19   and putting together a PowerPoint presentation that the Court

20   -- Maryland Courts there said, Employees are privileged to do

21   that, and it didn't harm the employer, and unless it harms the

22   employer --

23              THE COURT:  They said it on a motion to dismiss -- I

24   don't have the case number -- or --

25              MR. HANSEN:  I don't remember --

1          THE COURT: -- motion for summary judgment?

2          MR. HANSEN:  *Smith* was.  There are other cases that

3  were.  *Maryland Metals* was decided after a trial, I believe.

4          THE COURT:  After a trial.  Well, that's a different

5  story.

6          MR. HANSEN:  But the --

7          THE COURT:  We are not there.  I mean, you may be

8  right.  It may have been after --

9          MR. HANSEN:  But the --

10          THE COURT:  -- trial.

11          THE COURT REPORTER:  I'm sorry.  Can you just wait

12  until the judge finishes speaking?

13          MR. HANSEN:  I'm sorry.  I apologize.

14          THE COURT:  Just, I don't have the case, but I am --

15  it doesn't feel like, the way you are arguing it, that it would

16  go out on a motion to dismiss.  It could go out on summary

17  judgment at a trial.

18          MR. HANSEN:  Just let me look at the case, Your

19  Honor.  It was -- I think it was the dismissal -- it was

20  affirmed on appeal.  I was looking through it --

21          THE COURT:  Well, on a motion to dismiss, it was

22  granted?  It makes a difference.

23          MR. HANSEN:  Order of bill -- dismissing bill of

24  complaint of the firm, so it looks like it was a dismissal.

25  But, Your Honor, the legal principle is the legal principle.

1    You have to have facts.  Again, after *Twombly*, it's not enough

2    to say those things.  There have to be facts that make out a

3    plausible claim, both that whatever Mr. Orszag did harmed the

4    financial interests of FTI in the form of lost clients or lost

5    employees, none of which can be pleaded; and second, there have

6    to be facts plausibly establishing that what he did was

7    something competitive outside the confines of Compass Lexecon,

8    like what was done in *Aarow*, like what was done in *Shrang*.  Not

9    what was done here.

10            THE COURT:  It looks like the case you cited, though,

11   *Maryland Metals*, was a hearing on a -- it was a hearing, trial

12   taken -- evidence taken by a judge.

13            MR. HANSEN:  Your Honor --

14            THE COURT:  It makes a big difference.  We are on a

15   motion to dismiss.  We are not there.  You may prevail.

16            MR. HANSEN:  But in federal -- Your Honor, in federal

17   court -- I am repeating myself -- whether that was a trial or

18   wasn't a trial, they established the legal principle under

19   Maryland law that you need these facts and you don't --

20            THE COURT:  I -- I agree you need facts at the end.

21   The question is:  Do you get through the gate on what you got?

22            MR. HANSEN:  Exactly right, Your Honor.  And what

23   *Twombly* tells us is you need facts at the beginning to get

24   through the gate, too.  You need enough facts -- I am not

25   saying a trial record -- enough facts to establish a plausible

1  claim --

2          THE COURT:  Well, let me -- let me see -- hear from

3  Mr. Murphy why he thinks he has enough facts.

4          MR. MURPHY:  Thank you, Your Honor.

5      We -- we think we have enough facts alleged in the

6  complaint, and I think that counsel is really discounting some

7  of the allegations.

8          THE COURT:  I am not sure what we are talking about

9  now.  Are we talking about the duty of loyalty and fiduciary

10  --

11          MR. MURPHY:  Yes.

12          THE COURT:  -- the breach of fiduciary duty, or are

13  we back on scope or anything like that?  Where are we?

14          MR. MURPHY:  I think we are -- I think we are talking

15  about the breach of fiduciary duty claim.  The complaint

16  alleges that for a substantial period of time after we signed

17  this contract in January, Mr. Orszag engaged in activities that

18  were fundamentally at odds with his duty of loyalty to his

19  employer.  Among those activities were that he continued --in

20  paragraph 67 -- over the course of the year, he continued to

21  threaten to insight a mass resignation of Compass Lexecon

22  employees and to start a competing firm if things did not go

23  his way.

24      He approached -- paragraph 68 -- He approached senior

25  leadership of FTI and announced he was calling a meeting of all

1    the Compass Lexecon senior staff so he could describe what he

2    described as negative synergies between FTI and Compass Lexecon

3    which indicated to him that Compass Lexecon would be better off

4    if it weren't owned by FTI.

5         He planned to tell the staff that there had been a

6    significant rift between FTI and Compass Lexecon over conflict

7    issues, conflicts in terms of taking on clients.  This was in

8    paragraph 69.

9         He alleged and told his staff that he personally took a

10   worse deal for himself in order to get a larger deal done and

11   ensure that we all could stay together, which was, I think, not

12   correct.

13        He also tried to entice the Compass Lexecon staff to

14   depart with him.  In a statement to the staff, he said that the

15   best strategy for each of you is to focus on your work and let

16   my negotiations with FTI play themselves out.  There is most

17   certainly no need to polish your C.V.  Indeed, you should have

18   no concern about your future at all.  Because what he was

19   saying is if I leave, you can come with me.

20        He told FTI's leadership and board of directors in the

21   summer of 2023 that if they were to terminate him based on the

22   speech that he gave to the senior staff, 800 employees would

23   leave the next day, causing significant harm to Compass

24   Lexecon's business within a week.

25        And then just several weeks later, we found out that he

1  had prepared a investor PowerPoint, which is not a PowerPoint

2  about starting a new company by himself.  It's a PowerPoint

3  that implies, in fact, that everyone with Compass Lexecon would

4  come with him and that this would be an opportunity for him to

5  create a company that was valued at between a billion and $2

6  billion, and that it would be basically Compass Lexecon that

7  would be removed from FTI's ownership and would be owned by him

8  and others.

9       And this is -- we have had no discovery at this point.

10 These are things that we found out through statements that he

11 made, emails that he sent --

12            THE COURT:  Okay.  Assume you prove that he has -- he

13 acted to stir dissension in the ranks --

14            MR. MURPHY:  Yes.

15            THE COURT:  -- which may be a breach of fiduciary

16 duty or a duty of loyalty, what's the damage?  You don't know

17 at this point?

18            MR. MURPHY:  We don't know what the damages is.

19            THE COURT:  Well, what could it be?

20            MR. MURPHY:  It could be in November, when he's free

21 from the non-competition restraint, we may find that he,

22 indeed, starts a new company and that substantial numbers of

23 Compass Lexecon employees depart and join with him.

24       Now, I think we would be entitled to then --

25            THE COURT:  Could he do that, though, when there is

1    no injunction in place?  You are saying he couldn't do that?  I

2    thought he could do whatever he wanted to after November?

3         MR. MURPHY:  After November 20th, he could do that,

4    but it may be that they joined him after November 20th because

5    of solicitations that he made to them before November 20th, and

6    that's what we would be entitled to discover in discovery.

7         We -- we have one investor PowerPoint that he created

8    that happened to be on his personal computer.  We don't know

9    how many others he may have created and sent around.  We don't

10   know -- we can't allege -- we haven't had access to his

11   personal email.  We don't know what communications he's had

12   with investors or employees or clients that are all in

13   anticipation of starting a new business once he's freed from

14   these non-competition restraints.  We just don't know.  But we

15   are entitled to find out.

16        And as Your Honor suggests, even if -- even if there were

17   no damage that resulted, we'd still be entitled to nominal

18   damages for a senior managerial employee of our company to have

19   gone about all the things that he's done to sow dissension

20   within the ranks.  And although counsel suggests that nominal

21   damages are a contract remedy in Maryland, they are not.  But

22   nominal damages are available in tort.  And, in fact, Your

23   Honor wrote an opinion.  We didn't cite it.

24        THE COURT:  I am sure that's true.  In torts, they

25   are allowed all the time.

1          MR. MURPHY:  You wrote an opinion in a civil rights

2    case where you awarded attorneys' fees to the prevailing

3    plaintiff even though he could prove no actual damage, but he

4    was entitled to nominal damages based on the traditional

5    Maryland rule that if there is a breach, then the party who

6    suffered the breach is entitled to at least nominal damages.

7          And I have been dealing with nominal damages in Maryland

8    cases for 25 or 30 years.  I had a case many years ago where

9    punitive damages were awarded even though the plaintiff only

10   received nominal damages.  So it's a tort concept as well as a

11   contract concept.

12         And one of the cases I could cite for that proposition,

13   Your Honor, is *Horn vs. Seth*, 201 Maryland 589 from 1953, which

14   was a tort case that awarded nominal damages.  And there are

15   cases -- there are legions of cases.

16         So -- but the other thing I just wanted to say about the

17   remedies that we are seeking, in -- in the counts of the

18   complaint that deal with the breaches of the solicitation and

19   the non-competition clauses, we do ask for permanent injunctive

20   relief.  We haven't sought a preliminary injunction because we

21   couldn't at this point because we don't have the facts

22   necessary to say who is actually out there doing something.

23         THE COURT:  Help me out here.  Permanent and

24   injunctive relief for what?

25         MR. MURPHY:  During the period of the existence of

1   the -- of the non-compete.  We are not -- we weren't seeking --

2          THE COURT:  Until November you mean?

3          MR. MURPHY:  Yeah.  We filed this back a year ago, or

4   almost a year ago.  We filed this seven or eight months ago, in

5   November.  And at that time, we wanted to have a declaration

6   that these provisions were valid and not subject to California

7   law, which Your Honor has ruled on, and that if they are valid,

8   that we -- we should seek -- we should obtain injunctive relief

9   to prevent Mr. Orszag from violating them during the time that

10  they -- of the term of -- of the non-compete and the

11  non-solicitation.

12         And if there were damages that we can prove, we are

13  entitled to prove those damages.  But, again, this is a -- this

14  is a complaint.  We have alleged the facts.  We have alleged

15  more than sufficient facts, I think, to show that he has not

16  been faithful and loyal to his employer, and we are entitled to

17  conduct discovery and see where we go.

18         Thank you, Your Honor.

19         THE COURT:  Brief response on that, Mr. Hansen.

20         MR. HANSEN:  I think Mr. Murphy admitted they have

21  suffered no harm, and nominal damages is when you don't have

22  harm.  They have not been harmed.  Harm is the element of the

23  claim, not a dollar of damages.

24         Second, Your Honor, he spent a lot of time reading from a

25  complaint as if this were things that were said to employees.

1   The complaint makes clear they were in a draft speech that was

2   never given to the employees; that FTI went to Mr. Orszag,

3   asked him to take those things out or -- or edit the speech,

4   and then in paragraph 74 of the amended complaint, this is all

5   they say about the speech that was actually given.  He gave a

6   speech that says his demands would be met or resignations would

7   follow.  That's not a violation of anybody's duty.  All of the

8   things that Mr. Orszag did wasn't stirring dissension.  This

9   notion of, Oh, he was inciting mass revolt, that's what was

10  claimed in *Smith*, except the Court there said, Well, who was he

11  inciting?  How did he do that?  Who was he contacting?

12              THE COURT:  Well, they can develop that on discovery.

13              MR. HANSEN:  Your Honor, I just keep coming back to

14  that same --

15              THE COURT:  Well, you know, your argument is really a

16  common one, which is we don't have enough.  You know, there is

17  a concept in comparative law, which happens to be a sideline of

18  mine, and Brazilian law in particular, that translates "is" --

19  "is there good smoke in the case?"  There is good smoke here.

20      I don't know whether he's going to prove his case in the

21  end or not, but there is good smoke, that maybe there is more

22  that Mr. Orszag who's -- did certain things that they think --

23  that they are pretty sure he did.  He may have done some more.

24  I mean, that's what time will tell.

25      But, again, this is really just getting the case going.

1   This is not the end of it.  You are not entitled to a full

2   proof of their case at this stage.  Have they plausibly stated

3   a cause of action? and I think the answer is yes.  I mean, I am

4   not making that final decision now.  And I -- I disagree with

5   you that nominal damages are only available in contract because

6   they are awarded in tort all the time, or however it works.  I

7   mean, nominal damages are whenever you can't -- when you can

8   prove liability in a case and you can't prove the actual

9   damage, but --

10              MR. HANSEN:  Exactly our point, Your Honor.  Exactly

11  our point.  What the cases say on this tort is you have to have

12  actual harm, not nominal damages.  It's a separate element.  If

13  it was enough to prove -- as Your Honor just said, if you prove

14  the liability, well, you would necessarily be entitled to

15  nominal damages.

16              THE COURT:  You want me to close the door on their

17  claim.  Right?

18              MR. HANSEN:  I do, Your Honor, because it doesn't

19  state a claim, and it's important to, we think, do this, as you

20  said at the outset of our argument --

21              THE COURT:  Maybe -- maybe fully meet for summary

22  judgment if there is any time left to do that, but not now.

23  Not on a --

24              MR. HANSEN:  Well, Your Honor, the duty of loyalty

25  claim won't expire on November 20th.  That -- that's a damages

1  claim that Mr. Murphy has made very clear he will continue.  So

2  it's not -- it's not going to sunset.  We need to actually, we

3  think, as you said, have an orderly process here, and if they

4  don't have anything that proves both that he did something --

5  again, Your Honor says maybe there is smoke, maybe he did do

6  something.  With respect, Your Honor, that simply isn't enough

7  to get a case out of the starting gate.  You need facts that

8  plausibly suggest that they will show that, and they don't.

9      They simply have something he did in his own -- own

10 computer, which is of nothing, and they have facts that he

11 said, I want a different deal between Compass Lexecon and FTI.

12 And that's it.  That's just not enough.  And this claim -- we

13 are not going to be rid of this claim come November 20th.

14      THE COURT:  I certainly will let you say that in your

15 opposition.  I am just giving you my reaction to where we are

16 now.

17      Let's move on to possibly one final area, which is:  What

18 is the effect of the fact that Mr. Orszag is working for these

19 folks still?  What does that do to this case?  What am I

20 supposed to do with that issue?

21      MR. HANSEN:  It does many things for the case.

22      THE COURT:  All right.  Go ahead.  I will hear you.

23      MR. HANSEN:  Okay.  So, you know, we think it's a

24 really important fact -- and we are not injecting this because

25 it's in their proposed second amended complaint -- that

1   effective the day of his supposed cause termination, they got

2   him back, and they are holding him out to the public as a -- as

3   a consultant.  And they say, Well, we are just running out this

4   train, but if you look at the independent contractor agreement,

5   no, he's entitled to keep working, and they are taking on new

6   matters for him and he is generating a lot of money for Compass

7   Lexecon and FTI.

8        So what does it do for the case?  It shows there wasn't

9   incurable cause; there wasn't terrible conduct that justified

10  firing him as a disloyal, bad employee.  It makes no sense for

11  them to do that.

12       It also shows no damages because in the damages thing

13  that we just talked about, the harm, here is the harm that you

14  see in *Strang* and in other cases.  People leave.  Clients are

15  -- are lured away.  That's what happened in the *Aarow* case.

16  None of that has happened, indicating --

17       THE COURT:  Well, how do we know what he's doing on

18  the side?  He's working for the company.  Is there something

19  else he might be doing out there?  I am just asking you.  I

20  don't know how Mr. Murphy is going to argue it, but --

21       MR. HANSEN:  Not alleged.

22       THE COURT:  -- you say it's not necessarily

23  inconsistent with some of the provisions in the restrictive

24  covenants.

25       MR. HANSEN:  Your Honor, they don't allege it.  There

1   is no basis for alleging it.

2            THE COURT:  Well, I don't know.  I'll have to hear

3   from Mr. Murphy.

4            MR. HANSEN:  He's fully employed, doing a lot of

5   work, very, very significant work for Compass Lexecon now.

6   And, Your Honor, I can't -- you know, I am dealing with the

7   complaint --

8            THE COURT:  Right.

9            MR. HANSEN:  -- as alleged.  I am trying not to make

10  --

11           THE COURT:  Fair enough.

12           MR. HANSEN:  -- allegations of fact that aren't in

13  the complaint.  But I can tell you that after three complaints,

14  there isn't a single allegation that Mr. Orszag has done

15  anything independently in competition with FTI.  They do allege

16  that he's continuing to work as a consultant at Compass

17  Lexecon.  They do not allege a single employee has left.  And

18  Mr. Murphy just basically admitted it to you.  He said, Well,

19  maybe something will happen in the future.  There is no claim

20  then.  No claim yet.

21           It's -- it's a known, established thing, and discovery

22  won't change that.  Discovery can't change people leaving,

23  clients leaving.  It hasn't happened.  And because it hasn't

24  happened, there is not a colorable claim as a matter of law,

25  and the case doesn't go forward to discovery, with all respect,

1    Your Honor, smoke or no smoke.

2            THE COURT:  All right.  Mr. Murphy, what do you say

3    about that?

4            MR. MURPHY:  Well, with respect to the independent --

5    the independent consulting arrangement, FTI was faced with a

6    situation where they determined that Mr. Orszag needed to be

7    terminated for cause, and his relationship as the -- one of the

8    four key executives of Compass Lexecon had to end.  He would no

9    longer be the boss or one of the bosses of those many hundreds

10   of employees.

11           With respect to the clients, though, FTI had an

12   obligation to make sure that the clients were not harmed by the

13   absence of Mr. Orszag, who was a leading consultant expert for

14   law firms and other businesses in ongoing litigation around the

15   country.  And they did not want to have a situation where they

16   had to say to a client, Oh, by the way, the guy that you were

17   relying on to testify at your upcoming trial is no longer with

18   us.

19           So they entered into a relationship with Mr. Orszag that

20   he would continue to work on those ongoing matters, and if he

21   had new matters to bring in, that would be all right, but he

22   would be doing that as an independent contractor.  It was clear

23   that he was not going to have a continuing role as the head or

24   one of the heads of Compass Lexecon.  So it's a difference

25   between how they handled the matter internally and how they

1    handled the matter externally.

2           And although Mr. Hansen says, Well, he is earning a lot

3    of money for the company, he's also earning a lot of money for

4    himself.  He's not suffering.  This is not a situation whereby

5    having to sit out for a year, he's -- he's without a paycheck.

6    I mean, he has been paid quite handsomely under the independent

7    contractor arrangement, so that's -- that's the response.

8           THE COURT:  As of now, you don't have any cases of

9    actual solicitation in a particular given area or a particular

10   category of a person or entity?

11          MR. MURPHY:  We don't have any indication of him

12   soliciting clients to come join a new firm that he wants to

13   create.

14          We do have plenty of indications of his solicitation of

15   the employees of Compass Lexecon to -- you know, basically, we

16   have alleged that he attempted to insight a mass resignation.

17   Now, whether or not any of those employees leave or they don't

18   leave, we won't know that until probably November 20th or

19   November 21st.

20          THE COURT:  But just to get a glimmer of where you

21   are, and I am not going to give you my opinion on it, but are

22   you saying -- you know, I thought you did say this -- it's --

23   if he talked to some people now while the -- some aspect of the

24   covenants remain effective, and they leave with him after

25   November, you feel that would be actionable because they were

1  talked to while the injunction was in place, while the

2  covenants were in place?

3          MR. MURPHY:  Two things, Your Honor.  One, the

4  non-solicitation provision applied while he was employed by

5  compass and FTI and for a year thereafter, so that

6  non-solicitation provision would be applicable until November

7  of '24.

8      The breach of a duty of loyalty applied during the period

9  that he was employed.  So, in either event, if he is soliciting

10 employees to leave with him and -- and then -- and is trying to

11 insight what we have described in the complaint as a mass

12 resignation of those employees while he's an employee of FTI

13 and Compass or while he's subject to the non-solicitation

14 agreement in this contract, then we would have an actionable

15 claim for damages if, in fact, those employees subsequently

16 leave.

17         THE COURT:  Mr. Hansen, what do you say to that?

18         MR. HANSEN:  Your Honor, I just heard Mr. Murphy say

19 that they are taking new matters on for Mr. Orszag.  All this

20 talk about, well, we had to preserve clients and we had no

21 option, they had an option.  They are putting him out in a

22 harness just the way he was before taking on new matters.

23     Second of all, this business about inciting a mass

24 resignation, they claim that in the complaint for 2022, and,

25 yet, they signed him up to another agreement after that.  There

1    is no facts suggesting he did anything inciting.  That's a

2    conclusion entitled to no weight in a *Twombly* analysis.

3        He is not alleged to have said a single thing to a single

4    Compass person -- you know, just from the complaint, I am just

5    going from the complaint -- other than a speech he gave in

6    July, and they approved the speech, and he talked about -- he

7    predicted that maybe if things didn't get better, people would

8    leave.  People could leave, and that's not solicitation.

9        Moreover, we know that they didn't think it was improper

10   solicitation.  And I can tell you why very, very clearly.  We

11   know from the provision we looked at this morning you can cause

12   -- you can say there is a cause termination right if you act

13   against the employee within 90 days of the conduct.  And I am

14   sure you will remember that from the contract.  The speech was

15   in July.  If they had actually believed that in that speech, he

16   had solicited, in violation of his obligations to Compass

17   Lexecon and FTI, they would have terminated him for cause

18   within 90 days after giving him notice and an opportunity to

19   cure.  They didn't.

20       No one could consider an approved speech of the nature

21   that was shown in 74 to be a solicitation.  And that is all

22   there is.  That's why the Court in *Smith* dismissed the claim of

23   solicitation because even though in that case, 13 people walked

24   out the door in unison, there wasn't a fact about who was

25   talked to, when were they talked to, what was the talking to.

1        It's important to recognize that as pleaded, Your Honor,

2   Compass Lexecon is alleged to be an organization of highly

3   trained, skilled professionals.  The notion that they are sheep

4   that can be led around by the nose by Mr. Orszag or anybody

5   else is not plausible.  They will make their own decisions

6   about what to do with their careers.

7        But there -- again, Your Honor, I just simply have to say

8   that the analysis we think should be undertaken here is not

9   going from what the lawyers said, but going rigorously from the

10  complaint, putting aside conclusory statements like, Oh, he

11  solicited, or, He incited a mass revolt, and focusing only on

12  facts.  Who did he say something to?  What did he say?  I

13  respectfully submit there is no claim either for breach of duty

14  of loyalty or for actual solicitation.

15        And, Your Honor, we think that decision can be made now

16  based on what has been pleaded after three tries.  I mean, this

17  is not an initial complaint we are talking about here.  This is

18  a third go around, and that's what they have got, and, Your

19  Honor, you have said it yourself, the question is:  Is it

20  enough?  And we are not saying it has to be a full trial

21  record, but it has to at least be enough to nudge -- the

22  Supreme Court used the language "nudge it over into the zone of

23  plausibility."  And, Your Honor, with respect, I don't think

24  smoke will -- will nudge you over into that zone.  It's got to

25  be a fact.  And the only facts here are he gave an approved

1    speech.  That's not good enough.  That is not a fact.

2           THE COURT:  Well, let me do one final issue with you,

3    and that is -- we talked about geographic scope -- the

4    activities scope.  And let me put the burden back on you,

5    Mr. Murphy.  There are so many categories of individuals and

6    entities that he is not supposed to solicit: suppliers,

7    vendors.  I mean, what --

8           MR. HANSEN:  Independent contractors.

9           THE COURT:  Where does that come from?  I am really

10   asking Mr. Murphy because, frankly, as I say, I wasn't really,

11   I think, overseeing the case about Chick Filet.  I just wasn't

12   sure where one goes.  Based on the way this is written, it

13   doesn't look like there is much wiggle room.

14          MR. HANSEN:  We don't think there is any, Your Honor.

15   That's the point.

16          THE COURT:  Well, that's -- that's an issue, and

17   maybe, Mr. Murphy, you can answer that.

18          MR. MURPHY:  Your Honor, there is a carve out in the

19   -- in the non-competition for him to take a position that -- a

20   senior executive position in a company that does these same

21   sorts of services as FTI does as long as he's not engaged in

22   that part of the business.

23      So, look, it's a broad non-competition, but it takes into

24   account the fact of who he is and what he did.  He was not just

25   a salesman, as many of these cases involve, and he was not just

1   an economic consultant who testified, but he was the guy who

2   was one of the key managers, maybe the key manager, of this

3   entire operation.  And, so, the non-competition clause was

4   written broadly to prevent him from competing in that economic

5   consulting field, whether it be as a owner or a -- an employee

6   or a independent contractor working with some other company

7   that competes with FTI.

8        So, it is broad, there is no doubt about it, but he had

9   broad roles and --

10        THE COURT:  So if he worked for a supplier of FTI,

11   that would be -- that would be prohibited under your view of

12   the covenant?

13        MR. MURPHY:  I don't -- I don't know about a

14   supplier.

15        THE COURT:  Well, what does the language say?  Let's

16   look at it.  It's pretty broad.  Well, solicitation, in any

17   event, same --

18        MR. MURPHY:  Yes.

19        THE COURT: -- thing as whether it's the solicitation

20   or the non-comp.  Where are we?  I did read it earlier.  Hold

21   on one second.

22        MR. MURPHY:  Your Honor, I think it's paragraph

23   11(a)(3) that you are looking at, and that's part of the

24   non-solicitation covenant that talks about him not soliciting

25   consultants, contractors, subcontractors, suppliers, or vendors

1    of FTI.

2          THE COURT:  Any contractor, subcontractor, supplier,

3    or vendor to solicit to leave F -- is he saying to leave FTI,

4    or could he do it by -- if he -- if there are suppliers who

5    stayed with FTI and go with him, is that okay?

6          MR. MURPHY:  I would think that would be okay if it's

7    a -- if it's a company that supplies everybody and he -- you

8    know, he's not trying to take --

9          THE COURT:  Well, you are not saying they should be

10   solicited to -- you are saying they should -- he should be

11   precluded from soliciting them to leave FTI?

12         MR. MURPHY:  Correct.

13         THE COURT:  Okay.  All right.  Let me sort of --

14   let's face where we are in terms of time --

15         MR. MURPHY:  And, Your Honor, let me just say you

16   have raised some interesting questions about the blue penciling

17   provision, and I will be discussing that with my client.

18         THE COURT:  Well, I don't necessarily want to raise

19   with you right now.  I mean, here we are mid June looking to a

20   response -- your motion -- your second amended complaint is

21   filed.  Right?  I don't know whether the next step is to have

22   you file right away a supplement to your amendment, or whatever

23   we call it, that may go to the blue pencil issues, or you wait

24   until they file their opposition, then we see what decision is

25   made about the blue penciling, and then we are back.  And

1    that's going to take some time, even if I put you on a pretty

2    fast track, to get to that point where we then say, Okay, this

3    is -- this is the actual geographic limitation, this is the

4    actual activity limitation that you are dealing with.  Now

5    what?

6              MR. MURPHY:  Well, look, I'd be willing to discuss

7    this, obviously, with my client, and if my client thinks it's a

8    good idea, we can talk with Mr. Hansen and Mr. Orszag and see

9    if we can agree on narrowing the scope.

10             THE COURT:  Well, that's what I strongly suggest.

11   And maybe I -- I -- look, they have an opposition that would be

12   due -- not that it's going to be all that new because a lot of

13   it, as I say, is re-packaging -- but there will be some things,

14   and maybe to tighten the issues is for you to really address

15   with Mr. Hansen what -- was there some way to -- to scale back

16   on these things?

17       I am giving you my -- my view that I think the geographic

18   area is awfully large, so sort of telling you to be prepared,

19   and the same may be true with regard to -- I -- as I say,

20   reading the clause about the activities, it's to solicit those

21   people that leave FTI.

22             MR. MURPHY:  Yes.

23             THE COURT:  It's not -- it's not to preclude any

24   dealings with them.

25             MR. MURPHY:  That's true.

1          THE COURT:  And I may have misread that portion of it

2    earlier.  But I think to the extent that you can dial back a

3    little bit on these issues, it will give us a tighter base on

4    which to make the decision.  Otherwise, the next step would be

5    to hear, in a period of time, we are talking about 20 days to

6    hear an -- have an opposition from --

7          MR. MURPHY:  Yes, Your Honor.

8          THE COURT: -- from the plaintiff.  20 days.  Can you

9    do something sooner than that that would then allow them to

10   respond more precisely, Mr. Hansen?

11         MR. HANSEN:  Whatever Your Honor wishes.

12         THE COURT:  Your what?

13         MR. HANSEN:  Whatever Your Honor wishes.

14         THE COURT:  Again, I am looking at November.  I am

15   trying to -- I have got a law clerk who is doing a good job on

16   all this.  He is leaving me in August.  So I have to move on a

17   pretty fast track myself as far as being ready to decide this.

18   I mean, we are all up against the wall here.

19         MR. MURPHY:  Your Honor, as Mr. Hansen pointed out,

20   and it's true, our breach of fiduciary duty claim will extend

21   beyond the -- the end date of the non-competition provision,

22   and we would like to -- to have the opportunity to conduct some

23   discovery on that claim.

24         THE COURT:  Well, I think you can conduct some

25   discovery, but it might be helpful -- well, look at the

1  timeline.  Practically speaking, if you can get some reasonable

2  position on scope, that is geographic in scope primarily, then

3  maybe I can get -- and I get within 20 days, let's say, a

4  response from defendant, which allows them to address that as

5  well as everything else, I think we can get you an opinion by,

6  we are talking about, maybe at the earliest, mid August.

7  That's about where we could get something out.  Put Nicholas to

8  work real hard right away as we sort of get things done.

9      And then, at that point, you would know what the scope of

10  discovery would be in terms of, say, get all this to whatever,

11  I mean, whatever the period of the discovery -- ordinarily,

12  we'd want -- we'd be into October certainly, almost to

13  November.  But there -- there you have it.  I mean, then we'd

14  see what we had.  You'd have to get your discovery done in that

15  window, and we will see what we have in terms of -- of the

16  case.  And then --

17          MR. MURPHY:  Can we --

18          THE COURT:  Hold on a second.

19      -- and then we might be faced with a, either a request

20  for summary judgment or mootness.  I don't know.  I mean, I

21  just don't know where we are at that point.

22          MR. MURPHY:  Your Honor, can we --

23          THE COURT:  Maybe discovery will not dispose of the

24  case.

25          MR. MURPHY:  Could we propose a schedule for limited

1   discovery to take place in the near term?

2            THE COURT:  Well, what if you are out there -- I

3   mean, is there some discovery -- maybe that's the way to go

4   about this, that the issue of -- not on the geographic scope

5   issue because that's the one that really you need to talk about

6   --

7            MR. MURPHY:  Right.

8            THE COURT:  -- but if there is something that you say

9   goes to the issue of for cause, is there cause, the kind of

10  internal dissension, if you will, facts, it seems to me that

11  you could embark on discovery on that, I would say, right away.

12           MR. MURPHY:  And --

13           THE COURT:  That would involve document production

14  and deposition.  I don't think that would be objectionable.  I

15  mean, I am sure Mr. Hansen won't be happy with it, but I don't

16  have a problem with it.

17           MR. HANSEN:  Could I object, Your Honor?

18           THE COURT:  Yeah.  Sure.  Easy to object.

19           MR. HANSEN:  Well, Your Honor, we don't think they

20  have the claim.  We think the Court should -- we are going to

21  have an opposition in 20 days, and we are going to oppose it,

22  and at that point, we can sort out what is in the case and what

23  isn't in the case.

24       They have control over all the documents at Compass

25  Lexecon, so they already have that.  They have all the

1    employees available to them.  This is not some situation where

2    anything is going to go missing.  We think it should be done in

3    an orderly way.  We should oppose, the Court can decide and

4    rule on the issues, and then we can see what's in the case.  I

5    don't think we need to do anything rushed off now.  I think

6    that would be inappropriate.

7          THE COURT:  There is a provision under the rules for

8    limited discovery on certain preliminary issues.  I am sort of

9    making it clear that I do think that at least the allegations

10   have enough substance to go forward as to the alleged -- well,

11   how shall I characterize? -- conduct, inappropriate conduct of

12   Mr. Orszag, although there are some issues that are remaining

13   open.  And in order to at least get and entitle the plaintiff

14   to some discovery, instead of getting hung up in this long

15   wait-and-see process, I would be inclined to authorize some

16   discovery on that point.

17         I know you may object to it, but that's the way I think

18   I'd prefer to go.  This is an unusual case, and I, again,

19   rather than have a clock run out on the case, which one has a

20   feeling is part of what's -- what the risk is here, I would say

21   go forward.  I think I would allow discovery, limited, not --

22   to the issue of alleged inappropriate conduct, shall we call

23   it, by Mr. Orszag, as set forth in the second amended

24   complaint, and we will see where we go with it.

25         MR. HANSEN:  Your Honor, with respect, the only

1   information that's relevant to the cause for termination is

2   information known to FTI.

3          THE COURT:  Well, I don't know that.  I just don't

4   know that.

5          MR. HANSEN:  We have briefed it, Your Honor.  It's in

6   the cases we have cited.

7          THE COURT:  Well, he says not.  He says there are

8   emails, among other things.

9          MR. HANSEN:  But Your Honor --

10         THE COURT:  This is the old, you know, where there is

11  good smoke, who knows what else is there?

12         MR. HANSEN:  You can't terminate someone for cause on

13  things you don't know about, Your Honor.  You have to have

14  known about it in order to terminate for cause.

15         THE COURT:  No.  That's not true.  There are -- there

16  are -- when you -- when you have -- actually, that's -- the

17  concept of good smoke really applies in our law, too.  If there

18  is a reasonable basis for the inquiry, it can be permitted even

19  if they don't establish the, with certainty, the facts at the

20  end of the game -- at the end of the day.

21     I mean, look, that's the way I want to do it --

22         MR. HANSEN:  Okay, Your Honor.

23         THE COURT: -- so that's the way we are going to do

24  it.

25         MR. HANSEN:  Understood, Your Honor.

1          THE COURT:  This is the way we will end where we are.

2    Number one, we will enter a separate partial declaratory

3    judgment with respect to the applicable law being the State of

4    Maryland for the reasons stated on the record.

5          Second, there is -- the second amended complaint will be

6    allowed to be filed.

7          Third, the time to respond to the second amended

8    complaint is 20 days from today.  And you re-package it as you

9    will.  And, ordinarily, there will be a reply within, let's

10   say, seven days thereafter.  Okay?

11         Now, in the meantime, there will be limited discovery,

12   and that would go to the issue of the so-called inappropriate

13   conduct of Mr. Orszag, and that may mean a request for emails,

14   other letters, documents, a deposition of Mr. Orszag on that

15   point, and maybe somebody else.  That's what you have got.  And

16   I am going to rely on that.  And then we will see where we are

17   at the end of the motion to dismiss the second amended

18   complaint and the reply.

19         And it may be that I don't need to have a separate

20   hearing on that.  I may just do that on the papers where we

21   are, and we will see where we are.

22              MR. HANSEN:  Could we also conduct limited discovery?

23              THE COURT:  Yes.  What would you want to do?

24              MR. HANSEN:  Mr. Gunby, the CEO who authorized all

25   this.

1          THE COURT:  Yeah.  Same -- fair enough.  On the same

2    limited issue, I agree.  Same limited issue.

3        Anything else?

4          MR. HANSEN:  Nothing else, Your Honor.  Thank you.

5          THE COURT:  All right.  Thank you, gentlemen, ladies.

6    Thank you.

7        (The proceedings were concluded at 2:46 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              C E R T I F I C A T E

2

3                 I, Renee A. Ewing, an Official Court Reporter

4     for the United States District Court for the District of

5     Maryland, do hereby certify that the foregoing is a true and

6     correct transcript of the stenographically reported proceedings

7     taken on the date and time previously stated in the above

8     matter; that the testimony of witnesses and statements of the

9     parties were correctly recorded in machine shorthand by me and

10    thereafter transcribed under my supervision with computer-aided

11    transcription to the best of my ability; and that I am neither

12    of counsel nor kin to any party in said action, nor interested

13    in the outcome thereof.

14

15                      /s/ Renee A  Ewing

16
                        Renee A. Ewing, RPR, RMR, CRR
17                      Official Court Reporter
                        June 17, 2024
18

19

20

21

22

23

24

25

**'**

**'24** [1] - 33:7

**/**

**/s** [1] - 47:15

**1**

**100** [1] - 1:15
**11(a)(3** [1] - 37:23
**13** [3] - 1:11, 15:17, 34:23
**130** [2] - 10:16, 17:2
**145** [2] - 10:16, 17:3
**16** [1] - 5:4
**1615** [1] - 1:19
**17** [2] - 5:4, 47:17
**18** [2] - 2:5, 2:14
**1953** [1] - 24:13
**1:46** [1] - 1:11

**2**

**2** [1] - 22:5
**20** [5] - 40:5, 40:8, 41:3, 42:21, 45:8
**200** [1] - 1:24
**20036** [1] - 1:20
**201** [1] - 24:13
**2015** [1] - 5:4
**202** [1] - 1:20
**2022** [1] - 33:24
**2023** [2] - 3:22, 21:21
**2024** [3] - 1:11, 3:24, 47:17
**20770** [1] - 1:24
**20th** [6] - 23:3, 23:4, 23:5, 27:25, 28:13, 32:18
**21202-1031** [1] - 1:16
**21st** [1] - 32:19
**2240** [1] - 1:15
**25** [1] - 24:8
**2:46** [1] - 46:7

**3**

**30** [1] - 24:8
**301** [1] - 1:23
**326-7900** [1] - 1:20
**344-3227** [1] - 1:23

**4**

**400** [1] - 1:19
**410** [1] - 1:16

**5**

**589** [1] - 24:13

**6**

**6500** [1] - 1:24
**67** [1] - 20:20
**68** [1] - 20:24
**69** [1] - 21:8

**7**

**74** [3] - 14:1, 26:4, 34:21
**783-7000** [1] - 1:16

**8**

**800** [1] - 21:22

**9**

**90** [2] - 34:13, 34:18
**90-day** [1] - 15:6

**A**

**Aarow** [4] - 11:24, 12:15, 19:8, 29:15
**ability** [1] - 47:11
**able** [1] - 11:10
**absence** [1] - 31:13
**access** [1] - 23:10
**according** [1] - 15:10
**account** [1] - 36:24
**act** [1] - 34:12
**acted** [1] - 22:13
**ACTION** [1] - 1:4
**action** [5] - 9:15, 10:24, 13:1, 27:3, 47:12
**actionable** [2] - 32:25, 33:14
**activities** [9] - 4:25, 5:8, 6:7, 8:2, 20:17, 20:19, 36:4, 39:20
**activity** [9] - 2:15, 4:8, 5:20, 7:20, 8:11, 8:22, 9:3, 9:12, 39:4
**actual** [12] - 10:8, 10:10, 13:2, 13:17, 24:3, 27:8, 27:12, 32:9, 35:14, 39:3, 39:4
**address** [4] - 2:18, 16:20, 39:14, 41:4
**admitted** [2] - 25:20, 30:18
**affirmed** [1] - 18:20

**ago** [4] - 24:8, 25:3, 25:4
**agree** [3] - 19:20, 39:9, 46:2
**agreement** [3] - 29:4, 33:14, 33:25
**agreements** [2] - 4:24, 8:7
**ahead** [5] - 7:6, 13:13, 16:1, 16:4, 28:22
**AIDED** [1] - 1:25
**aided** [1] - 47:10
**allegation** [4] - 14:10, 15:9, 15:13, 30:14
**allegations** [4] - 12:23, 20:7, 30:12, 43:9
**allege** [7] - 13:2, 16:23, 23:10, 29:25, 30:15, 30:17
**alleged** [19] - 10:23, 11:15, 11:17, 11:19, 11:21, 11:23, 14:4, 20:5, 21:9, 25:14, 29:21, 30:9, 32:16, 34:3, 35:2, 43:10, 43:22
**alleges** [2] - 15:10, 20:16
**alleging** [1] - 30:1
**Allied** [1] - 7:11
**allow** [3] - 11:1, 40:9, 43:21
**allowed** [2] - 23:25, 45:6
**allows** [1] - 41:4
**almost** [2] - 25:4, 41:12
**amended** [15] - 8:24, 8:25, 10:14, 10:15, 11:18, 12:23, 17:3, 17:4, 26:4, 28:25, 38:20, 43:23, 45:5, 45:7, 45:17
**amendment** [1] - 38:22
**amount** [1] - 12:14
**analysis** [2] - 34:2, 35:8
**Anderson** [1] - 1:21
**announced** [1] - 20:25
**answer** [2] - 27:3, 36:17
**anticipation** [1] - 23:13
**antitrust** [1] - 4:20
**apologize** [1] - 18:13
**appeal** [1] - 18:20
**APPEARANCES** [1] - 1:12

**applicable** [2] - 33:6, 45:3
**applied** [2] - 33:4, 33:8
**applies** [3] - 8:22, 16:17, 44:17
**apply** [1] - 2:21
**approached** [2] - 20:24
**appropriate** [1] - 8:12
**approved** [4] - 34:6, 34:20, 35:25
**area** [5] - 2:6, 2:25, 28:17, 32:9, 39:18
**argue** [5] - 6:10, 7:7, 9:19, 16:13, 29:20
**arguing** [3] - 6:16, 17:1, 18:15
**argument** [2] - 26:15, 27:20
**arrangement** [2] - 31:5, 32:7
**aside** [1] - 35:10
**aspect** [1] - 32:23
**assume** [1] - 22:12
**assuming** [1] - 13:10
**attempted** [2] - 4:18, 32:16
**attorneys'** [1] - 24:2
**August** [2] - 40:16, 41:6
**authority** [1] - 5:18
**authorize** [1] - 43:15
**authorized** [1] - 45:24
**available** [3] - 23:22, 27:5, 43:1
**awarded** [4] - 24:2, 24:9, 24:14, 27:6
**awfully** [1] - 39:18

**B**

**bad** [1] - 29:10
**Baltimore** [1] - 1:16
**base** [1] - 40:3
**based** [4] - 21:21, 24:4, 35:16, 36:12
**basis** [5] - 3:6, 8:13, 15:18, 30:1, 44:18
**BEFORE** [1] - 1:10
**began** [1] - 15:6
**beginning** [1] - 19:23
**belongs** [1] - 4:3
**best** [2] - 21:15, 47:11
**better** [3] - 8:8, 21:3, 34:7
**between** [5] - 21:2, 21:6, 22:5, 28:11, 31:25
**beyond** [3] - 2:25,

5:21, 40:21
**bid** [1] - 12:17
**big** [3] - 8:6, 19:14
**bill** [2] - 18:23
**billion** [2] - 22:5, 22:6
**Bindagraphics** [1] - 7:12
**bit** [2] - 8:10, 40:3
**blue** [15] - 2:4, 2:10, 2:14, 5:14, 6:11, 6:17, 8:5, 8:15, 9:9, 9:13, 13:10, 38:16, 38:23, 38:25
**board** [1] - 21:20
**boss** [1] - 31:9
**bosses** [1] - 31:9
**Brazilian** [1] - 26:18
**breach** [15] - 12:20, 13:18, 13:20, 13:23, 15:25, 16:5, 20:12, 20:15, 22:15, 24:5, 24:6, 33:8, 35:13, 40:20
**breached** [1] - 12:4
**breaches** [2] - 10:8, 24:18
**brief** [2] - 5:5, 25:19
**briefed** [1] - 44:5
**bring** [1] - 31:21
**broad** [5] - 5:14, 36:23, 37:8, 37:9, 37:16
**broader** [1] - 4:22
**broadly** [1] - 37:4
**burden** [1] - 36:4
**business** [14] - 3:6, 11:6, 12:19, 12:25, 14:20, 14:22, 17:11, 17:14, 17:15, 17:17, 21:24, 23:13, 33:23, 36:22
**businesses** [1] - 31:14
**buy** [1] - 17:16
**BY** [3] - 1:14, 1:15, 1:19

**C**

**C.V** [1] - 21:17
**California** [2] - 5:10, 25:6
**car** [1] - 17:17
**careers** [1] - 35:6
**carefully** [1] - 14:16
**carve** [1] - 36:18
**case** [37] - 5:1, 5:8, 7:23, 10:2, 10:13, 10:23, 11:8, 12:11, 16:17, 17:5, 17:24,

18:14, 18:18, 19:10, 24:2, 24:8, 24:14, 26:19, 26:20, 26:25, 27:2, 27:8, 28:7, 28:19, 28:21, 29:8, 29:15, 30:25, 34:23, 36:11, 41:16, 41:24, 42:22, 42:23, 43:4, 43:18, 43:19
**cases** [17] - 4:20, 4:23, 6:3, 7:14, 11:24, 12:2, 17:7, 18:2, 24:8, 24:12, 24:15, 27:11, 29:14, 32:8, 36:25, 44:6
**categories** [1] - 36:5
**category** [1] - 32:10
**causing** [1] - 21:23
**center** [1] - 5:21
**CEO** [1] - 45:24
**certain** [3] - 3:10, 26:22, 43:8
**certainly** [7] - 3:4, 3:9, 4:22, 14:21, 21:17, 28:14, 41:12
**certainty** [2] - 6:20, 44:19
**certify** [1] - 47:5
**chairman** [1] - 15:8
**change** [2] - 30:22
**characterize** [1] - 43:11
**Cherrywood** [1] - 1:24
**Chick** [1] - 36:11
**Chouinard** [1] - 5:2
**cite** [3] - 7:14, 23:23, 24:12
**cited** [8] - 5:1, 5:4, 6:3, 11:24, 16:17, 17:7, 19:10, 44:6
**civil** [1] - 24:1
**CIVIL** [1] - 1:4
**claim** [31] - 10:9, 11:14, 12:4, 12:5, 12:9, 13:4, 13:23, 13:25, 15:15, 15:21, 19:3, 20:1, 20:15, 25:23, 27:17, 27:19, 27:25, 28:1, 28:12, 28:13, 30:19, 30:20, 30:24, 33:15, 33:24, 34:22, 35:13, 40:20, 40:23, 42:20
**claimed** [1] - 26:10
**claiming** [1] - 15:19
**claims** [4] - 11:1, 13:4, 13:17, 13:24
**class** [1] - 10:18
**clause** [6] - 6:4, 7:10, 8:20, 8:22, 37:3,

39:20
**clauses** [2] - 8:16, 24:19
**clear** [4] - 26:1, 28:1, 31:22, 43:9
**clearly** [1] - 34:10
**clerk** [4] - 2:3, 40:15
**client** [4] - 31:16, 38:17, 39:7
**clients** [10] - 16:22, 19:4, 21:7, 23:12, 29:14, 30:23, 31:11, 31:12, 32:12, 33:20
**clock** [1] - 43:19
**close** [1] - 27:16
**closer** [1] - 7:4
**colorable** [1] - 30:24
**coming** [1] - 26:13
**comment** [1] - 15:14
**common** [4] - 8:20, 13:25, 16:22, 26:16
**communicated** [1] - 15:6
**communications** [1] - 23:11
**comp** [1] - 37:20
**company** [15] - 3:8, 3:23, 4:1, 4:25, 5:7, 22:2, 22:5, 22:22, 23:18, 29:18, 32:3, 36:20, 37:6, 38:7
**comparative** [1] - 26:17
**compass** [1] - 33:5
**Compass** [33] - 3:5, 3:25, 4:2, 4:17, 4:21, 12:22, 13:21, 14:5, 14:12, 15:8, 19:7, 20:21, 21:1, 21:2, 21:3, 21:6, 21:13, 21:23, 22:3, 22:6, 22:23, 28:11, 29:6, 30:5, 30:16, 31:8, 31:24, 32:15, 33:13, 34:4, 34:16, 35:2, 42:24
**compete** [7] - 11:16, 11:20, 11:22, 13:5, 17:9, 25:1, 25:10
**competed** [1] - 16:10
**competes** [1] - 37:7
**competing** [4] - 17:11, 17:17, 20:22, 37:4
**competition** [10] - 4:24, 12:14, 22:21, 23:14, 24:19, 30:15, 36:19, 36:23, 37:3, 40:21
**competitive** [3] - 14:20, 14:22, 19:7

**competitor** [3] - 12:16, 12:19, 15:18
**complaint** [36] - 3:21, 5:17, 8:13, 8:25, 10:14, 10:15, 11:18, 12:23, 13:16, 14:15, 14:16, 15:10, 17:3, 17:4, 18:24, 20:6, 20:15, 24:18, 25:14, 25:25, 26:1, 26:4, 28:25, 30:7, 30:13, 33:11, 33:24, 34:4, 34:5, 35:10, 35:17, 38:20, 43:24, 45:5, 45:8, 45:18
**complaints** [1] - 30:13
**complexities** [1] - 7:8
**computer** [3] - 23:8, 28:10, 47:10
**COMPUTER** [1] - 1:25
**computer-aided** [1] - 47:10
**COMPUTER-AIDED** [1] - 1:25
**concept** [7] - 9:9, 16:15, 16:19, 24:10, 24:11, 26:17, 44:17
**concern** [1] - 21:18
**concluded** [1] - 46:7
**conclusion** [1] - 34:2
**conclusions** [1] - 12:3
**conclusory** [1] - 35:10
**conduct** [10] - 25:17, 29:9, 34:13, 40:22, 40:24, 43:11, 43:22, 45:13, 45:22
**confidential** [2] - 12:16, 12:18
**confines** [2] - 11:21, 19:7
**confirm** [1] - 2:17
**conflict** [1] - 21:6
**conflicts** [1] - 21:7
**consider** [1] - 34:20
**consistent** [1] - 5:16
**constituted** [1] - 13:20
**consultant** [5] - 3:17, 29:3, 30:16, 31:13, 37:1
**consultants** [1] - 37:25
**consulting** [3] - 3:18, 31:5, 37:5
**CONSULTING** [1] - 1:4
**contacting** [1] - 26:11
**contacts** [1] - 3:7
**context** [1] - 16:18
**continue** [2] - 28:1, 31:20

**continued** [2] - 20:19, 20:20
**CONTINUED** [1] - 1:9
**continuing** [2] - 30:16, 31:23
**contract** [9] - 2:4, 8:20, 8:21, 20:17, 23:21, 24:11, 27:5, 33:14, 34:14
**contractor** [5] - 29:4, 31:22, 32:7, 37:6, 38:2
**contractors** [2] - 36:8, 37:25
**contrast** [1] - 17:12
**control** [1] - 42:24
**convincing** [1] - 5:21
**correct** [4] - 14:21, 21:12, 38:12, 47:6
**correctly** [2] - 5:3, 47:9
**Counsel** [1] - 2:3
**counsel** [2] - 20:6, 23:20, 47:12
**count** [1] - 13:16
**country** [1] - 31:15
**counts** [3] - 13:15, 13:17, 24:17
**course** [2] - 8:8, 20:20
**COURT** [100] - 1:1, 2:2, 2:8, 2:10, 2:13, 2:14, 3:12, 4:5, 4:7, 4:10, 5:13, 5:18, 6:13, 7:14, 7:17, 7:21, 7:25, 8:14, 10:3, 10:21, 11:3, 13:1, 13:6, 13:10, 14:7, 14:13, 15:23, 16:1, 16:4, 16:12, 17:23, 18:1, 18:4, 18:7, 18:10, 18:11, 18:14, 18:21, 19:10, 19:14, 19:20, 20:2, 20:8, 20:12, 22:12, 22:15, 22:19, 22:25, 23:24, 24:23, 25:2, 25:19, 26:12, 26:15, 27:16, 27:21, 28:14, 28:22, 29:17, 29:22, 30:2, 30:8, 30:11, 31:2, 32:8, 32:20, 33:17, 36:2, 36:9, 36:16, 37:10, 37:15, 37:19, 38:2, 38:9, 38:13, 38:18, 39:10, 39:23, 40:1, 40:8, 40:12, 40:14, 40:24, 41:18, 41:23, 42:2, 42:8, 42:13, 42:18, 43:7, 44:3, 44:7,

44:10, 44:15, 44:23, 45:1, 45:23, 46:1, 46:5
**court** [2] - 11:9, 19:17
**Court** [27] - 1:23, 2:1, 2:7, 5:13, 6:5, 6:8, 6:10, 6:18, 6:22, 7:8, 8:7, 12:3, 13:8, 13:11, 15:16, 17:2, 17:19, 26:10, 34:22, 35:22, 42:20, 43:3, 47:3, 47:4, 47:17
**Courts** [2] - 7:9, 17:20
**courts** [1] - 4:21
**covenant** [2] - 37:12, 37:24
**covenants** [3] - 29:24, 32:24, 33:2
**create** [2] - 22:5, 32:13
**created** [3] - 6:9, 23:7, 23:9
**credit** [1] - 8:5
**CRR** [2] - 1:23, 47:16
**cure** [1] - 34:19
**cutting** [1] - 6:21

## D

**damage** [4] - 22:16, 23:17, 24:3, 27:9
**damages** [42] - 10:10, 10:15, 10:16, 10:19, 11:7, 13:2, 13:17, 13:25, 16:12, 16:15, 16:16, 16:18, 16:19, 16:20, 16:24, 22:18, 23:18, 23:21, 23:22, 24:4, 24:6, 24:7, 24:9, 24:10, 24:14, 25:12, 25:13, 25:21, 25:23, 27:5, 27:7, 27:12, 27:15, 27:25, 29:12, 33:15
**DANIEL** [1] - 1:15
**date** [2] - 40:21, 47:7
**David** [1] - 1:21
**day-to-day** [1] - 3:6
**days** [8] - 34:13, 34:18, 40:5, 40:8, 41:3, 42:21, 45:8, 45:10
**DC** [1] - 1:20
**deal** [4] - 21:10, 24:18, 28:11
**dealing** [4] - 11:11, 24:7, 30:6, 39:4
**dealings** [1] - 39:24
**decide** [5] - 5:13, 6:19, 6:22, 40:17, 43:3
**decided** [1] - 18:3

**deciding** [1] - 9:14
**decision** [6] - 5:4, 7:4, 27:4, 35:15, 38:24, 40:4
**decisions** [1] - 35:5
**declaration** [3] - 10:2, 10:3, 25:5
**declaratory** [5] - 13:1, 13:3, 13:4, 13:18, 45:2
**declare** [2] - 10:4, 10:5
**deemed** [1] - 2:5
**Defendant** [1] - 1:8
**defendant** [1] - 41:4
**DEFENDANT** [1] - 1:17
**defendants** [1] - 11:23
**demands** [2] - 14:2, 26:6
**depart** [2] - 21:14, 22:23
**deposition** [2] - 42:14, 45:14
**describe** [1] - 21:1
**described** [2] - 21:2, 33:11
**details** [1] - 3:14
**determined** [1] - 31:6
**develop** [1] - 26:12
**developed** [3] - 3:21, 5:25, 14:10
**dial** [1] - 40:2
**difference** [3] - 18:22, 19:14, 31:24
**different** [3] - 16:6, 18:4, 28:11
**direct** [1] - 3:7
**directors** [1] - 21:20
**disagree** [1] - 27:4
**discounting** [1] - 20:6
**discover** [1] - 23:6
**discovery** [27] - 10:21, 10:24, 11:1, 12:1, 22:9, 23:6, 25:17, 26:12, 30:21, 30:22, 30:25, 40:23, 40:25, 41:10, 41:11, 41:14, 41:23, 42:1, 42:3, 42:11, 43:8, 43:14, 43:16, 43:21, 45:11, 45:22
**discuss** [1] - 39:6
**discussing** [1] - 38:17
**disloyal** [1] - 29:10
**dismiss** [7] - 11:11, 12:12, 17:23, 18:16, 18:21, 19:15, 45:17
**dismissal** [3] - 8:13, 18:19, 18:24

**dismissed** [1] - 34:22
**dismissing** [1] - 18:23
**dispose** [1] - 41:23
**dispositive** [2] - 12:11, 17:6
**dissension** [4] - 22:13, 23:19, 26:8, 42:10
**DISTRICT** [3] - 1:1, 1:2, 1:10
**district** [1] - 7:9
**District** [3] - 5:3, 47:4
**DIVISION** [1] - 1:3
**division** [1] - 3:11
**document** [1] - 42:13
**documents** [3] - 12:17, 42:24, 45:14
**dollar** [1] - 25:23
**done** [11] - 17:12, 19:8, 19:9, 21:10, 23:19, 26:23, 30:14, 41:8, 41:14, 43:2
**door** [3] - 15:18, 27:16, 34:24
**doubt** [1] - 37:8
**down** [3] - 6:2, 9:4, 15:21
**draft** [1] - 26:1
**dramatically** [1] - 17:18
**due** [1] - 39:12
**during** [3] - 24:25, 25:9, 33:8
**duty** [17] - 12:4, 12:20, 13:20, 16:5, 16:6, 20:9, 20:12, 20:15, 20:18, 22:16, 26:7, 27:24, 33:8, 35:13, 40:20

## E

**earliest** [1] - 41:6
**earning** [2] - 32:2, 32:3
**East** [1] - 1:15
**easy** [1] - 42:18
**echoing** [1] - 2:11
**economic** [3] - 3:17, 37:1, 37:4
**edit** [1] - 26:3
**effect** [3] - 9:21, 9:24, 28:18
**effective** [2] - 29:1, 32:24
**effort** [2] - 8:15, 9:7
**eight** [1] - 25:4
**either** [3] - 33:9, 35:13, 41:19
**element** [2] - 25:22,

27:12
**elements** [2] - 12:6, 16:9
**email** [2] - 2:21, 23:11
**emails** [3] - 22:11, 44:8, 45:13
**embark** [1] - 42:11
**employed** [7] - 12:14, 12:15, 17:14, 30:4, 33:4, 33:9
**employee** [9] - 5:9, 16:10, 17:10, 23:18, 29:10, 30:17, 33:12, 34:13, 37:5
**Employees** [1] - 17:20
**employees** [26] - 3:8, 3:19, 4:17, 5:10, 10:18, 12:15, 13:21, 14:6, 14:12, 15:17, 17:13, 19:5, 20:22, 21:22, 22:23, 23:12, 25:25, 26:2, 31:10, 32:15, 32:17, 33:10, 33:12, 33:15, 43:1
**employer** [7] - 6:1, 12:19, 16:9, 17:21, 17:22, 20:19, 25:16
**end** [10] - 11:10, 19:20, 26:21, 27:1, 31:8, 40:21, 44:20, 45:1, 45:17
**enforce** [2] - 6:4, 10:5
**enforced** [1] - 13:8
**engaged** [4] - 4:25, 5:7, 20:17, 36:21
**enjoin** [1] - 10:7
**ensure** [1] - 21:11
**enter** [1] - 45:2
**entered** [1] - 31:19
**entice** [1] - 21:13
**entire** [1] - 37:3
**entities** [4] - 4:10, 4:20, 7:17, 36:6
**entitle** [1] - 43:13
**entitled** [14] - 9:16, 12:25, 22:24, 23:6, 23:15, 23:17, 24:4, 24:6, 25:13, 25:16, 27:1, 27:14, 29:5, 34:2
**entity** [1] - 32:10
**Esquire** [1] - 1:21
**ESQUIRE** [3] - 1:14, 1:15, 1:19
**essentially** [2] - 16:8, 16:24
**establish** [2] - 19:25, 44:19
**established** [2] - 19:18, 30:21

**establishing** [2] - 12:8, 19:6
**Europe** [3] - 3:10, 5:12, 5:21
**European** [3] - 3:11, 3:13, 4:21
**event** [3] - 2:4, 33:9, 37:17
**evidence** [2] - 14:23, 19:12
**Ewing** [4] - 1:23, 47:3, 47:15, 47:16
**exact** [1] - 12:10
**exactly** [4] - 11:13, 19:22, 27:10
**example** [2] - 3:20, 4:20
**exceed** [1] - 2:6
**except** [1] - 26:10
**executive** [1] - 36:20
**executives** [3] - 3:5, 3:11, 31:8
**existence** [1] - 24:25
**expansive** [1] - 7:18
**expedition** [1] - 11:4
**expert** [1] - 31:13
**expire** [1] - 27:25
**explodes** [1] - 6:15
**expressly** [1] - 11:16
**extend** [1] - 40:20
**extent** [4] - 2:19, 7:21, 7:22, 40:2
**externally** [1] - 32:1

## F

**face** [1] - 38:14
**faced** [2] - 31:5, 41:19
**fact** [14] - 5:19, 12:21, 12:22, 14:24, 22:3, 23:22, 28:18, 28:24, 30:12, 33:15, 34:24, 35:25, 36:1, 36:24
**facts** [26] - 10:25, 12:3, 12:8, 12:14, 15:22, 17:2, 19:1, 19:2, 19:6, 19:19, 19:20, 19:23, 19:24, 19:25, 20:3, 20:5, 24:21, 25:14, 25:15, 28:7, 28:10, 34:1, 35:12, 35:25, 42:10, 44:19
**fair** [2] - 30:11, 46:1
**faithful** [1] - 25:16
**fallback** [2] - 7:3, 9:2
**familiar** [1] - 2:22
**far** [1] - 40:17
**fast** [2] - 39:2, 40:17
**federal** [2] - 19:16

**Federal** [1] - 1:23
**fees** [1] - 24:2
**fiduciary** [6] - 16:5, 20:9, 20:12, 20:15, 22:15, 40:20
**field** [1] - 37:5
**FIGEL** [1] - 1:18
**file** [4] - 8:24, 9:1, 38:22, 38:24
**filed** [4] - 25:3, 25:4, 38:21, 45:6
**Filet** [1] - 36:11
**filings** [1] - 10:18
**final** [4] - 9:22, 27:4, 28:17, 36:2
**financial** [1] - 19:4
**fine** [2] - 11:22, 17:9
**finger** [1] - 11:14
**finishes** [1] - 18:12
**Fire** [1] - 7:11
**fired** [1] - 9:18
**firing** [1] - 29:10
**firm** [3] - 18:24, 20:22, 32:12
**firms** [1] - 31:14
**first** [6] - 4:12, 8:9, 8:24, 10:14, 12:7, 17:3
**Fischel** [3] - 15:8, 15:9, 15:11
**fishing** [1] - 11:4
**fix** [1] - 8:10
**focus** [1] - 21:15
**focusing** [1] - 35:11
**folks** [2] - 2:2, 28:19
**follow** [2] - 14:22, 26:7
**following** [1] - 15:1
**FOR** [3] - 1:2, 1:13, 1:17
**foregoing** [1] - 47:5
**foreign** [1] - 4:19
**form** [1] - 19:4
**forth** [1] - 43:23
**forward** [3] - 30:25, 43:10, 43:21
**four** [3] - 3:5, 3:11, 31:8
**frankly** [3] - 6:3, 10:7, 36:10
**FREDERICK** [1] - 1:18
**free** [2] - 11:20, 22:20
**freed** [1] - 23:13
**FTI** [31] - 1:4, 4:3, 6:9, 13:20, 15:11, 16:20, 16:23, 19:4, 20:25, 21:2, 21:4, 21:6, 21:16, 26:2, 28:11, 29:7, 30:15, 31:5, 31:11, 33:5, 33:12, 34:17, 36:21, 37:7,

37:10, 38:1, 38:3, 38:5, 38:11, 39:21, 44:2
**FTI's** [2] - 21:20, 22:7
**full** [2] - 27:1, 35:20
**fully** [3] - 11:20, 27:21, 30:4
**fundamentally** [1] - 20:18
**future** [5] - 10:16, 12:11, 17:5, 21:18, 30:19

## G

**game** [1] - 44:20
**gate** [3] - 19:21, 19:24, 28:7
**generating** [1] - 29:6
**gentlemen** [1] - 46:5
**geographic** [20] - 2:6, 2:15, 2:19, 2:22, 4:8, 4:11, 4:12, 5:7, 5:25, 6:23, 7:18, 7:19, 8:21, 9:3, 9:12, 36:3, 39:3, 39:17, 41:2, 42:4
**geographically** [2] - 5:15, 8:3
**geography** [1] - 8:12
**Germany** [1] - 17:16
**given** [4] - 3:4, 26:2, 26:5, 32:9
**glimmer** [1] - 32:20
**global** [2] - 5:6, 6:6
**goodwill** [2] - 6:1, 6:9
**granted** [1] - 18:22
**GREENBELT** [1] - 1:11
**Greenbelt** [1] - 1:24
**group** [3] - 3:19, 4:21, 4:22
**guess** [4] - 2:16, 6:15, 10:3, 10:4
**guessing** [1] - 17:1
**Gunby** [1] - 45:24
**guy** [2] - 31:16, 37:1

## H

**handled** [2] - 31:25, 32:1
**handsomely** [1] - 32:6
**Hansen** [10] - 5:22, 7:6, 25:19, 32:2, 33:17, 39:8, 39:15, 40:10, 40:19, 42:15
**HANSEN** [59] - 1:18, 1:19, 5:24, 7:7, 7:16, 7:19, 7:23, 8:1, 9:25,

10:12, 10:22, 11:13, 13:3, 13:7, 13:14, 14:9, 14:15, 15:24, 16:3, 16:8, 16:13, 17:25, 18:2, 18:6, 18:9, 18:13, 18:18, 18:23, 19:13, 19:16, 19:22, 25:20, 26:13, 27:10, 27:18, 27:24, 28:21, 28:23, 29:21, 29:25, 30:4, 30:9, 30:12, 33:18, 36:8, 36:14, 40:11, 40:13, 42:17, 42:19, 43:25, 44:5, 44:9, 44:12, 44:22, 44:25, 45:22, 45:24, 46:4
**hard** [1] - 42:15
**hard** [1] - 41:8
**harm** [15] - 10:20, 12:7, 12:9, 16:10, 16:21, 16:25, 17:4, 17:21, 21:23, 25:21, 25:22, 27:12, 29:13
**harmed** [7] - 12:9, 12:10, 16:21, 17:5, 19:3, 25:22, 31:12
**harmless** [1] - 15:14
**harms** [1] - 17:21
**harness** [1] - 33:22
**head** [1] - 31:23
**headquartered** [1] - 3:16
**heads** [1] - 31:24
**hear** [8] - 2:9, 2:13, 5:22, 20:2, 28:22, 30:2, 40:5, 40:6
**heard** [1] - 33:18
**hearing** [3] - 19:11, 45:20
**help** [1] - 24:23
**helpful** [2] - 2:23, 40:25
**hereby** [1] - 47:5
**highly** [1] - 35:2
**himself** [6] - 4:12, 14:11, 14:19, 21:10, 22:2, 32:4
**hold** [2] - 37:20, 41:18
**holding** [1] - 29:2
**Honor** [69] - 2:13, 3:4, 5:23, 5:24, 7:7, 7:13, 7:23, 8:3, 8:4, 9:25, 10:12, 10:22, 11:13, 11:19, 12:1, 12:5, 13:3, 15:21, 16:9, 16:14, 16:21, 17:7, 18:19, 18:25, 19:13, 19:16, 19:22, 20:4, 23:16, 23:23, 24:13,

25:7, 25:18, 25:24, 26:13, 27:10, 27:13, 27:18, 27:24, 28:5, 28:6, 29:25, 30:6, 31:1, 33:3, 33:18, 35:1, 35:7, 35:15, 35:19, 35:23, 36:14, 36:18, 37:22, 38:15, 40:7, 40:11, 40:13, 40:19, 41:22, 42:17, 42:19, 43:25, 44:5, 44:9, 44:13, 44:22, 44:25, 46:4
**HONORABLE** [1] - 1:10
**hope** [1] - 4:3
**hoped** [2] - 14:21, 15:2
**Horn** [1] - 24:13
**hundreds** [1] - 31:9
**hung** [1] - 43:14

## I

**idea** [2] - 9:8, 39:8
**ideas** [1] - 17:10
**identify** [1] - 15:7
**II** [2] - 1:9
**imminent** [1] - 13:2
**implications** [2] - 2:25, 3:2
**implies** [2] - 3:23, 22:3
**important** [3] - 27:19, 28:24, 35:1
**improper** [1] - 14:23, 34:9
**IN** [1] - 1:1
**inappropriate** [4] - 43:6, 43:11, 43:22, 45:12
**INC** [1] - 1:4
**incited** [1] - 35:11
**inciting** [4] - 26:9, 26:11, 33:23, 34:1
**inclined** [1] - 43:15
**including** [1] - 6:4
**inconsistent** [1] - 29:23
**incurable** [1] - 29:9
**indeed** [2] - 10:10, 22:22
**Indeed** [1] - 21:17
**independent** [7] - 29:4, 31:4, 31:5, 31:22, 32:6, 36:8, 37:6
**independently** [2] - 7:24, 30:15
**indicated** [1] - 21:3
**indicating** [2] - 9:2,

29:16
**indication** [1] - 32:11
**indications** [1] - 32:14
**indirect** [1] - 3:7
**individuals** [2] - 4:10, 36:5
**information** [6] - 4:15, 6:12, 12:16, 12:18, 44:1, 44:2
**initial** [1] - 35:17
**injecting** [1] - 28:24
**injunction** [8] - 9:21, 9:23, 10:1, 10:4, 23:1, 24:20, 33:1
**injunctions** [1] - 2:22
**injunctive** [4] - 9:16, 24:19, 24:24, 25:8
**inquiry** [1] - 44:18
**insight** [3] - 20:21, 32:16, 33:11
**instead** [1] - 43:14
**intended** [1] - 4:19
**intends** [1] - 3:24
**interested** [1] - 47:12
**interesting** [2] - 2:16, 38:16
**interests** [1] - 19:4
**internal** [1] - 42:10
**internally** [1] - 31:25
**interrelated** [1] - 4:7
**investor** [5] - 14:25, 15:3, 17:13, 22:1, 23:7
**investors** [3] - 3:22, 14:8, 23:12
**involve** [2] - 36:25, 42:13
**involved** [3] - 4:12, 4:16, 6:7
**involving** [1] - 4:20
**issue** [12] - 2:18, 2:20, 6:19, 14:7, 28:20, 36:2, 36:16, 42:4, 42:5, 42:9, 43:22, 45:12, 46:2
**issues** [7] - 21:7, 38:23, 39:14, 40:3, 43:4, 43:8, 43:12
**itself** [1] - 2:4

## J

**January** [1] - 20:17
**job** [3] - 8:6, 40:15
**join** [4] - 3:25, 15:2, 22:23, 32:12
**joined** [1] - 23:4
**jointly** [1] - 12:17
**Jonathan** [1] - 1:22
**JONATHAN** [1] - 1:7

**Judge** [1] - 2:8
**JUDGE** [1] - 1:10
**judge** [3] - 15:16, 18:12, 19:12
**judgment** [8] - 13:1, 13:4, 18:1, 18:17, 27:22, 41:20, 45:3
**July** [2] - 34:6, 34:15
**June** [4] - 15:5, 15:6, 38:19, 47:17
**JUNE** [1] - 1:11
**jurisdiction** [1] - 4:24
**justified** [1] - 29:9

## K

**keep** [4] - 8:25, 9:4, 26:13, 29:5
**KELLOGG** [1] - 1:18
**key** [3] - 31:8, 37:2
**kin** [1] - 47:12
**kind** [2] - 10:6, 42:9
**kinds** [1] - 11:6
**known** [3] - 30:21, 44:2, 44:14
**knows** [1] - 44:11

## L

**ladies** [1] - 46:5
**Lane** [1] - 1:24
**language** [2] - 35:22, 37:15
**large** [1] - 39:18
**larger** [1] - 21:10
**last** [2] - 10:12, 15:6
**law** [14] - 2:3, 8:17, 8:20, 12:5, 13:25, 19:19, 25:7, 26:17, 26:18, 30:24, 31:14, 40:15, 44:17, 45:3
**lawyers** [1] - 35:9
**leader** [1] - 3:18
**leadership** [2] - 20:25, 21:20
**leading** [1] - 31:13
**least** [6] - 7:9, 8:21, 24:6, 35:21, 43:9, 43:13
**leave** [16] - 14:2, 16:22, 21:19, 21:23, 29:14, 32:17, 32:18, 32:24, 33:10, 33:16, 34:8, 38:3, 38:11, 39:21
**leaving** [1] - 30:22, 30:23, 40:16
**led** [1] - 35:4
**left** [2] - 27:22, 30:17
**legal** [4] - 5:24, 18:25,

19:18
**legions** [1] - 24:15
**legitimately** [1] - 11:7
**letters** [1] - 45:14
**levels** [1] - 6:2
**Lexecon** [30] - 3:5, 3:25, 4:3, 4:18, 4:21, 12:22, 13:21, 14:5, 14:12, 15:8, 19:7, 20:21, 21:1, 21:2, 21:3, 21:6, 21:13, 22:3, 22:6, 22:23, 28:11, 29:7, 30:5, 30:17, 31:8, 31:24, 32:15, 34:17, 35:2, 42:25
**Lexecon's** [1] - 21:24
**liability** [2] - 27:8, 27:14
**likely** [1] - 13:12
**limitation** [7] - 5:7, 5:15, 5:25, 6:23, 9:3, 39:3, 39:4
**limitations** [6] - 2:6, 2:16, 2:19, 8:21, 8:22, 9:12
**limited** [10] - 2:25, 10:9, 11:7, 41:25, 43:8, 43:21, 45:11, 45:22, 46:2
**litigation** [1] - 31:14
**live** [1] - 6:24
**LLP** [1] - 1:14
**loan** [1] - 17:14
**located** [1] - 3:12
**locations** [1] - 4:13
**locus** [1] - 5:19
**look** [10] - 12:14, 18:18, 29:4, 36:13, 36:23, 37:16, 39:6, 39:11, 40:25, 44:21
**looked** [1] - 34:11
**looking** [5] - 6:15, 18:20, 37:23, 38:19, 40:14
**looks** [3] - 9:23, 18:24, 19:10
**lost** [4] - 10:18, 10:19, 19:4
**loyal** [1] - 25:16
**loyalty** [11] - 12:4, 12:20, 13:19, 13:23, 15:25, 20:9, 20:18, 22:16, 27:24, 33:8, 35:14
**loyalty/fiduciary** [1] - 16:6
**Ltd** [1] - 5:2
**lured** [1] - 29:15

## M

**machine** [2] - 17:16, 47:9
**main** [1] - 17:8
**management** [1] - 5:9
**manager** [1] - 37:2
**managerial** [1] - 23:18
**managers** [1] - 37:2
**MARK** [1] - 1:19
**MARYLAND** [2] - 1:2, 1:11
**Maryland** [20] - 1:16, 1:24, 4:23, 5:3, 8:20, 12:5, 12:6, 17:8, 17:12, 17:15, 17:20, 18:3, 19:11, 19:19, 23:21, 24:5, 24:7, 24:13, 45:4, 47:5
**mass** [1] - 20:21, 26:9, 32:16, 33:11, 33:23, 35:11
**matter** [10] - 5:19, 8:16, 9:19, 11:25, 14:24, 16:21, 30:24, 31:25, 32:1, 47:8
**matters** [6] - 4:20, 29:6, 31:20, 31:21, 33:19, 33:22
**maximally** [1] - 7:18
**maximum** [1] - 2:7
**mean** [26] - 5:14, 6:22, 6:25, 7:7, 7:17, 8:15, 9:21, 11:10, 16:4, 18:7, 25:2, 26:24, 27:3, 27:7, 32:6, 35:16, 36:7, 38:19, 40:18, 41:11, 41:13, 41:20, 42:3, 42:15, 44:21, 45:13
**meaning** [1] - 17:5
**meantime** [1] - 45:11
**Medispec** [3] - 5:2, 6:4, 6:5
**meet** [1] - 27:21
**meeting** [1] - 20:25
**members** [1] - 9:4
**MESSITTE** [1] - 1:10
**met** [2] - 14:2, 26:6
**Metals** [6] - 12:6, 17:8, 17:12, 17:15, 18:3, 19:11
**mid** [1] - 38:19, 41:6
**might** [11] - 2:23, 5:20, 5:21, 6:17, 7:3, 9:2, 12:11, 17:10, 29:19, 40:25, 41:19
**mind** [1] - 7:1
**mine** [1] - 26:18
**misread** [1] - 40:1

**missing** [1] - 43:2
**money** [3] - 29:6, 32:3
**months** [2] - 9:24, 25:4
**mootness** [1] - 41:20
**Moreover** [1] - 34:9
**morning** [1] - 34:11
**most** [1] - 21:16
**motion** [9] - 11:11, 12:12, 17:23, 18:1, 18:16, 18:21, 19:15, 38:20, 45:17
**MOTIONS** [1] - 1:9
**move** [3] - 13:15, 28:17, 40:16
**MOYLAN** [1] - 1:15
**MR** [94] - 3:4, 3:14, 4:6, 4:9, 4:14, 5:16, 5:23, 5:24, 7:7, 7:16, 7:19, 7:23, 8:1, 9:25, 10:12, 10:22, 11:13, 13:3, 13:7, 13:14, 14:9, 14:15, 15:24, 16:3, 16:8, 16:13, 17:25, 18:2, 18:6, 18:9, 18:13, 18:18, 18:23, 19:13, 19:16, 19:22, 20:4, 20:11, 20:14, 22:14, 22:18, 22:20, 23:3, 24:1, 24:25, 25:3, 25:20, 26:13, 27:10, 27:18, 27:24, 28:21, 28:23, 29:21, 29:25, 30:4, 30:9, 30:12, 31:4, 32:11, 33:3, 33:18, 36:8, 36:14, 36:18, 37:13, 37:18, 37:22, 38:6, 38:12, 38:15, 39:6, 39:22, 39:25, 40:7, 40:11, 40:13, 40:19, 41:17, 41:22, 41:25, 42:7, 42:12, 42:17, 42:19, 43:25, 44:5, 44:9, 44:12, 44:22, 44:25, 45:22, 45:24, 46:4
**multiple** [1] - 6:3
**MURPHY** [38] - 1:14, 3:4, 3:14, 4:6, 4:9, 4:14, 5:16, 5:23, 20:4, 20:11, 20:14, 22:14, 22:18, 22:20, 23:3, 24:1, 24:25, 25:3, 31:4, 32:11, 33:3, 36:18, 37:13, 37:18, 37:22, 38:6, 38:12, 38:15, 39:6, 39:22, 39:25, 40:7, 40:19, 41:17, 41:22,

41:25, 42:7, 42:12
**Murphy** [14] - 3:1, 6:17, 14:21, 20:3, 25:20, 28:1, 29:20, 30:3, 30:18, 31:2, 33:18, 36:5, 36:10, 36:17

## N

**narrow** [2] - 6:7, 8:9
**narrowing** [1] - 39:9
**nature** [1] - 34:20
**near** [1] - 42:1
**necessarily** [3] - 27:14, 29:22, 38:18
**necessary** [2] - 12:6, 24:22
**need** [16] - 6:11, 6:25, 9:8, 12:2, 12:3, 12:13, 19:19, 19:20, 19:23, 19:24, 21:17, 28:2, 28:7, 42:5, 43:5, 45:19
**needed** [1] - 31:6
**needs** [1] - 5:25
**negative** [1] - 21:2
**negotiations** [1] - 21:16
**never** [1] - 26:2
**new** [12] - 3:23, 4:1, 17:13, 22:2, 22:22, 23:13, 29:5, 31:21, 32:12, 33:19, 33:22, 39:12
**next** [3] - 21:23, 38:21, 40:4
**Nicholas** [1] - 41:7
**NO** [1] - 1:4
**nobody** [1] - 9:25
**noise** [1] - 12:24
**nominal** [21] - 16:12, 16:15, 16:16, 16:18, 16:19, 16:20, 16:24, 23:17, 23:20, 23:22, 24:4, 24:6, 24:7, 24:10, 24:14, 25:21, 27:5, 27:7, 27:12, 27:15
**non** [19] - 4:24, 11:9, 13:5, 22:21, 23:14, 24:19, 25:1, 25:10, 25:11, 33:4, 33:6, 33:13, 36:19, 36:23, 37:3, 37:20, 37:24, 40:21
**non-comp** [1] - 37:20
**non-compete** [3] - 13:5, 25:1, 25:10
**non-competition** [8] -

4:24, 22:21, 23:14, 24:19, 36:19, 36:23, 37:3, 40:21
**non-solicit** [1] - 13:5
**non-solicitation** [5] - 25:11, 33:4, 33:6, 33:13, 37:24
**non-suit** [1] - 11:9
**none** [2] - 19:5, 29:16
**nose** [1] - 35:4
**NOTES** [1] - 1:25
**nothing** [6] - 6:8, 13:18, 17:9, 17:12, 28:10, 46:4
**notice** [1] - 34:18
**notion** [2] - 26:9, 35:3
**November** [16] - 6:15, 22:20, 23:2, 23:3, 23:4, 23:5, 25:2, 25:5, 27:25, 28:13, 32:18, 32:19, 32:25, 33:6, 40:14, 41:13
**nudge** [1] - 35:21, 35:22, 35:24
**number** [2] - 17:24, 45:2
**numbers** [1] - 22:22
**NW** [1] - 1:19

## O

**object** [3] - 42:17, 42:18, 43:17
**objectionable** [1] - 42:14
**obligation** [1] - 31:12
**obligations** [1] - 34:16
**observed** [1] - 8:3
**obtain** [1] - 25:8
**obviously** [2] - 8:5, 39:7
**October** [1] - 41:12
**odds** [1] - 20:18
**OF** [3] - 1:2, 1:9, 1:25
**office** [1] - 17:18
**officers** [1] - 3:15
**offices** [1] - 3:15
**official** [1] - 47:17
**Official** [2] - 1:23, 47:3
**old** [1] - 44:10
**once** [1] - 23:13
**One** [1] - 7:13
**one** [30] - 3:3, 3:5, 3:11, 3:15, 4:7, 10:7, 10:24, 12:7, 12:22, 13:4, 13:18, 16:7, 16:14, 17:8, 23:7, 24:12, 26:16, 28:17, 31:7, 31:9, 31:24, 33:3, 34:20, 36:2,

36:12, 37:2, 37:21, 42:5, 43:19, 45:2
ones [1] - 17:8
ongoing [2] - 31:14, 31:20
open [1] - 43:13
operation [1] - 37:3
opinion [4] - 23:23, 24:1, 32:21, 41:5
opportunity [3] - 22:4, 34:18, 40:22
oppose [2] - 42:21, 43:3
opposite [1] - 12:10
opposition [8] - 5:5, 7:2, 8:24, 28:15, 38:24, 39:11, 40:6, 42:21
option [1] - 33:21
order [7] - 2:1, 9:2, 13:22, 18:23, 21:10, 43:13, 44:14
orderly [2] - 28:3, 43:3
ordinarily [2] - 41:11, 45:9
organization [1] - 35:2
original [2] - 10:14, 17:3
ORSZAG [1] - 1:7
Orszag [33] - 1:22, 2:24, 3:17, 5:25, 6:1, 6:9, 10:11, 10:17, 11:5, 11:15, 11:19, 12:4, 12:13, 12:21, 14:5, 19:3, 20:17, 25:9, 26:2, 26:8, 26:22, 28:18, 30:14, 31:6, 31:13, 31:19, 33:19, 35:4, 39:8, 43:12, 43:23, 45:13, 44:14
otherwise [1] - 40:4
outcome [1] - 47:13
outset [1] - 27:20
outside [3] - 11:23, 12:22, 19:7
overbroad [5] - 7:16, 7:20, 8:1, 8:3, 13:8
overseeing [1] - 36:11
own [5] - 14:19, 28:9, 35:5
owned [2] - 21:4, 22:7
owner [1] - 37:5
ownership [1] - 22:7

**P**

p.m [1] - 46:7
P.M [1] - 1:11
package [1] - 45:8

packaging [1] - 39:13
pages [1] - 5:4
paid [1] - 32:6
papers [1] - 45:20
paragraph [10] - 2:5, 2:14, 5:16, 14:1, 17:2, 20:20, 20:24, 21:8, 26:4, 37:22
paragraphs [1] - 11:18
part [3] - 36:22, 37:23, 43:20
partial [1] - 45:2
particular [3] - 26:18, 32:9
particularly [2] - 5:8, 12:5
parties [2] - 2:17, 47:9
parties' [1] - 8:7
parts [1] - 3:10
party [3] - 6:23, 24:5, 47:12
past [1] - 12:12
paycheck [1] - 32:5
pencil [5] - 5:15, 6:11, 6:17, 8:15, 38:23
penciled [1] - 8:5
penciling [4] - 2:4, 2:15, 38:16, 38:25
pencilled [1] - 13:11
pencilling [4] - 2:11, 6:11, 9:9, 9:13
People [1] - 15:11
people [14] - 14:2, 14:22, 14:25, 15:1, 15:3, 15:13, 16:22, 29:14, 30:22, 32:23, 34:7, 34:8, 34:23, 39:21
per [1] - 6:5
perfectly [3] - 11:22, 15:13, 17:8
perhaps [1] - 3:1
period [6] - 15:6, 20:16, 24:25, 33:8, 40:5, 41:11
permanent [2] - 24:19, 24:23
permissible [1] - 2:7
permitted [1] - 44:18
person [2] - 32:10, 34:4
personal [2] - 23:8, 23:11
personally [1] - 21:9
PETER [1] - 1:10
phase [1] - 11:12
PJM-23-3200 [1] - 1:4
place [5] - 8:9, 23:1, 33:1, 33:2, 42:1
places [1] - 3:3

plaintiff [5] - 10:23, 24:3, 24:9, 40:8, 43:13
Plaintiff [1] - 1:5
PLAINTIFF [1] - 1:13
plan [3] - 11:5, 14:7, 14:9
Plank [1] - 12:6
planned [1] - 21:5
planning [2] - 3:23, 14:19
plans [2] - 3:24, 11:22
plausibility [1] - 35:23
plausible [5] - 12:4, 12:9, 19:3, 19:25, 35:5
plausibly [4] - 14:4, 19:6, 27:2, 28:8
play [1] - 21:16
plead [2] - 12:7, 12:8
pleaded [7] - 10:13, 10:25, 12:21, 15:22, 19:5, 35:1, 35:16
pleading [1] - 9:22
pleadings [3] - 7:12, 9:13, 10:14
plenty [1] - 32:14
PLLC [1] - 1:18
plus [1] - 17:3
point [18] - 2:18, 3:16, 4:15, 8:17, 10:12, 13:11, 22:9, 22:17, 24:21, 27:10, 27:11, 36:15, 39:2, 41:9, 41:21, 42:22, 43:16, 45:15
pointed [2] - 2:3, 40:19
polish [1] - 21:17
portion [1] - 40:1
Portugal [1] - 3:16
pose [1] - 7:4
position [7] - 7:3, 8:18, 8:19, 9:2, 36:19, 36:20, 41:2
possibility [4] - 6:20, 6:21, 9:11, 9:23
possible [1] - 14:20
possibly [3] - 15:4, 15:14, 28:17
PowerPoint [8] - 3:21, 3:23, 14:17, 17:19, 22:1, 22:2, 23:7
practically [1] - 41:1
Pratt [1] - 1:15
precisely [1] - 40:10
preclude [1] - 39:23
precluded [1] - 38:11
predicted [1] - 34:7
prefer [1] - 43:18

preliminaries [1] - 9:17
preliminary [2] - 24:20, 43:8
prepare [1] - 17:9
prepared [4] - 5:14, 14:17, 22:1, 39:18
Present [1] - 1:21
presentation [3] - 15:1, 15:3, 17:19
preserve [1] - 33:20
presumably [1] - 2:15
pretty [4] - 26:23, 37:16, 39:1, 40:17
prevail [1] - 19:15
prevailing [1] - 24:2
prevent [2] - 25:9, 37:4
prevents [1] - 8:2
previously [1] - 47:7
primarily [1] - 41:2
principal [1] - 3:15
principle [6] - 5:19, 5:24, 7:15, 18:25, 19:18
privileged [1] - 17:20
problem [1] - 42:16
proceedings [2] - 46:7, 47:6
PROCEEDINGS [1] - 1:9
process [3] - 7:11, 28:3, 43:15
production [1] - 42:13
professional [2] - 3:7, 3:8
professionals [1] - 35:3
prohibited [1] - 37:11
promoting [1] - 11:5
pronouncing [1] - 5:3
proof [3] - 9:19, 14:14, 27:2
proposal [1] - 7:3
propose [2] - 5:14, 41:25
proposed [3] - 12:23, 17:3, 28:25
proposing [1] - 6:23
proposition [3] - 2:16, 5:2, 24:12
prospect [1] - 11:8
prove [7] - 11:10, 12:8, 22:12, 24:3, 25:12, 25:13, 26:20, 27:8, 27:13
proves [1] - 28:4
provide [2] - 2:4, 2:14
provided [1] - 3:9
provision [7] - 9:18,

33:4, 33:6, 34:11, 38:17, 40:21, 43:7
provisions [3] - 2:5, 25:6, 29:23
public [1] - 29:2
punitive [1] - 24:9
put [4] - 11:13, 11:17, 36:4, 39:1
Put [1] - 41:7
putting [5] - 16:4, 17:10, 17:19, 33:21, 35:10

**Q**

questions [2] - 15:13, 38:16
quite [2] - 11:3, 32:6

**R**

Rachel [1] - 1:21
raise [1] - 38:18
raised [1] - 38:16
ran [1] - 3:6
ranks [2] - 22:13, 23:20
rather [1] - 43:19
re [2] - 39:13, 45:8
re-package [1] - 45:8
re-packaging [1] - 39:13
reaction [1] - 28:15
read [3] - 2:20, 5:17, 37:20
reading [2] - 25:24, 39:20
ready [1] - 40:17
real [2] - 16:16, 41:8
really [13] - 3:6, 4:2, 4:11, 8:7, 20:6, 26:15, 26:25, 28:24, 36:9, 36:10, 39:14, 42:5, 44:17
reason [2] - 7:9, 16:14
reasonable [2] - 41:1, 44:18
reasons [2] - 16:14, 45:4
received [1] - 24:10
recognize [1] - 35:1
recognized [1] - 13:8
record [4] - 6:8, 19:25, 35:21, 45:4
recorded [1] - 47:9
redo [1] - 8:7
redoing [1] - 7:11
reduced [1] - 2:6
reference [1] - 3:20
refused [1] - 6:4

**regard** [1] - 39:19
**related** [1] - 7:21
**relationship** [2] - 31:7, 31:19
**relationships** [2] - 4:19, 5:10
**relevant** [1] - 44:1
**relief** [6] - 9:16, 10:6, 13:18, 24:20, 24:24, 25:8
**rely** [1] - 45:16
**relying** [1] - 31:17
**remain** [1] - 32:24
**remaining** [1] - 43:12
**remedies** [1] - 24:17
**remedy** [1] - 23:21
**remember** [2] - 17:25, 34:14
**removed** [1] - 22:7
**Renee** [5] - 1:23, 2:11, 47:3, 47:15, 47:16
**reordering** [1] - 8:11
**repeating** [1] - 19:17
**reply** [2] - 45:9, 45:18
**reported** [1] - 47:6
**Reporter** [3] - 1:23, 47:3, 47:17
**REPORTER** [3] - 2:8, 2:13, 18:11
**request** [3] - 10:2, 41:19, 45:13
**resign** [1] - 4:3
**resignation** [4] - 20:21, 32:16, 33:12, 33:24
**resignations** [1] - 26:6
**resolution** [1] - 15:22
**respect** [9] - 9:11, 9:25, 28:6, 30:25, 31:4, 31:11, 35:23, 43:25, 45:3
**respectfully** [2] - 8:12, 35:13
**respond** [2] - 40:10, 45:7
**response** [4] - 25:19, 32:7, 38:20, 41:4
**restraint** [1] - 22:21
**restraints** [1] - 23:14
**restriction** [1] - 10:9
**restrictions** [2] - 7:18, 7:20
**restrictive** [1] - 29:23
**result** [1] - 8:13
**resulted** [1] - 23:17
**revolt** [2] - 26:9, 35:11
**rid** [1] - 28:13
**rift** [1] - 21:6
**rights** [1] - 24:1

**rigorously** [1] - 35:9
**risk** [1] - 43:20
**RMR** [2] - 1:23, 47:16
**road** [2] - 9:4, 15:22
**role** [3] - 3:5, 5:9, 31:23
**roles** [1] - 37:9
**room** [1] - 36:13
**RPR** [1] - 47:16
**rule** [2] - 24:5, 43:4
**ruled** [1] - 25:7
**rules** [1] - 43:7
**run** [2] - 3:11, 43:19
**running** [1] - 29:3
**rushed** [1] - 43:5

## S

**salesman** [1] - 36:25
**scale** [1] - 39:15
**schedule** [1] - 41:25
**Schwartz** [1] - 1:21
**scope** [8] - 20:13, 36:3, 36:4, 39:9, 41:2, 41:9, 42:4
**se** [1] - 6:5
**seated** [1] - 2:2
**second** [19] - 8:25, 10:15, 12:13, 12:23, 13:20, 17:4, 17:7, 19:5, 25:24, 28:25, 33:23, 37:21, 38:20, 41:18, 43:23, 45:5, 45:7, 45:17
**securities** [1] - 10:18
**see** [17] - 8:20, 9:22, 11:9, 14:13, 20:2, 25:17, 29:14, 38:24, 39:8, 41:14, 41:15, 43:4, 43:15, 43:24, 44:16, 45:21
**seek** [2] - 7:18, 25:8
**seeking** [2] - 24:17, 25:1
**Seneca** [1] - 7:13
**senior** [7] - 3:5, 5:9, 20:24, 21:1, 21:22, 23:18, 36:20
**sense** [5] - 6:16, 7:1, 11:4, 16:22, 29:10
**sent** [5] - 12:16, 14:10, 14:11, 22:11, 23:9
**separable** [1] - 7:22
**separate** [5] - 12:24, 14:9, 27:12, 45:2, 45:19
**services** [2] - 3:9, 36:21
**set** [2] - 11:5, 43:23
**Seth** [1] - 24:13

**seven** [3] - 7:9, 25:4, 45:10
**several** [1] - 21:25
**shall** [2] - 43:11, 43:22
**sheep** [1] - 35:3
**shoehorned** [1] - 15:14
**short** [1] - 9:2
**shorthand** [1] - 47:9
**show** [5] - 9:17, 11:18, 13:24, 25:15, 28:8
**shown** [2] - 10:8, 34:21
**shows** [2] - 29:8, 29:12
**Shrang** [1] - 19:8
**shredding** [1] - 17:17
**side** [1] - 29:18
**sideline** [1] - 26:17
**signed** [2] - 20:16, 33:25
**significant** [3] - 21:6, 21:23, 30:5
**simply** [4] - 15:2, 28:6, 28:9, 35:7
**Singapore** [1] - 3:3
**single** [5] - 12:21, 30:14, 30:17, 34:3
**sit** [1] - 32:5
**sitting** [1] - 17:18
**situation** [4] - 31:6, 31:15, 32:4, 43:1
**skid** [2] - 13:12, 13:14
**skilled** [1] - 35:3
**slide** [1] - 13:23
**Smith** [4] - 15:16, 18:2, 26:10, 34:22
**smoke** [9] - 26:19, 26:21, 28:5, 31:1, 35:24, 44:11, 44:17
**so-called** [1] - 45:12
**solicit** [4] - 13:5, 36:6, 38:3, 39:20
**solicitation** [23] - 14:3, 14:4, 15:5, 15:15, 15:19, 15:20, 24:18, 25:11, 32:9, 32:14, 33:4, 33:6, 33:13, 34:8, 34:10, 34:21, 34:23, 35:14, 37:16, 37:19, 37:24
**solicitations** [1] - 23:5
**solicited** [8] - 13:21, 14:25, 15:19, 15:20, 17:13, 34:16, 35:11, 38:10
**soliciting** [6] - 15:9, 15:12, 32:12, 33:9, 37:24, 38:11
**solution** [1] - 7:10

**someone** [4] - 5:9, 15:7, 44:12
**somewhere** [2] - 9:19, 11:6
**sooner** [2] - 7:2, 40:9
**sorry** [3] - 2:8, 18:11, 18:13
**sort** [6] - 8:14, 38:13, 39:18, 41:8, 42:22, 43:8
**sorts** [1] - 36:21
**sought** [3] - 10:1, 24:20
**SOUTHERN** [1] - 1:3
**sow** [1] - 23:19
**SPAEDER** [1] - 1:14
**speaking** [3] - 18:12, 41:1
**speech** [12] - 14:1, 21:22, 26:1, 26:3, 26:5, 26:6, 34:5, 34:6, 34:14, 34:15, 34:20, 36:1
**spending** [1] - 9:6
**spent** [1] - 25:24
**spring** [1] - 3:24
**staff** [6] - 21:1, 21:5, 21:9, 21:13, 21:14, 21:22
**stage** [2] - 9:14, 27:2
**staring** [1] - 9:4
**start** [6] - 2:10, 2:20, 3:1, 3:23, 3:24, 20:22
**started** [1] - 14:22
**starting** [3] - 22:2, 23:13, 28:7
**starts** [1] - 22:22
**State** [1] - 45:3
**state** [1] - 27:19
**statement** [1] - 21:14
**statements** [3] - 22:10, 35:10, 47:8
**States** [5] - 3:9, 4:22, 5:11, 5:20, 47:4
**STATES** [2] - 1:1, 1:10
**stay** [2] - 15:12, 21:11
**stayed** [1] - 38:5
**stenographically** [1] - 47:6
**STENOTYPE** [1] - 1:25
**step** [2] - 38:21, 40:4
**still** [5] - 10:17, 11:11, 11:21, 23:17, 28:19
**stir** [1] - 22:13
**stirring** [1] - 26:8
**stop** [1] - 16:22
**story** [1] - 18:5
**Strang** [2] - 11:24,

29:14
**strategy** [1] - 21:15
**Street** [2] - 1:15, 1:19
**strongly** [1] - 39:10
**subcontractor** [1] - 38:2
**subcontractors** [1] - 37:25
**subject** [2] - 25:6, 33:13
**submit** [1] - 35:13
**subsequent** [1] - 13:16
**subsequently** [1] - 33:15
**substance** [1] - 43:10
**substantial** [2] - 20:16, 22:22
**successful** [1] - 14:25
**suffered** [3] - 16:10, 24:6, 25:21
**suffering** [1] - 32:4
**sufficient** [1] - 25:15
**suggest** [5] - 6:9, 6:17, 8:12, 28:8, 39:10
**suggesting** [1] - 34:1
**suggests** [2] - 23:16, 23:20
**suit** [1] - 11:9
**Suite** [3] - 1:15, 1:19, 1:24
**summary** [4] - 18:1, 18:16, 27:21, 41:20
**summer** [2] - 3:22, 21:21
**sunset** [1] - 28:2
**supervision** [1] - 47:10
**supplement** [1] - 38:22
**supplier** [3] - 37:10, 37:14, 38:2
**suppliers** [3] - 36:6, 37:25, 38:4
**supplies** [1] - 38:7
**suppose** [3] - 10:5, 10:8, 10:9
**supposed** [5] - 3:3, 13:17, 28:20, 29:1, 36:6
**supposedly** [1] - 14:5
**Supreme** [1] - 35:22
**sustained** [1] - 9:15
**synergies** [1] - 21:2

## T

**table** [2] - 8:18, 10:10
**talks** [1] - 37:24

**term** [2] - 25:10, 42:1
**terminate** [3] - 21:21, 44:12, 44:14
**terminated** [3] - 3:22, 31:7, 34:17
**termination** [3] - 29:1, 34:12, 44:1
**terms** [4] - 21:7, 38:14, 41:10, 41:15
**terrible** [1] - 29:9
**testified** [1] - 37:1
**testify** [1] - 31:17
**testimony** [1] - 47:8
**THE** [104] - 1:1, 1:2, 1:10, 1:13, 1:17, 2:2, 2:8, 2:10, 2:13, 2:14, 3:12, 4:5, 4:7, 4:10, 5:13, 5:18, 6:13, 7:14, 7:17, 7:21, 7:25, 8:14, 10:3, 10:21, 11:3, 13:1, 13:6, 13:10, 14:7, 14:13, 15:23, 16:1, 16:4, 16:12, 17:23, 18:1, 18:4, 18:7, 18:10, 18:11, 18:14, 18:21, 19:10, 19:14, 19:20, 20:2, 20:8, 20:12, 22:12, 22:15, 22:19, 22:25, 23:24, 24:23, 25:2, 25:19, 26:12, 26:15, 27:16, 27:21, 28:14, 28:22, 29:17, 29:22, 30:2, 30:8, 30:11, 31:2, 32:8, 32:20, 33:17, 36:2, 36:9, 36:16, 37:10, 37:15, 37:19, 38:2, 38:9, 38:13, 38:18, 39:10, 39:23, 40:1, 40:8, 40:12, 40:14, 40:24, 41:18, 41:23, 42:2, 42:8, 42:13, 42:18, 43:7, 44:3, 44:7, 44:10, 44:15, 44:23, 45:1, 45:23, 46:1, 46:5
**themselves** [1] - 21:16
**thereafter** [3] - 33:5, 45:10, 47:10
**thereof** [1] - 47:13
**thinking** [2] - 6:14, 8:14
**thinks** [2] - 20:3, 39:7
**third** [2] - 35:18, 45:7
**threaten** [1] - 20:21
**threats** [1] - 11:19
**three** [4] - 6:2, 9:24, 30:13, 35:16
**throughout** [3] - 3:9, 5:11

**throw** [3] - 7:10, 7:15, 8:15
**throwing** [1] - 9:8
**THURSDAY** [1] - 1:11
**tighten** [1] - 39:14
**tighter** [1] - 40:3
**timeline** [3] - 6:14, 7:1, 41:1
**today** [2] - 9:5, 45:8
**TODD** [1] - 1:18
**together** [5] - 15:18, 16:5, 17:10, 17:19, 21:11
**tomorrow** [1] - 9:5
**took** [3] - 12:15, 17:14, 21:9
**tort** [6] - 16:18, 23:22, 24:10, 24:14, 27:6, 27:11
**torts** [1] - 23:24
**track** [2] - 39:2, 40:17
**traditional** [1] - 24:4
**train** [1] - 29:4
**trained** [1] - 35:3
**transcribed** [1] - 47:10
**TRANSCRIPT** [1] - 1:9
**transcript** [1] - 47:6
**TRANSCRIPTION** [1] - 1:25
**transcription** [1] - 47:11
**translates** [1] - 26:18
**transmitted** [2] - 14:17, 14:18
**trial** [12] - 12:8, 15:21, 18:3, 18:4, 18:10, 18:17, 19:11, 19:17, 19:18, 19:25, 31:17, 35:20
**tried** [1] - 21:13
**tries** [1] - 35:16
**true** [6] - 23:24, 39:19, 39:25, 40:20, 44:15, 47:5
**try** [1] - 7:10
**trying** [7] - 8:25, 9:15, 13:11, 30:9, 33:10, 38:8, 40:15
**two** [9] - 8:10, 9:24, 12:6, 13:4, 13:5, 13:16, 16:9, 16:14, 33:3
**Twombly** [4] - 12:2, 19:1, 19:23, 34:2

## U

**under** [7] - 12:5, 17:7, 19:18, 32:6, 37:11,
43:7, 47:10
**understood** [1] - 44:25
**undertaken** [1] - 35:8
**unheard** [1] - 5:6
**unison** [1] - 34:24
**UNITED** [2] - 1:1, 1:10
**United** [5] - 3:9, 4:22, 5:11, 5:20, 47:4
**unless** [1] - 17:21
**unusual** [1] - 43:18
**up** [7] - 7:2, 11:5, 11:17, 13:24, 33:25, 40:18, 43:14
**upcoming** [1] - 31:17
**upheld** [2] - 4:24, 5:7
**urge** [1] - 7:8

## V

**valid** [3] - 10:9, 25:6, 25:7
**valued** [1] - 22:5
**vendor** [1] - 38:3
**vendors** [2] - 36:7, 37:25
**view** [2] - 37:11, 39:17
**violating** [1] - 25:9
**violation** [2] - 26:7, 34:16
**VOLUME** [1] - 1:9
**vs** [2] - 5:2, 24:13

## W

**wait** [6] - 6:18, 7:2, 8:24, 18:11, 38:23, 43:15
**wait-and-see** [1] - 43:15
**walked** [2] - 15:17, 34:23
**wall** [1] - 40:18
**wants** [1] - 32:12
**Washington** [1] - 1:20
**week** [1] - 21:24
**weeks** [1] - 21:25
**weight** [1] - 34:2
**wheels** [1] - 13:12
**whereby** [1] - 32:4
**whole** [2] - 3:10, 3:18
**wholesale** [1] - 8:11
**wiggle** [1] - 36:13
**WILLIAM** [1] - 1:14
**willing** [1] - 39:6
**window** [1] - 41:15
**wishes** [2] - 40:11, 40:13
**witnesses** [1] - 47:8
**word** [1] - 8:10

**words** [3] - 8:1, 8:23, 13:19
**works** [1] - 27:6
**world** [3] - 6:15, 8:4, 11:15
**worldwide** [6] - 2:22, 4:6, 4:24, 5:1, 5:8, 7:17
**worse** [1] - 21:10
**written** [3] - 13:9, 36:12, 37:4
**wrote** [2] - 23:23, 24:1

## Y

**year** [6] - 15:6, 20:20, 25:3, 25:4, 32:5, 33:5
**years** [2] - 24:8
**yourself** [2] - 6:16, 35:19

## Z

**zone** [2] - 35:22, 35:24
**ZUCKERMAN** [1] - 1:14

# Exhibit 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Southern Division)

| | |
|---|---|
| FTI CONSULTING, INC., | |
| Plaintiff, | |
| v. | Case No. 8:23-cv-03200-PJM |
| JONATHAN ORSZAG, | |
| Defendant. | |

## DEFENDANT JONATHAN ORSZAG'S OBJECTIONS AND RESPONSES TO FTI CONSULTING, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION

Under Federal Rules of Civil Procedure 26 and 34, Defendant Jonathan Orszag objects and responds to Plaintiff FTI Consulting, Inc.'s ("FTI") First Set of Requests for Production, dated June 21, 2024, as follows:

### PRELIMINARY STATEMENT

1.    The following Objections and Responses are made without waiving but, instead, preserving:  (a) the right to raise in any subsequent proceeding or in the trial of this or any other action all questions of authenticity, foundation, relevance, materiality, privilege, and evidentiary admissibility of any Documents or information provided or identified in these Responses; (b) the right to object on any ground to the use or introduction into evidence of any Documents or information in any subsequent proceeding or in the trial of this or any other action on any ground; and (c) the right to object on any ground at any time to additional discovery.

2.    An Objection or Response by Mr. Orszag to a Request for Production is not an admission that Mr. Orszag accepts or admits the existence of any facts assumed by such Request,

nor should an Objection or Response be taken to constitute admissible evidence as to any such assumed facts.

## GENERAL OBJECTIONS

The following General Objections apply to each and every one of the Requests for Production, and should be considered part of the Response to each and every one of the Requests. Any Specific Objections provided below are made in addition to these General Objections, and failure to reiterate a General Objection below does not constitute a waiver or limitation of that or any other Objection.

1.      Mr. Orszag objects to each and every Definition, Instruction, and Request to the extent it attempts to alter the scope of discovery or impose obligations that exceed those required by the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the District of Maryland, or any other applicable order.

2.      Mr. Orszag objects to each Request to the extent that it calls for the disclosure of Documents and Communications that is already in the possession, custody, or control of FTI or is otherwise available in the public domain. Mr. Orszag will not re-produce Documents and Communications that FTI already possesses, including Documents stored on Compass Lexecon LLC ("Compass Lexecon") systems and Communications with Compass Lexecon personnel using Compass Lexecon systems or accounts, and including Documents and Communications in the possession of FTI's Board of Directors or any individual member of the Board of Directors. Because Mr. Orszag has texted with Compass Lexecon personnel about expert work that is subject to confidentiality agreements between Compass Lexecon and its clients and/or Protective Orders entered by state and federal courts, and those Compass Lexecon personnel have copies of

2

their Communications via text, such Communications are in FTI's possession, custody, and control and FTI should access those texts directly.

3.      Mr. Orszag objects to the Requests to the extent they seek information not in his possession, custody, or control.

4.      Mr. Orszag objects to each Request to the extent that it seeks Documents or Communications that contain information that is subject to confidentiality agreements between Compass Lexecon and its clients and/or Protective Orders entered by state or federal courts around the country.  Mr. Orszag further objects to each Request to the extent that it would require counsel to review Documents or Communications that are covered by such confidentiality agreements or Protective Orders.  Mr. Orszag will not violate any confidentiality agreement or Protective Order to which he is bound by making materials available for review by counsel to the extent that doing so would violate any such agreement or Court order.  Documents stored on Compass Lexecon systems and Communications with Compass Lexecon personnel using Compass Lexecon systems or accounts are all subject to and encompassed by this Objection, as are text messages with Compass Lexecon personnel.

5.      Mr. Orszag objects to each Request to the extent that it seeks Documents or Communications protected by applicable privileges (including, but not limited to, the attorney-client privilege, the attorney work-product doctrine, or the common interest privilege) or otherwise protected under applicable law.  In the event such privileged information is disclosed in response to these Requests, such disclosure is inadvertent and shall not constitute a waiver of any privilege, doctrine, or other applicable ground for protecting such information from disclosure.

3

6.      Mr. Orszag objects to the Requests to the extent they seek non-public, competitively sensitive, and confidential commercial, financial, and strategic information in the absence of an adequate and unambiguous protective order pursuant to Federal Rule of Civil Procedure 26(c)(1)(G).

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

The following Objections to Definitions and Instructions apply to each and every one of the Requests, and should be considered part of Mr. Orszag's Responses to each and every one of the Requests.

1.      Mr. Orszag objects to the time period covered by the Requests as beyond the scope of the limited discovery authorized by the Court at the June 13, 2024 hearing and in its June 18, 2024 Order (ECF No. 47).  During that hearing, the Court indicated that it would allow limited discovery into whether there was "Cause" for Mr. Orszag's termination; in the Order, the Court limited discovery to the "alleged inappropriate conduct."  *See* Hr'g Tr. Vol. II, at 42:8-11 (June 13, 2024) ("but if there is something that you say goes to the issue of for cause, is there cause, the kind of internal dissension, if you will, facts, it seems to me that you could embark on discovery on that, I would say, right away.").  Insofar as the Requests seek Documents and Communications that post-date Mr. Orszag's termination by FTI, they are outside the scope of the limited discovery permitted by the Court.  Those materials cannot go to the issue of whether there was Cause for Mr. Orszag's termination, and they are not alleged or identified in the Second Amended Complaint.  In responding to these Requests, and subject to the General and Specific Objections, Mr. Orszag will produce non-privileged Documents and Communications in his possession, custody, or control for the period from January 1, 2023 up to and including November 20, 2023.

4

2.      Mr. Orszag objects to producing a privilege log covering privileged or protected information following the initiation of this litigation on the ground that it would be unduly burdensome.  Mr. Orszag will not log privileged or protected communications that post-date the filing of the lawsuit.

3.      Mr. Orszag objects to Instruction No. 6 as beyond the scope of Rule 34 of the Federal Rules of Civil Procedure and the Local Civil Rules of the United States District Court for the District of Maryland.

4.      Mr. Orszag objects to the Definition of "OtherCo" on the grounds that it is vague and ambiguous, and susceptible to multiple meanings.  The phrase "not including Plaintiff FTI Consulting, Inc. or any of its corporate subsidiaries" is vague and ambiguous, particularly in light of Mr. Orszag's authorized discussions with FTI President and Chief Executive Officer Steve Gunby and General Counsel Curtis Lu concerning various contemplated spinoffs of Compass Lexecon through the creation of another company in which FTI would hold an ownership interest.  Mr. Orszag further objects to the term "consulting services" as vague and ambiguous.  Mr. Orszag will construe "OtherCo" to mean any existing or planned enterprise separate from the structure of Compass Lexecon as it existed between January 1, 2023, and November 20, 2023, through which Mr. Orszag provided or contemplated in the future providing expert economic consulting services.

**SPECIFIC OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**  All Communications relating to OtherCo between You, on the one hand, and any actual or potential client, investor, investment advisor or broker, employee, supplier, landlord, vendor, or other provider of any service to OtherCo, or any person providing any service to You relating to OtherCo, on the other hand.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 1:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag further objects to this Request as it inaccurately assumes facts.  Subject to and without waiving the foregoing Objections and Responses, Mr. Orszag will produce non-privileged Communications during the relevant time period in his possession, custody, or control that are responsive to this Request and not already in FTI's possession, to the extent they exist.

**REQUEST FOR PRODUCTION NO. 2:**  All Communications relating to soliciting potential investments in OtherCo, including but not limited to any such communications between You and any person affiliated with Goldman Sachs, Lazard, or any other financial institution.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 2:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag further objects to this Request as it inaccurately assumes facts.  Subject to and without waiving the foregoing Objections and Responses, Mr. Orszag will produce non-privileged Communications during the relevant time period in his possession, custody, or control that are responsive to this Request and not already in FTI's possession, to the extent they exist.

**REQUEST FOR PRODUCTION NO. 3:**  All Communications relating to the formation, tax structure, capitalization, financing, business plans, or ownership of OtherCo, including any such Communications that are not privileged between You and any attorney affiliated with Munger, Tolles & Olson LLP.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 3:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag further objects to this Request as it inaccurately assumes facts.  Subject to and without waiving the foregoing Objections and Responses, Mr. Orszag will produce non-privileged Communications during the relevant time period in his possession, custody, or control that are responsive to this Request and not already in FTI's possession, to the extent they exist.

**REQUEST FOR PRODUCTION NO. 4:** All Documents reflecting the projected or actual capitalization or financial condition of OtherCo, including but not limited to capitalization tables, financial statements, budgets, or projections.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 4:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag further objects to this Request as it inaccurately assumes facts.  Subject to and without waiving the foregoing Objections and Responses, Mr. Orszag will produce non-privileged Documents during the relevant time period in his possession, custody, or control that are responsive to this Request and not already in FTI's possession, to the extent they exist.

**REQUEST FOR PRODUCTION NO. 5:** All Communications between You and any employee or independent consultant of Compass Lexecon LLC relating to the possible termination of his or her employment or consultancy with Compass Lexecon LLC or his or her possible future employment or consultancy with OtherCo.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 5:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag further objects to this Request as it inaccurately assumes facts.  Subject to and without waiving the foregoing Objections and Responses, Mr. Orszag will produce non-privileged Communications during the relevant time period in his possession, custody, or control that are responsive to this Request and not already in FTI's possession, to the extent they exist.

**REQUEST FOR PRODUCTION NO. 6:** All draft or final versions of the NewCo Slide Deck or any portion thereof.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 6:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag further objects to this Request as it inaccurately assumes facts.  Subject to and without waiving the foregoing General Objections, Mr. Orszag will produce non-privileged Documents during the relevant time

7

period in his possession, custody, or control that are responsive to this Request and not already in FTI's possession, to the extent they exist.

**REQUEST FOR PRODUCTION NO. 7:**  All Communications transmitting any draft or final version of the NewCo Slide Deck or any portion thereof.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 7:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag further objects to this Request as it inaccurately assumes facts.  Subject to and without waiving the foregoing Objections and Responses, Mr. Orszag will produce non-privileged Communications during the relevant time period in his possession, custody, or control that are responsive to this Request and not already in FTI's possession, to the extent they exist.

**REQUEST FOR PRODUCTION NO. 8:**  All Documents containing confidential information of FTI Consulting, Inc., Compass Lexecon LLC, or any of their corporate affiliates that you have disseminated to or shared with any person not affiliated with FTI Consulting, Inc. or Compass Lexecon LLC.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 8:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag further objects to this Request as it inaccurately assumes facts.  Mr. Orszag further objects to this Request as the term "confidential information" is vague and ambiguous, and not susceptible to a fixed meaning. Without conceding that any such information is, or has ever been treated as, confidential, Mr. Orszag will construe that term to include the categories of information listed in Request for Production No. 9.  Subject to and without waiving the foregoing Objections and Responses, Mr. Orszag will produce non-privileged Documents during the relevant time period in his possession, custody, or control that are responsive to this Request and not already in FTI's possession, to the extent they exist.

**REQUEST FOR PRODUCTION NO. 9:**  All Documents containing any of the following information.

      a.       Compass Lexecon LLC's revenue;

      b.       Compass Lexecon LLC's overhead expenses;

      c.       Compass Lexecon LLC's overhead expenses as a share of its revenue;

      d.       The total revenue generated by any particular employee or group of employees of Compass Lexecon LLC;

      e.       The amount of bonus compensation paid to any particular employee or group of employees of Compass Lexecon LLC; or

      f.       The amount of outstanding unforgiven loans that FTI Consulting, Inc. or any of its corporate subsidiaries had made to any particular employee or group of employees of Compass Lexecon LLC.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 9:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag further objects to this Request as it inaccurately assumes facts.  Mr. Orszag further objects to this Request to the extent that it seeks information that is publicly disclosed or information that can be deduced from public information of FTI or Compass Lexecon.  Mr. Orszag further objects to this Request since "Compass Lexecon LLC" is not defined and Compass Lexecon LLC is just one, among many, Compass Lexecon entities.  Mr. Orszag further objects to this Request on the ground that, through its counsel, FTI specifically requested on November 24, 2023 that Mr. Orszag image and retain documents on his computer and electronic devices, as discussed in the correspondence from James Webster to William Murphy, dated November 27, 2023, which Mr. Orszag has done. Subject to and without waiving the foregoing Objections and Responses, Mr. Orszag will produce non-privileged Documents during the relevant time period in his possession, custody, or control, in light of his document retention obligations, that are responsive to this Request and not already in FTI's possession, to the extent they exist.

9

**REQUEST FOR PRODUCTION NO. 10:**  All Documents referencing the termination of your employment with Compass Lexecon LLC.

**OBJECTIONS AND RESPONSES TO REQUEST FOR PRODUCTION NO. 10:**

Mr. Orszag incorporates the Objections and Responses above.  Mr. Orszag objects to the phrase "referencing the termination of your employment" as vague and susceptible to multiple meanings.  Mr. Orszag further objects to this Request as beyond the scope of the limited discovery granted by the Court in this matter.  Subject to and without waiving the foregoing Objections and Responses, Mr. Orszag construes the Request as seeking Documents referencing the termination of Mr. Orszag by FTI on November 20, 2023, and Mr. Orszag will produce non-privileged Documents during the relevant time period in his possession, custody, or control that are responsive to this Request and not already in FTI's possession, to the extent they exist.

July 22, 2024                                    Respectfully submitted,

                                                 */s/ Mark C. Hansen*

                                                 Mark C. Hansen (State Bar No. 12266)
                                                 James M. Webster, III (State Bar No. 23376)
                                                 David L. Schwarz (admitted *pro hac vice*)
                                                 Kevin D. Horvitz (admitted *pro hac vice*)
                                                 Rachel T. Anderson (admitted *pro hac vice*)
                                                 KELLOGG, HANSEN, TODD,
                                                   FIGEL & FREDERICK, P.L.L.C.
                                                 1615 M Street, N.W., Suite 400
                                                 Washington, D.C. 20036
                                                 Tel:  (202) 326-7900
                                                 Fax:  (202) 326-7999
                                                 mhansen@kellogghansen.com
                                                 jwebster@kellogghansen.com
                                                 dschwarz@kellogghansen.com
                                                 khorvitz@kellogghansen.com
                                                 randerson@kellogghansen.com

                                                 *Counsel for Defendant Jonathan M. Orszag*

10

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2024, I caused the foregoing to be served on the following via electronic mail.

William J. Murphy
Daniel P. Moylan
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Tel:  (410) 949-1146
Fax:  (420) 659-0436
wmurphy@zuckerman.com
dmoylan@zuckerman.com

Caroline Judge Mehta
Ezra B. Marcus
ZUCKERMAN SPAEDER LLP
1800 M Street, N.W., Suite 1000
Washington, D.C. 20036
Tel:  (202) 778-1800
Fax:  (202) 822-8106
cmehta@zuckerman.com
emarcus@zuckerman.com

Brian L. Stekloff
WILKINSON STEKLOFF
2001 M Street, N.W., 10th Floor
Washington, D.C. 20036
Tel:  (202) 847-4000
Fax:  (202) 847-4005
bstekloff@wilkinsonstekloff.com

*Counsel for Plaintiff FTI Consulting, Inc.*

*/s/ Mark C. Hansen*
Mark C. Hansen

KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.

*Counsel for Defendant Jonathan M. Orszag*

# Exhibit 4

| | |
|---|---|
| **From:** | Schwarz, David L. |
| **To:** | Moylan, Daniel; Anderson, Rachel T. |
| **Cc:** | Murphy, Bill; Marcus, Ezra; Webster, James M. |
| **Subject:** | RE: M&C Follow-Up |
| **Date:** | Wednesday, September 4, 2024 9:10:00 AM |

Dan,

I wanted to get back to you in advance of this afternoon's call with our position on the two issues you raised below.

With respect to the second issue, yes we have collected, reviewed and (to the extent responsive documents exist) intend to produce communications from Mr. Orszag's personal e-mail accounts with Compass Lexecon senders/recipients. In other words, we have not excluded Compass Lexecon recipients from that document review.

With respect to the first issue, your proposal remains unacceptable because the process you have described would cause Mr. Orszag to violate the Protective Orders to which he is bound. As we have explained, Mr. Orszag and his colleagues, including Mr. Israel and Mr. Padilla, discuss confidential and highly confidential information related to the cases in which they serve as experts. As is typical, the Protective Orders in those cases preclude them from making protected information available to anyone other than staff, and even then only to the extent necessary for their work on the case. That means Mr. Orszag cannot turn his texts over to us to review, as we are neither Compass Lexecon staff nor necessary for work on the relevant litigation. The same is true of Mr. Sharp – as you describe it, he does not work for Compass Lexecon, is not staff working on a specific engagement, and disclosure to him would not be necessary for work on the specific litigation. That is, therefore, unworkable.

Your proposal likely would also cause Mr. Orszag to violate the terms of confidentiality agreements with Compass Lexecon clients. In addition to litigation, Mr. Orszag (along with Mr. Israel and Mr. Padilla) is frequently hired to give advice on mergers, and we understand that clients may limit the disclosure of confidential information to those at Compass Lexecon who are part of the project team. Communications between Mr. Orszag and Mr. Israel and Mr. Padilla concerning such matters include confidential information and privilege (such as legal strategy). Mr. Orszag could not turn over texts that contain discussions of such matters to his counsel, or to anyone at FTI – again, Mr. Sharp does not work for Compass Lexecon and is not on any of the relevant project teams. And that is separate and apart from our understanding that there are engagements which require ethical walls between Compass Lexecon and FTI, which would be breached should an FTI employee be given access to information on the Compass Lexecon side of the wall.

Because FTI has possession, custody, and control over the devices used by its employees when engaging in business communications and has access to all of the relevant confidentiality agreements and Protective Orders, we continue to believe that Compass Lexecon – and we understand that Compass Lexecon has at least two lawyers on staff, Robert Paul and Theresa O'Brien – can access the materials directly after taking appropriate steps to ensure compliance with its employees' confidentiality obligations and applicable Protective Orders, and by securing appropriate client waivers or consent where needed. We assume that such steps have already been taken, as it is clear that FTI has continued to access Mr. Orszag's Compass Lexecon e-mail communications, which likewise contain information covered by client confidentiality agreements, ethical walls, and court-ordered Protective Orders.

Regards,

David L. Schwarz
Kellogg, Hansen, Todd, Figel, & Frederick, P.L.L.C.
1615 M Street, N.W. | Suite 400 | Washington, DC 20036 | (202) 326-7984

NOTICE: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately via reply e-mail, and then destroy all instances of this

communication. Thank you.


-----Original Message-----
From: Moylan, Daniel <dmoylan@zuckerman.com>
Sent: Friday, August 30, 2024 3:53 PM
To: Schwarz, David L. <dschwarz@kellogghansen.com>; Anderson, Rachel T. <randerson@kellogghansen.com>
Cc: Murphy, Bill <wmurphy@zuckerman.com>; Marcus, Ezra <EMarcus@zuckerman.com>; Webster, James M. <jwebster@kellogghansen.com>
Subject: [EXTERNAL] Re: M&C Follow-Up

Hi David and Rachel,

In light of timing sensitivity, we are writing now regarding two of the issues we had planned to raise on our call yesterday rather than wait until our rescheduled call next week.

First, with respect to your proposal outlined below to have a Compass Lexecon (CL) attorney perform a filter review of at least a subset of Mr. Orszag's texts, our understanding is that CL does not employ any in-house lawyers. As previously related, Jason Sharp occupies a position within FTI's law department in which he reviews confidential client information across all business units of FTI, including CL as part of the conflicts review process. There does not appear to us to be a better solution. Please confirm if this is acceptable, so that we can ensure the filter review is completed in time for production of responsive texts before the date planned for Mr. Orszag's deposition.

Second, we would like to clarify your position that Mr. Orszag objects to producing material already within FTI's possession. We have been expecting that your review and production will include emails between a personal email account of Mr. Orszag's and a CL employee, including if the CL employee was using a work email address. If we are mistaken about that, please let us know. We are not willing to agree to such emails being excluded – it is not reasonable to expect FTI to search the email accounts of an unknown number of employees for documents that are readily available to Mr. Orszag.

Please clarify your positions on each of these issues as soon as feasible, given they will need to be resolved in time for production of Mr. Orszag's documents before his deposition; in the meantime, FTI reserves all rights.

Thanks,
Dan

From: Schwarz, David L. <dschwarz@kellogghansen.com<mailto:dschwarz@kellogghansen.com>>
Sent: Friday, August 16, 2024 6:16 PM
To: Moylan, Daniel <dmoylan@zuckerman.com<mailto:dmoylan@zuckerman.com>>; Anderson, Rachel T. <randerson@kellogghansen.com<mailto:randerson@kellogghansen.com>>
Cc: Murphy, Bill <wmurphy@zuckerman.com<mailto:wmurphy@zuckerman.com>>; Marcus, Ezra <EMarcus@zuckerman.com<mailto:EMarcus@zuckerman.com>>
Subject: RE: M&C Follow-Up

EXTERNAL
Hi Dan,

I wanted to follow up on a couple outstanding items.

First, I believe that we are still waiting for your markup of the latest draft of the Protective Order (or at least I can't find it in my e-mail).  If you haven't sent that along yet, could you please try to send us your proposed language (and if I somehow missed it, my apologies, but could you please resend)?  The scope of the protections applicable to the FTI attorney designee for viewing HC information is a gatekeeping issue from our side, and we would like to nail that down in the near term.

Second, please let us know if you have been able to confirm that Mr. Fischel will be in Chicago on September 16.

Third, as I indicated on our last call but wanted to confirm in writing, we are not withholding any documents responsive to your RFP No. 8 (seeking "confidential information" shared with persons not affiliated with FTI or CL) on the grounds that FTI already has possession of the underlying confidential information.

Finally, on the issue of Mr. Orszag's texts, we don't believe that your proposal is feasible or addresses the concerns we have raised for a number of reasons.  For example, while Mr. Orszag does not have access to the confidentiality agreements between Compass Lexecon and its clients, our understanding is that many cover only Compass Lexecon, and not FTI.  We also understand that the topics of Mr. Orszag's text messages go beyond the fact of a retention and to the substance of particular cases, including potentially privileged and confidential client information, which would require explicit client consent to be shared outside the project team.  In addition, even if FTI had client approval to review these text messages, that would not address the Protective Orders that Mr. Orszag is subject to and which govern what he can do with protected information provided to him in those cases.  FTI is not within the scope of the Protective Order, so Mr. Orszag could not share protected information with an FTI employee without violating the applicable court orders.

Fortunately, this issue is significantly narrower than we originally anticipated. For the vast majority of relevant Compass Lexecon individuals, the number of text messages and potentially responsive text messages are de minimis.  Mr. Orszag can separate those out manually, and we will determine a way to produce them (which may involve screenshots) consistent with applicable Protective Orders and confidentiality concerns.  There are two individuals – Mark Israel and Jorge Padilla – for which this is not a feasible work around.  The number of texts involved are far too great (in the thousands), and Mr. Orszag frequently corresponds about active matters governed by confidentiality agreements and/or Protective Orders.  As for those two individuals (and only those two individuals), we propose that Compass Lexecon can collect the business phones from their employees (they are within Compass Lexecon's possession, custody or control), and a Compass Lexecon attorney can address the confidentiality agreements with its own clients and could also execute the appropriate undertaking(s) consistent with the applicable Protective Orders governing the cases discussed.  The Compass Lexecon attorney can then redact out protected or confidential information and provide the cleansed materials back to us.  That should comply with any underlying confidentiality agreement and avoid violations of court-ordered Protective Orders.

Happy to discuss further next week.  Regards,

David

David L. Schwarz
Kellogg, Hansen, Todd, Figel, & Frederick, P.L.L.C.
1615 M Street, N.W. | Suite 400 | Washington, DC 20036 | (202) 326-7984

NOTICE: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately via reply e-mail, and then destroy all instances of this communication. Thank you.

From: Moylan, Daniel <dmoylan@zuckerman.com<mailto:dmoylan@zuckerman.com>>
Sent: Tuesday, August 6, 2024 12:05 PM
To: Schwarz, David L. <dschwarz@kellogghansen.com<mailto:dschwarz@kellogghansen.com>>; Anderson, Rachel T. <randerson@kellogghansen.com<mailto:randerson@kellogghansen.com>>
Cc: Murphy, Bill <wmurphy@zuckerman.com<mailto:wmurphy@zuckerman.com>>; Marcus, Ezra <EMarcus@zuckerman.com<mailto:EMarcus@zuckerman.com>>
Subject: [EXTERNAL] M&C Follow-Up

Hi David and Rachel,

For Mr. Orszag's deposition, September 19 would require some shuffling on our end, although September 20 would

be better for Bill. Please let us know if the 20th could work on your end as well. We should be back in touch today or tomorrow with Mr. Gunby's and Mr. Holthaus's availability for deposition.

Regarding the filter review of Mr. Orszag's texts with his Compass Lexecon colleagues, FTI proposes that Jason Sharp—an FTI in-house counsel who participates in administering conflict review processes across the entire organization, including ethical screens—perform an initial review to redact third-party client confidences, prior to elevating those materials for further review and production. Please let us know if you would like to discuss this plan further, including the logistics related to collection. We would just want to be certain that any messaging apps used by Mr. Orszag to chat with colleagues are included in the collection.

We will be back in touch separately regarding additional points from last week's discussion.

Thanks,
Dan


[cid:image001.png@01DAFAF1.1DF356C0]<http://www.zuckerman.com/>
Daniel Moylan
Zuckerman Spaeder LLP
dmoylan@zuckerman.com<mailto:dmoylan@zuckerman.com>
100 EAST PRATT STREET, SUITE 2440 • BALTIMORE, MD 21202-1031
410.949.1159 direct • 301.775.6101 mobile • 410.659.0436 fax ► Download
vCard<https://www.zuckerman.com/vcard/Daniel_Moylan/> | zuckerman.com<http://www.zuckerman.com>

This transmission (including any attachments) from the law firm of Zuckerman Spaeder LLP may contain information that is confidential and/or subject to the attorney-client privilege or the work product doctrine. Use or dissemination of this information by anyone other than the intended recipient is prohibited and may be unlawful. If you have received this transmission in error, please immediately notify the sender by return email or contact us by telephone at 202.778.1800 and permanently delete all copies.

# Exhibit 5

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND


------------------------------x

FTI CONSULTING, INC.,            :

                                 :

          Plaintiff,             :

                                 :    Case No.

     vs.                         :

                                 :  8:23-cv-03200-

JONATHAN M. ORSZAG,              :      PJM

                                 :

          Defendant.             :

------------------------------x



VIDEOTAPED DEPOSITION OF

STEVE GUNBY

Wednesday, October 2, 2024

9:03 a.m. Eastern Daylight Time




Reported by: Dawn A. Jaques, CSR, CLR



_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

1    VIDEOTAPED Deposition of:

2

3                    STEVE GUNBY,

4      the witness, was called for examination by

5      counsel for the Defendants, pursuant to

6      notice, taken on Wednesday, October 2, 2024,

7      commencing at 9:03 a.m., the law offices of

8      Zuckerman Spaeder LLP, 1800 M Street, NW,

9      Suite 1000, Washington, D.C., reported by

10     Dawn A. Jaques, CSR, CLR, Notary Public in and

11     for the District of Columbia.

12

13

14

15

16

17

18

19

20

21

22

Page 3

1    APPEARANCES:

2    On behalf of the Plaintiff:

3         ZUCKERMAN SPAEDER LLP

4         By:  William J. Murphy, Esq.

5              Daniel P. Moylan, Esq.

6         100 East Pratt Street

7         Suite 2440

8         Baltimore, Maryland  21202-1031

9         (410) 949-1146  (Mr. Murphy)

10        (410) 949-1159  (Mr. Moylan)

11        wmurphy@zuckerman.com

12        dmoylan@zuckerman.com

13

14              - and -

15

16        Leila Bijan, Esq.

17        485 Madison Avenue

18        10th Floor

19        New York, New York  10022-5871

20        (212) 897-3432

21        lbijan@zuckerman.com

22

Page 4

```
 1   APPEARANCES (Continued):

 2   On behalf of the Defendants:

 3           KELLOGG, HUBER, HANSEN, TODD,

 4               FIGEL & FREDERICK P.L.L.C.

 5           By:  Mark Charles Hansen, Esq.

 6                Rachel T. Anderson, Esq.

 7                David L. Schwarz, Esq.

 8           Sumner Square

 9           1615 M Street, Suite 400

10           Washington, D.C.  20036

11           (202) 326-7904  (Mr. Hansen)

12           (202) 326-7916  (Ms. Anderson)

13           (202) 326-7984  (Mr. Schwarz)

14           mhansen@kellogghansen.com

15           randerson@kellogghansen.com

16           dschwarz@kellogghansen.com

17

18

19

20

21

22
```

Page 5

1    APPEARANCES (Continued):

2    ALSO PRESENT:

3            Curtis Lu, General Counsel

4            FTI Consulting

5            curtis.lu@fticonsulting.com

6

7            Jon Orszag, Defendant

8

9

10   VIDEOGRAPHER:

11           David Campbell, Digital Evidence Group

12

13

14

15

16

17

18

19

20

21

22

Page 337

1      about that first.

2              Some persons, some limited number of

3      persons, received the draft speech, including

4      you.  Did anyone who received the draft

5      speech, to your knowledge, leave Compass

6      Lexecon following receipt of the draft speech?

7         A    Not that I know of.  I don't know

8      who received it, but I don't know, so I can't

9      be sure.  I don't know who received it.

10             The four -- the people who are

11     mentioned on here as receiving it, none of

12     them have left the firm.

13        Q    Has anybody of significance left

14     Compass Lexecon since the summer of 2023?

15        A    I hate to say nobody of significance

16     because, you know, there are valuable people

17     at all levels of the company.

18             None of the prominent rainmakers

19     have left, but that doesn't mean some

20     wonderful people who work below the

21     rainmakers.  There are important people in a

22     company beyond the rainmakers.

Page 338

1        Q    Of course.  I mean, has any of those

2    important people left to your knowledge?

3        A    I don't know.  Yeah, some people

4    have left Compass Lexecon, we don't have zero

5    attrition, but none of the major rainmakers

6    have left.

7        Q    You don't know if anybody has left

8    attributable to anything Jon Orszag said or

9    did?

10        A    Not that I know of.

11        Q    Now let's talk about the speech he

12    actually gave.  You said a minute ago that the

13    speech he actually gave was modified as a

14    result of interactions between Mr. Orszag,

15    Mr. Lu, and members of the Board; is that

16    correct?

17        A    That's correct.

18        Q    And after the speech that was

19    actually given, no one left either, right?

20        A    Again, with the modification to the

21    no one, we don't know.  There are secretaries,

22    who were dedicated secretaries in Chicago

10/2/2024          FTI Consulting, Inc. v. Jonathan M. Orszag          Steve Gunby

Page 449



10      Q    And if he left, he had every right

11    under his contract to walk across the street

12    to a competitor firm or to start his own firm,

13    correct?

14      A    Yeah.  At some point there's a

15    notice requirement, but yes.

10/2/2024              FTI Consulting, Inc. v. Jonathan M. Orszag              Steve Gunby

Page 471



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20        Q    Is he just blowing off steam?

21        A    I didn't suggest that.  I said I was

22   deeply worried that he was, but I left open

Page 516

1  ████████████████████████████████

2  ████████████████████████████

3  ██████████████████████████

4          Q     Let me suggest another question.

5                Was demanding restructuring the

6  governance agreement to relinquish control

7  alone sufficient to constitute a firing

8  offense or breach of loyalty?

9          A     As we said, you know, it depends on

10  the context.  If Mother Teresa said, geez, I'd

11  like to have this relooked at, you wouldn't

12  fire somebody for that.

13          Q     Was demanding that FTI sell Compass

14  Lexecon for a fraction of its true value alone

15  enough to justify firing for cause or a breach

16  of loyalty?

17          A     You know, offering to buy Compass

18  Lexecon for a fraction of its true value never

19  would be.  A demand to do so, why are you

20  demanding, and why do you believe you have the

21  right to demand these things?  It suggests a

22  context that's broader.

10/2/2024              FTI Consulting, Inc. v. Jonathan M. Orszag              Steve Gunby

Page 517

1              But if he made an offer to say, hey,

2      I'd like to buy this for $300 million, we

3      wouldn't have fired him.

4          Q     If he puts the word I demand you

5      sell it to me for a dollar, that would be a

6      firing offense?

7          A     Not by itself.

8          ▮     ████████████████████████████████

9      ██████████████████████████████████████

10     █████████████████████

11             He had the right to do that, didn't

12     he?

13             MR. MURPHY:  Objection.

14             THE WITNESS:  He has the right to

15         resign and start a competing firm.  He

16         doesn't have the right to spend the full

17         year and longer period trying to get

18         alignment for people to join him and to

19         stir -- and to get others in the firm,

20         prime them to be all upset so that he can

21         get them, and to use that threat to try

22         to force us to sell the company to him at

Page 518

1      a discount.

2              BY MR. HANSEN:

3      ▮ ████████████████████████████████████

4      ████████████████

5              ████████████████████████

6              ██████████████████████████████████

7      ████████████████████████████████ you

8      ██████████████████████████████████

9      ██████████████

10             ████████████████████████████

11     ████████████████████████████████████

12     ██████████████████████████████████

13     ████████████████████████████████████

14     ████████████████████

15             ██████████████████████████████████

16     ██████████████████████████████████

17     ████████

18              BY MR. HANSEN:

19      Q    You couldn't fire Jon Orszag for

20     threatening to resign and start a competing

21     firm, could you?

22      A    That by itself, I wouldn't fire

1    anybody for.

2        Q    And all the communications about

3    employees was that employees would leave to

4    follow, not that he would do anything improper

5    to solicit them, isn't that right?

6        A    That's -- that's what he put in

7    writing, yes.

8    

9

10

11

12

13

14

15

16

17

18

19

20             How did those acts demonstrate that

21    he failed to perform his material duties?

22        A    Instead of working on behalf of the

# Exhibit 6

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

--------------------------------X

FTI CONSULTING, INC.,                    :

                    Plaintiff,           :

                                              Case No.:

     v.                                  :

                                              8:23-cv-03200-PJM

JONATHAN M. ORSZAG,                      :

                    Defendant.           :

--------------------------------X


Deposition of GERARD HOLTHAUS

Baltimore, Maryland

Monday, September 16, 2024

10:00 a.m.



Reported by: Matthew Goldstein, RMR, CRR



_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

1          Deposition of GERARD HOLTHAUS, held at:

2

3

4               Zuckerman Spaeder, LLP

5               100 East Pratt Street

6               Suite 2440

7               Baltimore, Maryland 21202

8

9

10

11

12        Pursuant to Notice, before Matthew Goldstein,

13   RMR, CRR, Notary Public in and for the State of

14   Maryland.

15

16

17

18

19

20

21

22

Page 3

```
 1                  A P P E A R A N C E S

 2            ON BEHALF OF THE PLAINTIFF, FTI CONSULTING,

 3            INC.:

 4            DANIEL P. MOYLAN, ESQUIRE

 5            ZUCKERMAN SPAEDER, LLP

 6            100 East Pratt Street

 7            Suite 2440

 8            Baltimore, Maryland 21202

 9            410.949.1159

10

11            ON BEHALF OF THE DEFENDANT, JONATHAN M.

12            ORSZAG:

13            DAVID L. SCHWARZ, ESQUIRE

14            KELLOGG HANSEN TODD FIGEL & FREDERICK PLLC

15            1615 M Street, N.W.

16            Suite 400

17            Washington, D.C. 20036

18            202.326.7900

19

20            ALSO PRESENT:

21            CURTIS LU, ESQ. - FTI CONSULTING

22            KIM JOHNSON - VIDEOGRAPHER
```

Page 75

1    not that I can remember.  I mean, that was much

2    more driven through the process of we're going to

3    do this.  So no.

4          Q.   Did you review it before filing?

5          A.   I did not review the details before the

6    filing, no.

7          Q.   Did you take any steps to verify the

8    accuracy of the complaint before its filing?

9          A.   I did not review it.

10         Q.   Okay.  Did you review it as part of your

11   prep for today?

12         A.   No, sir.

13         Q.   Okay.  Sitting here today, can you

14   identify a single client that Mr. Orszag allegedly

15   solicited to a competing firm?

16         A.   Can I?  No.

17         Q.   Okay.  Your attorneys have told the

18   court, and I'm going to quote, We don't have any

19   indication of Mr. Orszag soliciting clients, end

20   quote.

21              Any basis to contest that

22   representation?

Page 76

1      A.   I'm not familiar with that

2   representation, but our attorneys have said that,

3   is that what you're saying?

4      Q.   Yeah, that was a representation by your

5   attorneys to the court in this case.

6      A.   Okay.

7      Q.   And my question is:  Do you have any

8   basis to contest that representation?

9      A.   No, I don't have any information to do

10  that.

11     Q.   Okay.  Sitting here today, can you

12  identify a single Compass Lexecon professional

13  that Mr. Orszag has solicited to leave Compass

14  Lexecon?

15     A.   I cannot.

16     Q.   Okay.

17          MR. MOYLAN:  David, just when you have a

18  pause that makes sense logically, we've been going

19  over an hour.  So if we can just take a break.

20          MR. SCHWARZ:  Yeah, maybe five minutes

21  or less?

22          MR. MOYLAN:  No worries.

Page 77

1    BY MR. SCHWARZ:

2         Q.    Sitting here today can you identify a

3    single Compass Lexecon professional that has left

4    the company or reduced the services it provides to

5    Compass Lexecon as a result of anything Mr. Orszag

6    supposedly said or did?

7         A.    I don't know of anyone.

8         Q.    Okay.  Can you identify a single outside

9    consultant that has severed its relationship with

10   Compass Lexecon or reduced the services it

11   provided to Compass Lexecon as a result of

12   anything Mr. Orszag supposedly said or did?

13        A.    I cannot.

14        Q.    Okay.  Can you identify a single client

15   that has stopped working with Compass Lexecon as a

16   result of anything Mr. Orszag supposedly said or

17   did?

18        A.    No.

19        Q.    Can you identify a single instance where

20   Mr. Orszag offered consulting services outside of

21   Compass Lexecon during the period of his

22   employment?

9/16/2024                FTI Consulting, Inc. v. Jonathan M. Orszag                Gerard Holthaus

Page 78

1          A.    No.

2          Q.    Can you identify a single instance where

3    Mr. Orszag offered consulting services outside of

4    Compass Lexecon during the period following his

5    termination?

6          A.    No.

7          Q.    Sitting here today, can you identify any

8    company that Mr. Orszag has invested in that has

9    offered consulting services outside of Compass

10   Lexecon during the period of Mr. Orszag's

11   employment?

12         A.    No.

13         Q.    Can you identify any company that

14   Mr. Orszag has invested in that has offered

15   consulting services outside of Compass Lexecon

16   during the period following his termination?

17         A.    No.

18         Q.    Can you identify a competing venture

19   that offered consulting services outside of

20   Compass Lexecon using Mr. Orszag's name or

21   reputation during the period of his employment?

22         A.    No.

Page 79

1        Q.   Can you identify a competing venture

2   that offered consulting services outside of

3   Compass Lexecon using Mr. Orszag's name or

4   reputation during the period following his

5   termination?

6        A.   No.

7        Q.   Okay.

8             MR. SCHWARZ:  Why don't we take a quick

9   break.

10            THE VIDEOGRAPHER:  Off the record at

11   11:14.

12            (Recess from the record.)

13            THE VIDEOGRAPHER:  Back on the record at

14   11:25.

15   BY MR. SCHWARZ:

16        Q.   So I want to shift topics a bit.  I want

17   to focus on the -- go back to 2021-2022 time

18   period to help you orient.

19        A.   Okay.

20        Q.   Between 2021 and 2022, FTI and the

21   Compass Lexecon leadership negotiated over the

22   terms of a new economic and business structure;

Page 91

 1    it's revenue production is when you see somebody,

 2    you say -- you know, you asked the question,

 3    what's the production?  But I think the production

 4    is on there, I think.  I'm going by memory now,

 5    but...

 6        Q.    Okay.  But you only receive this after

 7    the end of the year?

 8        A.    It's a once-a-year report out, yeah.

 9        Q.    And when does it come around?

10        A.    February, each year.  The year is done,

11    the scorekeeping is over.

12        Q.    Does the board get any tracking updates

13    during the year?

14        A.    No.

15        Q.    So sitting here today, do you know who

16    the largest revenue originator is at Compass

17    Lexecon for 2024?

18        A.    I don't remember off the top of my head

19    ████████████████████████████████████████████████

20    ███████████████.  I just don't remember.

21        Q.    Okay.  I'm talking about 2024, so year

22    to date.

Page 92

1          A.    Oh, 2024.  No, we have no information.

2     I have no idea.

3          Q.    Okay.  So sitting here today, you're not

4     aware that ███████████████████████████████

5     ████████████████████████████████████

6          A.    I have no knowledge.

7          Q.    Does that surprise you?

8          A.    Well, does it surprise me?  Maybe a

9     little, but I don't have any reason to be -- he's

10    still, what do you call it, a -- I forget what

11    term we use, you know, a contracted performer for

12    our business, right.

13              May I ask him what the name of that

14    relationship is, just --

15          Q.    It's okay.  We just go off the best of

16    your recollection.

17          A.    I just don't remember.  But, you know, I

18    knew he was continuing to deal with clients that

19    he had under a contractual arrangement, even after

20    the lawsuit was filed.

21          Q.    Okay.  Do you know whether that

22    contractual arrangement covers only preexisting

# Exhibit 7

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                     GREENBELT DIVISION
   _____
 3                                        )
   FTI CONSULTING, INC.,                  )
 4                                        )
        Plaintiff,                        )
 5                                        )Docket Number
              vs.                         )8:23-cv-03200-PJM
 6                                        )
   JONATHAN M. ORSZAG,                    )
 7                                        )
        Defendant.                        )
 8 _____)

 9                     VOLUME I OF II

10              TRANSCRIPT OF MOTIONS HEARING
            BEFORE THE HONORABLE PETER J. MESSITTE
11           UNITED STATES DISTRICT COURT JUDGE
            THURSDAY, JUNE 13, 2024, AT 11:00 A.M.
12
   APPEARANCES:
13
   On Behalf of the Plaintiff:
14
        WILLIAM J. MURPHY, ESQUIRE
15      ZUCKERMAN SPAEDER LLP
        100 E. Pratt Street, Suite 2440
16      Baltimore, MD  21202
        (410)332-0444
17
        DANIEL P. MOYLAN, ESQUIRE
18      ZUCKERMAN SPAEDER LLP
        100 E. Pratt Street, Suite 2440
19      Baltimore, MD  21202
        (410)783-7000
20

21

22

23

24      ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPED NOTES***

25
```

```
1    APPEARANCES CONTINUED:

2

     On Behalf of the Defendant:
3
          MARK HANSEN, ESQUIRE
4         KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC
          1615 M. Street, NW, Suite 400
5         Washington, D.C.  20036
          (410)949-1159
6
     ALSO PRESENT:  Rachel Anderson
7                   David Schwarz
                    Jonathan Orszag
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2        (Court called to order.)

3            LAW CLERK:  All rise.  The United States District

4    Court for the District of Maryland is now in session.  The

5    Honorable Peter J. Messitte presiding.

6            THE COURT:  Ladies and gentlemen, be seated.

7            DEPUTY CLERK:  The matter now pending before the

8    court is Civil Action Number PJM-23-3200, FTI Consulting, Inc.,

9    versus Jonathan Orszag.  The matter now comes before the Court

10   for a motions hearing.

11           THE COURT:  All right.  Counsel for plaintiff,

12   identify yourself, please.

13           MR. MURPHY:  Your Honor, William Murphy; and with me

14   is Daniel Moylan for the plaintiff, FTI.

15           THE COURT:  All right.  Mr. Murphy, you'll be

16   arguing?

17           MR. MURPHY:  Yes, I will, Your Honor.

18           THE COURT:  All right.  Defendant?

19           MR. HANSEN:  Good morning, Your Honor.  Mark Hansen

20   for Defendant Jonathan Orszag.  With me is David Schwarz and

21   Rachel Anderson from my firm.

22           THE COURT:  Mr. Schwarz has not entered his

23   appearance, I believe.

24           MR. HANSEN:  He has not yet, Your Honor.

25           THE COURT:  Did he enter his appearance in the case?
```

1          **MR. HANSEN:** I believe he has not yet; he plans to.

2          **THE COURT:** Well, he can be seated at counsel table.

3 He's not to be acknowledged as representing the -- the

4 plaintiff -- or excuse me, the defendant until he enter his

5 appearance. All right for him to sit at counsel table.

6          **MR. HANSEN:** Thanks, Your Honor. We understand.

7          **THE COURT:** You have a paralegal sitting there as

8 well?

9          **MR. HANSEN:** No, that's Ms. Anderson, one of my

10 colleagues. She has entered an appearance.

11          **THE COURT:** All right. Very good. And the defendant

12 is here, Mr. Orszag?

13          **MR. HANSEN:** And Mr. Orszag is also present, Your

14 Honor.

15          **THE COURT:** All right. Very good.

16     Folks, before you start, looking at your case -- have a

17 seat -- I need to ask you some questions to try to understand

18 really what's going on in this case.

19     Is it my understanding that as of approximately November,

20 there's no injunction in effect at all; is that correct?

21          **MR. HANSEN:** That is correct, Your Honor.

22          **THE COURT:** All right. So whatever might be the

23 geographic temporal scope of the non-compete, and the breadth

24 of the classes that would be non-solicitable, all things are

25 off the table after that, correct? Unless there's an action

5

1   for damages that will be pending for some sort of breach based

2   on whatever the Court decides either today or in time was the

3   proper scope of the injunctions.

4       Am I correct?

5           MR. HANSEN:  Not quite, Your Honor.  I think -- I

6   think you're right, there's no court that's entered an

7   injunction, but --

8           THE COURT:  What?

9           MR. HANSEN:  There's no judicial injunction, but FTI

10  has claimed the non-compete, the non-solicitation.  Mr. Orszag

11  is under a cloud that prevents him from doing those things

12  without risk.  Third parties are also --

13          THE COURT:  But it ends in November, correct?

14          MR. HANSEN:  It ends November of this year, November

15  '24, correct, Your Honor.

16          THE COURT:  Right.  So after November '24, whatever

17  the proper scope of the injunctions might be, there's no

18  limitation at all, Mr. Orszag can do whatever he wants, right?

19          MR. HANSEN:  That's our position, Your Honor.  It's

20  also our position --

21          THE COURT:  All right.  Let me ask Mr. Murphy the

22  same thing.

23      You agree with that, that after November, as far as

24  injunctive relief is concerned, there's no injunction --

25          MR. MURPHY:  Your Honor, we have not sought a

1  preliminary injunction at this point, and we --

2         **THE COURT:**  But I guess my question goes more to the

3  time.  I thought it was a year's probation --

4         **MR. MURPHY:**  It is a year.

5         **THE WITNESS:**  -- up in November, and therefore,

6  there's no prayer for further --

7         **MR. MURPHY:**  The non-compete and the non-solicitation

8  clause both expire after one year from his date of termination.

9  There are actions for damages for breach of fiduciary duties.

10        **THE COURT:**  That's what I'm going to ask about.  I

11  don't -- I'm not even sure, maybe there is a prayer for

12  damages, but I don't know that we've gotten into that at all.

13     I mean, do you have -- you haven't had discovery yet?

14        **MR. MURPHY:**  No discovery, Your Honor.

15        **THE COURT:**  So you don't know whether, in fact, there

16  has been anybody who has been improperly solicited or if

17  there's been competition.

18        **MR. MURPHY:**  As alleged in the amended complaint,

19  Your Honor, we have enough information to suggest, at least,

20  that there's been solicitation of the employees of Compass

21  Lexecon in violation of the non-solicitation clause.

22        **THE COURT:**  With -- and, for example, employees have

23  been drawn away in consequence, or they could be?

24        **MR. MURPHY:**  None of them have left at this point.

25        **THE COURT:**  All right.  The question being then, in

1  November, there's no limit, though, right?  In other words,

2  they could be solicited after November?

3              **MR. MURPHY:**  That's -- that's true, they could be.

4              **THE COURT:**  All right.  Well, that's sort of an

5  interesting issue, then, as we -- as we get into this argument.

6       Let me scope out for you a couple of concerns that I have.

7       Ordinarily, when someone files a motion to amend the

8  pending complaint against which a motion to dismiss has been

9  filed, it presents all sorts of procedural -- extra procedural

10 obligations on the Court to try and sort --

11             **MR. MURPHY:**  Right.

12             **THE COURT:**  -- what is -- would be addressed in the

13 existing complaint, and what would be addressed -- allowed in

14 the subsequent amended complaint.

15             **MR. MURPHY:**  Right.

16             **THE COURT:**  The problem being that is it -- it's much

17 easier for the Court to have one self-contained document that

18 makes the points that the parties want to make, which is to say

19 a second amended complaint, some of which answers some of the

20 objections that are raised in the objection to the first

21 complaint.  So that's sort of the way I start.

22      But if we get to that point, and I allow the motion to

23 amend, which -- which I will, presumably, but there are

24 certainly issues that you can talk about today about whether

25 the scope of the injunction and so on, the breadth, whatever,

1    is inappropriate.

2        But I need to sort to pose that for you now, but as a

3    practical matter, particularly if there's going to be an

4    opposition to the second amended complaint, and maybe a reply

5    to that, we're getting on to November, aren't we?  I mean,

6    we're moving along here, and the question is, by the sound of

7    fury going on, to what end?

8        I mean, that's -- as I read your document, that's the way

9    I reacted.  What are we aiming at, particularly since I don't

10   see any -- at least any suggestion of hard damages at this

11   point, only potential damages.

12       Final point, then, being preliminarily, that it may well

13   be that the scope of the injunction and the non-solicitation

14   and non-compete are too broad, and then what?

15       Well, okay.  Let's hear you about that.

16       Now, for example, neither of you are particularly arguing,

17   at least the plaintiff doesn't -- sorry, at least I guess it

18   would be -- the plaintiff doesn't argue that you can blue

19   pencil, as you can under Maryland law, too broad a geographic

20   scope.  It would be like scope of the injunction is worldwide,

21   essentially.  And that may, on its face, be questionable, but I

22   don't have anything from the other side that tells me then what

23   would be a plausible, reasonable blue pencil.

24       Can you do that?

25       And then this second issue that sort of appears in all of

1  this, apart from the geographic error, if the scope of the

2  parties that are being solicited is too broad, what do we do

3  about that?  Does the whole complaint go out without prejudice

4  or with prejudice?  Or is that the kind of thing that a third

5  amended complaint would address and say in effect, look,

6  here -- let's say the key employees that should not be

7  solicited, but we're not talking about necessarily contractors,

8  suppliers, vendors, et cetera.  That's what I see as some of

9  the questions that are -- I guess the word is swirling right

10  now.

11          **MR. MURPHY:**  Yes, Your Honor.

12          **THE COURT:**  Okay.

13          **MR. MURPHY:**  Can I address some of those points?

14          **THE COURT:**  Go ahead.  You don't need to make a

15  fulsome answer here, but go ahead.

16          **MR. MURPHY:**  Our purpose in filing the complaint was

17  to assert that these provisions of Mr. Orszag's contract are

18  valid and enforceable in the face of claims by him that they

19  were not.  And his basic position, I think, is that California

20  law would govern his contract.

21          **THE COURT:**  California?

22          **MR. MURPHY:**  California law.

23          **THE COURT:**  California law.

24          **MR. MURPHY:**  And our position is that California law

25  does not govern his contract, that there is a Maryland choice

1    of law provision in his contract which was --

2              **THE COURT:**  Which there was.  That's my recollection.

3              **MR. MURPHY:**  Which was negotiated.  He agreed to it.

4    And under the restatement provisions, if -- it's only in a

5    situation where -- and we would concede for this purpose that

6    California flatly prohibits non-competes; California has done

7    so, but Maryland has not.

8         And it's our position that California law would be

9    applicable only if California law would apply in the absence of

10   a choice of law provision in the contract.

11        Maryland recognizes that the parties have freedom of

12   choice and they can choose to adopt the law of a state that has

13   a significant relationship to the -- to the matter.

14        FTI is a Maryland-based company, it's a Maryland

15   corporation.

16             **THE COURT:**  Is there not a choice of law provision in

17   the contract?

18             **MR. MURPHY:**  There is.  They are trying to avoid it

19   by saying California has a superior interest.  Our position

20   is --

21             **THE COURT:**  That's really the -- I've not broadly

22   accepted the conflicts rule in this state.  The choice of law

23   has been pretty much followed.

24             **MR. MURPHY:**  Yes, Your Honor.  And we agree a hundred

25   percent with that.

1          And we also say that California law wouldn't apply in the

2     absence of the choice of law provision because the contract was

3     made between -- well, it was signed by Mr. Orszag in California

4     but then sent back to Mr. Lu, who is a general counsel of FTI,

5     who signed it, I think, in Virginia or D.C., so that California

6     would not be the governing law under the lex loci contractus

7     provision.

8          **THE COURT:**  All right.

9          **MR. MURPHY:**  So we just wanted to have a plain

10    decision from the Court that the contract is governed by

11    Maryland law, and that these provisions are, therefore,

12    enforceable.

13         If we got to blue penciling, that would be in a situation

14    where we were actually seeking injunctive relief to prevent

15    Mr. Orszag from doing something.  We haven't reached that point

16    because once the lawsuit was filed, he -- he -- he didn't

17    abandon his position that he was going to start a new company

18    and take all the employees, but he hasn't acted on it yet.

19         **THE COURT:**  All right.  Well, we can maybe parse this

20    up along the way.

21         **MR. MURPHY:**  Sure.

22         **THE COURT:**  Let me just get a general response from

23    Mr. -- Mr. Hansen.

24         **MR. HANSEN:**  Thank you, Your Honor.

25         And it is our motion, so I would like to actually make our

1    arguments before Mr. -- my colleague, my friend, responds to

2    them.

3        Your Honor's questions, it's a good way to start the

4    argument, there's been no harm.  In Paragraph 130 of the first

5    complaint, and 145 of the amended complaint, they say there may

6    be harm in the future, so we don't have harm.

7        What we have is Mr. Orszag was a valued Compass Lexecon

8    consultant before November 20, and he's still a valued

9    consultant, held out to the public for new assignments.  He's

10   been doing it since November 20.  So there's no harm here.

11       Second, Your Honor, of the question you asked, the law on

12   blue penciling -- I'm just trying to address the Court's

13   questions, and then I'll go the rest of the argument, but the

14   response to something where you need the blue pencil, well, you

15   throw the case out first.

16       Blue penciling under *Deutsch Post*, under Judge Russell's

17   recent decision, in a case called *Blue Ridge Partners,* which it

18   came out after the briefing here, and we sent our authorities,

19   you can only blue pencil if it involves taking out a word or

20   two here or there.  You can't rewrite the clause.  You can't

21   add language.  You can't move things around.

22       And that's the express holding of the Fourth Circuit in

23   *Deutsche Post,* the express holding of Judge Russell in *Blue

24   Ridge Partners.*

25           **THE COURT:**  Well, I'm not going to buy that

1   proposition, but go ahead.  The fact that another judge in a

2   specific case may have said this is what it means.

3        I've been doing this for 40 years now.  I've had these

4   blue pencil cases in Maryland.  And, reasonably, it could be

5   pared back.  It can't be pared back unless there's a

6   proposition.

7        I've never heard the argument made that you can take out a

8   word or two.  That's all you can do.  That's certainly not the

9   law in Maryland.

10            **MR. HANSEN:**  Well, I don't mean --

11            **THE COURT:**  And maybe, candidly, what we ought to do

12   is address the conflicts issue first this morning.

13            **MR. HANSEN:**  We'll do that, Your Honor.

14            **THE COURT:**  And that way you can put to rest a lot of

15   the arguments that have are afloat.

16        Because, I've got to tell you, candidly, I'm going to have

17   trouble with you arguing that Maryland law with a choice of law

18   provision does not -- does not apply.

19            **MR. HANSEN:**  Well, I hope I'll have a chance to

20   persuade Your Honor otherwise.

21        We have a PowerPoint slide --

22            **THE COURT:**  To that -- to that point, on the issue of

23   why Maryland law should not apply, given the choice of law

24   clause, I'll certainly hear you on that.  That's something that

25   could be decided right now and perhaps will help us go forward.

1          **MR. HANSEN:**  Of course, Your Honor.

2          **THE COURT:**  If you have no objection, nothing further

3    to say preliminarily, let's do that.  Let's have you argue

4    since it's not -- it's not really your position that it

5    applies.

6          I guess the laboring order would be with the plaintiff to

7    say here's why Maryland law applies, and then you can respond,

8    and then I'll make a judgment about that.

9          Is that all right with you?

10          **MR. HANSEN:**  Of course, Your Honor.  We want to be of

11    assistance to the Court.

12          Would it be all right if I displayed the slides that

13    address that question, Your Honor, to help guide the argument?

14          **THE COURT:**  No, I am only saying because I know you

15    have PowerPoints and you want to get into a live discussion

16    about all the points that you make.  And there are certain

17    things that, at least at this juncture, since I would almost

18    certainly give the plaintiff leave to file the second amended

19    complaint, the -- some of these issues could be deferred until

20    I see what the opposition in the second amended complaint would

21    be.

22          Some of the arguments being the same as they are now, some

23    being presumably they disappear because the amended complaint

24    supplies inefficiencies.

25          Let's start -- if there's no objection, let's start with

1   the discussion of the -- whether the Maryland choice of law

2   provision applies to this transaction, and then we'll see where

3   we go.

4       **MR. HANSEN:**  Of course, Your Honor.  That's referred

5   to in our first slide, if I could just put that up.  It --

6       **THE COURT:**  Well, I think it's the plaintiff's burden

7   to suggest -- I mean, I don't know.  If there's a contract

8   clause that says that Maryland law applies, I would think their

9   argument would go first and you would argue why the choice of

10  law clause does not apply.

11      **MR. HANSEN:**  I think we're moving to dismiss, Your

12  Honor, on the grounds that the non-compete clause is utterly

13  unenforceable for five separate reasons.

14      **THE COURT:**  I got it -- I don't -- right now --

15      **MR. HANSEN:**  And it's California law.

16      **THE COURT:**  -- I don't anything except your

17  pleadings.

18      **MR. HANSEN:**  Right.

19      **THE COURT:**  Put before me the proposition that

20  Maryland law applies, the party as to the affirmative on that

21  topic should go first, and then you can explain why it doesn't

22  apply.

23      **MR. HANSEN:**  Thank you, Your Honor.

24      **THE COURT:**  Let's hear from Mr. Murphy on that.

25      **MR. HANSEN:**  Thank you, Your Honor.

1          **THE COURT:**  Why is Maryland law applicable?  Let's

2     start with the specific reference to the language in the

3     contract.

4          **MR. MURPHY:**  Thank you, Your Honor.

5          Paragraph 24 of Mr. Orszag's employment agreement is

6     captioned "governing law," and it states that the internal laws

7     of the state of Maryland, other than its conflict of loss

8     provisions, shall exclusively govern this agreement regardless

9     of any present or future residence, domicile, or place of

10    business of the parties.  Each party hereby irrevocably

11    consents and agrees that any claims and disputes between or

12    among them, other than certain disputes that arise under an

13    arbitration provision, shall be brought in any state or federal

14    court located in the state of Maryland.

15         In addition, each party submits and consents in advance to

16    a jurisdiction commenced in any Maryland court and waives any

17    objection that it might have based on forum non conveniens, and

18    consents to the granting of legal or equitable relief as deemed

19    appropriate by such court.

20         So it's a pretty plain statement that Maryland law

21    applies.

22         **THE COURT:**  Are you arguing both Maryland law governs

23    and choice of forum also has to be Maryland?

24         **MR. MURPHY:**  Yes, Your Honor.

25         **THE COURT:**  Those are two different propositions.

1     **MR. MURPHY:**  They are, but they are in the same

2  paragraph of the complaint.

3     And so that's why we filed the case initially in the

4  Circuit Court for Montgomery County.  It was removed, like, two

5  days later to this court by the -- by the defendant.  And

6  removal was proper.

7     Now, the -- as I understand the argument for California

8  law, it's based on the fact that California has a fairly long

9  history of deeming non-compete agreements and non-solicitation

10  agreements to be in conflict with California principles of free

11  competition.

12     Maryland has no such public policy, as Your Honor is aware

13  from the many cases you've handled over the years involving

14  non-competes.

15     In fact, the Maryland Legislature just -- I think,

16  Governor Moore just signed a statute which said that there will

17  be no noncompetition provisions in contracts of medical

18  professionals -- only medical and veterinary professionals --

19  leaving the implication that with respect to other industries,

20  the non -- the common law of Maryland continues to apply.

21     And so the plaintiff's argument says California law should

22  be -- should it be applicable because California has a greater

23  interest in the adjudication of this dispute than does

24  Maryland.

25     **THE COURT:**  Because why?

1          MR. MURPHY:  Well, they say because he lives in

2    California, and they say because California protects

3    California-based employees.

4          THE COURT:  As an aside, has he been a remote worker?

5    Is there a breach of order in place?  Is he due overtime or

6    what?  How --

7          MR. MURPHY:  My understanding is that he's based

8    principally in California, but he's a consultant for law firms

9    and others and -- he does his work well.

10          THE COURT:  Your client is based in Maryland?

11    Headquartered?

12          MR. MURPHY:  FTI is incorporated in Maryland and has

13    its base in Bowie, Maryland, and some executive offices in

14    Washington D.C.

15          THE COURT:  And the defendant never comes here?  Has

16    never come here?

17          MR. MURPHY:  Oh, he's come to Washington, I believe,

18    from time to time.

19          THE COURT:  Does he have an office here?

20          MR. MURPHY:  No, he does not have an office.

21          THE COURT:  So he works from home and then goes out

22    around the world?

23          MR. MURPHY:  He works from his office in Los Angeles,

24    and he has -- he has matters around the world -- well, at least

25    throughout the United States, and then some significant parts

1   of, I think, Europe as well.

2       So our position is that as a Maryland company, which

3   employs thousands of people, FTI has an interest in having a

4   uniform understanding that its non-compete provisions will be

5   governed by the law of the state where it's incorporated.  And

6   I think it makes perfect sense.

7       In addition, if this were a straightforward case involving

8   a breach of contract, and there was no choice of law provision,

9   the question would arise which law would apply?  And the answer

10  would be probably D.C. or Virginia law because that's where the

11  last acts to make the contract took place, when the general

12  counsel of FTI signed the contract and sent it back to

13  Mr. Orszag.

14      The states of -- the D.C. and Virginia, like Maryland,

15  recognize the enforceability of non-compete agreements.  So

16  there is no conflict between the law that would apply absent

17  the choice of law provision and the choice of law provision.

18      And in that situation, under the Restatement of Conflicts

19  of Law, Section 187, which has been interpreted by this Court

20  on several occasions, in that situation, you follow the choice

21  of law provision because the law of the state that would

22  otherwise apply would not be California law; and, therefore,

23  California's law and its rules and its public policy is really

24  irrelevant to this dispute under the restatement, because this

25  is either to be -- well, it's to be decided by Maryland law

20

 1  because there's no reason to set aside the choice of law

 2  provisions that the parties entered into when they signed the

 3  agreement.

 4       And that's the basic principle in the Fourth Circuit's

 5  decision in *Kunda v. Bard,* which we've cited, the party

 6  resisting a choice of law provision bears the burden of

 7  establishing that some different state's law applies.

 8       And in this case, Mr. Orszag cannot bear that burden

 9  because he can't establish that California law applies.  He

10  agreed to the Maryland choice of law provision, and the public

11  policy of California is irrelevant under the restatement,

12  Section 187(2).  That's our argument.

13            **THE COURT:**  Mr. Hansen?

14            **MR. MURPHY:**  Thank you, Your Honor.

15            **MR. HANSEN:**  Thank you, Your Honor.

16       First, the factual answer to one of your questions.

17  Mr. Orszag has an office in Los Angeles.

18            **THE COURT:**  What?

19            **MR. HANSEN:**  Los Angeles is where he has his office.

20       Your Honor, let's start with sort of a commonsense

21  overarching fact here.  No court anyplace that we can find or

22  my friend's side can find, has ever enforced a non-compete

23  against a California resident working from California.  And

24  that's because states honor the absolute prohibition that

25  California has.

 1          **THE COURT:**  You have a Maryland case that says what

 2  you just said?

 3          **MR. HANSEN:**  Pretty much, Your Honor.  *Fyfe.*  *Fyfe.*

 4          **THE COURT:**  Pretty much -- your proposition is,

 5  Maryland, which does honor non-compete clauses, will not

 6  enforce it against someone who has made a choice of law to

 7  Maryland because that person lives in California, which does

 8  not honor non-compete clauses.  Is that the gist of what you

 9  just said?

10          **MR. HANSEN:**  Close, Your Honor.

11      The *Fyfe* case, Judge Blake, considered a Delaware choice

12  of law that parties had agreed to, like here, went through a

13  187 analysis.  And as to the first prong of the 187 analysis,

14  Judge Blake held that it would offend the public policy of

15  California to give effect to the party's choice of Delaware.

16      What's a little bit different about that case, Your Honor,

17  and I don't want to overstate it --

18          **THE COURT:**  Was there a choice of law provision in

19  there?

20          **MR. HANSEN:**  There was, Your Honor.

21          **THE COURT:**  What was it?

22          **MR. HANSEN:**  Delaware, which has a similar law to

23  Maryland.  It doesn't prohibit them, but it certainly doesn't

24  encourage overbroad clauses like the one here.

25      Judge Blake says that would offend California's public

1    policy.  At the second step of the analysis, the parties agree

2    that California law should otherwise apply.

3        So here, Your Honor, we submit that clearly California law

4    otherwise applies because as the case cited by FTI makes clear,

5    there's an exception to the Maryland law of lex loci -- or lex

6    loci, I'm not sure what the Latin pronunciation is -- involving

7    fundamental interest.

8        In *Jackson,* Your Honor, there was a credit card agreement

9    claim involving a South Dakota issuer and a Maryland resident.

10   And the Court didn't just look to where the contract was

11   signed.  The Court looked to the fundamental policy interest of

12   Maryland to see whether it would violate Maryland's public

13   policy to give effect to a South Dakota choice of law.

14       And the Court said it would not, after considering

15   Maryland's policy analysis, and applied South Dakota law, a

16   foreign law.

17       In Judge Chasanow's decision in *American Motorist,*

18   Judge Chasanow made, I think, a very sensible statement which

19   is, it can't just be that Maryland looks to its own fundamental

20   policy interest in deciding whether parties' choice of law

21   clauses can be honored.  You have to -- in a world of comity,

22   you have to essentially allow Maryland to look at other states'

23   policy interests or they won't look at Maryland's policy

24   interest.

25       So in that case, Judge Chasanow -- this didn't involve a

1    non-compete.   Judge Chasanow applied Maryland law, even though

2    the contract was signed in Illinois, because of Maryland having

3    a superior interest to Illinois in that circumstance.

4        Your Honor, given the fact that there's no case anywhere

5    that says a California employee working from California can be

6    so bound, and given these cases that talk about how you would

7    apply the Maryland rule, we think it's pretty straightforward

8    that clearly you'd have to give effect to California's absolute

9    prohibition.

10       And, Your Honor, in addition, all roads lead -- all roads

11   lead to California here, because even if you were to say

12   Maryland law should apply, Maryland has choice of law rules

13   that refer to other states.

14       And if you're -- it's not in the complaints, it's in a

15   supplemental declaration filed by an FTI lawyer, if you were to

16   say, well, let's look to the place of contracting, which might

17   be Maryland -- I'm sorry, which might be Virginia or D.C., the

18   rules in those places apply the law of the place of

19   performance, in one instance, or the place with the greatest

20   interest than the other.

21       And, Your Honor, all of that explains why there is no case

22   that does what FTI wants to do here.  Courts have, in fact,

23   recognized that a California employee can't be shackled with

24   this kind of clause no matter what kind of machinations are

25   done for where a contract is signed or where you go to try and

```
 1  file a lawsuit.  We think that's pretty straightforward, Your

 2  Honor.

 3      All roads lead to California.  No case upholds a

 4  non-compete against a California resident; not one.

 5      And Judge Chasanow's case was pretty close, although not

 6  exactly on all fours.

 7      And, again, Your Honor, that's only one of five reasons

 8  why there's no claim here.

 9          THE COURT:  No claim for the application of Maryland

10  law or other reasons why the claim --

11          MR. HANSEN:  No claim for any of the six counts of

12  the first amended complaint or the rest of the complaint.

13          THE COURT:  Because, what, California law applies

14  across the board?  Is that because California law disposes of

15  those claims?

16          MR. HANSEN:  California law, among other reasons,

17  disposes of both the non-compete and the non-solicitation

18  declaratory judgment.  It disposes of the Counts Four, Five and

19  Six that talk about anticipatory repudiation, because if the

20  clauses are invalid, you can't repudiate them.

21      So four of the clauses are done away with by California

22  law.

23      But, again, there are other reasons to do away with those

24  clauses and the additional clauses, which we've --

25          THE COURT:  Well, what's the greater interest in
```

1  California over Maryland?  FTI is here.  He comes here.  He

2  really -- I guess, in this now remote activity, it's hard to

3  say that just because he lives there, that he works there.  He

4  works everywhere, doesn't he?

5       **MR. HANSEN:**  Well, Your Honor, there's no allegation,

6  I don't think even Mr. Murphy said it, that Mr. Orszag comes

7  and works in Maryland.  Honestly, FTI's core of operations on

8  the east coast, at least, is Washington.  They may have

9  incorporation in Maryland, but there's nothing of significance,

10 that we're aware of, that goes on in Maryland.

11      And, Your Honor, as many courts have recognized, the big

12 difference between permitting a non-compete clause, in some

13 limited instances, and flatly prohibiting them -- I mean,

14 California has gone so far, Your Honor, as to amend its

15 noncompetition rule in 16600.5 to make it effectively a tort to

16 even try to enforce one.

17      In other words, you can collect damages for someone's

18 efforts to enforce a non-compete against you whether or not you

19 agreed to it.  There's no exception.

20      The only instance in which California would allow a

21 non-compete is with the sale of the business, and that's very

22 clear.

23      So as Judge Blake said, I mean, it offends California's

24 policy to honor somebody's choice of law clause that says do

25 some other law, and I think that's a very clear holding.

1     So having acknowledged that question, is what law should

2   apply since the choice of law can't be honored without

3   offending California?

4     And we say, using the Maryland -- we're not saying don't

5   use Maryland's rules of doing this.  We're saying that in

6   *Jackson,* in *American Motorist,* the Court ultimately came down

7   to an interest analysis.

8     They said they were consistent with lex loci, but they

9   didn't actually follow lex loci; they followed an exception to

10   lex loci.  And the exception was where interests were at stake.

11     And, Your Honor, I don't think there's any serious debate

12   that the interest of California in saying our employees --

13          **THE COURT:**  What's the interest in California other

14   than protecting Mr. Orszag?

15          **MR. HANSEN:**  Your Honor, there are two --

16          **THE COURT:**  Why is that more -- let me pose another

17   point.

18     Suppose he moves to a state, since we're dealing remotely

19   these days, where if you file improperly a choice of law

20   proposition, you can be fined $100,000, would Maryland be

21   obliged to follow that?  Because that's where the employee

22   resides?

23          **MR. HANSEN:**  That would be a different choice of law

24   inquiry, Your Honor.

25          **THE COURT:**  It's what?

 1              MR. HANSEN:  That would be a different choice of law

 2    inquiry.

 3              THE COURT:  Why?

 4              MR. HANSEN:  Well, you look at the laws of that state

 5    to see whether enforcement -- if there was a choice of law

 6    provision, you would, first, under the restatement analysis,

 7    ask the question in that state, for that -- what you just have

 8    hypothesized, would that offend a fundamental public policy

 9    interest of that state?  That would be the question you'd ask.

10         You asked previously, your hypothetical, why does

11    California care?  It cares for two reasons, Your Honor.

12         One, employees should be free to move.  There shouldn't be

13    binding non-competes.

14         But there's a societal interest as well, Your Honor.  The

15    societal interest is this:  Free employee mobility benefits

16    competition.  And in a competitive economy, it's a good thing

17    to allow people to go out, compete, start new businesses.  It's

18    not just for their own benefit, it's for the benefit of

19    competition in general.

20         And that's why California has this absolute prohibition,

21    absolute prohibition.  Maryland does not have an absolute

22    prohibition, but it certainly has no interest in promoting or

23    encouraging non-competes.  In fact, in all the cases we've

24    cited --

25              THE COURT:  Let me ask you a question, when this

1  contract was signed, where was Mr. Orszag residing?

2            **MR. HANSEN:**  California.

3            **THE COURT:**  Why did he agree to this provision?

4            **MR. HANSEN:**  Your Honor, that comes up in every case.

5  If it's enough to agree to it to make it enforceable --

6            **THE COURT:**  Did he not know that it was -- was he

7  laying back and was he going to say, when they started to

8  enforce the clause, "Oh, you know what?  I'm protected by --

9  now by California law?"  How about that?  What --

10           **MR. HANSEN:**  Your Honor, actually -- well, what the

11  contract provides, and we would like to get to this in our

12  argument, he's not bound by a non-compete.

13           **THE COURT:**  He's what?

14           **MR. HANSEN:**  He actually is not bound by a

15  non-compete unless -- there's only one instance in which a

16  non-compete even comes into --

17           **THE COURT:**  I don't know how you get there.  I got to

18  deal with the conflicts issue first.

19       I'm asking a different question.

20       When he signed this contract, and he said Maryland law

21  will govern, was he really laying back thinking, "Well, you

22  know, I can avoid this because I know being a Californian

23  resident, it won't be enforceable?"

24       That's a different proposition.

25       I don't want to hear about California law at the moment.

1              **MR. HANSEN:**  There's no --

2              **THE COURT:**  Mr. Orszag -- well, look, this is part of

3    the balancing equation.  There's an equity issue here and

4    there's an orderliness issue.

5         I mean, how -- where he might choose to end up living, the

6    argument that you have, is that protecting that employee

7    against provisions that Maryland law may be more restrictive

8    about is always going to trump the case.  I mean, how does a

9    company that, presumably in good faith, negotiates all of these

10   terms end up in that situation?

11             **MR. HANSEN:**  Well, I'm going to answer Your Honor's

12   question.  There's nothing alleged by anybody about laying back

13   or improper motive.  Every one of the non-compete cases where

14   there's a choice in a contract, somebody signed it.  That's not

15   dispositive.  That's not even, frankly, relevant to the courts

16   because --

17             **THE COURT:**  I don't know why you say that.  Maybe

18   Judge Blake didn't say it, but I'm saying it.

19        You know, you're saying that somehow there's a compulsion

20   to follow -- I don't necessarily follow her analysis anyway,

21   but I'm just trying to weigh the equities here, and I really am

22   not persuaded by your suggestion that somehow -- and I've been

23   applying these rules for a long time.  I got to tell you, these

24   governing clauses are very orderly in a way that litigation

25   goes about.

1      We have a lot of companies here that are international,

2   whether it's Hyatt, or Marriott, or others, and they have these

3   choice of law provisions all the time.  And, classically, we'll

4   get a franchisee in Hawaii who says significant contacts are

5   here, throw out the Maryland choice of law, and we routinely

6   say not doing that.

7      How else -- how else is this company going to operate

8   other than dealing with Maryland courts and Maryland law?

9   Having to go to Hawaii or Alaska, or somewhere, wherever

10  Marriott or wherever a Hyatt is?  We routinely enforce these

11  clauses for the reason, that there's an orderly -- orderliness.

12         **MR. HANSEN:**  We're proposing orderliness, Your Honor.

13     And, Your Honor, with all respect, we don't believe this

14  Court has ever considered this issue.  This is a different

15  issue from what you're talking about in these other cases.

16  Here's a specific issue.

17     And FTI knew it was contracting with a California employee

18  protected by California law.

19     So when you're talking about balancing the equities, FTI

20  is a 8,000-person multinational conglomerate.  Mr. Orszag is a

21  human being.

22     The equities, FTI knew what it was getting into, too, and

23  the Courts have never found it a dispositive factor when

24  somebody agreed to something.  The question is whether it's

25  enforceable as a matter of law.

1    And the question, as your Honor has put it, what law

2  should apply in these circumstances?

3    And, again, it's not -- it's not about Marriott and the

4  businesses -- the franchisee, it's not about these other

5  contexts.  This is a unique case, which is why no one has ever

6  done it.  We find no court that has ever done it, enforce a

7  non-compete against a California employee.

8    So --

9    **THE COURT:**  That's not what you have in Judge Blake's

10  case.

11    **MR. HANSEN:**  She didn't enforce the Delaware choice

12  of law in that case.  She rejected the Delaware choice of law

13  and applied California law.

14    **THE COURT:**  Well, all right.

15    **MR. HANSEN:**  And then validated the non-compete.

16  That's what happened in that case, Your Honor.

17    **THE COURT:**  Let me hear Mr. Murphy's reply.

18    **MR. MURPHY:**  Thank you, Your Honor.

19    I think that Mr. Hansen has overstated Judge Blake's

20  decision in *Fyfe* and actually missed the basic point.

21    She begins her analysis by saying in Maryland, it is

22  generally accepted that the parties to a contract may agree as

23  to the law which will govern their transaction, citing the old

24  case of *Kronovet v. Lipchin* from 1980.

25    She then says that Maryland also follows the Restatement

1  of Conflicts, Section 187(2), with respect to exceptions that

2  might apply.

3      And she quotes the restatement and notes that there could

4  be an exception where the application of law of the chosen

5  state, in this case, Maryland, would be contrary to a

6  fundamental policy of a state which has a materially greater

7  interest than the chosen state in the determination of the

8  issue and -- and that is a very important word, "and" -- which

9  would be the state of the applicable law in the absence of an

10 effective choice of law by the parties.

11      In the case in front of her, the *Fyfe* case, the parties

12 agree that California law would apply if Delaware law didn't

13 apply.

14      But that's not our case.

15      California law would not apply in our case because it

16 would not be the applicable law that governs this contract

17 absent the Maryland choice of law provision.  It's irrelevant

18 because it is not the state where the contract was formed.

19      So, therefore, California law is completely irrelevant.

20      And, Judge Quarles had a decision which adopts this basic

21 analysis.  Again, the states are a little different, but

22 Judge Quarles' decision in *Ameritox* v. *Savelich,* which is in

23 our binder, he follows this basic approach:  You first decide

24 if there's a choice of law provision, and then you determine

25 whether there's some other state whose law would apply and --

1    and that state has to have a fundamental policy at issue.

2        And in that circumstance, where there is a state whose law

3    would otherwise apply, and there's a fundamental policy, then

4    you can apply the law of that state.

5        But that was not the case in the *Ameritox* decision.

6        And with Judge Blake's decision, it was only because the

7    parties agreed that California law would apply in absence of a

8    Maryland choice of law provision, or in this case, a Delaware

9    choice of law provision; it's only because of that agreement

10   that California law applied.

11       The same thing happened in the Fourth Circuit's decision,

12   the *Barnes* case that Mr. Orszag cites in his papers.

13       Again, the Court was careful to note that under the

14   restatement, you have to have both a policy of another state

15   that's fundamental and that state's law applies absence the

16   choice of law.

17       If that state's law would not apply absent the choice of

18   law, the choice of law governs.  And in Maryland, the choice of

19   law provision entered into by the parties presumptively is the

20   right law to apply.

21       That's -- that's our argument.

22           **THE COURT:**  Final word, Mr. Hensen?

23           **MR. HANSEN:**  Yes, Your Honor.

24       Just to answer your Honor's question a minute ago, I

25   didn't get a chance to answer, as we pointed out in our papers,

1   there is no non-compete for Mr. Orszag unless and until he

2   gives them cause under the specified paragraphs for a

3   termination.

4        When he entered into the contract, he had no expectations

5   in giving anybody cause.  He had no reason to think about a

6   cause termination.

7        Second, Your Honor, I know Your Honor was reading the *Fyfe*

8   case, and it's replete with considerations that California has

9   this strong public policy that's offended by a clause that's

10  chosen regarding by Delaware.

11       And what would otherwise apply, Your Honor, it's not lex

12  loci.  That's not what happened in *Jackson,* that's not what

13  happened in *American Motorist.*  Fundamental interests are what

14  the court weighs.

15       And it would be an odd result, indeed, if for the first

16  time, in any case we could find, the Court were to say, yes, it

17  would be offensive to California to allow the parties to choose

18  Maryland law, but we're going to choose Maryland law anyways

19  even though it's offensive to California.

20       Judge Chasanow said if Maryland started doing that, what's

21  to prevent other states from making a similar decision as to

22  Maryland's important public policy interests?

23       So there's really an important issue of comity here, Your

24  Honor, and there's nothing in these cases, with all respect to

25  my colleague, Mr. Murphy, that suggest that you should avoid

 1  looking at the important public policy interest at issue and

 2  apply some kind of reflexive -- or where was the contract

 3  entered into by the last signature?

 4       And even if you did that, Your Honor, right, as I said

 5  before, all roads lead to California.  If you were to apply

 6  Maryland law, it would defer to the place of contracting,

 7  allegedly.  Again, I don't agree with that, but that's what the

 8  lex loci would counsel.  And lex loci would say look to D.C. or

 9  Virginia, and that would send you on something called

10  transmission to California.  That's the way the conflict of law

11  principles in those places work.

12       So, again, that's one of many arguments we have as to why

13  this case should be dismissed.

14       But we think it would be very unfortunate if this Court

15  would be the first to enforce one of these noxious non-compete

16  provisions that California has made tortious to even try to

17  enforce.

18       Thank you, Your Honor.

19            **THE COURT:**  All right.  The Court is going to segment

20  off this issue and decide it right now, so have a seat.

21       In this case, FTI Consulting, Inc., has sued Jonathan

22  Orszag in several counts, essentially, because of an

23  employer/employee relationship.

24       And in connection with our -- with which the parties

25  celebrated an employment agreement, which was Exhibit A, the

1  parties' employment agreement dated January 15th, 2023, between

2  FTI, Lexicon, and Orszag.

3      And in the agreement, it provides at Paragraph 24 as

4  follows:

5      Governing law:  The internal laws of the state of

6  Maryland, paren, other than it's conflict of laws provisions,

7  shall exclusively govern this agreement regardless of any

8  present or future residents, domicile, or place of business of

9  the parties.

10      Each party hereby irrevocably consents and agrees that any

11  claims and disputes between and among the parties pertaining to

12  this agreement, or to any other matter arising out of or

13  relating to this agreement, and not governed by Section 27 of

14  the agreement, be brought in any state or federal court located

15  in the state of Maryland.

16      By execution and delivery of this agreement, each party

17  submits and consents in advance to such jurisdiction in any

18  action or suit commenced in any such court.

19      Each party hereby waives any objection to which it may

20  have based on forum non conveniens and hereby consents to the

21  granting of such legal or equitable, presumed to be relief,

22  relied on as deemed appropriate by such court.

23      Very extensive language.  Not necessarily the language

24  present in Judge Blake's case.

25      The argument made by the defendant in this case

1  essentially is that California law should govern this dispute

2  because that is where Mr. Orszag, against whom certain

3  non-compete and non-solicitation clauses are sought to be

4  enforced.  He resides there, so it goes.

5      There is no question that the explicit language of the

6  agreement says that Maryland law applies, and there's some

7  nouns and verbs and adverbs here that are rather significant.

8      "Regardless of any present or future residence," that's

9  what it says in that clause.

10      "Domicile or place of business of the parties," that's

11  what it says in this clause.

12      "Each party hereby irrevocably consents and agrees"

13  effectively that Maryland law will apply.

14      "By execution and delivery of this agreement, each party

15  submits and consents in advance of such jurisdiction and waives

16  any objection, moreover, that may have been based on forum non

17  conveniens and hereby consents to the granting of such legal or

18  equitable relief" -- I this the word is "relief" -- "as deemed

19  appropriate by such court."

20      Now, that's for starters.

21      The suggestion now is that somehow, in the case that did

22  not involve Maryland law, which was the *Fyfe* case, and the

23  judge had to choose between Delaware and California, that

24  somehow Maryland law is ousted because that's where Mr. Orszag

25  resides and because they have presumably strong policies

1  against non-compete clauses.

2      Maryland does generally enforce choice of law provisions

3  in its contracts under Restatement (Second) of Conflict of

4  Laws, Section 187(2).  Maryland can refuse to honor a choice of

5  law in two limited circumstances:

6      A, when the chosen state has no substantial relationship

7  to the parties or the transaction, and there's no other

8  reasonable basis for the parties' choice; or the application of

9  the chosen state would be contrary to a fundamental policy in

10  the state which has a materially greater interest than the

11  chosen state in the determination of a particular issue and

12  which, under Rule 188, would be the state applicable law in the

13  absence of an effective choice of law by the parties.

14      To this effect, *Jackson v. Pasadena Receivables* at 398 Md.

15  611, 619, I'm quoting the Restatement (Second) of Conflicts in

16  187(2).  The Court finds neither exception as to that provides

17  here.

18      First of all, Maryland obviously has a substantial

19  relationship to both the parties of the transaction in addition

20  to all the rather strong language and waiver and commitment in

21  the clause itself.

22      FTI and Compass Lexecon, which is very much conjoined, if

23  you will, Mr. Orszag, are both incorporated in Maryland, and

24  this dispute involves an agreement between the Maryland company

25  and its employee.

```
 1        I'll take notice of the Fyfe case, but, again, it doesn't
 2   lead me to a different conclusion.
 3        For the second application under the Restatement Provision
 4   provided, Maryland law regarding the dispute must be contrary
 5   to the fundamental policy of California.
 6        California must be the state of applicable law if the
 7   parties had not executed -- had not executed -- a choice of law
 8   provision, and California must have a materially greater
 9   interest in the dispute than Maryland.  Again, the Jackson
10   case, 398 Md. at 619.
11        Maryland's general proclivity to enforce non-compete and
12   non-solicit provisions contradicts -- the Court will accept
13   that -- California's blanket prohibitions on such provisions;
14   that is, comparing Maryland Code Annotated Commercial Law
15   22-616 with the California Business and Provisions Code at
16   16600.
17        But the exceptions, second element, is not met.
18   California would not be the state of applicable law in the
19   absence of the choice of law provision.
20        Maryland uses the lex loci contractus principle to
21   determine which state law can apply in the absence of a choice
22   of law provision, to this effect in Ameritox, Limited, at
23   92 F.3d 389, 397, Note 26, the District Court (2015), and the
24   American Motorist Insurance at 338 Md. 560, 573, 1995.
25        Pursuant to this doctrine, Maryland courts apply the law
```

1  of the place where the last act which makes the agreement a

2  binding contract performed.  This is normally the place where

3  the party signs the contract, which Orszag's agreement was D.C.

4  or Virginia, but presumably FTI's general counsel said they

5  provided.

6      It's not -- certainly not California.  So California would

7  not be the state of applicable law without the choice of law

8  clause.  Whether California has a stronger policy regarding

9  these clauses in Maryland is academic, in the Court's view,

10  because California simply would not provide the applicable law

11  in the absence of the choice of law provision, as I've stated.

12      Maryland law applies to this agreement, and therefore,

13  that is the decision of the Court.  Not the entire case at this

14  point, but it certainly, in my view, sets the ground for

15  further argument.

16      Now, let's perhaps proceed to the next point, which, I

17  guess, we ought to argue this.  If the Court allows the second

18  amended complaint to go forward, some of the deficiencies that

19  are pointed out in the motion to dismiss, obviously, would be

20  covered in that second amended complaint.

21      But it does seem to me, and I am inclined to allow the

22  second amended complaints, it's only five -- at the end of last

23  year, it's not even six full months that it's been pending, not

24  a very long time for a complicated case like this, in federal

25  court, to prohibit an amended complaint going forward.

1          What's curious is that the injunction only lasts for a
2    year.  And by the time we get to this, it looks like the whole
3    injunction disappears, which is why I was, frankly, somewhat
4    perplexed about the whole dust-up here, what are we doing here.

5          But that said, it may be worth, assuming that I will allow
6    the second amended complaint to go forward, and then, again,
7    the defendant would have to repackage his arguments responsive
8    to that first amended complaint, there are some areas that we
9    can talk about.  And I think I cited those.  And perhaps at
10   least we can get some glimmer of where we are.

11         Now that we've talked about Maryland law, blue penciling
12   will apply based on the Court's view and the question, what if
13   any, would be the result of that.

14         But we're talking about a non-compete, we're talking about
15   a non-solicitation clause.

16         Now, the question really is, is the non-compete -- excuse
17   me, is the non-compete clause enforceable?  Is it too broad?
18   Can that be blue penciled?  At least in one respect or another.

19         And is the non-solicitation clause too broad?  And I don't
20   think there's a provision for blue penciling that, but could it
21   be the subject of the other further amended count in the
22   complaint?

23         And perhaps that's the way to discuss it now without
24   necessarily making a final decision; more to point out to the
25   parties that that's the direction we are going, these decisions

1  are going to have to be made.

2      And, in fact, let me put it to rest, like you say.

3  Assuming that I will allow the second amended complaint to be

4  filed, the answer is I will.  So short answer is, second

5  amended will be filed.

6      And then, as a practical matter, it seems to me, then

7  they'll want to respond to the second amended complaint.  But

8  there are, I think, things that we can talk about now that may

9  inform both the way in which the second amended complaint is

10 responded to and replied to.

11     So allowing that the Court will not only find, as it has,

12 that Maryland law governs the transaction, and that the second

13 amended complaint will be permitted -- sorry, first amended

14 complaint will be permitted, let's talk about the issue of the

15 scope of the non-compete.

16     Now, as I read it, and to be more specific, it looks to be

17 pretty much worldwide.  I don't know that there's a lot of case

18 law around Maryland that says these kind of clauses are simply

19 allowed, effectively, where the outcome is someone can't

20 compete anywhere.  And not only the geographics, but the nature

21 of the competing businesses.

22     It looks like there's so much that FTI does around the

23 world, that this man could work at Chick-fil-A but nowhere

24 else.  And that's a problem I've got.

25     Be happy to hear you expand on that.

1          **MR. HANSEN:**  Thank you, Your Honor.

2      I presume the Court does not want to hear our argument

3  that an amendment should not be allowed for bad faith

4  prejudice, so I won't make those arguments, but we've made them

5  in our papers.

6          **THE COURT:**  About?

7          **MR. HANSEN:**  We've made an argument that amendment

8  should not be allowed because --

9          **THE COURT:**  No, I'm going to allow it.  I mean, this

10  is a fairly recent case, candidly. and the Court rarely does

11  not allow -- there's certainly no -- let's take one

12  proposition, very important, added to the counts or claims for

13  nonpayment of a loan, as I recall, a couple of billion dollars

14  in total, there's no reason why that should not go forward.  I

15  mean, this is a claim for money loaned, money earned.  Whether

16  it's valid or not, we shall see.

17      But there it is.  And it's been added within six months of

18  the filing of the suit.

19      That's just kind of another day at the office.  That's not

20  complicated.  That would not be a reason to deny amendment of

21  the complaint to add counts or something like that.

22      Maybe you should address that first and say why, if you're

23  going to do it.  I mean, I think I kind of made up my mind, but

24  if you want to tell me why those causes of action cannot go

25  forward, should not go forward, I'll be happy to let you make a

1    record.

2          MR. HANSEN:  Well, Your Honor, I don't want to waste

3    time making a record, but there's two very simple points.  And

4    again, we think we have to go count by count through the

5    proposed second amended complaint because some of it is futile,

6    at least some of it -- and even if you take those and say they

7    aren't, and why those are futile, why is FTI claiming that

8    Mr. Orszag has to repay those notes?  It's in their amended

9    complaint.  Because he was terminated for cause.

10          But as I would like to be able to explain, Your Honor, he

11    wasn't terminated for cause.

12          THE COURT:  Well, I don't know that yet.

13          MR. HANSEN:  Well, we know; they haven't pleaded it,

14    Your Honor, and that's what I would like to address to the

15    Court in my presentation.

16          THE COURT:  I haven't made any factual finding at all

17    on that.  Right now, all I know is that he was terminated,

18    although there's some curious rehiring that we may want to talk

19    about at some point, too.

20          But he was terminated, and whether it was for cause or not

21    for cause, I don't know.  If it's for cause, excuse me,

22    their -- the money can be recovered; is that the theory?

23          MR. HANSEN:  That's the theory, Your Honor.

24          And I would actually like to show the Court in some detail

25    what the contract provides that we don't even get to the

1    question of whether it's enforceable or not.

2         **THE COURT:**  Well, let's start with something which to

3    me seems fairly obvious, that without making a final judgment

4    in the matter, it would be reasonable at this point to allow a

5    party to say that money was owed to another loan.

6         Now, if you tell me why not only that he can't even be --

7    he should not even be able to put it in the complaint, much

8    less prove it, I'll hear from you.

9         Go ahead.

10        **MR. HANSEN:**  Your Honor, I made my point, which is

11   the reason they claim they can recover the money is he's

12   terminated for cause.  And if I could show Your Honor what the

13   contract says, there's no plausible allegation he was

14   terminated for cause as provided in the contract, ergo, there's

15   no basis for collecting the money.

16        Can I show you what the contract says?

17        **THE COURT:**  Sure, go ahead.  I'll let you make the

18   argument.

19        **MR. HANSEN:**  Okay.  Can we put the contract up?

20        Here's what -- we'll skip to the -- I got to put the

21   defense one, I'm sorry.

22        So let's go to the proposed second amended complaint, so

23   we know Your Honor has leapfrogged over the first amended

24   complaint.

25        In the first amended -- second amended complaint, if we go

1    to Count One, in 17C, and I mentioned this earlier, Your Honor,

2    Mr. Orszag was free to leave and compete unless there was cause

3    termination.  That's point one.

4        Point two, if you go on next, the only cause that could

5    justify termination would be acts that occurred in the 90 days

6    prior to the termination.  So that's what the contract

7    provides.

8        That's August 20 to November 20.

9        Very important, Your Honor, in order to terminate someone

10   for cause under this agreement, the company will specify

11   before -- before terminating, the company will specify the

12   grounds.  There is no pleading in either the first amended

13   complaint or the second amended complaint that Mr. Orszag was

14   ever given any notice.  The first notice of any kind of basis

15   for seeking to terminate him was on November 20 contemporaneous

16   with determination.

17       Moreover, Your Honor, the contract provides, under Section

18   7B, if the action is curable, the employee gets at least 30

19   days from the receipt.

20       Now, Your Honor, you pointed to a curious fact a minute

21   ago.  We know whatever problem they have is curable because

22   Mr. Orszag is still working for Compass Lexecon.  They have not

23   made any plausible allegation.

24           THE COURT:  Wait, though.  I thought that the -- as I

25   recall -- looked at your papers, the subsequent contract still

1  preserves any causes of action that exists prior to

2  repudiation.  Am I correct on that?

3          **MR. HANSEN:**  Yes, Your Honor, but he's still working

4  doing the same work he was doing before.  He's still working

5  for them, whether they preserved cause of action or not.  They

6  clearly have maintained their relationship.  It's not an

7  incurable relationship.  They have taken him -- he's held out

8  on their website and taking new matters, so they can't claim

9  it's an incurable problem.  He's still working for them,

10 regardless of whether they put in a reservation of rights as to

11 claims language.

12         **THE COURT:**  They call him a contractor now rather

13 than an employee?

14         **MR. HANSEN:**  They call him that, but he's still doing

15 the same work, taking in new clients, working -- held out as

16 one of their consultants.  These are all things --

17         **THE COURT:**  Is he subject to the employment

18 agreement?

19         **MR. HANSEN:**  No, the employment agreement --

20         **THE COURT:**  That's out --

21         **MR. HANSEN:**  This is a new agreement.

22         **THE COURT:**  What do you make of the fact that all

23 rights are reserved under the employment agreement?

24         **MR. HANSEN:**  It doesn't change the fact that he's

25 still doing the same thing he was doing before, and it doesn't

1  change the fact that he has a relationship with Compass

2  Lexecon.  I mean, it's just not -- it doesn't any make sense as

3  a matter of common sense.  That's not an incurable

4  relationship.

5      They want to handcuff him with a non-compete while he

6  continues to work for them and make money for them.

7      Your Honor, before we get to the question, this is where I

8  wanted to start my argument, these thorny questions of choice

9  of law don't even arise until a non-compete comes into play.

10  They don't just get to say, "Well, we got a non-compete."

11      Both in the first amended complaint and the second amended

12  complaint, they do not plead facts that establish they gave him

13  notice.  They do not plead facts that establish they gave him

14  notice.  They do no plead facts that establish he got a cure

15  period or that it was really incurable, they just recite the

16  conclusion, which doesn't count.  And what they claim as cause

17  is plainly not cause.

18      And if we can go to what they claim on that, it goes to

19  clear questions of law.

20      If you look at -- if you look at what they claim as the

21  cause, Let's talk about it.  This is what was in the letter

22  they sent on November 20th.

23      The only things they recite as supposed cause for

24  termination -- and, again, we have to compare this with the

25  contract and his duties and responsibilities, they say that on

1   particular dates between October 17 and November 3rd, in

2   communications only with the CEO, that's a man named Mr. Gundy,

3   he demanded a restructuring of the governance agreement between

4   Compass Lexecon and FTI indicating that the issue here isn't

5   Mr. Orszag is wanting more money, because he doesn't want more

6   money; he wanted to have a better relationship between the

7   subsidiary and the parent.

8        Your Honor, that is privileged employee conduct to

9   negotiate with an employer.  There is no credible basis for

10  saying that breached any employment duty.

11       Second, it's another negotiation point, demanded that FTI

12  sell Compass Lexecon for a fraction of its true value.  Well,

13  that's another negotiation point.  He's entitled to negotiate.

14  That does not create cause for termination.

15       Third, they say he threatened to resign.

16       Well, as I showed you a minute ago, Your Honor, his

17  contract expressly says he can resign and go compete.  So

18  saying he might do what he's privileged to do can't establish

19  cause for termination.

20       Now, Your Honor may say, well, he's a difficult employee,

21  they didn't like negotiating with him.  But the contract allows

22  FTI to terminate Mr. Orszag without cause, and they allow

23  Mr. Orszag to go off and compete.

24       So what's happened here is they have tried to give

25  themselves the right to this 12-month freeze period for

1   Mr. Orszag.  And your Honor has mentioned it several times.

2        You can say it's not so long in the case, we're in our

3   eight month now, and that's certainly true for your usual civil

4   cases, but this expires in November.  So every day that goes on

5   while this continues, they are getting the relief that they

6   have sought, effectively, because they are keeping Mr. Orszag

7   from competing and doing what he has a right to do.  He's

8   frozen.

9        And, you know, people have first-mover advantages.  It

10  matters to when you have to go out and start something new, and

11  they are keeping him from doing that.  The only place he can

12  work, as Your Honor pointed out, is a Chick-fil-A or at Compass

13  Lexecon, and that's why he's working at Compass Lexecon because

14  those are his choices.

15       So, Your Honor, we don't even get to a non-compete because

16  they haven't alleged facts that would give them a basis to

17  argue for the non-compete.

18       **THE COURT:**  Excuse me one second.

19       I have a 12:30 FBI agent coming in on another matter, I'm

20  going to have to break off, so I just need to keep track of the

21  time.

22       **MR. HANSEN:**  Of course, Your Honor.

23       Your Honor has already pointed to this, so I'm following

24  Your Honor's question.  We say you don't even get to talking

25  about a non-compete because the predicate hasn't been pleaded.

1    We have it very clear, the facts are there or not there.  And

2    they have three shots at it, Your Honor.

3        They tried an original complaint in state court, an

4    amended complaint, and now you've got a third amended complaint

5    on file.  They have tried.

6        Look at the -- I'm not going to read it aloud, Your Honor,

7    because you effectively characterized it.  But what this says,

8    in 9A, is that Mr. Orszag can't work for, own an interest in,

9    be a director, be a consultant of any company -- any company --

10   engaged in what they call competing business.

11       Now, you might think, well, competing business, that

12   sounds sort of innocuous, but let's go to the definition of

13   competing business.  It means consulting business.  It means

14   economic, financial, regulatory, corporate, and litigation

15   consulting services including those provided to law firms,

16   corporations, government.  It's everything, Your Honor.

17       FTI operates a vast array of different product lines

18   around the world, and -- what the cases have said, and Your

19   Honor is more familiar with them than I am, the only way you

20   can have a non-compete is if you're limiting it to the goodwill

21   the employee generated for the employer during his employment.

22       Mr. Orszag didn't generate any goodwill for FTI in all of

23   these areas or most of these areas, and they don't plead facts

24   they say that they -- that he did.

25       Then Your Honor pointed out the market area, that's

1  equally broad anywhere, basically, anywhere in the U.S.,
2  Europe, Israel, China, Singapore.  There's no plausible
3  argument Mr. Orszag generated any goodwill for FTI in those
4  places.  They've got an office in Helsinki doing something.
5  He's never been to Helsinki.  It's grotesquely overbroad.
6      So the question your Honor said several times, so what do
7  we do about that?  I respectfully submit that what courts have
8  done in these instances is grant motions to dismiss.  They
9  haven't said to the parties go back and rewrite your clause.
10 They haven't rewritten the clause for the parties.  They
11 basically said, sorry, that's too broad, we won't enforce it.
12     I'm not sure how you --
13         **THE COURT:**  The blue pencil law with regard to these
14 geographics, so recognized in the state of Maryland, whose law
15 applies, does allow you to trench back a clause which is too
16 broad, assuming it can be done reasonably.
17         **MR. HANSEN:**  Well, Your Honor, we've cited the cases.
18 We don't mean to disagree with Your Honor.
19         **THE COURT:**  Well, then, take, for example, applying
20 to the United States, or only to the United States and UK.  And
21 I don't know why -- I'm not going to argue plaintiff's case for
22 them, but that's the kind of thing that happens when you talk
23 about blue pencil under Maryland law.
24         **MR. HANSEN:**  Well, your Honor, there's both the
25 market area and the services.  They are both overbroad.

1          **THE COURT:**  Services is a separate proposition.

2    Whether you can tie up the rest of the world, even in the

3    United States if you're doing anything, that may be a problem.

4          **MR. HANSEN:**  All of the United States.

5       Your Honor, I don't mean to disagree with the Court, but

6    we don't believe the blue penciling allows the Court when it's

7    not even asked to do so by the parties.  FTI has not asked you

8    to blue pencil or suggested how it could be blue penciled.  We

9    don't --

10         **THE COURT:**  A judge gets the case, and you say throw

11   it out, and then they say it should stay on hold, a Court is

12   not blind to what the possibilities are.  And the Court may

13   well say, even though a party doesn't raise it, you've asked

14   for scope, it's too broad, we -- the defendant says throw it

15   out entirely.  And the Court then points out to the party that

16   has presumably made the -- supports the proposition that it's

17   too broad, if you can narrow it in a plausible way, you can do

18   it.

19      Not improper for the Court to point that out.  So whether

20   they have asked for it or not, well, that's life.  I mean --

21         **MR. MURPHY:**  Well, Your Honor, I don't -- a recent

22   decision of this Court has said --

23         **THE COURT:**  Let me hear from -- I want to stay with

24   your initial proposition, which is not a bad one, that you

25   shouldn't get prior notice on a for-cause dismissal.

1    And let's see what Mr. Murphy has to say about that.

2         **MR. MURPHY:**  Thank you, Your Honor.

3    Under the paragraph that governs terminations for cause,

4    Mr. Orszag, if there's cause, could be terminated immediately

5    upon notice from the company, and he would not be given

6    opportunity to cure unless the breach was deemed to be curable.

7    Now --

8         **THE COURT:**  What's the language you're relying on

9    that says that?  You're telling me that there's a provision

10   that basically, what, obviates the 30-day notice?

11        **MR. MURPHY:**  Yes.

12        **THE COURT:**  Let's look at it.

13   In Paragraph 17B of the contract, on Page 7, it reads as

14   follows:

15   Employee's termination for cause will be effective

16   immediately upon the company mailing or transmitting notice of

17   such termination provided the notice is given within 90 days

18   after discovery by the company of the event or conduct giving

19   rise to grounds to terminate the employee for cause.

20   Before terminating the employee for cause under

21   Subsections 2 through 6, the company will specify in writing to

22   employee the nature of the act, the omission or the failure

23   that it deems to constitute cause, and if the action is

24   curable, give the employee at least 30 days from the receipt of

25   such notice to correct the situation and thus avoid termination

1   for cause.

2       So he can be terminated for cause immediately; if the

3   matter that gives rise to the termination for cause is curable,

4   he can be given 30 days to cure it.

5           **THE COURT:**  If it is, he can -- he will be, he's

6   entitled to it.

7           **MR. MURPHY:**  He's entitled to if it's curable.

8           **THE COURT:**  All right.

9           **MR. MURPHY:**  Now, when the FTI sent the letter to

10  Mr. Orszag terminating him for cause, the company stated

11  exactly what provisions of the contract they believed he had

12  violated, and they said the company has determined that these

13  acts are uncurable.  This is in the Exhibit B, which was filed

14  under seal, the -- the termination for cause letter was filed

15  by us under seal.

16      And I think that counsel for Mr. Orszag tends to minimize

17  what it is that Mr. Orszag had done and what the company

18  believed constituted terminable acts for cause.

19      He was the -- one of the four senior executives of Compass

20  Lexecon, which is itself a multibillion dollar business with

21  800 employees worldwide, he had been the chief operating

22  officer, in effect, of that segment of the company prior to the

23  agreement in 2023.  They entered into a new governance

24  agreement that involves shared control between Mr. Orszag and

25  three other senior executives, and they changed the way in

1    which he was compensated in ways that he did not like.

2        Beginning in the summer of 2023, six months after he

3    signed the agreement, he began saying, "I want a new

4    agreement."  And he wanted two things:

5        He wanted to change the compensation formula so he would

6    get more money than he had been getting under the new contract;

7    and he wanted FTI to relinquish control of Compass Lexecon.

8        Mr. Orszag unfortunately has never gotten over the notion

9    that FTI owns Compass Lexecon.  Compass Lexecon is an LLC which

10   has one member:  That member is FTI, the company.

11       He is not an owner.  He has not been since he joined the

12   company in 2006, but he wanted to be an owner.  Not only did he

13   want to be an owner, in negotiating with the CEO of the

14   company, Mr. Gunby, he made it clear that "if you are not

15   willing to relinquish ownership and control to me and my other

16   group of senior folks, and give up FTI's control, then I will

17   leave and I will take everybody with me."

18       That's what he threatened.  That was the ultimatum that he

19   gave to Mr. Gunby in November.  That was the grounds for cause,

20   because when Mr. Gunby presented that proposal for Mr. Orszag

21   to the board of directors, the board of directors said, fire

22   him because he is disloyal.  He has fomented dissension among

23   the Compass Lexecon employees.  He wants to take them all.  He

24   said he would take them all.

25       And then we found in an e-mail that he sent -- after we

1  filed the complaint, the first complaint, we found in an e-mail
2  that he sent a plan that he developed to present to investors
3  in which he says, "We have" -- he and the other three, "We have
4  the best forensic consulting firm in the antitrust world, we're
5  the best in the world.  We have the greatest capacity to create
6  revenue.  We will bring in business.  And how will we do it?
7  We will take all the Compass Lexecon employees who are loyal to
8  me with me when I go."

9      This is what he was planning.  This is what he had
10 intimated to the CEO, "This is what I will do if you do not
11 accept my demand that you sell the company to me at a reduced
12 right or you relinquish control."

13     Now, what corporation would allow an employee to do that?
14 And this was an employee who had responsibility for managing
15 that entire unit of the company.  The Compass Lexecon unit was
16 within his responsibility.

17     He had a fiduciary duty to -- not just to Compass Lexecon,
18 but to FTI, the owner, to act in accordance with the best
19 interest of that company.  But that's not what he was about.

20     He said, do what I want you to do or I'm out of here and
21 everyone will leave with me.

22     And that's what this letter says:  You threatened that you
23 had resigned and start a competing firm taking other Compass
24 Lexecon senior professionals and staff with you if FTI refused
25 your demands.

1    And this is just a few months after he signed a new

2   contract that was a four-year contract that put him in charge

3   with the three other people of the -- of the Compass Lexecon

4   business.

5         THE COURT:  All right.

6         MR. MURPHY:  This was -- this was grounds for cause.

7   And this is not curable.  This is a breach of fiduciary

8   obligation.

9         THE COURT:  That's the issue, does the issue of

10  curability raise a genuine issue of material fact.  Is that --

11  can the Court, as a matter of law, on a motion to dismiss,

12  decide that these actions, presumably provable, are

13  non-curable?  And if they are, then a 30-day notice is not

14  required.

15       Your argument is, I think, Mr. Hansen, 30 days across the

16  board, under any circumstances.  The plaintiff says no, they

17  are not curable, no 30-day requirement -- notice is required.

18       Wouldn't that be something that would have to be

19  litigated?

20       I need to hear you quickly on this because I'm going to

21  have to --

22         MR. HANSEN:  Of course, Your Honor.

23       Actually, I think Mr. Murphy has taken quite a lot of

24  liberties with what's been alleged.

25       If you look at the termination notice, it refers to

1  communications with Mr. Gunby in October and early November.

2  In none of those communications does Mr. Orszag allegedly

3  threaten to take employees with him.  It's not even pleaded.

4      Second, Your Honor, you focused on the language.

5  Mr. Murphy got up and read the sentence before, what we've

6  highlighted on the screen.  It doesn't change what's

7  highlighted on the screen.

8      Before terminating an employee for cause, the company will

9  specify in writing, et cetera.

10     It's conceded that's not in either of the two complaints,

11 and it didn't happen.  That was a requirement independent --

12         **THE COURT:**  This is a writing.  A letter is a

13 writing.  It's whether it has to come 30 days or more; is that

14 right?

15         **MR. HANSEN:**  It has to come before -- materially

16 before termination.

17         **THE COURT:**  Well, he's not fired until he gets the

18 letter, is he?

19         **MR. HANSEN:**  He's not given notice until he is fired;

20 the firing is co-extensive with the notice.  Nothing happens

21 before November 20 --

22         **THE COURT:**  But you're saying 30 days under all

23 circumstances?

24         **MR. HANSEN:**  I'm saying under all circumstances, he

25 was entitled to prior notice.  And I'll tell you why that

1    matters, Your Honor.  It matters a lot.

2        I mean, the contract has just expressed, and the words

3    Mr. Murphy read don't change it at all, if FTI had said to

4    Mr. Orzig, we believe you're doing things that could subject

5    you to a firing for cause, he could leave.  He had the right to

6    leave and go compete and not be shackled by a non-compete.

7        He could, that day, say, "Okay, if you feel that way about

8    me, fine, I'm gone."

9        And, Your Honor, it's just so disingenuous, the jury

10   speech we heard, because I'll put up, if you want, Mr. Gunby's

11   communication to Mr. Orszag, which you have in the briefing, on

12   November 5th, 2023, where Mr. Gunby says to Mr. Orszag, after

13   all of these supposedly terrible acts that they are not telling

14   you about, "Thank you for your candor, we value -- you've been

15   direct and clear, we value your contributions, we hope we can

16   find a path" --

17       **THE COURT:**  This is contradicting evidence, so -- I

18   mean, you're saying we can prevail on that point, but he hasn't

19   demonstrated either cause or the curability.

20       Right now, all I have to decide is whether, as a matter of

21   law, not looking at all of these documents at this point --

22       **MR. HANSEN:**  Well, Mr. Murphy --

23       **THE COURT:**  Well, they have made an allegation, and

24   the allegation is that under the language of the contract, at

25   least one interpretation, is if it's curable, he gets 30 days.

1        The question is, is it curable?

2        If it's not curable, then maybe they don't have to give 30

3   days, if that's the way the trier of fact reads the contract.

4   I mean, that's really what I'm faced with on a motion to

5   dismiss.

6            MR. HANSEN:  Absolutely, Your Honor.

7            THE COURT:  Either you're right or you're wrong; I

8   don't know whether they are right or wrong.

9            MR. HANSEN:  Well, here's what we think the guidepost

10  is.  It's *Twombly*.  They can't say just those things in a

11  conclusory way.  There have to be facts established in a

12  plausible claim on three points, Your Honor; not just one, but

13  three points.

14       First, did they give notice as required by the contract?

15  Because if they didn't, they have no right to terminate him for

16  cause.  And that's independent of anything else.  And that you

17  have to decide as a matter of law.  Did they plead facts

18  sufficient to get that requirement?

19       Second, Your Honor, have they pleaded facts?  Not just

20  said it's incurable.

21       Your Honor, I was a lawyer in *Twombly*.  The other side

22  said plaintiffs are alleging a conspiracy.  They all got

23  together and kept people out of their territory.

24       The Court said that's not a fact, that's a conclusion,

25  claiming it's incurable is a conclusion.

1    What are the facts that show it's incurable?  The answer

2  is none, because the only facts they cite to are protected

3  employee conduct that he had every right to do.

4    I mean, Mr. Murphy got up and gave maybe a stemwinder

5  speech about how terrible this was.  Well, it wasn't terrible

6  and it was within his right.  They could absolutely say to him,

7  sorry, we're not going to negotiate with you, good luck, do

8  your best.

9    They didn't say that.

10    **THE COURT:**  I need to stop you on this.  I'm going to

11  need to recess.

12    I'm not deciding this finally.  A second amended -- a

13  second amended complaint, I have it now, and I think I'm

14  looking to an opposition from you, Mr. Hansen, to the second

15  amended complaint, and maybe a reply.

16    The -- I only get into this argument now to suggest to you

17  that as it's being argued, I do see at least the possibility

18  that this could be determined to be a non -- these acts could

19  be determined to be non-curable, and, therefore, under one

20  interpretation of the contract, no 30-day notice would be

21  required.

22    Now, whether, in fact, they can prove it, another matter.

23  Whether they have to be more specific in terms of their detail,

24  I mean, I'm looking at the letter, at least that seems to pass

25  muster for a motion to dismiss.

```
1        So I'm not -- I'm not really going to decide it finally.
2   I just wanted to point it out.  I hear your argument, and in
3   terms of where the parties go from this point, I do suggest to
4   you that maybe there is that triable issue, that issue that
5   can't be decided on a motion to dismiss about curability versus
6   non-curability.
7        And with that, I've got to recess shortly.  Just wait a
8   second.
9        I'm going to have to -- I hate to do this to you folks.
10  We're going to have to -- I want to give you more time to
11  argue.  I've got two non-moveable feasts coming up right now,
12  one is with the FBI, and then the other is with the clerk.
13       And then at 3:00, we begin a ceremony next door for, of
14  course -- we have about another hour more to argue, to hear
15  from you today, if you can stick around, if you're willing to.
16       But I won't be able to pick up until, I guess, maybe --
17  maybe 1:30 because of what's going to intervene.  Maybe 1:45,
18  actually, to allow for the two meetings that I have now.
19       Can you do it within that time, you think, between 1:45
20  and 2:45 today?
21           MR. HANSEN:  Your Honor, we'll be as efficient as we
22  can.
23           THE COURT:  Do the best you can.
24       Again, I'm not deciding that particular issue.  Actually,
25  whether, in fact -- I think we stopped on the point of whether
```

1  those two causes of actions can go forward.

2      And insofar as the argument was based on cause, insofar as

3  there's an issue about whether notice would be required, if it

4  was not curable, presumably, that would also respond to the

5  argument that they are unable to pursue the $2 billion loans.

6      Is there more that suggests why they couldn't go after

7  that money?

8          **MR. HANSEN:**  There is, Your Honor, because we believe

9  that their termination -- alleged termination for cause is bad

10 faith, is itself a breach of the agreement, and a breaching

11 party can't recover.

12         **THE COURT:**  Well, let me hear about that from you

13 when we reconvene, let's say, at 1:45.

14         **MR. HANSEN:**  Thank you, Your Honor.

15         **THE COURT:**  Okay.  Fair enough?  Thank you, folks.

16         **LAW CLERK:**  All rise.

17         **DEPUTY CLERK:**  This Honorable Court now stands in

18 recess.

19      (Proceedings were recessed at 12:23 p.m.)

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4       I, Paula J. Leeper, Federal Official Court Reporter, in

 5  and for the United States District Court for the District of

 6  Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that

 7  the foregoing is a true and correct transcript of the

 8  stenographically-reported proceedings held in the

 9  above-entitled matter and the transcript page format is in

10  conformance with the regulations of the Judicial Conference of

11  the United States.

12                         Dated this 17th day of June 2024.

13

14

15                         /S/ Paula J. Leeper
                           _____
16
                            Paula J. Leeper
17                          Federal Official Reporter

18

19

20

21

22

23

24

25
```

```
DEPUTY CLERK: [2]  3/2 60/17
LAW CLERK: [1]  60/15
MR. HANSEN: [72]
MR. MURPHY: [38]  3/13 3/17 5/25 6/4 6/7 6/14 6/18
 6/24 7/3 7/11 7/17 7/21 9/14 9/20 9/24 10/3
 10/18 10/24 11/9 11/21 16/4 16/24 17/1 18/1 18/7
 18/12 18/17 18/20 18/23 20/14 31/18 53/21 54/2
 54/11 55/7 55/9 58/6
THE COURT: [111]
THE WITNESS: [1]  6/5

$
$100,000 [1]  26/20
$2 [1]  64/5
$2 billion [1]  64/5

'
'24 [2]  5/15 5/16

/
/S [1]  65/15

0
0444 [1]  1/16

1
100 [2]  1/15 1/18
1159 [1]  2/5
11:00 [1]  1/11
12-month [1]  49/25
12:23 [1]  64/19
12:30 [1]  50/19
13 [1]  1/11
130 [1]  12/4
145 [1]  12/5
15th [1]  36/1
1615 [1]  2/4
16600 [1]  39/16
16600.5 [1]  25/15
17 [1]  49/1
17B [1]  54/13
17C [1]  46/1
17th [1]  65/12
187 [7]  19/19 20/12 21/13 21/13 32/1 38/4 38/16
188 [1]  38/12
1980 [1]  31/24
1995 [1]  39/24
1:30 [1]  63/17
1:45 [3]  63/17 63/19 64/13

2
20 [6]  12/8 12/10 46/8 46/8 46/15 59/21
20036 [1]  2/5
2006 [1]  56/12
2015 [1]  39/23
2023 [4]  36/1 55/23 56/2 60/12
2024 [2]  1/11 65/12
20th [1]  48/22
21202 [2]  1/16 1/19
22-616 [1]  39/15
24 [2]  16/5 36/3
2440 [2]  1/15 1/18
26 [1]  39/23
27 [1]  36/13
28 [1]  65/6
2:45 [1]  63/20

3
30 [8]  46/18 54/24 55/4 58/15 59/13 59/22 60/25
 61/2
30-day [4]  54/10 58/13 58/17 62/20
3200 [1]  3/8
332-0444 [1]  1/16
338 [1]  39/24
389 [1]  39/23
397 [1]  39/23
398 [2]  38/14 39/10
3:00 [1]  63/13
3rd [1]  49/1

4
40 [1]  13/3
400 [1]  2/4
410 [3]  1/16 1/19 2/5

5
560 [1]  39/24
573 [1]  39/24
5th [1]  60/12

6
611 [1]  38/15
616 [1]  39/15
619 [2]  38/15 39/10

7
7000 [1]  1/19
753 [1]  65/6
783-7000 [1]  1/19
7B [1]  46/18

8
8,000-person [1]  30/20
800 [1]  55/21
8:23-cv-03200-PJM [1]  1/5
```

```
9
90 [2]  46/5 54/17
949-1159 [1]  2/6
9A [1]  51/8

A
A.M [1]  1/11
abandon [1]  11/17
able [3]  44/10 45/7 63/16
above [1]  63/8
above-entitled [1]  65/9
absence [9]  10/9 11/12 32/9 37/3 33/15 38/13 39/19
 39/21 40/11
absent [3]  19/16 32/17 33/17
absolute [5]  20/24 23/8 27/20 27/21 27/21
absolutely [2]  61/6 62/6
academic [1]  40/9
accept [2]  39/12 57/11
accepted [2]  10/22 31/22
accordance [1]  57/18
acknowledged [2]  4/3 26/1
across [2]  24/14 58/15
act [3]  40/1 54/22 57/18
acted [1]  11/18
action [8]  3/8 4/25 36/18 43/24 46/18 47/1 47/5
 54/23
actions [3]  6/9 58/12 64/1
actually [1]  25/2
acts [6]  19/11 46/5 55/13 55/18 60/13 62/18
actually [10]  11/14 11/25 26/9 28/10 28/14 31/20
 44/24 58/23 63/18 63/24
add [2]  12/21 43/21
added [2]  43/12 43/17
addition [4]  16/15 19/7 23/10 38/19
additional [1]  24/24
address [7]  9/5 9/13 12/12 13/12 14/13 43/22 44/14
addressed [2]  7/12 7/13
adjudication [1]  17/23
adopt [1]  10/12
adopts [1]  32/20
advance [3]  16/15 36/17 37/15
advantages [1]  50/9
adverbs [1]  37/7
affirmative [1]  15/20
afloat [1]  31/11
after [13]  4/25 5/16 5/23 6/8 7/2 12/18 22/14
 54/18 56/2 56/25 58/1 60/12 64/6
again [13]  24/7 24/23 31/3 32/21 33/13 35/7 35/12
 39/1 39/9 41/6 44/4 48/24 63/24
against [9]  7/8 20/23 21/6 24/4 25/18 29/7 31/7
 37/2 38/1
agent [1]  50/19
ago [3]  33/24 46/21 49/16
agree [8]  5/23 10/24 22/1 28/3 28/5 31/22 32/12
 35/7
agreed [6]  10/3 20/10 21/12 25/19 30/24 32/7
agreement [30]  16/5 16/8 20/3 22/8 33/9 35/25 36/1
 36/3 36/7 36/12 36/13 36/14 36/16 37/6 37/14 38/24
 40/1 40/3 40/12 46/10 47/18 47/19 47/21 47/23 49/3
 55/23 55/24 56/3 56/4 64/10
agreements [3]  17/9 17/10 19/15
agrees [3]  16/11 36/10 37/12
ahead [5]  9/14 9/15 13/1 45/9 45/17
AIDED [1]  1/24
aiming [1]  8/9
Alaska [1]  30/9
all [58]  3/3 3/11 3/15 3/18 4/5 4/11 4/15 4/20
 4/22 4/24 5/18 5/21 6/12 6/25 7/4 7/9 8/25 11/8
 11/18 11/19 13/8 14/9 14/12 14/16 23/10 23/10
 23/21 24/3 24/6 27/23 29/9 34/5 34/7 34/14 34/24
 35/5 35/19 38/18 38/20 44/16 44/17 47/16 47/22
 51/22 53/4 55/8 56/23 56/24 57/7 58/5 59/22 59/24
 60/3 60/13 60/20 60/21 61/22 64/16
allegation [5]  25/5 45/13 46/23 60/23 60/24
alleged [5]  6/18 22/12 34/7 40/21 41/5
allegedly [2]  35/7 59/2
alleging [1]  61/22
alive [15]  7/22 22/22 25/20 27/17 34/17 40/21 41/5
 42/3 43/9 43/11 45/4 49/22 52/15 57/13 63/18
allowed [4]  7/13 42/19 43/3 43/8
allowing [1]  42/11
allows [3]  40/17 49/21 53/6
almost [1]  14/17
along [2]  8/6 11/20
aloud [1]  51/6
already [1]  50/23
also [8]  2/6 4/13 5/12 5/20 11/1 16/23 31/25 64/4
although [2]  24/5 44/18
always [1]  29/8
am [6]  5/4 14/14 29/21 40/21 47/2 51/19
amend [1]  7/7 7/23 25/14
amended [8]  6/18 7/14 7/19 9/5 12/5 14/18
 14/20 14/23 24/12 40/18 40/20 40/22 40/25 41/6
 41/8 41/21 42/3 42/5 42/7 42/9 42/13 42/13 44/5
 44/8 45/22 45/23 45/25 45/25 46/12 46/13 48/11
 48/11 51/4 51/4 62/12 62/13 62/13
amendment [3]  43/3 43/7 43/20
American [4]  22/17 26/6 34/13 39/24
Ameritox [3]  32/22 33/5 39/22
among [4]  16/12 24/16 36/11 56/22
analysis [9]  21/13 21/13 22/1 22/15 26/7 27/6
 29/20 31/21 32/21
Anderson [2]  2/6 3/21 4/9
Angelas [3]  18/23 20/17 20/19
Annotated [1]  39/14
another [11]  13/1 26/16 33/14 41/18 43/19 45/5
 49/11 49/13 50/19 62/22 63/14
answer [9]  5/19 19/20 26/16 29/11 33/24 33/25 42/4
 42/4 62/1
answers [1]  7/19
anticipatory [1]  24/19
```

```
antitrust [1]  57/4
anybody [3]  6/16 29/12 34/5
anyplace [2]
anything-or [3]                 /1/16
anyway [1]  29/20
anyways [1]  34/18
anywhere [4]  23/4 42/20 52/1 52/1
apart [1]  9/1
appearance [4]  3/23 3/25 4/5 4/10
APPEARANCES [2]  1/12 1/25
appears [1]  8/25
applicable [10]  10/9 16/1 17/22 32/9 32/16 38/12
 39/6 39/18 40/7 40/10
application [4]  24/9 32/4 38/8 39/3
applied [4]  22/15 23/1 31/13 33/10
applies [14]  14/5 14/7 15/2 15/8 15/20 16/21 20/7
 20/9 22/4 24/13 33/15 37/6 40/12 52/15
apply [33]  10/9 11/1 13/18 13/23 15/10 15/22 17/20
 19/16 19/22 22/2 22/7 23/8 23/18 26/2 31/2
 32/2 32/12 32/13 32/15 32/25 33/3 33/4 33/7 33/7
 33/20 34/11 35/2 35/5 37/13 39/21 39/25 41/12
applying [2]  29/23 52/19
approach [1]  32/23
appropriate [3]  16/19 36/22 37/19
approximately [1]  4/19
arbitration [1]  16/13
area [2]  51/25 52/25
areas [3]  41/8 51/23 51/23
aren't [2]  8/5 44/7
argue [8]  8/18 14/3 15/9 40/17 50/17 52/21 63/11
 63/14
argued [2]  62/17
arguing [4]  5/18 8/16 13/17 16/22
argument [24]  7/5 12/4 12/13 13/7 14/13 15/9 17/7
 17/21 20/12 28/12 29/6 33/21 36/25 40/15 43/2 43/7
 45/18 48/8 52/3 58/15 62/16 63/2 64/2 64/5
arguments [6]  12/1 13/15 14/22 35/2 41/7 43/4
arise [3]  16/12 19/9 48/9
arising [1]  36/12
around [7]  12/21 18/22 18/24 42/18 42/22 51/18
 63/15
array [1]  51/17
aside [2]  4/18 20/1
ask [6]  4/17 5/21 6/10 27/7 27/9 27/25
asked [6]  12/11 27/10 53/7 53/7 53/13 53/20
asking [1]  28/19
assert [1]  9/17
assignments [1]  12/9
assistance [1]  14/11
assuming [3]  41/5 42/3 52/16
August [1]  46/8
August [2]  46/8
authorities [1]  12/18
avoid [4]  10/18 28/22 34/25 54/25
aware [2]  17/12 25/10
away [3]  6/23 24/21 24/23

B
back [9]  11/4 13/5 13/5 19/12 28/7 28/21 29/12
 52/9 52/15
bad [3]  43/3 53/24 64/9
balancing [2]  29/3 30/19
Baltimore [2]  1/16 1/19
Bard [1]  20/5
Barnes [1]  33/12
base [1]  18/13
based [11]  5/1 10/14 16/17 17/8 18/3 18/7 18/10
 36/20 37/16 41/12 64/2
basic [5]  9/19 20/4 31/20 32/20 32/23
basically [3]  52/1 52/11 54/10
basis [5]  38/8 45/15 46/14 49/9 50/16
bear [1]  20/8
bears [1]  20/6
because [53]  11/2 11/16 13/16 14/14 14/23 17/22
 17/25 18/1 18/2 19/10 19/21 19/24 20/1 20/9 20/24
 21/7 22/4 23/2 23/11 24/13 24/14 24/19 25/3 26/21
 28/22 29/16 32/15 32/18 33/6 33/9 35/22 37/2 37/24
 37/25 40/10 43/8 44/5 44/9 46/21 49/5 50/6 50/13
 50/15 50/25 51/7 56/20 56/22 58/20 60/10 61/15
 62/2 63/17 64/8
before [19]  1/10 3/7 3/9 4/16 12/1 12/8 15/19 35/5
 46/11 46/11 47/4 47/25 48/7 54/20 59/5 59/8 59/15
 59/16 59/21
began [1]  56/3
begin [1]  63/13
Beginning [1]  56/2
begins [1]  31/21
Behalf [2]  1/13 2/2
being [9]  6/25 7/16 8/12 9/2 14/22 14/23 28/22
 30/21 62/17
believe [7]  3/23 4/1 18/17 30/13 53/6 60/4 64/8
believed [2]  55/11 55/18
benefit [2]  27/18 27/18
benefits [1]  27/15
best [5]  57/4 57/5 57/18 62/8 63/23
better [1]  49/6
between [13]  11/3 16/11 19/16 25/12 36/1 36/11
 37/23 38/24 49/1 49/3 49/6 55/24 63/9
big [1]  25/11
billion [2]  43/13 64/5
binder [1]  7/4
binding [2]  27/13 40/2
bit [1]  21/16
Blake [5]  21/11 21/14 21/25 25/23 29/18
Blake's [4]  31/9 31/19 33/6 36/24
blanket [1]  39/13
blind [1]  53/12
blue [18]  8/18 8/23 11/12 12/14 12/16 12/17
 12/19 12/23 13/4 41/11 41/18 41/20 52/13 52/23
 53/6 53/8 53/8
board [4]  24/14 56/21 56/21 58/16
both [10]  6/8 16/22 24/17 33/14 38/19 38/23 42/9
 48/11 52/24 52/25
```

**B**

bound [3]   23/6 28/12 28/14
Bowie [1]   19/6
breach [7]   5/1 6/9 18/5 19/8 54/6 58/7 64/10
breached [1]   49/10
breaching [1]   64/10
breadth [2]   4/23 7/25
break [1]   50/20
briefing [2]   12/18 60/11
bring [1]   57/6
broad [10]   8/14 8/19 9/2 41/17 41/19 52/1 52/11
  52/16 53/14 53/17
broadly [1]   10/21
brought [2]   16/13 36/14
burden [3]   15/6 20/6 20/8
business [12]   16/10 25/21 36/8 37/10 39/15 51/10
  51/11 51/13 51/13 55/20 57/6 58/4
businesses [3]   27/17 31/4 42/21
buy [1]   12/25

**C**

California [80]
California's [5]   19/23 21/25 23/8 25/23 39/13
California-based [1]   18/3
Californian [1]   28/22
call [3]   47/12 47/14 51/10
called [3]   3/2 12/17 35/9
came [2]   12/18 26/6
can't [17]   12/20 12/20 12/21 13/5 20/9 22/19 23/23
  24/20 26/2 42/19 45/6 47/8 49/18 51/8 61/10 63/5
  64/11
candidly [3]   13/11 13/16 43/10
candor [1]   60/14
cannot [2]   20/8 43/24
capacity [1]   57/5
captioned [1]   16/6
card [1]   22/8
care [1]   27/11
careful [1]   33/13
cares [1]   27/11
case [50]   3/25 4/16 4/18 12/15 12/17 13/2 17/3
  19/7 20/8 21/1 21/11 21/16 22/4 22/25 23/4 23/21
  24/3 24/5 28/4 29/8 31/5 31/10 31/12 31/16 31/24
  32/5 32/11 32/11 32/14 32/15 33/5 33/9 33/12 34/8
  34/16 35/13 35/21 36/24 36/25 37/21 37/22 39/1
  39/10 40/13 40/24 42/17 43/10 50/22 52/21 53/10
cases [10]   13/4 17/13 23/6 27/23 29/13 30/15 34/24
  50/4 51/18 52/17
cause [42]   34/2 34/5 34/6 34/17 44/20 44/21
  44/21 45/12 45/14 46/2 46/6 46/10 47/5 48/16 48/17
  48/21 48/23 49/14 49/19 49/22 53/25 54/3 54/4
  54/15 54/19 54/20 54/23 55/1 55/2 55/3 55/10 55/14
  55/18 56/19 58/6 59/8 60/5 60/19 61/16 64/2 64/9
causes [3]   43/24 47/1 64/1
celebrated [1]   35/25
CEO [3]   49/2 56/13 57/10
ceremony [1]   63/13
certain [3]   14/16 16/12 37/2
certainly [10]   7/24 13/8 13/24 14/18 21/23 27/22
  40/6 40/14 43/11 50/3
CERTIFICATE [1]   64/20
certify [1]   65/6
cetera [2]   9/8 59/9
chance [2]   13/19 33/25
change [5]   47/24 48/1 56/5 59/6 60/3
changed [1]   55/25
characterized [1]   51/7
charge [1]   58/2
Chasanow [4]   22/18 22/25 23/1 34/20
Chasanow's [2]   22/17 24/5
Chick [2]   42/23 50/12
Chick-fil-A [2]   42/23 50/12
chief [1]   55/21
China [1]   52/2
choice [55]   9/25 10/10 10/12 10/16 10/22 11/2
  13/17 13/23 15/1 15/9 16/23 19/8 19/17 19/17 19/20
  20/1 20/6 20/10 21/6 21/11 21/15 21/18 22/13 22/20
  23/12 25/24 26/2 26/19 26/23 27/1 27/5 29/14 30/3
  30/5 31/11 31/12 32/10 32/17 32/24 33/8 33/9 33/16
  33/17 33/18 33/18 38/2 38/4 38/8 38/13 39/7 39/19
  39/21 40/7 40/11 48/8
choices [1]   50/14
choose [5]   10/12 29/5 34/17 34/18 37/23
chosen [6]   32/4 32/7 34/10 38/6 38/9 38/11
Circuit [2]   12/22 17/4
Circuit's [2]   20/4 33/11
circumstance [2]   23/3 33/2
circumstances [5]   31/2 38/5 58/16 59/23 59/24
cite [1]   62/2
cited [5]   20/5 22/4 27/24 41/9 52/17
cites [1]   33/12
citing [1]   31/23
civil [2]   3/8 50/3
claim [12]   22/9 24/8 24/9 24/10 24/11 43/15 45/11
  47/8 48/16 48/18 48/18 61/12
claimed [1]   5/10
claiming [1]   44/7 61/25
claims [6]   9/18 16/11 24/15 36/11 43/12 47/11
classes [1]   4/24
classically [1]   30/3
clause [22]   6/8 6/21 12/20 13/24 15/8 15/10 15/12
  23/24 25/12 25/24 28/8 34/9 37/9 37/11 38/21 40/8
  41/15 41/17 41/19 52/9 52/10 52/15
clauses [14]   21/5 21/8 21/24 22/21 24/20 24/21
  24/24 24/24 29/24 30/11 37/3 38/1 40/9 42/18
clear [7]   22/4 25/22 25/25 48/19 51/1 56/14 60/15
clearly [3]   22/3 23/8 47/6
clerk [1]   63/12
client [1]   18/10
clients [1]   47/15
close [2]   21/10 24/5
cloud [1]   5/11

co [1]   59/20
co-extensive [1]   59/20
coast [1]   52/2
Coca-Cola [1]   54/18
colleague [2]   12/1 34/25
colleagues [1]   4/10
collect [1]   25/17
collecting [1]   45/15
come [4]   18/16 18/17 59/13 59/15
comes [7]   3/9 18/15 25/1 25/6 28/4 28/16 48/9
coming [2]   50/19 63/11
comity [2]   22/21 34/23
commenced [2]   16/16 36/18
Commercial [1]   39/14
commitment [1]   38/20
common [2]   17/20 48/3
commonsense [1]   20/20
communication [1]   60/11
communications [3]   49/2 59/1 59/2
companies [1]   30/1
company [25]   10/14 11/17 19/2 29/9 30/7 38/24
  46/10 46/11 51/9 51/9 54/5 54/16 54/18 54/21 55/10
  55/12 55/17 55/22 56/10 56/12 56/14 57/11 57/15
  57/19 59/8
compare [1]   48/24
comparing [1]   19/14
Compass [19]   6/20 12/7 38/22 46/22 48/1 49/4 49/12
  50/12 50/13 55/19 56/7 56/9 56/9 56/23 57/7 57/15
  57/17 57/23 58/3
compensated [1]   56/1
compensation [1]   56/5
compete [46]   4/23 5/10 6/7 8/14 15/12 17/9 19/4
  19/15 20/22 21/5 21/8 23/1 24/4 24/17 25/12 25/18
  25/21 27/17 28/12 28/15 28/16 29/13 31/7 31/15
  34/1 35/15 37/3 38/1 39/11 41/14 41/16 41/17 42/15
  42/20 46/2 48/5 48/9 48/10 49/17 49/23 50/15 50/17
  50/25 51/20 60/6 60/6
competes [4]   10/6 17/14 27/13 27/23
competing [6]   42/21 50/7 51/10 51/11 51/13 57/23
competition [6]   6/17 17/11 27/16 27/19
competitive [1]   27/16
complaint [47]   6/18 7/8 7/13 7/14 7/19 7/21 8/4
  9/3 9/5 9/16 12/5 12/5 14/19 14/20 14/23 17/2
  24/12 24/12 40/18 40/20 40/25 41/6 41/8 41/20 42/7
  42/7 42/9 42/13 42/14 43/21 44/5 44/9 45/7 45/22
  45/24 45/25 46/13 46/13 48/11 48/12 51/3 51/3 57/8
  57/11 62/1 62/13 62/15
complaints [3]   21/14 40/22 59/10
complexity [1]   72/19
complicated [2]   40/24 43/20
compulsion [1]   29/19
COMPUTER [1]   1/24
COMPUTER-AIDED [1]   1/24
concede [1]   10/5
conceded [1]   59/10
concerned [1]   5/24
concerns [1]   7/6
conclusion [4]   39/2 48/16 61/24 61/25
conclusory [1]   61/11
conduct [3]   49/8 54/18 62/3
Conference [1]   65/10
conflict [6]   16/7 17/10 19/16 35/10 36/6 38/3
conflicts [6]   10/22 13/12 19/18 28/18 32/1 38/15
conformance [1]   38/11
conglomerate [1]   30/20
conjoined [1]   38/22
connection [1]   35/24
consents [9]   16/11 16/15 16/18 36/10 36/17 36/20
  37/12 37/15 37/17
consequence [1]   6/23
considerations [1]   34/8
considered [2]   30/14
considering [1]   22/14
consistent [1]   26/8
conspiracy [1]   61/22
constitute [1]   54/23
constituted [1]   55/18
consultant [4]   12/8 12/9 18/8 51/9
consultants [1]   47/16
consulting [6]   1/3 3/8 35/21 51/13 51/15 57/4
contacts [1]   30/4
contained [1]   7/17
contemporaneous [1]   46/15
content [1]   31/5
CONTINUED [1]   2/1
continues [3]   17/20 48/6 50/5
contract [48]   9/17 9/20 9/25 10/1 10/10 10/17 11/2
  11/10 15/7 16/3 19/8 19/11 19/12 22/10 23/2 23/25
  28/1 28/11 28/20 29/14 31/22 32/16 32/18 34/4 35/2
  40/2 40/3 44/25 45/13 45/14 45/16 45/19 46/6 46/17
  46/20 46/25 49/17 49/21 54/13 55/11 56/6 58/2 58/2
  60/2 60/24 61/3 61/14 62/20
contracting [3]   23/16 30/17 35/6
contractor [1]   47/4
contractors [1]   9/7
contracts [2]   17/17 38/3
contractus [2]   11/6 39/20
contradicting [1]   60/17
contradicts [1]   39/12
contrary [3]   32/5 38/9 39/4
contributions [1]   60/15
control [5]   55/24 56/7 56/15 56/16 57/2
conveniens [2]   16/17 36/20 37/17
core [1]   25/7
corporate [1]   51/14
corporation [2]   10/15 57/13
corporations [1]   51/16
correct [9]   4/20 4/21 4/25 5/4 5/13 5/15 47/2
  54/25 65/7
couldn't [1]   64/6
counsel [8]   3/11 4/2 4/5 11/4 19/12 35/8 40/4
  55/16
count [5]   41/21 44/4 44/4 46/1 48/16

counts [5]   24/11 24/18 35/22 43/12 43/21
County [1]   17/4
coupled [1]   52/12
course [4]   30/14 49/14 58/22 58/22 63/14
count [58]   1/1 1/11 3/2 3/4 3/8 3/9 5/2 5/6 7/10
  7/17 11/10 14/11 16/14 16/16 16/19 17/4 17/5 19/19
  20/21 22/10 22/11 22/14 26/6 30/14 31/6 33/13
  34/14 34/16 35/14 35/19 36/14 36/18 36/20 37/19
  38/16 39/12 39/23 40/13 40/17 40/25 42/11 43/22
  43/10 44/15 44/24 51/3 53/5 53/6 53/11 53/12 53/15
  53/19 53/22 58/11 61/24 61/25 64/5 65/5
Court's [3]   12/22 40/9 41/12
courts [7]   23/22 25/11 29/15 30/3 30/23 39/25 52/7
covered [1]   40/20
create [2]   49/14 57/5
credible [1]   49/9
credit [1]   22/8
curability [4]   58/10 60/19 63/5 63/6
curable [14]   46/18 46/21 54/6 54/24 55/3 55/7 58/7
  58/13 58/17 60/25 61/1 61/2 62/19 64/4
cure [3]   48/14 54/6 55/4
curious [1]   41/1 44/18 46/20
cv [1]   1/5

**D**

D.C [8]   2/5 11/5 18/14 19/10 19/14 23/17 35/8 40/3
Dakota [3]   22/9 22/13 22/15
damages [6]   5/1 6/9 6/12 8/10 8/11 25/17
DANIEL [2]   1/17 3/14
date [1]   6/8
dated [2]   36/1 65/12
dates [1]   49/1
David [2]   2/7 3/20
day [18]   43/19 50/4 54/10 58/13 58/17 60/7 62/20
  65/12
days [12]   17/5 26/19 46/5 46/19 54/17 54/24 55/4
  58/15 59/13 59/22 60/25 61/3
deal [1]   28/18
dealing [2]   26/18 30/8
debate [1]   26/11
decide [6]   32/23 35/20 58/12 60/20 61/17 63/1
decided [3]   13/25 19/25 63/5
decides [1]   5/2
deciding [2]   60/22 63/24
decision [24]   11/10 12/17 20/5 22/17 31/20 32/20
  32/22 33/5 33/6 33/11 34/21 40/13 41/24 53/22
decisions [1]   41/25
declaration [1]   61/6
declaratory [1]   24/7
deemed [4]   16/18 36/22 37/18 54/6
deeming [1]   17/9
deems [1]   54/23
defendant [11]   1/7 2/2 3/18 3/20 4/4 4/11 17/5
  18/15 36/25 41/7 53/14
defense [1]   45/21
defer [1]   35/6
deferred [1]   14/19
deficiencies [1]   40/18
definition [1]   51/12
Delaware [9]   21/11 21/15 21/22 31/11 31/12 32/12
  33/8 34/10 37/23
delivery [2]   36/16 37/14
demand [1]   57/11
demanded [2]   49/3 49/11
demands [1]   57/25
demonstrated [1]   60/19
deny [1]   43/20
detail [2]   44/22 62/23
determination [3]   32/7 38/11 46/16
determine [2]   32/24 39/21
determined [3]   55/12 62/18 62/19
Deutsch [1]   12/16
Deutsche [1]   12/23
developed [1]   57/2
difference [1]   25/12
different [11]   16/25 20/7 21/16 26/23 27/1 28/19
  28/24 30/14 32/21 39/2 51/17
difficult [1]   49/20
direct [1]   60/15
direction [1]   41/3
director [1]   51/9
directors [2]   56/21 56/21
disagree [2]   52/18 53/5
disappear [1]   14/23
disappears [1]   41/3
discovery [6]   6/13 6/14 54/18
discuss [1]   41/23
discussion [2]   14/15 15/1
disingenuous [1]   60/9
disloyal [1]   56/22
dismiss [8]   7/8 15/11 40/19 52/8 58/11 61/5 62/25
  63/5
dismissal [1]   53/25
dismissed [1]   35/13
displayed [1]   14/12
disposes [3]   24/14 24/17 24/18
dispositive [2]   29/15 30/23
dispute [6]   17/23 19/24 37/1 38/24 39/4 39/9
disputes [3]   16/11 16/12 36/11
dissension [1]   56/22
DISTRICT [8]   1/1 1/1 1/11 3/3 3/4 39/23 65/5 65/5
DIVISION [1]   1/2
do [38]   5/18 6/13 8/24 9/2 9/2 13/8 13/11 13/13
  14/3 23/22 24/23 25/24 43/23 47/22 48/12 48/13
  48/14 49/18 49/18 50/7 52/6 52/7 53/7 53/17 57/6
  57/10 57/10 57/13 57/20 57/20 62/3 62/7 62/17 63/3
  63/9 63/19 63/23 65/6
Docket [1]   1/5
doctrine [1]   39/25
document [2]   7/17 8/2
documents [1]   60/21
doing [18]   5/11 11/15 12/10 13/3 26/5 30/6 34/20
  41/4 47/4 47/4 47/14 47/25 47/25 50/7 50/11 52/4

**D**

doing... [2] 53/3 60/4
dollar [1] 51/21
dollars [1] 43/13
domicile [1] 36/9 36/8 37/10
door [1] 63/13
down [1] 26/6
drawn [1] 61/23
due [1] 18/5
during [1] 51/21
dust [1] 41/4
dust-up [1] 41/4
duties [2] 6/9 48/25
duty [2] 49/10 57/17

**E**

e-mail [2] 56/25 57/1
each [7] 16/10 16/15 36/10 36/16 36/19 37/12 37/14
earlier [1] 46/1
early [1] 59/1
earned [1] 43/15
easier [1] 7/17
east [1] 25/8
economic [1] 51/14
economy [1] 27/16
effect [8] 4/20 9/5 21/15 22/13 23/8 38/14 39/22 55/22
effective [3] 32/10 38/13 54/15
effectively [5] 25/15 37/13 42/19 50/6 51/7
efficient [1] 63/21
efforts [1] 25/18
eight [1] 50/3
either [6] 5/2 19/25 46/12 59/10 60/19 61/7
element [1] 19/7
else [4] 30/7 30/7 42/24 61/16
employee [22] 23/5 23/23 26/1 27/6 29/6 30/17 31/7 35/23 38/25 46/18 47/13 49/8 49/20 51/21 54/19 54/20 54/23 54/11 57/14 57/19 59/8 62/3
Employee's [1] 54/15
employees [11] 6/20 6/22 9/6 11/18 18/3 26/12 27/12 55/21 56/23 57/7 59/3
employer [3] 35/23 49/9 51/21
employer/employee [1] 35/23
employment [8] 16/5 35/25 36/1 47/17 47/19 47/23 49/10 51/21
employs [1] 19/3
encourage [1] 21/24
encouraging [1] 27/23
end [4] 8/7 29/5 29/10 40/22
ends [2] 5/13 5/14
enforce [12] 21/6 25/16 25/18 28/8 30/10 31/6 31/11 35/15 35/17 38/2 39/11 52/11
enforceability [1] 19/15
enforceable [7] 9/18 11/12 28/5 28/23 30/25 41/17 45/1
enforced [2] 20/22 37/4
enforcement [1] 27/5
engaged [1] 51/10
enough [3] 6/19 28/5 64/15
enter [2] 3/25 4/4
entered [8] 3/22 4/10 5/6 20/2 33/19 34/4 35/3 55/23
entire [2] 40/13 57/15
entirely [1] 33/15
entitled [5] 49/13 55/6 55/7 59/25 65/9
equally [1] 52/1
equation [1] 29/3
equitable [3] 16/18 36/21 37/18
equities [1] 29/21 30/19 30/22
equity [1] 29/3
ergo [1] 45/14
error [1] 9/1
ESQUIRE [3] 1/14 1/17 2/3
essentially [4] 8/21 22/22 35/22 37/1
establish [5] 20/9 48/12 48/13 48/14 49/18
established [1] 61/11
establishing [1] 20/7
et [2] 9/8 59/9
Europe [2] 19/1 52/2
even [22] 6/11 23/1 23/11 25/6 25/16 28/16 29/15 34/19 35/4 35/16 40/23 44/6 44/25 45/6 45/7 48/9 50/15 50/24 53/2 53/7 53/13 59/3
event [1] 54/18
ever [5] 20/22 30/14 31/5 31/6 46/14
every [4] 28/4 29/13 50/4 62/3
everybody [1] 56/17
everyone [1] 57/21
everything [1] 51/16
everywhere [1] 25/4
evidence [1] 60/17
exactly [2] 24/6 55/11
example [3] 6/22 8/16 52/19
except [1] 15/16
exception [6] 22/5 25/19 26/9 26/10 32/4 38/16
exceptions [2] 32/1 39/17
exclusively [2] 16/8 36/7
excuse [4] 4/4 41/16 44/21 50/18
executed [2] 39/7 39/7
execution [2] 36/16 37/14
executive [1] 18/13
executives [2] 53/19 55/25
Exhibit [2] 35/25 55/13
existing [1] 7/13
exists [1] 47/1
expand [1] 42/25
expectations [1] 34/4
expire [1] 6/8
expires [1] 50/4
explain [2] 15/21 44/10
explains [1] 23/21
explicit [1] 37/5
express [2] 12/22 12/23

expressed [1] 60/2
expressly [1] 49/17
extent... [3] 37/4 37/4 42/2
extra... [1] 20/7

**F**

F.3d [1] 39/23
face [2] 8/21 9/18
faced [1] 61/4
fact [18] 6/15 13/1 17/8 17/15 20/21 23/4 23/22 27/23 42/2 46/20 47/22 47/24 48/1 58/10 61/3 61/24 62/22 63/25
factor [1] 30/23
facts [11] 48/12 48/13 48/14 50/16 51/1 51/23 61/11 61/17 61/19 62/1 62/2
factual [2] 20/16 44/16
failure [1] 54/22
Fair [1] 64/15
fairly [3] 17/8 43/10 45/3
faith [3] 29/9 43/3 64/10
familiar [1] 51/19
far [2] 5/23 25/14
FBI [2] 50/19 63/12
feasts [1] 63/11
federal [5] 16/13 36/14 40/24 65/4 65/17
feel [1] 60/7
few [1] 58/1
fiduciary [3] 6/9 57/17 58/7
FIGEL [1] 2/4
fil [2] 42/23 60/12
file [4] 14/18 24/1 26/19 51/5
filed [9] 7/9 11/16 17/23 42/15 42/4 42/5 55/13 55/14 57/1
files [1] 7/7
filing [2] 9/16 43/18
final [4] 8/12 33/22 41/24 45/3
finally [2] 42/22 63/1
financial [1] 51/14
find [6] 20/21 20/22 31/6 34/16 42/11 60/16
finding [1] 44/16
finds [1] 38/16
fine [1] 60/8
fined [1] 26/20
fire [1] 56/21
fired [2] 59/17 59/19
firing [2] 59/20 60/5
firm [3] 3/21 57/4 57/23
firms [2] 18/8 51/15
first [27] 7/20 12/14 12/15 13/12 15/5 15/9 15/21 20/16 21/13 24/12 27/6 28/18 32/23 34/15 35/15 38/18 41/8 42/13 43/22 45/23 45/25 46/12 46/14 46/19 57/1 61/14 64/?
first-mover [1] 50/9
five [4] 15/13 24/7 24/18 40/22
flatly [2] 10/6 25/13
focused [1] 59/4
folks [4] 4/16 56/16 63/9 64/15
follow [5] 19/20 26/9 26/21 29/20 29/20
followed [2] 10/23 26/9
following [1] 50/23
follows [4] 31/25 32/23 36/4 54/14
fomented [1] 56/22
foregoing [1] 65/7
foreign [1] 22/16
forensic [1] 57/4
format [1] 65/9
formed [1] 32/18
formula [1] 56/5
forum [4] 16/17 16/23 36/20 37/16
forward [8] 13/25 40/18 40/25 41/6 43/14 43/25 43/25 64/1
found [3] 30/23 56/25 57/1
four [4] 24/18 24/21 55/19 58/2
four-year [1] 58/2
fours [1] 24/6
Fourth [3] 12/22 20/4 33/11
fraction [1] 49/12
franchisee [2] 30/4 31/4
frankly [2] 29/15 41/3
FREDERICK [1] 2/4
free [4] 17/10 27/12 27/15 46/2
freedom [1] 10/11
freeze [1] 49/25
friend [1] 12/1
friend's [1] 20/22
front [1] 32/11
frozen [1] 50/8
FTI [35] 1/3 3/8 3/14 5/9 10/14 11/4 18/12 19/3 19/12 22/4 23/15 23/22 25/1 30/17 30/19 30/22 35/21 36/2 38/22 42/22 44/7 49/4 49/11 49/22 51/17 51/22 52/3 53/7 55/9 56/17 56/9 56/10 57/18 57/24 65/10
FTI's [3] 25/7 40/4 56/16
full [1] 40/23
fulsome [1] 9/15
fundamental [11] 22/7 22/11 22/19 27/8 32/6 33/1 33/3 33/15 34/13 38/9 39/5
further [4] 6/6 14/2 40/15 41/21
fury [1] 8/7
futile [2] 44/5 44/7
future [2] 12/6 16/9 36/8 37/8
Fyfe [8] 21/3 21/3 21/11 31/20 32/11 34/7 37/22 39/1

**G**

gave [4] 48/12 48/13 56/19 62/4
general [6] 11/2 11/22 19/11 27/19 39/11 40/4
generally [2] 31/22 38/2
generate [1] 51/22
generated [2] 51/21 52/3
gentlemen [1] 3/6
genuine [1] 58/10
geographic [3] 4/23 8/19 9/1

geographics [2] 42/20 52/14
getting [4] 8/5 30/22 50/5 56/6
gist [2] 41/10 41/10
give [6] 8/8 49/24 50/16 54/24
given [8] 11/23 23/4 23/6 46/14 54/5 54/17 55/4 59/19
gives [2] 34/2 55/3
giving [2] 34/5 54/18
glimmer [1] 41/10
go [34] 9/3 9/14 9/15 12/13 13/1 13/25 15/3 15/9 15/21 23/25 27/17 30/9 40/18 41/6 43/4 43/24 43/25 44/4 45/9 45/17 45/22 45/25 46/4 48/18 49/17 49/23 50/10 51/12 53/8 57/8 60/6 63/3 64/1 64/6
goes [7] 6/2 18/21 25/10 29/25 37/4 48/18 50/4
going [28] 4/18 6/10 8/3 8/7 11/17 12/25 13/16 28/7 29/8 29/11 30/7 34/18 35/19 40/25 41/25 42/1 43/9 43/23 50/20 51/6 52/21 58/20 62/7 60/20 63/1 63/9 63/10 63/17
gone [2] 23/4 60/8
good [7] 3/19 4/11 4/15 12/3 27/16 29/9 62/7
goodwill [3] 51/20 51/22 52/3
got [16] 11/13 13/16 15/14 28/17 29/23 42/24 45/20 48/10 48/14 51/4 52/4 59/5 61/22 64/7 63/11
gotten [2] 6/12 56/8
govern [7] 9/20 9/25 16/8 28/21 31/23 36/7 37/1
governance [2] 49/3 55/23
governed [3] 11/10 19/5 36/13
governing [1] 11/6 16/6 29/24 36/5
government [1] 51/16
Governor [1] 17/16
governs [5] 16/22 32/16 33/18 42/12 54/3
grant [1] 52/8
granting [3] 16/18 36/21 37/17
greater [5] 17/22 24/25 32/6 38/10 39/8
greatest [2] 23/15 55/12
GREENBELT [1] 1/2
grotesquely [1] 52/5
ground [1] 40/14
grounds [5] 15/12 46/12 54/19 56/19 58/6
group [1] 56/16
guess [7] 6/2 8/17 9/9 14/6 25/2 40/17 63/16
guide [1] 14/13
guidepost [1] 61/9
Gunby [5] 56/14 56/19 56/20 59/1 60/12
Gunby's [1] 60/10
Gundy [1] 49/2

**H**

handcuff [1] 48/5
handled [1] 17/13
HANSEN [9] 2/3 2/4 3/19 11/23 20/13 31/19 58/15 62/14
happen [1] 59/11
happened [5] 31/16 33/11 34/12 34/13 49/24
happily [2] 52/22 59/20
happy [2] 42/25 43/25
hard [2] 8/10 25/2
harm [4] 12/4 12/6 12/6 12/10
hasn't [3] 17/22 43/6
hate [1] 63/9
having [4] 19/3 23/2 26/1 30/9
Hawaii [2] 30/4 30/9
Headquartered [1] 18/11
hear [13] 8/15 13/24 15/24 24/25 31/17 42/25 43/2 45/8 53/23 58/20 63/2 63/14 64/12
heard [2] 13/7 60/10
hearing [2] 1/10 3/10
held [5] 22/9 31/14 47/7 47/15 65/8
help [2] 13/25 14/13
Helsinki [2] 52/4 52/5
Hensen [1] 33/22
hereby [7] 16/10 36/10 36/19 36/20 37/12 37/17 65/6
highlighted [2] 59/6 59/7
him [18] 4/5 5/11 9/18 46/15 47/7 47/12 47/14 48/5 48/12 48/13 49/21 50/11 55/10 56/22 58/2 59/3 61/15 62/6
his [20] 3/22 3/25 4/4 6/8 9/19 9/20 9/25 10/1 11/17 18/9 18/23 20/19 33/12 41/7 48/25 49/16 50/14 53/21 57/16 62/6
history [1] 17/9
hold [1] 53/11
holding [3] 12/22 12/23 25/25
home [1] 18/21
Honestly [1] 25/7
honor [115]
Honor's [4] 12/3 29/11 33/24 50/24
HONORABLE [3] 1/10 3/5 64/17
honored [2] 22/21 26/2
hope [2] 13/19 60/15
hour [1] 63/14
human [1] 30/22
hundred [1] 10/24
Hyatt [2] 30/2 30/10
hypothesized [1] 27/8
hypothetical [1] 27/10

**I**

I'll [10] 12/13 13/19 13/24 14/8 39/1 43/25 45/8 45/17 59/25 60/10
I'm [33] 6/10 6/11 12/12 12/25 13/16 22/6 23/17 28/8 28/19 29/18 29/21 38/15 43/9 45/21 50/22 50/23 51/6 52/12 52/21 57/20 58/20 59/24 60/6 61/4 62/10 62/12 62/13 62/24 63/1 63/1 63/9 63/24
I've [10] 10/21 13/3 13/3 13/7 13/16 29/22 40/11 42/24 63/7 63/11
identify [1] 3/12
II [1] 1/9
Illinois [2] 23/2 23/3
immediately [3] 54/4 54/16 55/2
implication [1] 17/19

**I**

important [6] 33/8 34/22 34/23 35/1 37/18 48/5
improper [2] 57/9 57/16
improperly [2] 6/16 26/19
inappropriate [1] 8/1
INC [1] 1/3 3/8 35/21
inclined [1] 40/21
including [1] 51/15
incorporated [2] 18/12 19/5 38/23
incorporation [1] 25/9
incurable [7] 47/7 47/9 48/3 48/15 61/20 61/25 62/1
indeed [1] 34/15
independent [2] 59/11 61/16
indicating [1] 49/4
industries [1] 17/19
inefficiencies [1] 14/24
inform [1] 42/9
information [1] 6/19
initial [1] 53/24
initially [1] 17/3
injunction [10] 4/20 5/7 5/9 5/24 6/1 7/25 8/13 8/20 41/1 41/3
injunctions [2] 5/3 5/17
injunctive [2] 5/24 11/14
innocuous [1] 51/12
inquiry [2] 26/24 27/2
insofar [2] 64/2 64/2
instance [3] 23/19 25/20 28/15
instances [2] 25/13 52/8
Insurance [1] 39/24
interest [23] 10/19 17/23 19/3 22/7 22/11 22/20 22/24 23/3 23/20 24/25 26/7 26/12 26/13 27/9 27/14 27/15 27/22 32/7 35/1 38/10 39/9 51/8 57/19
interesting [1] 7/5
interests [4] 22/23 26/10 34/13 34/22
internal [2] 16/6 36/5
international [1] 30/1
interpretation [2] 60/25 62/20
interpreted [1] 19/19
intervene [1] 63/17
intimated [1] 57/10
invalid [1] 24/20
investors [1] 57/2
involve [2] 22/25 37/22
involves [3] 12/19 38/24 55/24
involving [4] 17/13 19/7 22/6 22/9
irrelevant [4] 19/24 20/11 32/17 32/19
irrevocably [3] 16/10 36/10 37/12
is [184]
is utterly [1] 15/12
isn't [1] 49/4
Israel [1] 52/2
issue [25] 7/5 8/25 13/12 13/22 28/18 29/3 29/4 30/14 30/15 30/16 32/8 33/1 34/23 35/1 35/20 38/11 42/14 49/4 58/9 58/9 58/10 63/4 63/4 63/24 64/3
issuer [1] 22/9
issues [2] 7/24 14/19
it to [1] 28/5
itself [3] 38/21 55/20 64/10

**J**

Jackson [5] 22/8 26/6 34/12 38/14 39/9
January [1] 36/1
January 15th [1] 36/1
joined [1] 56/11
judge [23] 1/11 12/16 12/23 13/1 21/11 21/14 21/25 22/17 22/18 22/25 23/1 24/5 25/23 29/18 31/9 31/19 32/20 32/22 33/6 34/20 36/24 37/23 53/10
Judge Blake [1] 21/14
Judge Chasanow [1] 22/18
Judge Quarles' [1] 32/22
Judge Russell [1] 12/23
judgment [3] 14/8 24/18 45/3
judicial [2] 5/9 65/10
juncture [1] 14/17
JUNE [2] 1/11 65/12
jurisdiction [3] 16/16 36/17 37/15
jury [1] 60/9
justify [1] 46/5

**K**

keep [1] 50/20
keeping [2] 50/6 50/11
KELLOGG [1] 2/4
kept [1] 61/23
key [1] 9/6
kind [9] 9/4 23/24 23/24 35/2 42/18 43/19 43/23 46/14 52/22
knew [2] 30/17 30/22
Kronovet [1] 31/24
Kunda [1] 20/5

**L**

laboring [1] 14/6
Ladies [1] 3/6
language [10] 12/21 16/2 36/23 36/23 37/5 38/20 47/11 54/8 59/4 60/24
last [4] 19/11 35/3 40/1 40/22
lasts [1] 41/1
later [1] 17/5
Latin [1] 22/6
law [160]
laws [5] 16/6 27/4 36/5 36/6 38/4
lawsuit [2] 11/16 24/1
lawyer [2] 23/15 61/21
laying [3] 28/7 28/21 29/12
lead [5] 23/10 23/11 24/3 35/5 39/2
leapfrogged [1] 45/23
least [15] 6/19 8/10 8/17 8/17 14/17 18/24 25/8 41/10 41/18 44/6 46/18 54/24 60/25 62/17 62/24

**leave** [6] 14/18 46/2 56/17 57/21 60/5 60/6
leaving [1] 17/19
Lee [1] 48/5
left [1] 32/25
legal [3] 16/18 36/21 37/17
Legislature [1] 17/15
less [1] 45/8
letter [7] 48/21 55/9 55/14 57/22 59/12 59/18 35/8 39/20
lex [10] 11/6 22/5 22/5 26/8 26/9 26/10 34/11 35/8 35/8 39/20
Lexecon [19] 6/21 12/7 38/22 46/22 48/2 49/4 49/12 50/13 50/13 55/20 56/7 56/9 56/9 56/23 57/7 57/15 57/17 57/24 58/3
Lexicon [1] 36/2
liberties [1] 58/24
life [1] 53/20
limit [1] 7/1
limitation [1] 5/18
limited [3] 25/13 38/5 39/22
limiting [1] 51/20
lines [1] 51/17
Lipchin [1] 31/24
litigated [1] 58/19
litigation [2] 29/24 51/14
little [2] 21/16 32/21
live [1] 14/15
lives [3] 18/1 21/7 25/3
living [1] 29/5
LLC [1] 56/9
LLP [2] 1/15 1/18
loan [2] 43/13 45/5
loaned [1] 43/15
loans [1] 64/5
located [2] 16/14 36/14
loci [10] 11/6 22/5 22/6 26/8 26/9 34/12 35/8 35/8 39/20
long [4] 17/8 29/23 40/24 50/2
look [13] 9/5 22/10 22/22 22/23 23/16 27/4 29/2 35/8 48/20 48/20 51/6 54/12 58/25
looked [2] 22/11 46/25
looking [5] 4/16 35/1 60/21 62/14 64/24
looks [2] 22/19 41/2 42/16 42/22
Los [3] 18/23 20/17 20/19
loss [1] 16/7
lot [5] 13/14 30/1 42/17 58/23 60/1
loyal [1] 57/7
Lu [1] 11/4
luck [1] 62/7

**M**

machinations [1] 23/24
made [6] 11/3 13/7 21/6 22/18 35/16 36/25 42/1 43/4 43/7 43/23 44/16 45/10 46/23 51/16 56/14 60/23
mail [2] 56/25 57/1
mailing [1] 54/16
maintained [1] 47/6
make [14] 7/18 9/14 11/25 14/8 14/16 19/11 25/15 28/5 43/4 43/25 45/17 47/22 48/2 48/6
makes [4] 7/19 9/16 22/4 40/1
making [4] 34/21 41/24 44/3 45/3
man [2] 42/3 43/9
managing [1] 57/14
many [3] 17/13 25/11 35/12
MARK [2] 2/3 3/19
market [2] 51/25 52/25
Marriott [3] 30/2 30/10 31/3
MARYLAND [97]
Maryland's [6] 22/12 22/15 22/23 26/5 34/22 39/11
Maryland-based [1] 58/10
material [1] 58/10
materially [4] 32/6 38/10 39/8 59/15
matter [17] 3/7 3/9 8/3 10/13 23/24 30/25 36/12 42/6 45/4 48/3 50/19 53/3 58/11 60/20 61/17 62/22 65/9
matters [5] 18/24 47/8 50/10 60/1 60/1
may [15] 8/12 8/21 12/5 13/2 25/8 29/7 31/22 36/19 37/16 41/5 42/8 44/18 49/20 53/3 53/12
maybe [6] 6/11 8/4 11/19 13/11 29/17 43/22 61/2 62/4 62/15 63/4 63/16 63/17 63/17
MD [5] 1/16 1/19 38/14 39/10 39/24
mean [21] 6/13 8/5 8/8 13/10 15/7 25/13 25/23 29/5 29/8 43/9 43/15 43/23 48/2 52/18 53/5 53/20 60/2 60/18 61/4 62/4 62/20
means [3] 13/2 51/13 51/13
medical [2] 17/17 17/18
meetings [1] 63/18
member [2] 56/10 56/10
mentioned [2] 46/1 50/1
MESSITTE [2] 1/10 3/5
met [1] 39/17
might [9] 4/22 5/17 16/17 23/16 23/17 29/5 32/2 49/18 51/11
mind [1] 43/23
minimize [1] 55/16
minute [3] 33/24 46/20 49/16
missed [1] 31/20
mobility [1] 27/15
moment [1] 24/7
money [11] 43/15 43/15 44/22 45/5 45/15 48/6 49/5 49/6 56/16 64/7
Montgomery [1] 17/4
month [2] 49/25 50/3
months [4] 40/23 43/17 56/2 58/1
Moore [1] 17/16
more [14] 6/2 26/16 29/7 41/24 42/16 49/5 49/5 51/19 56/6 59/13 62/23 63/10 63/14 64/6
moreover [2] 37/16 46/17
morning [2] 3/19 13/12
most [1] 51/23
motion [9] 7/7 7/8 7/22 11/25 40/19 58/11 61/4 62/25 63/5

**motions** [3] 1/10 3/10 52/8
motive [1] 29/13
Motorists [1] 39/24
move [1] 63/11
moveable [1] 63/11
mover [1] 50/9
moves [1] 26/18
moving [2] 8/6 15/11
MOYLAN [2] 1/17 3/14
Mr [7] 11/23 12/1 29/2 30/20 52/3 60/22 62/4
Mr. [67]
Mr. Gunby [5] 56/14 56/19 56/20 59/1 60/12
Mr. Gunby's [1] 60/16
Mr. Gundy [1] 49/2
Mr. Hansen [5] 11/23 20/13 31/19 58/15 62/14
Mr. Hensen [1] 33/2
Mr. Lu [1] 11/4
Mr. Murphy [9] 3/15 5/21 15/24 25/6 34/25 54/1 58/23 59/5 60/3
Mr. Murphy's [1] 31/17
Mr. Orszag [39] 4/12 4/13 5/10 5/18 11/3 11/15 12/7 19/13 20/20 20/17 25/6 26/14 28/1 33/12 34/1 37/2 37/24 38/23 44/8 46/2 46/13 46/24 49/22 49/23 50/1 50/6 51/8 52/2 54/6 54/10 55/14 55/17 55/24 56/8 56/20 59/2 60/11 60/12
Mr. Orszag's [2] 9/17 16/5
Mr. Orzig [1] 60/4
Mr. Schwarz [1] 3/22
Ms. [1] 4/9
Ms. Anderson [1] 4/9
much [8] 7/16 10/23 21/3 21/4 38/22 42/17 42/22 45/7
multibillion [1] 55/20
multinational [1] 30/20
MURPHY [13] 1/14 3/13 3/15 5/21 15/24 25/6 34/25 54/1 58/23 59/5 60/3 60/22 62/4
Murphy's [1] 31/17
must [3] 39/4 39/6 39/8
muster [1] 62/25

**N**

named [1] 49/2
narrow [1] 53/17
nature [2] 42/20 54/22
necessarily [4] 9/7 29/20 36/23 41/24
need [8] 4/17 8/2 9/14 12/20 58/20 62/10 62/11
negotiate [3] 49/9 49/13 62/7
negotiating [1] 10/3
negotiates [1] 29/9
negotiating [2] 49/21 56/13
negotiation [2] 49/11 49/13
neither [2] 8/16 38/16
never [6] 13/7 18/15 18/16 30/23 52/5 56/8
new [11] 11/17 12/9 27/17 47/8 47/15 47/21 50/10 55/23 56/3 56/6 58/1
next [3] 40/16 46/4 63/13
no [54] 4/9 4/20 5/6 5/9 5/17 5/24 6/6 6/14 7/1 12/4 12/10 14/2 14/14 14/25 17/12 17/17 18/20 19/8 19/16 20/1 20/21 23/4 23/21 23/24 24/3 24/8 24/9 24/11 25/5 25/19 27/22 29/1 31/5 31/6 34/1 34/4 34/5 37/5 38/6 38/7 43/9 43/11 43/14 45/13 45/15 46/12 47/19 48/14 49/9 52/2 58/16 58/17 61/15 62/20
non [64] 4/23 4/24 5/10 6/7 6/7 6/21 8/13 8/14 10/6 15/12 16/17 17/9 17/9 17/14 17/20 19/14 19/15 20/22 21/5 21/8 23/1 24/4 24/17 24/17 25/12 25/18 25/21 27/13 27/23 28/12 28/16 28/19 28/23 31/7 31/15 34/1 35/15 36/20 37/3 37/3 37/16 38/11 39/11 39/12 41/14 41/15 41/16 41/17 41/19 42/15 48/5 48/9 48/10 50/15 50/17 50/25 51/20 58/13 60/6 62/18 62/19 63/6 63/11
non-compete [40] 4/23 5/10 6/7 8/14 15/12 17/9 19/4 19/15 20/22 21/5 21/8 23/1 24/4 24/17 25/12 25/18 25/21 28/12 28/15 28/16 29/13 31/7 31/15 34/1 35/15 37/3 38/1 39/11 41/14 41/16 41/17 42/15 48/9 48/9 48/10 50/15 50/17 50/25 51/20 60/6
non-curability [1] 63/6
non-curable [2] 58/13 62/19
non-moveable [1] 63/11
non-solicit [1] 39/12
non-solicitable [1] 4/24
non-solicitation [9] 5/10 6/7 6/21 8/13 17/9 24/17 37/3 41/15 41/19
noncompetition [2] 17/17 25/15
none [3] 6/24 59/2 62/2
nonpayment [1] 43/13
normally [1] 40/2
not [134]
note [2] 33/13 39/23
notes [3] 1/24 32/3 44/8
nothing [5] 14/2 25/9 29/12 34/24 59/20
notice [20] 39/1 46/14 46/14 48/13 48/14 53/25 54/5 54/10 54/14 54/17 54/25 58/13 58/17 58/25 59/19 59/20 59/25 61/14 62/20 64/3
notion [1] 56/8
nouns [1] 37/7
November [21] 4/19 5/13 5/14 5/14 5/16 5/23 6/5 7/1 7/2 8/5 12/8 12/10 46/8 46/15 48/22 49/1 50/4 56/19 59/1 59/21 60/12
November '24 [1] 5/16
November 20 [4] 12/8 12/10 46/8 46/15
November 20th [1] 48/22
November 3rd [1] 49/1
November 5th [1] 60/12
nowhere [1] 42/23
noxious [1] 35/15
Number [2] 1/5 3/8
NW [1] 2/4

**O**

objection [6] 7/20 14/2 14/25 16/17 36/19 37/16

**O**

objections [1]  7/20
obligation [2]  9/18 26/25
obligations [1]  7/10
obliged [1]  26/21
obviates [1]  54/10
obvious [1]  45/3
obviously [2]  38/18 40/19
occasions [1]  19/20
occurred [1]  46/5
October [2]  49/1 59/1
October 17 [1]  49/1
odd [1]  34/15
off [4]  4/25 35/20 49/23 50/20
offend [3]  21/14 21/25 27/8
offended [1]  34/9
offending [1]  26/3
offends [1]  25/23
offensive [2]  34/17 34/19
office [7]  18/19 18/20 18/23 20/17 20/19 43/19
  52/6
officer [1]  55/22
offices [1]  18/13
OFFICIAL [1]  65/1 65/4 65/17
Oh [2]  18/17 28/8
okay [5]  8/15 9/12 45/19 60/7 64/15
old [1]  31/23
omission [1]  54/22
once [1]  11/16
one [29]  4/9 6/8 7/17 20/16 21/24 23/19 24/4 24/7
  25/16 27/12 28/15 29/13 31/5 35/12 35/15 41/18
  43/11 45/21 46/1 46/3 47/16 50/18 56/3 56/9 55/19
  56/10 60/25 61/12 62/12
only [25]  8/11 10/4 10/9 12/19 14/14 17/18 24/7
  25/20 28/15 33/6 33/9 40/22 41/1 42/11 42/20 45/6
  46/4 48/23 49/2 50/11 51/19 52/20 56/12 62/2 62/16
operate [1]  30/7
operates [1]  51/17
operating [1]  55/21
operations [1]  25/7
opportunity [1]  54/6
opposition [3]  8/4 14/20 62/14
order [4]  3/2 14/6 18/5 46/9
orderliness [1]  29/4 30/11 30/12
orderly [2]  29/24 30/11
Ordinarily [1]  7/7
original [1]  51/3
ORSZAG [48]  1/6 2/7 3/9 3/20 4/12 4/13 5/10 5/18
  11/3 11/15 12/7 13/9 13/15 20/12 25/6 26/14 28/1
  29/2 30/20 33/12 34/1 35/22 36/2 37/2 37/24 38/23
  44/8 46/2 46/13 46/22 49/5 49/22 49/23 50/1 50/6
  51/8 51/22 52/3 54/4 55/10 55/16 55/17 55/24 56/8
  56/20 59/2 60/11 60/12
Orszag's [3]  9/17 16/5 40/3
Orzig [1]  60/4
other [30]  7/1 8/22 16/7 16/12 17/19 22/22 23/13
  23/20 24/10 24/16 24/23 25/17 25/25 26/13 30/8
  30/15 31/4 32/25 34/21 36/6 36/12 38/7 41/21 55/25
  56/15 57/3 57/23 58/3 61/21 63/12
others [2]  18/9 30/2
otherwise [6]  13/20 19/22 22/2 22/4 33/3 34/11
ought [2]  13/11 40/17
ousted [1]  37/24
out [27]  7/6 9/3 12/9 12/15 12/18 12/19 13/7 18/21
  27/17 30/5 33/25 36/12 40/19 41/24 47/7 47/15
  47/20 50/10 50/12 51/25 53/11 53/15 53/15 53/19
  57/20 61/23 63/2
outcome [1]  42/19
over [4]  17/13 25/1 45/23 56/8
overarching [1]  20/21
overbroad [3]  21/24 52/5 52/25
overstate [1]  21/17
overstated [1]  31/19
overtime [1]  18/5
owed [1]  45/5
own [3]  22/19 27/18 51/8
owner [4]  56/11 56/12 56/13 57/18
ownership [1]  56/15
owns [1]  56/9

**P**

p.m [1]  64/19
page [2]  54/13 65/9
papers [4]  33/12 33/25 43/5 46/25
paragraph [6]  12/4 16/5 17/2 36/3 54/3 54/13
paragraphs [1]  34/2
paralegal [1]  4/7
pared [2]  13/5 13/5
paren [1]  36/6
parent [1]  49/7
parse [1]  11/19
part [1]  29/2
particular [3]  38/11 49/1 63/24
particularly [3]  8/3 8/9 8/16
parties [27]  5/12 7/18 9/2 10/11 16/10 20/2 21/12
  22/1 31/22 32/10 32/11 33/7 33/19 34/17 35/24 36/9
  36/11 37/10 38/7 38/13 38/19 39/7 41/25 52/9 52/10
  53/7 63/3
parties' [3]  22/20 36/1 38/8
Partners [2]  12/17 12/24
parts [1]  18/25
party [14]  15/20 16/10 16/15 20/5 36/10 36/16
  36/19 37/12 37/14 40/3 45/5 53/13 53/15 64/11
party can't [1]  64/11
party's [1]  21/15
Pasadena [1]  38/14
pass [1]  62/24
path [1]  60/16
Paula [3]  65/4 65/15 65/16
pencil [8]  8/19 8/23 12/14 12/19 13/4 52/13 52/23
  53/8
penciled [2]  41/18 53/8

penciling [6]  11/13 12/12 12/16 41/11 41/20 53/6
pending [4]  3/7 5/1 7/8 40/23
people [3]  29/18 29/19 58/8
perfect [1]  19/6
performance [1]  23/19
performed [1]  40/2
perhaps [4]  13/25 40/16 41/9 41/23
period [2]  48/15 49/25
permitted [2]  42/13 42/14
permitting [1]  25/12
perplexed [1]  41/4
person [2]  21/7 30/20
persuade [1]  13/20
persuaded [1]  29/22
pertaining [1]  36/11
PETER [2]  11/24 12/1
pick [1]  63/16
PJM [2]  1/5 3/6
PJM-23-3200 [1]  3/8
place [2]  16/9 18/5 19/11 23/16 23/18 23/19 35/6
  36/8 37/10 40/1 40/2 50/11
places [3]  23/18 35/11 52/4
plain [2]  11/9 16/20
plainly [1]  48/17
plaintiff [10]  1/4 1/13 3/11 3/14 4/4 8/17 8/18
  14/6 14/18 58/16
plaintiff's [3]  15/6 17/21 52/21
plaintiffs [1]  61/22
plan [1]  57/2
planning [1]  57/9
plans [1]  4/1
plausible [6]  8/23 45/13 46/23 52/2 53/17 61/12
play [1]  48/9
plead [5]  48/12 48/13 48/14 51/23 61/17
pleaded [4]  44/13 50/25 59/3 61/19
pleading [1]  46/12
pleadings [1]  15/17
please [1]  3/12
PLLC [1]  2/4
point [25]  6/1 6/24 7/22 8/11 8/12 11/15 13/22
  26/17 31/20 40/14 40/16 41/24 44/19 45/4 45/10
  46/3 46/4 49/11 49/13 53/19 60/18 60/21 63/2 63/3
  63/21
pointed [6]  33/25 40/19 46/20 50/12 50/23 51/25
points [7]  7/18 9/13 14/16 44/3 53/15 61/12 61/13
policies [1]  37/25
policy [23]  17/12 19/23 20/11 21/14 22/1 22/11
  22/13 22/15 22/20 22/23 22/23 27/8 32/6 33/1
  33/3 33/14 34/9 34/22 35/1 38/9 39/5 40/8
pose [2]  8/2 26/16
position [9]  5/19 5/20 9/19 9/24 10/18 10/19 11/17
  14/4 19/2
possibilities [1]  53/12
possibility [1]  62/17
Post [2]  12/16 12/23
potential [1]  8/11
PowerPoint [1]  13/21
PowerPoints [1]  14/15
practical [3]  8/7 43/2 43/6
Pratt [2]  1/15 1/18
prayer [2]  6/6 6/11
predicate [1]  50/25
prejudice [3]  9/3 9/4 43/4
preliminarily [2]  8/12 14/3
preliminary [1]  6/1
present [7]  2/6 4/13 16/9 36/8 36/24 37/8 57/2
presentation [1]  44/15
presented [1]  56/20
presents [1]  7/9
preserved [1]  47/5
preserves [1]  47/1
presiding [1]  3/5
presumably [8]  37/23 14/23 29/9 37/25 40/4 53/16
  58/12 64/4
presume [1]  43/2
presumed [1]  36/21
presumptively [1]  33/19
pretty [8]  10/23 16/20 21/3 21/4 23/7 24/1 24/5
  24/22
prevail [1]  60/18
prevent [2]  11/14 34/21
prevents [1]  5/11
previously [1]  27/10
principally [1]  18/8
principle [2]  20/20 37/11
principles [2]  17/10 35/11
prior [5]  46/6 47/1 53/25 55/22 59/25
privileged [2]  49/8 49/18
probably [1]  19/10
probation [1]  6/3
problem [5]  7/16 42/24 46/21 47/9 53/3
procedural [2]  7/9 7/9
proceed [1]  40/16
proceedings [2]  64/19 65/8
proclivity [1]  39/11
product [1]  51/17
professionals [3]  17/18 17/18 57/24
prohibit [2]  21/23 40/25
prohibiting [1]  25/13
prohibition [5]  20/24 23/9 27/20 27/21 27/22
prohibitions [1]  39/13
prohibits [1]  10/6
promoting [1]  27/22
prong [1]  21/13
pronunciation [1]  22/6
proper [3]  5/3 5/17 17/6
proposal [1]  56/20
proposed [2]  44/5 45/22
proposing [1]  30/12
proposition [10]  13/1 13/6 15/19 21/4 26/20 28/24
  43/12 53/1 53/16 53/24
propositions [1]  16/25

protected [3]  28/8 30/18 62/2
protecting [2]  26/14 29/6
provability [1]  53/3
prove [2]  45/8 62/22
provide [1]  40/10
provided [5]  39/4 40/5 45/14 51/15 54/17
provides [6]  28/11 36/3 38/16 44/25 46/7 46/17
provision [29]  10/1 10/10 10/16 11/14 11/2 11/17 13/18
  15/2 16/13 19/8 19/17 19/17 19/21 20/6 20/10 21/18
  27/6 28/3 32/17 32/24 33/8 33/9 33/19 39/3 39/8
  39/13 39/22 40/11 41/20 54/9
provisions [16]  9/17 10/14 11/11 16/8 17/17 19/4
  20/2 29/7 30/3 35/16 36/6 38/2 39/12 39/13 39/15
  55/11
public [11]  12/9 17/12 19/23 20/10 21/14 21/25
  22/12 27/8 34/9 34/22 35/1
purpose [2]  9/16 10/5
pursuant [2]  39/25 65/6
pursue [1]  64/5
put [11]  13/14 15/5 15/19 31/1 42/2 45/7 45/19
  45/20 47/10 58/2 60/10

**Q**

Quarles [1]  32/20
Quarles' [1]  32/22
question [23]  6/2 6/25 8/6 12/11 14/13 19/9 26/1
  27/7 27/9 27/25 28/19 29/12 30/24 31/1 33/24 37/5
  41/12 41/16 45/11 48/7 50/24 52/6 61/1
questionable [1]  8/21
questions [7]  4/17 9/9 12/3 12/13 20/16 48/8 48/19
quickly [1]  58/20
quite [2]  5/5 58/23
quotes [1]  32/3
quoting [1]  38/15

**R**

Rachel [2]  2/6 3/21
raise [2]  53/13 58/10
raised [1]  7/20
rarely [1]  43/10
rather [3]  37/7 38/20 47/12
reaction [1]  11/15
reacted [1]  8/9
read [5]  8/8 42/16 51/6 59/5 60/3
reading [1]  34/7
reads [2]  54/13 61/3
really [12]  4/18 10/21 14/4 19/23 25/2 28/21 29/21
  34/23 41/16 48/15 61/4 63/1
reason [6]  20/1 30/11 34/5 43/14 43/20 45/11
reasonable [3]  8/23 38/8 45/4
reasonably [2]  13/4 52/16
reasons [6]  15/13 24/7 24/10 24/16 24/23 27/11
recall [2]  43/13 46/25
receipt [2]  46/19 54/24
Receivables [1]  38/14
recent [3]  12/17 43/10 53/21
recess [3]  62/11 63/7 64/18
recessed [2]  64/19
recite [2]  48/15 48/23
recognize [1]  19/15
recognized [3]  23/23 25/11 52/14
recognizes [1]  10/11
recollection [1]  10/2
reconvene [1]  64/13
record [2]  44/1 44/3
recover [2]  45/11 64/11
recovered [1]  44/22
reduced [1]  57/11
refer [1]  23/13
reference [1]  16/2
referred [1]  15/4
refers [1]  58/25
reflexive [1]  35/2
refuse [1]  38/4
refused [1]  57/24
regard [1]  52/13
regarding [3]  34/10 39/4 40/8
regardless [4]  16/8 36/7 37/8 47/10
regulations [1]  65/10
regulatory [1]  51/14
rehiring [1]  44/18
rejected [1]  31/12
relating [1]  36/13
relationship [9]  10/13 35/23 38/6 38/19 47/6 47/7
  48/1 48/4 49/6
relevant [1]  29/15
relied [1]  36/22
relief [7]  5/24 11/14 16/18 36/21 37/18 37/18 50/5
relinquish [3]  56/7 56/15 57/12
relying [1]  54/8
remote [2]  18/4 25/2
remotely [1]  26/18
removal [1]  17/6
removed [1]  17/4
repackage [1]  41/7
repay [1]  44/8
replete [1]  34/8
replied [1]  42/10
reply [3]  8/4 31/17 62/15
reported [1]  65/8
REPORTER [3]  65/1 65/4 65/17
representing [1]  4/3
repudiate [1]  24/20
repudiation [2]  24/19 47/2
required [5]  58/14 58/17 61/14 62/21 64/3
requirement [3]  56/17 59/11 61/18
reservation [1]  47/10
reserved [1]  47/23
residence [2]  16/9 37/8
resident [4]  20/22 22/9 24/4 28/23
residents [1]  36/8
resides [3]  26/22 37/4 37/25

**R**
residing [1] 28/1
resign [2] 31/8 36/1
resigned [1] 57/23
resisting [1] 20/6
respect [5] 17/19 30/13 32/1 34/24 41/18
respectfully [1] 52/7
respond [3] 14/7 42/7 64/4
responded [2] 42/10
responds [1] 12/1
response [2] 11/22 12/14
responsibilities [1] 48/25
responsibility [2] 57/14 57/16
responsive [1] 41/7
rest [5] 12/13 13/14 24/12 42/2 53/2
restatement [11] 14/10 19/18 19/24 20/11 27/6 31/25 32/3 33/14 38/3 38/15 39/3
restrictive [1] 29/7
restructuring [1] 49/3
result [2] 34/15 41/13
revenue [1] 57/6
rewrite [2] 12/20 52/9
rewritten [1] 52/10
Ridge [2] 12/17 12/24
right [44] 3/11 3/15 3/18 4/5 4/11 4/15 4/22 5/6 5/16 5/18 5/21 6/25 7/1 7/4 7/11 7/15 9/9 11/8 11/19 13/25 14/9 14/12 15/14 15/18 31/14 33/20 35/4 35/19 35/20 44/17 49/25 50/7 55/8 57/12 58/5 59/14 60/5 60/20 61/7 61/8 61/15 62/3 62/6 63/11
rights [2] 47/10 47/23
rise [4] 3/3 54/19 55/3 64/16
risk [1] 5/2
roads [4] 23/10 23/10 24/3 35/5
routinely [2] 30/5 30/10
rule [4] 10/22 23/7 25/15 38/12
rules [5] 19/23 23/12 23/18 26/5 29/23
Russell [1] 12/23
Russell's [1] 12/16

**S**
sale [1] 25/21
same [5] 5/22 14/22 17/1 33/11 47/4 47/15 47/25
Savelich [1] 32/22
saying [14] 10/19 14/14 24/24 26/5 26/12 29/18 29/19 31/21 49/10 49/18 56/3 59/22 59/24 60/13
Schwarz [3] 2/7 3/20 3/22
scope [11] 4/23 5/3 5/17 7/6 7/25 8/13 8/20 8/20 9/1 42/15 53/14
screen [2] 59/6 59/7
seal [2] 55/14 55/15
seat [2] 4/17 35/20
seated [2] 3/6 4/2
second [34] 7/19 8/4 8/25 12/11 14/18 14/20 14/20 22/1 34/7 38/3 38/15 39/3 39/17 40/17 40/20 40/22 41/6 42/3 42/4 42/7 42/9 42/12 44/5 45/22 45/25 46/13 48/11 49/11 50/18 59/4 61/19 62/12 62/23 63/18 63/8
Section [6] 19/19 20/12 32/1 36/13 38/4 46/17
see [9] 8/10 9/8 14/20 15/22 22/12 27/5 43/16 54/1 62/17
seeking [2] 11/14 46/15
seem [1] 40/21
seems [3] 42/6 45/3 62/24
segment [2] 35/19 55/22
self [1] 7/17
self-contained [1] 7/17
sell [2] 49/12 57/11
send [1] 35/9
senior [4] 55/19 55/25 56/16 57/24
sense [3] 19/6 48/2 48/3
sensible [1] 22/18
sent [7] 11/4 12/18 19/12 48/22 55/9 56/25 57/2
sentence [1] 59/5
separate [2] 15/13 53/1
serious [1] 26/11
services [3] 51/15 52/25 53/1
session [1] 3/4
set [1] 20/1
sets [1] 40/14
several [4] 19/20 35/22 50/1 52/6
shackled [2] 23/23 60/6
shall [4] 16/8 16/13 36/7 43/16
shared [1] 55/24
short [1] 42/4
shortly [1] 63/7
shots [1] 51/2
shouldn't [2] 27/12 53/25
show [4] 44/24 45/12 45/16 62/1
showed [1] 49/16
side [3] 8/22 20/22 61/21
signature [1] 35/3
signed [13] 11/3 11/5 17/16 19/12 20/2 22/11 23/2 23/25 28/1 28/20 29/14 56/3 58/1
significance [1] 25/9
significant [4] 10/13 18/25 30/4 37/7
signs [1] 40/3
similar [2] 21/22 34/21
simple [1] 44/3
simply [2] 40/10 42/18
since [7] 8/9 12/10 14/4 14/17 26/2 26/18 56/11
Singapore [1] 52/2
sit [1] 4/5
sitting [1] 4/7
situation [16] 10/5 11/13 19/18 19/20 29/10 54/25
six [5] 24/11 24/19 40/23 43/17 56/2
skip [1] 45/20
slide [2] 13/21 15/5
slides [1] 14/12
so [57] 4/22 5/16 6/15 7/21 7/25 10/7 11/5 11/9 11/25 12/6 12/10 16/20 17/3 17/21 18/21 19/2 19/15 22/3 22/25 23/6 24/21 25/14 25/25 26/1 30/19 31/8 32/19 34/23 35/12 35/20 37/4 40/6 42/4 42/11 42/22

43/4 45/22 45/22 46/6 47/9 48/19 49/24 50/2 50/4 50/15 50/20 50/23 52/6 52/6 52/14 53/7 53/19 55/23 56/8
social
solicit [1] 39/12
solicitable [1] 4/24
solicitation [10] 5/10 6/7 6/20 6/21 8/13 17/9 24/17 37/3 41/15 41/19
solicited [4] 6/10 7/12 9/2 9/7
somebody [2] 29/14 30/24
somebody's [1] 25/24
somehow [4] 29/19 29/22 37/21 37/24
someone [4] 7/7 21/6 42/19 46/9
someone's [1] 25/17
something [10] 11/15 12/14 13/24 30/24 35/9 43/21 45/2 50/12 54/18
somewhat [1] 41/3
somewhere [1] 30/9
sorry [6] 8/17 23/17 42/13 45/21 52/11 62/7
sort [8] 5/1 7/4 7/10 7/21 8/2 8/25 20/20 51/12
sorts [1] 7/9
sought [3] 5/25 37/3 50/6
sound [1] 8/6
sounds [1] 51/12
South [3] 22/9 22/13 22/25
SPAENER [2] 1/15 1/18
specific [5] 13/12 16/2 30/16 42/16 62/23
specified [1] 34/2
specify [4] 46/10 46/11 54/21 59/9
speech [2] 60/10 62/5
staff [1] 57/24
stake [1] 26/10
stands [1] 64/17
start [13] 4/16 7/21 11/17 12/3 17/25 14/25 16/2 20/20 27/17 47/22 48/18 50/13 57/23
started [2] 28/7 34/20
starters [1] 37/20
state [195] 10/12 10/22 16/7 16/13 16/14 19/5 19/21 26/18 27/4 27/7 27/9 32/5 32/6 32/7 32/9 32/18 32/23 33/1 33/2 33/4 33/14 36/5 36/14 36/15 38/6 38/9 38/10 38/11 38/12 38/19 39/18 39/21 40/7 51/3 52/14
state's [3] 20/7 33/15 33/17
statement [2] 40/11 55/10
states [16] 1/1 1/1 3/3 16/6 18/25 19/14 20/24 23/13 32/21 34/7 52/20 52/20 53/3 53/4 65/5 65/11
states' [1] 22/22
statute [1] 17/16
stay [2] 53/11 53/23
stemwinder [1] 62/4
stenographically [1] 65/8
stenographically-reported [1] 65/8
STENOTYPED [1] 1/24
step [1] 22/1
stick [1] 63/15
still [2] 12/8 46/22 46/25 47/3 47/4 47/9 47/14
stop [1] 62/10
stopped [1] 63/25
straightforward [3] 19/7 23/7 24/1
Street [3] 1/15 1/18 2/4
strong [3] 34/9 37/25 38/20
stronger [1] 40/8
subject [3] 41/21 47/17 60/4
submit [2] 22/3 52/7
submits [3] 16/15 36/17 37/15
Subsections [1] 54/21
subsequent [2] 7/14 46/25
subsidiary [1] 49/7
substantial [2] 38/6 38/18
such [12] 16/19 17/12 36/17 36/18 36/21 37/15 37/17 37/19 39/13 54/17 54/25
sued [1] 35/21
sufficient [1] 61/18
suggest [5] 6/19 15/17 34/25 62/16 63/3
suggested [1] 53/8
suggestion [2] 8/19 20/22 37/21
suggests [1] 64/6
suit [2] 36/18 43/18
Suite [3] 1/15 1/18 2/4
summer [1] 56/2
superior [2] 10/19 23/3
supplemental [1] 23/15
suppliers [1] 9/8
supplies [1] 14/24
supports [1] 53/16
Suppose [1] 26/18
supposed [1] 48/23
supposedly [1] 60/13
swirling [1] 9/9

**T**
table [1] 4/2 4/5 4/25
taken [2] 47/7 58/23
taking [4] 12/19 47/8 47/15 57/23
talk [9] 7/24 23/6 24/19 41/9 42/8 42/14 44/18 48/21 52/22
talked [1] 41/11
talking [6] 9/7 30/15 30/19 41/14 41/14 50/24
tell [3] 13/16 29/23 43/24 45/6 59/25
telling [2] 54/9 60/13
tells [1] 8/22
temporal [1] 4/23
tends [1] 55/16
terminable [1] 55/18
terminate [5] 46/9 46/15 49/22 54/19 61/15
terminated [8] 44/9 44/11 44/17 44/20 45/12 45/14 54/4 55/2
terminating [4] 46/11 54/20 55/10 59/8
termination [18] 6/8 34/3 34/6 46/3 46/5 46/6 48/24 49/14 49/19 54/15 54/17 54/23 55/14 58/25 59/16 64/9 64/9

terminations [1] 54/3
terms [3] 29/10 62/23 63/3
territorial
territory
Thanks [1] 4/6
themselves [1] 49/25
theory [2] 44/22 44/23
therefore [6] 6/5 11/11 19/22 32/19 40/12 62/19
they'll [1] 42/7
They've [1] 52/4
thing [6] 5/22 9/4 27/16 33/11 47/25 52/22
things [10] 4/24 5/11 12/21 14/17 42/8 47/16 48/23 56/4 60/4 61/10
think [32] 5/5 5/6 9/19 11/5 15/6 15/8 15/11 17/15 19/1 19/6 22/18 23/7 24/1 25/6 25/25 26/1 31/19 34/5 35/14 43/19 41/20 42/8 42/23 44/4 51/11 55/16 58/15 58/23 61/9 62/13 63/19 63/25
thinking [1] 28/21
third [4] 5/12 9/4 49/15 51/4
thorny [1] 48/8
though [5] 7/1 23/1 34/19 46/24 53/13
thought [2] 6/3 46/24
thousands [1] 19/3
threaten [1] 59/3
threatened [2] 49/15 56/18 57/22
three [6] 51/2 55/25 57/3 58/3 61/12 61/13
through [3] 21/12 44/4 54/21
throughout [1] 18/25
throw [4] 12/15 30/5 53/10 53/14
THURSDAY [1] 1/11
thus [1] 54/25
tie [1] 53/2
time [13] 5/2 6/3 18/18 18/18 29/23 30/3 34/16 40/24 41/2 44/3 50/21 63/10 63/19
times [2] 50/1 52/6
today [4] 5/2 7/24 63/15 63/20
TODD [1] 2/4
together [1] 61/23
took [1] 19/11
topic [1] 15/21
tort [1] 25/15
tortious [1] 35/16
total [1] 43/14
track [1] 50/20
transaction [5] 15/2 31/23 38/7 38/19 42/12
transcript [3] 1/10 65/7 65/9
TRANSCRIPTION [1] 1/24
transmission [1] 35/10
transmitting [1] 54/16
trench [1] 52/15
triable [1] 63/4
tried [3] 49/24 51/3 51/5
trier [1] 61/3
trouble [1] 13/17
true [4] 7/3 49/12 50/3 65/7
trump [1] 29/8
try [5] 4/17 7/10 23/25 25/16 35/16
trying [3] 10/18 12/12 29/21
two [14] 12/20 13/8 16/25 17/4 26/15 27/11 38/5 44/3 46/4 56/4 59/10 63/11 63/18 64/1
Twombly [2] 61/10 61/21

**U**
U.S [1] 52/1
U.S.C [1] 65/6
UK [1] 52/20
ultimately [1] 26/6
ultimatum [1] 56/18
unable [1] 64/5
uncurable [1] 55/13
under [30] 5/11 8/19 10/4 11/6 12/16 12/16 16/12 19/18 19/24 20/11 27/6 33/13 34/2 38/3 38/12 39/3 46/10 46/17 47/23 52/23 54/3 54/20 55/14 55/15 56/6 58/16 59/22 59/24 60/24 62/19
understand [3] 4/6 4/17 17/7
understanding [3] 4/19 18/7 19/4
unenforceable [1] 15/13
unfortunate [1] 35/14
unfortunately [1] 56/8
uniform [1] 19/4
unique [1] 31/5
unit [2] 57/15 57/15
UNITED [10] 1/1 1/1 3/3 18/25 52/20 50/3 53/4 65/5 65/11
unless [6] 4/25 13/5 28/15 34/1 46/2 54/6
until [7] 4/4 14/19 34/1 48/9 59/17 59/19 63/16
up [16] 6/5 11/20 15/5 28/4 29/5 29/10 41/4 43/23 45/19 53/2 56/16 59/5 60/10 62/4 63/11 63/16
upholds [1] 24/3
upon [2] 54/5 54/16
use [1] 26/5
uses [1] 39/20
using [1] 26/4
usual [1] 50/3
utterly [1] 15/12

**V**
valid [2] 9/18 43/16
validated [1] 31/15
value [3] 49/12 60/14 60/15
valued [2] 12/7 12/8
vast [1] 51/17
vendors [1] 9/8
verbs [1] 37/7
versus [2] 3/9 63/5
very [15] 4/11 4/15 22/18 25/21 25/25 29/24 32/8 35/14 36/23 38/22 40/24 43/12 44/3 46/9 51/1
veterinary [1] 17/18
view [3] 40/9 40/14 41/12
violate [1] 22/12
violated [1] 55/12
violation [1] 6/21
Virginia [1] 11/5 19/10 19/14 23/17 35/9 40/4

**V**

VOLUME [1]  1/9
vs [1]  1/5

**W**

wait [2]  46/24 63/7
waiver [1]  38/20
waives [3]  16/16 36/19 37/15
want [18]  7/18 14/10 14/15 21/17 28/25 42/7 43/2
43/24 44/2 44/18 48/5 49/5 53/23 56/3 56/13 57/20
60/10 63/10
wanted [8]  11/9 48/8 49/6 56/4 56/5 56/7 56/12
63/2
wanting [1]  49/5
wants [3]  5/18 23/22 56/23
was [76]
Washington [4]  2/5 18/14 18/17 25/8
wasn't [2]  44/11 62/5
waste [1]  44/2
way [15]  7/21 8/8 11/20 12/3 13/14 29/24 35/10
41/23 42/9 51/19 53/17 55/25 60/7 61/3 61/11
ways [1]  56/1
we'll [5]  13/13 15/2 30/3 45/20 63/21
website [1]  47/8
weigh [1]  29/21
weighs [1]  34/14
well [48]  4/2 4/8 7/4 8/12 8/15 11/3 11/19 12/14
12/25 13/10 13/19 15/6 18/1 18/9 18/24 19/1 19/25
23/16 24/25 25/5 27/4 27/14 28/10 28/21 29/2 29/11
31/14 44/2 44/12 44/13 45/2 48/10 49/12 49/16
49/20 51/11 52/17 52/19 52/24 53/13 53/20 53/21
59/17 60/22 60/23 61/9 62/5 64/12
went [1]  21/12
whatever [6]  4/22 5/2 5/16 5/18 7/25 46/21
wherever [2]  30/9 30/10
whether [26]  6/15 7/24 15/1 22/12 22/20 25/18 27/5
30/2 30/24 32/25 40/8 43/15 44/20 45/1 47/5 47/10
53/2 53/19 59/13 60/20 61/8 62/22 62/23 63/25
63/25 64/3
while [2]  48/5 50/5
whole [3]  9/3 41/2 41/4
whom [1]  37/2
whose [3]  32/25 33/2 52/14
WILLIAM [2]  1/14 3/13
willing [2]  56/15 63/15
within [5]  43/17 54/17 57/16 62/6 63/19
without [7]  5/12 9/3 26/2 40/7 41/23 45/3 49/22
won't [5]  22/23 28/23 43/4 52/11 63/16
word [6]  9/9 12/19 13/8 32/8 33/22 37/18
words [3]  7/1 25/17 60/2
work [8]  18/9 35/11 42/23 47/4 47/15 48/6 50/12
51/8
worker [1]  18/4
working [8]  20/23 23/5 46/22 47/3 47/4 47/9 47/15
50/13
works [5]  18/21 18/23 25/3 25/4 25/7
world [8]  18/22 18/24 22/21 42/23 51/18 53/2 57/4
57/5
worldwide [3]  8/20 42/17 55/21
worth [1]  41/5
wouldn't [2]  11/1 58/18
writing [4]  54/21 59/9 59/12 59/13
wrong [2]  61/7 61/8

**Y**

year [6]  5/14 6/4 6/8 40/23 41/2 58/2
year's [1]  6/3
years [2]  13/3 17/13
yes [8]  3/17 9/11 10/24 16/24 33/23 34/16 47/3
54/11
yet [5]  3/24 4/1 6/13 11/18 44/12
you'd [2]  23/8 27/9
you'll [1]  3/15
yourself [1]  3/12

**Z**

ZUCKERMAN [2]  1/15 1/18

# Exhibit 8

# FTI CONSULTING™

## Policy on Acceptable Use of Technology Resources

| | | | |
|---|---|---|---|
| *Issued By:* | *Information Technology* | *Policy No.:* | *IT-CIS-SIS-010* |
| *Region:* | *Global* | *Segment:* | *All Employees* |
| *Policy Owner:* | *Casey Watkins* | *Version: 8.0* | |
| *Policy Approver:* | *Matt Pachman; Greg Wills* | *Supersedes:* | *Version 7.2 dated March 7, 2022* |
| *Effective Date:* | *August 17,  2023* | *Updated Issue Date: August 17, 2023* | |

## Overview

FTI CONSULTING, Inc. and our subsidiaries and affiliates ("FTI Consulting" or our "Company") are committed to ethical behavior. As set out in our Code of Conduct and Compliance Policies and related policies (together with the "Code of Conduct"), we also understand that information security—keeping Company and client information confidential—is critical to FTI Consulting's success. In addition, our Policy on the Acceptable Use of Technology Resources sets forth the behaviors we should follow to protect employees, clients, and the Company from illegal or damaging activities involving our technology resources.

This Policy applies to all FTI Consulting group companies worldwide. All of us—employees, officers, and directors of our Company, as well as third-party contractors, clients, and vendors with access to FTI Consulting's systems or technology—are subject to this Policy. Therefore, the terms "user(s)," "we," and "us," as applied throughout this Policy, collectively refer to all parties mentioned above. We are expected to become familiar with and comply with this Policy, both in letter and spirit. In addition, we are responsible for ensuring that our colleagues and third parties with whom we interact comply with this Policy. Violations of this Policy may result in disciplinary action, up to and including termination or, for those third parties that are subject to this Policy, a determination of a material breach of their relationships or contractual arrangements with FTI Consulting.

Nothing in this Policy is intended to or shall prohibit any non-supervisory employee from discussing the employee's wages or terms and conditions of employment with any other individual, entity, union, or governmental agency. Further, nothing in this Policy is intended to or shall prohibit any conduct protected by Section 7 of the U.S. National Labor Relations Act or other applicable labor law. Employees will not be subject to disciplinary or other adverse employment action for engaging in such protected activity.

## Appropriate Use of Technology Resources

**FTI** CONSULTING™

In order to facilitate communications and engender successful business operations, FTI Consulting owns, operates, and maintains a number of technology resources which could contain sensitive data such as Personal Data (as that term is defined in various global Privacy laws), personally identifiable information (PII) and / or personal health information (PHI). Such resources include:

- Information services, such as electronic mail (e-mail), landline, voice over IP and wireless telephony, voice mail, databases, internet/intranet access, fax, file, and print services; and

- Computer equipment includes personal computers, portable computing devices, network servers, fixed and portable internet/intranet and e-mail access devices, and peripheral equipment such as disk drives, printers, modems, fax machines, and copiers.

These technology resources, regardless of physical location or whether leased, rented, or owned, are the property of FTI Consulting, as is all the information created, stored, or transmitted using such resources.

Our use of such technologies should be appropriate and in accordance with our Code of Conduct, our values, and sound professional judgment. Accordingly, incidental personal use of such resources is allowed as long as the usage does not violate FTI policies, does not interfere with your job performance or the performance of another FTI Consulting employee, or could otherwise harm the Company. However, do not assume a right to personal privacy or confidentiality when using any of FTI Consulting's technology resources, even if you do so for purely personal reasons. While the Company does not wish to examine personal information, FTI Consulting reserves the right to monitor any activity on any Company technology resource, to the extent permitted by applicable law.

FTI Consulting technology resources may not be used to transmit unsolicited commercial e-mail or to access, copy, save, transmit, display, print, or distribute software, messages, text, images, or other data:

- In a manner that is inconsistent with the licenses and copyrights of the vendors, authors, or owners of the material; or

- That is harassing, derogatory, defamatory, obscene, or offensive, including material that is sexually explicit or disparaging of others based upon their race, national origin, sex, disability, sexual orientation, age, religion, or political beliefs.

Under no circumstances shall any user run his/her own business at or through the Company. The use of FTI Consulting technology resources to conduct outside business is strictly prohibited.

Failure to comply with the restrictions on using Company technology for personal reasons may result in the Company taking such actions as accessing, reading, monitoring, deleting, copying, transmitting, and disclosing your personal information or confiscating the equipment to the extent permitted by applicable law.

**F T I**
**C O N S U L T I N G** ™

**Q:** FTI Consulting has issued Lawrence a computer to assist him with his job duties. Lawrence owns and operates two side businesses. One is a subscription-based blog, and the other is a business on eBay through which Lawrence resells items he buys at discount outlets. Both businesses have websites. When Lawrence is at work for FTI Consulting, he periodically does work for his two side businesses on his Company computer. He ensures he always gets his client work done, even if he has to work late. Are Lawrence's side businesses acceptable?

**A:** While Lawrence thinks his method of balancing his various interests is successful, Lawrence's supervisor may have a different view, especially if Lawrence is taking excessive time to complete client engagements and depending upon whether the contents of his blog conflict with his work. Additionally, Lawrence's use of his FTI Consulting computer to conduct business on behalf of his personal side businesses is not acceptable. Company-supplied technology is not to be used for other businesses.

### i.   E-Mail, Internet, and Electronic Communications Activities

We must each keep in mind that our e-mail, internet usage, and other electronic communications create permanent records of our thoughts and activities that can be forwarded without our consent. We must take the same care in drafting e-mails when drafting a letter on Company letterhead. Carefully review the language used and the recipients to ensure your communications uphold FTI Consulting's reputation for professionalism and integrity.

We are a professional services business, and appropriate business etiquette, customs, and courtesies should be followed by all users of FTI Consulting IT resources.

FTI Consulting Internet and e-mail resources are the property of FTI Consulting. Any use of FTI Consulting Internet and e-mail resources is made with the understanding that such use or communications are not private or anonymous. When users access the Internet through internal addresses and domain names registered to FTI Consulting, others may perceive them as representing the Company. Therefore, while employees are permitted to discuss their wages or terms and conditions of employment according to applicable laws (see page 1 of this Policy), our users shall not otherwise access the Internet for any purpose which would reflect negatively on FTI Consulting or its employees.

To determine compliance with our policies and applicable regulatory frameworks, for purposes of legal proceedings, to investigate misconduct, to locate information, or for any other business purpose, FTI Consulting may access, monitor, block, and act upon any message or communication or data created or viewed using any FTI Consulting technology resource at any time, including incoming and outgoing mail, Internet usage, telephone calls, and technical data and content, to the extent permitted by law. Additionally, the Information Technology Group routinely monitors technology resources and users of those resources for health, performance, and security purposes. During this routine monitoring activity and while providing technical support, the contents of messages, communications, or data in any system may be visible to the Information Technology Group staff. In a virus outbreak, denial of service attack, or

**FTI** CONSULTING™

related emergency, Information Technology Group staff may have to block or delete messages, communications, or data to protect FTI Consulting assets.

Because FTI Consulting periodically backs up all files and messages, and because computers re-use file storage space, files and messages may exist that are thought to have been deleted or erased. Users should understand that e-mail messages and other computer files may be electronically recalled or recreated regardless of whether the user has" deleted" or "erased" them. In instances in which an employee has requested the deletion of personal data, and FTI has subsequently recalled or recreated it; the employee will be notified.

You are not permitted to retrieve or view messages, communications, or data to which you have not been explicitly granted access. Users wishing to gain access to specific Highly Confidential Information (HCI), client company/client confidential information (CI), or other restricted data (such as Personal, PII, or HPI) must first acquire permission from the data owner and request that the access is changed through the IT Service Desk. The request should be processed with the user's supervisor's approval and by submitting an e-mail request to the IT Service Desk at ITServiceDesk@fticonsulting.com or ITG Global Cybersecurity and Privacy (GCP) for HCI.

---

**Q:** Ramon drafts several necessary e-mails relating to different FTI Consulting projects. One contains confidential information about one of our clients intended for that client. The other contains technical information about our processes and is intended for another client who signed a confidentiality agreement with our Company. Ramon realizes that he accidentally mixed up the e-mail recipients and has revealed confidential information about FTI Consulting and one of our clients. What should he do?

**A:** Ramon should immediately contact the Company's Compliance department or General Counsel to discuss the situation. We must be especially cautious not to reveal confidential information when inadvertently composing and sending electronic messages.

---

## ii. Social Media

Use of social media—blogs, podcasts, discussion forums, and social networks or other publicly available commercial websites — for FTI Consulting-related business purposes is allowed by authorized personnel only as long as such usage and communications comply with the Company's Social Media Policy, Code of Conduct, HR Data Protection Policy, and this policy. If you do not know whether you have been authorized, contact the Company's Communications department. Limited personal use of social media is allowed, provided:

- It does not interfere with your job duties;
- You safeguard confidential Company and client information at all times;

**FTI** ™
**C O N S U L T I N G**

- You do not attribute your personal opinions to FTI Consulting;

- You do not comment on FTI Consulting and its business, services, clients, or vendors;

- You do not convey the impression that you are acting on behalf of FTI Consulting; and

- You do not make inaccurate, misleading, or false statements.

If you inadvertently disclose confidential Company information through social media or networking sites, delete your posting immediately and report the disclosure to our Chief Information Officer and the Company's Compliance department.

### iii.    Security of Technology Resources

We are each responsible for the safety, security, and confidentiality of Company and client equipment and materials in our possession. The following are some basic rules for the security of technology resources:

- Do not leave FTI Consulting technology resources unattended (such as in the trunk of your car).

- Do not remove technology without your manager's permission.

- Protect all FTI technology resources that transmit or store confidential Company or client information from physical destruction by using and storing the resources a in a physically and environmentally secure location.

- Terminate all active sessions and lock your computer with a password-protected screensaver before leaving the system unattended.

- When finished working on a system, be sure to sign out of all active sessions on mainframes, computers, servers, and office PCs before leaving.

- Lock your office when unoccupied or at the end of each day and lock away all confidential Company or client information. If your building uses access passes, report lost passes immediately to your manager or the facilities department.

- Safeguard client and company data in accordance with FTI Consulting's Data Privacy Policy and the enterprise data security classification scheme.

- Ensure that the access and storage of Company data are proper and in accordance with client agreements.

- Return all client data to the client/FTI at the close of each project.

- If client data has been stored on laptops/desktops/Smartphones/tablets or notebooks, archive the data to a central file server designated by the project/engagement manager at the close of each project.

- If you have any questions on appropriately archiving (storing) client data, contact the FTI Consulting IT Service Desk at ITServiceDesk@fticonsulting.com.

**F T I**
**C O N S U L T I N G** ™

Immediately report all thefts to the FTI Consulting Facilities department and the FTI ITG - Global Cybersecurity and Privacy team (if losses of data or FTI Consulting equipment have occurred). In the case of personal data loss or damage, notification will be given to the Chief Risk Officer and FTI Data Privacy Officer. The more quickly you raise an issue with a lost or misplaced technology resource, the quicker the Company can resolve it, so raise any concerns promptly by contacting:

**Global Cyber Security & Privacy Incident Response:**

E-Mail: Security.reports@fticonsulting.com or call our voicemail number: [country calling code] +1 (410) 571-7096.

### iv.    Use of Web-hosted AI Platforms

Web-hosted AI platforms are online services that provide access to artificial intelligence (AI) tools and resources over the Internet. These platforms enable developers, data scientists, and other users to build, train, and deploy AI models without setting up their own infrastructure. Unless assessed and procured by FTI, these platforms are not intended for use as business tools, and users should consider the following when using any AI platform.

- Do not enter any client or FTI confidential information into such a tool for any purpose, and do not disclose sensitive or confidential information to Web-hosted AI Platforms. Web-hosted AI Platforms cannot determine the sensitivity of the information, and they may inadvertently disclose it to unauthorized parties.

- Users should know that Web-hosted AI Platforms are an artificial intelligence tool that may not always provide accurate or complete information. Users should exercise good judgment and critical thinking when interacting with AI Tools. They should not rely solely on its responses.

- Please do not engage in any activities that may compromise the security or integrity of Web-hosted AI Platforms or the computer systems it runs on. This includes attempting to exploit any vulnerabilities, uploading malicious code or malware, or engaging in unauthorized access.

- Users should follow all applicable laws and regulations for using artificial intelligence tools and data processing. This includes data privacy, data protection, and intellectual property laws.

- The company reserves the right to monitor all interactions with Web-hosted AI Platforms.

### v.    Unacceptable and Unlicensed Software and Computer Usage

FTI Consulting IT resources users must not install software without a valid, appropriate license on any FTI Consulting computer, file server, or networked device. Users of FTI Consulting IT resources must not install any software including data and software from external networks. The only software authorized for use on FTI Consulting desktops/laptops/PDAs/tablets or notebooks is software purchased through the normal FTI Consulting requisition procedures or purchased, developed, evaluated for security, and documented in-house. Any software currently not on the FTI Consulting approved list must be approved by IT before loading.

Software personally owned by FTI Consulting equipment users is prohibited from installation on file servers and enterprise equipment. Users should not install personally owned software on Company owned, leased, or controlled computers and devices. Requests for exceptions should be submitted to the IT Service Desk at ITServiceDesk@fticonsulting.com for review and approval by the Chief Information Officer or designated representative.

All software installed on FTI Consulting-owned, leased, or controlled computers, devices, and file servers that are not custom-developed in-house must have a license certificate or documentary proof of purchase of the license. A "proof of purchase" for a license can consist of any of the following:

- Approved purchase order;
- Invoice;
- Credit card invoice;
- Vendor proof of license certificate;
- Vendor end-user authorization form (for volume licensing);
- End-use license agreement; or
- Other Vendors provided proof of ownership documents (e.g., SOW).

No unauthorized computers and devices, including users' computing equipment, may be attached to the Company network except under established guidelines issued by the IT group.

---

### vi.    Password Management and Use of Antivirus Software

Every 90 days, you must choose a new network password complex enough for others not to guess it. This password should be unique to FTI and not used anywhere else for business or non-business purposes. If at any time you believe your password or system has been compromised, it is important to notify the Information Security team and change your password. Furthermore, you must not share or reveal your account details to anyone else. You must be sure to turn off or otherwise prevent access to Company computers, devices, and networks when you are not using them. Do

**FTI** CONSULTING™

not lend anyone else your fob or access codes. Additionally, passwords should not be stored in any form (paper, software file, or hand-held device) unless it is an FTI approved storage medium or a password management solution.

Viruses and malware represent a significant threat to our Company. Be sure to follow antivirus guidelines to prevent the spread of viruses and malware within the FTI Consulting network.

**Q:** Sally is working on a client project. As part of her research, she is visiting a website of a competitor of the client. The website asks her to download an add-on before the site will run. Is it okay for Sally to do this?

**A:** Sally is wise to be cautious. Malware and viruses are becoming an increasingly difficult challenge to deal with. She should be sure this is an authorized add-on before allowing it by contacting the FTI Consulting IT Service Desk at ITServiceDesk@fticonsulting.com. If it appears that the machine has already been infected, contact the Enterprise Information Security and Privacy team at Security.reports@fticonsulting.com.

### vii.    Mobile Device Management and Access to Corporate Resources

All prior sections of this document regarding the use of resources include mobile devices as well.

FTI personnel and contractors must not grant access to their mobile devices to unauthorized individuals.

Before initial use on the corporate network or related infrastructure, all mobile devices must be approved by IT. FTI Consulting, Inc. will maintain a list of approved mobile devices, related operating systems, and EMM-related software applications and utilities. See FTI Consulting's HR Data Protection Policy for guidelines on MDMs. Please get in touch with the IT Service Desk at ITServiceDesk@fticonsulting.com to review this information.

### Safeguarding Mobile Devices:

### Application-Level Device Safeguards

Users of mobile devices (Smartphones, other mobile phones, tablets, E-readers, and similar devices) that access FTI Consulting IT resources must have FTI Consulting's current Enterprise Mobility Management client (EMM) to gain access to those resources. This applies to corporate-owned and personally-owned mobile devices (BYOD).

A mobile device connecting to FTI resources must not have had the operating system altered (e.g., be 'jailbroken' or 'rooted').

**FTI**
**C O N S U L T I N G** ™

Mobile devices must have a complex password or PIN that meets the FTI complexity requirements. The minimum length of the password or PIN shall be six (6) characters. Devices that support less than four (6) character PINs shall not be allowed. Biometric devices such as Apple Touch ID or Face ID shall be allowed once a PIN or password is configured. A PIN or password should be unique and not easily identified with the user (not a birthday, anniversary, postal code of home or work, etc.). It **should not have** a repeating character pattern such as 1111111, 12121212, 12345678, etc.

Device owners must install any application, security patches, and OS updates deemed necessary by FTI in a timely manner to ensure the safety of FTI, Client Data, and the FTI Network. Failure to update devices will result in the denial of access to FTI resources.

Mobile devices will be set to wipe all corporate email, calendar, and contacts after ten (10) failed login attempts.

## Enterprise Mobility Management client:

The following Enterprise Mobility Client Applications must be downloaded onto practitioners' Apple and Windows Mobile devices:

- AirWatch Agent – Required to enroll devices into the AirWatch SaaS and confirm device compliance
- AirWatch Catalog – Downloaded along with the AirWatch Agent, AirWatch Catalog provides a recommended list of FTI Corporate apps downloadable from the vendor's app store

The following AirWatch Applications must be downloaded onto practitioners' Android devices (including Blackberry devices running Android OS):

- AirWatch Agent – Required to enroll devices into the AirWatch SaaS and confirm device compliance
- AirWatch Catalog – Downloaded along with the AirWatch Agent, AirWatch Catalog provides a recommended list of FTI Corporate apps downloadable from the vendor's app store.
- VMware Boxer – Required email, calendar, and contact management app

No additional application downloads are required to manage Blackberry devices running Blackberry OS.

## Physical Device Safeguards

Mobile devices should be kept in a user's possession and within sight whenever possible. Mobile devices should not be left unattended or stored insecurely. A lost or stolen mobile device containing or accessing company resources

should be reported to FTI IT Service Desk at ITServiceDesk@fticonsulting.com as soon as practicable after the device is found missing. When a mobile device is lost or stolen, FTI Consulting will take the following actions:

- Remotely "Enterprise Wipe" lost or stolen devices to remove only FTI corporate content or, with your permission, "Factory Reset" lost or stolen devices to factory settings to remove both corporate and personal content

When an employee, contractor, or affiliate terminates their business relationship with FTI Consulting, FTI Consulting will "Factory Reset" any corporate-owned mobile devices and "Enterprise Wipe" any personally owned mobile devices immediately following, but no longer than five business days from the termination event.

The "Factory Reset" removes corporate and personal content from the corporate-owned mobile device and restores the device to the manufacturer's original settings. The "Enterprise Wipe" removes all FTI email, calendars, and contacts from the personally owned mobile device. FTI makes a "best effort" not to remove personal content during the "Enterprise Wipe." However, the company is not responsible for the loss of any personal content.

The employees are responsible for backing up personal content on their mobile devices regularly.

Any attempt to contravene or bypass the mobile device management implementation or other security policies will result in immediate disconnection from all corporate resources, and there may be additional consequences in accordance with FTI Consulting's overarching security policy. Mobile devices that do not meet the requirements of FTI Consulting's current EMM client will not be allowed access to corporate resources.

---

**Q:** Terry, a new FTI employee, wishes to connect his personal mobile device to the FTI enterprise. Is it okay, and what steps must he go through to connect his device?

**A:** He should contact the IT Service Desk using the ITServiceDesk@fticonsulting.com email address to ensure his device is configured correctly to securely connect to the FTI network.

---

## Reporting Improper Activity

FTI Consulting strongly encourages all of us, regardless of location, to promptly raise questions or concerns. Doing so allows our Company to address them quickly and appropriately. This sentiment is echoed in our Code of Conduct and other Company policies and procedures.

You may make a report either orally or in writing (and anonymously if preferred and allowed by local law). Depending on the type of concern, generally, your supervisor or office manager will be in the best position to quickly address a concern; however, if the issue or concern is related to technical equipment usage or function, or security or data privacy concerns, then you may contact the FTI Consulting Enterprise Information Security Incident response line. You

may do so via e-mail at Security.reports@fticonsulting.com or call our voicemail number: [country calling code] +1 (410) 571-7096.

However, this is not your only option. For general matters related to improper activities or use of resources, you may also communicate your concerns directly to FTI Consulting's Chief Information Officer, FTI Consulting's Compliance department, or FTI Consulting's Data Protection Officer, as appropriate.

**Information and Assistance**

Contact the Enterprise Information Security and Privacy (EISP) team within the Information Technology Group (ITG) for further information regarding this Policy via the numbers available on Atlas or by e-mail to ITG Enterprise Information Security and Privacy.

**Associated Resources**

This Policy is augmented by the following:

- FTI Consulting Code of Ethics and Business Conduct

- FTI Consulting Information Security Policies, Standards and Procedures

- FTI Consulting Data Privacy Policies and Procedures

- FTI Consulting HR Data Protection Policy

- FTI Consulting EU Data Breach Policy

- FTI Consulting EISP Standard: Data Classification

- FTI Consulting EISP Standard: Minimum Standard for Connection Assets to FTI

- Consulting's Network

- FTI Consulting Social Media Policy