IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FTI CONSULTING, INC., | |
| *Plaintiff*, | |
| v. | Civ. No. **23-3200 PJM** |
| JONATHAN M. ORSZAG, | |
| *Defendant*. | |

## MEMORANDUM OPINION

In this diversity-jurisdiction case, FTI Consulting, Inc. ("FTI") has sued the former leader of one of its subsidiaries, Jonathan Orszag, to prevent him from carrying out his alleged plans to poach its employees and compete with FTI. Orszag responded to FTI's initial Complaint with a Motion to Dismiss (ECF Nos. 18, 19), which the Court dismissed as moot upon the filing of FTI's Second Amended Complaint. ECF No. 63; *see* Second Am. Compl. ("SAC"), ECF No. 48. Orszag has filed a renewed Motion to Dismiss the Second Amended Complaint (ECF Nos. 52, 53), which is now fully briefed (ECF Nos. 59, 61). No further hearing is necessary. *See* D. Md. Local R. 105.6. For the following reasons, the Court will **GRANT IN PART** and **DENY IN PART** Orszag's Motion to Dismiss the Second Amended Complaint (ECF Nos. 52, 53).

## BACKGROUND[1]

FTI, a Maryland corporation with its principal place of business in Bowie, Maryland, professes to be "one of the largest consulting firms in the world." SAC ¶¶ 1, 8.

---

[1] As will be explained below, for the purposes of resolving a motion to dismiss, the Court must accept all well-pled facts in a complaint as true. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). Accordingly, this Background section recounts the facts as they appear in FTI's Second Amended Complaint. At this stage, the Court does not express any view as to whether the facts alleged in the Second Amended Complaint are true.

Orszag, a California resident, *id.* ¶ 10, is an economic and financial consultant who frequently assists law firms and other entities with antitrust, regulatory compliance, and policy issues. *See id.* ¶ 20.

## I.

Orszag previously worked as a junior partner at a consulting firm called Competition Policy Associates, Inc. ("COMPASS"). *Id.* ¶ 19. In 2006 and 2007, FTI acquired COMPASS and another consulting firm, Lexecon, LLC. *Id.* ¶ 22. They merged the two firms to form a wholly owned subsidiary, Compass Lexecon, LLC. *Id.* Orszag joined Compass Lexecon as a Senior Managing Director and eventually became responsible for overseeing the day-to-day management of the firm. *See id.* ¶¶ 21, 23.

In April 2021, Orszag's employment agreement was on the eve of expiring. *See id.* ¶ 30. FTI and he began to negotiate the terms of a new employment agreement (the "Employment Agreement"). *See id.* According to FTI, the negotiations soon devolved into acrimony, in no small part due to Orszag's purported demands for increased compensation and a demand that he be given complete control over Compass Lexecon. *See id.* ¶¶ 30–31.

In June 2022, FTI alleges that, unless FTI acceded to his demands, Orszag "explicitly set out his intention to incite a mass resignation of key staff," the result of which would "collapse" Compass Lexecon. *Id.* ¶ 33. FTI says Orszag presented FTI's Board of Directors with a slide deck titled "A Going-Forward Compensation Proposal," which supposedly represented Orszag's "best and final offer," threatening that he would depart the company, bringing Compass Lexecon's employees with him, if his offer were not accepted by FTI. *See id.* ¶¶ 33–39. Orszag's presentation is said to have proceeded on the belief that, if he and other Compass Lexecon employees left the firm, they would go on to open the top economic consulting firm in the world, as a result of which

2

FTI would be unable to recreate the earnings it had enjoyed with Orszag on Compass Lexecon's roster. *See id.* ¶¶ 38–39, 40–43.

On January 15, 2023, despite the erosion of goodwill between the parties over the course of the prior year, FTI and Orszag entered into a Second Employment Agreement. *See id.* ¶ 44. The Second Employment Agreement was "part of a larger deal" in which the relevant stakeholders, including Orszag and FTI, agreed to "a new internal governance structure for Compass Lexecon," which was memorialized in a Governance Agreement executed on January 1, 2023. *Id.* ¶ 45. The new Governance Agreement specified that, while Orszag would continue to serve on Compass Lexecon's executive committee, he had to share his management authority with three committee members. *See id.* ¶ 47.

Orszag's Second Employment Agreement also included certain restrictive covenants that purported to limit, under specified circumstances, his ability to compete with FTI or solicit FTI's business and personnel were he to leave the company. *See id.* ¶¶ 50–62; ECF No. 52-5 ("Empl. Agreement").[2] The restrictive covenants were to last for one calendar year from the date that Orszag departed from the company. More specific details of the restrictive covenants will be discussed below.

In exchange for Orszag's agreement to be bound by these covenants, FTI represents that it promised him "substantial" compensation in the form of a generous base salary, incentive compensation, and a retention bonus totaling more than $2 million if Orszag stayed with the company for two years. *See* SAC ¶ 49; ECF No. 53-5 at 4–5. Additionally, the Second Employment Agreement incorporated by reference the existence of two interest-bearing loans that

---

[2] The Court cites to the redacted version of the Employment Agreement submitted by Orszag in connection with his Motion to Dismiss the Second Amended Complaint.

FTI had extended to Orszag in 2013 and 2015, the terms of which were defined in Orszag's prior employment agreement. *See* SAC ¶¶ 89–94. The 2013 loan took the form of a promissory note in the principal amount of approximately $10 million; the 2015 loan was similarly made, pursuant to a promissory note in the principal amount of more than $4 million (collectively, the "Promissory Notes"). *See id.*; ECF No. 52-3 at 5.

FTI claims that, shortly after the Second Employment Agreement was signed, Orszag began to act in ways that led FTI to question whether he ever intended to fulfill his end of the bargain struck in the Agreement, despite the fact that the Agreement had been reached after nearly a year of rough-and-tumble negotiations where both parties were represented by competent counsel. *See* SAC ¶¶ 46, 65. According to FTI, almost immediately after the ink on the Second Employment Agreement dried, Orszag reiterated his threats to "incite a mass resignation of Compass Lexecon employees" and, in July 2023, told FTI's senior leadership that he intended to deliver a speech to Compass Lexecon's 800 employees to expound upon his grievances. *Id.* ¶¶ 68–73. Orszag's planned remarks included his assertion that he "took a worse deal" for himself in the recent negotiation in order to "ensure that [Compass Lexecon] stayed together." *Id.* ¶ 70. He apparently intended to conclude his speech with an appeal to the employees, implying that they need not "polish" their resumes because they would continue to have a future with whatever team Orszag led. *Id.* ¶ 71. Around this same time, Orszag supposedly also told FTI leadership that, should they terminate him for his planned speech, he would take 800 employees with him the next day. *Id.* ¶ 72.

FTI says it eventually managed to convince Orszag to make his speech "less bombastic," *id.* ¶ 74, but, even as those discussions occurred, Orszag was allegedly working in the shadows to formulate plans for establishing a new company that would compete with FTI, taking with him

4

"all or substantially all" of Compass Lexecon's then-existing personnel and business. *Id.* ¶ 75. These plans are said to have included an "investor presentation," which was to be created by Orszag to "eliminate negative synergies [with FTI]" and allow Orszag and others at Compass Lexecon more freedom in the governance of the business. *Id.* The presentation purportedly also clarified that the new entity would be populated by all the current Compass Lexecon employees, and estimated that, because the new entity would effectively leech all of Compass Lexecon's employees (and business), the valuation of the enterprise would be equivalent with that already enjoyed by Compass Lexecon. *See id.* ¶ 76. FTI claims that Orszag's investor presentation also exploited "confidential information" pertaining to Compass Lexecon's estimated revenue, its overhead expenses as a share of revenue, the total revenue generated directly by the subsidiary's senior professionals, the amount of compensation paid to those senior professionals, and the amount outstanding on loans FTI had made to Compass Lexecon employees. *See id.* ¶ 79.

In October 2023, Orszag met with an executive of FTI, expressing again his desire to change the governance at Compass Lexecon. *See id.* ¶¶ 81–82. During the conversation, Orszag allegedly told the FTI executive that the company had two options: either (1) hand over control of Compass Lexecon to him by selling the subsidiary at "a fraction of its true value"; or (2) accept that Orszag would depart the company and start a competing firm. *See id.* ¶¶ 82–85.

FTI chose a third path: terminating Orszag "for Cause." *See id.* ¶ 86. On November 20, 2023, FTI notified Orszag that he had been terminated "for Cause," effective immediately; the notice purportedly cited its "Cause" as "uncurable," leading to his termination as delineated in his Employment Agreement, namely, the communications Orszag had with FTI in October and November 2023. *See id.*

5

Two days later, however, on November 22, 2023, Compass Lexecon brought Orszag back on board, entering into a "Consulting Agreement" with Orszag, supposedly to "avoid or minimize any interruption in services to clients." *Id.* ¶ 87. FTI says that this Consulting Agreement allowed Orszag to continue providing services for current Compass Lexecon clients and to receive "significant compensation" for the one-year duration of the restrictive covenants in Orszag's Second Employment Agreement. *Id.*

Shortly after terminating Orszag, FTI says it demanded that Orszag pay back the principal and accrued interest (excluding amounts previously forgiven) on both the 2013 and 2015 Promissory Notes he signed. *See id.* ¶¶ 89–93. Roughly a week later, Orszag responded by refusing to repay either of the loans. *See id.* ¶¶ 94–95.

## II.

On November 20, 2023, the same day FTI terminated Orszag "for Cause," FTI and Compass Lexecon filed suit against him in the Circuit Court for Montgomery County. *See* ECF No. 3. Two days later (the same day that the Consulting Agreement was executed), Orszag removed the case to this Court. *See* ECF No. 1. FTI then filed an Amended Complaint, which removed Compass Lexecon as a plaintiff party, otherwise preserving the substance of the original state-court Complaint. *See* ECF No. 7-1.

On December 21, 2023, Orszag filed his first Motion to Dismiss FTI's Amended Complaint. *See* ECF Nos. 18, 19. Two weeks later, on January 9, 2024, FTI filed a Motion for Leave to File a Second Amended Complaint, which purported to address some of the pleading deficiencies Orszag had identified in his initial Motion to Dismiss. *See* ECF No. 24. The parties briefed their respective positions in both Motions, *see* ECF Nos. 29, 30, 31, 33, 34, and on June 13, 2024, the Court held a hearing on the Motions. *See* ECF No. 38.

6

In his briefs and at the hearing, Orszag's arguments primarily focused on his belief that the restrictive covenants in the Employment Agreement were unenforceable. *See* Tr. at ECF Nos. 42, 46. Both the Non-Compete and Non-Solicitation provisions could not be enforced, said Orszag, because the contract should be governed by California law inasmuch it affects his rights as a California resident, and California law, as a rule, prohibits the enforcement of any non-compete or non-solicitation provisions in employment contracts. *See id.*

At the conclusion of the hearing, the Court made three rulings: (1) it entered a partial declaratory judgment that Maryland law applies to the parties' dispute; (2) it granted FTI's Motion for Leave to File Second Amended Complaint; and (3) it granted limited discovery on "the issue of the so-called inappropriate conduct of Mr. Orszag." ECF No. 42 at 45. The Court also instructed the parties to submit proposed changes to the Employment Agreement—in other words, to "blue-pencil" any restrictions in the Non-Compete and Non-Solicitation provisions that might otherwise be deemed unenforceable.

After the hearing, FTI sent Orszag its blue-pencil proposal, which made the following changes to the Employment Agreement:

> 11.  <u>Non-Solicitation Covenants</u>.
>
> a.  During the Non-Solicit Period, Employee will not, directly or indirectly, whether for Employee or for any other individual or entity (other than Company):
>
> * * *
>
> iii. Solicit, induce or otherwise attempt to influence any person whom the FTI Group employes or **who act as independent consultants to the FTI Group** ~~otherwise engages to perform services (including, but not limited to, independent consultants, engineers or sales representatives) or any contractor, subcontractor, supplier, or vendor of the FTI Group,~~ to leave the employ of ~~or engagement with,~~ or discontinue providing services

7

to, the FTI Group, or reduce the amounts or level of service they provide to the FTI Group, or otherwise interfere with or disrupt the FTI Group's relationship with these individuals ~~or entities~~, *provided, however,* that this restriction will not apply in the case of any clerical employee of the FTI Group or in the case of any other employee whose employment with the FTI Group has been terminated for at least one year.

\* \* \*

17.    <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the meaning set forth below:

A.    <u>Competing Business</u>. For the purposes hereof, the term "Competing Business" means (i) economic, ~~financial, regulatory, corporate and litigation~~ consulting services, including those provided to law firms, corporations and governmental bodies in connection with legal or regulatory proceedings, strategic decision making and/or public policy debates or matters (collectively, "Consulting Services"), ~~and (ii) any other business which is competitive with any business of the FTI Group that (A) involves Employee, (B) is conducted during the term of this Agreement, and (C) Employee was actively involved with or had knowledge of during his employment with the Company.~~

B.    <u>Market Area</u>. The parties acknowledge and agree that the Company's business is national in scope and character and that, as a result, it is reasonable and appropriate that the term "Market Area" for purposes of this Agreement means (i) the United States of America.~~, the United Kingdom, continental Europe (including, without limitation, the Scandinavian peninsula), Israel, China, Singapore, Chile and Argentina, and (ii) any other location in which the FTI Group has an office or in which the FTI Group offers or provides Consulting Services to clients in the ordinary course of its business.~~

FTI's July 1, 2024 Status Report, ECF No. 51 (bold words added). Orszag disagreed with FTI's proposed revisions, contending that they were overbroad and that they improperly added supplementary language. *See* ECF No. 59 at 10 (citing *Deutsche Post Glob. Mail, Ltd. v. Conrad*, 116 F. App'x 435, 439 (4th Cir. 2004)).

Thereafter, Orszag filed Motions to Dismiss the Second Amended Complaint (ECF Nos. 52, 53), which are now ripe.

## MOTION TO DISMISS

The purpose of Rule 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (internal quotation marks omitted). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

When deciding a motion to dismiss, a court "must accept as true all of the factual allegations contained in the complaint," and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted). The court, however, is not required to accept unsupported legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 12(b)(6), failure to state a claim, Orszag moves to dismiss Count I (Declaratory Judgment that the Non-Compete Provisions are Valid and

Enforceable), Count II (Declaratory Judgment that the Non-Solicitation Provisions are Valid and Enforceable), Count III (Breach of Contract (Non-Solicitation Provisions)), Count IV (Breach or Anticipatory Breach of Contract (Non-Compete Provisions)), and Count VI (Breach of Duty of Loyalty). To be clear, Orszag does not seek dismissal of FTI's claim for Anticipatory Breach of Contract (Non-Solicit Provisions) or either count involving the promissory notes.

### A. Counts I and II Are Dismissed with Prejudice.

At the outset, the Court resolves Counts I and II in Orszag's favor, both of which seek declaratory relief. In these counts, FTI asks the Court to declare that Orszag may not compete or solicit with FTI or Compass Lexecon "until November 20, 2024." SAC ¶¶ 108(b), 122(b). Since that date is now past, Counts I and II are no longer relevant and could be **DISMISSED AS MOOT**.

However, the enforceability vel non of the provisions will necessarily be decided by FTI's other causes of action. While a federal district court may issue declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaratory judgment is "an extraordinary remedy," which rests "in the sound discretion" of the district court. *Aetna Cas. & Surety Co. v. Quarles*, 92 F.2d 321, 324 (4th Cir. 1937). "A federal court has discretion to entertain a declaratory judgment action if the relief sought (i) will serve a useful purpose in clarifying and settling the legal relations in issue and (ii) will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* (internal quotation marks omitted) (quoting *Continental Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir.1994)). A declaratory judgment, however, does not serve a useful purpose and should be denied when "another remedy will be more effective or appropriate under the circumstances." *Quarles*, 92 F.2d at 325–26.

FTI's declaratory judgment claims present issues that will necessarily be decided in resolving its other viable claims, namely its claims for breach of the Second Employment Agreement's Non-Compete and Non-Solicitation provisions. The Court therefore is in a position

to **GRANT** Orszag's Motion as to Counts I and II of the Second Amended Complaint and will **DISMISS** those Counts **WITH PREJUDICE**.

## B. The Restrictive Covenants are Enforceable After Blue-Penciling.

Orszag claims that the Second Employment Agreement's restrictive covenants are unenforceable both factually and facially. The Court disagrees. Both the Non-Compete and Non-Solicit provisions are enforceable (once blue-penciled) and his motion with respect to FTI's Breach of Contract counts (Counts III–V) will be **DENIED WITHOUT PREJUDICE**.

### a. Factual Enforceability

As a threshold matter, Orszag attacks the enforceability of the Non-Compete and Non-Solicit restrictions by arguing that FTI failed to comply with the notice requirement in the Second Employment Agreement when it terminated Orszag's employment for Cause. Based on this failure, he says, the Non-Compete and Non-Solicitation covenants were never properly triggered, he was never bound by them, and could therefore never have breached them. The Court takes a different view.

The text pertaining to the covenants reads:

> Employee's termination for Cause will be *effective immediately* upon Company mailing or transmitting notice of such termination, provided such notice is given within 90 days after the discovery by Company of the event or conduct giving rise to grounds to terminate the Employee for cause. Before terminating Employee for Cause under subsections (ii) through (vi) above, Company will specify in writing to Employee the nature of the act, omission or failure that it deems to constitute cause and *if the action is curable, give Employee at least thirty (30) days from the receipt of such notice to correct the situation* (and thus avoid termination for Cause).

Empl. Agreement at 7 (emphasis added).

The Court rejects Orszag's factual attack on FTI's compliance with the Second Employment Agreement on notice grounds. FTI has sufficiently alleged that the circumstances

11

constituting Cause on Orszag's part were incurable and therefore his termination could arguably have begun "effective immediately." While Orszag can perhaps argue, as a matter of fact, that his actions couldn't have been incurable since he was subsequently re-hired as an independent consultant (and thus possibly entitled to notice and the opportunity to cure), these are factual questions not suitable for resolution at this stage.

### b.  Facial Enforceability

The Court turns to the more fundamental question at issue: whether the Non-Compete and Non-Solicitation provisions can be facially enforceable. After permissible blue-penciling, it finds they can.

In Maryland, non-compete and non-solicitation clauses are enforceable if: (1) the employer has a legally protected interest; (2) the restrictive covenant is no wider in scope and duration than is reasonably necessary to protect the employer's interest; (3) the covenant does not impose an "undue hardship" on the employee; and (4) the covenant does not violate public policy. *Conrad*, 116 F. App'x at 438.

There is no dispute that FTI has a legally protected interest in ensuring that Orszag not trade on the goodwill with clients that he gained while working at the firm. Nor is there any dispute that Orszag had frequent contact with clients, whom he solicited and served, as well as with employees and other independent consultants whom he led and managed. Orszag's principal claim is that FTI's proposed blue-penciled provisions are overbroad and legally unenforceable.

The reasonable necessity of a covenant's scope and duration frequently presents factual issues not properly resolved on a motion to dismiss. *See Becker v. Bailey*, 268 Md. 93, 97 (1973). It is true that if a restrictive covenant is "too broad on its face," it may be declared unenforceable as a matter of law, with no need for factual development. *Id.*; *see, e.g.*, *Conrad*, 116 F. App'x at 438; *Allied Fire Prot., Inc. v. Thai*, No. PWG-17-551, 2017 WL 4354802, at *5 (D. Md. Oct. 2,

12

2017). In *Allied Fire Protection v. Thai*, Judge Grimm of this Court found that a non-compete provision was unenforceable where it was "not narrowly tailored to protect customer goodwill that the employee cultivated during his employment" because, among other reasons, the covenant purported to prohibit the employee from engaging "*directly* or *indirectly* in *any* type of engineering, consulting, or general construction business *anywhere* . . . in the world" for a duration of five years. 2017 WL 4354802, at *6.

While the Non-Compete and Non-Solicitation provisions in this case are overbroad in somewhat similar fashion, the point is that that is not the end of the inquiry, given what FTI has proposed to blue-pencil. As another colleague of this Court, Judge Blake, explained in *Bindagraphics*:

> If a restrictive covenant is unnecessarily broad, a court may blue pencil or excise language to reduce the covenant's reach to reasonable limits. A court may not, however, rearrange or supplement the language of the restrictive covenant to precipitate a properly tailored revision. A court can only blue pencil a restrictive covenant if the offending provision is neatly severable. A court may not excise the dominant language or words from a covenant that is part of a single indivisible promise. Nor can a court supplement, rearrange, or otherwise rewrite the language of the restrictive covenant.

*Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565, 573–74 (D. Md. 2019) (cleaned up) (citing *Conrad*, 116 F. App'x at 439).

FTI has proposed blue-penciling the Agreement so that the Non-Solicitation covenant applies only to FTI employees and independent consultant *individuals*, and deletes the inclusion of contractors, subcontractors, suppliers, and vendor individuals or entities. The Non-Compete provision has also been limited in scope to cover only economic consulting services in the United

States. *See* ECF No. 51. Removing the excised language from FTI's proposal is, as Judge Blake affirmed, "neatly severable," such that suitable provisions could fairly read as follows:

> 11.  Non-Solicitation Covenants.
>
>> b.  During the Non-Solicit Period, Employee will not, directly or indirectly, whether for Employee or for any other individual or entity (other than Company):
>>
>> \* \* \*
>>
>>> iii. Solicit, induce or otherwise attempt to influence any person whom the FTI Group employs or ~~otherwise engages to perform services (including, but not limited to,~~ independent consultants, ~~engineers or sales representatives) or any contractor, subcontractor, supplier, or vendor~~ of the FTI Group, to leave the employ of ~~or engagement with,~~ or discontinue providing services to, the FTI Group, or reduce the amounts or level of service they provide to the FTI Group, or otherwise interfere with or disrupt the FTI Group's relationship with these individuals ~~or entities,~~ *provided, however,* that this restriction will not apply in the case of any clerical employee of the FTI Group or in the case of any other employee whose employment with the FTI Group has been terminated for at least one year.
>
> \* \* \*
>
> 17.  Definitions. For purposes of this Agreement, the following terms shall have the meaning set forth below:
>
>> C.  Competing Business. For the purposes hereof, the term "Competing Business" means (i) economic, ~~financial, regulatory, corporate and litigation~~ consulting services, including those provided to law firms, corporations and governmental bodies in connection with legal or regulatory proceedings, strategic decision making and/or public policy debates or matters (collectively, "Consulting Services"), ~~and (ii) any other business which is competitive with any business of the FTI Group that (A) involves Employee, (B) is conducted during the term of this Agreement, and (C) Employee was actively involved with or had knowledge of during his employment with the Company.~~

14

D. <u>Market Area</u>. The parties acknowledge and agree that the Company's business is national in scope and character and that, as a result, it is reasonable and appropriate that the term "Market Area" for purposes of this Agreement means (i) the United States of America, ~~the United Kingdom, continental Europe (including, without limitation, the Scandinavian peninsula), Israel, China, Singapore, Chile and Argentina, and (ii) any other location in which the FTI Group has an office or in which the FTI Group offers or provides Consulting Services to clients in the ordinary course of its business.~~

These proposed excisions properly and fairly reduce the scope of the restrictions, leaving provisions which the Court finds enforceable.

Both parties cite *Aerotek, Inc. v. Obercian*, 377 F. Supp. 3d 539 (D. Md. 2019), to support their contrary positions, but the Court finds in favor of upholding the blue-penciled restrictions. The important aspect of *Aerotek* is that there the court "focuse[d] its inquiry on the breadth of the provision's proscriptions *based on the 'facts and circumstances'* of this case." *Id.* at 546 (emphasis added). There, the court compared Obercian's restrictive covenants to those of *Allegis Group, Inc. v. Jordan*, No. GLR-12-2535, 2014 WL 2612604 (D. Md. June 10, 2014), where "a similar noncompete was enforceable against an employee who founded his own competing business" after leaving his employer. 377 F. Supp. at 548. But going to work for a competitor (the circumstances of Obercian) differs substantially from leaving an employer, poaching hundreds of its employees, and doing so with the intent to destroy the company. *See id.*

Here, where it is alleged that Orszag took steps to form a directly competing business, exfiltrating a massive number of employees and clients with him, Orszag's suggestion that he merely intended to go into a competing business that engaged in economic consulting grossly mischaracterizes the "facts and circumstances of this case." Relatedly, his claim that the Non-Solicitation provision covers many employees Orszag has potentially never met, or many potential

15

clients as to whom FTI has no protectable interest, are simply factual questions not properly resolved on a motion to dismiss. *See Becker*, 268 Md. at 97.

At this stage, the Court finds that the blue-penciled restrictions are reasonably limited to "prevent exploitation by [an] employee's confidential knowledge of the employer's trade and personal contacts established with its patrons." *Id.* at 99. This is especially so given FTI's specific allegations regarding Orszag's position within Compass Lexecon, his extensive contact with employees and clients, *see Conrad*, 116 F. App'x at 438, and his plan to start a directly competing business that he believes will submarine FTI's business. *Obercian*, 377 F. Supp. 3d at 548. Moreover, the parties specifically agreed to make every effort to make the restrictions enforceable:

> If any restriction set forth in this Section is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic areas as to which it may be enforceable.

Empl. Agreement at 14, 16. The Court respects that clause and will enforce the parties' agreement, blue-penciled as FTI proposes.

### C. Count III (Breach of Contract (Non-Solicit Provisions))

Having found the excised Non-Solicit and Non-Compete provisions are enforceable, the Court turns to FTI's allegations that Orszag breached those provisions. In Count III, FTI alleges that Orszag breached the Non-Solicit provisions by seeking to coordinate the mass departures of Compass Lexecon's top-ranking employees. Orszag argues that FTI's allegations at base are conclusory and do not sufficiently plead that he solicited employees or clients because the Second Employment Agreement is expressly limited to "affirmative solicitation" under § 11(b).

Generally, a breach of contract is a "failure, without legal excuse, to perform any promise that forms the whole or part of a contract." *Kunda v. Morse*, 229 Md. App. 295, 304 (2016)

16

(internal quotation omitted). A breach of contract claim requires (1) a contractual obligation, (2) breach, and (3) resulting injury. *See Wal-Mart Real Est. Bus. Tr. v. Garrison Realty Invs., LLC*, 657 F. Supp. 3d 757, 766 (D. Md. 2023); *Cont'l Masonry Co. v. Verdel Const. Co.*, 279 Md. 476, 480 (1977). "A breach . . . may be inferred from the 'refusal of a party to recognize the existence of a contract, or the doing of something inconsistent with its existence.'" *C. W. Blomquist & Co. v. Cap. Area Realty Invs.*, 270 Md. 486, 494 (1973) (quoting *Friedman v. Katzner*, 139 Md. 195, 201 (1921)).

Here, FTI has alleged sufficient facts for the Court to conclude that Orszag plausibly breached the Non-Solicitation provision by, at a minimum, threatening that his departure from FTI would be followed by 800 other Compass Lexecon employees. This threat clearly implies that Orszag had already reached, or planned to reach, an agreement with many if not all of those employees to leave FTI *en masse*, and that he had at least spoken to those employees to win their support. That FTI has identified a particular date and time of his solicitous comments, as well as the content of those comments, bolsters its claim. *Cf. Albert S. Smyth Co. v. Motes*, No. CV CCB-17-677, 2018 WL 3635024, at *9 (D. Md. July 31, 2018) (dismissing claim for breach of non-solicitation provision where the complaint failed to allege "when or how . . . employees were solicited, or even who most of them are").

Orszag argues that FTI only speculates that it "*may* suffer substantial damages, including lost revenues and employees," as a result of Orszag's conduct. SAC ¶ 128 (emphasis added). While such speculation alone may not suffice to state an injury resulting from an alleged breach, FTI makes the further point that it felt obligated to re-hire Orszag under the Consultant Agreement in order to ensure that he did not compete for the remainder of his one-year restriction period. It would not be unreasonable to infer that any amount that FTI paid to Orszag under the Consultant

Agreement to keep him close could be read as resulting injury flowing from Orszag's potential breach of fiduciary duty.[3] Accordingly, the Court **DENIES** Orszag's Motion as to Count III.

### D. Count IV (Breach or Anticipatory Breach of Contract (Non-Compete Provisions))

In Count IV, FTI accuses Orszag of breaching the Non-Compete provisions by taking steps to set up his own firm post-employment. Orszag counters that FTI fails to allege any actual competition, that preparing to compete in the future doesn't suffice to state a claim.

To establish an anticipatory breach of contract under Maryland law, a plaintiff must allege "'a definite, specific, positive, and unconditional repudiation of the contract by one of the parties to the contract.'" *Tate v. Am. Gen. Life Ins. Co.*, 627 F. Supp. 3d 480, 492 (D. Md. 2022) (quoting *Transam. Premier Life Ins. Co. v. Selman & Co.*, 401 F. Supp. 3d 576, 596 (D. Md. 2019)). "Maryland law recognizes that 'when in anticipation of the time of performance one definitely and specifically refuses to do something which he is obligated to do, so that it amounts to a refusal to go on with the contract, it may be treated as a breach by anticipation.'" *Transam. Premier Life Ins. Co.*, 401 F. Supp. 3d at 596 (quoting *C.W. Blomquist & Co.*, 270 Md. at 494)). Expressions of doubt are not enough for repudiation, but some expressions indicating disinclination to perform do suffice for repudiation. *See C.W. Blomquist & Co.*, 270 Md. at 495. Additionally, acts indicating preparation to breach the contract are normally sufficient for repudiation. *See Transam. Premier Life Ins. Co.*, 401 F. Supp. 3d at 596; *Himelfarb v. Am. Exp. Co.*, 301 Md. 698, 704 (1984) (finding repudiation when parties to the contract refused to pay an impending fee pursuant to the contract).

Orszag, it seems, ventures well beyond raising doubt about what he might do with respect to the Non-Compete covenant. Shortly before being terminated, he allegedly threatened FTI,

---

[3] *See* Michael Corleone: "My father taught me many things . . . . He taught me keep your friends close, but your enemies closer." From The Godfather II.

saying that he would leave the firm, drain its staff, and begin his own competing firm if FTI did not cede him complete control of Compass Lexecon. SAC ¶ 84. He even gave FTI a deadline for it to come to a decision. *Id.* ¶ 85. FTI further alleges that Orszag, even during his employment, prepared to compete with FTI, availing himself of FTI's and Compass Lexecon's confidential information as part of his efforts to solicit investors. *Id.* ¶ 79. All these actions demonstrate that Orszag went beyond speculation of an anticipatory breach; he waded into the much deeper waters of refusing to comply with the parties' contract. He purportedly engaged in highly charged conversations about possibly breaching the covenant, threatened to breach it, even laid plans to breach it. *See Transam. Premier Life Ins. Co.*, 401 F. Supp. 3d at 596. Remarkably, he still insists he does not have to follow the Non-Compete covenant. A trier of fact, however, could very well decide that taken together, his comportment "amounts to a refusal to go on with the contract." *Id.*

FTI need say no more as to this claim for now. The Court **DENIES** Orszag's Motion to Dismiss on Count IV. FTI has pleaded a plausible claim for relief for anticipatory breach of the Non-Compete provisions.

### E. Count VI (Breach of Fiduciary Duty of Loyalty)

In Count VI, FTI alleges Orszag breached his duty of loyalty in part because he sought to "orchestrate a mass resignation" from FTI to create a new firm that would directly compete with his former employer. SAC ¶ 73. "To establish a breach of fiduciary duty . . . a plaintiff must show: '(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary.'" *Plank v. Cherneski*, 469 Md. 548, 599 (2020) (quoting *Froelich v. Erickson*, 96 F. Supp. 2d 507, 526 (D. Md. 2000)). FTI has plausibly stated the first two elements of a breach of the duty of loyalty, which Orszag, in any case, does not appear to dispute. *See Md. Metals, Inc. v. Metzner*, 282 Md. 31, 40–41 (1978).

19

Orszag only argues —again—that FTI has failed to plead the necessary element of damage. The Court harks back to its analysis regarding Orszag's breach of the Non-Solicit provisions: FTI may well have believed that it had no choice but to keep a volatile employee close, re-hiring him under the Consultant Agreement only to ensure that at least he would not compete for the remainder of his one-year restriction period. The Court **DENIES** Orszag's motion with respect to Count VI.

## CONCLUSION

For the foregoing reasons, it is hereby

> **ORDERED**
>
> 1. Orszag's Motion to Dismiss Second Amended Complaint for Failure to State a Claim (ECF Nos. 52, 53) is **GRANTED IN PART AND DENIED IN PART**;
>
>     a. Besides being **MOOT**, it is **GRANTED** with respect to Counts I and II. Counts I and II are **DISMISSED WITH PREJUDICE**; and
>
>     b. It is **DENIED** with respect to Counts III, IV, and VI.
>
> 2. The Hearing in this case presently set for December 17, 2024 is **CANCELED**.
>
> 3. Counsel for the parties are **DIRECTED** to submit a Joint Proposed Scheduling Order to the Court within thirty (30) days from the date of entry of the accompanying Order.

A separate Order will **ISSUE**.

December 5, 2024

_____
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE