# Exhibit A

**PUBLIC - REDACTED**

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (the "Agreement") is entered into as of January **15th** 2023, and effective as of January 1, 2023 (the "Effective Date"), by and among FTI Consulting, Inc., a Maryland corporation ("FTI"), Compass Lexecon LLC, a Maryland limited liability company which is a wholly-owned subsidiary of FTI (the "Company"), and Jonathan M. Orszag ("Employee").

## WITNESSETH:

WHEREAS, FTI is a multi-disciplinary consulting firm which operates through FTI and its subsidiaries and affiliates (the "FTI Group"), and the Company is in the business of providing economics consulting services, including litigation support, public policy studies, and business consulting (the "Business") under the name Compass Lexecon; and

WHEREAS, Employee and the Company have agreed to the terms of Employee's employment relationship with the Company, for the period of time and subject to the provisions set forth in this Agreement.

NOW, THEREFORE, the parties agree as follows:

1.  Employment. The Company employs Employee and Employee accepts such employment upon the terms and conditions set forth in this Agreement.

2.  Term of Employment. The term of Employee's employment under this Agreement will start on the Effective Date and continue until December 31, 2026 (the "Initial Term"), unless otherwise agreed to in writing by the Company and Employee or terminated earlier in accordance with this Agreement. The period of time between the Effective Date and the termination of Employee's employment hereunder shall be referred to herein as the "Term". In all events, however, Employee's employment hereunder shall be entirely at-will.

3.  Position and Duties. During the Term, Employee will be employed as a Senior Managing Director of the Company with his primary location of employment in Los Angeles County, California. Employee shall report to the Chief Executive Officer of FTI (the "FTI CEO") or such other senior executive officer who may be designated by FTI. Employee shall (a) originate, manage and perform consulting services consistent with past practice, (b) perform such other duties and responsibilities relating to the Company as may be reasonably assigned to him by the FTI CEO or such other senior executive officer who may be designated by FTI, provided they are generally consistent with the duties performed by Employee in 2022, and (c) subject to Section 10, and in a manner substantially consistent with his practice from January 1, 2006 to the Effective Date, devote substantially all of his business time, attention, and energies to the performance of Employee's duties and responsibilities hereunder; *provided* that Employee shall not be deemed in breach hereof solely as a result of a reasonable reduction in the number of billable hours he incurs, where such reduction is not the result of Employee's failure or refusal to diligently fulfill his duties and responsibilities as set forth herein.

Employee will undertake such travel as is or may be reasonably necessary or appropriate in connection with the performance of his duties, responsibilities and obligations to the Company and FTI. Employee, in the performance of his duties, responsibilities and obligations hereunder, shall observe and adhere to the applicable policies, practices and procedures of the Company, such as now or hereafter in existence or as supplemented, amended, modified or restated by the Company in its sole discretion. Notwithstanding the foregoing, Employee may engage in personal, charitable, professional, teaching and investment activities to the extent such activities do not conflict or materially interfere with Employee's performance of his duties, responsibilities and services to and for the Company and its clients or are otherwise restricted by this Agreement or any policies, practices or procedures of the Company. Employee, in the performance of his duties, responsibilities and obligations hereunder, shall observe and adhere to the applicable policies, practices and procedures of the Company.

4.   Compensation.

   a.   ███████████████████████

        i.   ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ██████████████████████

        ii.  ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████
             ████████████████████████████████

2



iii. ███████████████████████████████
███████████████████████████████
███████████████████████████████
████████████████████████

b.   ████████████████

i.   ███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████████████████

3



ii.

c.

i.

ii.

d.

5.    <u>Employee Benefit Plans and Perquisites</u>.

  a.  <u>General</u>. Employee will be eligible to participate in such qualified employee pension plans, group health, long term disability and group life insurance plans, and any other welfare and fringe benefit plans, arrangements, programs and perquisites generally maintained or provided

4

by FTI from time to time to or for the benefit of its executive employees (or, if not offered solely to executive employees, to employees generally) ("Benefit Plans"), at a level commensurate with Employee's position and FTI policy regarding other similarly situated FTI employees. Employee's participation in any Benefit Plans will be subject to the terms of the applicable plan documents and FTI's generally applied policies. FTI in its discretion may from time to time adopt, modify, interpret, or discontinue such plans or policies. Employee will be given full credit for service with Compass Lexecon and its predecessors under the Benefit Plans and for purposes of determining Employee's period of employment under any vacation, sick pay or other paid time off plan of FTI and for determining other entitlements and terms of employment affected by seniority under FTI's employment policies. Employee's decision not to participate in a Benefit Plan for a period of time shall not prohibit Employee's participation in such Benefit Plan at a later date, if the terms of the Benefit Plan so permit.

b. <u>Reimbursement of Business Expenses</u>. Employee is authorized to incur reasonable expenses in carrying out Employee's duties and responsibilities under this Agreement, and Company will promptly pay or reimburse Employee for all such expenses that are so incurred upon presentation of appropriate vouchers or receipts, subject to the applicable expense reimbursement policies in effect from time to time with respect to executives of Company.

c. <u>Other Incentive Compensation Plans or Programs</u>. The parties to this Agreement understand and agree that Employee's right to compensation for services rendered to the Company and FTI are set forth in this Agreement and that Employee is not entitled to participate in any incentive compensation plan or program not specifically designated in this Agreement (including, without limitation, any plans or programs related to retention bonuses or forgivable loans). Employee hereby expressly waives any right to participate in any incentive compensation plan or program not expressly designated in this Agreement, including, but not limited to, the FTI Consulting, Inc. Senior Managing Director Incentive Compensation Plan and/or the Key Senior Managing Director Incentive Compensation Plan.

6. <u>No Payments to Governmental Officials</u>. Employee will not knowingly pay or authorize payment of any remuneration to or on behalf of any governmental official which would constitute a violation of applicable law. The Company will neither request nor require Employee to offer to make or make a payment of any remuneration to or on behalf of any governmental official other than those required or expressly permitted by applicable law. Employee shall comply with the Company's code of conduct, including without limitation the Company's Anti-Corruption Policy, in effect and as may be amended from time to time.

7. <u>Termination of Employment</u>.

5

a. <u>Resignation</u>.  Employee may voluntarily resign Employee's employment under this Agreement at any time upon at least 90 days' prior written notice to Company.  The Company may waive such notice or authorize a shorter notice period in its sole discretion (and any such waiver or authorization shall not cause any such resignation to constitute a termination by the Company).

b. <u>Termination by Company for Cause</u>.  The Company may terminate Employee's employment for "<u>Cause</u>" if (and only if) one or more of the following occur:

    i. Employee's indictment for, conviction of or guilty or *nolo contendre* plea to a crime involving moral turpitude or a felony;

    ii. Employee's failure to satisfactorily perform any material employment or other duties, obligations or responsibilities under this Agreement or any other written agreement with any member of the FTI Group;

    iii. Employee engages in intemperate use of alcohol, use of illegal drugs, or use of drugs prescribed for Employee other than in accordance with medical instructions, which adversely affect in any material respect the performance of his duties for the Company;

    iv. Employee's commission or omission of any act involving material dishonesty, embezzlement, misappropriation of assets, or fraud with respect to the Company or any of its affiliates or any of their respective employees or clients;

    v. Employee's violation of any written policy of the Company or any of its affiliates, which has or could reasonably be expected to adversely affect the Company or any of its affiliates in any material respect (whether business-related, financial, reputational or otherwise), or engaging in any willful misconduct, gross negligence, violation of law or other bad act related to his employment or otherwise which has or could reasonably be expected to adversely affect the Company or any of its affiliates in any material respect (whether business-related, financial, reputational or otherwise);

    vi. Employee's failure to (A) use his reasonable best efforts to perform his material duties and responsibilities to the FTI Group consistent with his efforts and activities prior to the execution of this Agreement (other than as a result of Disability), (B) devote substantially all of his business time, attention and energies to the performance of Employee's duties and responsibilities hereunder, consistent with his efforts and activities prior to the execution of this

6

Agreement (other than as a result of Disability), or (C) comply with any of the restrictions contained in Sections 9 through 16.

Employee's termination for Cause will be effective immediately upon Company mailing or transmitting notice of such termination, provided such notice is given within 90 days after the discovery by Company of the event or conduct giving rise to grounds to terminate Employee for Cause. Before terminating Employee for Cause under subsections (ii) through (vi) above, Company will specify in writing to Employee the nature of the act, omission or failure that it deems to constitute Cause and if the action is curable, give Employee at least thirty (30) days from the receipt of such notice to correct the situation (and thus avoid termination for Cause). For clarification, "Cause" shall not include a reduction in Employee's productivity or billable hours to the extent that such reduction is the result of (1) changes in business conditions which are not caused by Employee (including, without limitation, any changes resulting from the Company's or FTI's entering bankruptcy or ceasing operations) or are beyond the control of Employee, (2) changes in the manner in which he handles cases (including the reasonable use of other experts employed by the FTI Group), to the extent such changes (x) are taken in good faith in a manner reasonably expected to benefit the FTI Group and (y) are not themselves a basis for Cause or the direct or indirect result of, or otherwise related to, circumstances constituting Cause, (3) changes in his reputation or desirability as an expert witness (other than, in each such case, as a result of (i) circumstances otherwise constituting Cause or directly or indirectly resulting from, or related to, circumstances constituting Cause, or (ii) intentional conduct by Employee in an attempt to cause the termination of this Agreement), or (4) Employee's Disability (as defined in Section 7(d), but without regard to the time periods set forth therein).

c.    <u>Termination by Company Without Cause</u>. Subject to the provisions hereof, Company may terminate Employee's employment under this Agreement before the end of the Term, without Cause, upon thirty (30) days' prior written notice.

d.    <u>Termination Due to Disability</u>. If Employee incurs a "<u>Disability</u>" (as defined below), Company may terminate Employee's employment. For the purposes hereof, Employee will be deemed to incur a "Disability" if Employee is (i) unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in imminent and untimely death or can be expected to last for a continuous period of not less than twelve (12) months, or (ii) by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving (or otherwise becoming eligible to receive) income replacement benefits for a period of not less than three (3) months under an accident and health plan covering Company employees. If Employee's employment is terminated on account of Disability, for purposes of this Agreement such termination shall not be considered a termination for Cause or a termination without Good Reason.

7

e. <u>Termination by Employee for Good Reason</u>.  Employee may resign for "<u>Good Reason</u>" if (and only if), without Employee's prior written consent, the Company or FTI:

i. fails to maintain Employee in the office or the position, or a substantially equivalent office or position, of or with the FTI Group relating to the operation of the Company which Employee holds as of the date of this Agreement (other than any such change that occurs for "Cause," that is made to accommodate Employee's entitlement to leave under the Family and Medical Leave Act, or that results from an accommodation under the Americans with Disabilities Act);

ii. takes any action which results in a substantial diminution in his authorities, duties, responsibilities or status from those in effect as of the date of this Agreement (other than any such change that occurs for "Cause," that is made to accommodate Employee's entitlement to leave under the Family and Medical Leave Act, or that results from an accommodation under the Americans with Disabilities Act);

iii. knowingly instructs Employee to perform an unlawful or dishonest act;

iv. fails to make one or more material payments to Employee as required by the terms set forth in Section 4 of this Agreement or commits a material breach of a material provision of the Agreement that has or is reasonably likely to have a significant adverse effect on Employee; or

v. liquidates, dissolves or winds up the Company or FTI, or FTI materially reduces its business activities in a manner which materially, adversely affects Employee, or FTI or the Company ceases to do business (other than as a part of a reorganization in which the activities of the Company are continued in substantially the same manner as before entering the reorganization).

However, Employee shall not be entitled to terminate his employment for Good Reason unless (i) he has given the Company written notice of the facts giving rise to Good Reason within ninety (90) days after the discovery by Employee of the event or circumstance giving rise to Good Reason, (ii) the Company has failed to cure the situation within thirty (30) days thereafter and (iii) Employee actually terminates his employment within thirty (30) days following the expiration of Company's cure period as set forth in sub-section (ii) above and, at the time of such termination, no act, omission or failure has occurred that could constitute Cause (without regard for any notice or cure provisions related thereto).  For clarification, "Good Reason"

8

shall not include (A) a loss of business opportunity of Employee as a result of the reasonable application of FTI's conflict of interest and client engagement policies as in effect from time to time applicable to the FTI Group as a whole, (B) a reasonable increase in Employee's duties or billable hours that is not inconsistent with past practices of Employee as a result of general improvements or increases in the Company's business, (C) a diminution in Employee's authorities, duties, responsibilities or status as a result of any reduction of Employee's productivity or billable hours to the extent that such reduction is the result of (1) changes in business conditions which are not caused by the Company or which are beyond the control of the Company, (2) changes in the manner in which Employee handles cases (including the reasonable use of other experts employed by the FTI Group) or (3) changes in Employee's or the Company's reputation or desirability as an expert witness (including in each such case, as a result of (i) circumstances constituting Cause or (ii) intentional conduct by Employee in an attempt to cause the termination of this Agreement), (D) a change in authority, duties, responsibilities, or position (i) solely because FTI, its parent, subsidiary, or affiliate becomes an affiliate of another corporation or entity, (ii) because there has been a change in the reporting hierarchy involving Employee, (iii) because of Disability or (iv) because Employee has requested or otherwise agreed in writing to a change in status, including, but not limited to, less than full-time employment, a leave of absence, job-sharing or a consulting or independent contractor relationship, or (E) any modifications to the Governance Agreement, effective as of January 1, 2023, by and among FTI, Daniel R. Fischel, Mark Israel, Jorge Padilla and Employee (as may be amended from time to time, the "Governance Agreement") or any additions to or removals from the Executive Committee (as defined in the Governance Agreement). The existence of the Good Reason shall not be affected by Employee's temporary incapacity due to physical or mental illness not constituting a Disability.

    f.    <u>Death</u>. If Employee dies during the Term, then the Term will end as of the date of Employee's death.

8.    <u>Payments on Termination of Employment</u>.

    a.    <u>Termination by Company for Cause or by Employee Without Good Reason</u>. If (1) Company terminates Employee's employment for Cause or if Employee resigns without Good Reason or (2) Employee's employment terminates upon expiration of the Initial Term on December 31, 2026 without an intervening mutually agreeable, express extension of employment, then Company will pay to Employee: (i) the earned but unpaid amount, if any, of (A) Employee's Base Compensation through the Termination Date and (B) the Premium in Section 4(ii), in accordance with applicable law, (ii) the unpaid amount, if any, of Employee's previously earned and unpaid Annual Bonus under the Incentive Compensation Plan (including, without limitation, any Bonus True-Up (as defined in the

9

Incentive Compensation Plan) for the year prior to the year in which the Termination Date occurs, payable in accordance with (and subject to) the terms (other than Section 3.3) of the Incentive Compensation Plan, (iii) the amount of any substantiated but previously unreimbursed business expenses incurred through the Termination Date in accordance with Section 5(b), and (iv) any additional vested entitlements, if any, to which Employee is entitled under the terms of any Benefit Plan in which Employee was a participant (collectively, "<u>Accrued Compensation</u>").

b.    <u>Termination by Company Without Cause or by Employee for Good Reason</u>. If the Company terminates Employee's employment without Cause or if Employee resigns for Good Reason prior to the end of the Initial Term, Employee will be entitled to receive the following payments and benefits, subject to Sections 8(e) and 31 notwithstanding any provision herein:

    i.    any Accrued Compensation, payable as set forth in Section 8(a);

    ii.    pro rata Annual Bonus under the Incentive Compensation Plan for the calendar year including the Termination Date but ending after the Termination Date, determined by multiplying (A) the amount Employee would have received had he been employed on the last day of such year by (B) a fraction, the numerator of which is the number of days from the beginning of such year through the Termination Date, and the denominator of which is the number of calendar days in such year ("<u>Prorated Annual Bonus</u>"), which amount shall be paid on the date(s) on which the payments are made to active participants in the Incentive Compensation Plan for such calendar year (and in no event prior to January 1, or after December 31, of the calendar year following the year in which the Termination Date occurs);

    iii.    the aggregate amount of any unpaid Retention Bonuses, payable within thirty (30) days following the Termination Date;

    iv.    subject to Employee's valid election to continue group health plan coverage under Section 4980B of the Code and the regulations thereunder, continuing group health plan coverage for Employee and, where applicable, Employee's spouse and eligible dependents at the same benefit and contribution levels in effect from time to time with respect to applicable active FTI employees ("<u>Benefit Continuation Coverage</u>") from the Termination Date through the later of (A) the first anniversary of the Termination Date, (B) the earlier of (x) the last day of the Initial Term or (y) the 18-month anniversary of the Termination Date (the "<u>Benefit Continuation Period</u>").  If and to the extent such Benefit Continuation Coverage is not permitted by the applicable plan, is not exempt from the application of Section 409A (as defined below),  or is not permitted

10

US-DOCS\136524355.23

without violating (or incurring penalties or other costs under) applicable law, Employee will instead be entitled to monthly cash payments equal to the amount necessary to reimburse Employee and/or Employee's spouse and eligible dependents, on an after-tax basis, for the reasonable cost of comparable individual or other replacement coverage for the Benefit Continuation Period. The Benefit Continuation Coverage will run concurrently with any COBRA continuation coverage; and

Employee shall not be entitled to any of the foregoing payments or benefits unless Employee complies with all surviving provisions of any non-competition agreement, non-solicitation agreement, confidentiality agreement or invention assignment agreement signed by Employee, including but not limited to those contained herein.

c.  <u>Termination Due to Death or Disability</u>.  In the event of the termination of Employee's employment due to death or Disability prior to the end of the Initial Term, Employee (or Employee's estate or other beneficiary) will be entitled to receive the following payments and benefits, subject to Sections 8(e) and 31 notwithstanding any provision herein:

i.  any Accrued Compensation payable as set forth in Section 8(a);

ii.  Prorated Annual Bonus, which amount shall be paid on the date(s) on which the payments are made to active participants in the Incentive Compensation Plan for such calendar year (and in no event prior to January 1, or after December 31, of the calendar year following the year in which the Termination Date occurs);

iii.  the aggregate amount of any unpaid Retention Bonuses, payable within thirty (30) days following the Termination Date;

iv.  Benefit Continuation Coverage, where applicable, for Employee, Employee's spouse and Employee's eligible dependents for the Benefit Continuation Period.  If and to the extent such Benefit Continuation Coverage is not permitted by the applicable plan, is not exempt from the application of Section 409A (as defined below), or is not permitted without violating (or incurring penalties or other costs under) applicable law, Employee will instead be entitled to monthly cash payments equal to the amount necessary to reimburse Employee and/or Employee's spouse and eligible dependents, on an after tax basis, for the reasonable cost of comparable individual or other replacement coverage for the Benefit Continuation Period. The Benefit Continuation Coverage will run concurrently with any COBRA continuation coverage.

11

For the avoidance of doubt, termination due to death or Disability shall not constitute a termination by the Company without Cause or by Employee for Good Reason.

d. <u>No Other Benefits on Termination of Employment</u>.  The parties expressly agree that the payments set forth in this Section 8 are the only payments that Employee shall be entitled to receive upon termination of employment and that such payments supersede any other salary continuation or severance payment or any other amounts payable upon termination of employment pursuant to any Company policy, plan, practice, or agreement (exclusive of any vested interests Employee may have in any broad-based pension or retirement plan).  Except as specifically set forth in Section 8(b)(ii) and 8(c)(ii), Employee shall not have any right to continue to receive amounts specified in Section 4(a) or (b) of this Agreement through the end of the term of this Agreement.

e. <u>Release</u>. Any and all amounts payable and benefits or additional rights provided pursuant to this Agreement beyond the Accrued Compensation shall only be payable if Employee delivers to the Company and does not revoke a general release of claims in favor of the Company in the form attached hereto as <u>Exhibit D</u>. Such release shall be executed and delivered (and no longer subject to revocation, if applicable) by Employee within sixty (60) days following termination.  To the extent that the foregoing sixty (60)-day release consideration period spans two (2) calendar years, any amounts scheduled to be paid and benefits or additional rights scheduled to be provided pursuant to this Agreement during such sixty (60)-day period that are conditioned on the execution of a release and that constitute non-qualified deferred compensation for purposes of Section 409A shall not be paid or provided or commence to be paid or provided until such second calendar year.

9. <u>Non-Competition Covenants</u>.

a. Employee acknowledges and agrees that (i) he has unique technical expertise associated with the Business (ii) he is well known in the industry, (iii) his services to the FTI Group are special, unique and extraordinary, (iv) Employee has valuable business contacts with clients and potential clients of the FTI Group and with professionals in the industry, (v) in connection with his employment with the Company, he will be provided with access to and become familiar with confidential and proprietary information and trade secrets belonging to the FTI Group, and that such information and trade secrets could be used or revealed, directly or indirectly, intentionally or unintentionally, in any subsequent employment with a competitor of the FTI Group in any position (x) comparable to the position he holds with the FTI Group under this Agreement (i.e., Senior Managing Director), or (y) with responsibilities comparable to those of the position he holds with FTI

12

Group under this Agreement, including, but not limited to, overseeing and providing expert analysis and/or testimony or other Consulting Services (as defined below) and supervising and managing others who provide the same (any such position, a "Comparable Position"), (vi) in the event of a breach of the covenants contained in this Section 9, the FTI Group will be deprived of the benefit it has bargained for pursuant to this Agreement; and (vii) the FTI Group would not have entered into this Agreement but for the covenants contained in this Section 9. Accordingly, in consideration of his employment with the Company pursuant to this Agreement, and other good and valuable consideration, the receipt of which is hereby acknowledged, Employee agrees that, during the Non-Compete Period (as defined below), Employee will not, without Company's prior written consent, directly or indirectly on Employee's own behalf or on behalf of any other person, firm or entity other than the FTI Group (A) engage in; (B) own or control any interest in (except as a passive investor of less than five percent (5%) of the publicly traded stock of a publicly held company); (C) act as a director, officer, manager, member, employee, trustee, agent, partner, joint venture, participant, consultant of or be obligated to, or be connected in any advisory, business or ownership capacity (except as a passive investor of less than five percent (5%) of the publicly traded stock of a publicly held company) with; (D) lend credit or money for the purpose of the establishing or operating; or (E) allow Employee's name or reputation to be used by, any firm, corporation, partnership, trust or other business enterprise directly or indirectly engaged in, any Competing Business in the Market Area; *provided* that Employee's collaborative work on behalf of the FTI Group with other consulting firms in connection with a Company or FTI Group matter, in accordance with past practice, shall not be considered a violation of this Section 9. The parties agree that the foregoing shall not prevent Employee from working for or performing services on behalf of a Competing Business if such Competing Business is also engaged in other lines of business and if Employee's employment or services are restricted to such other lines of business, and Employee will not be providing direct or indirect support, advice, instruction, direction or other guidance in a Comparable Position to lines of business that constitute the Competing Business.

b.  The parties agree that the relevant public policy aspects of covenants not to compete have been discussed, and that every effort has been made to limit the restrictions placed upon Employee to those that are reasonable and necessary to protect the FTI Group's legitimate interests. Employee acknowledges that, based upon his education, experience, and training, this non-compete provision will not prevent him from earning a livelihood and supporting himself and his family during the relevant time period.

US-DOCS\136524355.23

Employee further acknowledges that, in light of the nature of the Business and of the services Employee is performing for the Company, the geographic, industry and temporal restrictions (as set forth in the definitions of the terms "Market Area", "Competing Business", "Non-Compete Period" and "Non-Solicit Period", respectively) are reasonable in scope, and reflect the actual scope and reach of the business of the FTI Group. Employee acknowledges and agrees that he has had the opportunity to, and has consulted with, an attorney of his choosing in connection with this Agreement (including, without limitation, Sections 9 through 18, 24 and 27 (including, without limitation, the governing law and arbitration provisions therein)).

c.    If any restriction set forth in this Section is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic areas as to which it may be enforceable.

d.    The restrictions contained in this Section are necessary for the protection of the business and goodwill of the Company and/or the FTI Group and are acknowledged by Employee to be reasonable for such purposes. Employee acknowledges and agrees that any material breach of this Section will cause the Company and/or the FTI Group substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief.

e.    The existence of a claim, charge, or cause of action by Employee against the Company and/or the FTI Group shall not constitute a defense to the enforcement by the Company and/or the FTI Group of the foregoing restrictive covenants, but such claim, charge, or cause of action shall be adjudicated separately.

f.    The provisions of this Section shall survive termination or expiration of this Agreement unless otherwise specifically provided in the Agreement.

10.    <u>Commercial and Outside Endeavors</u>.    Employee may not serve as a paid governmental or paid public policy advisor or paid consultant, may not serve for pay on any corporate, governmental or governmental policy advisory boards or committees, without the permission of the FTI General Counsel, such consent not to be unreasonably withheld.

11.    <u>Non-Solicitation Covenants</u>.

a.    During the Non-Solicit Period, Employee will not, directly or indirectly, whether for Employee or for any other individual or entity (other than Company):

      i.      solicit business regarding any case or matter upon which Employee worked on behalf of Company;

      ii.     solicit any person or entity (A) who is or was a client of the business of FTI Group and (B) which Employee directly or indirectly provided any services for (including, without limitation, in a management, supervisory or oversight role), solicited business from, or otherwise had contact with (either directly or through any direct or indirect reports) during the term of his employment with the Company (1) to terminate, reduce or otherwise modify their business with the FTI Group or (2) otherwise for the purposes of Employee directly or indirectly engaging in any Competing Business in the Market Area; or

      iii.    solicit, induce or otherwise attempt to influence any person whom the FTI Group employs or otherwise engages to perform services (including, but not limited to, any independent consultants, engineers or sales representatives) or any contractor, subcontractor, supplier, or vendor of the FTI Group, to leave the employ of or engagement with, or discontinue providing services to, the FTI Group, or reduce the amounts or level of service they provide to the FTI Group, or otherwise interfere with or disrupt the FTI Group's relationship with these individuals or entities, *provided*, *however*, that this restriction will not apply in the case of any clerical employee of the FTI Group or in the case of any other employee whose employment with the FTI Group has been terminated for at least one year.

    b.    Employee acknowledges that every effort has been made to limit the restrictions placed upon Employee under this Section to those that are reasonable and necessary to protect the legitimate interests of the FTI Group. FTI acknowledges that the solicitation limited by Section 11 of this Agreement is limited to affirmative solicitation (whether direct or indirect), and nothing in this Agreement will preclude Employee from (i) responding to and acting upon any communication that is initiated solely by any client or employee (and without any prior breach of this Agreement by Employee) or (ii) generally announcing through a communication (including without limitation to clients and employees), upon termination of employment, his future plans following such termination (as long as such announcement does not invite or otherwise solicit any client of the business of FTI Group or person whom the FTI Group employs or otherwise engages to perform services or any contractor, subcontractor, supplier, or vendor of the FTI Group to join, provide services to, or otherwise become engaged by Employee, whether directly or indirectly, in any new business endeavor), provided that no such response, action or announcement is permitted to the

15

extent it otherwise violates (or would reasonably be expected to result in violation of) Section 9, 11 or 12, as applicable.

c.   If any restriction set forth in this Section is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic areas as to which it may be enforceable.

d.   The restrictions contained in this Section are necessary for the protection of the business and goodwill of the FTI Group and their affiliates and are acknowledged by Employee to be reasonable for such purposes.  Employee acknowledges and agrees that any material breach of this Section will cause the FTI Group and/or their affiliates substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the FTI Group shall have the right to seek specific performance and injunctive relief.

e.   The provisions of this Section shall survive termination or expiration of this Agreement.

f.   The existence of a claim, charge, or cause of action by Employee against the Company or the FTI Group shall not constitute a defense to the enforcement by the Company or the FTI Group of the foregoing restriction, but such claim, charge, or cause of action shall be adjudicated separately.

12.   <u>Confidential Information of Company</u>.

a.   As used herein, "<u>Confidential Information</u>" shall mean information and compilations of information, whether generated or acquired by the FTI Group or obtained from third parties, disclosed or otherwise made known to or accessed by Employee in the course of or in connection with Employee's employment with the Company and relating to the business of the FTI Group, their clients, vendors or other persons, however such information is embodied and irrespective of whether it is labeled as "proprietary" or "confidential",  including, but not limited to, information regarding or comprising any trade secrets, proprietary knowledge, operating procedures, finances, financial condition, organization, employees, customers, client lists, suppliers, distributors, agents, and other personnel, business activities, budgets, strategic or financial plans, objectives, marketing plans, documents, products, services, price and price lists, operating and training materials, data bases and analyses and all other documents relating thereto or strategies of the FTI Group.  However, Confidential Information will not include any information which is or becomes available in the public domain other than through any unauthorized disclosure by or fault of Employee .

16

b.      Employee acknowledges that as a result of his responsibilities at the Company, he will be exposed and given access to the Confidential Information of the Company.  Employee understands and agrees that his access to the Confidential Information is for the sole and exclusive purpose of performing work for the benefit of the Company and that the Company has a substantial ongoing investment in the development of such Confidential Information which would be injured irreparably if this Agreement were breached. At all times during the term of his employment and thereafter, Employee agrees that he will maintain the Confidential Information in strictest confidence and, unless required to do so by legal process (such as subpoena), not disclose to any individual or business enterprise of any nature, or use for his own personal use or financial gain, whether individually or on behalf of another person, firm, corporation or entity, any Confidential Information other than disclosure to Company personnel who need to know such information in connection with their work for the Company.  Without limiting the generality of the foregoing, Employee agrees that the Company or members of the FTI Group have agreements with other persons that may include agreements that impose obligations or restrictions regarding the confidential nature of work pursuant to such an agreement.  Employee agrees to be bound by all such obligations and restrictions made known to him, and to do whatever is reasonably necessary to satisfy such obligations.  In the event Employee is required by legal process to disclose any Confidential Information, he shall give prompt notice thereof to Company to allow Company to object to such process, obtain a protective order or take other reasonable action.

13.      <u>Confidentiality of this Agreement</u>.  Employee and the FTI Group agree that the existence, terms and provisions of this Agreement are to remain strictly confidential and the parties will take all appropriate and reasonable actions to preserve and maintain such confidentiality, unless as otherwise required by law or to assert or defend against claims related to this Agreement.  The parties further agree that any disclosure of the existence or any of the terms or provisions of this Agreement by either the FTI Group or Employee will constitute a violation of the Agreement, except that the FTI Group or Employee may disclose the existence or the terms and provisions of this Agreement (a) to an accountant, attorney or other agent for such party, provided such disclosure is necessary and the party requires that such agent agree to be bound by the provisions of this Section 13; (b) as required by law, *provided* that the disclosing party provides the non-disclosing party with written notice of the reason and circumstances for such disclosure as soon as possible prior to such disclosure, or as otherwise explicitly permitted by the Maryland Equal Pay for Equal Work  law; or (c) to the minimum extent necessary to enforce this Agreement.  Notwithstanding the foregoing, violation of this Section 13 shall not constitute a material breach for purposes of determining termination for Cause (as defined in Section 7(b)) or for Good Reason (as defined in Section 7(e)).

14.      <u>Confidential Information of Others</u>.  Employee will not use in working for Company and will not disclose to the FTI Group any trade secrets or, other

17

information Employee does not have the right to use or disclose and that the FTI Group is not free to use without liability of any kind. Employee will promptly inform Company in writing of any patents, copyrights, trademarks, or other proprietary rights known to Employee that Company will violate because of information provided to it by Employee.

15.   <u>Property Rights</u>. Employee confirms that all Confidential Information is and must remain the exclusive property of the FTI Group. All business records, business papers, and business documents kept or created by Employee in the course of Employee's employment by Company relating to the business of the FTI Group must be and remain the property of Company. Upon the termination of this Agreement or upon Company's reasonable request at any time, Employee must promptly deliver to Company any material containing Confidential Information or other property belonging to Company (written or otherwise) not otherwise in the public domain. Employee will not, without Company's consent, retain copies, excerpts, summaries, or compilations of the foregoing information and materials. The rights and obligations set forth in this Section will continue indefinitely and will survive the termination of this Agreement and Employee's employment with Company.

16.   <u>Intellectual Property</u>.

   a.   All inventions, discoveries, trade secrets, know-how, ideas, improvements, developments, processes, designs, techniques, formulas, source and object codes, data, programs and other works of authorship, in whatever media recorded, whether or not patentable or copyrightable and all embodiments thereof, including documents, papers, notebooks, drawings or other materials (collectively "<u>Work Product</u>"), that Employee conceives, creates, makes, invents, or discovers or that otherwise relates to or results from any work Employee performs or performed for the FTI Group or that arises from the use or assistance of the FTI Group's facilities, materials, personnel or Confidential Information in the course of Employee's employment (whether or not during usual working hours), whether conceived, created, discovered, made, or invented individually or jointly with others, will, together with all the worldwide patent, copyright, trade secret, or other intellectual property rights in all such Work Product, be and remain the absolute property of Company. All such Work Product shall be considered "works made for hire" owned by Company to the extent consistent with applicable law. To the extent not considered "works made for hire" exclusively owned by Company as the author under applicable law, Employee hereby irrevocably and unconditionally waives, and assigns to Company, all Employee's right, title and interest in and to (whether existing before, on, or after the date of this Agreement that may otherwise vest in Employee) all Work Product and any intellectual property rights therein, wherever in the world enforceable. Without limitation Employee waives the right to be identified as the author of any such Work Product and the right not to have any such Work Product subjected to derogatory treatment.

18

Notwithstanding the foregoing, Company acknowledges that Employee (i) has (and in the future shall be entitled to) write books and articles for publication under his own name and is (and shall be) entitled to receive and retain the copyright thereon and any royalties therefrom, so long as such books or articles do not disclose or exploit any confidential or proprietary information of the FTI Group or their clients; and (ii) shall be entitled to request, subject to the FTI Group's prior written consent, which consent shall not be unreasonably withheld, one copy of any report, transcript or testimony submitted to a court, arbitrator or government agency while Employee was employed by the FTI Group (*provided* that such material shall continue to be subject to all applicable confidentiality agreements and policies applicable thereto).

b.      Employee will promptly disclose to Company for its sole use and benefit any and all Work Product (whether patentable or not) that Employee develops, acquires, conceives or reduces to practice (whether or not during usual working hours) while employed by Company.  Employee will promptly disclose to Company all patent applications, letter patent, utility and design patents, copyrights and reissues thereof, or any foreign equivalents thereof, that may at any time be filed or granted for or upon any such Work Product.  In connection therewith:

     i.      Employee will, without charge but at Company's expense, promptly execute and deliver such applications, assignments, descriptions and other instruments as Company may consider reasonable necessary or proper to procure or vest title to any Work Product or any, patent applications, patents, copyright registration applications or reissues thereof in Company and to enable it to obtain and maintain the entire worldwide right and title thereto; and

     ii.      Employee will provide to Company at its expense all such assistance as Company may reasonably require in the prosecution of applications for such patents, copyright registrations or reissues thereof, in the prosecution or defense of any patent or copyright office interferences or proceedings that may be initiated involving any such applications, patents or copyrights and in any litigation in which Company may be involved relating to any Work Product or intellectual property rights relating thereto.  Company will reimburse Employee for reasonable out-of-pocket expenses incurred and pay Employee reasonable compensation for Employee's time if Company no longer employs Employee.

c.      To the extent, if any, that Employee owns rights to works, inventions, discoveries, proprietary information, and copyrighted or copyrightable works, or other forms of intellectual property that are incorporated in any Work Product, Employee agrees that Company will have an unrestricted, nonexclusive, royalty-free, perpetual, transferable license to make, use, sell,

19

offer for sale, reproduce, display, perform, distribute, create derivative works of and sublicense such Work Product in whatever form, and Employee hereby grants such license to Company.

d.    Without limiting the scope of Section 16(c), the provisions of Section 16(a) assigning rights to Employee created inventions shall  not apply to an invention for which no equipment, supplies, facility or Confidential Information of Company (including any of its predecessors) was used and that was developed entirety on Employee's own time, unless (a) the invention relates (i) directly to the business of the FTI Group, or (ii) the FTI Group's actual or anticipated research or development, or (b) the invention results from any work Employee performed as an employee of Company.

e.    Employee shall cooperate and assist the FTI Group at Company's reasonable request and expense in any dispute, controversy, or litigation to which Company is a party (but not any litigation between Company and Employee) and with respect to which he obtained knowledge while employed by Company or any of its predecessors, affiliates, successors, or assigns, including, but not limited to, his participation in any court or arbitration proceedings, giving of testimony, signing of affidavits, or such other personal cooperation as counsel for Company shall request.

17.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the meaning set forth below:

a.    <u>Competing Business</u>.  For the purposes hereof, the term "<u>Competing Business</u>" means (i) economic, financial, regulatory, corporate and litigation consulting services, including those provided to law firms, corporations and governmental bodies in connection with legal or regulatory proceedings, strategic decision making and/or public policy debates or matters (collectively, "<u>Consulting Services</u>"), and (ii) any other business which is competitive with any business of the FTI Group that (A) involves Employee, (B) is conducted during the term of this Agreement, and (C) Employee was actively involved with or had knowledge of during his employment with the Company.

b.    <u>Market Area</u>.  The parties acknowledge and agree that the Company's business is national in scope and character and that, as a result, it is reasonable and appropriate that the term "<u>Market Area</u>" for purposes of this Agreement means (i) the United States of America, the United Kingdom, continental Europe (including, without limitation, the Scandinavian peninsula), Israel, China, Singapore, Chile and Argentina, and (ii) any other location in which the FTI Group has an office or in which the FTI Group offers or provides Consulting Services to clients in the ordinary course of its business.

US-DOCS\136524355.23

c.  <u>Non-Compete Period</u>. "<u>Non-Compete Period</u>" means the period beginning on the Effective Date and ending on whichever of the following dates is applicable: (i) in the event of a termination of Employee's employment by the Company for Cause, the first anniversary of the Termination Date, and (ii) in the event of a termination of Employee's employment for any reason other than as set forth in subsection (i), Termination Date. For the sake of clarity, the parties agree that, unless Employee is terminated for Cause per the terms of this Agreement, there will be no non-compete restrictions under Section 9 applicable to him following the termination of his employment.

d.  <u>Non-Solicit Period</u>. "<u>Non-Solicit Period</u>" means the period beginning on the Effective Date and ending on the first anniversary of the Termination Date.

18.  <u>Enforceability</u>. If any of the provisions of Sections 9 through 17 are ever deemed to exceed the time, geographic area, or activity limitations the law permits, the limitations will be reduced to the maximum permissible limitation, and Employee and Company authorize a court or arbitrator having jurisdiction to reform the provisions to the maximum time, geographic area, and activity limitations the law permits; *provided*, *however*, that such reductions apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

19.  <u>Remedies</u>. In view of the position of confidence and trust which Employee has enjoyed with Company and his relationship with the customers, suppliers and employees of the Company, and recognizing the access to Confidential Information which he has had and the fact that his covenants herein constitute material provisions of this Agreement, Employee expressly acknowledges that the restrictive covenants set forth in this Agreement are necessary in order to protect and maintain the proprietary interests, goodwill and other legitimate business interests of the FTI Group. Without limiting the remedies available to the parties, each party acknowledges that a breach of any of the covenants in Sections 9 through 16 may result in material irreparable injury to the FTI Group for which there is no adequate remedy at law, and that it will not be possible to measure damages for such injuries precisely. The parties agree that if there is a breach or threatened breach of such covenants, Company will be entitled to obtain a temporary restraining order and/or preliminary or permanent injunction restraining Employee from engaging in prohibited activities or such other relief as may be required to specifically enforce any of said covenants. Each party agrees that all remedies expressly provided for in this Agreement are cumulative of any and all other remedies now existing at law or in equity. In addition to the remedies provided in this Agreement, the parties will be entitled to avail themselves of all such other remedies as may now or hereafter exist at law or in equity for compensation, and for the specific enforcement of the aforementioned covenants. Resort to any remedy provided for in this Section or provided for by law will not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies, or preclude a recovery of monetary damages and compensation. Each

21

US-DOCS\136524355.23

party agrees that no party hereto must post a bond or other security to seek an injunction.

20.    Assignment.  The Company may assign or otherwise transfer this Agreement and any and all of its rights, duties, obligations, or interests under it to:

    a.     Company's other affiliates or subsidiaries; or

    b.     any successor to all or a material part of the business of Company (directly or indirectly).

Upon such assignment or transfer, any such business entity shall be deemed to be substituted for Company for all purposes and, in the case of assignment or transfer to a successor described in Section 20(b), "FTI CEO" shall be substituted with the Chief Executive Officer of such successor (or an applicable affiliate). Notwithstanding any such assignment or transfer to an entity described in Section 20(a), Company shall remain jointly and severally liable, with such assignee or transferee, for the performance of its obligations hereunder.  Except as herein provided, this Agreement may not otherwise be assigned or transferred by Company.  Without Company's prior written consent, Employee may not assign or delegate the obligations of Employee under this Agreement.

21.    Severability.  If the final determination of an arbitrator or a court of competent jurisdiction declares, after the expiration of the time within which judicial review (if permitted) of such determination may be perfected, that any term or provision of this Agreement is invalid or unenforceable, the remaining terms and provisions will be unimpaired, and the invalid or unenforceable term or provision will be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. Any prohibition or finding of unenforceability as to any provision of this Agreement in any one jurisdiction shall not invalidate or reader unenforceable such provision in any other jurisdiction.

22.    Amendment Waiver.  The terms of this Agreement may not be modified, amended, or waived other than by a written instrument signed by the parties.  Any party's waiver of the other party's compliance with any provision of this Agreement is not a waiver of any other provision of this Agreement or of any subsequent breach by such party of a provision of this Agreement.  No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

23.    Withholding.  The Company will be entitled to reduce its compensatory payments to Employee hereunder for withholding and FICA and Medicare taxes and any other withholdings and contributions required by law.

24.    Governing Law.  The internal laws of the State of Maryland (other than its conflict of laws provisions) shall exclusively govern this Agreement.  Regardless of any present or future residence, domicile or place of business of the parties, each party

hereby irrevocably consents and agrees that any claims and disputes between or among the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement and not governed by Section 27 of this Agreement be brought in any state or federal court located in the State of Maryland. By execution and delivery of this Agreement, each party submits and consents in advance to such jurisdiction in any action or suit commenced in any such court. Each party hereby waives any objection which it may have based on forum non conveniens and hereby consents to the granting of such legal or equitable relied as deemed appropriate by such court.

25. <u>Notices</u>. Notices may be given in writing by personal delivery, by certified mail, return receipt requested, by telecopy, or by overnight delivery. Employee should send or deliver notices for FTI or the Company to FTI, care of its General Counsel, at its corporate headquarters. The Company will send or deliver any notice given to Employee at Employee's address as reflected on Company's personnel records. Employee and Company may change the address for notice by like notice to the others. Employee and Company agree that notice is deemed received on the date it is personally delivered, the date it is received by certified mail, the date of guaranteed delivery by overnight service, or the date the fax machine confirms receipt.

26. <u>Superseding Effect</u>. Except as specifically referenced in Section 4(b)(i), this Agreement supersedes all prior or contemporaneous negotiations, commitments, agreements, and writings between Employee and Company with respect to the subject matter. All such other negotiations, commitments, agreements, and writings including, without limitation, that certain Third Amended and Restated Employment Agreement by and among FTI and Employee, dated as of December 18, 2013 (as may have been amended) (the "<u>Prior Employment Agreement</u>"), and any bonus or incentive plans or programs described therein, will have no further force or effect, and the parties to any such other negotiation, commitment, agreement, or writing will have no further rights or obligations thereunder.

27. <u>Dispute Resolution</u>. In the event that any dispute, difference, controversy, claim or dispute (a "<u>Dispute</u>") that arises out of, or in connection with, this Agreement (including any question relating to its validity, interpretation, termination, implementation or alleged breach of its terms or anything done or omitted to be done pursuant to this Agreement), such Dispute shall be subject to the dispute resolution procedures set forth in Section 7 of the Governance Agreement *mutatis mutandis*.

28. <u>Indemnification and Liability Insurance</u>. The Company and FTI shall indemnify Employee to the fullest extent permitted by applicable law with regard to Employee's actions (or inactions) on behalf of Company or other member of the FTI Group, with advancement of legal fees on a current basis as permitted by law. The Company and FTI shall cover Employee under applicable professionals, directors, and officers and other appropriate liability insurance policies both during

and, while any potential liability exists, after the term in the same amount and to the same extent, if any, as Company and FTI cover their other senior executives.

29. <u>Time is of the Essence</u>. Time is of the essence in the performance of this Agreement.

30. <u>Key Man Insurance</u>. If requested by the Company, Employee shall cooperate with the Company's efforts to obtain and maintain life insurance with death benefits payable to the Company, the cost of such insurance to be paid by the Company. In the event that either (a) the Company decides to terminate the existing key man insurance policy on the Employee (the "<u>Key Man Policy</u>") while Employee remains employed during the Term, or (b) Employee's employment is terminated for any reason (other than by the Company for Cause) on or prior to the end of the Initial Term, Employee shall be given the option by the Company (to the extent permitted by the terms and conditions of the Key Man Policy or other applicable policy and insurer without additional cost to the Company) to maintain, solely at his own expense, the Key Man Policy, or any other life insurance with death benefits then maintained by the Company, with such death benefits then payable to Employee's designated heir or estate (except to the extent of any cash surrender value as of the Termination Date, which shall remain payable to the Company).

31. <u>Section 409A</u>.

    a. Notwithstanding anything in this Agreement to the contrary, if Employee is a "specified employee" as described in Internal Revenue Code section 409A and the Treasury Regulations thereunder ("<u>Section 409A</u>") and as determined by the Company, any amount to which Employee would otherwise be entitled during the first six months following Employee's Termination Date that constitutes nonqualified deferred compensation within the meaning of Section 409A and that is therefore not exempt from Section 409A as involuntary separation pay or a short-term deferral, will be accumulated and paid without interest on the first business day of the seventh month following the date of Employee's Termination Date. This Agreement shall be interpreted and administered, to the extent possible, in a manner so as to comply with the requirements of Section 409A. The parties shall cooperate in good faith so as to make any amendments to this Agreement or any related agreements that are necessary to comply with said requirements, *provided*, *however*, that no such amendments shall result in any additional cost or expense to the Company or FTI.

    b. <u>Reimbursement of Business Expenses and Provision of In-Kind Benefits</u>. Notwithstanding anything to the contrary in the Agreement, with respect to any reimbursement of expenses of, or any provision of in-kind benefits to, Employee, as specified under this Agreement, the reimbursement of expenses or provision of in-kind benefits shall be subject to the following conditions: (i) the expenses eligible for reimbursement or the amount of in-kind benefits provided in one taxable year shall not affect the expenses

24

eligible for reimbursement or the amount of in-kind benefits provided in any other taxable year; (ii) the reimbursement of an eligible expense shall be made no later than the end of the year after the year in which such expense was incurred; and (iii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit.

c.     <u>Separation from Service</u>. "Termination of employment" or words of similar import, as used in this Agreement, means "separation from service" as defined in Section 409A for purposes of any payments under this Agreement that are deferred compensation subject to Section 409A. As used in this Agreement, the effective date of Employee's termination of employment shall be referred to herein as the "<u>Termination Date</u>".

32.    <u>Rules of Interpretation</u>.   Each of the parties has had the opportunity to be represented by counsel in the negotiation and preparation of this Agreement.  The parties agree that this Agreement is to be construed as jointly drafted.  Accordingly, this Agreement will be construed according to the fair meaning of its language, and the rule of construction that ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Agreement.

33.    <u>Successors: Binding Agreement</u>.  This Agreement, and all rights hereunder and under the Incentive Compensation Plan, shall inure to the benefit of, and be enforceable by, and shall be binding upon, the parties hereto and their respective heirs, devisees, legatees, executors, administrators, successors, and personal or legal representatives, and assignees, except the right and obligation of employment runs only to Employee.

34.    <u>Counterparts</u>.   For convenience of the parties and to facilitate execution, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document. Transmission by facsimile of an executed counterpart signature page hereof by a party hereto shall constitute due execution and delivery of this Agreement by such party.

35.    <u>Whistleblower Protection and Trade Secrets</u>. Notwithstanding anything to the contrary contained herein, nothing in this Agreement prohibits Employee from reporting possible violations of federal law or regulation to any United States governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes-Oxley Act of 2002, or any other whistleblower protection provisions of state or federal law or regulation (including the right to receive an award for information provided to any such government agencies). Furthermore, in accordance with 18 U.S.C. § 1833, notwithstanding anything to the contrary in this Agreement: (a) Employee shall not be in breach of this Agreement, and shall not be held criminally or civilly liable under any federal or state trade secret law (i) for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or

25

investigating a suspected violation of law, or (ii) for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (b) if Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Employee may disclose the trade secret to Employee's attorney, and may use the trade secret information in the court proceeding, if Employee files any document containing the trade secret under seal, and does not disclose the trade     secret,     except     pursuant     to court order.

[*remainder of page intentionally left blank*]

26

IN WITNESS WHEREOF, the undersigned have signed this Agreement, which shall be effective as of the Effective Date.

**COMPASS LEXECON LLC**

By: _____
Name:
Title:

**JONATHAN M. ORSZAG**

_____

**FTI CONSULTING, INC.**

By: _____
Name:
Title:

*Signature Page to Employment Agreement*

IN WITNESS WHEREOF, the undersigned have signed this Agreement, which shall be effective as of the Effective Date.

**COMPASS LEXECON LLC**

By: _____

Name: Curtis P. Lu

Title: General Counsel

**JONATHAN M. ORSZAG**

_____

**FTI CONSULTING, INC.**

By: _____

Name: Curtis P. Lu

Title: General Counsel

*Signature Page to Employment Agreement*