## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| FTI CONSULTING, INC., | |
| *Plaintiff,* | Civil Action No.: 8:23-cv-03200-PJM |
| v. | |
| JONATHAN ORSZAG, | |
| *Defendant.* | **JURY TRIAL DEMANDED** |
| | |
| JONATHAN ORSZAG, | |
| *Counterclaim Plaintiff,* | |
| v. | |
| FTI CONSULTING, INC. | |
| AND | |
| STEVEN H. GUNBY<br>9508 Hemswell Place<br>Potomac, MD 20854<br>(Montgomery County), | |
| *Counterclaim Defendants.* | |

**ANSWER, DEFENSES, AND COUNTERCLAIMS BY DEFENDANT
AND COUNTERCLAIM PLAINTIFF JONATHAN ORSZAG**

Defendant Jonathan M. Orszag hereby answers the Second Amended Complaint

("Complaint") filed by Plaintiff FTI Consulting, Inc. ("FTI") on June 18, 2024, as follows.

Each paragraph below corresponds to the same-numbered paragraph in the Complaint.

All allegations not expressly admitted are denied.  Defendant does not interpret the headings or

footnotes in the Complaint as well-pleaded allegations to which any response is required.  To the

extent that a response is required to the headings or footnotes, Defendant denies all such

allegations in the headings and footnotes.  Unless otherwise defined, capitalized terms refer to

the capitalized terms defined in the Complaint, but any such use is not an acknowledgment or

admission of any characterization FTI may ascribe to the terms.

**NATURE OF THE CASE**

1.      Denied.

2.      Defendant admits that FTI purported to terminate his Employment Agreement

for Cause on November 20, 2023.  Defendant denies the remaining allegations in Paragraph 2.

3.      Paragraph 3 purports to characterize the contents of Defendant's Employment

Agreement, to which no response is required.  The Employment Agreement speaks for itself

and Defendant respectfully refers the Court to the Employment Agreement for a full and

accurate statement of its contents.  Defendant denies the allegations in Paragraph 3 to the extent

that they are inconsistent with the Employment Agreement.  Defendant admits that he was a

high-ranking employee of Compass Lexecon LLC ("Compass Lexecon") and received

compensation during the time period he was employed by Compass Lexecon.  Paragraph 3

purports to state conclusions of law as to which no response is required.  Insofar as a response is

required, Defendant denies those conclusions of law.  Defendant denies the remaining

allegations in Paragraph 3.

4.      Denied.

5.      Denied.

6.      Defendant denies the allegations in the first sentence of Paragraph 6, which are

based on a false premise.  Defendant lacks knowledge or information sufficient to form a belief

as to FTI's top priority, and on that basis denies the allegations in the second sentence of

Paragraph 6.

7.      Paragraph 7 purports to state conclusions of law to which no response is

required.  To the extent that a response is required, Defendant denies the allegations of Paragraph 7.

## THE PARTIES

8.      Defendant admits that FTI is a Maryland corporation and a global business advisory firm, but denies the remaining allegations because Defendant lacks knowledge or information sufficient to form a belief as to whether FTI's principal place of business is in Maryland, given that FTI states in its securities filings that its executive offices are in Washington, D.C.

9.      Admitted, except as to the legal effect of the purported assignment of rights, interests, duties, and obligations under the Employment Agreement from Compass Lexecon to FTI, to which no response is required.  To the extent that a response is required to that specific allegation, Defendant denies it.

10.      Admitted.

## JURISDICTION AND VENUE

11.      Admitted.

12.      Paragraph 12 purports to quote and characterize the legal effect of the contents of the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 12 to the extent that they are inconsistent with the Employment Agreement and denies the remaining allegations in Paragraph 12.  Paragraph 12 also purports to state conclusions of law to which no response is required.  To the extent that a response is required, Defendant denies the remaining allegations in Paragraph 12.

13.      Paragraph 13 purports to state conclusions of law to which no response is

required.  To the extent that a response is required, Defendant admits that he has not contested personal jurisdiction in this action.

14.     Paragraph 14 purports to state conclusions of law to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 14.

## FACTUAL BACKGROUND

15.     Defendant admits the allegations in the first and third sentences of Paragraph 15. Defendant lacks sufficient knowledge or information to admit or deny the allegations in the second sentence of Paragraph 15, and on that basis denies them.

16.     Admitted, except to the characterization of "three core offerings."

17.     Admitted.

18.     Defendant admits that FTI has invested financial resources into hiring Compass Lexecon leaders, senior professionals, and staff.  Defendant denies that any such "compensation and employment packages" are confidential, and denies the remaining allegations of Paragraph 18.

19.     Defendant admits the allegations in the first sentence of Paragraph 19. Defendant denies the allegations in the second sentence of Paragraph 19.

20.     Defendant admits the allegations in the first sentence of Paragraph 20. Defendant admits that he was responsible for maintaining relationships with Compass Lexecon's clients, and with securing new business, and denies the remaining allegations in the second sentence of Paragraph 20.

21.     Paragraph 21 purports to characterize the contents of Defendant's Employment Agreement, to which no response is required.  The 2006 Employment Agreement speaks for itself and Defendant respectfully refers the Court to the 2006 Employment Agreement for a full

and accurate statement of its contents. Defendant denies the allegations in Paragraph 21 to the extent that they are inconsistent with the 2006 Employment Agreement.

22.    Defendant admits the first sentence of Paragraph 22. Paragraph 22 purports to characterize the contents of the Joint Operations Agreement (the "JOA"), to which no response is required. The JOA speaks for itself and Defendant respectfully refers the Court to the JOA for a full and accurate statement of its contents. Defendant denies the allegations in Paragraph 22 to the extent that they are inconsistent with the JOA and denies the remaining allegations in Paragraph 22.

23.    Defendant admits that he was responsible for the day-to-day management of Compass Lexecon from 2007 until his purported termination for Cause. Defendant denies the remaining allegations in Paragraph 23.

24.    Defendant admits that he had access to some Compass Lexecon financial information, but denies the allegations concerning the confidentiality of such information. Defendant denies the remaining allegations in Paragraph 24.

25.    Denied.

26.    Defendant admits that, in 2013, he entered into a third amendment of his Employment Agreement and the Second JOA. To the extent that Paragraph 26 purports to characterize the 2013 Employment Agreement and the Second JOA, no response is required. The 2013 Employment Agreement and the Second JOA speak for themselves and Defendant respectfully refers the Court to those agreements for a full and accurate statement of their contents. Defendant denies the allegations in Paragraph 26 to the extent they are inconsistent with the 2013 Employment Agreement and/or the Second JOA.

27.    Defendant denies that his compensation increased four-fold from 2011 to 2023.

Defendant lacks knowledge or information sufficient to form a belief as to the compensation of all other professionals in the industry, and on that basis denies the remaining allegations in Paragraph 27.

28.    Denied.

29.    Paragraph 29 purports to characterize the contents of the 2013 Employment Agreement and Defendant's previous employment agreements, to which no response is required.  The 2013 Employment Agreement (and prior such agreements) speak for themselves and Defendant respectfully refers the Court to the 2013 Employment Agreement and its predecessors for a full and accurate statement of their contents.  Defendant denies the allegations in Paragraph 29 to the extent that they are inconsistent with the Employment Agreement or past such agreements.  To the extent that a response is required, Defendant denies the allegations in Paragraph 29.

30.    Defendant denies the allegations in the first sentence of Paragraph 30. Defendant lacks knowledge or information sufficient to form a belief as to FTI's beliefs, and on that basis denies the allegations in the second sentence of Paragraph 30.

31.    Defendant admits that he entered into a new employment agreement in 2023. Defendant denies the remaining allegations in Paragraph 31.

32.    Denied.

33.    Denied.

34.    Defendant denies the allegations in Paragraph 34 insofar as they suggest that Defendant presented a PowerPoint slide deck to FTI's Board of Directors.

35.    Denied.

36.    To the extent that Paragraph 36 purports to characterize the contents of the June 2022 Presentation, no response is required.  The June 2022 Presentation speaks for itself and

Defendant respectfully refers the Court to the June 2022 Presentation for a full and accurate statement of its contents. Defendant denies the remaining allegations in Paragraph 36.

37.    To the extent that Paragraph 37 purports to quote and characterize the contents of the June 2022 Presentation, no response is required. The June 2022 Presentation speaks for itself and Defendant respectfully refers the Court to the June 2022 Presentation for a full and accurate statement of its contents. Defendant denies the allegations in Paragraph 37 to the extent they are inconsistent with the June 2022 Presentation.

38.    Paragraph 38 purports to quote and characterize the contents of the June 2022 Presentation, to which no response is required. The June 2022 Presentation speaks for itself and Defendant respectfully refers the Court to the June 2022 Presentation for a full and accurate statement of its contents. Defendant denies the remaining allegations in Paragraph 38.

39.    Paragraph 39 purports to quote and characterize the contents of the June 2022 Presentation, to which no response is required. The June 2022 Presentation speaks for itself and Defendant respectfully refers the Court to the June 2022 Presentation for a full and accurate statement of its contents. Defendant denies the remaining allegations in Paragraph 39.

40.    Denied.

41.    Denied, except to the extent that Paragraph 41 purports to quote and characterize the contents of the June 2022 Presentation, to which no response is required. The June 2022 Presentation speaks for itself and Defendant respectfully refers the Court to the June 2022 Presentation for a full and accurate statement of its contents. Defendant further denies the allegations in Paragraph 41 to the extent they are inconsistent with the June 2022 Presentation.

42.    To the extent that Paragraph 42 purports to quote and characterize the contents of the June 2022 Presentation, no response is required. The June 2022 Presentation speaks for

itself and Defendant respectfully refers the Court to the June 2022 Presentation for a full and accurate statement of its contents. Defendant denies the allegations in Paragraph 42 to the extent they are inconsistent with the June 2022 Presentation, and denies the remaining allegations in Paragraph 42.

43.    Denied.

44.    Denied.

45.    Admitted.

46.    Denied.

47.    Paragraph 47 purports to characterize the contents and effect of the Governance Agreement, to which no response is required. The Governance Agreement speaks for itself and Defendant respectfully refers the Court to the Governance Agreement for a full and accurate statement of its contents. Defendant denies the allegations in Paragraph 47 to the extent they are inconsistent with the Governance Agreement and denies the remaining allegations in Paragraph 47.

48.    Defendant admits that he continued to be employed as a Senior Managing Director of Compass Lexecon under the 2023 Employment Agreement. The allegation that Defendant was "still projected to receive substantial annual personal compensation" is vague and imprecise, and Defendant denies the allegation on that basis.

49.    Paragraph 49 purports to characterize the contents of the Employment Agreement, to which no response is required. The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents. To the extent that a response is required, Defendant denies the allegations in Paragraph 49.

50.     Denied.

51.     Paragraph 51 purports to quote and characterize the contents of the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 51 to the extent they are inconsistent with the Employment Agreement.

52.     Paragraph 52 purports to quote and characterize the contents of the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 52 to the extent they are inconsistent with the Employment Agreement.

53.     Paragraph 53 purports to quote the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  FTI has purported to modify the non-compete clause during the pendency of this litigation.  Defendant denies the allegations in Paragraph 53 to the extent they are inconsistent with the Employment Agreement or FTI's purported modifications.

54.     Paragraph 54 purports to quote the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  FTI has purported to modify the non-compete clause during the pendency of this litigation.  Defendant denies the allegations in Paragraph 54 to the extent they are inconsistent with the Employment Agreement, or FTI's purported modifications.

55.     Paragraph 55 purports to quote and characterize the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 55 to the extent they are inconsistent with the Employment Agreement, and denies the remaining allegations in Paragraph 55.

56.     Denied.

57.     Paragraph 57 purports to quote the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  FTI has purported to modify the non-solicitation clause during the pendency of this litigation.  Defendant denies the allegations in Paragraph 57 to the extent they are inconsistent with the Employment Agreement, or FTI's purported modifications.

58.     Paragraph 58 purports to quote and characterize the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 58 to the extent they are inconsistent with the Employment Agreement and denies the remaining allegations in Paragraph 58.

59.     Paragraph 59 purports to quote and characterize the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 59 to the extent they are

inconsistent with the Employment Agreement and denies the remaining allegations in Paragraph 59.

60.     Paragraph 60 purports to quote and characterize the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 60 to the extent they are inconsistent with the Employment Agreement and denies the remaining allegations in Paragraph 60.

61.     Paragraph 61 purports to quote and characterize the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  To the extent that a response is required, Defendant denies the allegations in Paragraph 61.

62.     Paragraph 62 purports to quote the Employment Agreement, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents. Defendant denies the allegations in Paragraph 61 to the extent they are inconsistent with the Employment Agreement, and denies the remaining allegations in Paragraph 62.

63.     Denied, except to the extent that Paragraph 63 purports to characterize the contents of the June 2022 Presentation, to which no response is required.  The June 2022 Presentation speaks for itself and Defendant respectfully refers the Court to the June 2022 Presentation for a full and accurate statement of its contents.  To the extent that a response is required, Defendant denies the allegations in Paragraph 63 entirely.

64.    Denied.

65.    Denied.

66.    Denied.

67.    Denied.

68.    Denied, except that Defendant admits that he shared draft scripts of a speech to be given at a meeting of Compass Lexecon senior staff with the Chief Executive Officer, General Counsel, and Chairman of the Board of FTI.

69.    Paragraph 69 purports to quote and characterize the text of a draft speech, to which no response is required. The draft speech speaks for itself and Defendant respectfully refers the Court to the draft for a full and accurate statement of its contents. Defendant denies the allegations in Paragraph 69 to the extent they are inconsistent with the draft speech.

70.    Paragraph 70 purports to quote and characterize the text of a draft speech, to which no response is required. The draft speech speaks for itself and Defendant respectfully refers the Court to the draft for a full and accurate statement of its contents. Defendant admits that he took a worse deal for himself in the last negotiation to get a larger deal done and to help Compass Lexecon employees remain at the firm.

71.    Paragraph 71 purports to quote and characterize the text of a draft speech, to which no response is required. The draft speech speaks for itself and Defendant respectfully refers the Court to the draft for a full and accurate statement of its contents. Defendant denies the allegations in Paragraph 71 to the extent they are inconsistent with the draft speech and denies the remaining allegations in Paragraph 71.

72.    Denied.

73.    Denied.

74.    Denied.

75.    Denied, except to the extent that the fourth sentence of Paragraph 75 purports to quote a draft presentation Defendant transmitted to himself.  The draft presentation speaks for itself and Defendant respectfully refers the Court to the draft presentation for a full and accurate statement of its contents.  Defendant denies the allegations in the fourth sentence of Paragraph 75 to the extent they are inconsistent with the draft presentation.

76.    Denied, except to the extent that Paragraph 76 purports to quote and characterize the Investor Presentation.  The draft Investor Presentation speaks for itself and Defendant respectfully refers the Court to the draft Investor Presentation for a full and accurate statement of its contents.

77.    Denied.

78.    Denied.

79.    Denied.

80.    Denied, except as to the second sentence, which purports to characterize the contents of an email message.  That email message speaks for itself, and Defendant respectfully refers the Court to the email message for a full and accurate statement of its contents.  To the extent that a response is required, Defendant denies the allegation.

81.    Denied.

82.    Defendant admits that he met with an executive of FTI in October 2023 and proposed control and governance changes to Compass Lexecon.  Defendant denies the remaining allegations in Paragraph 82.

83.    Denied.

84.    Denied.

85.     Defendant admits that he met with executives of FTI in November 2023 and proposed control and governance changes to Compass Lexecon and requested that they respond to his proposals by November 27, 2023.  Defendant denies the remaining allegations in Paragraph 85.

86.     Defendant admits that FTI *purported* to terminate him for Cause on November 20, 2023 and that he received a Notice of Termination for Cause after he was called and informed of his termination.  Paragraph 86 further purports to characterize the Notice of Termination for Cause and its legal effect, to which no response is required.  The Notice speaks for itself and Defendant respectfully refers the Court to the Notice for a full and accurate statement of its contents.  To the extent that a response is required, Defendant denies the allegations characterizing the Notice and denies the remaining allegations in Paragraph 86.

87.     Defendant admits that he entered into a consulting agreement with Compass Lexecon on November 22, 2023, effective as of November 20, 2023.  To the extent that Paragraph 87 further purports to characterize the Consulting Agreement, no response is required.  The Consulting Agreement speaks for itself and Defendant respectfully refers the Court to the Consulting Agreement for a full and accurate statement of its contents.  Defendant denies the remaining allegations in Paragraph 87.

88.     Paragraph 88 purports to characterize the Consulting Agreement, to which no response is required.  The Consulting Agreement speaks for itself and Defendant respectfully refers the Court to the Consulting Agreement for a full and accurate statement of its contents. Insofar as a response is required, Defendant denies the allegations in Paragraph 88.

89.     Paragraph 89 purports to characterize the Employment Agreement and 2013 Promissory Note, to which no response is required.  The Employment Agreement and 2013

14

Promissory Note speak for themselves and Defendant respectfully refers the Court to those documents for a full and accurate statement of their contents.  Defendant denies the allegations in Paragraph 89 to the extent they are inconsistent with the Employment Agreement and 2013 Promissory Note.

90.     Paragraph 90 purports to characterize the Employment Agreement and 2015 Promissory Note, to which no response is required.  The Employment Agreement and 2015 Promissory Note speak for themselves and Defendant respectfully refers the Court to those documents for a full and accurate statement of their contents.  Defendant denies the allegations in Paragraph 90 to the extent they are inconsistent with the Employment Agreement and 2015 Promissory Note.

91.     Paragraph 91 purports to characterize the Employment Agreement and Promissory Notes, to which no response is required.  The Employment Agreement and Promissory Notes speak for themselves and Defendant respectfully refers the Court to those documents for a full and accurate statement of their contents.  Defendant denies the allegations in Paragraph 91 to the extent they are inconsistent with the Employment Agreement and Promissory Notes.

92.     Denied.

93.     Paragraph 93 purports to state a legal conclusion regarding the effect of the Promissory Notes, to which no response is required.  Insofar as a response is required, Defendant denies the allegations in Paragraph 93.

94.     Defendant admits that he received a letter from FTI on December 12, 2023, regarding the Promissory Notes.  To the extent that Paragraph 94 purports to characterize the contents of the December 12 Letter, no response is required.  The December 12 Letter speaks

for itself and Defendant respectfully refers the Court to the December 12 Letter for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 94 to the extent they are inconsistent with the December 12 Letter, and denies that he had any obligation under the 2013 and 2015 Promissory Notes.

95.    Defendant admits that he transmitted a letter to FTI on December 20, 2023, regarding the Promissory Notes.  To the extent that Paragraph 95 purports to characterize the contents of the December 20 Letter, no response is required.  The December 20 Letter speaks for itself and Defendant respectfully refers the Court to the December 20 Letter for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 95 to the extent they are inconsistent with the December 20 Letter.

## <u>COUNT I</u>

96.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.  To the extent that a response is required, Defendant incorporates his responses to the preceding paragraphs of the Complaint as if fully set forth herein.

97.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

98.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

99.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

100.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

101.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

102.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

103.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

104.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

105.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

106.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

107.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

108.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.  Paragraph 108 further states a prayer for relief to which no response is required.  To the extent that a response is required, Defendant denies the allegation and request for relief in Paragraph 108 and denies that FTI is entitled to any relief.

109.    Count I has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.  Paragraph 109 further states a prayer for relief and legal conclusion to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 109 and denies that FTI is entitled to any relief.

## **COUNT II**

110.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.  To the extent that a response is required, Defendant incorporates his responses to the preceding paragraphs of the Complaint as if fully set forth herein.

111.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

112.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

113.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

114.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

115.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

116.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

117.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

118.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

119.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

120.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

121.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.

122.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no

response is required.  Paragraph 122 further states a prayer for relief to which no response is required.  To the extent that a response is required, Defendant denies the allegation and request for relief in Paragraph 122 and denies that FTI is entitled to any relief.

123.    Count II has been dismissed with prejudice, *see* ECF No. 81, and therefore no response is required.  Paragraph 123 further states a prayer for relief and legal conclusion to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 123 and denies that FTI is entitled to any relief.

## COUNT III

124.    Defendant incorporates his responses to the preceding paragraphs of the Complaint as if fully set forth herein.

125.    Paragraph 125 purports to characterize the Employment Agreement and its legal effect, to which no response is required.  Paragraph 125 further purports to state a legal conclusion regarding the Non-Solicit Provision, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 125 to the extent they are inconsistent with the Employment Agreement.  To the extent that a response is required, Defendant denies the allegations in Paragraph 125.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Paragraph 129 states a prayer for relief to which no response is required.  To the extent that a response is required, Defendant denies the allegation and request for relief in Paragraph 129 and denies that FTI is entitled to any relief.

## COUNT IV

130.    Defendant incorporates his responses to the preceding paragraphs of the Complaint as if fully set forth herein.

131.    Paragraph 131 purports to characterize the Employment Agreement and its legal effect, to which no response is required.  Paragraph 131 further purports to state a legal conclusion regarding the Non-Compete Provision, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 131 to the extent they are inconsistent with the Employment Agreement.  To the extent that a response is required, Defendant denies the allegations in Paragraph 131.

132.    Denied.

133.    Denied.

134.    Denied.

135.    Paragraph 135 states a prayer for relief to which no response is required.  To the extent that a response is required, Defendant denies the allegation and request for relief in Paragraph 135 and denies that FTI is entitled to any relief.

## COUNT V

136.    Defendant incorporates his responses to the preceding paragraphs of the Complaint as if fully set forth herein.

137.    Paragraph 137 purports to characterize the Employment Agreement and its legal effect, to which no response is required.  Paragraph 137 further purports to state a legal conclusion regarding the Non-Solicit Provision, to which no response is required.  The Employment Agreement speaks for itself and Defendant respectfully refers the Court to the

Employment Agreement for a full and accurate statement of its contents.  Defendant denies the allegations in Paragraph 137 to the extent they are inconsistent with the Employment Agreement.  To the extent that a response is required, Defendant denies the allegations in Paragraph 137.

138.    Denied.

139.    Denied.

140.    Denied.

141.    Paragraph 141 states a prayer for relief to which no response is required.  To the extent that a response is required, Defendant denies the allegation and request for relief in Paragraph 141 and denies that FTI is entitled to any relief.

**COUNT VI**

142.    Defendant incorporates his responses to the preceding paragraphs of the Complaint as if fully set forth herein.

143.    Paragraph 143 purports to state a legal conclusion regarding Defendant's obligations to FTI and Compass Lexecon, to which no response is required.  To the extent that a response is required, Defendant denies the allegations in Paragraph 143.

144.    Denied.

145.    Denied.

146.    Paragraph 146 states a prayer for relief to which no response is required.  To the extent that a response is required, Defendant denies the allegation and request for relief in Paragraph 146 and denies that FTI is entitled to any relief.

**COUNT VII**

147.    Defendant incorporates his responses to the preceding paragraphs of the Complaint as if fully set forth herein.

148.    Paragraph 148 purports to characterize the Employment Agreement and 2013 Promissory Note and the legal effect of both documents, to which no response is required.  The Employment Agreement and 2013 Promissory Note speak for themselves and Defendant respectfully refers the Court to the Employment Agreement and 2013 Promissory Note for a full and accurate statement of their contents.  Defendant denies the allegations in Paragraph 148 to the extent they are inconsistent with the Employment Agreement and 2013 Promissory Note.  To the extent that a response is required, Defendant denies the allegations in Paragraph 148.

149.    Paragraph 149 purports to state a legal conclusion regarding the 2013 Promissory Note, to which no response is required.  Paragraph 149 also purports to characterize a December 20 Letter from Mr. Orszag to FTI, to which no response is required.  The December 20 Letter speaks for itself, and Defendant respectfully refers the Court to the December 20 Letter for a full and accurate statement of its contents.  To the extent that a response is required, Defendant denies the allegations in Paragraph 149.

150.    Denied.

151.    Paragraph 151 states a prayer for relief to which no response is required.  To the extent that a response is required, Defendant denies the allegation and request for relief in Paragraph 151 and denies that FTI is entitled to any relief.

## COUNT VIII

152.    Defendant incorporates his responses to the preceding paragraphs of the Complaint as if fully set forth herein.

153.    Paragraph 153 purports to characterize the Employment Agreement and 2015 Promissory Note and the legal effect of both documents, to which no response is required.  The Employment Agreement and 2015 Promissory Note speak for themselves and Defendant respectfully refers the Court to the Employment Agreement and 2015 Promissory Note for a

full and accurate statement of their contents.  Defendant denies the allegations in Paragraph 153 to the extent they are inconsistent with the Employment Agreement and 2013 Promissory Note. To the extent that a response is required, Defendant denies the allegations in Paragraph 153.

154.    Paragraph 154 purports to state a legal conclusion regarding the 2015 Promissory Note, to which no response is required.  Paragraph 154 also purports to characterize a December 20 Letter from Defendant to Plaintiff, to which no response is required.  The December 20 Letter speaks for itself, and Defendant respectfully refers the Court to the December 20 Letter for a full and accurate statement of its contents.  To the extent that a response is required, Defendant denies the allegations in Paragraph 154.

155.    Denied.

156.    Paragraph 156 states a prayer for relief to which no response is required.  To the extent that a response is required, Defendant denies the allegation and request for relief in Paragraph 156 and denies that FTI is entitled to any relief.

## AFFIRMATIVE DEFENSES

Defendant submits his Defenses below and incorporates by reference his responses to the allegations in the Complaint into each of the Defenses set forth below.  The statement of any Defense does not assume the burden of proof, persuasion, or production for any issues, facts, or elements of a claim to which the applicable law places the burden upon FTI.

## FIRST DEFENSE

Plaintiff's claims are barred for failure to state a claim upon which relief can be granted including for the reasons set forth in Defendant's previously filed motions to dismiss and memoranda in support thereof, and including because the non-competition and non-solicitation provisions are overly broad and unenforceable and because Plaintiff incorrectly interprets the Cause provisions in the Employment Agreement, which do not bar negotiations for a better employment deal or governance agreement, nor any statement of intent to pursue opportunities outside of Compass Lexecon, which are expressly permitted under the terms of the Employment Agreement.

## SECOND DEFENSE

Plaintiff's claims are barred, in whole or in part, by the equitable doctrines of estoppel, acquiescence, and unclean hands.

## THIRD DEFENSE

Plaintiff's contract claims are barred, in whole or in part, because Plaintiff materially breached the contracts at issue.

## FOURTH DEFENSE

Plaintiff's duty of loyalty claim is barred, in whole or in part, by Maryland Code, Labor and Employment § 3-304.1, and Maryland Code, Commercial Law § 11-1207.

## FIFTH DEFENSE

Plaintiff's claims, in whole or in part, have been waived through FTI's course of conduct.

## SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, under California law and Plaintiff's claims, in whole or in part, are properly assessed under California law.

## SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff assumed the risk of any allegedly tortious behavior by Defendant and/or because Plaintiff contributed to any such behavior.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, under the doctrine of accord and satisfaction.

## NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any actual injury or harm as a result of any representation, omission, action, inaction, or conduct by Defendant or otherwise.  To the extent that any such damage, injury, or loss has occurred, such damage, injury, or loss is wholly speculative and uncertain.

## TENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because any injury or harm suffered by Plaintiff is not the result of any representation, omission, action, inaction, or conduct by Defendant and was not proximately caused by Defendant, and further because the conduct and actions of persons or entities other than Defendant constituted a superseding or intervening cause of any damage, loss, or injury allegedly sustained.

## ELEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff failed to mitigate, minimize, or avoid any damages it allegedly sustained.

## TWELFTH DEFENSE

Plaintiff has not established any basis for entitlement to attorneys' fees, costs, expenses, or interest.  Defendant is entitled to attorneys' fees, costs, and expenses.

## THIRTEENTH DEFENSE

The damages and remedies that Plaintiff seeks, if awarded, would result in unjust enrichment to Plaintiff.

## ADDITIONAL DEFENSES

Defendant reserves the right to assert additional defenses based on additional information determined through discovery and factual development of this case.

## PRAYER FOR RELIEF

WHEREFORE, Defendant respectfully requests that the Court enter an order:

A.    Denying all relief requested by Plaintiff in the Complaint;

B.    Entering judgment against Plaintiff and in favor of Defendant;

C.    Dismissing the Complaint with prejudice;

D.    Awarding Defendant his attorneys' fees, costs, and expenses; and

E.    Awarding Defendant such other and further relief as the Court deems just and appropriate.

## COUNTERCLAIMS FOR INJUNCTIVE RELIEF,
## DAMAGES, AND DISGORGEMENT

Counterclaim Plaintiff Jonathan M. Orszag ("Plaintiff"), by and through his undersigned counsel, brings these Counterclaims against Counterclaim Defendants FTI Consulting, Inc. ("FTI") and Steven H. Gunby (together, "Defendants"), and alleges as follows:

## INTRODUCTION

1.      Counterclaim Plaintiff Jonathan Orszag is one of the world's leading antitrust and economic consultants and has founded and led two leading economic consulting firms.  This action arises out of a fraudulent scheme by his former employer, FTI, and its President and Chief Executive Officer ("CEO"), Steven H. Gunby, to prevent Mr. Orszag from competing with FTI, consistent with his express contractual right to do so.  Mr. Gunby falsely represented that he would negotiate with Mr. Orszag in good faith and expeditiously to address serious concerns raised by Mr. Orszag and his colleagues about the relationship between FTI and Compass Lexecon LLC ("Compass Lexecon").  But while feigning good faith and, in fact, encouraging those discussions, FTI and Mr. Gunby were secretly working with counsel to prepare a bad-faith lawsuit for the sole and admitted purpose of "putting a cloud over" Mr. Orszag's head.  Though meritless, Mr. Gunby knew that a lawsuit would buy FTI time if Mr. Orszag decided to resign and launch a competing venture, as his contract permitted him to do.  Without prior notice or an opportunity to cure (each an express contractual requirement), FTI fired Mr. Orszag and, the same day, filed a baseless lawsuit against him falsely claiming that it had Cause to terminate him because he engaged in the very discussions that FTI and Mr. Gunby had encouraged.  Compass Lexecon's Chairman testified under oath that he knew of no Cause for Mr. Orszag's termination, and that at all times "what [Mr. Orszag] was doing was trying to further the best interests of Compass Lexecon in a way that was perfectly appropriate."  And discovery has revealed that FTI

manufactured the for-Cause termination (there was no Cause) so that it could claim that Mr. Orszag was subject to a non-compete. As if to highlight its own bad faith, FTI turned around and immediately asked Mr. Orszag to resume work at Compass Lexecon through a consulting agreement, which allowed FTI to continue to earn millions of dollars from his work. This action seeks to hold FTI and Mr. Gunby accountable for their fraud, breach of contract, abusive discharge, and tortious interference.

2.      FTI is a large, publicly traded consulting firm, with approximately one-quarter of its profits coming from its wholly-owned subsidiary, Compass Lexecon. Compass Lexecon is itself a combination of two firms. FTI acquired Lexecon in 2003 and Competition Policy Associates, Inc. ("Compass") in 2006, and the two firms merged in 2007 to create the world's foremost economic consulting firm.

3.      Mr. Orszag was, until his purported "for Cause" termination by FTI's Board of Directors on November 20, 2023, a Senior Managing Director of Compass Lexecon and member of Compass Lexecon's Executive Committee, a position he held since the inception of Compass Lexecon in 2007. Mr. Orszag was a co-founder of Compass, and had co-run both Compass and Compass Lexecon since their founding. He has testified in some of the most important antitrust litigations over the past two decades and is widely viewed as one of the world's leading antitrust economists. Mr. Orszag held a unique status within Compass Lexecon (and in the economic consulting industry) because he served as the day-to-day manager while also generating significant revenues for the firm. As a testifying expert, he was one of a handful of Compass Lexecon professionals who were directly or indirectly responsible for a majority of Compass Lexecon's revenues. This past year, *after* his bad-faith termination, Mr. Orszag was Compass Lexecon's single largest revenue generator.

4.      FTI's fraud took place against the backdrop of an increasingly tense and frayed relationship between Compass Lexecon and FTI.  Although Compass Lexecon and FTI had a largely harmonious and productive relationship under a prior generation of FTI leadership, their relationship had deteriorated by mid-2023 as a result of FTI's serial mismanagement.  In particular, FTI had created obstacles to Compass Lexecon's continued success while furthering its own parochial interests, including by preventing Compass Lexecon from undertaking valuable and professionally significant engagements on cutting-edge matters.  When asked directly by a senior Compass Lexecon professional in the Summer of 2023, Mr. Gunby could not identify a single way in which FTI was contributing to Compass Lexecon's success.  While FTI had become an increasing drag on that success, FTI continued to take a majority of Compass Lexecon's profits, including the lion's share of those profits in 2023.

5.      The leaders of Compass Lexecon (including Mr. Orszag, his fellow Executive Committee members, and other senior Compass Lexecon professionals) raised these issues with FTI on many occasions.  In particular, they (not just Mr. Orszag) expressed concerns about FTI's exercise of veto power over important, high-profile, and high-revenue generating opportunities that were available to Compass Lexecon professionals; FTI's subpar and sometimes non-functioning back-office services (such as billing and accounts payable); and the very large share of Compass Lexecon profits that FTI extracts to the detriment of the Compass Lexecon team. Compass Lexecon professionals often questioned why FTI earned so much money on their backs when FTI referred them virtually no business but contributed significant, negative synergies.

6.      These issues came to a head (again) in the late Spring and early Summer of 2023 when FTI blocked Compass Lexecon from taking on an important engagement for a leading client in the ███████████ industry and then claimed to be under a "secret agreement" with ██

████████████████████████████████ that precluded it from saying why.

Compass Lexecon's Chairman accused FTI's leadership of engaging in "██████" conduct by

effectively soliciting and accepting a "█████████" – i.e., of taking money from ██████ in

return for conflicting Compass Lexecon out of working against ██████ on future matters – and

described FTI's actions as ████████████████████████████████

████████." In response, the entire Compass Lexecon Executive Committee threatened to

resign. This crisis posed an existential threat to both Compass Lexecon and FTI. Indeed, one of

the key drivers of FTI's bad-faith negotiations with Mr. Orszag was the risk that Compass

Lexecon's deep bench of talent could walk away at any time. Compass Lexecon has more than

800 talented, highly educated, and experienced economists and consultants, and yet with only

██ exceptions in mid-2023, FTI had not obtained from those valuable and mobile employees

any agreement that would restrict them from leaving and joining or starting a competing firm

(i.e., "non-competes" or "non-compete agreements"). Although those employees' freedom to

compete was and is a major threat to FTI's business, FTI never publicly disclosed that nearly all

of Compass Lexecon can leave at any time without any restriction on competing.[1] Mr. Orszag

advised FTI that its securities disclosures were misleading and needed to be changed.

    7.    In transparent discussions with FTI's senior leadership, including Defendant

Gunby, Mr. Orszag and many others expressed their dismay about these events, concern about

---

[1] FTI's SEC Form 10-K for the year ended December 31, 2022, notes that it has "703 Senior Managing Directors and equivalent personnel" across its organization and states that "[s]ubstantially all of our written employment agreements with our Senior Managing Directors and equivalent employees include non-competition and non-solicitation covenants." FTI Consulting, Inc., 2022 Annual Report (Form 10-K) at 11, 21-22 (Feb. 23, 2023). That disclosure suggests that most senior level executives at Compass Lexecon are subject to non-competes, when, at that time, only █ such executives in the United States and Europe were subject to restrictions on their ability to compete. Compass Lexecon's Chairman, one of the world's leading securities fraud experts, described this disclosure as "███████████" in communications with Mr. Orszag. *See* Daniel Fischel Dep. Tr. 94:13-95:12 (Sept. 16, 2024).

Compass Lexecon's lack of control over its own destiny, and frustration over the excessive extraction of Compass Lexecon profits by FTI.  In the view of the Compass Lexecon Executive Committee, addressing these issues was necessary for both the long-term health of their business and the continued retention of its many talented professionals.  Mr. Gunby authorized a senior FTI executive to engage in negotiations with Mr. Orszag about ███████████████████ ███████████████████████████████████████████████████████████████ ██████████████████  During the negotiations, that FTI executive advised another member of the Compass Lexecon Executive Committee that he sought to negotiate some middle ground where FTI could cede more control to Compass Lexecon without requiring any disclosure to investors about a "████████████."  Critically, *at no point during these conversations* did FTI ever express the view that anything said or done by Mr. Orszag during these negotiations would provide a basis for his termination, or that his termination was even a possibility.  Nor did FTI follow the requirements under Mr. Orszag's Employment Agreement by giving him notice and an opportunity to cure any purported violation (for example, by ceasing to engage in those same discussions).

8.     On the contrary, the leaders of FTI, and in particular Mr. Gunby, embarked on a concerted campaign to persuade Mr. Orszag to stay at Compass Lexecon.  FTI feared that, if Mr. Orszag left Compass Lexecon, a significant number of Compass Lexecon professionals would follow him out the door, a materialization of the very risk that FTI had failed to disclose to the public.  To forestall Mr. Orszag's resignation, FTI and Mr. Gunby cited his prominence, his great appeal to clients, the high esteem in which he was held by his colleagues, his potential for firm-wide leadership, and many other flattering and positive things.  In September 2023, Mr. Gunby suggested that Mr. Orszag would be a great candidate to succeed him as CEO of FTI.

Then, just weeks before FTI terminated Mr. Orszag, Mr. Gunby wrote to him that "we value your contributions to Compass Lexecon/FTI, and I do hope that we can find a path forward for you to remain at the firm."[2]  At no point did Mr. Gunby claim that Mr. Orszag had acted improperly or that he was in any way restricted from leaving to practice his profession at a new or different firm, a fact that Mr. Gunby confirmed under oath.

9.     Mr. Orszag was open and straightforward about his concerns and his options.  He told Mr. Gunby and others that he was unsatisfied with how FTI was treating him and other Compass Lexecon professionals.  He communicated that he was seeking to protect Compass Lexecon's long-term future by negotiating with FTI to allow Compass Lexecon to have more control over its own operations and to ensure that the compensation earned by the two entities reflected their relative contribution to the profits Compass Lexecon created.  And he told FTI that, if Compass Lexecon's collective concerns were not resolved, he would leave (as was his explicit contractual right) and would launch a competing firm (as was also his explicit contractual right).  After all of the discussions that supposedly created Cause, Mr. Gunby acknowledged Mr. Orszag's contractual right to resign and compete, writing that FTI would "certainly work hard to retain folks should you make the unfortunate decision to leave."

10.     To forestall that competition, Mr. Gunby falsely represented in a November 5, 2023, email that he would negotiate with Mr. Orszag in "good faith" and asked for additional time to continue their discussions.  In reliance on Mr. Gunby's false promise to act in good faith, Mr. Orszag continued negotiations with FTI through mid-November 2023.  But all the while,

---

[2] *See FTI Consulting, Inc. v. Orszag*, No. 8:23-cv-03200 (D. Md. Nov. 22, 2023) ("*FTI Action*"), ECF No. 18-6 (Email from Steve Gunby to Jon Orszag and others re Follow up (Nov. 5, 2023)).

FTI and Mr. Gunby were secretly plotting to terminate Mr. Orszag, having already hired outside counsel to prepare and file a bad-faith lawsuit.

11.    Amidst these supposedly good-faith discussions, FTI's Board (at Mr. Gunby's orchestration, according to the testimony of FTI's Board Chairman) suddenly and without notice purported to terminate Mr. Orszag for Cause.  Within hours, they (together with, they claimed, Compass Lexecon) filed a lawsuit against Mr. Orszag in a bad-faith attempt to enforce a purported non-compete provision in his Employment Agreement to prevent him from joining or starting a competing firm.  As Mr. Gunby conceded under oath, FTI deliberately concealed its termination decision (which had been made at a Board meeting three days earlier) until the day of the lawsuit, because it was not in FTI's "interest" to disclose its true plan to Mr. Orszag or anyone else on the Compass Lexecon Executive Committee.

12.    By creating a for-Cause termination out of thin air, FTI and Mr. Gunby sought to put Mr. Orszag on "ice" for a year because in that case – and only in that case – would Mr. Orszag be subject to a one-year non-compete under his Employment Agreement.  That goal was specifically discussed by the Board as part of the Mr. Gunby-led deliberations, as FTI's Board Chairman, Gerard Holthaus, reluctantly admitted at his deposition.  The one-year period (through November 20, 2024) provided FTI and Mr. Gunby time to try to forestall potential employee departures, time to change its disclosures to investors, and time to sell FTI stock before Mr. Orszag could compete.  The motivation for Mr. Gunby's scheme is set forth in FTI's own documents.  At end of July 2023, Mr. Gunby prepared talking points for an executive session with the Board where he identified the disputes with Compass Lexecon as placing "█████████" and indicated that it would be "███████████████████████████." Roughly two weeks after advising the Board (but not investors) of ███████████████

████████, Mr. Gunby sold a significant amount of FTI stock.[3]  Then, shortly after terminating

Mr. Orszag, FTI changed its risk disclosures to investors.  Thereafter, Mr. Gunby and other FTI

executives and Board members sold additional FTI stock.

13.    By contrast, had Mr. Orszag resigned and competed, as was his clear contractual

right, the consequences for FTI and Mr. Gunby would have been dire.  Had that occurred,

Compass Lexecon's Chairman stated in an email to Mr. Orszag, "████████████████████

████████████████████████████████████████."

14.    FTI's bad faith is further demonstrated by the fact that it terminated Mr. Orszag

and filed the lawsuit on behalf of Compass Lexecon without ever discussing those actions with

any member of the Compass Lexecon Executive Committee.  Not only did Compass Lexecon's

Executive Committee have no issues with Mr. Orszag's performance, but they believed

Mr. Orszag was at all times focused on and acting in Compass Lexecon's long-term interests.

Indeed, Compass Lexecon's Chairman said in a speech to the company's professionals shortly

after FTI terminated Mr. Orszag that:

> I've been an unbelievable, and we all have, beneficiary of all the things that Jon has
> done for the firm.  There's never been a better partner than Jon.  Never been
> anybody more devoted to the success of the firm than Jon.  Never [been] anybody
> more focused on creating opportunities for all of our people in the firm. . . .
> [W]orking tirelessly on all kinds of issues that other people don't hear about . . .
> [i]n addition to Jon being a very distinguished expert himself, it's really hard to
> describe how much everybody in the firm relied on Jon to make the firm run, to do
> the right thing for the firm to make the firm successful.

Compass Lexecon's Executive Committee therefore insisted that Compass Lexecon's name be

dropped from FTI's action, refusing to be party to a lawsuit against Mr. Orszag.  On December

1, 2023, FTI relented and filed an amended complaint that dropped Compass Lexecon as a party.

---

[3] FTI did not identify any of these sales as having been made "pursuant to a contract, instruction, or
written plan that intended to satisfy the affirmative defense conditions of Rule 10b5-1(c)."

15.    Under Mr. Orszag's Employment Agreement with FTI, "Cause" is expressly and narrowly defined.  It only permits a for-Cause termination for conduct such as: criminal indictment; a failure to satisfactorily perform the duties and obligations under the Employment Agreement; use of drugs and alcohol that adversely affects the performance of those duties; acts involving material dishonesty, embezzlement, or fraud; violating written policies or engaging in willful misconduct; and failure to use reasonable best efforts to perform his obligations consistent with historical practice.  *See* Employment Agreement § 7(b) (attached as Ex. A).

16.    Further under the Employment Agreement, any claim that there was "Cause" to terminate Mr. Orszag had to be made within 90 days of the events giving rise to the claim, to be followed by at least a 30-day period in which Mr. Orszag would have the opportunity to "cure" any alleged basis for dismissal.  *See id.*  And FTI had to give Mr. Orszag written notice of the acts purportedly constituting Cause *before* it could subsequently terminate him.

17.    At no point prior to November 20, 2023, did FTI claim that any such Cause existed, or give the contractually required notice.  Indeed, on November 5, 2023, after *all* of the purported acts that FTI would claim constituted Cause, Mr. Gunby – to whom Mr. Orszag reported – wrote Mr. Orszag that he and FTI "value your contributions to Compass Lexecon/FTI" and "hope that we can find a path forward for you to remain at the firm," because "[y]ou are a very talented professional."  Then, on November 16, 2023, just days before his termination, Mr. Orszag asked FTI's General Counsel whether he had ever done anything inconsistent with his Employment Agreement, and FTI's General Counsel did not identify anything.  FTI's November 20, 2023, letter purporting to fire Mr. Orszag for Cause merely incanted the contract language and contained not a single fact that constituted "Cause" under the Employment Agreement.  Defendant Gunby conceded under oath that none of the conduct

specified in the Termination Letter amounted to Cause for termination.  FTI's Board Chairman similarly testified about the lack of facts underlying the "Cause" termination.

18.    Contrary to the requirements of the Employment Agreement, FTI also offered no opportunity for Mr. Orszag to cure any purported basis for his dismissal and failed to give the separate written notice required before he could be terminated.

19.    FTI's conduct was an egregious attempt to ice a talented and valuable professional who had every right to ply his trade elsewhere.  In executing this clumsy assault, FTI not only breached its contract with Mr. Orszag, but it and Mr. Gunby also fraudulently induced Mr. Orszag to refrain from exercising his contractual rights, sought to enforce legally invalid restrictive covenants for the admitted, anticompetitive purpose of slowing him down, tortiously interfered with Mr. Orszag's business opportunities, abusively discharged him, and caused significant damage to him.  He seeks injunctive relief to stop the effects of FTI's wrongful conduct and monetary and punitive damages and disgorgement to compensate him for the harm he has suffered as a result of Defendants' fraudulent scheme.

## THE PARTIES

20.    Plaintiff Jonathan M. Orszag is a citizen of the State of California, where he resides.  Throughout the relevant time period, Mr. Orszag worked in California out of Compass Lexecon's Century City, California office.  His Employment Agreement states that he will perform his contractual obligations primarily from California.

21.    Defendant FTI Consulting, Inc. is a publicly traded Maryland corporation with its headquarters in Washington, D.C.

22.    Defendant Steven H. Gunby is a citizen of the State of Maryland, where he resides.  Mr. Gunby is the President and CEO of FTI, and a member of its Board of Directors.

## JURISDICTION AND VENUE

23.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is a matter between citizens of different States and the amount in controversy exceeds $75,000, exclusive of costs and interest.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because FTI is a resident of this District and both Defendants are residents of the State of Maryland.

25.    This Court has personal jurisdiction over FTI because FTI is organized under the laws of the State of Maryland. *See* Md. Code Ann., Cts. & Jud. Proc. § 6-102(a).

26.    This Court has personal jurisdiction over Mr. Gunby because he is a resident of the State of Maryland. In addition, Mr. Gunby serves on the Board of Directors of FTI, a Maryland corporation, and this suit arises out of actions taken in his capacity as a Director of FTI. *See id*. § 6-102(a)-(b).

## FACTUAL BACKGROUND

### A.    The Founding and Management of Compass Lexecon

27.    Mr. Orszag founded Competition Policy Associates, Inc. ("Compass") in 2003 along with four renowned economists. From its inception, Compass served as a leading antitrust consulting firm, providing advisory and expert services to corporations, law firms, and governments around the world. Compass grew rapidly, with Mr. Orszag both working as an expert and co-managing the overall business of the firm. In 2005, FTI approached Compass about a potential acquisition, and the parties reached an agreement for FTI to purchase Compass in a deal valued at approximately $70 million.[4] FTI had purchased Lexecon, another economic

---

[4] Press Release, *FTI Consulting to Acquire Competition Policy Associates, Inc.*, FTI Consulting, Inc. (Nov. 21, 2005), https://ir.fticonsulting.com/news-releases/news-release-details/fti-consulting-acquire-competition-policy-associates-inc.

consulting firm, back in 2003,[5] but was concerned about its future and saw the Compass acquisition as an insurance policy.  In 2007, Compass and Lexecon agreed to merge, forming Compass Lexecon in January 2008.[6]

28.    Since then, and until his abrupt termination on November 20, 2023, Mr. Orszag served on the Executive Committee of Compass Lexecon, helping to manage the firm and oversee its tremendous growth, including into Europe, Asia, and South America.  Compass Lexecon grew from approximately 170 professionals at the time of the merger to more than 800 professionals.  Based on the efforts of Mr. Orszag and his colleagues, Compass Lexecon became the leading economic consulting firm in the world, consistently topping industry rankings of economic consulting firms.

29.    While there were periodic disagreements between Compass Lexecon and FTI during the early years of their partnership, both entities saw the benefit of their relationship, and both profited from it.  The relationship began to change in early 2014, when FTI's Executive Chairman Dennis Shaughnessy and CEO Jack B. Dunn, IV stepped down and were replaced by Steven H. Gunby, who joined as FTI's President and CEO.  Unlike their predecessors, Mr. Gunby and his leadership team never took the time to understand Compass Lexecon's business or to develop relationships with its senior staff because, in Mr. Gunby's words, he "had other priorities within FTI."

---

[5] Press Release, *FTI Consulting To Acquire Lexecon From Nextera Enterprises*, FTI Consulting, Inc. (Sept. 25, 2003), https://ir.fticonsulting.com/news-releases/news-release-details/fti-consulting-acquire-lexecon-nextera-enterprises.

[6] News Release, *COMPASS and Lexecon Combine Operations*, Compass Lexecon (Jan. 16, 2008), https://www.compasslexecon.com/insights/news/compass-and-lexecon-combine-operations.

30.     Mr. Gunby also positioned himself between Compass Lexecon and FTI's Board of Directors.  While Mr. Orszag had met with the FTI Board of Directors many times under the prior leadership – explaining the Compass Lexecon business and the opportunities and obstacles it faced – neither Mr. Orszag nor any other member of Compass Lexecon's senior leadership team met with the Board between the time Mr. Gunby assumed the role of President and CEO in 2014 and Mr. Orszag's termination in November 2023.  As a result, the FTI Board had virtually no direct knowledge of Compass Lexecon and its professionals even though Compass Lexecon generates roughly 25 percent of FTI's profits.

31.     From the beginning of his tenure as CEO, Mr. Gunby resented Mr. Orszag's fierce advocacy for Compass Lexecon's professionals.  Whenever there was an issue between Compass Lexecon and FTI – and there were many – it fell on Mr. Orszag to defend the interests of Compass Lexecon against a parent company that increasingly treated it as a profit center and not as a partner.

32.     By 2020, Compass Lexecon's senior leadership team saw themselves as approaching a crossroads.  They sought a long-term arrangement that would signal to the larger Compass Lexecon organization that the senior leadership would be there for the long haul.  That was critically important to the Compass Lexecon professionals, who had close personal relationships with one another but little connection with the rest of FTI.  The leadership team additionally sought to reset the economic relationship between Compass Lexecon and FTI, which they believed to be critical to Compass Lexecon's long-term success.

33.     For years, FTI refused to engage in any meaningful negotiations.  In May 2022, frustrated by the lack of progress in their negotiations with Mr. Gunby, the Compass Lexecon leadership team presented their final offer to FTI's executives and indicated that, if necessary,

they would take their proposal to FTI's Board of Directors to see whether the relationship could be salvaged. On a call that same day, one member of Compass Lexecon's leadership team (not Mr. Orszag) told FTI that he would resign if a deal on the proposed terms did not get done. On May 31, 2022, Compass Lexecon's current President sent a PowerPoint presentation to the full FTI Board, which was meeting to discuss the future of the FTI-Compass Lexecon partnership, on behalf of the entire Compass Lexecon leadership team.

34.    The presentation explained that FTI had earned an extraordinary return on its investment – some $█ million in EBITDA in 2021 – even though FTI contributed effectively nothing to Compass Lexecon's net revenue; FTI cost Compass Lexecon $███████ a year through conflicts and other negative synergies; FTI's executive team spent virtually no time managing Compass Lexecon's day-to-day business, which was run by its Executive Committee; and the services FTI provided were ██████████ Compass Lexecon. The presentation also explained that the members of the senior leadership team were "each recognized in the marketplace as among the top few economic consultants in the world." Without a deal, the presentation explained, two or three of the senior leaders would leave in the near term, and "open a new firm."

35.    After contentious negotiations, during which FTI's CEO threatened to "bury [Mr. Orszag] in litigation" if he refused to accept FTI's demands, Compass Lexecon's leadership team finally reached an agreement with FTI on economics and governance in early 2023. Mr. Orszag (along with two other Executive Committee members) agreed to enter into a new four-year employment contract, but he insisted that he would not be bound by any non-compete agreement going forward. If FTI, through its high-handedness, again made the relationship untenable, Mr. Orszag insisted that he be free to walk away and start afresh somewhere else –

whether at an existing firm or by setting up his own firm to compete with FTI. As he explained to FTI's General Counsel in a December 10, 2022, email, "we were crystal clear in DC that there will be no non-compete at the end of the term (given Steve [Gunby]'s behavior in this negotiation of threatening to 'bury me in litigation'). . . . [T]he deal is 100% dead if you continue to insist on a post-term non-compete." Mr. Orszag reiterated that point later the same day: "this has been – and continues to be – a deal-level issue. So the package will include no non-compete post-term of the contract – or there is no deal." And he reiterated it again four days later.

36.    Mr. Orszag knew Mr. Gunby's threats of litigation were real. When senior FTI employees have left to work for competitors, FTI – under Mr. Gunby's leadership and direction – has reflexively sued those senior employees and their new employers. Instead of competing to retain employees on the merits, FTI resorts to intimidation and litigation as a matter of corporate policy, as Compass Lexecon's Chairman confirmed at his deposition.[7]

B.    **Mr. Orszag's January 2023 Employment Agreement**

37.    In late December 2022, Mr. Orszag and FTI's General Counsel – who exclusively negotiated the contract among themselves – reached agreement on a compromise position. FTI agreed that Mr. Orszag's contract would have no non-compete with one narrow exception – if Mr. Orszag were terminated for Cause. Mr. Orszag had repeatedly expressed the view that any

---

[7] Since 2010, FTI has sued at least seven different employees in the United States – in addition to Mr. Orszag – for leaving FTI to work for competitors. *See, e.g.*, *FTI Consulting, Inc. v. Westerman*, No. 1:24-cv-01055 (D.D.C. Apr. 12, 2024); *FTI Consulting, Inc. v. Poer*, No. 1:24-cv-02035 (D.D.C. July 12, 2024); *FTI Consulting, Inc. v. Gamble*, No. 24-C-19-2857 (Md. Cir. Ct. May 14, 2019); *FTI LLC v. Berkeley Res. Grp.*, No. 16-15363CA01 (Fla. Cir. Ct. Miami-Dade Cnty. June 23, 2016); *FTI LLC v. Duffy*, No. 1684CV03176 (Mass. Super. Ct. Oct. 17, 2016); *FTI Consulting, Inc. v. Rinaudo*, No. 15-653886 (N.Y. Sup. Ct. Dec. 22, 2015); *FTI LLC v. Flynn*, No. 15-653109 (N.Y. Sup. Ct. 2015); *FTI LLC v. Holder*, No. 2015-CA-4598-B (D.C. Super. Ct. June 23, 2015); *FTI Consulting, Inc. v. Sloane*, No. 13-651368 (N.Y. Sup. Ct. Apr. 16, 2013).

non-compete provision of any kind would be void, because Mr. Orszag lived and worked in California where such restrictions were categorically unlawful and contrary to public policy.  FTI agreed to bear any risk that the provisions would be declared invalid under California law.

38.    Mr. Orszag and FTI's General Counsel also had specific discussions concerning Mr. Orszag's right to resign and compete at any time.  During these discussions, FTI's General Counsel expressly acknowledged that the compromise language included in the final agreement gave Mr. Orszag the unrestricted right to resign at any time (on 90 days' notice) and that, following his resignation, he was free to compete without restriction.  Again, FTI agreed to bear that risk.

39.    The parties effectuated this agreement and, from California, Mr. Orszag signed a new Employment Agreement with Compass Lexecon and FTI on January 15, 2023, which was made effective as of January 1, 2023.  *See* Ex. A (Employment Agreement).

40.    The relevant terms of Mr. Orszag's new Employment Agreement are as follows: Mr. Orszag would continue to be employed by and serve as Senior Managing Director of Compass Lexecon, "with his primary location of employment in Los Angeles County, California."  *Id.* § 3.  His responsibilities included: (a) originating, managing, and performing consulting services consistent with past practice; (b) performing other duties assigned to him by FTI's CEO or designated representative (if consistent with his duties in 2022); and (c) substantially devoting his time and energies to his responsibilities "in a manner substantially consistent with his practice from January 1, 2006 to the Effective Date."  *Id.*  The Employment Agreement would run through December 31, 2026, but was subject to termination by Mr. Orszag or FTI with or without reason.  *Id.* § 2.

1.    *The Employment Agreement's "Term"*

41.    The "Term" of the Employment Agreement was based upon six potential forms of separation, each of which had collateral consequences for Mr. Orszag's compensation and post-termination obligations.[8]  Under Section 7(a), Mr. Orszag was entitled to resign for any reason at any time, provided only that he give "at least 90 days' prior written notice to [Compass Lexecon]."

42.    Under Section 7(b), Compass Lexecon was entitled to terminate Mr. Orszag for "Cause" "if (and only if) one or more of the following occur":

i.    Employee's indictment for, conviction of or guilty or *nolo contendre* plea to a crime involving moral turpitude or a felony;

ii.    Employee's failure to satisfactorily perform any material employment or other duties, obligations, or responsibilities under this Agreement or any other written agreement with any member of the FTI Group;

iii.    Employee engages in intemperate use of alcohol, use of illegal drugs, or use of drugs prescribed for Employee other than in accordance with medical instructions, which adversely affect in any material respect the performance of his duties for the Company[9];

iv.    Employee's commission or omission of any act involving material dishonesty, embezzlement, misappropriation of assets, or fraud with respect to the Company or any of its affiliates or any of their respective employees or clients;

v.    Employee's violation of any written policy of the company or any of its affiliates . . . or engaging in any willful misconduct, gross negligence, violation of law, or other bad act related to his employment or otherwise which has or could reasonably be expected to adversely affect the Company or any of its affiliates in any material respect (whether business-related, financial, reputational, or otherwise); or

vi.    Employee's failure to (A) use his reasonable best efforts to perform his material duties and responsibilities to the FTI Group consistent with his efforts and activities prior to the execution of this Agreement . . . , (B) devote

---

[8] Two of those forms of separation – death (§ 7(f)) and disability (§ 7(d)) – are not discussed herein.

[9] The "Company" is defined as Compass Lexecon.

substantially all of his business time, attention and energies to the performance of Employee's duties and responsibilities hereunder, consistent with his efforts and activities prior to the execution of this Agreement . . . , or (C) comply with any of the restrictions contained in Sections 9 through 16.

43.    The Employment Agreement contains two significant limitations on Compass Lexecon's ability to terminate Mr. Orszag for Cause.

44.    First, while a for-Cause termination is made "effective immediately upon Company mailing or transmitting notice of such termination," that notice *must be "given within 90 days after the discovery by Company of the event or conduct giving rise to grounds to terminate Employee for Cause*." Ex. A, § 7(b) (Employment Agreement) (emphasis added). In other words, if more than 90 days have passed since the event or conduct purportedly giving rise to a basis for termination for Cause, Mr. Orszag cannot be terminated for Cause on that basis.

45.    Second, "[b]efore terminating Employee [Mr. Orszag] for Cause under subsections (ii) through (vi) above" – i.e., with the exception of criminal activity – the "Company will specify in writing to Employee the nature of the act, omission or failure that it deems to constitute Cause *and* if the action is curable, give Employee at least thirty (30) days from the receipt of such notice to correct the situation (and thus avoid termination for Cause)." *Id.* (emphasis added). That separate writing must precede *any* attempted termination for Cause.

46.    Under Section 7(c), Compass Lexecon could terminate Mr. Orszag's Employment Agreement at any point in time "without Cause, upon thirty (30) days' prior written notice."

47.    Finally, under Section 7(e), Mr. Orszag could "resign for <u>Good Reason</u>' if (and only if), without [his] prior written consent, the Company or FTI" took certain specified actions.

48.    The form of Mr. Orszag's termination directly impacted his compensation. If he were terminated for Cause, or if he resigned without Good Reason, Mr. Orszag was entitled to recover (in relevant part) the earned but unpaid amount of (i) his "Base Compensation" prior to

the termination date – which is defined to include his hours worked on fee matters (plus some client-development hours) multiplied by the rate at which his services are billed by Compass Lexecon; and (ii) a "Premium," which is defined to include a portion of the computer and administrative charges that Compass Lexecon bills on his engagements. Mr. Orszag would also be entitled to any unpaid amount of his prior year's bonus under the Incentive Compensation Plan. *See id.* §§ 4(a), 8(a). If Mr. Orszag were terminated without Cause, or if he resigned with Good Reason, he would be entitled to that same compensation as well as: (i) a *pro rata* portion of his Annual Bonus under the Incentive Compensation Plan for the year of his termination; (ii) the aggregate amount of any unpaid Retention Bonuses, and (iii) continued healthcare benefits. *See id.* § 8(b). Under his Employment Agreement, Mr. Orszag was entitled to a Retention Bonus of $██████ if he remained in his position through January 1, 2024. *Id.* § 4(d). Mr. Orszag also was entitled to purchase the $20 million key-man life insurance policy that FTI had purchased as to him. *See id.* § 30.

### 2.    *Restrictive Covenants Under the Employment Agreement*

49.    Section 9 of the Employment Agreement contains "Non-Competition Covenants" that are applicable during the course of Mr. Orszag's employment but apply post-employment *if and only if* he is terminated for Cause. That particular limitation is set forth in the definition of the "Non-Compete Period," which appears in Section 17(c) of the Employment Agreement. The Non-Compete Period is defined as "the period beginning on the Effective Date and ending on whichever of the following dates is applicable: (i) in the event of a termination of the Employee's employment by the Company for Cause, the first anniversary of the Termination Date, and (ii) in the event of a termination of Employee's employment for any reason other than as set forth in subsection (i), Termination Date." Ex. A, § 17(c) (Employment Agreement). That confirmed Mr. Orszag's position, expressed throughout 2022, that there would be no deal if FTI

insisted upon a non-compete provision that applied post-termination, with the narrow exception of a for-Cause termination (which Mr. Orszag could avoid after receiving the required notice either by curing any purported basis or by resigning).  To avoid any disagreement, Section 17(c) ends with the following language: "For the sake of clarity, the parties agree that, unless Employee is terminated for Cause per the terms of this Agreement, *there will be no non-compete restrictions under Section 9 applicable to him following the termination of his employment*." (Emphasis added.)

50.    The Employment Agreement contains separate "Non-Solicitation Covenants," *see id.* § 11, which are applicable during the term of the Employment Agreement and for one year thereafter, *see id.* § 17(d) (defining "Non-Solicit Period").  The Non-Solicitation Covenants prohibit Mr. Orszag from affirmatively soliciting business on any specific case or matter that he previously worked on, soliciting any client of the FTI Group that he did work for (whether directly or through a supervisory role) or previously pitched, or soliciting employees or consultants of FTI to leave or reduce their work for FTI.  *See id.* § 11(a)(i)-(iii).  The type of solicitation the Employment Agreement covers "is limited to affirmative solicitation (whether direct or indirect), and nothing in th[e] Agreement will preclude [Mr. Orszag] from (i) responding to and acting upon any communication that is initiated solely by any client or employee . . . (ii) or generally announcing through a communication (including, without limitation, to clients and employees), upon termination of employment his future plans following such termination (as long as such announcement does not invite or otherwise solicit any client of the business of the FTI Group or person whom the FTI Group employs" or otherwise engages. *Id.* § 11(b).

### 3. *Mr. Orszag Complied with the 2023 Employment Agreement*

51.    Throughout 2023, Mr. Orszag and his colleagues continued to strengthen Compass Lexecon while protecting its long-term interests.  As Mr. Orszag told the firm in announcing the new contracts, Compass Lexecon had finalized "███████████████████████████ ██████████████████████."  Within weeks of signing the deal, Mr. Orszag presented a "Strategy for the Future" of Compass Lexecon to the firm's senior professionals.  This plan was critical to ensuring the long-term viability of the firm and the retention of its professionals. Mr. Orszag sent a copy of the presentation to Mr. Gunby in February 2023, explaining that his "█████████████████████████████████████████████████████ ████████████████████████████████."  Soon thereafter, Mr. Orszag and his fellow Executive Committee members launched an aggressive recruiting campaign, offering a number of people substantial upfront money to join Compass Lexecon.  These efforts paid off, and Compass Lexecon recruited a number of talented economists to its roster while also retaining existing staff by successfully negotiating new agreements.

52.    In 2023, Mr. Orszag worked as hard (or harder) than he had in previous years.  In the first 11 months of 2023, he worked close to 3,000 hours – including working on client matters, dealing with FTI on behalf of Compass Lexecon, recruiting employees and contractors to Compass Lexecon, and developing new business for the firm.  Mr. Orszag fully performed, and more than satisfied, his obligations under the Employment Agreement.

### C.    FTI's Actions Since January 2023 Caused a Significant Rift with Compass Lexecon

### 1.    *FTI's Dysfunctional Back-Office Services*

53.    While the Compass Lexecon senior leadership team had hoped that the tensions with FTI had been put to rest with the new agreements, almost immediately thereafter FTI took a

series of actions that impaired Compass Lexecon's business and caused an outcry from Compass Lexecon professionals worldwide.  For example, FTI historically had provided certain back-office services to Compass Lexecon, including billing operations, for which Compass Lexecon ███ FTI.  Deficiencies in FTI's back-office services came to a head in early 2023 after FTI moved to a new billing system over the objections of Mr. Orszag and Compass Lexecon more generally.  As one of Mr. Orszag's colleagues explained in an email to FTI, "███████████ ████████████████████████████████████████████████' and that "███████████ █████████████████████████████████████."  The consequences expressed were significant: "████████████████████ ███████████████████████████████████. In the words of another member of the senior leadership team, "███████████ ██████████████████████████."

### 2.    *FTI Repeatedly Blocks Compass Lexecon Engagements*

54.    In early 2023 – after the new agreements were in place – FTI adopted a new conflicts position with respect to cases before the U.K. High Court that prevented Compass Lexecon from accepting desirable engagements.  As one member of the Compass Lexecon senior leadership team remarked at the time, "███████████████████████████ ██████████████████████████"  On behalf of Compass Lexecon, whose U.K. professionals had turned to Mr. Orszag to seek redress, Mr. Orszag secured a legal opinion from a leading U.K. barrister that FTI's newly adopted position was inconsistent with U.K. law.  And Mr. Orszag advised Mr. Gunby that Compass Lexecon viewed the new company position "████████████████████████████████████ ██████████████████."  FTI again refused to relent.  That cost Compass

Lexecon and its professionals potentially ███████ in revenue, caused significant frustration among its U.K. staff, and reignited questions about the negative synergies flowing from the relationship with FTI.

55.     Then, in June 2023, FTI advised Compass Lexecon that Compass Lexecon could not accept an engagement from ███████ in one of the leading cases brought by ███████ challenging the ███████ industry.  A large team from Compass Lexecon had worked on the cryptocurrency litigation brought by the SEC against Ripple Labs and had developed expertise that it expected to leverage in significant cryptocurrency-related engagements going forward.  Because the specific ███████ engagement had cleared initial conflict checks, Compass Lexecon had already advised counsel from a leading law firm (that routinely engaged Compass Lexecon on cutting-edge litigation) that there would be no issue with the retention.  After FTI vetoed the engagement, Compass Lexecon demanded an explanation.  But FTI refused to provide it, claiming that it was under an NDA with its client and could not even identify the client, much less describe the nature of the conflict.  Compass Lexecon's senior leadership team subsequently learned from an FTI executive that the secret client was ███████.

56.     The Compass Lexecon senior leadership team was livid.  The Chairman of Compass Lexecon wrote to Mr. Gunby that "███████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████ ███" In additional correspondence with FTI's Board Chairman, he characterized the Secret Agreement as ███████████████████████████████ ███," and communicated that ███████████████████████████ ███████████████████████." He additionally accused FTI of accepting the

equivalent of a "███████████" from ██████ to prevent Compass Lexecon from working

against ██████ on any ███████████ cases: "████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████' In sworn testimony, FTI's Board Chairman has confirmed the accuracy

of this description – i.e., ██████ offered to engage FTI on the condition that it conflict Compass

Lexecon out of future engagements against ██████, and FTI made a conscious decision to

prioritize the immediate and certain revenue from ██████ over the potential impact on Compass

Lexecon.

57.    As anger escalated, Compass Lexecon's Chairman threatened to resign if FTI did

not reverse its position.  He told Mr. Gunby and FTI's Chairman that the "██████████████

████████████."  On a subsequent call and in discussions with Mr. Gunby and a senior FTI

executive, the rest of the Compass Lexecon senior leadership team all communicated that they

would resign as well.

58.    Mr. Gunby and other FTI executives turned to Mr. Orszag to try to find a solution

to the problem, including potentially ██████████ Compass Lexecon from FTI through the

creation of a ████████████████  Those potential solutions ultimately proved unnecessary as

FTI reversed course and allowed Compass Lexecon to accept the ██████ engagement as a one-

off exception.  FTI's Board Chairman testified that Compass Lexecon's Chairman had put a gun

to FTI's head, forcing it to relent.

59.     Shortly after FTI's reversal on ████████, Mr. Orszag was approached by another ██████████ firm to work as an expert in litigation against ██████. FTI again prohibited Compass Lexecon from accepting the engagement.

60.     In late June, Mr. Gunby traveled to Chicago to meet with a number of Compass Lexecon's senior professionals – effectively, a portion of Compass Lexecon's roughly 100 top professionals, including many of the people affected by the ████████ episode – to "explain" what had transpired. The meeting did not go well. One senior professional rated it a █ on a scale of 0 to 10 where ████████████████████████ and the Chicago senior staff was furious. Compass Lexecon's Chairman testified that Mr. Gunby's statements at the meeting "just literally created a riot, . . . a riot of people, our people, who were just outraged at what FTI did." Several of the senior professionals threatened to resign on the spot. As Mr. Orszag later explained to FTI's Chairman, "█████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████." In the days following the meeting, Compass Lexecon's Chairman again ████████████████, and he told Mr. Gunby and FTI's Chairman that he now felt it was necessary to ███████████████ between FTI and Compass Lexecon, and that the professionals at Compass Lexecon all shared this belief. He also suggested that FTI needed to think about whether it "████████████████████████" to its investors, advice that Mr. Orszag communicated to FTI's General Counsel, and that was forwarded to Mr. Gunby.

61.     Given the escalating tension with FTI in the late Spring and early Summer 2023, the Compass Lexecon Executive Committee concluded that they needed to provide more transparency about the events to the most senior Compass Lexecon professionals. Mr. Orszag

drafted talking points for a call with the senior staff, received and incorporated comments from the Compass Lexecon Executive Committee, and then shared a draft with FTI's senior leadership.  While the discussions with FTI were contentious, Mr. Orszag and FTI's Board Chairman ultimately agreed upon a script which reassured the senior staff that the Executive Committee was working to address issues with FTI, and that they should focus on their client work.  FTI's Board Chairman ultimately thanked Mr. Orszag for his leadership on these issues and told him that he was glad they had come to an "amicable solution," as "[t]hat bodes well for the future."

62.     In response to these accelerating crises, the Compass Lexecon Executive Committee asked the FTI Board to undertake two formal investigations.  *First*, Compass Lexecon's Chairman requested that independent members of the Board conduct a "███████ ███████████" of FTI's and Mr. Gunby's actions in entering into the Secret Agreement with ███, addressing "███████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████."  *Second*, Mr. Orszag asked the Board to conduct a formal investigation of the positive and negative synergies associated with the Compass Lexecon-FTI relationship.  Mr. Orszag made this request after Mr. Gunby could not identify ██████████████████████ in Compass Lexecon's relationship with FTI.  The Board agreed to conduct both investigations.

**D.    Mr. Orszag Attempts To Negotiate a Resolution with FTI**

63.     By early September 2023, Compass Lexecon and FTI had made little progress on the ██████ structural solution, which Mr. Gunby had authorized Mr. Orszag and FTI's

General Counsel to investigate.  Mr. Orszag also learned that Mr. Gunby had been disparaging him on calls with other members of Compass Lexecon's Executive Committee.  As a result, Mr. Orszag raised with FTI's Chairman, and later with Mr. Gunby, whether it would be best to negotiate an amicable separation.  On a September 20, 2023 video conference with Mr. Gunby, Mr. Orszag suggested that they separate the structural relationship between Compass Lexecon and FTI from their own personal issues.  Mr. Gunby indicated that the Board was still investigating ██████, and volunteered that the Board had considered ██████████ ████████████, but said that was not a viable option.

64.    While Mr. Gunby went on to praise Mr. Orszag's leadership skills, he also expressed his fear that, if Mr. Orszag resigned from Compass Lexecon and started a new endeavor, it was possible that the entire Compass Lexecon business would depart with him.  As Mr. Gunby conceded under oath, Mr. Orszag emphasized that this would all occur without him soliciting a single individual, because the economists at Compass Lexecon are rational actors and know that he would build a top-notch firm and pay them handsomely.

65.    Mr. Gunby and Mr. Orszag met for a follow-up dinner in Washington, D.C. on October 17, 2023, and had a conversation that Mr. Orszag memorialized by email.  He indicated that there were two fundamental issues that needed to be addressed.  First, "the lack of trust between myself (and other Compass Lexecon personnel) and FTI arising out of the ████/conflict issues and the billing/services issues."  Second, he expressed his view that the economics should be changed between FTI and Compass Lexecon "given the relative contributions we [each] make."  Mr. Orszag saw the trust issues as a threshold question, and expressed the view that structural changes were necessary to address it.  He further explained that, "if FTI does not want to address these issues in a meaningful and collaborative way, then

you will force me to depart and start a new firm."  If that happened, he assured Mr. Gunby that he would "of course work with you to make my departure as smooth as possible for all involved."

66.    On the economics, Mr. Orszag agreed to look at options that would give fair profits to the FTI shareholders.  But he expressed the view that the market significantly overvalued Compass Lexecon as a part of FTI because the market did not understand (because FTI had failed to disclose) that nearly all of Compass Lexecon (representing approximately 25 percent of FTI's profits) was free to resign and compete at any time.  Mr. Orszag ended by reiterating his commitment to work on an amicable resolution and proposed that they meet in New York to continue their dialogue.

67.    On November 2, 2023, Mr. Orszag met with Mr. Gunby and FTI's General Counsel over dinner in New York.[10]  At that dinner, Mr. Orszag expressed his openness to a multitude of ways for restructuring the relationship between Compass Lexecon and FTI.

68.    The next day, November 3, 2023, Mr. Orszag wrote to Mr. Gunby to follow up on the dinner meeting.  Mr. Orszag repeated his request that FTI answer the threshold question whether Mr. Gunby and FTI were open to a potential restructuring of the FTI-Compass Lexecon relationship.  He wrote that, if FTI were not open to such discussions, then it should let him know in the near term.  "And, if this will not work, we need to begin discussing what a transition would look like so clients are well served and my departure is addressed directly and transparently for several reasons, including that my departure would clearly be a material event

---

[10] *See FTI Action*, ECF No. 18-6 (Email from Jon Orszag to Steve Gunby and others re Follow up (Nov. 3, 2023)).

for FTI." Mr. Orszag asked for FTI to get back to him on the threshold restructuring issue by November 13, 2023.

69.    Mr. Orszag was not alone in these views. One of his fellow Executive Committee members emailed Mr. Gunby on November 4, 2023, to express the view that FTI needed to restructure the relationship between the two companies. In his words, "████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████." On this point, the view of the Compass Lexecon senior leadership team was unanimous.

70.    On November 5, 2023, Mr. Gunby replied to Mr. Orszag to reiterate that he and FTI "value your contributions to Compass Lexecon/FTI" and "hope we can find a path forward for you to remain at the firm," because "[y]ou are a very talented professional, and there is always a chance that if you left others might be attracted to whatever you decide to do." He also asked for more time to respond to Mr. Orszag's threshold question whether Mr. Gunby and FTI were open to structuring a change of control over Compass Lexecon. Mr. Gunby represented that FTI needed more time because he would be in Asia the week of November 6, the Board would be meeting the week of November 13, and after that the Board would need more time "to think about all of this." Mr. Gunby represented in no uncertain terms that "you have my commitment that we will work with you expeditiously and without delay," and "I intend to

continue our discussions transparently and in good faith and hope you will too."[11]  Mr. Gunby never suggested that there was anything improper about the discussions between himself and Mr. Orszag, nor did he ever suggest (much less provide the requisite written notice) that Mr. Orszag's continued engagement in those discussions could be the basis for termination, again facts confirmed by Mr. Gunby under oath.

71.    Mr. Orszag responded the next day that he understood why the November 13 deadline might not be possible, and in reliance on Mr. Gunby's representations, stated he was willing to extend that deadline to November 27, after the Thanksgiving holiday, to accommodate FTI.  Mr. Orszag also offered to meet with FTI's Board "at any time so that they can understand our business better."  And, once again, he made clear that "what matters here is that we continue to discuss the future in good faith – with directness and transparency – and ensure in all scenarios that our clients continue to be well served.  I appreciate your commitment to that — and you have mine as well."

72.    On November 16, 2023, Mr. Orszag spoke with FTI's Chairman and its General Counsel for approximately 30 minutes to discuss the current situation.  At the end of that conversation, Mr. Orszag asked FTI's General Counsel point blank whether there was anything Mr. Orszag had done that was inconsistent with his obligations under the Employment Agreement, and if so, asked the General Counsel to inform him of that.  He did not identify any conduct inconsistent with Mr. Orszag's contractual obligations.

---

[11] *See FTI Action* at ECF No. 18-6 (Email from Steve Gunby to Jon Orszag and others re Follow up (Nov. 5, 2023)).

### E.        FTI Abruptly Fires Mr. Orszag, Purportedly for "Cause"

73.    Throughout the Fall of 2023, while outwardly professing to be negotiating transparently and in good faith, Mr. Gunby and FTI were secretly planning to ambush Mr. Orszag with a manufactured for "Cause" termination.  FTI's Board Chairman has acknowledged that FTI had retained outside counsel to pursue a litigation strategy as early as September 2023, around the time that Mr. Orszag first reached out to discuss an amicable separation.  FTI and Mr. Gunby knew that Mr. Orszag had an express contractual right to resign at any time, for any or no reason at all.  FTI and Mr. Gunby likewise knew that if Mr. Orszag exercised his contractual right to resign, he was free to compete without restriction.  And Mr. Orszag's Employment Agreement further allowed him to make a public announcement of his plans, and to engage with any client or employee who reached out to him following any such announcement.  *See* Ex. A, § 11(b) (Employment Agreement).  Because of the admitted risk that Mr. Orszag's resignation could result in the loss of a significant portion of Compass Lexecon's professionals and revenue – all without Mr. Orszag affirmatively soliciting a single client or professional – FTI and Mr. Gunby concluded that they needed to forestall his resignation at all costs.

74.    In the Summer and Fall of 2023, Mr. Gunby held several meetings with FTI's Board to discuss the challenging relationship between Compass Lexecon and FTI.  According to Mr. Gunby's talking points for an ███████████████████████, he advised them that it would be "█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████"  Mr. Gunby's pre-meeting

notes also expressed the view that ██████████████████████████████████████████
███████████

75.    Even though Compass Lexecon's Chairman had threatened to resign ██████████

██████ if FTI did not change course and had asked the independent Board members to

conduct a formal investigation of Mr. Gunby and his decision to enter into the Secret Agreement

with ██████, Mr. Gunby used his meetings with the Board to try to blame the relationship

breakdown on Mr. Orszag.  As part of his scenario planning, Mr. Gunby affirmatively misled the

Board.  After his November 3 meeting with Mr. Orszag, the discussions at which are

memorialized in emails that Mr. Orszag and Mr. Gunby exchanged immediately thereafter,

Gunby falsely told the Board that Mr. Orszag "████████████████████████████████████

███████████████████████████████████████████."  Mr. Orszag made no such

statement.  Mr. Gunby also falsely told the Board that Mr. Orszag "████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████" (emphasis added).  This was doubly false –

Mr. Orszag had consistently indicated that his preference was to restructure the FTI-Compass

Lexecon relationship, not to leave, and the very member of the Executive Committee referenced

by Mr. Gunby had himself told Mr. Gunby just two days earlier that if Mr. Orszag chose to

leave, "████████████████████████████████████████████████████████████████."

Rather than advise the Board of this communication, Mr. Gunby falsely attributed the statement

to Mr. Orszag in an attempt to poison the Board against him.

76.    Mr. Gunby had no further substantive interactions with Mr. Orszag after sending

the November 5 email in which he promised to continue their discussions transparently and in

good faith.  Despite having just told Mr. Orszag that he wanted him to remain at Compass

Lexecon, Mr. Gunby used the Board meeting to procure his termination.  On November 17,

2023, the FTI Board met to discuss taking the last step in Mr. Gunby's scheme.  According to

FTI's Chairman, Mr. Gunby led the discussion and orchestrated the outcome.  ████████████

███████████████████████████████████████████████ – a

statement that Mr. Orszag had never made.  ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

    77.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████ as is necessary under Mr. Orszag's Employment Agreement to avoid the 30-day cure

period.  FTI's Board Chairman testified that any determination by the Board would be

memorialized in the Board Minutes, and ████████████████████████████████████

████████████████.

    78.    Early in the morning of November 20, 2023, as Mr. Orszag was boarding a flight

with his family for the Thanksgiving holiday, Mr. Gunby called Mr. Orszag and informed him

that he had been terminated, purportedly for Cause, effective immediately.  This was followed by

a written "Notice of Termination for Cause" (the "Notice of Termination") (attached as Ex. B) from Mr. Gunby, firing Mr. Orszag effective immediately.

79.     The Notice of Termination for Cause purported to be from Compass Lexecon, "acting through its sole member, FTI Consulting, Inc."  *Id.* at 1.  Mr. Orszag subsequently learned that Compass Lexecon's Executive Committee was unaware of FTI's actions, and that none had been consulted about or involved in Mr. Orszag's firing or the Notice of Termination. When Compass Lexecon's employees pressed for an explanation for Mr. Orszag's termination, Mr. Gunby told them that the Board had terminated Mr. Orszag because he had threatened to leave the company and "had a gun to their head."  Mr. Gunby subsequently admitted to senior Compass Lexecon professionals that the real reason FTI had fired and sued Mr. Orszag was to buy FTI time, and in the hope that the litigation would embarrass Mr. Orszag and thereby hurt his relationships with clients and colleagues.

80.     The Notice of Termination identified just three factual bases for Mr. Orszag's purported termination for Cause, namely, that "█████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████," Mr. Orszag had:

(1) "████████████████████████████████████████ ████████████████";

(2) "████████████████████████████████████████"; and

(3) "██████████████████████████████████████████ ████████████████████████████████████."

81.     The Notice of Termination did not explain how the three acts alleged in the Notice – ████████████████████████████████████████████████████



– constituted "Cause" as defined in the Employment

Agreement.  Under oath, Mr. Gunby conceded that the conduct alleged in the Notice of

Termination did not amount to Cause for termination.

82.    The Notice of Termination offered no opportunity to cure the alleged acts but

rather stated, in conclusory fashion, that "████████████████████████

████████" because they "████████████████████████

████████████████████████████████

████████████████████████████████

████████" Ex. B, at 2 (Notice of Termination).  The Notice of Termination did not explain how

or why the acts – which were part of a negotiation in which FTI and Mr. Gunby participated –

were "uncurable," consistent with the Board's failure to ever make such a determination.  Nor

did the Notice attempt to reconcile its conclusory allegations with Mr. Gunby's November 5

correspondence, which indicated that FTI wanted Mr. Orszag to remain at Compass Lexecon, or

the conversation that Mr. Orszag had with FTI's Chairman and its General Counsel on

November 16, when Mr. Orszag asked them to identify any way in which he had violated his

Agreement, and they were silent.  FTI also failed to provide the separate written notice required

*before* it could purport to terminate Mr. Orszag for Cause.

83.    In light of Mr. Gunby's repeated assurances that he and FTI would negotiate in

good faith, Mr. Orszag actively engaged in routine business activities.  On Friday, November

17th alone, he had filed an expert report; pitched a new matter to a major law firm; assisted in

bringing in a new case; worked with FTI's General Counsel to submit a letter to a court in China addressing a potential conflict issue; consulted with the General Counsel about a potential litigation matter involving a new Compass Lexecon employee; emailed with Mr. Gunby and the General Counsel about a cost issue in Europe; and participated in a client call. Over the weekend, Mr. Orszag emailed with the General Counsel about an accounting issue, began recruiting an energy economist to Compass Lexecon, worked on retaining a new matter, and coordinated with another Executive Committee member about an upcoming management committee meeting. Despite interacting with FTI's General Counsel multiple times on Friday, November 17, and over the weekend, and despite Mr. Orszag's point blank question on November 16th, the General Counsel never raised any question or issue about Mr. Orszag's performance under his Employment Agreement or indicated that, behind the scenes, FTI was finalizing the paperwork to fire Mr. Orszag and to file a 28-page complaint against him.

**F.     FTI's Claimed Cause Was Not Cause and FTI Provided No Opportunity To Cure**

84.     None of the claimed actions rise to the definition of Cause, even if Mr. Orszag had done what the Notice of Termination alleged.

85.     But at no time did Mr. Orszag demand that " ████████████████████████ ████████████████ ." On the contrary, Mr. Orszag conveyed multiple times orally and in writing that he was open to a variety of solutions to changing the economics of the business and was "agnostic" to the structure of achieving that.

86.     At no time did Mr. Orszag say he would " ████████████████████████ ████████████████ ." He always explained that people likely would leave on their own and that he would, at all times, honor any restrictive covenant that applied to him. As the Chairman of Compass Lexecon testified, the economic consulting industry is structured so that

when an expert leaves to join another firm, the professional staff solicits that expert for a position, not the other way around.  Mr. Gunby also conceded under oath that Mr. Orszag "never claimed he would solicit anybody."

87.    Mr. Orszag did not affirmatively solicit any Compass Lexecon employee or consultant during the contractual Non-Solicitation period (i.e., from January 2023 through November 20, 2024).  In fact, he convinced multiple employees to remain at Compass Lexecon when they advised him about competing job offers and their desire to leave.  In July of 2024, 110 of Compass Lexecon's most senior U.S.-based professionals sent a letter to Mr. Gunby, the Board, and Mr. Orszag stating that they had never been solicited by Mr. Orszag at any time.  Letter to Steve Gunby and the FTI Board (July 3, 2024) (attached as Ex. C).  And the only Compass Lexecon employees who have testified to date likewise confirmed under oath that Mr. Orszag never solicited them.  Remarkably, despite the conclusory allegations they have made throughout the litigation, neither FTI nor its counsel appears to have asked a single Compass Lexecon professional whether they were solicited by Mr. Orszag (none were).

88.    The pretextual nature of Mr. Orszag's firing is further evident from the timing of his discussions with FTI.  While the "acts" supposedly constituting Cause occurred in his conversations with Mr. Gunby between October 17, 2023 and November 3, 2023, Mr. Gunby wrote to Mr. Orszag on November 5, 2023 – two days *after* the last event – and stated that he and FTI "value your contributions to Compass Lexecon/FTI" and "hope we can find a path forward for you to remain at the firm," because "[y]ou are a very talented professional."  Far from telling Mr. Orszag that their discussions constituted Cause for termination and providing the requisite opportunity to cure (by ceasing the discussions), Mr. Gunby encouraged Mr. Orszag to engage in further negotiations.  And in numerous interactions between November 3 and November 20,

2023, neither Mr. Gunby (to whom Mr. Orszag directly reported) nor FTI's General Counsel raised any issues about his performance under his Employment Agreement.

89.     FTI's claim that the purported "Cause" for Mr. Orszag's termination was incurable was likewise pretextual.  Not only did the Board ████████████████████████, but Mr. Gunby acknowledged under oath that he could at any time have instructed Mr. Orszag to stop negotiating for better working conditions for Compass Lexecon and its professionals.  He further conceded that the only thing "incurable" about Mr. Orszag's actions was that Mr. Orszag would not relinquish his clear contractual rights under his Employment Agreement – including the right to resign at any time, and the right to compete following his resignation.

**G.     FTI Makes Good on Its Promise To "Bury" Mr. Orszag**

90.     True to Mr. Gunby's earlier threat to "bury" Mr. Orszag in litigation, just hours after terminating Mr. Orszag on November 20, FTI and Compass Lexecon sued Mr. Orszag in Maryland state court.

91.     Mr. Orszag timely removed the case to federal court.  *See FTI Consulting, Inc. v. Orszag*, No. 8:23-cv-03200 (D. Md. Nov. 22, 2023) (*FTI Action*).

92.     As with Mr. Orszag's firing, Compass Lexecon's Executive Committee had no knowledge of the lawsuit until after it was filed.  Likewise, it had not been consulted about or involved in the drafting or filing of the suit against Mr. Orszag, despite Compass Lexecon appearing as a named plaintiff in the suit.  Shortly after the suit was filed and removed to federal court, Compass Lexecon's Executive Committee demanded that Compass Lexecon be removed from the lawsuit.

93.     On December 1, 2023, FTI purportedly entered into an "Assignment of Employment Agreement" with Compass Lexecon, pursuant to which Compass Lexecon "assigned" all of its rights, duties, obligations, and interests under Mr. Orszag's Employment

Agreement to FTI (the "Assignment Agreement").  Once again, Compass Lexecon's Executive Committee was not consulted about or involved in the drafting or execution of the Assignment Agreement.  FTI's General Counsel, purportedly acting both as President and General Counsel of Compass Lexecon and as General Counsel of FTI, is listed as both the Assignor and Assignee on the Assignment Agreement and is the only signatory to the Agreement.  On information and belief, this purported Assignment Agreement was entered into because Compass Lexecon's Executive Committee did not believe that Mr. Orszag had ever violated his Employment Agreement, and further believed that the lawsuit against him was pretextual.  Because the Compass Lexecon Executive Committee believed that Mr. Orszag had acted properly at all times, FTI needed to remove it from the picture.

94.    On December 1, 2023, FTI filed an amended complaint in this Court removing Compass Lexecon as a party.  *See FTI Action*, ECF No. 7.  FTI's amended complaint also added an allegation describing the Assignment Agreement.  *See id.*; *see also FTI Action*, ECF No. 7-1, at 29.  FTI's claims and allegations were otherwise identical to those in its original complaint.

95.    On January 9, 2024, in the midst of briefing Mr. Orszag's motion to dismiss, FTI filed a motion for leave to file yet another amended complaint.  *See FTI Action*, ECF No. 24.  The proposed Second Amended Complaint contains additional allegations that FTI was aware of (or should have been aware of) at the time it filed its initial complaint and its first amended complaint.  By delaying the proceedings through serial amendments, FTI sought to run out the clock so that it could get the benefit of a de facto non-compete for a year to which it had no right under Mr. Orszag's Employment Agreement.  That was all part of Mr. Gunby's admitted scheme to buy FTI time.

**H.    Defendants Try To Undermine Mr. Orszag's Future, While Mr. Orszag Dutifully Serves His Clients and Protects His Colleagues**

96.    FTI and Mr. Gunby sought to use the de facto one-year non-compete they had manufactured to tie up Compass Lexecon personnel and dissuade them from ever working with Mr. Orszag.  Following Mr. Orszag's abusive termination, Mr. Gunby traveled to various Compass Lexecon offices to meet with senior personnel.  During these discussions, Mr. Gunby routinely attacked Mr. Orszag as a person (claiming that Mr. Orszag was only out for himself and suggesting that Mr. Gunby possessed secret, damning information about him) and tried to undermine his personal and professional relationships.

97.    While Mr. Gunby was working to interfere with the relationships between Mr. Orszag and his former colleagues, Mr. Orszag was working to serve Compass Lexecon's (and thus FTI's) clients and protect their interests.  At the time of Mr. Orszag's termination, he was actively engaged as a testifying expert by a number of Compass Lexecon's clients and was set to testify in one of those engagements on November 29, 2023.  Despite having accused Mr. Orszag of "████████████████████████████████," Ex. B, at 1 (Notice of Termination), firing him for Cause, and suing him, Compass Lexecon contacted Mr. Orszag on November 20, 2023, to ask him to continue working for Compass Lexecon as an independent contractor.  This was not done to prevent Mr. Orszag from competing or to preserve some purported benefit under his Employment Agreement.  Rather, Compass Lexecon understood that clients had paid ████████ of dollars for the work performed by Mr. Orszag and staff working under his direction, and that Compass Lexecon could not serve those clients or protect their interests unless Mr. Orszag continued to serve as their expert.  Mr. Orszag agreed to work as an independent contractor based on his sense of duty to his clients and to the professional staff at Compass Lexecon.  In December 2024, after the purported non-compete had lapsed, Compass

Lexecon's Chairman stated publicly that Mr. Orszag "during the year did everything he possibly could to help our people, to build up our people, [and to] help our clients. . . . So we would not have had the success without Jon and we are grateful to him."

98.     In the year since his fraudulent termination, Mr. Orszag continued working diligently for Compass Lexecon as an independent contractor.  In fact, he accepted dozens of new engagements after his purported termination for Cause.  In 2024, Mr. Orszag personally billed more than 2,600 hours.  And during that period, according to Compass Lexecon's Chairman, "he had the most successful year of any economic consultant in our history and as far as I know in any consulting firm's history."  By means of the consulting arrangement, FTI retained the financial benefit of Mr. Orszag's work and his client engagements while seeking to harm him both financially and reputationally.

**I.     Defendants' Unlawful Conduct Has Harmed and Is Harming Mr. Orszag**

99.     Although FTI and Mr. Gunby repeatedly reassured Mr. Orszag – up through at least November 5, 2023, two weeks before his termination – that they intended to negotiate with him "transparently and in good faith," it is now apparent that Defendants were stringing Mr. Orszag along so that he would not exercise his contractual right to resign.  They had no intention of continuing negotiations transparently and in good faith, as Mr. Gunby falsely represented, and were secretly working on papers to sue him.  Defendants recognized that, if Mr. Orszag left Compass Lexecon voluntarily, as was his right under Section 7(a) of his Employment Agreement, he would not be subject to his Employment Agreement's narrow non-compete provision (purportedly applicable only with for-Cause termination) and would be free to start a competing firm along with anyone else who elected to leave Compass Lexecon to join him.  And under the non-solicitation provisions of the Agreement, any client or Compass

Lexecon professional who initiated contact with Mr. Orszag was free to move their business or their work to wherever Mr. Orszag went, including a new venture.

100.   Defendants feared competing with any new venture that Mr. Orszag might establish.  They knew that he had twice founded, built up, and co-managed the day-to-day operations of world leading economic consulting firms – Compass and then Compass Lexecon – and were afraid that he would do so again.  Mr. Gunby also knew that clients hire individual experts, not FTI, and that Mr. Orszag had a significant book of business that would travel with him to any such venture.  Indeed, since his bad-faith termination, Mr. Orszag's clients consistently have indicated – unprompted – that they would follow him if he formed or joined a competitor.

101.   Defendants likewise knew that Mr. Orszag had earned the trust and loyalty of Compass Lexecon's leadership and its professionals through all the work he had done over the years to protect and promote their interests.  During their discussions in the Fall of 2023, Mr. Gunby expressed his concern that a large portion of Compass Lexecon would follow Mr. Orszag to an existing competitor or a new venture if Mr. Orszag were to leave.  And, in the weeks following FTI's bad-faith termination, nearly 150 of Compass Lexecon's senior staff, organized on their own and sent a letter to Mr. Gunby and the FTI Board expressing their "strong support and respect for Jon" and their "deep alarm" with his termination, which they believed was "not in the long term best interest[s] of Compass Lexecon."  Letter to Steve Gunby and the FTI Board (Dec. 18, 2023) (attached as Ex. D).  The senior staff additionally conveyed that Mr. Orszag had been a "tireless and generous advocate both for Compass Lexecon generally and for many of us personally" and had been "instrumental in creating a collegial environment at Compass Lexecon" that "has been a critical factor in our ability to recruit and retain high quality

talent." FTI and Mr. Gunby knew and feared that Mr. Orszag would do the same at any new venture he started, and that these professionals would follow him there.

102.   On top of all that, as Mr. Gunby himself recognized, Mr. Orszag's resignation would be a material, reportable event for FTI as a public company.  So would that of his Executive Committee colleague who advised Mr. Gunby that, if Mr. Orszag resigned, he would ███  shortly thereafter.  Together, they are two of Compass Lexecon's (and FTI's) ███ ████████████  Moreover, under their employment agreements, ██████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████.  That created the real possibility that a full 25 percent of FTI's profits could disappear overnight – the very reason that Mr. Orszag had repeatedly warned Mr. Gunby and other FTI executives that FTI's SEC filings were materially misleading.

103.   Defendants knew terminating Mr. Orszag (purportedly for Cause) and suing him on top of that would create legal uncertainty, and thereby prevent or delay Mr. Orszag from launching a competing venture.  Among other things, FTI believed that with the lawsuit pending, it would be more difficult for Mr. Orszag to fund a new venture, colleagues at Compass Lexecon and other firms who wanted to work with Mr. Orszag would be concerned about joining a new venture that would launch under a cloud, and clients would be cautious to move business to a venture that would be mired in litigation.  As Mr. Gunby has conceded, FTI believed that simply by tying Mr. Orszag up in litigation, it could avoid having to compete at all for at least a year, and to compete fully and fairly for perhaps even longer.

104.   That would also buy FTI time to change its risk disclosures to investors, given the material inaccuracies Mr. Orszag had long insisted that it correct.  Although only ██ Compass

Lexecon professionals in the United States and Europe were so bound, FTI's risk disclosures stated that "[s]ubstantially all of our written employment agreements with our Senior Managing Directors and equivalent employees include non-competition and non-solicitation covenants."  In early 2024, FTI changed that language to simply state that: "While our written employment agreements with our Senior Managing Directors and equivalent employees may include non-competition and non-solicitation clauses, such clauses may offer us only limited or no protections and may be unenforceable in one or more jurisdictions."[12]

105.   In moments of candor, Mr. Gunby has admitted the essential elements of Defendants' fraudulent scheme.  In particular, he has advised senior Compass Lexecon professionals that FTI had no choice but to terminate Mr. Orszag because he had said he would resign, and FTI could not allow him to exercise his contract right to leave and compete. Mr. Gunby has told others that he was simply trying to "tie [Jon] up in litigation for as long as possible," believing that litigation would hinder Mr. Orszag's ability to raise money from potential funders and attract professionals to his new venture.  Mr. Gunby has expressed his hope that FTI's lawsuit would sufficiently embarrass Mr. Orszag to dissuade clients and colleagues from working with him, and he has repeatedly referenced the lawsuit as an argument why Compass Lexecon professionals should not join Mr. Orszag at a new business.  In recent weeks, Mr. Gunby has advised Compass Lexecon professionals that the lawsuit was originally filed to keep Mr. Orszag from leaving, and continues to be prosecuted to prevent Mr. Orszag from ever competing against FTI.

---

[12] FTI Consulting, Inc., 2023 Annual Report (Form 10-K) at 23 (Feb. 22, 2024), https://ir.fticonsulting.com/static-files/995ad49b-57ef-45fd-91f0-a21f815cadf8.

106.    FTI and Mr. Gunby have been unjustly enriched as a direct consequence of their fraudulent scheme.  To protect the interest of clients and colleagues, Mr. Orszag entered into a consulting agreement so that he could continue to provide the expert services for which he had been retained.  In the twelve months after his bad-faith termination, Mr. Orszag has been responsible for generating significant revenue for FTI.  The vast majority of those fees (and those of other colleagues who would have followed him) would have been paid to Mr. Orszag but for Defendants' fraud.

### COUNT I
### FRAUD
### (against All Defendants)

107.    Mr. Orszag re-alleges and incorporates by reference his allegations above.

108.    Mr. Gunby, acting on behalf of FTI, falsely represented to Mr. Orszag on multiple occasions that FTI and Mr. Gunby were negotiating with him "transparently and in good faith," that they welcomed and encouraged an open exchange of positions, and sought a resolution that would lead Mr. Orszag to stay at Compass Lexecon.  On November 5, 2023, FTI and Mr. Gunby further advised Mr. Orszag that he "would work with [him] expeditiously and without delay," and hoped to "find a path forward for [Mr. Orszag] to remain at the firm" – but needed more time "to think about all of this."

109.    Defendants knew their representations to Mr. Orszag were false.  Defendants never intended to and did not negotiate with Mr. Orszag transparently or in good faith, and they had no intention of keeping Mr. Orszag as an employee of the firm.  Rather, Defendants needed to prevent Mr. Orszag from resigning (as was his contractual right) and then competing against FTI at a new employer or new venture.  Despite Mr. Gunby's false representation, Defendants did not need more time to think about the negotiations.  Rather, Defendants needed more time for their outside counsel to prepare a lawsuit against Mr. Orszag so that, when they purported to fire

Mr. Orszag for Cause, they could immediately sue him to enforce what they knew to be legally invalid Non-Competition and Non-Solicitation Covenants in his Employment Agreement. Mr. Gunby has admitted that FTI sued Mr. Orszag in bad faith to slow him down, all in furtherance of Defendants' fraudulent scheme.

110.    Defendants' misrepresentations were made with the purpose of defrauding Mr. Orszag so that he would not voluntarily resign, as he had told them he would do, and as was his right.  Defendants knew that Mr. Orszag had the right to resign and compete at any time – that right is clearly spelled out in his Employment Agreement and was specifically discussed with FTI's General Counsel prior to its execution.

111.    Mr. Orszag reasonably relied on Defendants' misrepresentations, which were made by the CEO of a public company concerning a matter that was material to FTI and its shareholders.  He continued to negotiate with Defendants and in reliance on Defendants' statements that they were willing to negotiate in good faith, were actively considering his proposals, and wanted him to remain at the firm.

112.    But for Mr. Gunby's misrepresentation, Mr. Orszag would have voluntarily resigned, as he was contractually entitled to do, and set up a new firm to compete against them.

113.    As a result of FTI's fraud, Mr. Orszag has been deprived of compensation, bonuses, loan forgiveness, and the key-man insurance policy that he is entitled to under the Employment Agreement; his reputation has been harmed; and he has lost profits he would have earned absent the fraud.  Mr. Orszag suffered injury in California, where he lives and works.

114.    As a direct result of FTI's fraud, it has been unjustly enriched.  FTI has received revenue that would have gone to Mr. Orszag but for its fraud.

115.     The unlawful conduct alleged above was engaged in and/or ratified by the officers, directors, and/or managing agents of FTI, including Defendant Gunby, who committed the acts alleged herein maliciously, fraudulently, and/or oppressively in conscious disregard of Mr. Orszag's rights.  Mr. Orszag is therefore entitled to recover punitive damages.

<u>COUNT II</u>
**WRONGFUL TERMINATION/ABUSIVE DISCHARGE
IN VIOLATION OF PUBLIC POLICY
(against FTI)**

116.     Mr. Orszag re-alleges and incorporates by reference his allegations above.

117.     FTI was Mr. Orszag's employer in 2023.  On November 20, 2023, Defendants discharged Mr. Orszag, purportedly for Cause, in violation of California public policy.

118.     FTI discharged Mr. Orszag for Cause to prevent him from resigning his employment (as he was contractually entitled to do) and competing with them on the merits (as he was also contractually entitled to do), which would have revealed that FTI's securities disclosures were materially misleading, and would itself have been a material, disclosable event.

119.     Defendants discharged Mr. Orszag in violation of public policy: (a) in retaliation for his complaints to Mr. Gunby and to FTI's General Counsel that FTI's securities disclosures were materially misleading, because they falsely suggested that most Compass Lexecon senior staff were bound by non-competes, when in fact all but ███ of the senior professionals in the United States and Europe could leave and compete against Compass Lexecon at any time; and/or (b) in retaliation for him indicating that he intended to exercise his right to compete consistent with fundamental California public policy, including California Business & Professions Code § 16600 *et seq*.

120.     Had Mr. Orszag resigned (as he was contractually entitled to do) and competed with Compass Lexecon, as he had indicated, Mr. Gunby and FTI's General Counsel knew and

understood that much of the Compass Lexecon staff was likely to follow Mr. Orszag, without any solicitation on his part, resulting in the materialization of the risk that FTI had failed to disclose in its public securities filings.  FTI and Mr. Gunby wrongfully discharged Mr. Orszag to hide FTI's material nondisclosure in violation of the federal securities laws, to buy time to change FTI's securities disclosures, and in retaliation for Mr. Orszag's complaints about FTI's securities disclosures (which were complaints Mr. Orszag reasonably believed to be about violations of applicable federal and other statutes, regulations, and laws requiring publicly traded companies like FTI to make accurate disclosures and to avoid material misstatements in their public filings).

121.    Following Mr. Orszag's abusive and retaliatory discharge, FTI in fact changed the materially misleading securities disclosures that Mr. Orszag had advised FTI and Mr. Gunby to change.

122.    As a result of FTI's abusive and retaliatory discharge of Mr. Orszag, he has been deprived of compensation, bonuses, loan forgiveness, and the key-man insurance policy that he is entitled to under the Employment Agreement; his reputation has been harmed; and he has lost profits he would have earned absent the abusive discharge.

123.    Mr. Orszag suffered injury in California, where he lives and works.

124.    The unlawful conduct alleged above was engaged in and/or ratified by the officers, directors, and/or managing agents of FTI, who committed the acts alleged herein maliciously, fraudulently, and/or oppressively in conscious disregard of Mr. Orszag's rights.  Mr. Orszag is therefore entitled to recover punitive damages.

<u>COUNT III</u>
**WRONGFUL TERMINATION IN VIOLATION OF CALIFORNIA LABOR CODE**
**§ 1102.5**
**(against FTI)**

125.    Mr. Orszag re-alleges and incorporates by reference his allegations above.

126.    FTI was Mr. Orszag's employer in 2023.  On November 20, 2023, Defendant discharged Mr. Orszag in violation of California Labor Code § 1102.5.

127.    FTI discharged Mr. Orszag in retaliation for his repeated complaints in 2023 to FTI's CEO Mr. Gunby, and to its General Counsel, that FTI's public disclosures were materially misleading because they falsely suggested that most Compass Lexecon senior staff were bound by non-competes, when in fact all but ▉ of the senior professionals in the United States and Europe could leave and compete against Compass Lexecon at any time.

128.    Had Mr. Orszag resigned (as he was contractually entitled to do) and competed with Compass Lexecon, Mr. Gunby and FTI's General Counsel knew and understood that most of the Compass Lexecon staff was likely to follow Mr. Orszag, without any solicitation on his part, resulting in the materialization of the risk that FTI had failed to disclose.  FTI and Mr. Gunby wrongfully discharged Mr. Orszag in retaliation for his complaints about FTI's failure to make proper securities disclosures, complaints which he reasonably believed to be violations of applicable federal and other statutes, regulations, and laws requiring publicly traded companies like FTI to make accurate disclosures and to avoid material misstatements in their public filings.

129.    Following Mr. Orszag's wrongful and retaliatory termination, FTI in fact changed the materially misleading securities disclosures that Mr. Orszag had advised FTI to change.

130.    As a result of FTI's wrongful termination of Mr. Orszag, he has suffered damages, including, without limitation, deprivation of compensation, bonuses, loan forgiveness, and the

key-man insurance policy that he is entitled to under the Employment Agreement; his reputation has been harmed; and he has lost income he would have earned absent the wrongful termination.

131.    Mr. Orszag suffered injury in California, where he lives and works.

132.    The unlawful conduct alleged above was engaged in and/or ratified by the officers, directors, and/or managing agents of FTI, who committed the acts alleged herein maliciously, fraudulently, and/or oppressively in conscious disregard of Mr. Orszag's rights.  Mr. Orszag is therefore entitled to recover punitive damages.

## COUNT IV
## BREACH OF CONTRACT
### (against FTI)

133.    Mr. Orszag re-alleges and incorporates by reference his allegations above.

134.    Mr. Orszag and FTI entered into the Employment Agreement effective as of January 1, 2023.  Mr. Orszag has performed under the Employment Agreement.

135.    Under Section 7(b) of the Employment Agreement, "Employee's termination for Cause will be effective immediately upon Company mailing or transmitting notice of such termination, provided such notice is given within 90 days after the discovery by Company of the event or conduct giving rise to grounds to terminate Employee for Cause.  Before terminating Employee for Cause under subsections (ii) through (vi) above, Company will specify in writing to Employee the nature of the act, omission or failure that it deems to constitute Cause and if the action is curable, give Employee at least thirty (30) days from the receipt of such notice to correct the situation (and thus avoid termination for Cause)."

136.    In violation of Section 7(b) of the Employment Agreement, FTI failed to give Mr. Orszag written notice specifying the nature of the act, omission, or failure that it deemed to constitute Cause *before* terminating him on November 20, 2023.

137.    In violation of Section 7(b) of the Employment Agreement, FTI failed to give Mr. Orszag at least 30 days to cure the act, omission, or failure that FTI deemed to constitute Cause before terminating him on November 20, 2023.  Defendants have conceded that the purported Cause was curable because Mr. Gunby could have told Mr. Orszag at any time to stop negotiating and to stop requesting any restructuring of the relationship between FTI and Compass Lexecon.  In Mr. Gunby's own words: "I guess I could have[,]" but "I never said stop making these demands."

138.    In violation of Section 7(b) of the Employment Agreement, FTI failed to identify any act, omission, or failure by Mr. Orszag that actually constitutes "Cause" as defined therein and that occurred within 90 days after the discovery by FTI of the event or conduct purportedly giving rise to grounds to terminate Mr. Orszag for Cause.  There was no Cause, as Mr. Orszag did not engage in any conduct violating the Cause provisions.

139.    In further violation of Section 7(b) of the Employment Agreement, FTI failed to specify the actual basis for Mr. Orszag's termination and claimed in bad faith that he had violated the Cause provisions of the contract without any good-faith factual basis for doing so.

140.    On October 2, 2024, Mr. Gunby admitted that the conduct identified in the Termination Letter did not, in fact, constitute Cause.  For example, Mr. Gunby conceded that "[a] request to sell Compass Lexecon . . . is not by itself a firing offense" and in discussions of a potential sale, Mr. Orszag "did not provide details of the valuation of such a transaction." Mr. Gunby further admitted that a "threat to resign and go compete" is "not a basis for firing, not for cause."  And neither was predicting that "other [Compass Lexecon] clients and staff" would choose to leave if Mr. Orszag left.  The Chairman of FTI's Board also conceded that FTI

terminated Mr. Orszag to stop him from competing after Mr. Orszag refused to relinquish his express contractual rights to resign and compete.

141.   It was reasonably foreseeable that FTI's breach of the Employment Agreement would prevent Mr. Orszag from starting a competing venture and from earning the revenue associated with such a firm.  That was FTI's goal in breaching the Employment Agreement.

142.   As a result of FTI's breaches of the Employment Agreement, Mr. Orszag has been deprived of compensation, bonuses, loan forgiveness, and other benefits that he is entitled to under the Employment Agreement; his reputation has been harmed; and he has lost profits he would have earned absent the breaches.

## COUNT V
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS
### (against All Defendants)

143.   Mr. Orszag re-alleges and incorporates by reference his allegations above.

144.   Defendants engaged in intentional, willful acts with malice and unlawful purpose to damage Mr. Orszag in his pursuit of lawful business.  Defendants fraudulently induced Mr. Orszag to hold off on competing based on the false representations that they were negotiating in good faith, fabricated a "for Cause" termination, and then filed a lawsuit against Mr. Orszag in bad faith, seeking to enforce what Defendants knew to be legally invalid restrictive covenants in a contract that they themselves have breached, solely for the admitted malicious intent of slowing down Mr. Orszag and embarrassing him to prevent him from competing with them or pursuing meaningful employment.

145.   By these acts, Defendants intentionally and willfully delegitimized Mr. Orszag's business relationships with potential investors, lenders, employees, and clients to discourage those parties from doing business with Mr. Orszag while litigation was pending.

146.    Mr. Orszag had possible future business relationships with investors, lenders, employees, and clients that were likely to occur but for Defendants' intentional and willful acts. Since his bad-faith termination, every single one of Mr. Orszag's dozens of clients have indicated, unprompted, that they would have followed him were he to launch a competitor.  For example, shortly after his termination, the General Counsel of Client A volunteered to Mr. Orszag that "we would be staying with you."  Likewise, Mr. Orszag's long-standing client Client B insisted in early 2024 that Mr. Orszag continue serving as its expert wherever he worked, refusing to work with anyone else.[13]  During that same time period, numerous colleagues also have independently reached out and advised Mr. Orszag that they would follow him to any competing venture – i.e., without any solicitation.  Multiple future investors in his prospective venture also have reaffirmed their interest to fund its launch.  But just as FTI planned, its improper lawsuit and bad-faith termination scheme prevented all of these business relationships from forming at a new venture.

147.    As a result of Defendants' interference, Mr. Orszag lost profits he would have earned absent the interference, and has suffered reputational harm.  Defendants have also been unjustly enriched by their actions, as they have received more than a hundred million dollars in revenue that otherwise would have flowed to Mr. Orszag.  Mr. Orszag suffered injury in California, where he lives and works.

### COUNT VI
### UNJUST ENRICHMENT
### (against All Defendants)

148.    Mr. Orszag re-alleges and incorporates by reference his allegations above.

---

[13] The identities of Clients A and B are highly confidential, and will be disclosed to counsel for Defendants subject to the Protective Order.

149.    By virtue of their fraudulent scheme, Defendants have improperly received an undeserved benefit from Mr. Orszag in the form of more than a hundred million dollars in revenue generated on his matters that would have gone to Mr. Orszag and his new venture but for their wrongdoing.  At the time of Mr. Orszag's bad-faith termination for purported (but nonexistent) Cause, he was serving as the lead expert on multiple large matters, many of which he had been working on for years.  Those clients had a significant, vested interest in Mr. Orszag's expertise, and, as Compass Lexecon well knew when it immediately re-hired Mr. Orszag as an independent contractor, those clients needed and expected Mr. Orszag to continue working on their cases.  FTI also knew that Mr. Orszag's expert services were in high demand, and that clients were likely to hire Mr. Orszag on new matters throughout 2024 (as, in fact, happened).  If Mr. Orszag had been able to compete by starting his own venture, those clients in all likelihood would have followed him.

150.    In addition, Mr. Gunby has personally benefited in the form of tens of millions of dollars in stock sales in the months following Mr. Gunby's fraud, as FTI's stock price would have likely plummeted had Mr. Orszag resigned and competed, and had FTI lost Mr. Orszag's revenue generation.

151.    Defendants were aware of the benefit that they obtained from Mr. Orszag. Compass Lexecon tracks revenue origination on a monthly basis, and Defendants Gunby and FTI received reports indicating both the extent of Mr. Orszag's revenue generation and the fact that he was Compass Lexecon's single largest revenue generator in 2024.  Defendants were also aware that had they not fraudulently forestalled Mr. Orszag's resignation, they would not have received the financial benefits they obtained.

152.    Defendant Gunby was aware that he would not have generated a financial windfall through his stock sales but for his fraud.  Mr. Gunby had been repeatedly warned by Mr. Orszag that FTI's securities disclosures were materially misleading.  In fact, FTI and Mr. Gunby used the one-year window secured through their fraudulent scheme to correct their misleading disclosures.

153.    Under the circumstances, it would be unconscionable and inequitable to allow FTI and Mr. Gunby to retain the benefits of their fraudulent scheme.

**COUNT VII**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE**
**§§ 16600, 16600.1, 16600.5 & 17200**
**(against FTI)**

154.    Mr. Orszag re-alleges and incorporates by reference his allegations above.

155.    Throughout the relevant time period, Mr. Orszag lived and worked in the State of California, as specifically and expressly contemplated by his Employment Agreement.  He worked out of Compass Lexecon's Century City, California office – one of two Compass Lexecon offices in the State of California.

156.    Throughout the relevant time period, FTI did business in the State of California, operating multiple offices with hundreds of employees.  FTI was aware of California's statutory prohibition on attempting to enforce a non-compete clause, disclosing in its SEC filings that non-compete clauses had been banned in multiple jurisdictions, including California.  FTI additionally acknowledged that California's ban on enforcing non-compete clauses extended "to agreements created out-of state."

157.    California Business & Professions Code § 16600 categorically prohibits restraints of trade or restrictive covenants (such as any non-compete provisions, non-solicit provisions, and overly broad confidentiality provisions) in a contract with a California-based employee (subject

only to statutory exceptions within the Business & Professions Code not applicable here). It renders "every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind" void "to that extent," such as Mr. Orszag's Employment Agreement and the restrictive covenants therein. Cal. Bus. & Prof. Code § 16600(a), (b)(1).

158.    California Business & Professions Code § 16600.5 prohibited FTI, Mr. Orszag's former employer, from attempting to enforce any invalid restrictive covenant in his Employment Agreement, including but not limited to the non-compete provision. *Id.* § 16600.5(a) ("Any contract that is void under this chapter is unenforceable regardless of where and when the contract was signed."); *id.* § 16600.5(b) ("An employer or former employer shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed.").

159.    FTI willfully violated California's prohibition on enforcing invalid restrictive covenants. With full knowledge of California law, which proscribed any attempt to enforce an invalid restrictive covenant against a California employee without regard to where a contract may have been signed, FTI in bad faith attempted to enforce multiple invalid restrictive covenants (including an invalid (and inapplicable) non-compete clause and an invalid non-solicitation clause). That constitutes "a civil violation" under California law. *Id.* § 16600.5(d).

160.    Because Mr. Orszag was employed after January 1, 2022, FTI was also required under California law to provide him with statutory notice that any non-compete clause in his Employment Agreement was void as a matter of law. FTI failed to provide any such notice by February 14, 2024, as required by statute, or ever, which independently constitutes an act of unfair competition under California Business & Professions Code § 17200 *et seq.* *Id.* § 16600.1(b)(1), (c). Instead, FTI wrote to Mr. Orszag on February 14, 2024 and falsely

advised him that the California statute did not apply, in violation of the plain language of Section 16600 *et seq.*

161.    Mr. Orszag has suffered injury in fact and has lost money or property as a result of the unfair competition, and has also suffered damages as a result of FTI's unlawful attempt to enforce prohibited and otherwise invalid restrictive covenants.  Mr. Orszag lost profits he would have earned absent the interference, and has suffered reputational harm.  He additionally incurred legal fees and other costs that he is entitled to recover under California law.  *Id.* § 16600.5(e)(2).

## PRAYER FOR RELIEF

WHEREFORE, Mr. Orszag respectfully requests that the Court:

a.  Permanently enjoin Defendants from tortiously interfering with Mr. Orszag's business relationships;

b.  Declare the restrictive covenants in Mr. Orszag's Employment Agreement invalid;

c.  Award Mr. Orszag compensatory damages for the harm caused by Defendants;

d.  Order Defendants to disgorge all improper gains;

e.  Award Mr. Orszag punitive damages;

f.  Hold Defendants jointly and severally liable for all damages resulting from their unlawful conduct;

g.  Award Mr. Orszag his reasonable costs and expenses incurred in this action, including attorneys' fees;

h.  Award Mr. Orszag pre- and post-judgment interest at the interest rate allowed by law; and

i.  Award all further relief the Court deems just and proper.

DATED:  January 17, 2025                By:    */s/ Mark C. Hansen*                

                                  Mark C. Hansen (State Bar No. 12266)
                                  James M. Webster, III (State Bar No. 23376)
                                  David L. Schwarz (admitted *pro hac vice*)
                                  Kevin D. Horvitz (admitted *pro hac vice*)
                                  Rachel T. Anderson (admitted *pro hac vice*)
                                  KELLOGG, HANSEN, TODD,
                                    FIGEL & FREDERICK, P.L.L.C.
                                  1615 M Street, N.W., Suite 400
                                  Washington, D.C. 20036
                                  Tel.: (202) 367-7900
                                  Fax: (202) 326-7999
                                  Email: mhansen@kellogghansen.com
                                  Email: jwebster@kellogghansen.com
                                  Email: dschwarz@kellogghansen.com
                                  Email: khorvitz@kellogghansen.com
                                  Email: randerson@kellogghansen.com

                                  *Counsel for Defendant and*
                                  *Counterclaim Plaintiff Jonathan Orszag*

## **DEMAND FOR JURY TRIAL**

Mr. Orszag hereby requests a trial by jury on all issues raised herein.

                                  */s/ Mark C. Hansen*                
                                  Mark C. Hansen

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 17, 2025, the foregoing document was filed through the ECF system, which caused a copy of the document to be served on all registered participants identified on the Notice of Electronic Filing.

*/s/ Mark C. Hansen*
Mark C. Hansen

KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.

*Counsel for Defendant and*
*Counterclaim Plaintiff Jonathan Orszag*