**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

FTI CONSULTING, INC.,

                *Plaintiff*,

    v.

JONATHAN M. ORSZAG,

                *Defendant.*

Case No. 8:23-cv-03200-BAH

JONATHAN M. ORSZAG,

                *Counterclaim Plaintiff*,

    v.

FTI CONSULTING, INC. AND
STEVEN H. GUNBY,

                *Counterclaim Defendants.*

**COUNTERCLAIM PLAINTIFF JONATHAN M. ORSZAG'S**
**OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ........................................................................................................................1

BACKGROUND ..........................................................................................................................1

    A.    Mr. Orszag's Contractual Rights To Resign and To Compete
        (2022-2023)...................................................................................................................2

    B.    FTI Poisons Its Relationship with Compass Lexecon (Early 2023
        to Mid-2023) ...............................................................................................................3

    C.    Defendants' Scheme To Defraud Mr. Orszag (Late 2023 to 2024).......................4

    D.    The Aftermath of Mr. Orszag's Wrongful Termination .........................................8

PROCEDURAL HISTORY............................................................................................................9

LEGAL STANDARD...................................................................................................................10

ARGUMENT ..............................................................................................................................10

I.    Mr. Orszag Has Stated a Claim for Fraud Against FTI and Mr. Gunby
    (Count I).........................................................................................................................11

II.    California Law Governs Mr. Orszag's Non-Fraud Counterclaims...................................15

    A.    The Court Must Address Choice of Law Issue-by-Issue and Take
        Mr. Orszag's (Not FTI's) Allegations as True......................................................15

    B.    Mr. Orszag's Allegations Establish That California Law Governs ......................16

III.    Mr. Orszag Has Stated a Claim for Wrongful Termination (Count II) ............................19

IV.    Mr. Orszag Has Stated a Claim Under California Labor Code § 1102.5 .........................22

V.    Mr. Orszag Has Stated a Claim for Breach of Contract (Count IV)................................23

    A.    FTI Failed To Give the Contractually Required Notice *Before*
        Termination...............................................................................................................23

    B.    FTI Mischaracterized Its Grounds for Termination as "Uncurable" ...................24

    C.    FTI Reads the for-Cause Protections out of the Contract ....................................24

VI.    Mr. Orszag Has Stated a Claim for Tortious Interference (Count V)...............................25

VII.    Mr. Orszag Has Stated a Claim for Unjust Enrichment (Count VI) ................................ 27

VIII.   Mr. Orszag Has Stated a Claim Under California's Prohibition on
        Restrictive Covenants (Count VII) ................................................................................. 29

CONCLUSION .................................................................................................................... 30

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES

*Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502
    (D. Md. 2013) ....................................................................................................12

*Adler v. Am. Standard Corp.*, 538 F. Supp. 572 (D. Md. 1982) ....................................21

*Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260
    (Md. 1994) .......................................................................................................26

*Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038
    (Md. 1995) .......................................................................................................11

*Appel v. Hupfield*, 84 A.2d 94 (Md. 1951) ...................................................................12

*Application Grp., Inc. v. Hunter Grp., Inc.*, 72 Cal. Rptr. 2d 73
    (Cal. Ct. App. 1998)...........................................................................................18

*AXE Props. & Mgmt., LLC v. Merriman*, 311 A.3d 376 (Md. 2024)..........................28

*Baker ex rel. Thomas v. Gen. Motors Corp.*, 522 U.S. 222 (1998) ...............................30

*Banko v. Apple Inc.*, 20 F. Supp. 3d 749 (N.D. Cal. 2013)....................................19, 25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................10

*Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986 (D. Md. 2019) ...........................6

*Cheney Bros., Inc. v. Batesville Casket Co.*, 47 F.3d 111 (4th Cir. 1995)....................14

*Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, *In re*,
    295 F. Supp. 3d 927 (N.D. Cal. 2018) ...............................................................12

*Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)..............................................21

*Clements v. Emery Worldwide Airlines, Inc.*, 44 F. Supp. 2d 1141 (D. Kan. 1999) ...................18

*D'Sa v. Playhut, Inc.*, 102 Cal. Rptr. 2d 495 (Cal. Ct. App. 2000) ...............................20

*Davis v. Advanced Care Techs., Inc.*, 2007 WL 2288298 (E.D. Cal. Aug. 8, 2007)....................18

*Dep't of Fair Emp't & Hous. v. Lucent Techns., Inc.*, 642 F.3d 728 (9th Cir. 2011)....................21

*Doe v. Johns Hopkins Health Sys. Corp.*, 274 F. Supp. 3d 355 (D. Md. 2017) ...........................25

*Dowell v. Biosense Webster, Inc.*, 102 Cal. Rptr. 3d 1 (Cal. Ct. App. 2009)................................29

*Edwards v. Arthur Andersen LLP*, 189 P.3d 285 (Cal. 2008) ............................................29

*Erie Ins. Exch. v. Heffernan*, 925 A.2d 636 (Md. 2007)............................................15, 16

*Evans v. United States*, 105 F.4th 606 (4th Cir. 2024) ..................................................14

*Felichko v. Schechter*, 2019 WL 1318109 (D. Md. Mar. 22, 2019)............................17

*Finch v. Hughes Aircraft Co.*, 469 A.2d 867 (Md. App. 1984)................................11

*First Union Nat'l Bank v. Steele Software Sys. Corp.*, 838 A.2d 404
    (Md. App. 2003) ...........................................................................................................14

*Focus Fin. Partners, LLC v. Holsopple*, 250 A.3d 939 (Del. Ch. 2020).....................18

*Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599 (M.D. Pa. 1994)...........................13

*Graves v. Lioi*, 930 F.3d 307 (4th Cir. 2019).........................................................16, 23

*Gross v. Sussex Inc.*, 630 A.2d 1156 (Md. 1993) ........................................................14

*Harig v. Progress Rail Servs. Corp.*, 166 F. Supp. 3d 542 (D. Md. 2015)...................25

*Hill v. Cross Country Settlements, LLC*, 936 A.2d 343 (Md. 2007)............................27

*Hobbs v. St. Martin*, 320 F. Supp. 3d 748 (D. Md. 2018) ............................................27

*Hoffman v. Stamper*, 867 A.2d 276 (Md. 2005) .........................................................14

*Hoyt v. Sprague*, 103 U.S. 613 (1881) .......................................................................30

*Ibarra v. United States*, 120 F.3d 472 (4th Cir. 1997)...............................................10

*JMP Sec. LLP v. Altair Nanotechnologies Inc.*, 2012 WL 892157
    (N.D. Cal. Mar. 14, 2012).........................................................................................19

*Jones v. Koons Auto., Inc.*, 2013 WL 3713845 (D. Md. July 15, 2013)........................17

*Kelley v. Corr. Corp. of Am.*, 750 F. Supp. 2d 1132 (E.D. Cal. 2010) ..........................19

*Khajavi v. Feather River Anesthesia Med. Grp.*, 100 Cal. Rptr. 2d 627
    (Cal. Ct. App. 2000).....................................................................................................25

*Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937 (Cal. 2003) ..........................26

*Lacks v. Ultragenyx Pharm., Inc.*, 734 F. Supp. 3d 397 (D. Md. 2024)........................28

*Lapchak v. Paradigm Biopharmaceuticals (USA), Inc.*, 2025 WL 437904
    (S.D. Cal. Feb. 7, 2025) ...............................................................................................21

*Lawson v. PPG Architectural Finishes, Inc.*, 503 P.3d 659 (Cal. 2022) .......................................23

*Lazar v. Super. Ct.*, 909 P.2d 981 (Cal. 1996) ...............................................................................11

*Levin v. Singer*, 175 A.2d 423 (Md. 1961) ....................................................................................15

*Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737 (D. Md. 2003).........................11

*McLain v. Great Am. Ins. Cos.*, 256 Cal. Rptr. 863 (Cal. Ct. App. 1989) ....................................25

*Merritt, Hawkins & Assocs., LLC v. Caporicci*, 2016 WL 1757251
(Tex. App. May 2, 2016) ...........................................................................................................18

*Miller v. U.S. Foodservice, Inc.*, 405 F. Supp. 2d 607 (D. Md. 2005) ..........................................21

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023) .......................................................30

*Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663 (Md. 1984)............................................................26

*NetRoadshow, Inc. v. Carrandi*, 2025 WL 99754 (N.D. Ga. Jan. 7, 2025),
*appeal pending*, No. 25-10388 (11th Cir.)...........................................................................16, 29

*Niday v. Roehl Transp., Inc.*, 934 N.W.2d 29 (Iowa Ct. App. 2019) ............................................18

*Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40 (1st Cir. 1994)............................................................16

*Plotkin v. Lehman*, 1999 WL 259669 (4th Cir. Apr. 30, 1999) .....................................................16

*Poer v. FTI Consulting, Inc.*, 2024 WL 4859085 (N.D. Cal. Nov. 20, 2024) ..............................29

*Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 239 Cal. Rptr. 3d 908
(Cal. Ct. App. 2018)...................................................................................................................27

*Robinson v. Am. Honda Motor Co.*, 551 F.3d 218 (4th Cir. 2009)................................................30

*Ross v. Cnty. of Riverside*, 248 Cal. Rptr. 3d 696 (Cal. Ct. App. 2019)........................................22

*Sass v. Andrew*, 832 A.2d 247 (Md. App. 2003) ...........................................................................14

*Scott v. Burbank Unif. Sch. Dist.*, 2023 WL 3609302 (Cal. Ct. App. May 24, 2023)..................17

*SpinCycle, Inc. v. Kalender*, 186 F. Supp. 2d 585 (D. Md. 2002).................................................11

*Super. Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F. Supp. 2d 298 (2000),
*adhered to on denial of reconsideration* (D. Md. June 27, 2000) ....................................16

*Tameny v. Atl. Richfield Co.*, 610 P.2d 1330 (Cal. 1980).......................................................19, 20

*Techno Lite, Inc. v. Emcod, LLC*, 257 Cal. Rptr. 3d 643 (Cal. Ct. App. 2020)............................21

v

*TGG Ultimate Holdings, Inc. v. Hollett*, 224 F. Supp. 3d 275 (S.D.N.Y. 2016) ..........................18

*Tobacco II Cases*, *In re*, 207 P.3d 20 (Cal. 2009) .......................................................................12

*U.S. Tobacco Cooperative Inc. v. Big South Wholesale of Virginia, LLC*,
    899 F.3d 236 (4th Cir. 2018) ...............................................................................................16

*Universal Health Servs., Inc. v. United States*, 579 U.S. 176 (2016) ............................................13

*Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386
    (M.D.N.C. 2003) ............................................................................................................ 12-13

*Ward Dev. Co. v. Ingrao*, 493 A.2d 421 (Md. App. 1985) ...........................................................13

*Wholey v. Sears Roebuck*, 803 A.2d 482 (Md. 2002) .............................................................20, 22

*Wimbush v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*,
    2015 WL 2090654 (D. Md. May 4, 2015) ............................................................................19

*Xia Bi v. McAuliffe*, 927 F.3d 177 (4th Cir. 2019) ......................................................................14

*Yau v. Santa Margarita Ford, Inc.*, 176 Cal. Rptr. 3d 824 (Cal. Ct. App. 2014) ...................20, 21

*Yuan v. Johns Hopkins Unive.*, 157 A.3d 254 (Md. 2017) ..........................................................21


STATUTES AND RULES

Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.* ..........................................................14

Cal. Bus. & Prof. Code

    § 16600.5..........................................................................................................................29, 30

    § 16600.5(b).....................................................................................................................29, 30

    § 16600.5(e).............................................................................................................................29

Cal. Lab. Code:

    § 1102.5...........................................................................................................................17, 22

    § 1102.5(b)..............................................................................................................................22

Fed. R. Evid. 201 .............................................................................................................................6

OTHER MATERIALS

FTI Consulting, Inc.:

*2023 Annual Report* (Feb. 22, 2024), https://ir.fticonsulting.com/static-files/9b254e7e-b7f1-4c6b-b130-645b7bb28bef ................................................29

Code of Ethics and Business Conduct (June 8, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000887936/00011931 2523165385/d430433d8k.htm ......................................................................12

https://finance.yahoo.com/quote/FCN/ ..................................................................6

26 Richard A. Lord, *Williston on Contracts* (4th ed. 2003) ........................13

Restatement (Second) of Conflict of Laws (1971) ...................................9, 18

Restatement (Second) of Torts (1977) ..................................................13, 15

## INTRODUCTION

Defendants' Motion is a public relations exercise masquerading as a legal filing, all in furtherance of FTI Consulting, Inc.'s ("FTI") admitted plot to stifle competition.  The Motion does not (and hardly tries to) take the Counterclaims' detailed allegations of Defendants' fraud as true.  Instead, Defendants spin an intemperate and specious counter-narrative that has no place in a motion to dismiss.  Because they have no good-faith arguments against the Counterclaims, Defendants argue the Motion as though the Court (Messitte, J.) somehow made *findings of fact* when merely holding that FTI had pleaded plausible claims in its separate complaint.  They go so far as to scrub words like "alleged" and "FTI claims" from quotations where inconvenient for their rewriting of the case's history and Judge Messitte's prior opinions.[1]  On the merits, Defendants essentially argue that Mr. Gunby has a license to lie – a shocking assertion for the CEO of a publicly traded firm – implausibly claiming that no reasonable person could have relied upon Mr. Gunby's explicit written commitments.  Then, they contend that FTI is free to operate as a California employer while flouting California statutes that govern conduct within its borders.  No such immunity exists.

Mr. Orszag's heavily documented allegations lay bare Defendants' unlawful scheme.  Taking those allegations as true, he has stated plausible claims for fraud, breach of contract, statutory violations, and each of his other counts.  The Court therefore should deny the Motion.

## BACKGROUND

Mr. Orszag is one of the world's leading antitrust and economic consultants.  *See* Answer and Counterclaims ("Counterclaims"), ECF No. 89, ¶ 1.  In 2003, he co-founded Competition

---

[1] *Compare* Mot. at 1 ("Mr. Orszag 'worked in the shadows'") *with* Mem. Op., ECF No. 80 at 4 ("Orszag was **allegedly** working in the shadows"); Mot. at 2 ("Mr. Orszag has continued his efforts to 'exploit[]' confidential information") (citation omitted) *with* Mem. Op., ECF No. 80 at 5 ("**FTI claims** that Orszag[] . . . exploited 'confidential information'").

Policy Associates, Inc. ("Compass"). FTI acquired Compass in 2005 and later merged it with Lexecon (another economic consulting firm) to create Compass Lexecon.

From its creation in January 2008 through November 20, 2023 (the date of his fraudulent termination), Mr. Orszag served on Compass Lexecon's Executive Committee and co-managed the thriving firm. *Id.* ¶ 28. But relations with Compass Lexecon's parent company, FTI, became tense after Mr. Gunby was named FTI's President and CEO in 2014. *Id.* ¶¶ 29-30. For nearly a decade, Mr. Orszag advocated on behalf of Compass Lexecon's professionals whenever disagreements arose with their parent company. Although Compass Lexecon generated roughly 25% of FTI's profits, *id.* ¶ 30, FTI treated it as a profit center, not a partner, *id.* ¶ 31.

**A.    Mr. Orszag's Contractual Rights To Resign and To Compete (2022-2023)**

In early 2023, three of Compass Lexecon's four senior leaders (including Mr. Orszag) entered into new contracts. Counterclaims ¶¶ 32-35. Because Mr. Gunby had repeatedly threatened to "bury" Mr. Orszag in litigation should he ever leave, Mr. Orszag insisted that his new agreement allow him to resign at any time and then compete without restriction. *Id.* ¶ 35.

Mr. Orszag's personal negotiations with FTI's General Counsel eventually yielded an agreement (the "Employment Agreement") that contained a non-compete potentially applicable *only* if Mr. Orszag were terminated for Cause. Section 17(c) of the agreement emphasized, "[f]or the sake of clarity, . . . unless Employee is Terminated for Cause per the terms of this Agreement, there will be no non-compete restrictions under Section 9 applicable to him following the termination of his employment." FTI also had to give "notice" of any alleged Cause for termination "within 90 days after the discovery by Company of the event or conduct giving rise to grounds to terminate" him for Cause, and "**[b]efore**" any for-Cause termination. ECF No. 87-1, Employment Agreement § 7(b) (emphasis added). Additionally, "if the action [wa]s curable," FTI had to grant Mr. Orszag 30 days to cure and thereby avoid termination. *Id.*

2

The Employment Agreement provides for different business and financial outcomes depending on the nature of its termination. If Mr. Orszag terminates (with or without "Good Reason") or if FTI terminates without Cause, Mr. Orszag is free to compete. But if FTI terminates for Cause, the Agreement purportedly saddles Mr. Orszag with a one-year non-compete and slashes his compensation (eliminating, e.g., various bonuses). Counterclaims ¶ 48.

Mr. Orszag signed the Employment Agreement in California, where he resided and still resides. *Id.* ¶ 39. The agreement expressly states that Mr. Orszag's place of employment would be Los Angeles County, California, and Mr. Orszag worked out of Compass Lexecon's Century City, California office. *Id.* ¶ 40. It also provides that Mr. Orszag would report directly to FTI's CEO, Mr. Gunby. *See* Employment Agreement § 3; Counterclaims ¶ 88.

**B.      FTI Poisons Its Relationship with Compass Lexecon (Early 2023 to Mid-2023)**

While Mr. Orszag had hoped that the January 2023 agreements would reset the Compass Lexecon-FTI relationship, FTI took a series of disastrous actions that undermined Compass Lexecon's business and caused an outcry from its professionals. Counterclaims ¶¶ 53-54. The relationship reached a breaking point in June 2023, when FTI blocked Compass Lexecon from taking on a prestigious new engagement for a ██████████ client ██████████ after initially clearing the engagement. *Id.* ¶ 55. When Compass Lexecon demanded an explanation, FTI claimed to be under a non-disclosure agreement that precluded it from identifying its secret client or the supposed conflict. FTI's Board Chairman testified that FTI's secret client was ████ ████████████████████████████████, that it had offered to hire FTI on the condition it block Compass Lexecon from working against ██████ in ████████████ litigation, and that FTI chose to accept this revenue stream without regard for the effect on Compass Lexecon. *Id.* ¶ 56.

Compass Lexecon's leadership and employees were outraged. Its Chairman – former University of Chicago Law School Dean Daniel Fischel – told Mr. Gunby that "██████



" and "███████████████████████████

██████" and that "██████████████████████████

████████████████." *Id.*  Mr. Fischel additionally accused FTI of accepting a "███████████"

from ██████, *id.*, threatened to resign, and told FTI's Chairman that Compass Lexecon ████

████████████, *id.* ¶ 57.  The rest of Compass Lexecon's Executive Committee advised FTI

they would resign too.  *Id.*

After a disastrous meeting in late June 2023 between Mr. Gunby and several of Compass

Lexecon's top professionals, Mr. Fischel demanded ████████████ in the Compass Lexecon-

FTI relationship and told Mr. Orszag that FTI needed to consider whether it "██████

████████████" to shareholders.  *Id.* ¶ 60.  Mr. Orszag communicated that advice to

FTI's General Counsel, who then forwarded the message to Mr. Gunby.  *Id.*

Thereafter, the relationship between Mr. Orszag and Compass Lexecon and FTI

deteriorated further.  *Id.* ¶¶ 62-63.  Mr. Fischel asked FTI's Board to ████████████ FTI's

unethical arrangement with ██████, while Mr. Orszag asked the Board to investigate the costs

and benefits of the Compass Lexecon-FTI relationship (after Mr. Gunby could not identify ██

██████ to Compass Lexecon).  *Id.* ¶ 62.  Contemporaneously, Mr. Gunby advised FTI's Board

that this crisis "████████████████████████."  *Id.* ¶ 74.  Days later – and without

disclosing this material nonpublic information to FTI's public investors – Mr. Gunby sold tens

of millions of dollars of FTI stock.  *Id.* ¶¶ 12-13.

**C.    Defendants' Scheme To Defraud Mr. Orszag (Late 2023 to 2024)**

After learning in September 2023 that Mr. Gunby had been defaming him in

conversations with other Executive Committee members, Mr. Orszag contacted FTI's Board

Chairman and suggested an amicable separation from FTI.  At the Chairman's request,

Mr. Orszag reiterated that position to Mr. Gunby, who sought to convince Mr. Orszag to stay. Counterclaims ¶ 63. On a September 20, 2023 call, Mr. Gunby expressed his fear that if Mr. Orszag resigned and launched a competing endeavor, as he had a contractual and statutory right to do, the entire Compass Lexecon business might depart with him, all without Mr. Orszag soliciting anyone. *Id.* ¶ 64.

Mr. Orszag and Mr. Gunby met on October 17 and again on November 2, 2023, and Mr. Orszag memorialized their conversations in follow-up emails. *Id.* ¶¶ 65, 67. Each time, Mr. Orszag told Mr. Gunby that FTI's actions had created significant trust issues – with himself and with Compass Lexecon more generally. Echoing Compass Lexecon's Chairman, Mr. Orszag explained that these issues required ██████████████████████████ ████████████████████████. *Id.* ¶ 65. Another Executive Committee member communicated the same view to Mr. Gunby in early November, writing that "████████ ████████████████████████████████████," that "████████████ ████████," and that "████████████████████████████." *Id.* ¶ 69. Mr. Orszag expressed his preference for working out a negotiated solution. If that failed, though, he indicated that he intended to exercise his contractual rights to resign and to launch a new economic consulting business. In that case, he committed to working with FTI to ensure a smooth transition that would safeguard clients' best interests. *Id.* ¶¶ 65, 68.

During these discussions in the weeks preceding his termination, Mr. Orszag again advised Mr. Gunby that FTI's securities disclosures were false and misleading. FTI's risk disclosures stated that "substantially all of our written employment agreements with our Senior Managing Directors and equivalent employees include non-competition and non-solicitation covenants," when only █ Compass Lexecon professionals in the U.S. and Europe had any non-

compete. *Id.* ¶ 6 n.1.  Mr. Orszag told Mr. Gunby that the market did not understand that nearly all of Compass Lexecon's professionals were free to walk out the door at any time to a competitor, and FTI's stock price was artificially inflated as a result.[2]

During these discussions, Mr. Gunby feigned good faith and a willingness to negotiate. Mr. Gunby knew that, if Mr. Orszag exercised his contractual rights to resign and to compete, he would almost certainly be successful (having already founded and led two leading economic consulting businesses in Compass and Compass Lexecon).  And Mr. Gunby feared the consequences.  Understanding that Mr. Orszag's potential departure put "███████████████" Mr. Gunby engaged in a fraudulent scheme to prevent that from happening.  *Id.* ¶ 74.

When Mr. Orszag requested a response by November 13, 2023, to his threshold question whether FTI would consider a structural solution, Mr. Gunby stalled for time.  In a November 5 email, Mr. Gunby praised Mr. Orszag and claimed that "I do hope that we can find a path forward for you to remain at the firm." *Id.* ¶ 8.  To delay Mr. Orszag's notice of resignation, Mr. Gunby pleaded for more time.  He told Mr. Orszag that "you have my commitment that we will work with you expeditiously and without delay" and affirmatively represented that he would "continue [the] discussions transparently and in good faith." *Id.* ¶ 70.  On this basis, Mr. Gunby asked Mr. Orszag to extend his deadline until November 27.  Mr. Orszag acknowledged Mr. Gunby's commitment to continue negotiations in "good faith" and agreed to hold off from giving notice in reliance on those express commitments. *Id.* ¶¶ 70-71, 83.

---

[2] After Mr. Orszag and others publicly announced the launch of a competing endeavor in February 2025 – i.e., the materialization of the risk that FTI had failed to disclose – FTI's stock price dropped by approximately 14.2% (from $190.16 on February 19 to $162.99 on February 20, 2025), losing roughly $1 billion in market value. *See* https://finance.yahoo.com/quote/FCN/. The Court can take judicial notice of FTI's stock drop. *See Burley v. Baltimore Police Dep't*, 422 F. Supp. 3d 986, 1011-12 (D. Md. 2019); Fed. R. Evid. 201.

Mr. Gunby's representations were knowingly false. While committing to negotiate transparently and in good faith, Mr. Gunby had been secretly working with litigation counsel since September to manufacture a phony "for Cause" termination and to craft a baseless lawsuit that would allow FTI to try to saddle Mr. Orszag with a one-year non-compete. *Id.* ¶ 73. Mr. Gunby needed more time to implement his fraudulent scheme – acknowledged in moments of candor to numerous Compass Lexecon employees – to prevent Mr. Orszag from leaving Compass Lexecon in the short term and from ever competing in the long term. *Id.* ¶¶ 73-74.

Despite his express written commitments to Mr. Orszag, and his representation that he wanted Mr. Orszag to remain at Compass Lexecon, Mr. Gunby spent November lining up the FTI Board behind his scheme. To do so, Mr. Gunby repeatedly misled the Board. He blamed Mr. Orszag for the deterioration in the relationship, withholding that the entire Compass Lexecon Executive Committee had threatened to resign and that at least three members (including the Chairman) had told Mr. Gunby the Compass Lexecon-FTI relationship ███████████. Mr. Gunby falsely told the Board that Mr. Orszag had asked to ██████████████ (he did not), *id.* ¶ 75, and claimed that Mr. Orszag ████████ when, in fact, Mr. Orszag had repeatedly expressed his preference for restructuring the Compass Lexecon-FTI relationship. And although another Compass Lexecon Executive Committee member had advised Mr. Gunby, in writing, that if Mr. Orszag were to leave "██████████████████████████████████ ██████████████████████," Mr. Gunby falsely attributed that statement to Mr. Orszag himself. *Id.*

At a November 17, 2023 Board meeting, Mr. Gunby convinced the Board to approve the final step in his fraud. After again misleading the Board about his discussions with Mr. Orszag, Mr. Gunby led the Board through a ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████. *Id.*

¶¶ 76-77.  As FTI's Chairman conceded under oath, one reason the Board claimed Cause was so it could argue that Mr. Orszag was subject to a one-year non-compete.  *Id.*

On November 20, 2023, Mr. Gunby called Mr. Orszag in California and informed him that he had been terminated "for Cause."  *Id.* ¶ 78.  FTI provided no prior notice.  Instead, after the call, FTI sent a Notice of Termination, falsely claiming "Cause."  *Id.* ¶ 80; Ex. A.  Everything supposedly constituting Cause occurred *before* Mr. Gunby's November 5 communication advising Mr. Orszag that he wanted him to remain at Compass Lexecon and committing to negotiate in good faith.  Counterclaims ¶ 80.  Mr. Gunby admitted under oath that none of the specific acts identified in the Termination Notice actually constituted Cause or were incurable.  *Id.* ¶ 81.

Making good on Mr. Gunby's threats to bury Mr. Orszag in litigation, FTI filed a bad-faith suit that same day.  Mr. Gunby later bragged to colleagues that FTI brought suit to embarrass Mr. Orszag in the hope that it would undermine his relationships with his colleagues and clients and thereby prevent Mr. Orszag from launching a competing venture.  *Id.* ¶ 79.

**D.    The Aftermath of Mr. Orszag's Wrongful Termination**

The very day of his termination, Compass Lexecon asked Mr. Orszag to enter into an independent contractor agreement so that he would continue to work for Compass Lexecon.  To avoid any disruption to his clients and colleagues, Mr. Orszag agreed.  Counterclaims ¶ 97.  While working to get out from under the cloud cast by FTI's bad-faith suit, Mr. Orszag devoted himself to serving clients, having what Compass Lexecon's Chairman described as "the most successful year of any economic consultant in our history and as far as I know in any consulting firm's

history." *Id.* ¶ 98.  By preventing his departure, FTI retained the financial benefit of Mr. Orszag's client engagements while harming him both financially and reputationally.  *Id.*

## PROCEDURAL HISTORY

FTI sued Mr. Orszag on November 20, 2023, in Maryland state court.  After removal, FTI delayed proceedings by amending its complaint twice.  *See* ECF Nos. 1, 7, 48.

On June 13, 2024, the Court (Messitte, J.) heard argument on Mr. Orszag's motion to dismiss FTI's First Amended Complaint.  The Court considered a threshold question of which State's law governed the Employment Agreement – California law (where Mr. Orszag lived and worked) or Maryland law (pursuant to a choice-of-law provision in the agreement).

For the limited purpose of "further argument" on Mr. Orszag's motion to dismiss – "[n]*ot the entire case*" – the Court held that Maryland law applied.  ECF No. 46, Morning Hr'g Tr. 40:12-15 (emphasis added).  The Court explained that Maryland courts may depart from a choice-of-law provision if applying the law "of the chosen state would be contrary to a fundamental policy in the state which has a materially greater interest than the chosen state in the determination of a particular issue" and the law of "which," absent "an effective choice of law by the parties," would govern.  *Id.* at 38:2-13 (reciting Restatement (Second) of Conflict of Laws § 187(2) (1971)).  The Court understood that Mr. Orszag relied solely on where he resided, not where his Employment Agreement had been formed (as the complaint contained no relevant allegations).  *Id.* at 36:25-37:4.  Reasoning that the place of contracting ordinarily controls, the Court stated:  "This is normally the place where the party signs the contract, which Orszag's agreement was D.C. or Virginia . . . .[3]  So California would not be the state of applicable law without the choice of law clause."  *Id.* at 39:25-40:8.  The Court therefore held "Maryland law

---

[3] FTI's First Amended Complaint said nothing about where the Employment Agreement was signed.  The Court instead relied on an untested declaration from FTI.  *See* ECF No. 29-1.

applies to this agreement." *Id.* at 40:12. But the Court clarified that the ruling "set[ ] the ground for further argument"; it did not govern "the entire case at this point." *Id.* at 40:12-15. And the Court authorized discovery into why FTI had terminated Mr. Orszag. *See* ECF No. 47.

After FTI amended its complaint a second time, Mr. Orszag moved to dismiss it as well. The Court granted that motion in part and denied it in part in December 2024. *See* ECF No. 81. The Court dismissed Counts I and II as moot, as the purported non-compete and non-solicit provisions had expired on November 20, 2024. *See* ECF No. 80 at 10. It also held (over Mr. Orszag's objection) that, under Maryland law, those provisions could be narrowed by its "blue-penciling." *See id.* at 12-16. Assuming as true the facts alleged in the complaint, as required on a motion to dismiss, the Court allowed FTI's claims for breach of contract and breach of fiduciary duty to proceed. *See id.* at 18-20.

On January 17, 2025, Mr. Orszag filed his answer, affirmative defenses, and counterclaims against FTI and Mr. Gunby. *See* ECF Nos. 87, 88, 89.

## LEGAL STANDARD

The Court is duty-bound to "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). And the factual allegations in the complaint need only "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

Defendants make no serious effort to meet Mr. Orszag's allegations as pleaded. Instead, to distract from their fraud, they level a series of personal attacks predicated on contesting the well-pleaded factual allegations in the Counterclaims. Defendants can argue a competing narrative to the jury in due course but they offer no basis to dismiss the Counterclaims.

## I.    Mr. Orszag Has Stated a Claim for Fraud Against FTI and Mr. Gunby (Count I)

Mr. Orszag has alleged that, on November 3 and 5, 2023, Mr. Gunby asked him to delay any resignation by representing that negotiations were ongoing, by committing to continue negotiating "transparently and in good faith," by promising to work with Mr. Orszag "expeditiously and without delay," and by emphasizing that he wanted to "find a path forward for [Mr. Orszag] to remain at the firm." Counterclaims ¶ 108 (brackets in original). Each statement was knowingly false when made. Further, each was intended to keep Mr. Orszag from exercising his contractual rights to resign and to compete so that FTI could ambush him with a manufactured termination "for Cause." Mr. Orszag relied on those express commitments from his direct superior in declining to resign and compete, and this fraud cost him a year's worth of earnings as FTI's competitor rather than its indentured servant. *Id.* ¶¶ 111-113.

Under both California and Maryland law, these allegations plead fraud with specificity:[4] (1) Mr. Gunby made multiple false representations, (2) knowing they were false when made, (3) to induce Mr. Orszag *not* to exercise his contractual rights to resign and to compete, (4) Mr. Orszag reasonably relied on those misrepresentations in holding off from giving notice of his resignation, and (5) he suffered injury as a result. *See SpinCycle, Inc. v. Kalender*, 186 F. Supp. 2d 585, 590 (D. Md. 2002) (citing *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1047 (Md. 1995)); *Lazar v. Super. Ct.*, 909 P.2d 981, 984 (Cal. 1996).

Defendants cannot contest the core elements of Mr. Orszag's fraud claim. They cannot deny that Mr. Gunby made these specific statements, as they are documented in writing. They cannot dispute that Mr. Gunby's representations were false when made, as FTI's Board

---

[4] "In all material respects, the California law of fraud is identical to that of Maryland." *Finch v. Hughes Aircraft Co.*, 469 A.2d 867, 888 (Md. App. 1984). That moots Defendants' choice-of-law argument. *See Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 750 (D. Md. 2003) (absent a dispositive conflict between state laws, "the choice is immaterial").

Chairman testified that FTI had hired litigation counsel to pursue legal claims at least two months earlier.  Counterclaims ¶ 73.  And they cannot seriously deny that Mr. Gunby's misrepresentations were intended to induce reliance.  Mr. Orszag had asked for an answer by no later than November 13, and Mr. Gunby sought more time (in consideration for which he committed to negotiate transparently and in good faith) precisely to convince Mr. Orszag to delay any resignation.

Instead, Defendants deny (at 7-10) that Mr. Gunby's statements were "material" and assert that no reasonable person in Mr. Orszag's position could have relied on the commitments made by FTI's CEO.  Maryland law says otherwise.  *See Appel v. Hupfield*, 84 A.2d 94, 97 (Md. 1951) ("There is a *prima facie* presumption of honesty and fairness in the dealings of mankind, and hence when one person makes a promise to another as an inducement for a change of position, the promisee has the right to assume that the promisor has an existing intention to fulfill his promise.").  Indeed, FTI's own Code of Conduct (filed with the SEC) declares "honesty" is a principle that "should be followed *at all times*."[5]  FTI cannot tell employees that "[d]irect and honest communications and behavior are critical to the success of our firm,"[6] and then claim no one could trust statements by its President and CEO.  And, in any event, materiality is a fact issue rarely appropriate for resolution on the pleadings,[7] and Mr. Orszag has amply pleaded it.

---

[5] FTI Consulting, Inc. Code of Ethics and Business Conduct at 7 (June 8, 2023) (emphasis added), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000887936/000119312523165385/d430433d8k.htm.

[6] *Id.* at 2.

[7] *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1013-14 (N.D. Cal. 2018) (denying motion to dismiss fraud claim and quoting California Supreme Court's holding in *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009), that "materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it"); *Ademiluyi v. PennyMac Mortg. Inv. Tr. Holdings I, LLC*, 929 F. Supp. 2d 502, 533 (D. Md. 2013) (similar, under Maryland law); *see also Volumetrics Med. Imaging, Inc. v.*

Mr. Orszag alleges that Mr. Gunby made a specific request – give me more time before you exercise any right to resign – by committing to negotiate transparently and in good faith towards a resolution that would keep Mr. Orszag at Compass Lexecon.  That commitment was fraudulent because Defendants were preparing to sue Mr. Orszag and uninterested in changing FTI's relationship with Compass Lexecon.  *See* Restatement (Second) of Torts § 530(1) (1977) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.").  Whether Mr. Gunby's statements were material turns on "'the effect on the likely or actual behavior of'" Mr. Orszag, as "'the recipient of the alleged misrepresentation.'"  *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016) (quoting 26 Richard A. Lord, *Williston on Contracts* § 69:12, at 549 (4th ed. 2003)).  If *either* "(a) a reasonable man" in Mr. Orszag's position "would attach importance to" Defendants' true intentions "in determining his choice of action" *or* (b) Defendants "kn[ew] or ha[d] reason to know that" Mr. Orszag viewed that issue as important, then Mr. Gunby's false statements were material.  *Ward Dev. Co. v. Ingrao*, 493 A.2d 421, 426 (Md. App. 1985) (quoting Restatement (Second) of Torts § 538).  Defendants ignore that standard altogether.

Mr. Orszag's allegations easily satisfy both tests for materiality.  Any reasonable person in Mr. Orszag's position who knew Defendants' true intentions would have resigned.  *See Fox's Foods, Inc. v. Kmart Corp.*, 870 F. Supp. 599, 609 & n.11 (M.D. Pa. 1994) (denying summary judgment regarding fraudulent statements of intention where defendant gave "assurances" that could "be viewed as intending to induce [plaintiff] to delay asserting contractual rights").  And

---

*ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386, 414 (M.D.N.C. 2003) (in case applying North Carolina's substantively similar law, denying summary judgment given genuine issue of disputed facts as to "whether the alleged statements of future intent were material and whether the speaker had no intention of complying at the time the statement was made").

Mr. Orszag repeatedly told Mr. Gunby he would exercise his right to resign if Defendants were unwilling to entertain a restructuring.  *See* Counterclaims ¶¶ 65-68.

Mr. Gunby's statements are nothing like those found too "vague, general, or indefinite" in Defendants' cases (at 7-10).  Almost all of those cases were decided on summary judgment or after trial (not on the pleadings).[8]  Further, their facts are unlike those here.  Defendants' lead case (*First Union*) concerned generalizations and puffery stated amidst an arm's-length negotiation between two businesses about their potential future dealings (e.g., "as we grow, you'll grow").  *See* 838 A.2d at 443.  Here, by contrast, Mr. Orszag's direct superior falsely told him he had a future with the firm to entrap him into being fired on trumped-up "Cause."[9]

Defendants next argue (at 10) that "Mr. Orszag cannot plausibly contend that he relied on Mr. Gunby or FTI to share their full negotiating positions with their counterparty in the

---

[8] *See First Union Nat'l Bank v. Steele Software Sys. Corp.*, 838 A.2d 404, 425-26 (Md. App. 2003) (jury verdict); *Cheney Bros., Inc. v. Batesville Casket Co.*, 47 F.3d 111, 114 (4th Cir. 1995) (judgment as a matter of law after plaintiff rested during jury trial); *see also Hoffman v. Stamper*, 867 A.2d 276, 293 (Md. 2005) (jury trial); *Sass v. Andrew*, 832 A.2d 247, 248 (Md. App. 2003) (jury trial); *Gross v. Sussex Inc.*, 630 A.2d 1156, 1158 (Md. 1993) (summary judgment).  The only exceptions are those Defendants cite only for background procedural points (at 7), and neither the facts nor the claims in those cases resemble this one.  *Cf. Evans v. United States*, 105 F.4th 606, 609 (4th Cir. 2024) (affirming dismissal of wrongful-death claim under Federal Tort Claims Act); *Xia Bi v. McAuliffe*, 927 F.3d 177, 185-86 (4th Cir. 2019) (affirming dismissal of claims for fraud under Virginia law and federal securities laws for failure to plead justifiable reliance, based on "glaring" "omissions," such as "whether any plaintiff even relied on a given misstatement at all").

[9] Defendants' other cases are no closer.  *Cheney Brothers* (Mot. at 10) is distinguishable not only because it was decided under South Carolina law and at summary judgment, but also because it involved a customer's representation to a supplier that "'business as usual' would continue," made in the context of "arm's length" dealings between parties who, unlike here, had "no fiduciary[,] confidential," or ongoing "contractual" relationship. 47 F.3d at 114-15.  Defendants' other cases – *Hoffman*, *Gross*, and *Sass* (Mot. at 8-9) – were not vagueness cases, and *Hoffman* and *Gross* come out the wrong way for Defendants:  The court in *Hoffman* affirmed a liability judgment (remanding on damages issues), *see* 867 A.2d at 293-94, and *Gross* reversed a grant of summary judgment (expressly declining to address materiality, *see* 630 A.2d at 1163 n.5). In *Sass*, the court reversed a jury verdict for failure to prove actual reliance, which is not at issue here.  *See* 832 A.2d at 267.

negotiation." But parties to fraught negotiations enjoy no license to lie about their intentions, as FTI contends. *See Levin v. Singer*, 175 A.2d 423, 432 (Md. 1961) ("[F]raud may be predicated on promises made with a present intention not perform them."). And Mr. Orszag's fraud claim hardly turns on any expectation Defendants would volunteer "their full negotiation positions." Mr. Gunby promised to be transparent – i.e., if FTI would not entertain the threshold request for a restructuring, it would say so. And Mr. Gunby promised to continue negotiations in good faith – a representation FTI was not then working with litigation counsel to manufacture a sham termination and to file a bad-faith lawsuit. Mr. Orszag can hardly be faulted for taking FTI's CEO at his word. *See* Restatement (Second) of Torts § 544 ("The recipient of a fraudulent misrepresentation of intention is justified in relying upon it if the existence of the intention is material and the recipient has reason to believe that it will be carried out.").

## II.    California Law Governs Mr. Orszag's Non-Fraud Counterclaims

Defendants' assertion (at 5-7) that Maryland law governs all of Mr. Orszag's claims ignores settled Maryland law requiring choice of law to be addressed issue-by-issue (not in gross). Further, Judge Messitte's explicitly narrow choice-of-law holding does not control on this Motion, because the Court now must take Mr. Orszag's allegations (not FTI's allegations) as true. Applied to the Counterclaims, Maryland's choice-of-law principles establish that California law rightly governs all of Mr. Orszag's claims and, at minimum, all his tort claims.

### A.    The Court Must Address Choice of Law Issue-by-Issue and Take Mr. Orszag's (Not FTI's) Allegations as True

Because this case involves events spanning multiple States, Maryland law requires the Court to decide which law governs on an issue-by-issue basis. This doctrine, known as depeçage, often results in "applying the tort law of a foreign jurisdiction to certain issues while applying Maryland law to other issues." *Erie Ins. Exch. v. Heffernan*, 925 A.2d 636, 649 (Md. 2007).

That is because, in general, tort claims are governed by the law of the State where the injury

occurred (*lex loci delicti*) and contract claims are governed by the law of the State where a

contract was formed (*lex loci contractus*).  *See id.* (applying Delaware law to tort claim and

Maryland law to contract claim).  This conclusion holds even where a contract has a choice-of-

law provision.  *See Super. Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.*, 197 F. Supp. 2d 298,

309 (2000) (tort claims that are merely "related to the contract" are governed by background

Maryland choice-of-law rules), *adhered to on denial of reconsideration* (D. Md. June 27, 2000).

Ignoring depeçage, Defendants assert (at 6) that Maryland law must apply to all claims

that "implicate the Court's prior analysis of the restrictive covenants" as law of the case.  But

Judge Messitte disclaimed any ruling that Maryland law would govern "the entire case."

ECF No. 46, Morning Hr'g Tr. 40:12-15.  And the law-of-the-case doctrine "poses no bar to

the assessment of past holdings based on a different procedural posture" and "different facts."

*Graves v. Lioi*, 930 F.3d 307, 318 (4th Cir. 2019).[10]  Defendants cite no case holding otherwise.[11]

### B.    Mr. Orszag's Allegations Establish That California Law Governs

Taking Mr. Orszag's allegations as true, California law applies to his Counterclaims.  *First*,

Mr. Orszag's tort claims (Counts I, II, V & VI) are all governed by Maryland's *lex loci delicti*

rule, under which the law of the place of injury (California) governs.  *See supra* pp. 15-16 (citing

*Erie Ins. Exch.*, 925 A.2d at 649, and *Super. Bank*, 197 F. Supp. 2d at 309).  *Second*, Mr. Orszag's

---

[10] Judge Messitte's decision is also interlocutory, so it would not control this Court's decision in any event.  *See Plotkin v. Lehman*, 1999 WL 259669, at *1 (4th Cir. Apr. 30, 1999) (per curiam) (judgment noted at 175 F.3d 1285 (table)) (transferee court did not err in granting motion to dismiss that transferor court had denied, as "'[i]nterlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case'") (quoting *Perez-Ruiz v. Crespo-Guillen*, 25 F.3d 40, 42 (1st Cir. 1994)).

[11] Neither *NetRoadshow, Inc. v. Carrandi*, 2025 WL 99754 (N.D. Ga. Jan. 7, 2025), *appeal pending*, No. 25-10388 (11th Cir.), nor *U.S. Tobacco Cooperative Inc. v. Big South Wholesale of Virginia, LLC*, 899 F.3d 236 (4th Cir. 2018), had anything to do with choice of law.

statutory claims (Counts III & VII) are subject to the same rule.  *See Jones v. Koons Auto., Inc.*, 2013 WL 3713845, at *6 (D. Md. July 15, 2013) (applying *lex loci delicti* to statutory claims); *Scott v. Burbank Unif. Sch. Dist.*, 2023 WL 3609302, at *3 (Cal. Ct. App. May 24, 2023) (describing California Labor Code § 1102.5 claim as akin to a tort).

While the Employment Agreement's choice-of-law provision is unenforceable for the reasons discussed below, even if it applied, it would have no impact on Mr. Orszag's tort claims or his statutory claims.  The language of that provision, on its face, reaches only the contract itself.  *See* § 24 ("The internal laws of the State of Maryland (other than its conflict of laws provisions) shall exclusively govern this Agreement.").  By contrast, the choice-of-forum provision extends to any dispute "pertaining to this Agreement or to any matter arising out of or relating to this Agreement."  *Id.*  That use of vastly different language narrowly circumscribes the scope of the choice-of-law clause as this Court has repeatedly held.  In *Felichko v. Schechter*, for example, this Court refused to extend the contractual choice-of-law provision to plaintiff's fraud and negligent misrepresentation claims where the agreement "provides for the application of Delaware law to the contract itself, but it does not contain the broad 'arising out of or related to' language that would encapsulate contract-related tort claims." 2019 WL 1318109, at *9 (D. Md. Mar. 22, 2019); *see also Jones*, 2013 WL 3713845, at *6. California law therefore governs all of Mr. Orszag's tort and statutory claims.

As for the breach-of-contract claim (Count IV), as Judge Messitte explained, the Court may disregard the Employment Agreement's choice-of-law provision if applying Maryland law "would be contrary to a fundamental policy in the state which has a materially greater interest than the chosen state in the determination of a particular issue" and the law of "which, . . . in the absence an effective choice of law by the parties," would govern.  ECF No. 46, Morning Hr'g Tr.

17

38:2-13 (quoting Restatement (Second) of Conflict of Laws § 187(2)).  Mr. Orszag's allegations

establish that he signed the Employment Agreement in California and that the parties intended he

would perform his obligations in California.  Counterclaims ¶¶ 39-40.  These facts establish that

California law would govern absent any choice-of-law provision.[12]

Further, applying Maryland law "would be contrary to a fundamental policy in" California.

ECF No. 46, Morning Hr'g Tr. 38:2-13 (quoting Restatement (Second) of Conflict of Laws

§ 187(2)).  California prohibits non-compete and non-solicitation provisions, and it would violate

that policy "to allow an out-of-state employer/competitor to limit employment and business

opportunities in California."  *Application Grp., Inc. v. Hunter Grp., Inc.*, 72 Cal. Rptr. 2d 73,

86 (Cal. Ct. App. 1998) (refusing to enforce Maryland choice-of-law provision in contract with

California employee because "California has a materially greater interest than does Maryland in

the application of its law to the parties' dispute, and that California's interests would be more

seriously impaired if its policy were subordinated to the policy of Maryland").[13]

---

[12] *See, e.g.*, *Clements v. Emery Worldwide Airlines, Inc.*, 44 F. Supp. 2d 1141, 1145 (D. Kan. 1999) ("Under [the *lex loci contractus*] approach, the court looks to where the last act necessary for the creation of the contract takes place, and that state's law controls.  In employment situations, this will generally be the place where the employee accepts the job offer."); *see also Niday v. Roehl Transp., Inc.*, 934 N.W.2d 29, 38-40 (Iowa Ct. App. 2019) (collecting decades of cases from many States holding that employment contracts are formed where the employee accepted the offer, notwithstanding other conditions, as that is "the last act necessary to a meeting of the minds"); Restatement (Second) of Conflict of Laws § 196 ("The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered . . . .").

[13] *See also Focus Fin. Partners, LLC v. Holsopple*, 250 A.3d 939, 958-59 (Del. Ch. 2020) (applying Restatement (Second) of Conflict of Laws § 187(2) to find "that California has a fundamental public policy against non-competition and non-solicitation provisions and that California has a materially greater interest in that policy than Delaware's interest in promoting freedom of contract"); *Merritt, Hawkins & Assocs., LLC v. Caporicci*, 2016 WL 1757251, at *4 (Tex. App. May 2, 2016) (similar for Texas law); *TGG Ultimate Holdings, Inc. v. Hollett*, 224 F. Supp. 3d 275, 283 (S.D.N.Y. 2016) (New York); *Davis v. Advanced Care Techs., Inc.*, 2007 WL 2288298, at *7 (E.D. Cal. Aug. 8, 2007) (Connecticut).

### III.    Mr. Orszag Has Stated a Claim for Wrongful Termination (Count II)

Mr. Orszag alleges that he was employed in California, Counterclaims ¶ 20; wrongfully

terminated there in retaliation for repeatedly informing FTI's CEO and General Counsel that the

company's securities disclosures were materially misleading, and for indicating that he would

exercise his right to compete following his resignation consistent with California public policy,

*id.* ¶¶ 117-119, 126-127; and suffered harm – including loss of compensation, reputational

damage, and lost business opportunities – while living and working in California, *id.* ¶¶ 122-123,

130-131.  These allegations establish that California law governs his wrongful-termination tort

claim.  *See Wimbush v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, 2015 WL

2090654, at *7 (D. Md. May 4, 2015) (*lex loci delicti* applies to wrongful termination).[14]

They also state a claim for wrongful termination in violation of public policy (known as

a *Tameny* claim in California[15]) because they show that "his dismissal violated a policy that is

fundamental, beneficial for the public, and embodied in statute or constitutional provision."

*Kelley v. Corr. Corp. of Am.*, 750 F. Supp. 2d 1132, 1145 (E.D. Cal. 2010).  Mr. Orszag's

termination for advising FTI of its misleading securities disclosures violated public policies

promoting accurate disclosures by public companies and protecting whistleblowers.  *See Banko*

*v. Apple Inc.*, 20 F. Supp. 3d 749, 758 (N.D. Cal. 2013) (denying motion to dismiss where

plaintiff's "termination" allegedly "violate[d] the policy behind both the Sarbanes-Oxley and

Dodd-Frank Acts," including "public policies against embezzlement, illegitimate corporate tax

---

[14] By failing to address California law, Defendants have waived any argument that Mr. Orszag
failed to state a wrongful-termination claim under California substantive law.  *See JMP Sec. LLP
v. Altair Nanotechnologies Inc.*, 2012 WL 892157, at *6 (N.D. Cal. Mar. 14, 2012) (denying
motion for judgment on the pleadings because defendant "bears the burden of showing that the
applicable substantive law entitles it to judgment on the face of the pleadings," yet had failed to
"take[ ] the requisite preliminary step of ascertaining which substantive law applies").
[15] *See Tameny v. Atl. Richfield Co.*, 610 P.2d 1330 (Cal. 1980).

deductions, and encouragement of whistleblowing").  Mr. Orszag's termination for expressing

an intent to exercise contractual and statutory rights to resign and thereafter compete likewise

violates a fundamental California public policy.  *See D'Sa v. Playhut, Inc.*, 102 Cal. Rptr. 2d

495, 499 (Cal. Ct. App. 2000) (prohibition on restrictive covenants reflects fundamental public

policy, supporting a wrongful-termination claim).

Defendants assert that Mr. Orszag's claim fails because he did not "report[ ] alleged

misconduct *externally*, 'to the appropriate law enforcement or judicial official.' "  Mot. at 11

(quoting *Wholey v. Sears Roebuck*, 803 A.2d 482, 496 (Md. 2002)).  But California courts have

specifically rejected an external reporting requirement, holding that purely internal reporting of

misconduct suffices for a *Tameny* claim.  *See Yau v. Santa Margarita Ford, Inc.*, 176 Cal. Rptr.

3d 824, 832-34 (Cal. Ct. App. 2014) (reversing dismissal of wrongful termination in violation of

public policy claim where plaintiff complained internally to superiors about statutory violations).

Defendants also contend (at 11-12) that Mr. Orszag fails to plead causation by alleging

that FTI terminated him for the "*different* purpose" of "prevent[ing] or delay[ing] Mr. Orszag

from launching a competing venture."  But Defendants misread the allegations in the Counterclaims,

which demonstrate that Defendants' goals were inextricably intertwined.  Defendants needed to

sideline Mr. Orszag (through his bad-faith termination) because, if he resigned and competed, the

market would learn that FTI's securities disclosures were materially misleading.  Counterclaims

¶ 74.  Mr. Gunby himself acknowledged that, if Mr. Orszag were to leave and launch a competing

venture, many Compass Lexecon professionals would follow – demonstrating the falsity of FTI's

securities disclosures and creating the "█████" problem.  *Id.* ¶ 120.  FTI had to prevent Mr. Orszag

from competing "to buy time to change FTI's securities disclosures," *id.*, which it revised after

Mr. Orszag's abusive discharge, *id.* ¶ 121.  As Compass Lexecon's Chairman opined at the time,

had Mr. Orszag resigned and competed in 2023, ████████████████████████████████

20

███████████████████████████████████████████." *Id.* ¶ 13.  The Counterclaims further allege that Mr. Orszag advised Mr. Gunby that FTI's securities disclosures were false in the meetings immediately preceding his termination.  *See supra* p. 5.

Nothing in California law requires that the wrongful termination be motivated *solely* by the protected activity.  If either Mr. Orszag's reporting of securities violations *or* his indication that he would exercise his rights to resign and compete played a substantial factor in his termination, he has stated a claim.  *See Yau*, 176 Cal. Rptr. 3d at 831 (plaintiff need only plead that "termination was substantially motivated by a violation of public policy" to state a tort claim for wrongful termination).  FTI's suggestion (at 11-13) that it is immune from liability if any one factor that motivated it to fire Mr. Orszag were lawful contravenes California law.[16]

Even if Maryland law applied, Mr. Orszag has stated a claim because he has pled that FTI terminated him for reasons that "violate [a] clear mandate of public policy" (preventing securities fraud) and that there was "a nexus between" his "conduct" and FTI's "decision to fire" him.  *Miller v. U.S. Foodservice, Inc.*, 405 F. Supp. 2d 607, 610 (D. Md. 2005).  That is sufficient under Maryland law.  *See Adler v. Am. Standard Corp.*, 538 F. Supp. 572, 579 (D. Md. 1982) (sustaining wrongful-termination claim where plaintiff alleged "that he threatened the exposure of defendant's violations of federal tax laws, that he was fired as a result and that the

---

[16] None of Defendants' cases supports the Defendants' position.  *Yuan v. Johns Hopkins University*, 157 A.3d 254 (Md. 2017), turned on whether Food and Drug Administration regulations embodying "scientific norms" regarding "research misconduct" stated a "sufficiently clear public policy to serve as the basis for a claim of wrongful discharge," *id.* at 265 – nothing like the clear dictates of the federal securities laws.  The plaintiff in *Lapchak v. Paradigm Biopharmaceuticals (USA), Inc.*, 2025 WL 437904, at *7 (S.D. Cal. Feb. 7, 2025), failed to allege that his employer even *knew* about the alleged protected activity.  Among other distinctions, *Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam), and *Department of Fair Employment & Housing v. Lucent Technologies, Inc.*, 642 F.3d 728 (9th Cir. 2011), were decided on summary judgment and so do not bear on whether Mr. Orszag's allegations state a claim.  And *Techno Lite, Inc. v. Emcod, LLC*, 257 Cal. Rptr. 3d 643 (Cal. Ct. App. 2020), confirms California's prohibition on post-termination non-competes.

tendency of such firing was to prevent the disclosure of these violations in contravention of a

clear federal policy which is incorporated as public policy by the State of Maryland"). 

Defendants' only case (*Wholey*) concerned a security officer's investigation and internal

reporting of a retail store manager's wrongdoing.  That is worlds apart from the facts here, where

Mr. Orszag reported specific securities law violations to FTI's CEO and its General Counsel.

## IV.    Mr. Orszag Has Stated a Claim Under California Labor Code § 1102.5

Mr. Orszag has pleaded each element of a *prima facie* case under California Labor Code

§ 1102.5(b):  He (1) "engaged in protected activity, (2) [FTI] subjected [him] to an adverse

employment action, and (3) there is a causal link between the two."  *Ross v. Cnty. of Riverside*,

248 Cal. Rptr. 3d 696, 704 (Cal. Ct. App. 2019).[17]

Defendants concede (at 13-14) that California Labor Code § 1102.5 applies to Mr. Orszag.

Correctly so.  Section 1102.5(b) prohibits an employer from terminating an employee who

discloses information "to a person with authority over the employee or another employee who

has the authority to investigate, discover, or correct the violation or noncompliance . . . if the

employee has reasonable cause to believe that the information discloses a violation of state or

federal statute."  By its plain language, Mr. Orszag's internal reporting of FTI's securities

disclosure violations to Mr. Gunby – "a person with authority over the employee" – suffices.

Implicitly recognizing that Mr. Orszag's actions fall within the statute's reach, Defendants

instead assert (at 13-14) that Mr. Orszag has failed to plead "that his termination was causally

related to his complaints about FTI's public filings" and that he "alleges that he was terminated

for other reasons."  But as with Mr. Orszag's wrongful-termination tort claim, there is no

requirement that the protected activity be the *sole* reason for his termination.  So long as *any*

---

[17] On a motion to dismiss, Defendants cannot try to rebut the *prima facie* case by claiming
"a legitimate, nonretaliatory explanation for [FTI's] acts."  *Ross*, 248 Cal. Rptr. 3d at 704.

protected activity was a "contributing factor" to his termination, he has stated a claim.  *See*

*Lawson v. PPG Architectural Finishes, Inc.*, 503 P.3d 659, 666 (Cal. 2022) ("Even if the

employer had a genuine, nonretaliatory reason for its adverse action, the plaintiff still carries

the burden assigned by statute [§ 1102.5] if it is shown that the employer also had at least one

retaliatory reason that was a contributing factor in the action.").

## V.    Mr. Orszag Has Stated a Claim for Breach of Contract (Count IV)

FTI breached the Employment Agreement three times over.  *First*, FTI failed to give

Mr. Orszag pre-termination notice.  *Second*, it falsely claimed that the purported grounds

were incurable (and denied him an opportunity to cure).  *Third*, FTI fired Mr. Orszag in bad

faith, as FTI lacked any legitimate grounds for Cause.  FTI's breach injured Mr. Orszag, denying

him compensation and depriving him of the financial benefits of competing for a year.

### A.    FTI Failed To Give the Contractually Required Notice *Before* Termination

Under the Employment Agreement, FTI had to provide Mr. Orszag with notice of the

supposed conduct that created Cause *before* it could terminate him.[18]  FTI provided no such prior

notice.  Nothing in Judge Messitte's Order "directly forecloses" this breach claim, as FTI falsely

contends (at 15).  Judge Messitte never addressed the legal argument as to what the contract

required, denying only Mr. Orszag's "*factual attack* . . . on notice grounds," treating that

argument as "not suitable for resolution *at this stage*."  ECF No. 80 at 11-12 (emphases added).

His order cannot bind the Court at this "different procedural posture."  *Graves*, 930 F.3d at 318.

Because Mr. Orszag has alleged (and Defendants do not dispute) that FTI failed to provide notice

*before* purporting to terminate him, FTI breached the Employment Agreement's plain language.

---

[18] *See* Employment Agreement § 7(b) ("Before terminating Employee for Cause under
subsections (ii) through (vi) above, Company will specify in writing to Employee the nature
of the act, omission or failure that it deems to constitute Cause . . . .").

**B.** **FTI Mischaracterized Its Grounds for Termination as "Uncurable"**

FTI next contends (at 15) that Mr. Orszag failed to assert that the grounds for his termination were curable. But that ignores the well-pled allegations, including Mr. Gunby's concession, under oath, that *all* of the stated grounds for termination were, in fact, curable. Counterclaims ¶ 89. As Mr. Gunby acknowledged, he could have asked Mr. Orszag at any time to stop negotiating for better working conditions for Compass Lexecon's employees. *Id.* ¶ 137.

Each of Defendants' supposedly "uncurable and material acts" could have been cured easily. *Id.* ¶¶ 80, 97, 137. Had Mr. Orszag ever ████████████████████████ (he did not, *see id.* ¶ 68), ████████████████████ (he did not, *see id.* ¶ 81), or ██████████████████████████████████████ (he did not, *see id.*), Mr. Gunby could have directed him to stop doing so. Mr. Gunby conceded "I guess I could have," but "I never said stop making these demands." *Id.* ¶ 137. In other words, "Cause" was always curable.

Rewriting the factual allegations, FTI claims (at 15) that "Mr. Orszag's threats and demands were incompatible with conduct [*sic*] of a fiduciary." But the Counterclaims allege that FTI's Termination Notice was pretextual, that Mr. Orszag never made any of the "demands" FTI invented, and that Mr. Orszag engaged in negotiations at FTI's encouragement and only after advising the Chairman that they should work out an amicable separation. Counterclaims ¶¶ 63, 66. Defendants cannot contest these well-pled facts on a motion to dismiss.[19]

**C.** **FTI Reads the for-Cause Protections out of the Contract**

FTI next claims (at 16) that it was free to manufacture a "for Cause" termination because "the provision of the Employment Agreement defining 'Cause' is not, in and of itself, the sort of

---

[19] Whether Mr. Orszag would have resigned or chosen to cure the manufactured bases for Cause is of no consequence, *contra* Mot. at 15 n.7, because the Employment Agreement granted him that choice. FTI's breach deprived Mr. Orszag of that right and allowed FTI to claim he was subject to a one-year non-compete based on its bad-faith termination.

direct contractual obligation that can support a breach claim." And it claims (at 17) it could

invent non-existent Cause so long as it identified that fiction in the termination letter.

Defendants' position contradicts both California and Maryland law. In both States,

if an employment contract requires cause for termination, an employer who terminates an

employee without cause breaches that contract.[20] Mr. Orszag has alleged just that – i.e., that

FTI's purported grounds for his termination either never occurred or do not establish Cause.

Counterclaims ¶¶ 84-87. And Mr. Gunby has acknowledged to multiple executives on multiple

occasions "that the real reason FTI had fired and sued Mr. Orszag was to buy FTI time, and in

the hope that the litigation would embarrass Mr. Orszag." *Id.* ¶ 79; *see also id.* ¶ 140 (elaborating).

If, as the Counterclaims allege, there was no Cause, then FTI breached the contract. And that

breach injured Mr. Orszag by depriving him of both the financial benefits associated with a

termination without Cause and the ability to compete without the cloud FTI cast over him. *See*

*id.* ¶ 48 (explaining compensation impacts). FTI improperly reads these distinctions between

termination without and for Cause out of the Employment Agreement.

## VI.    Mr. Orszag Has Stated a Claim for Tortious Interference (Count V)

Mr. Orszag has alleged the essential elements of a tortious-interference claim:

Defendants engaged in intentional and willful acts – their fraud, wrongful termination, and

baseless litigation[21] – that were calculated and intended to cause him damages, were done

---

[20] *See Banko*, 20 F. Supp. 3d at 759; *Khajavi v. Feather River Anesthesia Med. Grp.*, 100 Cal.
Rptr. 2d 627, 645-46 (Cal. Ct. App. 2000); *McLain v. Great Am. Ins. Cos.*, 256 Cal. Rptr. 863,
870 (Cal. Ct. App. 1989) (affirming breach-of-contract verdict because "there was substantial
evidence to support the jury's verdict that appellants did not have cause to discharge McLain");
*accord Harig v. Progress Rail Servs. Corp.*, 166 F. Supp. 3d 542, 550 (D. Md. 2015) (denying
summary judgment on breach-of-contract claim because there was a factual dispute over whether
the employer had mischaracterized the termination as "for just cause").
[21] *See Doe v. Johns Hopkins Health Sys. Corp.*, 274 F. Supp. 3d 355, 370 (D. Md. 2017)
("wrongful" acts "include 'common law torts . . . , fraud, . . . and the institution or threat of

without right or justifiable cause, and resulted in actual damages. *See Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663, 675 (Md. 1984); *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003) (different formulation for similar elements).

Defendants' arguments (at 17-18) again contest Mr. Orszag's factual allegations, not whether they state a claim. Defendants claim that FTI could not tortiously interfere with Mr. Orszag's relationships (personally or through his anticipated new venture) with clients and employees who, they assert, belonged to Compass Lexecon. But the Counterclaims make clear that clients hired Mr. Orszag, not his employer, and multiple clients advised they would follow him to any new competing venture. Counterclaims ¶ 146. Nor are Compass Lexecon employees indentured servants to FTI. Many were upset with FTI's mismanagement and unethical actions, and Mr. Gunby acknowledged that most were likely to follow Mr. Orszag to any new venture, necessitating his fraud. *Id.* ¶ 101. Defendants unambiguously interfered with each of those very real and profitable relationships – indeed, Mr. Gunby repeatedly bragged that FTI's lawsuit was intended to disrupt Mr. Orszag's known relationships with his clients and colleagues so that none would work with him at any future venture. *Id.* ¶¶ 144-147. Defendants additionally sought to disrupt relationships with investors and lenders by the same wrongful means. *Id.*

Defendants acknowledge (at 18) that bad-faith litigation can constitute tortious conduct under Maryland law. Contesting the facts alleged in the Counterclaims, Defendants deny that FTI's litigation was brought in bad faith, relying on the Court's partial denial of FTI's motion to dismiss. But the Court had to assume the truth of FTI's specious allegations, so its decision says nothing about the merits of FTI's made-up claims. FTI knows, for example, that Mr. Orszag never competed during the year following his termination – it retained him as an independent

---

groundless civil suits . . . in bad faith' ") (quoting *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994)).

contractor the day it terminated him, and that year he was Compass Lexecon's single largest revenue generator. Yet FTI has asserted a bad-faith breach-of-contract claim alleging he competed. And Mr. Gunby has admitted that FTI filed suit to disrupt Mr. Orszag's relationships with clients and colleagues and to try to prevent competition. Counterclaims ¶ 105.

Defendants' final argument (at 18) that they did not use wrongful means fails for the same reason as their argument against Mr. Orszag's fraud claim fails. *See supra* Part I.

## VII.    Mr. Orszag Has Stated a Claim for Unjust Enrichment (Count VI)

Mr. Orszag also has pleaded all the essential elements of a claim for unjust enrichment: (1) he "conferred a benefit upon the defendant[s]; (2) the defendant[s] knew of or appreciated the benefit; and (3) the defendant[s] accepted or retained the benefit under such circumstances that it would be inequitable to allow the defendant[s] to retain the benefit without paying value in return." *Hobbs v. St. Martin*, 320 F. Supp. 3d 748, 752 (D. Md. 2018) (citing *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007)); *see also Pro. Tax Appeal v. Kennedy-Wilson Holdings, Inc.*, 239 Cal. Rptr. 3d 908, 915 (Cal. Ct. App. 2018) (similar under California law).

In the wake of his sham termination, Mr. Orszag generated "more than a hundred million dollars in revenue" for FTI as an independent contractor. Counterclaims ¶ 149; *see also id.* ¶¶ 98, 106. In fact, Mr. Orszag "was Compass Lexecon's single largest revenue generator in 2024." *Id.* ¶ 151. Defendants knowingly benefited from that revenue generation, which would have gone to Mr. Orszag's competing endeavor but for Defendants' fraud. *Id.* ¶ 149. That was Mr. Gunby's express plan – to use the sham termination and bad-faith litigation to prevent Mr. Orszag from leaving or competing, while securing the benefits of his labor. *Id.* ¶¶ 35, 149. Meanwhile, Mr. Gunby personally benefited from his fraudulent scheme by exploiting the purported one-year non-compete period to sell tens of millions of dollars of FTI stock while FTI's stock price was artificially inflated. *Id.* ¶ 150. Under the circumstances, allowing FTI

27

and Mr. Gunby to reap the rewards of their fraud would be inequitable.  *Cf. id.* ¶ 103.

FTI claims (at 19) that, because Mr. Orszag accepted the independent contractor role, he cannot bring an unjust-enrichment claim.  But Mr. Orszag is not bringing an unjust-enrichment claim based on the independent contractor agreement.  Rather, his claim is predicated on FTI's fraud:  but for the cloud FTI created by its bad-faith litigation, Mr. Orszag would have launched a competing endeavor and reaped financial benefits of doing so a year earlier.

*AXE Properties & Management, LLC v. Merriman* explained that, despite the "general rule" against "a claim for unjust enrichment . . . where the subject matter of the claim is covered by an express contract between the parties," "a plaintiff *may allege* causes of action for breach of contract and unjust enrichment concurrently when there is evidence of fraud or bad faith."  311 A.3d 376, 394, 399 (Md. 2024) (cleaned up).  Mr. Orszag has pleaded both fraud and bad faith, and he is not asserting a claim based on the independent contractor agreement.

Finally, Mr. Gunby challenges (at 20) the unjust-enrichment claim because the benefit he received by dumping FTI stock was not conferred on him by Mr. Orszag.  This again ignores the Counterclaims.  By shackling Mr. Orszag to Compass Lexecon for a year, and preventing him from competing, Mr. Gunby ensured that FTI's stock price remained artificially inflated, allowing him to earn millions in excess profits before FTI's stock price collapsed upon the news of Mr. Orszag's competing venture.  Counterclaims ¶¶ 150, 152; *see also supra* n.2 (FTI's stock price fell 14.2% upon the public announcement of Mr. Orszag's new venture).  Mr. Gunby's factual challenge to Mr. Orszag's causation allegation is no defense.  *See Lacks v. Ultragenyx Pharm., Inc.*, 734 F. Supp. 3d 397, 431 (D. Md. 2024) ("Remoteness is a consideration that bears on how much to disgorge, not a barrier to stating an unjust enrichment claim.").

28

## VIII.   Mr. Orszag Has Stated a Claim Under California's Prohibition on Restrictive Covenants (Count VII)

Mr. Orszag also has stated a claim for relief under California Business & Professions Code § 16600.5(b) and (e).  Those provisions outlaw "employee noncompetition agreements" (with inapplicable exceptions), *Dowell v. Biosense Webster, Inc.*, 102 Cal. Rptr. 3d 1, 9 (Cal. Ct. App. 2009) (quoting *Edwards v. Arthur Andersen LLP*, 189 P.3d 285, 288 (Cal. 2008)), and create a private tort claim against any entity that includes such a provision in a contract with or seeks to enforce one against a California employee.  As explained above, Defendants' attempt (at 20) to avoid California's statutory prohibition fails.  Defendants' other two arguments are unpersuasive.

Defendants first deny (at 21) that they are subject to California law.  But courts regularly recognize that § 16600.5 governs non-resident businesses that hire California employees.  *See supra* n.13.  Indeed, FTI's recent SEC filings acknowledge that many States have banned non-competes and that California's prohibition specifically covers non-resident employers like FTI.[22] Defendants' cases are inapposite, as they concern (1) a non-resident employee who did not work in California, *see Poer v. FTI Consulting, Inc.*, 2024 WL 4859085, at *11 (N.D. Cal. Nov. 20, 2024), and (2) an employee who moved to California only after entering the agreement, *see NetRoadshow*, 2025 WL 99754, at *4-5.  Mr. Orszag, by contrast, consistently lived and worked in California, as his Employment Agreement expressly provides.  Counterclaims ¶¶ 39-40.

That FTI's position is made-for-litigation is laid bare by its contemporaneous statements. In Mr. Gunby's November 20, 2023, email to Mr. Orszag transmitting FTI's Termination Notice, Mr. Gunby noted that FTI will be paying Mr. Orszag his outstanding wages "in accordance with California law."  Ex. A.  That email also attached a letter from FTI's General Counsel notifying

---

[22] *See* FTI Consulting, Inc., *2023 Annual Report* at 23 (Feb. 22, 2024), https://ir.fticonsulting.com/static-files/9b254e7e-b7f1-4c6b-b130-645b7bb28bef.  As noted above, FTI changed its disclosures only after terminating Mr. Orszag.

Mr. Orszag of a change of relationship "pursuant to provisions of Section 1089 of the California Unemployment Insurance Code." *Id.*[23]  These statements establish FTI's clear understanding that California's labor and employment statutes (like § 16600.5) govern its relationships with California employees like Mr. Orszag.  And California's statutes apply irrespective of the Employment Agreement – whatever the contract may provide, FTI violated California's Business & Professions Code when it included, and then again when it sought to enforce, a non-compete provision in an agreement with a California employee.[24]

Finally, FTI claims (at 21-22) that, if § 16600.5(b) did apply, it would unconstitutionally regulate access to Maryland courts.  If anything, allowing FTI to immunize itself from complying with California law when it operates in California would be unconstitutional, as Maryland must not intrude upon the "'legislative power of [California] to act upon persons and property within the limits of its own territory.'"  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 375 (2023) (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)).  FTI's sole case, *Baker ex rel. Thomas v. General Motors Corp.*, 522 U.S. 222, 238 (1998), concerned one state court's ability to issue rulings regulating proceedings in another state court.  *Baker* has nothing to do with a state statute regulating the primary conduct of firms doing business within its borders.  Having chosen to operate in California and hire California employees, FTI is bound by California labor law.

## CONCLUSION

For the reasons stated above, Mr. Orszag respectfully urges the Court to deny Defendants' Motion To Dismiss the Counterclaims.

---

[23] The Court can consider the transmittal here because the Termination Notice is quoted and relied on throughout the Complaint.  *See Robinson v. Am. Honda Motor Co.*, 551 F.3d 218, 222-23 & n.2 (4th Cir. 2009) (on motion to dismiss, court can consider documents expressly relied on in complaint); Counterclaims ¶¶ 78-82, 84-89, 97, 135-136 (discussing Termination Notice).

[24] Section 16600.5 has no choice-of-law exception, does not allow employers to contract out of its application, and applies "regardless of whether the contract was signed . . . outside of California."

DATED: April 11, 2025                   Respectfully submitted,

                                        By:   */s/ Mark C. Hansen*

                                              Mark C. Hansen (State Bar No. 12266)
                                              James M. Webster, III (State Bar No. 23376)
                                              David L. Schwarz (admitted *pro hac vice*)
                                              Kevin D. Horvitz (admitted *pro hac vice*)
                                              Rachel T. Anderson (admitted *pro hac vice*)
                                              KELLOGG, HANSEN, TODD,
                                                FIGEL & FREDERICK, P.L.L.C.
                                              1615 M Street, N.W., Suite 400
                                              Washington, D.C. 20036
                                              Tel.: (202) 326-7900
                                              Fax: (202) 326-7999
                                              Email: mhansen@kellogghansen.com
                                              Email: jwebster@kellogghansen.com
                                              Email: dschwarz@kellogghansen.com
                                              Email: khorvitz@kellogghansen.com
                                              Email: randerson@kellogghansen.com

                                              *Counsel for Defendant and*
                                              *Counterclaim Plaintiff Jonathan M. Orszag*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 11, 2025, the foregoing document was filed in this matter through the Court's CM/ECF system, causing a copy to be served on all registered participants identified on the Notice of Electronic Filing.

*/s/ Mark C. Hansen*
Mark C. Hansen

*Counsel for Defendant and*
*Counterclaim Plaintiff Jonathan M. Orszag*