### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| FTI CONSULTING, INC., | * |
| Plaintiff, | * |
|  | * |
| v. | * |
|  | * |
| JONATHAN ORSZAG, | * |
| Defendant. | * |
|  | * |

Civil No. 23-3200-BAH

------------------------------------------

|  |  |
|---|---|
| JONATHAN ORSZAG, | * |
| Counterclaim Plaintiff, | * |
|  | * |
| v. | * |
|  | * |
| FTI CONSULTING, INC. ET AL, | * |
| Counterclaim Defendants. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### <u>MEMORANDUM OPINION</u>

Plaintiff FTI Consulting, Inc. ("FTI") brought suit against Jonathan Orszag alleging breach of contract and breach of the fiduciary duty of loyalty. ECF 48 (Second Amended Complaint). Orszag filed a counterclaim against both FTI and against Steven Gunby (collectively "Counterclaim Defendants"), alleging fraud, wrongful termination, breach of contract, tortious interference with business relationships, unjust enrichment, and violations of California state statutes. ECF 87.[1] Pending before the Court is the Counterclaim Defendants' motion to dismiss

---

[1] The sealed version of Orszag's answer and counterclaim is docketed at ECF 87, while the redacted version is docketed at ECF 86. The Court will cite to the complete document provided at ECF 87 but does not include any of the information redacted in ECF 86.

Orszag's counterclaim. ECF 100. Orszag filed an opposition, ECF 101, and Counterclaim Defendants filed a reply, ECF 107. All filings include memoranda of law, while Orszag's counterclaim and opposition include exhibits.[2] In addition, Orszag has filed two pending motions to seal, ECFs 88 and 103.

The Court has reviewed all relevant filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2023). Accordingly, for the reasons stated below, the Counterclaim Defendants' motion to dismiss is GRANTED in part and DENIED in part, while Orszag's motions to seal are GRANTED.

## I.    **BACKGROUND**[3]

### A.    **Factual Background**

#### 1.    Origins of the Relationship

In 2003, Orszag co-founded Competition Policy Associates, Inc. ("Compass"), which he describes as "a leading antitrust consulting firm" that provides "advisory and expert services to corporations, law firms, and governments around the world." ECF 87, at 37 ¶ 27. In 2005, FTI, a multinational consulting firm, "approached Compass about a potential acquisition, and the parties reached an agreement for FTI to purchase Compass in a deal valued at approximately $70 million." *Id.* Thereafter, Compass merged with another consulting firm acquired by FTI, forming Compass Lexecon in January 2008. *Id.* at 38 ¶ 27. Following the merger, Orszag served on Compass Lexecon's Executive Committee and oversaw the firm's growth worldwide. *Id.* ¶ 28.

---

[2] The Court references all filings by their respective ECF numbers and page numbers by the ECF-generated page numbers at the top of the page.

[3] The facts provided in this section are taken from Orszag's counterclaim and are assumed true for the purposes of the pending motion to dismiss. *See Kan. City Live Block 124 Retail, LLC v. Kobe Kan., LLC*, Civ. No. 14-3236-GLR, 2015 WL 6151266, at *1 n.1 (D. Md. Oct. 16, 2015) (citing *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).

Orszag describes "periodic disagreements between Compass Lexecon and FTI during the early years of their partnership" but avers that "both entities saw the benefit of their relationship, and both profited from it." ECF 87, at 38 ¶ 29. However, in 2014, after Gunby became FTI's President and CEO, the relationship between FTI and Compass Lexecon began to shift. *Id.* According to Orszag, Gunby "never took the time to understand Compass Lexecon's business or to develop relationships with its senior staff" and attempted to distance Compass Lexecon from FTI's Board of Directors, as Gunby "resented" Orszag's "fierce advocacy for Compass Lexecon's professionals." *Id.* at 38–39 ¶¶ 29–31.

### 2.    The 2022–2023 Employment Agreement Negotiations

Beginning in 2020, Compass Lexecon's leadership team sought to "reset the economic relationship between Compass Lexecon and FTI," but FTI "refused to engage in any meaningful negotiations" for several years. ECF 87, at 39 ¶¶ 32–33. In May 2022, frustrated by the lack of progress, the Compass Lexecon leadership presented their "final offer to FTI's executives and indicated that, if necessary, they would take their proposal to FTI's Board of Directors to see whether the relationship could be salvaged." *Id.* at 39–40 ¶ 33. This presentation emphasized the profitability of Compass Lexecon for FTI, despite the fact that FTI simultaneously "contributed effectively nothing to Compass Lexecon's net revenue." *Id.* at 40 ¶ 34. It also explained that, without a deal, "two or three of the senior leaders" of Compass Lexecon "would leave in the near term" to open a new firm. *Id.*

After contentious negotiations, during which Gunby threatened to "bury" Orszag in litigation, Compass Lexecon's leadership team finally reached an agreement with FTI in early 2023. ECF 87, at 40 ¶ 35. As part of this agreement, Orszag states, he and two other Compass Lexecon executives "agreed to enter into a new four-year employment contract, but he insisted that he would

3

not be bound by any non-compete agreement going forward," and stressed as much to FTI's general counsel in a December 10, 2022 email. *Id.* FTI and Orszag reached a deal on the non-compete issue later that month, with FTI agreeing that the limited non-compete provision in Orszag's contract would only apply if Orszag were terminated for cause. *Id.* at 41 ¶ 37. On January 15, 2023, Orszag signed the new employment agreement ("Employment Agreement") with Compass Lexecon and FTI, which was made effective as of January 1, 2023. *Id.* at 42 ¶ 39.

Orszag maintains that the Employment Agreement permitted him to "resign for any reason at any time, provided only that he give 'at least 90 days' prior written notice to [Compass Lexecon].'" ECF 87, at 43 ¶ 41 (alteration in pleading). Compass Lexecon, meanwhile, could terminate Orszag "for cause" only in certain circumstances, including if Orszag accrued a criminal conviction, failed to satisfactorily perform material employment duties, committed any dishonest act, or engaged in willful misconduct. *Id.* at 43–44 ¶ 42. Further, in the event of Orszag's termination for cause, the Employment Agreement required Compass Lexecon to tender notice of the grounds for termination to Orszag within 90 days of the discovery of the offending conduct. *Id.* at 44 ¶ 44. And it required Compass Lexecon to specify the nature of the grounds for termination and provide Orszag at least 30 days to cure the action.[4] *Id.* ¶ 45. The nature and form of any termination "directly impacted" Orszag's post-termination compensation. *Id.* ¶ 48. Finally, the employment agreement contained non-solicitation covenants that prohibited Orszag from "affirmatively soliciting business on any specific case or matter that he previously worked on" for the term of the Employment Agreement and for one year thereafter. *Id.* at 46 ¶ 50. Orszag notes

---

[4] Orszag explains that the notice provision was not applicable in instances involving criminal activity. ECF 87, at 44 ¶ 45.

that he not only complied with the Employment Agreement but also worked hard to grow and strengthen Compass Lexecon. *Id.* at 47 ¶ 51.

### 3.   Ongoing Conflicts Between FTI and Compass Lexecon

Despite the new agreement, the relationship between FTI and Compass Lexecon continued to deteriorate throughout the early months of 2023. Orszag alleges that FTI implemented a problematic billing system "over the objections" of both Orszag and Compass Lexecon, adopted a conflicts position that prevented Compass Lexecon from accepting business in the U.K., and blocked Lexecon from crypto-currency related engagements. ECF 87, at 47–49 ¶¶ 53–55. As a result, Orszag indicates, the senior leadership team at Compass Lexecon was "livid." *Id.* at 49 ¶ 56. Multiple members of the team, including Compass Lexecon's chairman, threatened to resign if FTI "did not reverse its position." *Id.* at 50 ¶ 57. Though FTI eventually did allow Compass Lexecon to accept a particular crypto-currency engagement "as a one-off exception," the relationship between the two entities continued to worsen. *Id.* at 50–51 ¶¶ 58–60.

### 4.   Structural Negotiations

From September through early November 2023, Orszag sought to negotiate a resolution of the conflict between FTI and Compass Lexecon or else to pursue a structured separation of the two entities. ECF 87, at 52–53 ¶ 63. Throughout these negotiations, Orszag made clear that he thought it imperative to address the "trust issues" between Compass Lexecon and FTI and to explore structural changes in light of the relative economic contributions of Compass Lexecon to FTI's business. *See id.* at 53 ¶ 65, 54 ¶ 68. Gunby responded in seeming good faith, affirming both Orszag's value to FTI and Gunby's commitment to finding a path forward for Orszag to remain at the firm. *Id.* at 55 ¶ 70. During this period, on November 16, Orszag also met with FTI's chairman and its general counsel to discuss the situation, and asked "point blank" whether there was anything

5

he "had done that was inconsistent with his obligations under the Employment Agreement." *Id.* at 56 ¶ 72. The general counsel did not identify any such conduct. *Id.* However, Orszag contends, FTI and Gunby were secretly planning to "ambush" him with a "manufactured" for cause termination. *Id.* at 57 ¶ 73. As part of this plan, Orszag alleges, Gunby held several meetings with FTI's board during which he tried "to blame the relationship breakdown on Mr. Orszag" and "affirmatively misled" the board into believing that Orszag preferred to leave FTI rather than restructure the relationship. *Id.* at 58 ¶ 75.

### 5.    The Termination and Its Aftermath

On November 20, 2023, without prior written notice, Orszag received a call from Gunby informing him that he had been terminated for cause, effective immediately. ECF 87, at 59 ¶ 79. Compass Lexecon employees, who had not been made aware of Orszag's impending termination, pressed Gunby for an explanation and were told that Orszag "had threatened to leave the company and 'had a gun to their head.'" *Id.* at 60 ¶ 79. However, Orszag states, Gunby later admitted to senior Compass Lexecon employees that the "real reason" behind the termination of, and subsequent lawsuit against, Orszag "was to buy FTI time" and "embarrass" Orszag. *Id.* ¶ 79.

FTI provided Orszag with a Notice of Termination for Cause ("Notice"), which enumerated three purported bases for Orszag's termination. ECF 87, at 60 ¶ 80. These generally alleged that Orszag had threatened FTI with various consequences in the course of the negotiations between Compass Lexecon and FTI.[5] *Id.* According to Orszag, none of these factors constituted "cause" as defined in the Employment Agreement, and Gunby allegedly conceded at some point that the conduct alleged did not amount to cause sufficient to justify termination. *Id.* at 61 ¶ 81. Even if the alleged conduct did amount to cause for termination, Orszag says, he was not provided with

---

[5] The specifics of the alleged grounds for termination are sealed.

an opportunity to cure the alleged deficiencies as required under the contract. *Id.* at 64 ¶ 89. And finally, Orszag denies engaging in solicitation of existing Compass Lexecon employees or any other conduct that would have violated the Employment Agreement. *Id.* 62–63 ¶¶ 86–87.

Despite his termination, Orszag reports that he continued to work for Compass Lexecon as an independent contractor, billing over 2,600 hours for his work in 2024. ECF 87, at 67 ¶ 98. Under this arrangement, FTI "retained the financial benefit of Mr. Orszag's work and his client engagements while seeking to harm him both financially and reputationally." *Id.*

### 6.    Present Litigation

FTI filed suit against Orszag in the Circuit Court of Montgomery County, Maryland on November 20, 2023. ECF 1, at 1. Orszag removed the action on November 22. *Id.* The case was originally assigned to Judge Peter Messitte. Orszag filed an initial motion to dismiss on December 21, 2023, *see* ECF 18, which was mooted by FTI's filing of a second amended complaint on June 18, 2024, *see* ECF 48. On July 3, 2024, Orszag filed a renewed motion to dismiss, *see* ECF 53, which Judge Messitte granted in part and denied in part on December 5, 2024, *see* ECF 81; *see also FTI Consulting, Inc. v. Orszag*, Civ. No. 23-3200-PJM, 2024 WL 5007554 (D. Md. Dec. 5, 2024). Earlier in 2024, following extensive briefing and a hearing, Judge Messitte also entered an order of partial declaratory judgment in favor of FTI holding that "the law of the State of Maryland applies to Orszag's Employment Agreement with FTI." ECF 49, at 1. The case was transferred to the undersigned on January 22, 2025.

At issue here are Orszag's counterclaims against FTI and Gunby, detailed above. Orszag alleges that FTI's actions have caused him substantial harm. ECF 87, at 67 ¶ 99. He also alleges that Gunby himself "has admitted the essential elements of Defendants' fraudulent scheme," telling others that he was trying to "tie [Orszag] up in litigation for as long as possible" and hoping

7

to "sufficiently embarrass Mr. Orszag to dissuade clients and colleagues from working with him[.]" *Id.* at 70 ¶ 105. Orszag brings seven counterclaims: fraud against all Counterclaim Defendants (count I), wrongful termination in violation of California public policy against FTI (count II), wrongful termination in violation of California Labor Code § 1102.5 against FTI (count III), breach of contract against FTI (count IV), tortious interference with business relations against all Counterclaim Defendants (count V), unjust enrichment against all Counterclaim Defendants (count VI), and violations of various sections of the California Business and Professions Code (count VII). *Id.* at 71–83 ¶¶ 107–161. Counterclaim Defendants seek dismissal of all counts. ECF 100-1, at 27.

## II.    LEGAL STANDARD

"On a motion to dismiss a counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6), courts apply the same standard of review applicable to a motion to dismiss a complaint." *Explorer Ins. Co. v. Nagel Farm Serv., Inc.*, Civ. No. 24-1346-ABA, 2025 WL 1798132, at \*4 (D. Md. June 30, 2025) (citing, *inter alia*, *Bayles v. Marsh Realty & Assocs., LLC*, Civ. No. 20-3322-DKC, 2021 WL 1198144, at \*2 (D. Md. Mar. 30, 2021); *Sand Canyon Corp. v. Bank of New York Mellon*, Civ. No. 19-2815-GLR, 2020 WL 5250288, at \*2 (D. Md. Sept. 3, 2020)). Federal Rule of Civil Procedure 12(b)(6) governs dismissals for failure to "state a claim upon which relief can be granted." In considering a motion under this rule, courts discount legal conclusions stated in the complaint and "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A court then draws all reasonable inferences in favor of the plaintiff and considers whether the complaint states a plausible claim for relief on its face. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 253 (4th Cir. 2009). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"The complaint must offer 'more than labels and conclusions' or 'a formulaic recitation of the elements of a cause of action[.]'" *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 747 (4th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). At the same time, a "complaint will not be dismissed as long as [it] provides sufficient detail about [the plaintiff's] claim to show that [the plaintiff] has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014).

## III.    ANALYSIS

### A.    Motions to Seal

As an initial matter, the Court examines the two pending motions to seal—ECFs 88 and 103—and determines that sealing is appropriate. Throughout this case, Orszag has filed similar motions to seal sensitive personal, financial, and corporate information, all of which have been granted. *See* ECFs 20, 28, 50, and 60. As with the previous filings, the instant motions ask that the Court seal Orszag's answer and counterclaims (ECF 88) as well as his response in opposition to the Counterclaim Defendants' motion to dismiss (ECF 103) because both contain information "that the parties agreed to maintain as confidential and file under seal pursuant to the Stipulated Protective Order entered by the Court" at ECF 71. ECF 88, at 2. In light of that order, the Court finds that good cause exists to seal both the answer and counterclaims as well as the response to the motion to dismiss. Accordingly, Orszag's motions to seal, ECFs 88 and 103, shall be granted and his answer and counterclaims at ECF 87 as well as his response in opposition at ECF 101 shall be sealed.

### B.    Motion to Dismiss

Before turning to each of the counts articulated in the counterclaim, the Court will address

the Parties' dispute over whether California or Maryland law applies to the underlying issues. In

particular, the Parties dispute the meaning and scope of Judge Messitte's determination that "the

law of the State of Maryland applies to Orszag's Employment Agreement with FTI." ECF 49, at

1.

Counterclaim Defendants argue that Orszag ignores Judge Messitte's prior determination

that Maryland law governs the Employment Agreement and instead incorrectly seeks to apply

California law to his counterclaims. ECF 100-1, at 11. Orszag responds that, in light of

Maryland's *lex loci delicti* rule, both his tort claims (counts I, II, V, and VI) and his related statutory

claims (counts III and VII) are governed by California law. ECF 101, at 24. As for the breach of

contract claim (count IV), Orszag argues that the Employment Agreement's Maryland choice of

law provision would contradict fundamental public policy in both Maryland and California and so

may be disregarded.[6] *Id.* at 25.

Turning first to the breach of contract claim, the Court determines that Judge Messitte

unambiguously held that Maryland law applied to the contract claims at issue here. *See* ECF 49,

at 1; *see also* ECF 46 (transcript of the hearing held June 13, 2024), at 13:16–18 and 40:12–13.

Though Orszag contended in previous filings, *see, e.g.,* ECF 33, at 13, as well as during the

hearing, *see* ECF 46, at 22:17–24, that applying Maryland law to contractual provisions such as

---

[6] In reply, Counterclaim Defendants posit that there is no material difference between the law of
Maryland and the law of California with respect to counts I (fraud), IV (breach of contract), and
VI (unjust enrichment) and so no choice of law analysis is warranted for those counts. ECF 107,
at 6. They further accept, for the purposes of the present motion only, that the California statute
in question in count III applies to Orszag. *Id.* at 7. However, they maintain that choice of law
questions do have material import to the parties arguments' regarding counts II (wrongful
termination), V (tortious interference), and VII (Cal. Bus. & Prof. Code §§ 16600.1 and 16600.5)
and maintain that Maryland law should apply. *Id.*

the non-compete agreement would run afoul of California public policy, Judge Messitte did not accept this argument. Instead, he "weigh[ed] the equities" in favor of emphasizing the need for order in applying choice of law provisions specifically as well as contractual language more generally. *Id.* at 29:21–30:11. In considering Orszag's repetition of the same arguments here, *see* ECF 101, at 26, the Court sees no reason to depart from Judge Messitte's prior determination as to the applicability of Maryland law in evaluating the Parties' contractual claims, including Orszag's counterclaim for breach of contract.

At the same time, Judge Messitte did note during the hearing that Maryland law may not apply to "the entire case at this point," ECF 46, at 40:13–14, and it is this statement that underlies the Parties' disagreement as to the governing law for Orszag's remaining counterclaims. Orszag takes the position that the remaining counts arise either in tort or in statute, and so should be governed by California law under Maryland's *lex loci delicti* rule. ECF 101, at 24. By contrast, the Counterclaim Defendants argue that Judge Messitte's ruling at ECF 49 "necessarily implicates several of [ ] Orszag's counterclaims[.]" ECF 107, at 6. In effect, the parties dispute whether the Maryland choice of law provision in the Employment Agreement encompasses Orszag's tort and statutory counterclaims.

"In the Fourth Circuit, courts may apply choice of law provisions that are 'sufficiently broad to encompass contract-related tort claims' . . . to non-contract claims." *Bresler v. Wilmington Tr. Co.*, 348 F. Supp. 3d 473, 488 n.10 (D. Md. 2018) (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 628 (4th Cir. 1999)). "Under Maryland law, courts look to the intent of the parties as reflected by the plain language of the contract to determine whether a choice of law provision applies to contract related tort claims." *Aegis Bus. Credit, LLC v. Brigade*

11

*Holdings, Inc.*, Civ. No. 21-668-AAQ, 2023 WL 5352407, at *3 (D. Md. Aug. 18, 2023) (citing

*Superior Bank, F.S.B. v. Tandem Nat. Mortg. Inc.*, 197 F. Supp. 2d 298, 309 (D. Md. 2000)).

Here, the Employment Agreement contains a clause providing that "[t]he internal laws of

the State of Maryland (other than its conflict of laws provisions) shall exclusively govern this

agreement." ECF 87-1, at 23 § 24. The Agreement further stipulates that each party "irrevocably

consents and agrees that any claims or disputes between or among the parties pertaining to this

Agreement or to any matter arising out of or relating to this Agreement . . . be brought in any state

or federal court located in the State of Maryland." *Id.* at 24 § 24. Contrary to Orszag's contention,

the Court determines that this language of the Employment Agreement does extend to causes of

action that arise from or relate to the contract. While Orszag attempts to bifurcate the choice of

law provision from the forum selection clause, *see* ECF 101, at 25 the Court is not convinced that

the two can be read so distinctly; the forum selection clause and the choice of law provision ought

to be read in tandem. *See Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d

224, 232–33 (Md. 2013) (internal quotation omitted) ("[A] contract must be construed in its

entirety and, if reasonably possible, effect must be given to each clause so that a court will not find

an interpretation which casts out or disregards a meaningful part of the language of the writing

unless no other course can be sensibly and reasonably followed.").[7]

---

[7] Though not binding precedent, the Court finds the reasoning employed in the Fourth Circuit's recent decision in *GMS Industrial Supply, Inc. v. Greer* helpful in addressing the question at hand. *See* No. 22-2090, 2014 WL 4024034 (4th Cir. Sept. 3, 2024). That case involved a choice of law provision specifying that the contract "shall be governed by and construed in accordance with the laws of the State of Virginia" and a forum selection clause specifying that "the exclusive venue for any action, demand, claim or counterclaim relating to or arising from" the agreement "shall be in the state or federal courts located in Virginia Beach, Virginia." *Id.* at *4. In making its decision, the panel held that the forum selection and choice of law provisions meant that contract-related claims must also be governed by Virginia state law. *Id.* Though finding that the forum selection clause was not "dispositive," the panel determined that "it would be incongruous to require the parties to sue in Virginia, where the contract claims would be resolved under Virginia law and any

Reading the choice of law provision in line with the forum selection clause, the Court turns to the question of whether Orszag's tort claims are contemplated by the provision's applicability to "any claims and disputes between or among the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement." ECF 87-1, at 25 § 24.  When considering contracts with similar language, other judges in this district have determined that a choice of law provision extended to *contract-related* tort claims as well.  *See, e.g.*, *Bresler*, 348 F. Supp. 3d at 488 n.10 (finding a choice of law provision extended to contract-related tort claims where the contract specified that "all matters pertaining to [its] validity, construction, and application" were to be governed by Delaware law); *Plum House IV, Inc. v. Wells Fargo Merch. Servs.*, Civ. No. 15-2294-CCB, 2016 WL 337492, at *3 (D. Md. Jan. 28, 2016) (determining that a contractual choice of law provision reached tort claims where the contract specified that "New York law will apply to [p]laintiff's *causes* of action" and seeing "no reason why [such] a clear, consensual stipulation . . . should not dictate which state's law applies to the parties' controversy, including any negligence claims) (emphasis in original); *c.f. Felichko v. Schecter*, Civ. No. 18-1392-RDB, 2019 WL 1318109, at *9 (D. Md. Mar. 22, 2019) (declining to apply a choice of law provision where the contract did not contain broad language such as "arising out of or related to" that would "encapsulate contract-related tort claims").  The Court is satisfied that the same result is appropriate here, and thus the choice of law provision encompasses tort claims arising from the contract as well as strictly contractual claims.

As a final step, the Court now examines whether Orszag's tort or tort-related counterclaims—fraud, common law and statutory wrongful termination, tortious interference with

---

*related* tort claims wouldn't be." *Id.* at *5 (citing *Zaklit v. Glob. Linguist Sols.*, LLC, No. 1:14-cv-314, 2014 WL 3109804, at *11 (E.D. Va. July 8, 2014)) (emphasis in *GMS*).

business relations, unjust enrichment, and violations of the California Business and Professions Code—can be said to arise from the Employment Agreement. Orszag identifies the basis for his fraud claim as Counterclaim Defendants' allegedly false representations that they were engaging "transparently and in good faith" with Orszag during the times relevant to this action. ECF 87, at 71 ¶ 108. His wrongful termination, tortious interference, and unjust enrichment claims also turn on the allegations of fraudulent misrepresentation aimed at securing Orszag's termination and Counterclaim Defendants' motivations in doing so. *Id.* at 73 ¶ 118, 78 ¶ 144, 80 ¶ 149. Accordingly, the Court determines that each of these four claims implicates the interpretation and application of the Employment Agreement, as each hinges on the fact of Orszag's termination and whether it was validly deemed to be for "cause" according to the terms of the Agreement itself. The Court determines that these four tort claims bear a sufficiently close relationship to the contract at issue so as to bring them within the reach of the Agreement's Maryland choice of law provision.[8]

That leaves the two counterclaims arising under California statute. The first, count III, is brought under California Labor Code § 1102.5, which establishes California's statutory prohibition on terminations in violation of public policy. The second, count VII, alleges violations of California Business & Professional Code §§ 16600, 16600.1, 16600.5, and 17200, which set out California's prohibition on non-compete clauses in employment contracts. Counterclaim Defendants do not challenge the application of California law to count III, as they allow, for the purposes of the present motion only, that the Court may apply section 1102.5 for the sake of analyzing the sufficiency of the claim. ECF 107, at 13 n.8. They do, however, contend that Orszag

---

[8] Counterclaim Defendants contend that, notwithstanding any choice of law issues, there is no material difference between Maryland and California with respect to fraud, breach of contract, and unjust enrichment. ECF 107, at 6. Orszag explicitly agrees with this proposition in his response brief and cites to both Maryland and California law in addressing those claims. *See* ECF 101, at 19, 33, and 35.

voluntarily disclaimed the protection of California's non-compete law by virtue of accepting the Maryland choice of law provision in the Employment Agreement. ECF 100-1, at 25. For his part, Orszag contends that FTI previously recognized the limitations imposed by the non-compete statute and acknowledged that it was bound by California law in that respect. ECF 101, at 38.

At first glance, it does appear that contractual duties governed by statute – and therefore independent of any contract – may not be encompassed by a choice of law provision. *See GMS*, 2024 WL 4024034, at *6. However, as discussed below, the Court finds that, even assuming California law validly governs the disposition of these two claims, Orszag has nevertheless failed to state a claim for relief under the statutes.

### 1.    Fraud (Count I)

"In Maryland, it has long been clear that fraud may consist in the suppression of the truth as well as in the assertion of a falsehood." *Stanley v. Central Garden & Pet Corp.*, 891 F. Supp. 2d 757, 765 (D. Md. 2012). Here, Orszag asserts a fraudulent misrepresentation claim, *see* ECF 87, at 71–73 ¶¶ 107–115, which requires the following elements:

> (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005). A plaintiff alleging fraud also "must state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b). For allegations of affirmative fraudulent misrepresentation, "this requires alleging the who, what, when, where, and how of an alleged fraud." *Singh v. Lenovo (United States.) Inc.*, 510 F. Supp. 3d 310, 326 (D. Md. 2021).

Here, Orszag alleges that FTI and Gunby "falsely represented to [ ] Orszag on multiple occasions that FTI and [ ] Gunby were negotiating with him 'transparently and in good faith,'" all while they "never intended to and did not negotiate with [ ] Orszag transparently or in good faith, and they had no intention of keeping [ ] Orszag as an employee of the firm." ECF 87, at 71 ¶¶ 108–09. Orszag points specifically to Gunby's statements that he intended to "work with [Orszag] expeditiously and without delay" and that he "hoped to 'find a path forward for [Orszag] to remain at [FTI],'" though he required time "to think about all of this." *Id.* at ¶ 108.

Assuming the veracity of these allegations, the relevant statements are simply too vague to constitute fraudulent misrepresentation. Orszag does not contend that Gunby, or anyone else at FTI, made any definitive promise or other representation to Orszag that would reasonably lead him to believe that he would definitely remain at FTI. Rather, the statements in question represented only general statements of potentially hoped-for outcomes that are not actionable as fraud. *See First Union Nat. Bank v. Steele Software Sys. Corp.*, 838 A.2d 404, 443 (Md. App. 2003) (finding that a business entity's statements about a "long term mutually beneficial relationship" had "no concrete terms, and [were] general statements of expectation or opinion"); *see also K.C. Co., Inc. v. Pella Corp.*, Civ. No. 20-227-DKC, 2021 WL 288195, at *7 (D. Md. Jan. 28, 2021) (finding that "optimistic" promises to use "best efforts" were too broad to be actionable). The fraud counterclaim will therefore be dismissed.

### 2.    Wrongful Termination (Count II)

Orszag's second counterclaim is one for "wrongful termination/abusive discharge in violation of public policy." ECF 87, at 73. He alleges that FTI discharged him for cause "to prevent him from resigning his employment," which he alleges "would have revealed that FTI's

securities disclosures were materially misleading, and would itself have been a material, disclosable event." *Id.* ¶ 118. Orszag argues that he was fired in retaliation for suggesting to Gunby and FTI's general counsel "that FTI's securities disclosures were materially misleading, because they falsely suggested that most Compass Lexecon senior staff were bound by non-competes," when the vast majority of the senior professionals could, in fact, "leave and compete against Compass Lexecon at any time." *Id.* ¶ 119. Alternatively, he contends that he was fired in retaliation for raising his "right to compete consistent with fundamental California public policy[.]" *Id.*

"To state a plausible claim of wrongful discharge, the plaintiff-employee must allege that (1) he was discharged; (2) the basis for his discharge violated a clear mandate of public policy; and (3) there is a nexus between his conduct and the employer's decision to discharge him." *Donovan v. Alfred Hosp., LLC*, Civ. No. 24-2087-MJM, 2025 WL 958556, at *4 (D. Md. Mar. 31, 2025) (citing *Wholey v. Sears Roebuck*, 803 A.2d 482, 489 (Md. 2002)).

Here, Orszag has failed to allege sufficient factual content to support a wrongful discharge claim. Instead, throughout his complaint, he repeatedly avers that he was fired to "embarrass him" and "buy time," not because his resignation would reveal misleading disclosures. ECF 87, at 60 ¶ 79. And though Orszag does allege that his resignation would represent "a material, reportable event for FTI as a public company," *id.* at 69 ¶ 102, he does not provide any specific facts as to conduct he specifically took and how such conduct was linked to his termination. Even construing Orszag's general contention that he "advised FTI that its SEC filings were materially misleading" as sufficient, affirmative conduct, his complaint would still fail to provide factual allegations regarding the causal link between such conduct and his termination. As another judge in this district explained, Plaintiff "does not suggest, for instance, that he refused to violate the law or to

harm a third party and that he was consequently fired; nor does he aver that he was terminated for exercising a legal right or duty or for performing an important public function."[9] *Rollins v. Rollins Trucking, LLC*, Civ. No. 15-3312-JKB, 2016 WL 81510, at *5 (D. Md. Jan. 7, 2016). Instead, Plaintiff "focus[es] exclusively on Defendants' conduct rather than his own" and so "has pleaded himself outside the confines of Maryland's wrongful discharge tort." *Id.* The Court has no basis on which to conclude that there is any nexus between Orszag's supposed conduct and the "motivation" for his termination. *Yuan v. Johns Hopkins Univ.*, 157 A.3d 254, 262 (Md. 2017) (internal quotation omitted).

### 3.    Cal. Labor Code § 1102.5 (Count III)[10]

As with Maryland law, California prohibits employers from terminating an employee for disclosing a violation of state or federal statute to government officials or law enforcement. Cal. Labor Code § 1102.5. And like Maryland, California requires that a plaintiff seeking to establish a claim for wrongful termination in violation of public policy must provide facts sufficient for a court to infer a causal relationship between disclosure of unlawful activities and any adverse treatment. *Ferrick v. Santa Clara Univ.*, 231 Cal. App. 4th 1337, 1357 (Cal. Ct. App. 2014). As above, because Orszag both fails to provide facts sufficient to show that he reported unlawful activity and to establish a causal link between the alleged reporting and his termination, count III will also be dismissed.

---

[9] Though Plaintiff says that he was fired in retaliation for "indicating that he intended to exercise his right to compete consistent with fundamental California public policy," ECF 87, at 73 ¶ 119, California public policy is not relevant here. Rather, the tort of wrongful discharge under Maryland law centers on "the public policy of *Maryland*," not another state. *Wholey*, 803 A.2d at 491 (emphasis added).

[10] As noted above, the Counterclaim Defendants do not dispute that the Court may apply California law in its analysis of this claim, at least for the sole purpose of resolving the motion to dismiss. ECF 107, at 12 n.8.

4.    Breach of Contract (Count IV)

Orszag alleges that FTI breached the Employment Agreement by failing to provide pre-termination notice, falsely claiming that the purported grounds for the termination were incurable, and firing Orszag in bad faith, without cause. ECF 87, at 76–77 ¶¶ 135–39. By contrast, Counterclaim Defendants argue that Judge Messitte foreclosed Orszag's ability to bring the first argument, that he has not sufficiently alleged that the conduct in question was curable under the Employment Agreement, and that the Agreement's definition of "good cause" does not support a standalone breach of contract claim. ECF 100-1, at 20–21.

"Under Maryland law, 'the formation of a contract requires mutual assent (offer and acceptance), an agreement definite in its terms, and sufficient consideration.'" *Montage Furniture Servs., LLC v. Regency Furniture, Inc.*, 966 F. Supp. 2d 519, 524 (D. Md. 2013) (quoting *CTI/DC, Inc. v. Selective Ins. Co. of Am.*, 392 F.3d 114, 123 (4th Cir. 2004)) (cleaned up). In order to state a claim for breach of contract according to Maryland law, a plaintiff must establish: (1) that the defendant owed the plaintiff a contractual obligation and (2) that the defendant breached that obligation. *See Reamer v. State Auto. Mut. Ins. Co.*, 556, F. Supp. 3d 544, 550 (D. Md. 2021), *aff'd* 2022 WL 17985700 (4th Cir. Dec. 29, 2022); *see also RRC Ne., LLC v. BAA Maryland, Inc.*, 994 A.2d 430, 442 (2010) ("In order to state a claim for breach of contract, a plaintiff need only allege the existence of a contractual obligation owed by the defendant to the plaintiff, and a material breach of that obligation by the defendant.")

The Court is not persuaded by Counterclaim Defendants' arguments. While Judge Messitte did address the question of FTI's compliance with the Employment Agreement in his December 5, 2024 memorandum opinion, he did not "foreclose" any particular avenue to Orszag but merely found that FTI had "sufficiently alleged that the circumstances constituting [c]ause on Orszag's part were incurable and therefore his termination could arguably have begun 'effective

19

immediately.'" ECF 80, at 11–12. What's more, Judge Messitte confined this analysis to terminations for cause in the specific event of violations of FTI's non-solicitation and non-compete policies, not as a general rule for any and all for-cause terminations. *Id.* This does not represent a final, factual determination and it does not bar Orszag from advancing his breach of contract claim now.

However, the Court does determine that Orszag cannot bring a breach of contract claim based on the allegation that he was fired without cause. The contractual provision regarding termination sets out that an employee can be terminated for cause only in certain events—such as criminal conviction, failure to satisfactorily perform job duties, commission of an act of material dishonesty, and violation of written company policy—and even then only if the conduct is found to be incurable and following a 90-day notice period. ECF 87-1, at 9 § 7(b). At the same time, it allowed for terminations without cause, following a 30-day notice period. *Id.* at 10 § 7(c). "Employment agreements are in Maryland are presumptively at-will," and this presumption may only be overcome if an employment contract provides that an employee can be terminated for just cause alone. *Harrig v. Progress Rail Servs. Corp.*, 166 F. Supp. 3d 542, 550 (D. Md. 2015). "A clear for-cause termination provision" is indicated by the presence of a provision in the contract that allows termination only for cause. *Spacesaver Sys., Inc. v. Adam*, 98 A.3d 264, 279 (Md. 2014). Here, it is true that the Employment Agreement defined the procedures required in the event of a for-cause termination, while it also allowed for termination without cause. *See* ECF 87-1, at 10 § 7(c). The Court therefore determines that the Agreement evinces no "clear" provision that permits termination only for good cause, and so the traditional Maryland rule of at-will

employment applies.[11]  Orszag therefore cannot bring a breach of contract claim on the theory that he was terminated without good cause.

Nevertheless, Orszag has still stated a claim for breach of contract on the basis of his allegations that he received neither notice nor opportunity to cure.  He specifically states that he never engaged in any of the behavior alleged as grounds for his termination.  ECF 87, at 60–61 ¶ 80, 63 ¶ 87.  Orszag also asserts that discussions about restructuring FTI had been ongoing for years and that not only did Gunby fail to give him an opportunity to "cure" the behavior but also never gave any indication that the behavior violated the terms of the Employment Agreement.  *Id.* at 63–64 ¶¶ 87–89.  In sum, Orszag argues that his conduct during the negotiations, at a minimum, did not violate the non-compete or non-solicitation provisions of the Employment Agreement and so was not subject to the "immediate" termination effects of those provisions.  As such, he has alleged facts sufficient to suggest that he was entitled to receive both notice and an opportunity to cure, but never received either and thus has stated a claim for breach of contract on those bases.

### 5.    Tortious Interference (Count V)

"Under Maryland law, tortious interference with economic relations requires a claimant to show '(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.'"  *First Data Merch. Servs. Corp. v. SecurityMetrics, Inc.*, 672 F. App'x 229, 236 (4th Cir. 2016) (quoting *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994)).  The kind of "wrongful or unlawful acts that could form the basis" for

---

[11] The traditional rule establishes that an employer "'terminate an employee for any reason, even a reason that is arbitrary, capricious, or fundamentally unfair,' and it is not the role of the court" to intervene in most circumstances.  *Goode v. Am. Veterans, Inc.*, 874 F. Supp. 2d 430, 449 (D. Md. 2012) (quoting *Towson Univ. v. Conte*, 862 A.2d 941, 949 (Md. 2001)).

a tortious interference claim include "violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution·or threat of groundless civil suits or criminal prosecutions in bad faith." *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000) (quoting *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 271 (Md. 1994)).

Because his fraud claim warrants dismissal, Counterclaim Defendants argue, Orszag has failed to allege that any underlying tortious conduct occurred or·was calculated to damage him. ECF 100-1, at 22. However, even though the Court has determined that Orszag did indeed fail to state a claim for fraud, his tortious interference claim can still move forward based on Orszag's additional allegations that FTI pursued a "bad faith" lawsuit against him. ECF 87, at 78 ¶ 144. Orszag asserts that FTI's lawsuit is "pretextual," a belief he says is shared by Compass Lexecon's Executive Committee, and characterizes it as an attempt by Gunby to "bury" him in litigation. *Id.* at 65 ¶ 93, 64·¶ 90. In support, Orszag cites alleged comments from Gunby to the effect that Gunby was "simply trying to 'tie [Orszag] up in litigation for as long as possible'" and "expressed his hope that FTI's lawsuit would sufficiently embarrass [ ] Orszag to dissuade ·clients and colleagues from working with him[.]" *Id.* at 70 ¶ 105. The Court determines that these allegations are sufficient to state a claim for a wrongful act. *C.f. Leading Tech. Composites, Inc. v. MV2, LLC.*, Civ. No. 19-1256-CCB, 2019 WL 4962312, at *4–*5 (D. Md. Oct. 8, 2019) (finding that a claim for tortious interference was not sufficiently alleged where it was not supported by examples of "objective baselessness or subjective bad faith").

Orszag has also met the remaining requirements necessary to bring a tortious interference claim. He has alleged that the lawsuit was brought to cause him professional harm, *see* ECF 87, at 70 ¶ 105, done baselessly for the purpose of causing him financial and reputational damage, *see*

*id.*, and resulted in actual damage, *see id.* at 79 ¶ 146. Accordingly, Orszag has sufficiently stated a claim for tortious interference with business relations.[12]

### 6.    Unjust Enrichment (Count VI)

"A claim for unjust enrichment has three elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defendant of the benefit; and (3) acceptance or retention by the defendant of the benefit without the payment of its value." *Singh*, 510 F. Supp. 3d at 328 (citing *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007)). While an action for unjust enrichment is typically not available where the claim is governed by an express contract, exceptions apply in instances of where "there is evidence of fraud or bad faith, there has been a breach of contract or a mutual recission of the contract, when recission is warranted, or when the express contract does not fully address" the entire subject matter of the claim. *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 608–09 (Md. 2000).

Orszag's unjust enrichment claim derives from his allegations that the Counterclaim Defendants have, through their "fraudulent scheme" to terminate him, "improperly received an undeserved benefit from [ ] Orszag in the form of more than a hundred million dollars in revenue generated on his matters that would have gone to [ ] Orszag and his new venture but for [Counterclaim Defendants'] wrongdoing." ECF 87, at 80 ¶ 149. Counterclaim Defendants argue that a contract—the independent consultant agreement—was at issue and therefore a claim for

---

[12] Judge Messitte's prior determinations of the plausibility of FTI's claims, *see* ECF 80, do not alter this conclusion. Judge Messitte's conclusion that FTI had stated plausible claims does not represent an objective, factual determination as to Orszag's counterclaims. Further, Counterclaim Defendants do not point to any caselaw that would undermine the proposition that competing claims can both contain sufficient factual allegations as to be deemed plausible.

unjust enrichment is unavailable to Orszag. ECF 100-1, at 24. They also argue more broadly that Orszag's allegations do not fit within the framework of an unjust enrichment claim. *Id.* at 23.

It is true that the consulting arrangement was covered by an express contract, which Orszag references in his answer, *see* ECF 87, at 14 ¶¶ 87–88, and attached as a response to a previous filing, *see* ECF 31-2.[13] And this consulting agreement explicitly sets out Orszag's compensation package for his consultancy work. *Id.* at 3–4. Nevertheless, Maryland recognizes, at least in theory, that unjust enrichment claims may be asserted even when a contract is present if there is "evidence of fraud or bad faith." *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 609 (2000). Orszag has made such an allegation here, contending that Counterclaim Defendants were unjustly enriched by virtue of their "bad faith" action. ECF 87, at 71 ¶ 106. And though his arguments regarding the amount of lost revenue ring of speculation, it clears the low bar set by the motion to dismiss standard.

The Court is therefore satisfied that Orszag has sufficiently pleaded a claim for unjust enrichment. He has alleged that Counterclaim Defendants' bad faith induced him to enter into a consultancy agreement which resulted in him losing out on a substantial amount of business that he would have received if not for those bad faith actions.

### 7.   Cal. Bus. & Prof. Code. Claims (count VII)

Orszag's final claims arise under California Business & Professional Code §§ 16600, 16600.1, 16600.5, and 17200, which set out the state's prohibition on non-compete clauses in employment contracts. The disposition of this count is controlled by Judge Messitte's previous determinations that Maryland law applies to the Employment Agreement, *see* ECF 49, at 1, and that the non-compete provision was valid under Maryland law, *see* ECF 80, at 16. Because

---

[13] The redacted version is docketed at ECF 30-5. As with Orszag's answer and counterclaims, the Court cites to the sealed version without including any redacted information.

California law does not apply to the agreement, it cannot provide a basis for Orszag to assert any claim about the propriety or impropriety of the non-compete clause. *See Marion Weinreb & Assocs., Inc. v. Valogic, LLC*, Civ. No. 04-3836-JFM, 2006 WL 890724, at *2 (D. Md. Mar. 29, 2006) (citing *ABF Cap. Corp. v. Grove Props. Co.*, 126 Cal.App.4th 204, 215 (Cal. Ct. App. 2005)) (determining that even where a non-compete agreement "might have been unlawful under California law," the question was not relevant where California law did not govern that agreement).

## IV.    CONCLUSION

For the foregoing reasons, Counterclaim Defendants' motion to dismiss, ECF 100, is GRANTED in part and DENIED in part.   Orszag's motions to seal, ECFs 88 and 103, are GRANTED.

A separate implementing Order will issue.


Dated: July 24, 2025                                                      /s/
                                                         Brendan A. Hurson
                                                         United States District Judge

25