# Exhibit 1
## Public - Redacted

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

FTI CONSULTING, INC.,
  16701 Melford Blvd., Suite 200
  Bowie, MD 20715,

COMPASS LEXECON LLC,
  555 12th Street NW, Suite 501
  Washington, DC 20004

       *Plaintiffs*,

    *v.*

JONATHAN ORSZAG,
  660 Club View Drive
  Los Angeles, CA 90024,

MARK ISRAEL, Ph.D.,
  7122 Arrowood Road
  Bethesda, MD 20817,

ECONIC PARTNERS LLC
  10100 Santa Monica Blvd., Ste. 925
  Los Angeles, CA 90067,

       *Defendants.*

Case No.: 8:23-cv-03200-BAH-AAQ

**REDACTED VERSION**

## [PROPOSED] THIRD AMENDED COMPLAINT

Plaintiffs FTI Consulting, Inc. ("FTI") and Compass Lexecon LLC ("Compass Lexecon"), by and through their undersigned counsel, bring this Third Amended Complaint against Defendants Jonathan Orszag ("Mr. Orszag"), Mark Israel, Ph.D. ("Dr. Israel"), and their current company Econic Partners LLC ("Econic"), and allege as follows:

## NATURE OF THE CASE

1.    FTI and Compass Lexecon seek to hold two former employees, Mr. Orszag and Dr. Israel, accountable for their breaches of contractual and fiduciary duties, including the theft of valuable and confidential business information and the unlawful solicitation of clients and

employees, in order to launch a competing business, Econic.  FTI and Compass Lexecon further seek to hold Econic liable for the tortious acts undertaken by Mr. Orszag and Dr. Israel—two of its "Founding Partners."  Together, all Defendants conspired to harm FTI and Compass Lexecon through improper and tortious means.

2.      For his part, Mr. Orszag threatened and initiated the plan to take over FTI's wholly owned subsidiary, Compass Lexecon, while still serving as its senior manager, breaching his fiduciary duties and violating agreements that forbade such conduct.

3.      While still an employee, Mr. Orszag secretly negotiated with major investment banks to obtain investment capital for his new firm.  ████████████████

██████████████████████████████████████████████

███████████████████████████████████████

4.      Just a year later, that same investment bank provided a nine-figure investment, which permitted Mr. Orszag to start Econic and then to raid dozens of FTI's and Compass Lexecon's clients and hundreds of its consulting professionals.

5.      A critical part of this scheme, as detailed below, was Dr. Israel's effort to weaken Compass Lexecon from within, while serving as its President through March 31, 2025.  While Mr. Orszag attacked from the outside, Dr. Israel operated on the inside, steering FTI's and Compass Lexecon's employees and clients to Econic right after its public launch in early February 2025.

6.      Dr. Israel engaged in these tortious acts after he secretly agreed, as early as November 2024, with Mr. Orszag to take an equity stake in Econic valued at tens of millions of dollars. Dr. Israel then continued to work for Compass Lexecon for at least four months without disclosing this significant conflict of interest—all while Econic poached Compass Lexecon's clients and professionals with Dr. Israel's help. Not only did Dr. Israel fail to meet his duty to

protect Compass Lexecon from Econic and Mr. Orszag's raids on its clients and employees, Dr. Israel took part in the raids himself.

7.      Dr. Israel also shared FTI's and Compass Lexecon's trade secrets and confidential business information with Mr. Orszag to advance their common purpose of targeting Compass Lexecon's key clients, matters, and personnel for the new firm.

8.      FTI and Compass Lexecon have suffered hundreds of millions of dollars in damages from Defendants' acts, including the loss of clients, employees, and revenue. They are suffering ongoing harm through Dr. Israel's breaches of his current non-solicitation obligations and both individual Defendants' breaches of their confidentiality obligations.

9.      Plaintiffs therefore bring this action seeking damages and injunctive relief for the harms caused by Defendants' improper and tortious acts, including Mr. Orszag's and Dr. Israel's fiduciary breaches and their misappropriation of trade secrets and sensitive commercial information belonging to FTI and Compass Lexecon.  Plaintiffs also seek relief requiring Defendants to disgorge the profits wrongfully derived from Mr. Orszag's and Dr. Israel's breaches of fiduciary duty and misappropriation of trade secrets.

## THE PARTIES

10.      Plaintiff FTI is a Maryland corporation with its principal place of business located at 16701 Melford Blvd., Suite 200, Bowie, MD 20715.  FTI is a global business advisory firm.

11.      Plaintiff Compass Lexecon is a wholly owned subsidiary of FTI and is a Maryland limited liability company with a local business address at 555 12th Street NW, Suite 501, Washington, DC, 20004.  FTI is the sole member of Compass Lexecon.  On December 1, 2023, Compass Lexecon assigned all of its rights, interests, duties and obligations under Mr. Orszag's Employment Agreement to FTI pursuant to Section 20(a) of the Employment Agreement.

12.     Defendant Econic Partners LLC is a limited liability company formed under the laws of the State of Delaware in November 2024, with its principal place of business located in Los Angeles, California. Mr. Orszag ███████████████████████████████ and serves as Econic's principal manager.

13.     Defendant Mr. Orszag is an individual who resides in Los Angeles, California. Mr. Orszag was employed by Compass Lexecon as a Senior Managing Director, and his Employment Agreement was entered into with Compass Lexecon and FTI. Mr. Orszag organized Econic on November 20, 2024, while he was still bound by restrictive covenants. On or around February 19, 2025, Mr. Orszag publicly launched his new economic consulting venture, Econic, and is a "Founding Partner" of Econic.

14.     Defendant Dr. Israel is an individual who resides in Bethesda, Maryland. Dr. Israel most recently served as Compass Lexecon's President from January 2024 through March 31, 2025. On April 1, 2025, one day after his resignation from Compass Lexecon, Dr. Israel announced that he had joined Econic as a "Founding Partner."

**JURISDICTION AND VENUE**

15.     This action was originally filed by FTI and Compass Lexecon in the Circuit Court for Montgomery County, Maryland; in November 2023, Mr. Orszag removed this action based on diversity jurisdiction under 28 U.S.C. § 1332(a)(1).

16.     This Court has subject matter jurisdiction over this action under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and supplemental jurisdiction over the violations of common law and contractual duties under 28 U.S.C. § 1367.

17.     Mr. Orszag expressly consented to the jurisdiction of this Court in his Employment Agreement, which contains a valid and enforceable forum selection clause, designating the state

and federal courts of Maryland as agreed forums for the resolution of claims or disputes pertaining to the Employment Agreement.

18.    This Court may exercise personal jurisdiction over Dr. Israel based on his domicile in the State of Maryland, pursuant to Md. Code Ann., Cts. & Jud. Proc. ("Courts") § 6-102, and pursuant to mandatory contractual forum-selection and choice-of-law provisions contained in his employment agreement with Compass Lexecon and FTI.

19.    This Court may exercise personal jurisdiction over all Defendants pursuant to Courts § 6-103, because: (a) each individual Defendant transacted business in Maryland through their long-term employment or consulting relationships with Compass Lexecon and FTI, as more fully set forth below; (b) Econic, through its agents, Mr. Orszag and Dr. Israel, transacted business and performed work in Maryland; and (c) all Defendants caused tortious injury in Maryland to FTI, a Maryland corporation with its principal place of business in Maryland, and Compass Lexecon, a Maryland company, by their or by their agents' various acts and omissions inside or outside the State.

20.    Further, this Court may exercise personal jurisdiction over all Defendants based on their participation in a civil conspiracy, as more fully set forth below, to engage in unfair competition to harm FTI and Compass Lexecon, for the purpose of advancing the interests of Econic and their personal financial interests, while undermining the interests of FTI and Compass Lexecon.

21.    After Econic's formation, Dr. Israel acted as an agent of, or co-conspirator with, Econic and Mr. Orszag.  From the time of Econic's formation through at least April 1, 2025, Dr. Israel worked primarily out of his residence in Maryland, and his forum contacts are attributable to Econic because he was acting to advance Econic's interests, in violation of his fiduciary,

employment, and statutory duties to FTI and Compass Lexecon.  Based on their close longstanding professional relationship, Mr. Orszag—the principal and founder of Econic—knew that Dr. Israel was a Maryland resident who worked out of his Maryland residence.  That knowledge of Econic's principal and founder is attributable to Econic.

22.    Based on Mr. Orszag's knowledge, Econic knew, at the time it joined the conspiracy with Dr. Israel, that Dr. Israel would take acts in Maryland to harm FTI in Maryland.

23.    Dr. Israel also engaged in acts in April 2025, while working for Econic, that violated his restrictive covenants under his employment agreement with FTI and Compass Lexecon. Upon information and belief, Dr. Israel took these acts while in Maryland.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to these claims occurred in Maryland.

## ALLEGATIONS OF FACT COMMON TO ALL COUNTS

**A.    Compass Lexecon is FTI's Global, Renowned Economic Consulting Business**

25.    FTI is a global business advisory firm dedicated to helping organizations manage change, mitigate risk, and resolve disputes related to a variety of complex issues, including financial, legal, operational, political and regulatory, reputational, and transactional issues.  Its clients include the world's leading law firms, financial institutions, and Fortune 100 companies, and, with 40 years of experience, FTI has become a consultant and trusted advisor to numerous clients in many industries.  FTI's practices include (i) corporate finance & restructuring, (ii) economic consulting, (iii) forensic and litigation consulting, (iv) strategic communications, and (v) technology.

26.    Compass Lexecon is a wholly owned subsidiary of FTI and is the primary provider of services within FTI's economic consulting segment.  Compass Lexecon provides critical insight in legal and regulatory proceedings, strategic decisions, and public policy debates.  The firm

delivers a wide range of services that center around its three core offerings: Antitrust & Competition Economics, Financial Economics, and International Arbitration.

27.    Compass Lexecon has over 20 offices and over 700 employees worldwide.

28.    FTI has invested significant resources in recruiting and retaining Compass Lexecon's leaders, senior professionals, and staff.  To protect its substantial investment in the Compass Lexecon business, and the interests of its clients and hundreds of employees, FTI has entered into competitive, confidential compensation and employment packages to retain Compass Lexecon's senior professionals.

**B.    Mr. Orszag's History at Compass Lexecon**

29.    Prior to his termination by FTI, Mr. Orszag worked in economic and financial consulting with expertise in antitrust, regulatory, policy, and litigation matters.  He became a Senior Managing Director of Compass Lexecon and eventually was responsible for day-to-day management of that firm, including maintaining relationships with FTI's and Compass Lexecon's current and previous clients, and with securing new business.

30.    By virtue of his position within Compass Lexecon, Mr. Orszag had extensive access to FTI's and Compass Lexecon's confidential information, including information about Compass Lexecon's financial performance, revenue generation, client lists, billing rates, employee compensation, overhead expenses, operations, and business strategies and plans.

31.    Between 2011 and the date of his termination in 2023, Mr. Orszag's compensation increased nearly four-fold.  The net effect was that Mr. Orszag became one of the most highly-paid professionals in the consulting industry.  FTI's senior management always insisted that Mr. Orszag—given his role at Compass Lexecon—be bound by robust post-employment restrictions to protect Compass Lexecon should he ever decide to leave the firm.

32.     Each time that he agreed to a new employment contract, Mr. Orszag agreed to be bound by such restrictions. As the expiration of his employment agreement drew near in 2022, however, Mr. Orszag had his eyes set on an "outside option"—starting a new firm—that, in his words, would make him and Dr. Israel even more "wildly rich."

**C.      In 2022, Mr. Orszag, Assisted by Dr. Israel, Hatched His Plan by Threatening to Start a New Firm**

33.     During negotiations in 2022 over his compensation and the governance of Compass Lexecon, Mr. Orszag explicitly set out his intention to incite a mass resignation of key staff that would collapse Compass Lexecon if FTI refused to give in to his demands for greater compensation and control.

34.     In a June 2022 presentation to FTI's Board of Directors, Mr. Orszag and Dr. Israel threatened that if "no deal" were reached, they and other senior professionals would leave FTI together. Mr. Orszag and Dr. Israel warned that this mass departure would significantly reduce Compass Lexecon's profitability.

35.     The presentation further warned that Mr. Orszag, Dr. Israel, and their allies would end up "competing in the market" against Compass Lexecon, such that "FTI should expect key staff to depart with [them] or to competitors – or FTI will have to pay existing staff substantially more to retain them, thus lowering margins further."

36.     Mr. Orszag and Dr. Israel also threatened that "[t]here [would be] no reasonable chance that FTI could recreate earnings . . . without [them and other Compass Lexecon senior professionals] – especially with some of those leaders competing in the marketplace."

37.     The plan was not intended merely to compete with Compass Lexecon but represented their goal to destroy or damage FTI's economic consulting business and take it for

themselves.  Over the next two years, Mr. Orszag would bring this plot to fruition, with the crucial assistance of Dr. Israel.

     **D.**     **Mr. Orszag and Dr. Israel Pretended to Change Course by Entering into the Employment Agreements and a Governance Agreement**

     38.     After months of heated negotiations, toward the end of 2022, FTI, Mr. Orszag, and Dr. Israel reached a resolution, at least on paper, on the terms of their employment and the governance structure of Compass Lexecon.  Mr. Orszag and Dr. Israel, however, soon showed they lacked a genuine intent to live up to their fiduciary and contractual commitments to FTI.

     39.     Mr. Orszag entered into the operative Employment Agreement with Compass Lexecon and FTI effective as of January 1, 2023.  *See* Ex. A.  The Employment Agreement was part of a larger set of contracts under which Mr. Orszag, Dr. Israel, and others agreed to accept a new internal governance structure for Compass Lexecon, effective on January 1, 2023.

     40.     Dr. Israel also entered into a new employment agreement with Compass Lexecon and FTI on January 14, 2023, and made effective as of January 1, 2023, and which was later amended as of December 22, 2023.  Exs. C, D (filed under seal).   Mr. Orszag and Dr. Israel communicated about the negotiations and their agreements.

     41.     Under his Employment Agreement, Mr. Orszag continued to be employed as a Senior Managing Director of Compass Lexecon and was still projected to receive significant annual personal compensation.

     42.     Mr. Orszag further agreed to the application of Maryland governing law, jurisdiction, and venue provisions.  Ex. A § 24.

     43.     To protect its significant investment by retaining Mr. Orszag as an employee, FTI negotiated for restrictive covenants, including a non-competition covenant in the event of his termination for cause (the "Non-Compete Provisions") and a non-solicitation covenant (the "Non-

Solicit Provisions").  As Mr. Orszag knew, the Non-Compete and Non-Solicit Provisions he agreed to, in exchange for substantial compensation and benefits from FTI, were fully valid and enforceable.

44.    Yet, soon after this litigation started, Mr. Orszag abandoned his contractual commitments to FTI by arguing that his restrictive covenants were unenforceable under California law. In multiple opinions and a partial declaratory judgment, this Court rejected those arguments, holding that Maryland law applies and that Mr. Orszag's restrictive covenants are facially valid under Maryland law. ECF Nos. 49, 80, 112.

### 1.    *Non-Compete Provisions*

45.    Mr. Orszag's Non-Compete Provisions, customary in the consulting industry, are detailed and narrow.

46.    Under Section 9 of his Employment Agreement, Mr. Orszag agreed that during his employment and for a one-year restricted period after his employment (if he were terminated for cause), he would not (without Compass Lexecon's permission, which was not provided) undertake a defined set of actions, including to: engage in, own or control any interest in, a competing venture (except as a passive investor in a publicly traded company); act as an officer, director, or manager of such a venture; provide financing for its establishment; or allow his name or reputation to be used for it.  Ex. A § 9(a).

47.    The Non-Compete Provisions are limited in scope and duration, as approved by the Court earlier in these proceedings through "blue-penciling."  *See* ECF No. 80, at 12-16.

48.    ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

## 2.    *Non-Solicit Provisions*

49.    Mr. Orszag's Non-Solicit Provisions, also customary in the consulting industry, are detailed, narrow, and contained in a specific "Non-Solicitation Covenants" section of the Employment Agreement.

50.    Under Section 11 of the Employment Agreement, Mr. Orszag agreed not to, "directly or indirectly, whether for Employee or for any other individual or entity (other than Company)," solicit Company clients or employees subject to specific terms and conditions. *See* Ex. A § 11(a).

51.    The Non-Solicit Provisions are limited in scope and duration, as approved by the Court earlier in these proceedings through "blue-penciling."  *See* ECF No. 80, at 12-16.  For example, the blue-penciled restriction found acceptable by the Court was limited to the solicitation of FTI's individual employees and independent contractors involved in economic consulting. *Id.* at 14.

52.    The Non-Solicit Provisions were further reasonably limited to "affirmative solicitation," allowing Mr. Orszag to respond to communications initiated solely by others or to announce generally his future plans, "provided that no such response, action or announcement is permitted to the extent it otherwise violates (or would reasonably be expected to result in violation of) Section 9, 11 or 12, as applicable."  *See* Ex. A § 11(b).

53.    Mr. Orszag was bound by the Non-Solicit Provisions through November 20, 2024, the one-year anniversary of his termination.

54.    Dr. Israel's most recent Employment Agreement contains Non-Solicit Provisions that are similarly limited in scope and direction, subject to the Court's blue-penciling ruling.

55.    Dr. Israel continues to remain bound by his Non-Solicit Provisions up through the one-year anniversary of his resignation from Compass Lexecon—through March 31, 2026. Ex. E.

### 3.    *Confidentiality Agreements*

56.    Under Section 12 of the Employment Agreement ("Confidentiality Agreement"), and in related employment policies governing his access to and use of FTI technology resources and information, Mr. Orszag agreed that his access to Confidential Information, defined to include trade secrets of Compass Lexecon and FTI, "is for the sole and exclusive purpose of performing work for the benefit of the Company." Ex. A §§ 12(a), (b).

57.    Mr. Orszag therefore agreed to maintain such information "in strictest confidence" (except as required by legal process), and "not disclose [it] to any individual or business enterprise of any nature, or use for his own personal use or financial gain." *Id.* § 12(b).

58.    The Confidentiality Agreement, also customary in the consulting industry, is detailed and narrow in scope.

59.    ██████████████████████████████████

██████████████████████████████████████████

███████████████████████████

60.    Under his employment agreement, Mr. Orszag agreed that any breach or threatened breach of the Non-Compete Provisions, the Non-Solicit Provisions, the Confidentiality Agreement, or any other restrictions contained in §§ 9-16 of the agreement would cause substantial and irreparable harm to FTI and Compass Lexecon and that FTI and Compass Lexecon would become entitled to injunctive relief to secure their rights under the agreement. *See* Ex. A §§ 9(d), 11(d), 12(b), 19. ██████████████████████████████████

██

### E.    In 2023, Mr. Orszag, Joined By Dr. Israel, Began to Execute the Takeover Plan by Sowing Dissension Within Compass Lexecon

61.    The new employment agreements did not stop Mr. Orszag from pursuing his takeover plan with Dr. Israel.

62.    Mr. Orszag knew that they needed significant capital investment and a defection of a large number of Compass Lexecon employees to start the new firm he had threatened to create.

63.    ████████████████████████████████████████████████████████████████████████████████████████████████

64.    ████████████████████████████████████████████████████████████████████████████████████████████████████████

65.    ████████████████████████████████████████ Mr. Orszag openly fomented dissension by seizing upon certain internal issues, including challenges with a new firmwide billing system and FTI's decision to decline, due to conflicts, two client matters originated by Compass Lexecon.

66.    Mr. Orszag aligned with Dr. Israel, who told him in May 2023 that, if the conflicts issues were not resolved, they should "separate" themselves "from these conflicts."

67.    In advance of a June 2023 meeting among senior Compass Lexecon professionals and FTI management regarding the conflicts issues, Mr. Orszag urged Compass Lexecon professionals to question why they should stay with the firm since, he claimed, many were not bound by non-competition covenants.  Reflecting consciousness of his disloyalty, Mr. Orszag asked these colleagues not to identify him as the source for their questions.

68. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

69.     In July 2023, Mr. Orszag announced to FTI senior leadership his plan to call a meeting of Compass Lexecon senior staff, during which he would recount supposed "negative synergies" between FTI and Compass Lexecon.  Mr. Orszag showed FTI his draft "scripts" of the speech he planned to give to Compass Lexecon's senior staff.  His intent in these scripts was clear—to sow seeds of discontent among Compass Lexecon staff to create a fault line, from which Mr. Orszag could engineer a separation of Compass Lexecon from FTI.

70.     In the draft speech, Mr. Orszag would warn of a "significant rift" between FTI and Compass Lexecon and identify a set of "negative synergies," which, he contended, were causing "trust issues" between the parent and its subsidiary.

71.     Mr. Orszag threatened on a call with FTI leadership and directors around the same time that if FTI were to terminate Mr. Orszag for delivering his planned speech, 800 employees would leave the next day, causing significant harm to Compass Lexecon within a week or two.

72.     Thus, just six months into Mr. Orszag's new Employment Agreement, Mr. Orszag reneged on his duties by threatening his own employer's corporate existence.  His plan to compete with FTI and his threats to orchestrate a mass resignation remained locked and loaded.

73.     It was only as a result of extensive efforts by FTI's senior management that Mr. Orszag agreed to give a less bombastic speech.  Nonetheless, in the speech Mr. Orszag ultimately delivered to Compass Lexecon staff, he made clear that his demands to FTI must be met or resignations of the senior leadership of Compass Lexecon would follow.

F. ████████████████████████████████████
████████████████████████████

74.    Mr. Orszag's conduct in the spring and summer of 2023 went well beyond internally amplifying internal dissent regarding conflicts issues.  At the same time, Mr. Orszag—with Dr. Israel's knowledge—was talking with outside investors ████████████████████████ ████████████████

75.    To conceal his true intentions, in June 2023, Mr. Orszag suggested to FTI that he begin discussions to explore a small-scale divestiture of a few professionals from Compass Lexecon, for the limited purpose to avoid future conflicts of interest that might prevent one or both firms from accepting new business matters.

76.    But Mr. Orszag's suggestion was intentionally misleading because he neglected to inform FTI that he had already been reaching out to outside investors for weeks, to discuss a massive restructuring that would separate the whole of Compass Lexecon from FTI.

77.    On June 17, 2023, FTI's general counsel warned Mr. Orszag that it was premature for Mr. Orszag or others to engage with third parties on any potential restructuring options.

78.    Rather than adhering to that directive, as a loyal fiduciary should have done, Mr. Orszag instead deepened his engagement with potential investors, including Goldman Sachs, for the outcome he personally favored—an act of corporate theft to create a "NewCo" venture, which would absorb all or most of Compass Lexecon's business and put it under the control of Mr. Orszag and his hand-picked allies.

79.    ██████████████████████████████████████ ████████████████████████████████████

80.    During the same time period in which he was meeting with investors, Mr. Orszag sought out confidential information from within Compass Lexecon, including the amount of

experts' outstanding forgivable loans (which would need to be repaid if Mr. Orszag were to attract those employees to his new firm) and revenue originated by experts.

81. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

82. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

83. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

84. FTI never authorized Mr. Orszag to disclose the confidential information of Compass Lexecon and FTI to any outside investors or other third parties, let alone for purposes of appropriating Compass Lexecon's business. ████████████████████████

████████████████████████████████████████████████

████████████

85. ████████████████████████████████████████████

████████████████████████████████████████████

86. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

87. █████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

**G.      As He Sought Outside Investment, Mr. Orszag Improperly Primed Compass Lexecon Professionals for His New Firm**

88. █████████████████████████████████████████

██████████████████████████████████ Mr. Orszag began undisclosed efforts to attract Compass Lexecon professionals toward his new venture.

89.      A critical element in raiding Compass Lexecon's professional ranks was Mr. Orszag's plan to offer equity, backed by Goldman Sachs' valuation and its expected investment.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

90.      Without the anticipated large investment from Goldman Sachs, Mr. Orszag would not have been able to attract the large number of Compass Lexecon employees needed to start his new firm, which necessitated making significant up-front payments to lure them to join the new firm.   In conversations with Compass Lexecon employees, Mr. Orszag profiled the financial support of Goldman Sachs as a key reason for them to join his new firm.

91.     At various times and places, both before and after his restricted period ended, Mr. Orszag conveyed to certain Compass Lexecon professionals his plans to offer equity to selected partners in his new venture.

92.     For example, on June 25, 2023, a senior Compass Lexecon professional recounted an earlier conversation in which Mr. Orszag promised to "make sure that I get my current deal (with the new conditions as per my prior email) plus some equity share so that I would be no worse off than my new current deal [with Compass Lexecon]," when Mr. Orszag would start a new firm.

93.     In October 2023, Mr. Orszag held a dinner meeting in Milan, Italy, with the leaders of Compass Lexecon's European group. Mr. Orszag conveyed that, if the senior managing directors of that group moved to Mr. Orszag's new firm, they would become equity partners. He provided illustrative values for one unit (1%) of equity in the new venture.

94.     At multiple meetings of Compass Lexecon's Chicago-based management committee in 2023, Mr. Orszag openly discussed the idea of separating Compass Lexecon from FTI. He complained of an "FTI tax" that could be redistributed among partners in a new separate venture and argued that Compass Lexecon should not remain affiliated with FTI.  Mr. Orszag freely recounted his dealings with Goldman Sachs about investing in his planned venture.

**H.      Mr. Orszag's Unreasonable Threats and Demands to FTI Escalate in October and November 2023**

95.     The tipping point with Mr. Orszag came in October and November 2023, when Mr. Orszag revealed that he had no intention of living up to the commitments he had made under his Employment Agreement, and his fiduciary duties to Compass Lexecon and FTI.

96.     █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

97.    Mr. Orszag referenced the two paths in discussions with Compass Lexecon professionals in the fall of 2023. In the "amicable separation," FTI would retain only a small ownership interest in its own Compass Lexecon subsidiary, while FTI would get nothing in the "unamicable separation." This was a Hobson's choice amounting to no choice at all.

98.    In October 2023, Mr. Orszag met with the Chief Executive Officer of FTI.  During that meeting and in email correspondence that followed, Mr. Orszag presented a plan to overhaul the Compass Lexecon business to reapportion shareholder value and control to himself.  Mr. Orszag proposed that there be "significant changes to the control and governance of Compass Lexecon" and stated, "control changes are necessary to chart a path forward."

99.    In conveying his plans, Mr. Orszag demanded that FTI sell the Compass Lexecon business to him for a fraction of its true value.

100.    This time, Mr. Orszag made clear that the only "resolution" he would accept was the following "choice" for FTI:  Either (1) cede control of Compass Lexecon, or (2) he will "depart and start a new firm."

101.    No responsible board of directors for a public company charged with safeguarding shareholder value could accept such a major corporate restructuring, based on threats and phantom terms like those put forward by Mr. Orszag.

102.    After considerable efforts by FTI's executive management team and board members to dissuade Mr. Orszag from pursuing this extreme course, events reached a breaking point in

November 2023, when Mr. Orszag issued an ultimatum: FTI could either accept his proposed restructuring in principle—with the most critical economic and other terms left to be negotiated—by November 27, 2023, or else Mr. Orszag would make good on his threats and leave with Compass Lexecon's personnel and business following him in a mass departure.

103.  FTI regarded Mr. Orszag's threats as a more immediate and extreme version of the similar threats he and Dr. Israel had made the year before.

104.  Coupled with that history and his steady erosion of goodwill and trust throughout 2022 and 2023, Mr. Orszag's November 2023 ultimatum signaled that he was irredeemably placing his personal ambitions and benefits above the interests of FTI and Compass Lexecon, and that he did not care about the damage he might inflict on either company.

105.  Faced with this evidence of Mr. Orszag's intentional disloyalty, FTI's board of directors met on November 17, 2023, and voted unanimously to terminate Mr. Orszag for cause.

### I.    Mr. Orszag's Termination for Cause

106.    FTI terminated Mr. Orszag's employment for cause on November 20, 2023.  That day, FTI transmitted to Mr. Orszag a Notice of Termination for Cause that specified the acts that formed the basis for FTI's decision to terminate him and the provisions of the Employment Agreement under which Cause for termination existed. Ex. B. The Notice of Termination for Cause also advised Mr. Orszag of FTI's determination that the Cause for termination was not curable, explaining the grounds for that determination.  *Id.*  Mr. Orszag's termination was effective immediately. FTI initiated this litigation that same day, filing suit against Mr. Orszag in the Circuit Court for Montgomery County, Maryland. ███████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████

107.    On November 22, 2023, to avoid or minimize any interruption in services to its clients with pending matters, Compass Lexecon entered into a consulting agreement with Mr. Orszag effective as of November 20, 2023 (the "Consulting Agreement").   The Consulting Agreement enabled Mr. Orszag to continue to provide consulting services to then-current Compass Lexecon clients, including serving as an expert, and provided that Mr. Orszag would receive significant compensation for these services.

108.    Mr. Orszag remained bound by the restrictive covenants in his Employment Agreement during the one-year period of his Consulting Agreement, through and including November 20, 2024.

109.    At no time did Mr. Orszag move for a preliminary or permanent injunction to stop FTI's efforts to enforce his restrictive covenants while they were in force. While forgoing any of those legal actions, Mr. Orszag instead consciously preferred to keep working as a consultant for FTI and Compass Lexecon for the full period of his restrictive covenants.

110.    During this one-year period, Mr. Orszag worked with Dr. Israel to implement their shared plan to take over Compass Lexecon's business.

111.    Mr. Orszag received all the compensation he bargained for under his Consulting Agreement with Compass Lexecon, amounting to tens of millions of dollars of compensation paid to him under the terms of the Consulting Agreement.

112.    Compass Lexecon fully performed all its obligations to Mr. Orszag under the Consulting Agreement and Mr. Orszag never claimed otherwise.

113.    By entering into the Consulting Agreement and forgoing any timely motion to enjoin FTI's enforcement of his restrictive covenants, Mr. Orszag waived or forfeited any claim

to amounts above those actually paid by Compass Lexecon for the consulting services that he provided to Compass Lexecon's clients under the Consulting Agreement.

### J.    Mr. Orszag's Refusal to Repay Loans from FTI

114.    In his Employment Agreement, Mr. Orszag acknowledged that FTI had made him an interest-bearing loan pursuant to two promissory notes, which were attached as Exhibits B and C to the Employment Agreement.  *See* Ex. A § 4(c)(i) (referencing the "2013 Loan" and the "2013 Promissory Note"); *id.* § 4(c)(ii) (referencing the "2015 Loan" and the "2015 Promissory Note").

115.    In the Employment Agreement, Mr. Orszag agreed to abide by the terms of the 2013 Promissory Note and the 2015 Promissory Note.

116.    Under the terms of each promissory note, if the Employment Agreement were to be terminated by FTI for Cause, then all unpaid principal and accrued interest, not including amounts previously forgiven, would become due and payable immediately, and Mr. Orszag would be required to make full payment within 10 days (in the case of the 2013 Loan) or 10 business days (in the case of the 2015 Loan).[1]

117.    Under the terms of each promissory note, the entire amount of unpaid principal and accrued interest on the 2013 Loan and the 2015 Loan became due and payable on November 20, 2023, when Mr. Orszag was terminated for Cause.

118.    On December 12, 2023, FTI wrote to Mr. Orszag specifying these amounts and advising him of his obligation to pay them pursuant to the terms of the 2013 Promissory Note and 2015 Promissory Note.  FTI requested that Mr. Orszag make these payments immediately and advised him that he would be in default if he did not do so.

---

[1] The 2013 and 2015 Promissory Notes are included as Exhibits B and C to the unredacted version of the Employment Agreement, which was previously filed under seal at Mr. Orszag's request.

119.    On December 20, 2023, Mr. Orszag replied to FTI, expressly refusing to pay the outstanding principal and accrued interest on the 2013 and 2015 Promissory Notes.

**K.    Dr. Israel Works To Benefit Mr. Orszag's New Venture, Econic, By Undermining Compass Lexecon from Within**

120.    In this Third Amended Complaint, FTI presents claims against Mr. Orszag and Dr. Israel based on newly discovered evidence.

121.    At least from May 2024 through March 2025, if not earlier, Mr. Orszag and Dr. Israel acted in concert as part of a coordinated, tortious effort to take over, weaken, or destroy Compass Lexecon's business by raiding its professionals and clients, all to benefit their own personal financial interests and the financial interests of their new firm, Econic. ██████

████████████████████████████████████████

████████████████████████████████████

122.    From the time of its formation and continuing through March 31, 2025, and thereafter, Econic—acting through Mr. Orszag—was aware of, and benefitted from Dr. Israel's acts of corporate perfidy.  Econic and Mr. Orszag consciously ratified Dr. Israel's misconduct and, upon information and belief, never directed Dr. Israel to refrain from taking actions designed to harm Compass Lexecon and benefit Econic, while Dr. Israel was still employed by FTI and Compass Lexecon.

123.    It was a critical priority for FTI and Compass Lexecon to have a conflict-free President to defend Compass Lexecon's interests from the threats posed by Econic.  Had Dr. Israel informed FTI and Compass Lexecon's senior leaders that he had committed to join Econic and accept an undisclosed financial interest in Econic, they would have immediately terminated his service as Compass Lexecon's President.

      1.      ***Dr. Israel Shares FTI and Compass Lexecon Trade Secrets with Mr. Orszag After His Termination for Cause***

124.      On at least four occasions in 2024, Dr. Israel shared highly sensitive revenue reports with Mr. Orszag, against the interests of Compass Lexecon and FTI and without authorization. Dr. Israel did so knowing that Mr. Orszag was in active litigation against FTI for his plans and was continuing to execute their shared plans to take over the business of Compass Lexecon.

125.      The materials accessed, shared, used, or disclosed by Dr. Israel without permission were trade secrets of FTI and Compass Lexecon. They included extensive aggregations of data about FTI and Compass Lexecon's professionals, clients, finances, and operations, which derive independent economic value from not being generally known or readily reproducible outside the firm, as more particularly described in Count VI below.

126.      The materials accessed, shared, used, or disclosed by Dr. Israel without permission also included commercially sensitive, inside information about FTI and Compass Lexecon. Dr. Israel and Mr. Orszag had no legitimate business purpose to advance the interests of FTI and Compass Lexecon under the circumstances and during the times when they accessed, shared, used, or disclosed those materials.

127.      Through their unauthorized conduct, Mr. Orszag and Dr. Israel misappropriated trade secrets belonging to Plaintiffs ███████████████████████████ ████████████████████████████ all to benefit their personal interests.

      2.      ***Dr. Israel Conceals His Agreement to Accept a Significant Equity Stake in Econic While Serving As Compass Lexecon President***

128.      Unknown to senior leaders of FTI and Compass Lexecon, while Dr. Israel was serving as President of Compass Lexecon, he agreed to take an eight-figure equity stake in their direct competitor, Econic.  On November 21, 2024, Dr. Israel wrote to his financial advisor that he would "serve on the board of Jon O's new firm, and own 2% of that firm."

129.    Dr. Israel later told his advisors, in December 2024, that his equity stake in Econic was valued at approximately $20 million and that they should further discuss his "role" in the new firm. ███████████████████████████████████████████████████████

███████████████████████████

130.    Without disclosing this vital information to FTI or Compass Lexecon, Dr. Israel signed a new employment agreement on December 13, 2024, with FTI and Compass Lexecon, in which he agreed to continue in his role as Compass Lexecon's President through March 31, 2025.

131.    ███████████████████████ this agreement contained Non-Solicit and Non-Compete Provisions, as well as a Confidentiality Agreement. The Non-Compete Provisions were in effect through March 31, 2025; the Non-Solicit Provisions continue through at least March 31, 2026; and the Confidentiality Agreement does not have an expiration date. Ex. E § 9, 11, 12.

132.    At no point during the negotiations of this agreement or during its term did Dr. Israel inform the senior leaders of FTI or Compass Lexecon of his arrangements with Mr. Orszag, his significant financial interest in Econic, or his plans to join Econic.

133.    To the contrary, in multiple conversations with FTI's CEO and Compass Lexecon's Chairman, and with others, in late 2024 through March 2025, Dr. Israel led his colleagues to believe that he was planning to scale back his consulting practice, engage in teaching, or become an independent contractor after his term as President ended.

134.    On December 16, 2024—soon after signing his lucrative new Employment Agreement with Compass Lexecon and FTI—Dr. Israel emailed all Compass Lexecon North America employees to announce that he would remain "as Compass Lexecon President through Q1, 2025." He emphasized that "my plans remain unchanged . . . I will move into an independent contractor expert position as of April 1, 2025."

135.    Dr. Israel did not disclose his conflict even as he sought greater responsibility over Compass Lexecon's affairs. After the leader of Compass Lexecon's East Coast Competition group announced her departure for Econic, Dr. Israel wrote to FTI's CEO and Compass Lexecon's Chairman, on January 8, 2025, that his "recommendation" was that "I act as the head of the ECC [East Coast Competition group at Compass Lexecon], at least until things settle down some. Part of why I stayed on for this quarter is to help smooth issues like this that come up."

136.    Throughout his dishonest course of dealings, Dr. Israel abused his colleagues' trust by failing to reveal his plans to the leaders of FTI and Compass Lexecon until March 31, 2025, when he sent an email announcing his resignation as Compass Lexecon's President, with immediate effect, and his decision to join Econic "as a Founding Partner and Member of the Board of Managers," the next day.

137.    In his email, Dr. Israel admitted that he withheld the truth from his former colleagues "to avoid making such an announcement while still serving as Compass Lexecon President."

### 3.    *Dr. Israel Steers Clients and Professionals to Econic, While Still Serving as Compass Lexecon's President*

138.    Worst yet, while concealing his interest in Econic from senior leaders at FTI and Compass Lexecon, Dr. Israel actively worked with Mr. Orszag to undermine Compass Lexecon's business interests, further abusing his position of trust, while advancing his personal interests and Econic's business interests after its public launch in February 2025.

139.    In his role as President and as one of Compass Lexecon's top revenue generators in 2023 and 2024, Dr. Israel had a unique ability to impact Compass Lexecon's business interests for good or for ill.

140.    For his part, Mr. Orszag sought to lure Compass Lexecon employees to Econic with offers of equity backed by the Goldman Sachs investment Mr. Orszag had improperly obtained.

141.    And, as Dr. Israel confided in Mr. Orszag in early February 2025, Dr. Israel viewed his "job" at Compass Lexecon as helping Compass Lexecon employees leave for Econic.  As part of that "job" of hollowing out his employer's business interests, Dr. Israel suggested that a Compass Lexecon professional (Colleague 1) should withhold billings for his time working for Compass Lexecon and instead bill the services to the client after joining Econic. Dr. Israel remarked that Colleague 1 should leave Compass Lexecon soon so all the time could be included on a February bill sent by Econic.

142.    Dr. Israel also aggressively steered business from Compass Lexecon to Econic on various occasions in February and March 2025, when he was working from Maryland, including:

    a.    Dr. Israel encouraged Client A to move its business to Econic, telling the client, "we can certainly move as much of the work as possible to Econic." Underlining his dishonesty, Dr. Israel asked that Client A "not mention [to Compass Lexecon's Chairman] what you know of my plans vis-à-vis Econic."

    b.    Dr. Israel asked if Colleague 2, whom Dr. Israel knew was heading to Econic, wanted to run a new matter for Client B. Dr. Israel suggested that Colleague 2 propose four potential experts at Econic—including Mr. Orszag—to Client B. When Colleague 2 expressed ethical concerns about this while still employed by Compass Lexecon, Dr. Israel volunteered to call Client B himself. Dr. Israel never presented this matter to Compass Lexecon or submitted a conflicts check.

    c.    When Client C asked for help on a new matter, Dr. Israel explained he was slowing down and proposed a specific colleague he knew would soon be leaving

Compass Lexecon to join Econic. That colleague and another Econic professional led the matter at Econic, with Dr. Israel subcontracting through Econic until he resigned from Compass Lexecon.

d.    After declining another matter with a potential new client ("Client D"), Dr. Israel promptly emailed Mr. Orszag and another Econic professional to ask if either would be interested. Ultimately, Dr. Israel proposed two professionals to Client D who both joined Econic as "Founding Partners."

e.    Dr. Israel contacted other former and current Compass Lexecon professionals, who either had joined, or were planning to join, Econic, about reaching out to Compass Lexecon clients to discuss Econic with those clients.

143.    Even when a client preferred not moving its business from Compass Lexecon to Econic, Dr. Israel reacted with frustration: Dr. Israel complained to a colleague who was heading for Econic that the client was "being difficult" because the client "wants everything at CL [Compass Lexecon]," rather than Econic. Dr. Israel told the colleague that he might stop serving as an expert if the client would not move to Econic.

### 4.    *Dr. Israel Violates His Non-Solicit Provisions After Joining Econic*

144.    FTI and Compass Lexecon recently learned that Dr. Israel has continued violating his ongoing non-solicit obligations after leaving Compass Lexecon. Dr. Israel remains subject to his Non-Solicit Provisions through March 31, 2026, because he is working at, and has an interest in, a competing business. Ex. E.

145.    After joining Econic, in April 2025, Dr. Israel solicited another Compass Lexecon client to move its business from Compass Lexecon to Econic.

146.    As Dr. Israel told the client, with Mr. Orszag copied on the email, "I would LOVE it if some arrangement can be reached where I could work on this using an Econic team[.]"

147.  That direct solicitation violates Dr. Israel's Non-Solicit Provisions.

**J. Defendants' Tortious Acts Have Substantially Damaged FTI and Compass Lexecon**

148.  Defendants' campaign of misconduct has resulted in severe economic consequences for FTI and Compass Lexecon. Compass Lexecon has experienced a significant net loss in revenues from its top fifty clients, including multi-million-dollar losses in revenues from over a dozen of its largest clients since Econic's launch. Compass Lexecon has lost well over a hundred of its professionals to Econic, and also has incurred higher expenses through retention costs and increased salaries as a result of Defendants' actions. All these losses, which amount to hundreds of millions of dollars, if not more, were caused in significant part by the tortious actions and breaches of contract and fiduciary duty committed by Mr. Orszag and Dr. Israel, actions which improperly benefited them both financially and improperly benefited their new firm, Econic.

149.  These significant harms are the intended consequences of Mr. Orszag's and Dr. Israel's plans beginning from 2022—to take over Compass Lexecon, poach its clients, and raid its employees. ███████████████████████████████████████████████████████

████████████████████████████████████████████████████ Using the draw of that Goldman Sachs investment, Mr. Orszag touted the promise of equity to Compass Lexecon employees to lure them to his new firm, Econic. Meanwhile, Dr. Israel—entrusted by the leaders of FTI and Compass Lexecon to be the President of Compass Lexecon—sabotaged it from within.  With Econic's and Mr. Orszag's blessing, Dr. Israel steered clients and employees to Econic, having secretly agreed to accept an ownership stake worth tens of millions of dollars.  This coordinated and tortious attack on FTI and Compass Lexecon violated Defendants' statutory, contractual, and common law duties as described below.

## COUNT I: BREACH OF CONTRACT (NON-SOLICIT PROVISIONS) (AGAINST MR. ORSZAG)

150.    Plaintiff FTI realleges and incorporates by reference the above allegations as if set forth herein.

151.    Mr. Orszag entered into a binding contract with FTI and Compass Lexecon effective January 1, 2023, when he executed the Employment Agreement.  Under the Employment Agreement, Mr. Orszag agreed to be bound by the Non-Solicit Provisions, which explicitly prohibited Mr. Orszag from soliciting FTI and Compass Lexecon clients or employees under certain circumstances during his employment and for one year following his termination from Compass Lexecon.

152.    Mr. Orszag breached the Non-Solicit Provisions by soliciting, inducing, or attempting to influence senior professionals, consultants, and other employees at Compass Lexecon to leave FTI in the event he left.  Mr. Orszag specifically sought to coordinate a mass departure of Compass Lexecon's highest performing and top-ranking employees.  Mr. Orszag also threatened FTI and Compass Lexecon with the departure of other key staff members in the event he left Compass Lexecon.  By these and other actions set forth herein, at a minimum, Mr. Orszag has disrupted or attempted to disrupt the relationships between FTI and Compass Lexecon and their clients, prospective clients, and key employees.

153.    During the contractual non-solicitation period, Mr. Orszag initiated contact with FTI and Compass Lexecon employees for some or all of the following purposes: to review the status of his ongoing efforts to form a new competing venture; to summarize his efforts to raise financing for that venture; to describe the estimated value of that new venture; and to estimate the value of units of equity participation in his new venture for those employees whom he would offer

equity participation in the event they would join that venture, including as more particularly set forth above. *See, e.g.*, *supra* ¶¶ 91-94.

154.    At least some of the individual employees of FTI or Compass Lexecon who received such communications from Mr. Orszag during his contractual non-solicitation period understood that his communications were implied or express forms of solicitation for them to join Mr. Orszag's new venture upon terms to be defined in a future offer.

155.    At least one individual employee of FTI or Compass Lexecon who heard such communications from Mr. Orszag during the contractual non-solicitation period later accepted such an offer and left Compass Lexecon to join Econic.

156.    In June 2023, Mr. Orszag told a Compass Lexecon professional that the professional would receive equity in any new company Mr. Orszag started.

157.    In October 2023, Mr. Orszag conveyed to European leaders of Compass Lexecon that if those individuals moved to Mr. Orszag's new firm they would become equity partners.

158.    Upon information and belief, Mr. Orszag arranged for Dr. Israel's board seat and equity interest before November 21, 2024.

159.    FTI and Compass Lexecon have fully performed their obligations under the Employment Agreement.

160.    As a direct result of Mr. Orszag's breaches of his Non-Solicit Provisions, Plaintiff FTI has suffered substantial damages, as described in paragraph 148.

## COUNT II: BREACH OF CONTRACT (NON-COMPETE PROVISIONS)
## (AGAINST MR. ORSZAG)

161.    Plaintiff FTI realleges and incorporates by reference the above allegations as if set forth herein.

162.    Mr. Orszag entered into a binding contract with FTI and Compass Lexecon effective January 1, 2023, when he executed the Employment Agreement.  Under the Employment Agreement, Mr. Orszag agreed to be bound by the Non-Compete Provisions, which explicitly prohibited Mr. Orszag from competing with Compass Lexecon for one year following Mr. Orszag's termination for cause.

163.    The Non-Compete Provisions are valid and enforceable, and applied in full force during the period prior to and for one year following Mr. Orszag's termination from Compass Lexecon and FTI.

164.    By the actions described above, namely Mr. Orszag's plan to invalidate his restrictive covenants in California, his intent to continue soliciting FTI and Compass Lexecon employees upon his departure from FTI, his plans and actions to set up his own competing firm post-employment, and his steps taken in furtherance of those plans during and after his employment, Mr. Orszag has breached and unequivocally repudiated and renounced his obligations under the Non-Compete Provisions.

165. As a result of Mr. Orszag's breaches as defined in this Count, Plaintiff FTI has suffered substantial damages as described in paragraph 148.

## COUNT III: BREACH OF FIDUCIARY DUTY OF LOYALTY
### (AGAINST MR. ORSZAG)

166.    Plaintiff FTI realleges and incorporates by reference the above allegations as if set forth herein.

167.    Mr. Orszag, as a Senior Managing Director of Compass Lexecon and subject to his Employment Agreement with FTI and Compass Lexecon, owed a fiduciary duty of loyalty to FTI and Compass Lexecon.  This duty required Mr. Orszag to, among other things, act solely for the benefit of FTI and Compass Lexecon in all matters within the scope of his employment and to avoid all conflicts between his duties of loyalty to FTI and Compass Lexecon and his self-interest.

168.    By the course of conduct alleged herein, Mr. Orszag breached or willfully breached his fiduciary obligations to FTI and Compass Lexecon.  While employed by FTI and Compass Lexecon, Mr. Orszag acted self-interestedly and in breach of his duties to FTI and Compass Lexecon, which obligated him to deliver his best efforts to FTI and Compass Lexecon and avoid disruption to FTI's and Compass Lexecon's business.  Mr. Orszag's actions in breach of his duty of loyalty included: (i) soliciting Compass Lexecon's senior professionals and employees and otherwise seeking to organize a mass resignation from FTI; (ii) threatening to create a competing business and to appropriate the Compass Lexecon business; (iii)  taking advanced steps toward creating a competing business with the aspiration of appropriating the entire Compass Lexecon business; and (iv) █████████████████████████████████████████████ ███████████████████████████████████████████████

169.    As a direct result of Mr. Orszag's breach of his fiduciary obligations, Plaintiffs have suffered substantial damages as described in paragraph 148.

## COUNT IV: BREACH OF CONTRACT (2013 PROMISSORY NOTE)
## (AGAINST MR. ORSZAG)

170.    Plaintiff FTI realleges and incorporates by reference the above allegations as if set forth herein.

171.    Mr. Orszag entered into a binding contract with Plaintiff when he agreed to the 2013 Promissory Note.  Under the terms of the 2013 Promissory Note, in the event that Mr. Orszag's Employment Agreement was terminated for Cause prior to January 1, 2024, any unpaid principal and accrued interest, not including amounts previously forgiven, would become due and payable immediately, and Mr. Orszag would be required to make full payment within 10 days.

172.    Mr. Orszag breached his repayment obligation under the 2013 Promissory Note when he failed to repay the outstanding principal and accrued interest within 10 days of his termination for Cause on November 20, 2023.  On December 20, 2023, in response to FTI's request after the deadline had passed that Mr. Orszag make full payment immediately or be in default, Mr. Orszag explicitly disavowed any payment obligation under the 2013 Promissory Note.

173.    As a direct result of Mr. Orszag's breach of his repayment obligation under the 2013 Promissory Note, Plaintiff FTI has suffered damages—specifically, loss of the unpaid principal and accrued interest that Mr. Orszag was obligated to repay.

## COUNT V: BREACH OF CONTRACT (2015 PROMISSORY NOTE)
## (AGAINST MR. ORSZAG)

174.    Plaintiff FTI realleges and incorporates by reference the above allegations as if set forth herein.

175.    Mr. Orszag entered into a binding contract with Plaintiff when he agreed to the 2015 Promissory Note. Under the terms of the 2015 Promissory Note, in the event that Mr. Orszag's Employment Agreement was terminated for Cause prior to January 1, 2024, any unpaid principal and accrued interest, not including amounts previously forgiven, would become due and

payable immediately, and Mr. Orszag would be required to make full payment within 10 business days.

176.    Mr. Orszag breached his repayment obligation under the 2015 Promissory Note when he failed to repay the outstanding principal and accrued interest within 10 business days of his termination for Cause on November 20, 2023.  On December 20, 2023, in response to FTI's request after the deadline had passed that Mr. Orszag make full payment immediately or be in default, Mr. Orszag explicitly disavowed any payment obligation under the 2015 Promissory Note.

177.    As a direct result of Mr. Orszag's breach of his repayment obligation under the 2015 Promissory Note, Plaintiff FTI has suffered damages—specifically, loss of the unpaid principal and accrued interest that Mr. Orszag was obligated to repay.

## COUNT VI: MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 (AGAINST MR. ORSZAG AND DR. ISRAEL)

178.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

179.    In implementing his plans to take over Compass Lexecon, Mr. Orszag received significant assistance from Dr. Israel, including by his accessing, sharing, using, and disclosing to Mr. Orszag sensitive confidential information of FTI and Compass Lexecon.

180.    These materials included trade secrets of Plaintiffs that derive independent economic value from not being generally known or readily ascertainable outside FTI and Compass Lexecon.

181.    Up through at least December 2024, Mr. Orszag and Dr. Israel improperly accessed, shared, used, or disclosed, without permission, data aggregations showing extensive, detailed information about Compass Lexecon's financial performance, personnel performance, and client-matters, including, by way of example and not limitation, the following trade secrets:

a. a revenue origination report that Dr. Israel disclosed on May 17, 2024, to Mr. Orszag (who was then an independent contractor no longer serving in a management role for Compass Lexecon, and actively planning to form a competing venture), organized in three separate worksheets showing (among other things) aggregate fees earned by Compass Lexecon for the year-to-date up through April 2024, detailed fee income by originator, and fee generation details about dozens of specific client-matters, many or most of which did not concern Mr. Orszag;

b. a revenue report that Dr. Israel disclosed on August 30, 2024, to Mr. Orszag, organized at Dr. Israel's request in three separate worksheets that showed a summary of revenues by each expert who worked on client-matters, detailed information about revenues earned by experts on dozens of client-matters, and revenues by client-matters for the year-to-date up through July 2024;

c. a consolidated revenue report that Dr. Israel disclosed on September 18, 2024, to Mr. Orszag, organized in seven separate worksheets that showed similar detailed information about Compass Lexecon revenues earned through August 2024, fees by originator, details about revenues for specific client-matters, and revenues earned by each expert who worked on particular client-matters; and

d. a consolidated revenue report that Dr. Israel disclosed on October 17, 2024, to Mr. Orszag, organized in seven separate worksheets showing similar detailed information about Compass Lexecon revenues earned through September 2024.

182.    The reports identified in the preceding paragraph were transmitted in interstate commerce. They were generated by Compass Lexecon from databases owned, controlled, and

maintained by FTI and distributed on a monthly basis only to a few of the highest-level executives of Compass Lexecon and FTI.

183.    After Mr. Orszag was terminated in November 2023, he was removed as a recipient of reports like those in this Count because he had been terminated from his management role, he had made clear his intention to set up a competing firm, and he was in active litigation against FTI for (among other things) breach of his fiduciary duties owed to Compass Lexecon and FTI.

184.    The data contained in these subject reports, which were accessed, shared, used, or disclosed by Dr. Israel and Mr. Orszag without permission, were so extensive that they could not feasibly have been memorized or recreated from sources outside of FTI or Compass Lexecon.

185.    FTI and Compass Lexecon invested significant time, money, expertise, and resources over a period of years to procure, develop, maintain, and populate the databases used to generate the specific data reports identified herein, which are specific examples of trade secrets misappropriated by Mr. Orszag and Dr. Israel.

186.    The revenue reports identified in this Count had independent economic value based on their secrecy, by showing monthly business trends allowing FTI and Compass Lexecon to identify important and emerging clients, client-matters, revenue originators, and experts working on client-matters.

187.    FTI and Compass Lexecon's senior executive management use the reports described in this Count to identify trends in revenue generations from clients and professionals over time, which is essential information used in retention and business development efforts and in making compensation decisions.

188.    In the hands of a competitor or would-be competitor like Mr. Orszag and Dr. Israel, the reports would allow them to target recruitment and business development efforts based on

extensive real-time information about the business opportunities from clients and professionals Mr. Orszag was planning to raid from Compass Lexecon, and in fact did raid once he established Econic. For example, they could use the reports to decide what employment terms to present to specific professionals and what engagement terms to offer specific clients.

189.    FTI and Compass Lexecon use and have used commercially reasonable measures to maintain the secrecy and confidentiality of the foregoing materials, including through the following contractual, policy, technological, and physical means: (1) by requiring FTI and Compass Lexecon personnel, including each individual Defendant while they were employed by Compass Lexecon, to enter into confidentiality agreements to safeguard company confidential information; (2) by requiring FTI and Compass Lexecon personnel, including each individual Defendant, to comply with policies governing the acceptable use of FTI and Compass Lexecon technology resources; (3) by imposing access controls on FTI and Compass Lexecon technology resources, such as password protection, multi-factor authentication, and data encryption; and (4) by imposing extensive physical security measures to restrict access to FTI and Compass Lexecon offices and facilities only to authorized personnel, clients, and other approved visitors.

190.    On information and belief, Mr. Orszag's and Dr. Israel's purposes for accessing, sharing, using, and disclosing Plaintiffs' trade secrets were to advance their personal financial interests and Econic's interests over the interests of FTI and Compass Lexecon, through some or all of the following means: (1) to facilitate efforts to recruit FTI and Compass Lexecon personnel to join Econic; (2) to improve their financial models based on Compass Lexecon's financial performance, personnel levels, structure, and operations, to seek and secure third-party investment for Econic, as though it was substantially equivalent in value to Compass Lexecon; and (3) to seek and originate business for Econic from existing or former clients of Compass Lexecon. Through

these means, Mr. Orszag and Dr. Israel were able to avoid significant time and cost in attempting to build a rival startup firm to take over Compass Lexecon, an established company with hundreds of personnel operating worldwide for decades.

191.    Mr. Orszag and Dr. Israel's conduct in misappropriating Plaintiffs' trade secrets was active and willful, in view of the overall context of their actions taken over a substantial time-period, as set out throughout this Complaint.

192.    As a direct and proximate result of Mr. Orszag's and Dr. Israel's misappropriation of trade secrets, FTI and Compass Lexecon have suffered significant economic injury, as described in paragraph 148.

193.    In turn, Mr. Orszag and Dr. Israel have been unjustly enriched by receiving significant economic and reputational benefits that stemmed from their acts of misappropriation of Plaintiffs' trade secrets.

194.    Mr. Orszag and Dr. Israel have never accounted to Plaintiffs for their unauthorized acts of misappropriation; nor have they assured Plaintiffs that their trade secrets are no longer being used and are no longer within Defendants' possession, custody, or control.

195.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

## COUNT VII: BREACH OF CONTRACT (CONFIDENTIALITY AGREEMENTS) (AGAINST MR. ORSZAG AND DR. ISRAEL)

196.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

197.    █████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

198.    █████████████████████████████████████████

███████████████████████████████████████████████

██████████

199.    From at least 2023 through present, including as more particularly set forth above, Mr. Orszag and Dr. Israel breached and continue to breach their respective Confidentiality Agreements by accessing, sharing, using, or disclosing to third parties, extensive volumes of confidential information of FTI or Compass Lexecon, or materials prepared based on confidential information of FTI or Compass Lexecon, for unauthorized competitive purposes of Mr. Orszag and the business he intended to launch, and contrary to FTI's or Compass Lexecon's business interests.

200.    Mr. Orszag's and Dr. Israel's purposes for accessing, sharing, using, and disclosing FTI's and Compass Lexecon's trade secrets and other confidential information were to advance Econic's interests, for their own improper personal benefits, over the interests of FTI and Compass Lexecon, as described above.

201.    As a direct and proximate result of Mr. Orszag and Dr. Israel's breaches of their Confidentiality Agreements, FTI and Compass Lexecon have suffered significant economic injury, as described in paragraph 148.

202.    In turn, Mr. Orszag and Dr. Israel have been unjustly enriched by receiving improper significant economic and reputational benefits that stemmed from their breaches of the Confidentiality Agreements.

203.    Mr. Orszag and Dr. Israel have never accounted to Compass Lexecon or FTI for their unauthorized acts of misappropriation, much less assured Plaintiffs that their trade secrets and other confidential information are no longer being used and are no longer within Defendants' possession, custody, or control.

204.    ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████

## COUNT VIII: BREACH OF FIDUCIARY DUTY OF LOYALTY
## (AGAINST DR. ISRAEL)

205.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

206.    Dr. Israel, as a senior manager and President of Compass Lexecon, owed employment and fiduciary duties to Compass Lexecon and FTI. These duties required Dr. Israel, among other things, to act solely for the benefit of FTI and Compass Lexecon in all matters within the scope of his employment and to avoid all conflicts between his duties and his self-interest or the interests of Econic.

207.    By the course of conduct alleged herein, Dr. Israel breached or willfully breached his fiduciary obligations to FTI and Compass Lexecon. While still employed by Compass Lexecon but having already—and secretly—agreed to join Econic, Dr. Israel steered lucrative business opportunities away from Compass Lexecon to Econic. Dr. Israel also encouraged employees of Compass Lexecon to resign from the firm and join Econic, including by attempting to steer business toward those departing employees. He engaged in deception by taking active and specific steps to conceal his actions from the senior leadership of Compass Lexecon and FTI, evidencing his consciousness of disloyalty and a pattern of disregard for the truth.

208.    Dr. Israel had a duty to disclose, as of November 21, 2024, if not earlier, that he had agreed to accept a 2% equity position in Econic and a seat on Econic's board. He breached that duty by consciously withholding these material facts from Compass Lexecon and FTI.

209.    Dr. Israel's additional actions in breach of his duties of loyalty included, without authorization, accessing, sharing, using, or disclosing FTI's and Compass Lexecon's trade secrets and other confidential information and resources to facilitate Mr. Orszag's efforts to establish a competing business to take over Compass Lexecon.

210.    As a direct and proximate result of Dr. Israel's gross breaches of his duty of loyalty, Plaintiffs have suffered substantial damages, as described in paragraph 148.

### COUNT IX: BREACH OF CONTRACT (NON-SOLICIT PROVISIONS) (AGAINST DR. ISRAEL)

211.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

212.    Dr. Israel breached and, on information and belief, continues to breach his Non-Solicit Provisions.

213.    Dr. Israel entered into a binding contract with FTI and Compass Lexecon effective January 1, 2025, which contained Non-Solicit Provisions that prohibited Dr. Israel from soliciting FTI or Compass Lexecon business and clients under certain circumstances during his employment.

214.    Dr. Israel breached his Non-Solicit Provisions while President of Compass Lexecon by steering clients and business of FTI and Compass Lexecon to Econic, including as more particularly set forth in paragraphs 141-147 above.

215.    Dr. Israel remains subject to his non-solicitation obligations through March 31, 2026. In April 2025, he breached that restrictive covenant by reaching out to a client of Compass Lexecon and seeking to obtain their business for Econic.  On information and belief, Dr. Israel's breaches of his Non-Solicit Provisions are ongoing.

216.    FTI and Compass Lexecon have fully performed their obligations under Dr. Israel's employment agreements.

217.    As a direct and proximate result of Dr. Israel's breaches of his Non-Solicit Provisions, Plaintiffs have suffered substantial damages, as described in paragraph 148.

218.    Because Dr. Israel's breaches of his Non-Solicit Provisions have deprived Plaintiffs of the benefit of their bargain, Plaintiffs seek an order extending the non-solicit period by the full period of his non-compliance.

## COUNT X: BREACH OF CONTRACT (NON-COMPETE PROVISIONS) (AGAINST DR. ISRAEL)

219.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

220.    ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

221. By the actions described above, including his agreement to accept equity in, and a board seat with, Econic, his misappropriation and disclosure of trade secrets to Mr. Orszag for competitive purposes, his coordination with Mr. Orszag on their shared interest in developing the business of Econic, his steering of business opportunities to Econic, and his acts of disloyalty and dishonesty at times when he was serving as Compass Lexecon's President and was charged to defend the company against Mr. Orszag's competitive threats, Dr. Israel violated his Non-Compete Provisions.

222. As a result of Dr. Israel's breaches as defined in this Count, Plaintiffs suffered substantial damages, as described in paragraph 148.

## COUNT XI: FRAUD
## (AGAINST DR. ISRAEL)

223. Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

224. Dr. Israel owed a duty to FTI and Compass Lexecon to disclose material information that FTI and Compass Lexecon would reasonably want to know.

225. As part of his duty, Dr. Israel should have disclosed in November 2024, if not earlier, that he had already agreed to accept a 2% equity stake, worth tens of millions of dollars, in Econic and a board seat.

226. As part of his duty, Dr. Israel should have disclosed his acceptance of an offer of employment with Econic prior to his resignation from Compass Lexecon on March 31, 2025.

227. In failing to disclose these material facts and through his steering of Compass Lexecon clients and employees to Econic, Dr. Israel intended to defraud and deceive FTI and Compass Lexecon.

228.    FTI and Compass Lexecon relied on the absence of such truthful disclosures in allowing Dr. Israel to serve as Compass Lexecon's President while Mr. Orszag and Econic were seeking to poach Compass Lexecon's employees.

229.    FTI and Compass Lexecon relied on the absence of Dr. Israel's disclosures to their detriment and, as a result, suffered substantial damages, as described in paragraph 148.

**COUNT XII: UNJUST ENRICHMENT**
**(AGAINST ECONIC)**

230.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

231.    As a result of the foregoing alleged misconduct by the individual Defendants, including their misappropriation of FTI's trade secrets, misuse of their confidential information, breaches of fiduciary and employment duties owed to them, soliciting their personnel and clients in violation of restrictive covenants, and steering their clients and business opportunities to Econic, Econic has received significant economic benefits. Those benefits include the receipt of lucrative business opportunities, valuable trade secrets and confidential information of FTI and Compass Lexecon, valuable intangible assets developed based on those trade secrets and confidential information, ███████████████████████████████████████ ████████████████████████████████████████ ██████████ and Econic's ability to employ talented economic consulting professionals who were recruited based at least in part on the misappropriation and disclosure of those trade secrets and confidential information and/or in violation of the individual Defendants' Non-Solicitation obligations.

232.    Because Mr. Orszag and Dr. Israel—both "Founding Partners" of Econic—knew and intended that their actions enriched Econic at the expense of FTI and Compass Lexecon,

Econic gained actual or imputed knowledge that it was receiving these benefits under circumstances that make it inequitable for Econic to retain those benefits.

233.    To avoid a manifest inequity, under the facts and circumstances more particularly alleged throughout this Complaint, the Court should establish a constructive trust over all profits earned by Econic that are fairly traceable to the Defendants' inequitable conduct.

## COUNT XIII (TORTIOUS INTERFERENCE)
### (AGAINST MR. ORSZAG AND ECONIC)

234.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

235.    Beginning on November 20, 2024, Mr. Orszag was the principal and founder of Econic, and his acts alleged in this Complaint on and after that date were taken within the scope of his employment with Econic and to benefit Econic.

236.    Mr. Orszag and Econic were aware at all times that Dr. Israel owed fiduciary and employment duties to Compass Lexecon, ███████████████████████ ███████████████████████ while serving as its President through March 31, 2025.

237.    Mr. Orszag and Econic used that knowledge intentionally to undermine Compass Lexecon's interests from within, for Econic's benefit.

238.    Despite their knowledge of Dr. Israel's duties to FTI and Compass Lexecon, Mr. Orszag and Econic induced Dr. Israel to breach those fiduciary and contractual duties owed to Plaintiffs, by offering him a 2% equity stake in Econic, estimated to be worth tens of millions of dollars, and a board seat, while Dr. Israel was the President of Compass Lexecon.

239.    Upon information and belief, Mr. Orszag and Dr. Israel reached this agreement in principle while Mr. Orszag was still subject to his non-solicit restrictive covenant, which extended through November 20, 2024.

240.    Econic ratified Mr. Orszag's offer—and Dr. Israel's agreement to accept the offer—as shown by Dr. Israel's repeated references to his offer with his financial advisors and others in late 2024 and early 2025, after Econic's formation.  In early March 2025, Dr. Israel sent a copy of his Econic offer letter to his financial advisor.

241.    Mr. Orszag and Econic understood that Dr. Israel would continue outwardly to serve as Compass Lexecon's President for over four months, while having a significant undisclosed financial interest in Econic, which was Compass Lexecon's direct competitor.

242.    Mr. Orszag and Econic benefited from Dr. Israel's conflict, as he took steps to advance the interests of Econic between, at least, November 20, 2024, and March 31, 2025, rather than serving the interests of Compass Lexecon, the company to which he owed fiduciary and employment duties in his role as President.

243.    The actions taken by Mr. Orszag and Econic, without justification, intentionally interfered with Plaintiffs' contractual relationship with Dr. Israel.

244.    As a direct and proximate result of Mr. Orszag's and Econic's improper interference with Dr. Israel's fiduciary and contractual duties to Plaintiffs, Plaintiffs have suffered substantial damages, as described in paragraph 148.

## COUNT XIV (UNFAIR COMPETITION)
### (AGAINST ALL DEFENDANTS)

245.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

246.    All Defendants engaged in unfair competition against Plaintiffs through their improper and tortious acts, as further set forth above.

247.    Those tortious and improper acts of both individual Defendants include, among others, misappropriation of Plaintiffs' trade secrets, misuse of their confidential information,

breaches of fiduciary and employment duties owed to them, soliciting their personnel and clients in violation of restrictive covenants, steering their clients and business opportunities to Econic, and Mr. Orszag's tortious interference with Dr. Israel's relationship with FTI.

248.    During the times that each individual Defendant was acting as an agent of Econic, Econic was liable for their tortious acts under principles of agency and *respondeat superior*.

249.    As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered substantial damages, as described in paragraph 148.

<u>COUNT XV: CIVIL CONSPIRACY</u>
<u>(AGAINST ALL DEFENDANTS)</u>

250.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

251.    Mr. Orszag and Dr. Israel committed themselves to pursue a new competing venture that would come to include each of the forms of actionable misconduct described in this Complaint, including misappropriation of FTI's and Compass Lexecon's trade secrets, misuse of their confidential information, breaches of fiduciary and employment duties owed to Plaintiffs, soliciting their personnel and clients in violation of restrictive covenants, and steering their clients and business opportunities to Econic, all of which constituted unfair competition.

252.    Mr. Orszag and Dr. Israel had a meeting of the minds to engage in these forms of misconduct from at least May 2024, and continuing through Dr. Israel's departure from Compass Lexecon, starting with Dr. Israel's unauthorized disclosures of sensitive information to Mr. Orszag.

253.    From Econic's formation through Dr. Israel's departure from Compass Lexecon, Econic, through Mr. Orszag, joined the civil conspiracy with Dr. Israel.

254.    Defendants' means and methods, as more particularly described above, included acts of deceit and concealment, as they subverted the interests of Compass Lexecon in favor of their new venture, including during times when Dr. Israel served as an FTI and Compass Lexecon fiduciary.

255.    Mr. Orszag—whose acts are imputed to Econic after its formation—and Dr. Israel had extensive direct interactions through which they formed an agreement to compete against FTI and Compass Lexecon that came to include unlawful, tortious, inequitable, and dishonest means, and they persisted in refining and deepening that course of actionable conduct by involving other individuals and entities – including Compass Lexecon employees and clients – in their dishonest scheme.

256.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have suffered substantial damages, as described in paragraph 148.

<h3 style="text-align:center">PRAYER FOR RELIEF</h3>

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)    Enter judgment in favor of Plaintiffs and against Defendants for compensatory damages in excess of $75,000;

(b)    Award to Plaintiffs damages pursuant to the statutory multiplier under the Defend Trade Secrets Act;

(c)    Award to Plaintiffs their reasonable attorneys' fees, plus costs and pre-judgment and post-judgment interest;

(d)    Order Defendants to disgorge their profits stemming from their acts of misappropriation and tortious acts;

(e) Establish a constructive trust in favor of Plaintiffs, under the Court's jurisdiction, to hold any and all profits stemming from the inequitable or unlawful conduct of the Defendants alleged herein that was taken for the benefit of Econic;

(f) Hold Defendants jointly and severally liable for all damages resulting from their unlawful conduct;

(g) Award Plaintiffs punitive damages against Dr. Israel and Mr. Orszag;

(h) Enjoin Mr. Orszag and Dr. Israel from further ongoing access to, or possession, use, disclosure, or sharing of, FTI's and Compass Lexecon's trade secrets and confidential information; and enjoin Dr. Israel from further ongoing breaches of his restrictive covenant not to solicit Compass Lexecon clients, business, and professionals;

(i) Enter an order extending the period of Dr. Israel's Non-Solicit Provisions to account for his periods of noncompliance following his departure from Compass Lexecon;

(j) Award all additional civil remedies available in law and fact based on Defendants' foregoing actionable conduct proven at trial; and

(k) Award all further relief the Court deems just and appropriate.

*　　*　　*　　*

50

**ZUCKERMAN SPAEDER LLP**

    */s/ William J. Murphy*
William J. Murphy (Fed. Bar No. 00497)
Daniel P. Moylan (Fed. Bar No. 26476)
Sara L. Alpert Lawson (Fed. Bar No. 31011)
Kirk E. MacKinnon Morrow (Fed. Bar No. 31703)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 949-1146 (office)
(410) 659-0436 (fax)
wmurphy@zuckerman.com
dmoylan@zuckerman.com
slawson@zuckerman.com
kmackinnonmorrow@zuckerman.com

Ivano Ventresca (Fed. Bar No. 30763)
2100 L Street NW, Suite 400
Washington, DC 20037
(202) 778-1800 (office)
(202) 822-8106 (fax)
iventresca@zuckerman.com

Amy E. Philip (*pro hac vice* pending)
485 Madison Avenue, 19th Floor
New York, NY 10022
(212) 704-9600 (office)
(212) 704-4256 (fax)
aphilip@zuckerman.com

*Counsel for Plaintiffs*

# Exhibit E
# Public - Redacted

## AMENDED AND RESTATED EMPLOYMENT AGREEMENT

This AMENDED AND RESTATED EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of December 13, 2024, and effective as of January 1, 2025 (the "Effective Date"), by and among FTI Consulting, Inc., a Maryland corporation ("FTI"), Compass Lexecon LLC, a Maryland limited liability company which is a wholly-owned subsidiary of FTI (the "Company"), and Mark Israel ("Employee").

## WITNESSETH:

WHEREAS, FTI is a multi-disciplinary consulting firm which operates through FTI and its subsidiaries and affiliates (the "FTI Group"), and the Company is in the business of providing economics consulting services, including litigation support, public policy studies, and business consulting (the "Business") under the name Compass Lexecon;

WHEREAS, Employee, FTI and the Company have previously entered into that certain Employment Agreement, dated as of January 14, 2023, effective as of January 1, 2023, as amended pursuant to that certain Amendment No. 1 to Employment Agreement, dated as of December 22, 2023, by and between FTI, the Company and Employee (the "Prior Employment Agreement");

WHEREAS, Employee and the Company have agreed to the terms of Employee's employment relationship with the Company, for the period of time and subject to the provisions set forth in this Agreement, which shall supersede the Prior Employment Agreement in its entirety;

NOW, THEREFORE, the parties agree as follows:

1.    Employment.  The Company employs Employee and Employee accepts such employment upon the terms and conditions set forth in this Agreement.

2.    Term of Employment.

    a.   The term of Employee's employment under this Agreement will start on the Effective Date and continue until March 31, 2025 (the "Transition Date"), unless otherwise agreed to in writing by the Company and Employee or terminated earlier in accordance with this Agreement. The period of time between the Effective Date and the termination of Employee's employment hereunder shall be referred to herein as the "Term". In all events, however, Employee's employment hereunder shall be entirely at-will. To the extent Employee's employment with the Company is terminated for any reason prior to the Effective Date, this Agreement shall be void *ab initio*.

    b.   Following the Transition Date, Employee shall no longer remain employed under this Agreement, his employment shall be deemed terminated, and he shall instead become a consultant of the Company pursuant to a consulting agreement substantially in the form attached hereto as Exhibit A (such agreement, the "Consulting Agreement"). Notwithstanding the foregoing, in the event the Celerystix Consulting Agreement (defined below) is extended, the parties to this Agreement agree to enter into good-faith

negotiations to amend the Consulting Agreement to extend the term of the Consulting Agreement and to grant the Company a right of first refusal.

3.  <u>Position and Duties</u>.  During the Term, Employee will be employed as a Senior Managing Director of the Company with his primary location of employment in Washington, D.C.  Employee shall report to the Chief Executive Officer of FTI (the "<u>FTI CEO</u>") or such other senior executive officer who may be designated by FTI. Employee shall (a) originate, manage and perform consulting services consistent with past practice, (b) perform such other duties and responsibilities relating to the Company as may be reasonably assigned to him by the FTI CEO or such other senior executive officer who may be designated by FTI, provided they are generally consistent with the duties performed by Employee in 2024, and (c) subject to Section 10, and in a manner substantially consistent with his practice in 2024, devote substantially all of his business time, attention, and energies to the performance of Employee's duties and responsibilities hereunder; *provided* that Employee shall not be deemed in breach hereof solely as a result of a reasonable reduction in the number of billable hours he incurs, where such reduction is not the result of Employee's failure or refusal to diligently fulfill his duties and responsibilities as set forth herein.  Employee will undertake such travel as is or may be reasonably necessary or appropriate in connection with the performance of his duties, responsibilities and obligations to the Company and FTI.  Employee, in the performance of his duties, responsibilities and obligations hereunder, shall observe and adhere to the applicable policies, practices and procedures of the Company, such as now or hereafter in existence or as supplemented, amended, modified or restated by the Company in its sole discretion. Notwithstanding the foregoing, Employee may engage in personal, charitable, professional, teaching and investment activities to the extent such activities do not conflict or materially interfere with Employee's performance of his duties, responsibilities and services to and for the Company and its clients or are otherwise restricted by this Agreement or any policies, practices or procedures of the Company. Employee, in the performance of his duties, responsibilities and obligations hereunder, shall observe and adhere to the applicable policies, practices and procedures of the Company.

4.  

2



3



4



5.    <u>Employee Benefit Plans and Perquisites</u>.  During the Term:

5

a.  <u>General</u>.  Employee will be eligible to participate in such qualified employee pension plans, group health, long term disability and group life insurance plans, and any other welfare and fringe benefit plans, arrangements, programs and perquisites generally maintained or provided by FTI from time to time to or for the benefit of its executive employees (or, if not offered solely to executive employees, to employees generally) ("<u>Benefit Plans</u>"), at a level commensurate with Employee's position and FTI policy regarding other similarly situated FTI employees.  Employee's participation in any Benefit Plans will be subject to the terms of the applicable plan documents and FTI's generally applied policies.  FTI in its discretion may from time to time adopt, modify, interpret, or discontinue such plans or policies.  Employee will be given full credit for service with Compass Lexecon and its predecessors under the Benefit Plans and for purposes of determining Employee's period of employment under any vacation, sick pay or other paid time off plan of FTI and for determining other entitlements and terms of employment affected by seniority under FTI's employment policies.  Employee's decision not to participate in a Benefit Plan for a period of time shall not prohibit Employee's participation in such Benefit Plan at a later date, if the terms of the Benefit Plan so permit.

b.  <u>Reimbursement of Business Expenses</u>.  Employee is authorized to incur reasonable expenses in carrying out Employee's duties and responsibilities under this Agreement, and Company will promptly pay or reimburse Employee for all such expenses that are so incurred upon presentation of appropriate vouchers or receipts, subject to the applicable expense reimbursement policies in effect from time to time with respect to executives of Company.

c.  <u>Other Incentive Compensation Plans or Programs</u>.  The parties to this Agreement understand and agree that Employee's right to compensation for services rendered to the Company and FTI are set forth in this Agreement and that Employee is not entitled to participate in any incentive compensation plan or program not specifically designated in this Agreement (including, without limitation, any plans or programs related to forgivable loans).  Employee hereby expressly waives any right to participate in any incentive compensation plan or program not expressly designated in this Agreement, including, but not limited to, the FTI Consulting, Inc. Senior Managing Director Incentive Compensation Plan and/or the Key Senior Managing Director Incentive Compensation Plan.

6.  <u>No Payments to Governmental Officials</u>.  Employee will not knowingly pay or authorize payment of any remuneration to or on behalf of any governmental official which would constitute a violation of applicable law.  The Company will neither request nor require Employee to offer to make or make a payment of any remuneration to or on behalf of any governmental official other than those required or expressly permitted by applicable law.  Employee shall comply with the

6

Company's code of conduct, including without limitation the Company's Anti-Corruption Policy, in effect and as may be amended from time to time.

7.    <u>Termination of Employment</u>.

a.    <u>Resignation</u>.  Employee may voluntarily resign Employee's employment under this Agreement at any time upon at least 90 days' prior written notice to Company.  The Company may waive such notice or authorize a shorter notice period in its sole discretion (and any such waiver or authorization shall not cause any such resignation to constitute a termination by the Company).

b.    <u>Termination by Company for Cause</u>.  The Company may terminate Employee's employment for "<u>Cause</u>" if (and only if) one or more of the following occur:

i.    Employee's indictment for, conviction of or guilty or *nolo contendre* plea to a crime involving moral turpitude or a felony;

ii.    Employee's failure to satisfactorily perform any material employment or other duties, obligations or responsibilities under this Agreement or any other written agreement with any member of the FTI Group;

iii.    Employee engages in intemperate use of alcohol, use of illegal drugs, or use of drugs prescribed for Employee other than in accordance with medical instructions, which adversely affect in any material respect the performance of his duties for the Company;

iv.    Employee's commission or omission of any act involving material dishonesty, embezzlement, misappropriation of assets, or fraud with respect to the Company or any of its affiliates or any of their respective employees or clients;

v.    Employee's violation of any written policy of the Company or any of its affiliates, which has or could reasonably be expected to adversely affect the Company or any of its affiliates in any material respect (whether business-related, financial, reputational or otherwise), or engaging in any willful misconduct, gross negligence, violation of law or other bad act related to his employment or otherwise which has or could reasonably be expected to adversely affect the Company or any of its affiliates in any material respect (whether business-related, financial, reputational or otherwise);

vi.    Employee's failure to (A) use his reasonable best efforts to perform his material duties and responsibilities to the FTI Group consistent with his efforts and activities prior to the execution of this

7

Agreement (other than as a result of Disability), (B) devote substantially all of his business time, attention and energies to the performance of Employee's duties and responsibilities hereunder, consistent with his efforts and activities prior to the execution of this Agreement (other than as a result of Disability), or (C) comply with any of the restrictions contained in Sections 9 through 16.

Employee's termination for Cause will be effective immediately upon Company mailing or transmitting notice of such termination, provided such notice is given within 90 days after the discovery by Company of the event or conduct giving rise to grounds to terminate Employee for Cause. Before terminating Employee for Cause under subsections (ii) through (vi) above, Company will specify in writing to Employee the nature of the act, omission or failure that it deems to constitute Cause and if the action is curable, give Employee at least thirty (30) days from the receipt of such notice to correct the situation (and thus avoid termination for Cause). For clarification, "Cause" shall not include a reduction in Employee's productivity or billable hours to the extent that such reduction is the result of (1) changes in business conditions which are not caused by Employee (including, without limitation, any changes resulting from the Company's or FTI's entering bankruptcy or ceasing operations) or are beyond the control of Employee, (2) changes in the manner in which he handles cases (including the reasonable use of other experts employed by the FTI Group), to the extent such changes (x) are taken in good faith in a manner reasonably expected to benefit the FTI Group and (y) are not themselves a basis for Cause or the direct or indirect result of, or otherwise related to, circumstances constituting Cause, (3) changes in his reputation or desirability as an expert witness (other than, in each such case, as a result of (i) circumstances otherwise constituting Cause or directly or indirectly resulting from, or related to, circumstances constituting Cause, or (ii) intentional conduct by Employee in an attempt to cause the termination of this Agreement), or (4) Employee's Disability (as defined in Section 7(d), but without regard to the time periods set forth therein).

c.    <u>Termination by Company Without Cause</u>.  Subject to the provisions hereof, Company may terminate Employee's employment under this Agreement before the end of the Term, without Cause, upon thirty (30) days' prior written notice.

d.    <u>Termination Due to Disability</u>.  If Employee incurs a "<u>Disability</u>" (as defined below), Company may terminate Employee's employment.  For the purposes hereof, Employee will be deemed to incur a "Disability" if Employee is (i) unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in imminent and untimely death or can be expected to last for a continuous period of not less than twelve (12) months, or (ii) by reason of any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months, receiving (or otherwise

8

becoming eligible to receive) income replacement benefits for a period of not less than three (3) months under an accident and health plan covering Company employees. If Employee's employment is terminated on account of Disability, for purposes of this Agreement such termination shall not be considered a termination for Cause or a termination without Good Reason.

e.    Termination by Employee for Good Reason. Employee may resign for "Good Reason" if (and only if), without Employee's prior written consent, the Company or FTI:

i.    fails to maintain Employee in the office or the position, or a substantially equivalent office or position, of or with the FTI Group relating to the operation of the Company which Employee holds as of the date of this Agreement (other than any such change that occurs for "Cause," that is made to accommodate Employee's entitlement to leave under the Family and Medical Leave Act, or that results from an accommodation under the Americans with Disabilities Act);

ii.    takes any action which results in a substantial diminution in his authorities, duties, responsibilities or status from those in effect as of the date of this Agreement (other than any such change that occurs for "Cause," that is made to accommodate Employee's entitlement to leave under the Family and Medical Leave Act, or that results from an accommodation under the Americans with Disabilities Act);

iii.    knowingly instructs Employee to perform an unlawful or dishonest act;

iv.    fails to make one or more material payments to Employee as required by the terms set forth in Section 4 of this Agreement or commits a material breach of a material provision of this Agreement that has or is reasonably likely to have a significant adverse effect on Employee; or

v.    liquidates, dissolves or winds up the Company or FTI, or FTI materially reduces its business activities in a manner which materially, adversely affects Employee, or FTI or the Company ceases to do business (other than as a part of a reorganization in which the activities of the Company are continued in substantially the same manner as before entering the reorganization).

However, Employee shall not be entitled to terminate his employment for Good Reason unless (i) he has given the Company written notice of the facts giving rise to Good Reason within ninety (90) days after the discovery by Employee of the event or circumstance giving rise to Good Reason, (ii) the

9

Company has failed to cure the situation within thirty (30) days thereafter and (iii) Employee actually terminates his employment within thirty (30) days following the expiration of Company's cure period as set forth in sub-section (ii) above and, at the time of such termination, no act, omission or failure has occurred that could constitute Cause (without regard for any notice or cure provisions related thereto). For clarification, "Good Reason" shall not include (A) a loss of business opportunity of Employee as a result of the reasonable application of FTI's conflict of interest and client engagement policies as in effect from time to time applicable to the FTI Group as a whole, (B) a reasonable increase in Employee's duties or billable hours that is not inconsistent with past practices of Employee as a result of general improvements or increases in the Company's business, (C) a diminution in Employee's authorities, duties, responsibilities or status as a result of any reduction of Employee's productivity or billable hours to the extent that such reduction is the result of (1) changes in business conditions which are not caused by the Company or which are beyond the control of the Company, (2) changes in the manner in which Employee handles cases (including the reasonable use of other experts employed by the FTI Group) or (3) changes in Employee's or the Company's reputation or desirability as an expert witness (including in each such case, as a result of (i) circumstances constituting Cause or (ii) intentional conduct by Employee in an attempt to cause the termination of this Agreement), (D) a change in authority, duties, responsibilities, or position (i) solely because FTI, its parent, subsidiary, or affiliate becomes an affiliate of another corporation or entity, (ii) because there has been a change in the reporting hierarchy involving Employee, (iii) because of Disability or (iv) because Employee has requested or otherwise agreed in writing to a change in status, including, but not limited to, less than full-time employment, a leave of absence, job-sharing or a consulting or independent contractor relationship, or (E) any modifications to the Governance Agreement, effective as of January 1, 2023, by and among FTI, Daniel R. Fischel, Jonathan M. Orszag, Jorge Padilla and Employee (as may be amended from time to time, the "Governance Agreement") or any additions to or removals from the Executive Committee (as defined in the Governance Agreement). The existence of the Good Reason shall not be affected by Employee's temporary incapacity due to physical or mental illness not constituting a Disability.

    f.    <u>Death</u>. If Employee dies during the Term, then the Term will end as of the date of Employee's death.

8.    <u>Payments on Termination of Employment</u>.

    a.    <u>Termination by Company for Cause or by Employee Without Good Reason; Expiration of the Term</u>. If (1) Company terminates Employee's employment for Cause or if Employee resigns without Good Reason or (2)

10

Employee's employment terminates upon expiration of the Term on the Transition Date, then Company will pay to Employee: (i) the earned but unpaid amount, if any, of (A) Employee's Base Compensation through the Termination Date and (B) the Premium in Section 4(a)(ii), in accordance with applicable law, (ii) the unpaid amount, if any, of (A) Employee's previously earned and unpaid Annual Bonus for the year prior to the year in which the Termination Date occurs, (B) the 2024 Supplemental Bonus and the 2024 Restructuring Bonus, (C) solely to the extent such termination occurs on the Transition Date, the 2025 Annual Bonus, and (D) if the Termination Date is in 2025, a prorated payment of the 2025 Retention Bonus that would have been due for the month of the Termination Date determined by multiplying (x) ███████ by (y) a fraction, the numerator of which is the number of days from the beginning of the month of the Termination Date through the Termination Date, and the denominator of which is the number of days in the month of the Termination Date, payable at the same time such installment would have been paid but for such termination of employment (the "Prorated 2025 Retention Bonus"), and (iii) the amount of any substantiated but previously unreimbursed business expenses incurred through the Termination Date in accordance with Section 5(b), and (iv) any additional vested entitlements, if any, to which Employee is entitled under the terms of any Benefit Plan in which Employee was a participant (the payments described in subsections (i) through (iv) (other than the Prorated 2025 Retention Bonus), collectively, "Accrued Compensation").

b.    <u>Termination by Company Without Cause or by Employee for Good Reason</u>. If the Company terminates Employee's employment without Cause or if Employee resigns for Good Reason prior to the end of the Term, Employee will be entitled to receive the following payments and benefits, subject to Sections 8(e) and 31 notwithstanding any provision herein:

   i.    any Accrued Compensation, payable as set forth in Section 8(a), and the entire Retention Bonus specified in paragraph 4(e), payable at the same times(s) it would have been paid but for such termination of employment;

   ii.   the entire Annual Bonus for the fiscal year in which the termination occurs (e.g., all of the 2024 Annual Bonus if the termination is in 2024, and the 2025 Annual Bonus as specified in paragraph 4(b)(iii) of this Agreement if the termination is in 2025), which amount shall be paid on the date on which the payments would have been made but for such termination of employment; and

   iii.  subject to Employee's valid election to continue group health plan coverage under Section 4980B of the Code and the regulations thereunder, continuing group health plan coverage for Employee

11

and, where applicable, Employee's spouse and eligible dependents at the same benefit and contribution levels in effect from time to time with respect to applicable active FTI employees ("<u>Benefit Continuation Coverage</u>") from the Termination Date through the later of (A) the first anniversary of the Termination Date, or (B) December 31, 2026 (the "<u>Benefit Continuation Period</u>"). If and to the extent such Benefit Continuation Coverage is not permitted by the applicable plan, is not exempt from the application of Section 409A, or is not permitted without violating (or incurring penalties or other costs under) applicable law, Employee will instead be entitled to monthly cash payments equal to the amount necessary to reimburse Employee and/or Employee's spouse and eligible dependents, on an after-tax basis, for the reasonable cost of comparable individual or other replacement coverage for the Benefit Continuation Period. The Benefit Continuation Coverage will run concurrently with any COBRA continuation coverage.

Employee shall not be entitled to any of the foregoing payments or benefits unless Employee complies with all surviving provisions of any non-competition agreement, non-solicitation agreement, confidentiality agreement or invention assignment agreement signed by Employee, including but not limited to those contained herein.

c.    <u>Termination Due to Death or Disability</u>.  In the event of the termination of Employee's employment due to death or Disability prior to the end of the Term, Employee (or Employee's estate or other beneficiary) will be entitled to receive the following payments and benefits, subject to Sections 8(e) and 31 notwithstanding any provision herein:

i.    any Accrued Compensation payable as set forth in Section 8(a);

ii.    Prorated Annual Bonus, which amount shall be paid on the date on which the payments would have been made but for such termination of employment; and

iii.    Benefit Continuation Coverage, where applicable, for Employee, Employee's spouse and Employee's eligible dependents for the Benefit Continuation Period.  If and to the extent such Benefit Continuation Coverage is not permitted by the applicable plan, is not exempt from the application of Section 409A (as defined below), or is not permitted without violating (or incurring penalties or other costs under) applicable law, Employee will instead be entitled to monthly cash payments equal to the amount necessary to reimburse Employee and/or Employee's spouse and eligible dependents, on an after tax basis, for the reasonable cost of comparable individual or other replacement coverage for the Benefit Continuation Period.

12

The Benefit Continuation Coverage will run concurrently with any COBRA continuation coverage.

For the avoidance of doubt, termination due to death or Disability or due to expiration of the Term shall not constitute a termination by the Company without Cause or by Employee for Good Reason.

d.    <u>No Other Benefits on Termination of Employment</u>.  The parties expressly agree that the payments set forth in this Section 8 are the only payments that Employee shall be entitled to receive upon termination of employment and that such payments supersede any other salary continuation or severance payment or any other amounts payable upon termination of employment pursuant to any Company policy, plan, practice, or agreement (exclusive of any vested interests Employee may have in any broad-based pension or retirement plan).  Except as specifically set forth in Section 8(a), 8(b)(ii) and 8(c)(ii), Employee shall not have any right to continue to receive amounts specified in Section 4(a) or (b) of this Agreement through the end of the term of this Agreement.

e.    <u>Release</u>.

Any and all amounts payable and benefits or additional rights provided pursuant to this Agreement beyond the Accrued Compensation shall only be payable if Employee delivers to the Company and does not revoke a general release of claims in favor of the Company in the form attached hereto as <u>Exhibit B</u>. Such release shall be executed and delivered (and no longer subject to revocation, if applicable) by Employee within sixty (60) days following termination.  To the extent that the foregoing sixty (60)-day release consideration period spans two (2) calendar years, any amounts scheduled to be paid and benefits or additional rights scheduled to be provided pursuant to this Agreement during such sixty (60)-day period that are conditioned on the execution of a release and that constitute non-qualified deferred compensation for purposes of Section 409A shall not be paid or provided or commence to be paid or provided until such second calendar year.

9.    <u>Non-Competition Covenants</u>.

a.    Employee acknowledges and agrees that (i) he has unique technical expertise associated with the Business (ii) he is well known in the industry, (iii) his services to the FTI Group are special, unique and extraordinary, (iv) Employee has valuable business contacts with clients and potential clients of the FTI Group and with professionals in the industry, (v) in connection with his employment with the Company, he will be provided with access to and become familiar with confidential and proprietary information and

13

trade secrets belonging to the FTI Group, and that such information and trade secrets could be used or revealed, directly or indirectly, intentionally or unintentionally, in any subsequent employment with a competitor of the FTI Group in any position (x) comparable to the position he holds with the FTI Group under this Agreement (i.e., Senior Managing Director), or (y) with responsibilities comparable to those of the position he holds with FTI Group under this Agreement, including, but not limited to, overseeing and providing expert analysis and/or testimony or other Consulting Services (as defined below) and supervising and managing others who provide the same (any such position, a "Comparable Position"), (vi) in the event of a breach of the covenants contained in this Section 9, the FTI Group will be deprived of the benefit it has bargained for pursuant to this Agreement; and (vii) the FTI Group would not have entered into this Agreement but for the covenants contained in this Section 9.  Accordingly, in consideration of his employment with the Company pursuant to this Agreement, and other good and valuable consideration, the receipt of which is hereby acknowledged, Employee agrees that, during the Non-Compete Period (as defined below), Employee will not, without Company's prior written consent, directly or indirectly on Employee's own behalf or on behalf of any other person, firm or entity other than the FTI Group (A) engage in; (B) own or control any interest in (except as a passive investor of less than five percent (5%) of the publicly traded stock of a publicly held company); (C) act as a director, officer, manager, member, employee, trustee, agent, partner, joint venture, participant, consultant of or be obligated to, or be connected in any advisory, business or ownership capacity (except as a passive investor of less than five percent (5%) of the publicly traded stock of a publicly held company) with; (D) lend credit or money for the purpose of the establishing or operating; or (E) allow Employee's name or reputation to be used by, any firm, corporation, partnership, trust or other business enterprise directly or indirectly engaged in, any Competing Business in the Market Area; *provided* that Employee's collaborative work on behalf of the FTI Group with other consulting firms in connection with a Company or FTI Group matter, in accordance with past practice, shall not be considered a violation of this Section 9.  The parties agree that the foregoing shall not prevent Employee from working for or performing services on behalf of a Competing Business if such Competing Business is also engaged in other lines of business and if Employee's employment or services are restricted to such other lines of business, and Employee will not be providing direct or indirect support, advice, instruction, direction or other guidance in a Comparable Position to lines of business that constitute the Competing Business.

14

b.      The parties agree that the relevant public policy aspects of covenants not to compete have been discussed, and that every effort has been made to limit the restrictions placed upon Employee to those that are reasonable and necessary to protect the FTI Group's legitimate interests. Employee acknowledges that, based upon his education, experience, and training, this non-compete provision will not prevent him from earning a livelihood and supporting himself and his family during the relevant time period. Employee further acknowledges that, in light of the nature of the Business and of the services Employee is performing for the Company, the geographic, industry and temporal restrictions (as set forth in the definitions of the terms "Market Area", "Competing Business", "Non-Compete Period" and "Non-Solicit Period", respectively) are reasonable in scope, and reflect the actual scope and reach of the business of the FTI Group. Employee acknowledges and agrees that he has had the opportunity to, and has consulted with, an attorney of his choosing in connection with this Agreement (including, without limitation, Sections 9 through 18, 24 and 27 (including, without limitation, the governing law and arbitration provisions therein)).

c.      If any restriction set forth in this Section is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic areas as to which it may be enforceable.

d.      The restrictions contained in this Section are necessary for the protection of the business and goodwill of the Company and/or the FTI Group and are acknowledged by Employee to be reasonable for such purposes.  Employee acknowledges and agrees that any material breach of this Section will cause the Company and/or the FTI Group substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief.

e.      The existence of a claim, charge, or cause of action by Employee against the Company and/or the FTI Group shall not constitute a defense to the enforcement by the Company and/or the FTI Group of the foregoing restrictive covenants, but such claim, charge, or cause of action shall be adjudicated separately.

f.      The provisions of this Section shall survive termination or expiration of this Agreement unless otherwise specifically provided in this Agreement.

10.     <u>Commercial and Outside Endeavors</u>.    Employee may not serve as a paid governmental or paid public policy advisor or paid consultant, may not serve for pay on any corporate, governmental or governmental policy advisory boards or

15

committees, without the permission of the FTI General Counsel, such consent not to be unreasonably withheld.

11.    <u>Non-Solicitation Covenant</u>

a.    **Client Matters**.  During the Non-Solicit Period, Employee will not, directly or indirectly, whether for Employee or for any other individual or entity (other than Company):

i.    solicit business regarding any case or matter upon which Employee worked on behalf of Company; or

ii.    solicit any person or entity (A) who is or was a client of the business of FTI Group and (B) which Employee directly or indirectly provided any services for (including, without limitation, in a management, supervisory or oversight role), solicited business from, or otherwise had contact with (either directly or through any direct or indirect reports) during the term of his employment with the Company, to terminate, reduce or otherwise modify their business with the FTI Group, *provided, however* that such limitation described in this subsection (ii) shall only apply if the Employee has a Competing Relationship.

iii.    Notwithstanding the foregoing and for the avoidance of doubt, the restrictions under this Section 11(a) (A) are limited to affirmative solicitation (whether direct or indirect), and nothing in this Agreement will preclude Employee from (a) responding to and acting upon any communication that is initiated solely by any third party initiating contact with the Employee regarding a new case or matter; and (B) do not restrict the Employee from merely providing his contact information in order to enable third parties to contact the Employee.

b.    **FTI Group People**. During the Non-Solicit Period, Employee will not, directly or indirectly, whether for Employee or for any other individual or entity (other than Company):

i.    solicit, induce or otherwise attempt to influence any person whom the FTI Group employs or otherwise engages to perform services (including, but not limited to, any independent consultants, engineers or sales representatives) or any contractor, subcontractor, supplier, or vendor of the FTI Group, to leave the employ of or engagement with, or discontinue providing services to, the FTI Group, or reduce the amounts or level of service they provide to the FTI Group, or otherwise interfere with or disrupt the FTI Group's relationship with these individuals or entities, *provided*, *however*,

16

that this restriction will not apply in the case of any clerical employee of the FTI Group or in the case of any other employee whose employment with the FTI Group has been terminated for at least one year.

ii.     For purposes of this paragraph 11, Employee's general announcements and advertisements, whether in print, on social media websites (such as LinkedIn) or otherwise, do not constitute a prohibited solicitation. FTI acknowledges that the solicitation limited by Section 11(b) of this Agreement is limited to affirmative solicitation (whether direct or indirect), and nothing in this Agreement will preclude Employee from (a) responding to and acting upon any communication that is initiated solely by any person (and without any prior breach of this Agreement by Employee), or (b) providing his contact information in order to enable third parties to contact the Employee.

c.     Employee acknowledges that every effort has been made to limit the restrictions placed upon Employee under this Section to those that are reasonable and necessary to protect the legitimate interests of the FTI Group. FTI acknowledges that the solicitation limited by Section 11 of this Agreement is limited to affirmative solicitation (whether direct or indirect), and nothing in this Agreement will preclude Employee from (i) responding to and acting upon any communication that is initiated solely by any client or employee (and without any prior breach of this Agreement by Employee) or (ii) generally announcing through a communication (including without limitation to clients and employees), upon termination of employment, his future plans following such termination (as long as such announcement does not invite or otherwise solicit any client of the business of FTI Group or person whom the FTI Group employs or otherwise engages to perform services or any contractor, subcontractor, supplier, or vendor of the FTI Group to join, provide services to, or otherwise become engaged by Employee, whether directly or indirectly, in any new business endeavor), provided that no such response, action or announcement is permitted to the extent it otherwise violates (or would reasonably be expected to result in violation of) Section 9, 11 or 12, as applicable.

d.     If any restriction set forth in this Section is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or geographic area, it shall be interpreted to extend over the maximum period of time, range of activities or geographic areas as to which it may be enforceable.

e.     The restrictions contained in this Section are necessary for the protection of the business and goodwill of the FTI Group and their affiliates and are

17

acknowledged by Employee to be reasonable for such purposes. Employee acknowledges and agrees that any material breach of this Section will cause the FTI Group and/or their affiliates substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the FTI Group shall have the right to seek specific performance and injunctive relief.

f.    The provisions of this Section shall survive termination or expiration of this Agreement.

g.    The existence of a claim, charge, or cause of action by Employee against the Company or the FTI Group shall not constitute a defense to the enforcement by the Company or the FTI Group of the foregoing restriction, but such claim, charge, or cause of action shall be adjudicated separately.

12.    <u>Confidential Information of Company</u>.

a.    As used herein, "<u>Confidential Information</u>" shall mean information and compilations of information, whether generated or acquired by the FTI Group or obtained from third parties, disclosed or otherwise made known to or accessed by Employee in the course of or in connection with Employee's employment with the Company and relating to the business of the FTI Group, their clients, vendors or other persons, however such information is embodied and irrespective of whether it is labeled as "proprietary" or "confidential", including, but not limited to, information regarding or comprising any trade secrets, proprietary knowledge, operating procedures, finances, financial condition, organization, employees, customers, client lists, suppliers, distributors, agents, and other personnel, business activities, budgets, strategic or financial plans, objectives, marketing plans, documents, products, services, price and price lists, operating and training materials, data bases and analyses and all other documents relating thereto or strategies of the FTI Group. However, Confidential Information will not include any information which is or becomes available in the public domain other than through any unauthorized disclosure by or fault of Employee.

b.    Employee acknowledges that as a result of his responsibilities at the Company, he will be exposed and given access to the Confidential Information of the Company. Employee understands and agrees that his access to the Confidential Information is for the sole and exclusive purpose of performing work for the benefit of the Company and that the Company has a substantial ongoing investment in the development of such Confidential Information which would be injured irreparably if this Agreement were breached. At all times during the term of his employment and thereafter, Employee agrees that he will maintain the Confidential Information in strictest confidence and, unless required to do so by legal

18

process (such as subpoena), not disclose to any individual or business enterprise of any nature, or use for his own personal use or financial gain, whether individually or on behalf of another person, firm, corporation or entity, any Confidential Information other than disclosure to Company personnel who need to know such information in connection with their work for the Company.  Without limiting the generality of the foregoing, Employee agrees that the Company or members of the FTI Group have agreements with other persons that may include agreements that impose obligations or restrictions regarding the confidential nature of work pursuant to such an agreement.  Employee agrees to be bound by all such obligations and restrictions made known to him, and to do whatever is reasonably necessary to satisfy such obligations.  In the event Employee is required by legal process to disclose any Confidential Information, he shall give prompt notice thereof to Company to allow Company to object to such process, obtain a protective order or take other reasonable action.

13.    <u>Confidentiality of this Agreement</u>.  Employee and the FTI Group agree that the existence, terms and provisions of this Agreement are to remain strictly confidential and the parties will take all appropriate and reasonable actions to preserve and maintain such confidentiality, unless as otherwise required by law or to assert or defend against claims related to this Agreement.  The parties further agree that any disclosure of the existence or any of the terms or provisions of this Agreement by either the FTI Group or Employee will constitute a violation of this Agreement, except that the FTI Group or Employee may disclose the existence or the terms and provisions of this Agreement (a) to an accountant, attorney or other agent for such party, provided such disclosure is necessary and the party requires that such agent agree to be bound by the provisions of this Section 13; (b) as required by law, *provided* that the disclosing party provides the non-disclosing party with written notice of the reason and circumstances for such disclosure as soon as possible prior to such disclosure, or as otherwise explicitly permitted by the Maryland Equal Pay for Equal Work  law; or (c) to the minimum extent necessary to enforce this Agreement.  Notwithstanding the foregoing, violation of this Section 13 shall not constitute a material breach for purposes of determining termination for Cause (as defined in Section 7(b)) or for Good Reason (as defined in Section 7(e)).

14.    <u>Confidential Information of Others</u>.  Employee will not use in working for Company and will not disclose to the FTI Group any trade secrets or, other information Employee does not have the right to use or disclose and that the FTI Group is not free to use without liability of any kind.  Employee will promptly inform Company in writing of any patents, copyrights, trademarks, or other proprietary rights known to Employee that Company will violate because of information provided to it by Employee.

15.    <u>Property Rights</u>.  Employee confirms that all Confidential Information is and must remain the exclusive property of the FTI Group.  All business records, business papers, and business documents kept or created by Employee in the course of

19

Employee's employment by Company relating to the business of the FTI Group must be and remain the property of Company. Upon the termination of this Agreement or upon Company's reasonable request at any time, Employee must promptly deliver to Company any material containing Confidential Information or other property belonging to Company (written or otherwise) not otherwise in the public domain.  Employee will not, without Company's consent, retain copies, excerpts, summaries, or compilations of the foregoing information and materials. The rights and obligations set forth in this Section will continue indefinitely and will survive the termination of this Agreement and Employee's employment with Company.

16.    <u>Intellectual Property</u>.

a.    All inventions, discoveries, trade secrets, know-how, ideas, improvements, developments, processes, designs, techniques, formulas, source and object codes, data, programs and other works of authorship, in whatever media recorded, whether or not patentable or copyrightable and all embodiments thereof, including documents, papers, notebooks, drawings or other materials (collectively "<u>Work Product</u>"), that Employee conceives, creates, makes, invents, or discovers or that otherwise relates to or results from any work Employee performs or performed for the FTI Group or that arises from the use or assistance of the FTI Group's facilities, materials, personnel or Confidential Information in the course of Employee's employment (whether or not during usual working hours), whether conceived, created, discovered, made, or invented individually or jointly with others, will, together with all the worldwide patent, copyright, trade secret, or other intellectual property rights in all such Work Product, be and remain the absolute property of Company. All such Work Product shall be considered "works made for hire" owned by Company to the extent consistent with applicable law.  To the extent not considered "works made for hire" exclusively owned by Company as the author under applicable law, Employee hereby irrevocably and unconditionally waives, and assigns to Company, all Employee's right, title and interest in and to (whether existing before, on, or after the date of this Agreement that may otherwise vest in Employee) all Work Product and any intellectual property rights therein, wherever in the world enforceable.  Without limitation Employee waives the right to be identified as the author of any such Work Product and the right not to have any such Work Product subjected to derogatory treatment. Notwithstanding the foregoing, Company acknowledges that Employee (i) has (and in the future shall be entitled to) write books and articles for publication under his own name and is (and shall be) entitled to receive and retain the copyright thereon and any royalties therefrom, so long as such books or articles do not disclose or exploit any confidential or proprietary information of the FTI Group or their clients; and (ii) shall be entitled to request, subject to the FTI Group's prior written consent, which consent shall not be unreasonably withheld, one copy of any report, transcript or

20

testimony submitted to a court, arbitrator or government agency while Employee was employed by the FTI Group (*provided* that such material shall continue to be subject to all applicable confidentiality agreements and policies applicable thereto).

b.    Employee will promptly disclose to Company for its sole use and benefit any and all Work Product (whether patentable or not) that Employee develops, acquires, conceives or reduces to practice (whether or not during usual working hours) while employed by Company. Employee will promptly disclose to Company all patent applications, letter patent, utility and design patents, copyrights and reissues thereof, or any foreign equivalents thereof, that may at any time be filed or granted for or upon any such Work Product. In connection therewith:

i.    Employee will, without charge but at Company's expense, promptly execute and deliver such applications, assignments, descriptions and other instruments as Company may consider reasonable necessary or proper to procure or any, vest title to any Work Product or any, patent applications, patents, copyright registration applications or reissues thereof in Company and to enable it to obtain and maintain the entire worldwide right and title thereto; and

ii.    Employee will provide to Company at its expense all such assistance as Company may reasonably require in the prosecution of applications for such patents, copyright registrations or reissues thereof, in the prosecution or defense of any patent or copyright office interferences or proceedings that may be initiated involving any such applications, patents or copyrights and in any litigation in which Company may be involved relating to any Work Product or intellectual property rights relating thereto. Company will reimburse Employee for reasonable out-of-pocket expenses incurred and pay Employee reasonable compensation for Employee's time if Company no longer employs Employee.

c.    To the extent, if any, that Employee owns rights to works, inventions, discoveries, proprietary information, and copyrighted or copyrightable works, or other forms of intellectual property that are incorporated in any Work Product, Employee agrees that Company will have an unrestricted, nonexclusive, royalty-free, perpetual, transferable license to make, use, sell, offer for sale, reproduce, display, perform, distribute, create derivative works of and sublicense such Work Product in whatever form, and Employee hereby grants such license to Company.

d.    Without limiting the scope of Section 16(c), the provisions of Section 16(a) assigning rights to Employee created inventions shall not apply to an invention for which no equipment, supplies, facility or Confidential

21

Information of Company (including any of its predecessors) was used and that was developed entirely on Employee's own time, unless (a) the invention relates (i) directly to the business of the FTI Group, or (ii) the FTI Group's actual or anticipated research or development, or (b) the invention results from any work Employee performed as an employee of Company.

e.    Employee shall cooperate and assist the FTI Group at Company's reasonable request and expense in any dispute, controversy, or litigation to which Company is a party (but not any litigation between Company and Employee) and with respect to which he obtained knowledge while employed by Company or any of its predecessors, affiliates, successors, or assigns, including, but not limited to, his participation in any court or arbitration proceedings, giving of testimony, signing of affidavits, or such other personal cooperation as counsel for Company shall request.

17.    <u>Definitions</u>.  For purposes of this Agreement, the following terms shall have the meaning set forth below:

a.    <u>Competing Business</u>. "<u>Competing Business</u>" means (i) economic, financial, regulatory, corporate and litigation consulting services, including those provided to law firms, corporations and governmental bodies in connection with legal or regulatory proceedings, strategic decision making and/or public policy debates or matters (collectively, "<u>Consulting Services</u>"), and (ii) any other business which is competitive with any business of the FTI Group that (A) involves Employee, (B) is conducted during the term of this Agreement, and (C) Employee was actively involved with or had knowledge of during his employment with the Company.

b.    <u>Competing Relationship</u>. "Competing Relationship" means the Employee (A) owns or controls any interest in (except as a passive investor of less than five percent (5%) of the publicly traded stock of a publicly held company); (B) acts as a director, officer, manager, member, employee, trustee, agent, partner, joint venture, participant, consultant of or be obligated to, or be connected in any advisory, business or ownership capacity (except as a passive investor of less than five percent (5%) of the publicly traded stock of a publicly held company) with; (C) lends credit or money for the purpose of the establishing or operating; or (D) allows Employee's name or reputation to be used by, any firm, corporation, partnership, trust or other business enterprise directly or indirectly engaged in, any Competing Business in the Market Area.

c.    <u>Market Area</u>.  The parties acknowledge and agree that the Company's business is national in scope and character and that, as a result, it is reasonable and appropriate that the term "<u>Market Area</u>" for purposes of this Agreement means (i) the United States of America, the United Kingdom, continental Europe (including, without limitation, the Scandinavian

22

peninsula), Israel, China, Singapore, Chile and Argentina, and (ii) any other location in which the FTI Group has an office or in which the FTI Group offers or provides Consulting Services to clients in the ordinary course of its business.

d.    <u>Non-Compete Period</u>. "<u>Non-Compete Period</u>" means the period beginning on the Effective Date and ending on March 31, 2025.

e.    <u>Non-Solicit Period</u>. "<u>Non-Solicit Period</u>" means the period beginning on the Effective Date and ending on the first anniversary of the Termination Date.

f.    <u>Company North America/China/Latin America EBITDA</u>. "<u>Company North America/China/Latin America EBITDA</u>" means, with respect to any period, the EBITDA for the Company in the North American, China and Latin America reporting units, calculated in a manner consistent in all material respects with FTI's publicly reported financial statements for such period (or any longer period which includes such period). The determination of Company North America/China/Latin America EBITDA for any applicable period shall be determined by FTI and any such determination made in good faith shall be conclusive, final and binding upon Employee and all other parties concerned; <u>provided</u> that, (i) for purposes of Fiscal 2024, the 2024 Annual Bonus will not be taken into account for purposes of calculation of Company North America/China/Latin America EBITDA, and (ii) for purposes of Fiscal 2025, the 2025 Annual Bonus will not be taken into account for purposes of calculation of Company North America/China/Latin America EBITDA.

g.    <u>Company US EBITDA</u>. "<u>Company US EBITDA</u>" means, with respect to any period, the Company North American reporting unit, calculated in a manner consistent in all material respects with FTI's publicly reported financial statements for such period (or any longer period which includes such period). The determination of Company US EBITDA for any applicable period shall be determined by FTI and any such determination made in good faith shall be conclusive, final and binding upon Employee and all other parties concerned.

18.    <u>Enforceability</u>. If any of the provisions of Sections 9 through 17 are ever deemed to exceed the time, geographic area, or activity limitations the law permits, the limitations will be reduced to the maximum permissible limitation, and Employee and Company authorize a court or arbitrator having jurisdiction to reform the provisions to the maximum time, geographic area, and activity limitations the law permits; <i>provided</i>, <i>however</i>, that such reductions apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made.

19.    <u>Remedies</u>. In view of the position of confidence and trust which Employee has enjoyed with Company and his relationship with the customers, suppliers and

23

employees of the Company, and recognizing the access to Confidential Information which he has had and the fact that his covenants herein constitute material provisions of this Agreement, Employee expressly acknowledges that the restrictive covenants set forth in this Agreement are necessary in order to protect and maintain the proprietary interests, goodwill and other legitimate business interests of the FTI Group. Without limiting the remedies available to the parties, each party acknowledges that a breach of any of the covenants in Sections 9 through 16 may result in material irreparable injury to the FTI Group for which there is no adequate remedy at law, and that it will not be possible to measure damages for such injuries precisely. The parties agree that if there is a breach or threatened breach of such covenants, Company will be entitled to obtain a temporary restraining order and/or preliminary or permanent injunction restraining Employee from engaging in prohibited activities or such other relief as may be required to specifically enforce any of said covenants. Each party agrees that all remedies expressly provided for in this Agreement are cumulative of any and all other remedies now existing at law or in equity. In addition to the remedies provided in this Agreement, the parties will be entitled to avail themselves of all such other remedies as may now or hereafter exist at law or in equity for compensation, and for the specific enforcement of the aforementioned covenants. Resort to any remedy provided for in this Section or provided for by law will not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies, or preclude a recovery of monetary damages and compensation. Each party agrees that no party hereto must post a bond or other security to seek an injunction.

20.    <u>Assignment</u>.  The Company may assign or otherwise transfer this Agreement and any and all of its rights, duties, obligations, or interests under it to:

    a.    Company's other affiliates or subsidiaries; or

    b.    any successor to all or a material part of the business of Company (directly or indirectly).

Upon such assignment or transfer, any such business entity shall be deemed to be substituted for Company for all purposes and, in the case of assignment or transfer to a successor described in Section 20(b), "FTI CEO" shall be substituted with the Chief Executive Officer of such successor (or an applicable affiliate). Notwithstanding any such assignment or transfer to an entity described in Section 20(a), Company shall remain jointly and severally liable, with such assignee or transferee, for the performance of its obligations hereunder. Except as herein provided, this Agreement may not otherwise be assigned or transferred by Company. Without Company's prior written consent, Employee may not assign or delegate the obligations of Employee under this Agreement.

21.    <u>Severability</u>.  If the final determination of an arbitrator or a court of competent jurisdiction declares, after the expiration of the time within which judicial review

24

(if permitted) of such determination may be perfected, that any term or provision of this Agreement is invalid or unenforceable, the remaining terms and provisions will be unimpaired, and the invalid or unenforceable term or provision will be deemed replaced by a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. Any prohibition or finding of unenforceability as to any provision of this Agreement in any one jurisdiction shall not invalidate or reader unenforceable such provision in any other jurisdiction.

22. <u>Amendment; Waiver</u>. The terms of this Agreement may not be modified, amended, or waived other than by a written instrument signed by the parties. Any party's waiver of the other party's compliance with any provision of this Agreement is not a waiver of any other provision of this Agreement or of any subsequent breach by such party of a provision of this Agreement. No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

23. <u>Withholding</u>. The Company will be entitled to reduce its compensatory payments to Employee hereunder for withholding and FICA and Medicare taxes and any other withholdings and contributions required by law.

24. <u>Governing Law</u>. The internal laws of the State of Maryland (other than its conflict of laws provisions) shall exclusively govern this Agreement. Regardless of any present or future residence, domicile or place of business of the parties, each party hereby irrevocably consents and agrees that any claims and disputes between or among the parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement and not governed by Section 27 of this Agreement be brought in any state or federal court located in the State of Maryland. By execution and delivery of this Agreement, each party submits and consents in advance to such jurisdiction in any action or suit commenced in any such court. Each party hereby waives any objection which it may have based on forum non conveniens and hereby consents to the granting of such legal or equitable relied as deemed appropriate by such court.

25. <u>Notices</u>. Notices may be given in writing by personal delivery, by certified mail, return receipt requested, by telecopy, or by overnight delivery. Employee should send or deliver notices for FTI or the Company to FTI, care of its General Counsel, at its corporate headquarters. The Company will send or deliver any notice given to Employee at Employee's address as reflected on Company's personnel records. Employee and Company may change the address for notice by like notice to the others. Employee and Company agree that notice is deemed received on the date it is personally delivered, the date it is received by certified mail, the date of guaranteed delivery by overnight service, or the date the fax machine confirms receipt.

26. <u>Superseding Effect</u>. This Agreement supersedes all prior or contemporaneous negotiations, commitments, agreements, and writings between Employee and

25

Company with respect to the subject matter. All such other negotiations, commitments, agreements, and writings including, without limitation, the Prior Employment Agreement and any prior employment agreement or arrangement between Employee and any of FTI, the Company or any of their respective affiliates, and any bonus or incentive plans or programs described therein, will have no further force or effect, and the parties to any such other negotiation, commitment, agreement, or writing will have no further rights or obligations thereunder.

27.  <u>Dispute Resolution</u>. In the event that any dispute, difference, controversy, claim or dispute (a "<u>Dispute</u>") that arises out of, or in connection with, this Agreement (including any question relating to its validity, interpretation, termination, implementation or alleged breach of its terms or anything done or omitted to be done pursuant to this Agreement), such Dispute shall be subject to the dispute resolution procedures set forth in Section 7 of the Governance Agreement *mutatis mutandis*.

28.  <u>Indemnification and Liability Insurance</u>. The Company and FTI shall indemnify Employee to the fullest extent permitted by applicable law with regard to Employee's actions (or inactions) on behalf of Company or other member of the FTI Group, with advancement of legal fees on a current basis as permitted by law. The Company and FTI shall cover Employee under applicable professionals, directors, and officers and other appropriate liability insurance policies both during and, while any potential liability exists, after the term in the same amount and to the same extent, if any, as Company and FTI cover their other senior executives.

29.  <u>Time is of the Essence</u>. Time is of the essence in the performance of this Agreement.

30.  <u>Key Man Insurance</u>. If requested by the Company, Employee shall cooperate with the Company's efforts to obtain and maintain life insurance with death benefits payable to the Company, the cost of such insurance to be paid by the Company.

31.  <u>Section 409A</u>.

   a.  Notwithstanding anything in this Agreement to the contrary, if Employee is a "specified employee" as described in Internal Revenue Code Section 409A and the Treasury Regulations thereunder ("<u>Section 409A</u>") and as determined by the Company, any amount to which Employee would otherwise be entitled during the first six months following Employee's Termination Date that constitutes nonqualified deferred compensation within the meaning of Section 409A and that is therefore not exempt from Section 409A as involuntary separation pay or a short-term deferral, will be accumulated and paid without interest on the first business day of the seventh month following the date of Employee's Termination Date. Each payment hereunder (including each installment payment) shall be treated as a separate payment for purposes of Section 409A.

26

b.    This Agreement shall be interpreted and administered, to the extent possible, in a manner so as to comply with the requirements of Section 409A. The parties shall cooperate in good faith so as to make any amendments to this Agreement or any related agreements that are necessary to comply with said requirements, *provided*, *however*, that no such amendments shall result in any additional cost or expense to the Company or FTI.

c.    <u>Reimbursement of Business Expenses and Provision of In-Kind Benefits</u>. Notwithstanding anything to the contrary in this Agreement, with respect to any reimbursement of expenses of, or any provision of in-kind benefits to, Employee, as specified under this Agreement, the reimbursement of expenses or provision of in-kind benefits shall be subject to the following conditions: (i) the expenses eligible for reimbursement or the amount of in-kind benefits provided in one taxable year shall not affect the expenses eligible for reimbursement or the amount of in-kind benefits provided in any other taxable year; (ii) the reimbursement of an eligible expense shall be made no later than the end of the year after the year in which such expense was incurred; and (iii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit.

d.    <u>Separation from Service</u>. "Termination of employment" or words of similar import, as used in this Agreement, means "separation from service" as defined in Section 409A for purposes of any payments under this Agreement that are deferred compensation subject to Section 409A. As used in this Agreement, the effective date of Employee's termination of employment shall be referred to herein as the "<u>Termination Date</u>".

32.    <u>Rules of Interpretation</u>. Each of the parties has had the opportunity to be represented by counsel in the negotiation and preparation of this Agreement. The parties agree that this Agreement is to be construed as jointly drafted. Accordingly, this Agreement will be construed according to the fair meaning of its language, and the rule of construction that ambiguities are to be resolved against the drafting party will not be employed in the interpretation of this Agreement.

33.    <u>Successors: Binding Agreement</u>. This Agreement, and all rights hereunder, shall inure to the benefit of, and be enforceable by, and shall be binding upon, the parties hereto and their respective heirs, devisees, legatees, executors, administrators, successors, and personal or legal representatives, and assignees, except the right and obligation of employment runs only to Employee.

34.    <u>Counterparts</u>. For convenience of the parties and to facilitate execution, this Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same document. Transmission by facsimile of an executed counterpart signature page hereof by a

27

party hereto shall constitute due execution and delivery of this Agreement by such party.

35.    <u>Whistleblower Protection and Trade Secrets</u>. Notwithstanding anything to the contrary contained herein, nothing in this Agreement prohibits Employee from reporting possible violations of federal law or regulation to any United States governmental agency or entity in accordance with the provisions of and rules promulgated under Section 21F of the Securities Exchange Act of 1934 or Section 806 of the Sarbanes-Oxley Act of 2002, or any other whistleblower protection provisions of state or federal law or regulation (including the right to receive an award for information provided to any such government agencies). Furthermore, in accordance with 18 U.S.C. § 1833, notwithstanding anything to the contrary in this Agreement: (a) Employee shall not be in breach of this Agreement, and shall not be held criminally or civilly liable under any federal or state trade secret law (i) for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, or (ii) for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal; and (b) if Employee files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Employee may disclose the trade secret to Employee's attorney, and may use the trade secret information in the court proceeding, if Employee files any document containing the trade secret under seal, and does not disclose the trade secret, except pursuant to court order.

#154036408v5<US-DOCS> - FTI - Mark Israel Amended and Restated Employment Agreement (...docx
US-DOCS\154036408.5163456v2

IN WITNESS WHEREOF, the undersigned have signed this Agreement, which shall be effective as of the Effective Date.

**COMPASS LEXECON LLC**                        **MARK ISRAEL**

By: _____                    _____
Name: Curtis P Lu
Title: General Counsel


**FTI CONSULTING, INC.**

By: _____
Name: Curtis P. Lu
Title: General Counsel

**Exhibit A**







## Exhibit B

## Release

This General Release (hereinafter this "**Release**") is made and entered into on the date set forth below by and between the undersigned (hereinafter the "**Employee**") and FTI Consulting, Inc. (hereinafter "**FTI**").

1.     Employee and FTI entered into an Employment Agreement dated as of December ____, 2024, as may be amended from time to time (the "**Agreement**").

2.     Employee's employment by FTI terminated effective **[DATE]** (the "**Termination Date**"), pursuant to Section [__] of the Agreement. In connection with such termination, Employee shall, subject to Employee's timely execution and non-revocation of this Release, receive certain payments and benefits pursuant to Section 8 of the Agreement (collectively, the "**Separation Benefits**").

3.     In consideration of the promises and consideration set forth in the Agreement, and as required by the Agreement:

(a)     Employee's Release. Employee, on behalf of himself and his heirs, executors, representatives, agents, insurers, administrators, successors, and assigns (collectively, the "**Releasors**"), irrevocably and unconditionally fully and forever waive, release and discharge FTI, and its past and present parents, subsidiaries, affiliates (including, without limitation, Compass Lexecon LLC and its affiliates), predecessors, successors, assigns, related companies, entities or divisions, and their past and present employee benefit plans, trustees, fiduciaries and administrators, and any and all of its and their respective past and present officers, directors, partners, insurers, agents, representatives, attorneys and employees in their corporate and individual capacities (collectively, the "**Released Parties**") from any and all claims, demands, actions, causes of actions, obligations, judgments, rights, fees, damages, debts, obligations, liabilities, and expenses (inclusive of attorneys' fees) of any kind whatsoever (collectively, "**Claims**"), whether known or unknown, from the beginning of time to the date of Employee's execution of this Release, including, without limitation, any claims under any federal, state, local, or foreign law, that Releasors may have, have ever had or may in the future have arising out of, or in any way related to Employee's hire, benefits, employment, termination, or separation from employment with FTI and any actual or alleged act, omission, transaction, practice, conduct, occurrence, or other matter, including, but not limited to:

(i)     any and all claims under Title VII of the Civil Rights Act, as amended, the Americans with Disabilities Act, as amended, the Family and Medical Leave Act, as amended, with respect to existing but not prospective claims, the Fair Labor Standards Act, the Equal Pay Act, as amended, Employee Retirement Income Security Act, as amended (with respect to unvested benefits), the Civil Rights Act of 1991, as amended, Section 1981 of U.S.C. Title 42, the Worker Adjustment and Retraining Notification Act, as amended, the Age Discrimination in Employment Act, as amended, the Uniform Services Employment and Reemployment Rights Act, as amended, the Genetic Information Nondiscrimination Act of 2008, [*to insert applicable state laws*], all of their

respective implementing regulations, and any other federal, state, local, or foreign law (statutory, regulatory, or otherwise) that may be legally waived and released;

(ii) any and all claims for compensation of any type whatsoever, including but not limited to claims for salary, wages, bonuses, commissions, incentive compensation, vacation, and severance that may be legally waived and released;

(iii) any and all claims arising under tort, contract, and quasi-contract law, including but not limited to claims of breach of an expressed or implied contract, tortious interference with contract or prospective business advantage, breach of the covenant of good faith and fair dealing, promissory estoppel, detrimental reliance, invasion of privacy, nonphysical injury, personal injury or sickness or any other harm, wrongful or retaliatory discharge, fraud, defamation, slander, libel, false imprisonment, and negligent or intentional infliction of emotional distress; and

(iv) any and all claims for monetary or equitable relief, including but not limited to attorneys' fees, back pay, front pay, reinstatement, experts' fees, medical fees or expenses, costs, and disbursements.

However, this general release and waiver of claims excludes, and Employee does not waive, release, or discharge: (A) any of Employee's rights arising under this Release, including without limitation, the right to receive the Separation Benefits; (B) any right to file an administrative charge or complaint with the Equal Employment Opportunity Commission, or other similar federal or state administrative agencies, although Employee waives any right to monetary relief related to such a charge or administrative complaint; (C) claims which cannot be waived by law, such as claims for unemployment benefits and workers' compensation; (D) any immunity or indemnification rights from FTI or any of its affiliates; (E) any rights to contribution from affiliates of FTI with respect to rights or claims set forth in subsections (A) through (D) or (F) of this paragraph; and (F) any rights to vested benefits, such as pension or retirement benefits, the rights to which are governed by (and subject to) the terms of the applicable plan documents and award agreements.

If Employee applies for unemployment benefits, FTI shall not actively contest it. However, FTI will respond truthfully, completely, and timely to any inquiries by the state unemployment insurance agency or department of labor concerning the termination of Employee's employment.

(b)     Specific Release of ADEA Claims

Employee further acknowledges that Employee is waiving and releasing claims under the Age Discrimination in Employment Act, as amended, and has had [21/45] days to consider the terms of this Release and consult with an attorney of Employee's choice, although Employee may sign it sooner if desired (such last date by which Employee must sign this release, the "**Release Consideration End Date**"). Further, Employee acknowledges and agrees that (i) changes to this Release, whether material or immaterial, do not restart the running of the applicable consideration period, and (ii) Employee shall have an additional 7 days from signing this Release (the end of

such seven-day period, the "**Release Revocation End Date**") to revoke consent to Employee's release of claims under the ADEA by delivering notice of revocation to Curtis Lu, 555 12th Street, NW, Washington, DC, 20004 by email/fax/overnight delivery before the end of the 7-day period.

This Release shall not become effective until the 8th day after Employee and FTI execute this Release ("**Effective Date**"). No payments due to Employee under the Agreement shall be made or begin in the event that Employee does not sign this Release before the Release Consideration End Date or revokes this release before the Release Revocation End Date.

4.      Employee specifically agrees and acknowledges:

(a)      that this Release is intended to be a general release that extinguishes all Released Claims by the Releasors against the Released Parties (except those outlined in Section 3(a) above) which includes, without limitation, all Released Claims which may exist as of the date of this Release, but which Employee does not know to exist in Employee's favor, whether through ignorance, oversight, error, negligence, or otherwise, and which might, if known, have materially affected Employee's decision to enter into this Release;

(b)      that the facts and/or the law may be materially different from what Employee understands them to be, and that Employee expressly assumes the risk thereof, and such shall not affect the validity or enforceability of this Release;

(c)      that the consideration that Employee will receive in exchange for Employee's waiver of the rights and claims specified herein exceeds anything of value to which Employee is already entitled;

(d)      that Employee was hereby informed by FTI in writing to consult with an attorney;

(e)      that Employee has had a reasonable period of time within which to consider this Release;

(f)      that Employee has entered into this Release knowingly and voluntarily with full understanding of its terms and after having had the opportunity to seek and receive advice from counsel of Employee's choosing[; and

(g)      that Employee was given a copy of this Release and related OWBPA disclosures and in accordance with the Older Worker's Benefits Protection Act ("**OWBPA**"), had at least 45 days to consider this Release].

5.      Employee represents that neither Employee nor any other Releasor (a) has any pending claim against FTI and/or any of the Released Parties, (b) has filed a complaint, charge or claim with any court or governmental agency against FTI and/or any of the Released Parties, or (c) has assigned any claim against FTI and/or any of the Released Parties to any person or entity. In the event any claim or suit is filed on Employee's or any other Releasor's behalf with respect to a Released Claim, Employee waives any and all rights to receive monetary damages or injunctive relief in favor of Employee. The waiver of rights and claims under the ADEA does not extend to any rights or claims arising after Employee executes this Release.

6.      Employee acknowledges and reaffirms that the provisions of Section 11 of the Agreement (relating to the continuing applicability of post-employment obligations of Employee) will remain in force and effect in accordance with their terms.

7.      Employee represents that Employee has not taken, and does not have in Employee's possession or control, any materials containing such confidential or proprietary information.

8.      Employee may accept the consideration set forth in the Agreement by delivering an executed copy of this Release to FTI, to the attention of Curtis Lu, 555 12th Street, NW, Washington, DC, 20004 after Employee's Termination Date and on or before the Release Consideration End Date.

9.      Notwithstanding anything to the contrary, nothing in this Release shall (a) prohibit Employee from making reports of possible violations of federal law or regulation to any governmental agency or entity in accordance with the provisions of, and rules promulgated under, any whistleblower protection provisions of state or federal law or regulation, or from collecting any financial incentives in connection therewith, or (b) require notification or prior approval by FTI of any reporting described in the foregoing clause.

10.     This Release will be governed by the laws of the State of Maryland.

11.     Employee further declares and represents that Employee has carefully read and fully understands the terms of this Release, that Employee had the opportunity to seek advice and assistance of counsel with regard to this Release, and that Employee knowingly and voluntarily, of Employee's own free will, without any duress, being fully informed and after due deliberate thought and action, accepts the terms of and signs the same as Employee's own free act.

**AGREED:**

_____

Employee:

Date:_____

STATE OF
_____
            )
                              )        SS.
COUNTY OF
_____
            )

On this [ ● ] day of [ ● ], 20[ ● ], [ ● ] (**"Employee"**) before me personally appeared, to me known to be the person described in and who executed this Release and acknowledged that he/she executed the same as his/her free act and deed.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my official seal in the Country and State aforesaid, the day and year first above written.

_____

Notary Public

My Commission Expires: