# Exhibit 2
# Public - Redacted

# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Southern Division)

FTI CONSULTING, INC.,

__16701 Melford Blvd., Suite 200
__Bowie, MD 20715,

                    Plaintiff,

        v.

COMPASS LEXECON LLC,
    555 12th Street NW, Suite 501
    Washington, DC 20004

                    *Plaintiffs*,

                    *v.*

JONATHAN ORSZAG,                    Case No.: 8:23-cv-03200-PJMBAH-AAQ
__660 Club View Drive
;
__Los Angeles, CA 90024,                    **REDACTED VERSION**

Defendant.
MARK ISRAEL, Ph.D.,
    7122 Arrowood Road
    Bethesda, MD 20817,

ECONIC PARTNERS LLC
    10100 Santa Monica Blvd., Ste. 925
    Los Angeles, CA 90067,

                    *Defendants.*

**SECOND**

**[PROPOSED] THIRD AMENDED COMPLAINT**

Plaintiff

Plaintiffs FTI Consulting, Inc. ("FTI~~"), on its own behalf"~~) and ~~as assignee~~Compass Lexecon LLC ("Compass Lexecon"), by and through ~~its~~their undersigned counsel, ~~brings~~bring this Third Amended Complaint against ~~Defendant~~Defendants Jonathan Orszag ("Mr. Orszag~~"~~")"), Mark Israel, Ph.D. ("Dr. Israel"), and ~~alleges~~their current company Econic Partners LLC ("Econic"), and allege as follows:

**NATURE OF THE CASE**

1.    FTI~~, one~~ and Compass Lexecon seek to hold two former employees, Mr. Orszag and Dr. Israel, accountable for their breaches of contractual and fiduciary duties, including the ~~largest consulting firms in~~ theft of valuable and confidential business information and the ~~world, seeks to prevent a now-former senior executive~~unlawful solicitation of clients and employees, in order to launch a competing business, Econic.  FTI and Compass Lexecon further seek to hold Econic liable for the tortious acts undertaken by Mr. Orszag and Dr. Israel—two of its ~~economic consulting business, Mr. Orszag, from following~~ "Founding Partners."  Together, all Defendants conspired to harm FTI and Compass Lexecon through improper and tortious means.

~~1.~~2.    For~~on~~ his ~~explicitly threatened plans to (1) compete with and (2) raid other senior professionals and employees from that business, and (3) harm FTI's ability to conduct that business going forward.  Mr.~~ part, Mr. Orszag threatened and initiated ~~his plans while serving as a central manager of FTI's Compass Lexecon business segment, in direct violation of his fiduciary duties to FTI and its~~ the plan to take over FTI's wholly- owned subsidiary, Compass Lexecon ~~LLC ("Compass Lexecon"),~~, while still serving as its senior manager, breaching his fiduciary duties and ~~specific~~violating agreements ~~not to take~~that forbade such ~~actions.~~conduct.

~~3.    This dispute arises from Mr. Orszag's breach of his fiduciary duty of loyalty to FTI and Compass Lexecon and breach of the restrictive covenants under his employment agreement.~~

While still an employee, Mr. Orszag secretly negotiated with major investment banks to obtain investment capital for his new firm. ███████████████

████████████████████████████████████████

███████████████████████████

4.      Just a year later, that same investment bank provided a nine-figure investment, which permitted Mr. Orszag to start Econic and then to raid dozens of FTI's and Compass Lexecon's clients and hundreds of its consulting professionals.

5.      A critical part of this scheme, as detailed below, was Dr. Israel's effort to weaken Compass Lexecon from within, while serving as its President through March 31, 2025. While Mr. Orszag attacked from the outside, Dr. Israel operated on the inside, steering FTI's and Compass Lexecon's employees and clients to Econic right after its public launch in early February 2025.

6.      Dr. Israel engaged in these tortious acts after he secretly agreed, as early as November 2024, with Mr. Orszag to take an equity stake in Econic valued at tens of millions of dollars. Dr. Israel then continued to work for Compass Lexecon for at least four months without disclosing this significant conflict of interest—all while Econic poached Compass Lexecon's clients and professionals with Dr. Israel's help. Not only did Dr. Israel fail to meet his duty to protect Compass Lexecon from Econic and Mr. Orszag's raids on its clients and employees, Dr. Israel took part in the raids himself.

7.      Dr. Israel also shared FTI's and Compass Lexecon's trade secrets and confidential business information with Mr. Orszag to advance their common purpose of targeting Compass Lexecon's key clients, matters, and personnel for the new firm.

8.      FTI and Compass Lexecon have suffered hundreds of millions of dollars in damages from Defendants' acts, including the loss of clients, employees, and revenue. They are

suffering ongoing harm through Dr. Israel's breaches of his current non-solicitation obligations and both individual Defendants' breaches of their confidentiality obligations.

2.    Plaintiffs therefore bring this action seeking damages and injunctive relief for the harms caused by Defendants' improper and tortious acts, including Mr. Orszag's and Dr. Israel's fiduciary breaches and their misappropriation of trade secrets and sensitive commercial information belonging to FTI and Compass Lexecon.  Plaintiffs also seek relief requiring Defendants to disgorge the profits wrongfully derived from Mr. Orszag's and Dr. Israel's breaches of fiduciary duty and misappropriation of trade secrets.Ex. A (as described below, the "Employment Agreement").  The Employment Agreement was terminated effective as of November 20, 2023.  Ex. B ("Notice of Termination for Cause").[1]

3.    Under the Employment Agreement, Mr. Orszag agreed to abide by covenants not to compete with FTI or Compass Lexecon and not to solicit FTI's or Compass Lexecon's employees or clients during his employment and continuing for one year after termination (the "Restrictive Covenants").[2]  See Employment Agreement §§ 9, 11, 17(c), 17(d).  In addition, by virtue of his status as a high-ranking employee of Compass Lexecon, Mr. Orszag owed a fiduciary duty of loyalty to FTI and Compass Lexecon, which also precluded him from taking the many actions he has taken to undermine FTI's Compass Lexecon business.  Mr. Orszag, in fact, recommitted to his fiduciary duties and these specific obligations to FTI and Compass Lexecon in 2023 in the latest iteration of his Employment Agreement.  And in return and reliance upon these

[1] Contemporaneously with filing this Second Amended Complaint, FTI is filing a motion for leave to file a complete, unredacted copy of the Employment Agreement and its attachments (Ex. A), as well as the Notice of Termination for Cause (Ex. B) under seal.

[2] Capitalized terms not defined herein have the meaning provided for in the Employment Agreement.

duties and obligations of Mr. Orszag, FTI awarded substantial compensation to Mr. Orszag over the course of his 17-year employment with FTI.

4.    In spite of these clear commitments, Mr. Orszag has repeatedly threatened to start a competing firm immediately upon his departure, solicited other senior professionals and employees of Compass Lexecon to leave with him to start such a competing firm, disparaged FTI, and threatened to harm FTI's economic consulting business unless it met his every demand. Immediately prior to his termination and the filing of this lawsuit, Mr. Orszag's latest demands to keep him from carrying out these threats were that FTI either (1) relinquish control of Compass Lexecon, or (2) sell the entire Compass Lexecon business for a fraction of what it is worth.

5.    Recognizing the true value of the building blocks of its business—its employees and clients—FTI has been left with no meaningful choice other than to protect its business, employees, and clients by seeking to stop Mr. Orszag's plan.

6.    With Mr. Orszag's employment now at an end, FTI may face substantial harm to its business and client relationships if Mr. Orszag were to follow through on his plans. Protecting employees and avoiding disruption to client interests are FTI's top priority.

7.9.    FTI therefore brings this action seeking injunctive and legal relief for Mr. Orszag's contractual and fiduciary breaches, and further threatened breaches, including declarations that the Restrictive Covenants are valid and enforceable.

**THE PARTIES**

8.10.    Plaintiff FTI is a Maryland corporation with its principal place of business located at 16701 Melford Blvd., Suite 200, Bowie, MD 20715. FTI is a global business advisory firm.

9.11.    Plaintiff Compass Lexecon is a wholly-owned subsidiary of FTI and is a Maryland limited liability company with a local business address at 555 12th Street NW, Suite 501,

5

Washington, DC, 20004.  FTI is the sole member of Compass Lexecon.  On December 1, 2023, Compass Lexecon assigned all of its rights, interests, duties and obligations under ~~the~~Mr. Orszag's Employment Agreement to FTI pursuant to Section 20(a) of the Employment Agreement.

12.    Defendant Econic Partners LLC is a limited liability company formed under the laws of the State of Delaware in November 2024, with its principal place of business located in Los Angeles, California. Mr. Orszag ██████████████████████████ and serves as Econic's principal manager.

~~10.~~13.  Defendant Mr. Orszag is an individual who resides in Los Angeles, California. Mr. Orszag was employed by Compass Lexecon as a Senior Managing Director, and his Employment Agreement was entered into with Compass Lexecon and FTI. Mr. Orszag organized Econic on November 20, 2024, while he was still bound by restrictive covenants. On or around February 19, 2025, Mr. Orszag publicly launched his new economic consulting venture, Econic, and is a "Founding Partner" of Econic.

14.    Defendant Dr. Israel is an individual who resides in Bethesda, Maryland. Dr. Israel most recently served as Compass Lexecon's President from January 2024 through March 31, 2025. On April 1, 2025, one day after his resignation from Compass Lexecon, Dr. Israel announced that he had joined Econic as a "Founding Partner."

## JURISDICTION AND VENUE

15.    ~~Mr.~~This action was originally filed by FTI and Compass Lexecon in the Circuit Court for Montgomery County, Maryland; in November 2023, Mr. Orszag removed this action based on diversity jurisdiction ~~and FTI agrees that this~~ under 28 U.S.C. § 1332(a)(1).

~~11.~~16.  ~~This~~ Court has subject matter jurisdiction ~~under 28 U.S.C. § 1332(a)(1).~~ over this action under the Defend Trade Secrets Act, 18 U.S.C. § 1836(c), and supplemental jurisdiction over the violations of common law and contractual duties under 28 U.S.C. § 1367.

~~12.~~      Mr. ~~The Parties~~Orszag expressly consented to the jurisdiction of this Court in ~~the~~his Employment Agreement, which contains a valid and enforceable forum selection clause, ~~stating:~~

> ~~The internal laws of the State of Maryland (other than its conflict of laws provisions) shall exclusively govern this Agreement. Regardless of any present or future residence, domicile or place of business of the parties, each party hereby irrevocably consents and agrees that any claims and disputes between or among~~designating the ~~parties pertaining to this Agreement or to any matter arising out of or relating to this Agreement and not governed by Section 27 of this Agreement be brought in any~~ state ~~or~~and federal ~~court located in the State of Maryland.  By execution and delivery of this Agreement, each party submits and consents in advance to such jurisdiction in any action or suit commenced in any such court. Each party hereby waives any objection which it may have based on forum non conveniens and hereby consents to~~ courts of Maryland as agreed forums for the resolution of claims or disputes pertaining to the ~~granting of such legal or equitable relie[f] as deemed appropriate by such court.~~

17.      Employment Agreement ~~§ 24. .~~

18.      ~~Pursuant to Md.~~ This~~Code Ann., Cts. & Jud. Proc. § 6-103, this~~ Court may ~~also~~ exercise personal jurisdiction over Dr. Israel based on his domicile in the State of Maryland, pursuant to Md. Code Ann., Cts. & Jud. Proc. ~~Mr. Orszag because he~~ ("Courts") § 6-102, and pursuant to mandatory contractual forum-selection and choice-of-law provisions contained in his employment agreement with Compass Lexecon and FTI.

19.      This Court may exercise personal jurisdiction over all Defendants pursuant to Courts § 6-103, because: (a) each individual Defendant transacted business in Maryland ~~by virtue of his Employment Agreement with FTI and Compass Lexecon.~~through their long-term employment or consulting relationships with Compass Lexecon and FTI, as more fully set forth

7

below; (b) Econic, through its agents, Mr. Orszag and Dr. Israel, transacted business and performed work in Maryland; and (c) all Defendants caused tortious injury in Maryland to FTI, a Maryland corporation with its principal place of business in Maryland, and Compass Lexecon, a Maryland company, by their or by their agents' various acts and omissions inside or outside the State.

20.     Further, this Court may exercise personal jurisdiction over all Defendants based on their participation in a civil conspiracy, as more fully set forth below, to engage in unfair competition to harm FTI and Compass Lexecon, for the purpose of advancing the interests of Econic and their personal financial interests, while undermining the interests of FTI and Compass Lexecon.

21.     After Econic's formation, Dr. Israel acted as an agent of, or co-conspirator with, Econic and Mr. Orszag.  From the time of Econic's formation through at least April 1, 2025, Dr. Israel worked primarily out of his residence in Maryland, and his forum contacts are attributable to Econic because he was acting to advance Econic's interests, in violation of his fiduciary, employment, and statutory duties to FTI and Compass Lexecon.  Based on their close longstanding professional relationship, Mr. Orszag—the principal and founder of Econic—knew that Dr. Israel was a Maryland resident who worked out of his Maryland residence.  That knowledge of Econic's principal and founder is attributable to Econic.

22.     Based on Mr. Orszag's knowledge, Econic knew, at the time it joined the conspiracy with Dr. Israel, that Dr. Israel would take acts in Maryland to harm FTI in Maryland.

13.23. Dr. Israel also engaged in acts in April 2025, while working for Econic, that violated his restrictive covenants under his employment agreement with FTI and Compass Lexecon. Upon information and belief, Dr. Israel took these acts while in Maryland.

14.24.  Venue is proper in this Court pursuant to ~~the Employment Agreement and~~ 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to ~~FTI's~~these claims occurred in Maryland.

### ~~FACTUAL BACKGROUND~~

### ALLEGATIONS OF FACT COMMON TO ALL COUNTS

**A.     Compass Lexecon is FTI's Global, Renowned Economic Consulting Business**

15.25.  FTI is a global business advisory firm dedicated to helping organizations manage change, mitigate risk, and resolve disputes related to a variety of complex issues, including financial, legal, operational, political and regulatory, reputational, and transactional issues.  Its clients include the world's leading law firms, financial institutions, and Fortune 100 companies, and, with 40 years of experience, FTI has become a ~~market leading firm~~consultant and ~~a~~ trusted advisor to numerous clients in ~~various~~many industries.  FTI's practices include (i) corporate finance & restructuring, (ii) economic consulting, (iii) forensic and litigation consulting, (iv) strategic communications, and (v) technology.

16.26.  Compass Lexecon is a wholly-owned subsidiary of FTI and is the primary provider of services within FTI's economic consulting segment.  Compass Lexecon provides critical insight in legal and regulatory proceedings, strategic decisions, and public policy debates.  The firm delivers a wide range of services that center around its three core offerings: Antitrust & Competition Economics, Financial Economics, and International Arbitration.

17.27.  Compass Lexecon has over 20 offices and over ~~800~~700 employees worldwide.

**~~B.     FTI Employs Highly-Esteemed Consultants at Compass Lexecon~~**

18.28.  FTI has invested significant resources in recruiting and retaining Compass Lexecon's leaders, senior professionals, and staff.  To protect its substantial investment in the Compass Lexecon business, and the interests of its clients and hundreds of employees, FTI has

9

entered into competitive, confidential compensation and employment packages ~~in order~~ to retain Compass Lexecon's senior professionals.

### ~~C.~~B.   Mr. Orszag's History at Compass Lexecon

~~19.    Mr. Orszag joined FTI in 2006 upon FTI's acquisition of Competition Policy Associates, Inc. ("COMPASS"), of which Mr. Orszag was affiliated, and which was comprised of some of the leading competition economists in the world.   At the time of this acquisition, Mr. Orszag was a junior partner of COMPASS.~~

~~20.~~29.  Prior to his termination by FTI, Mr. Orszag worked in ~~the area of~~ economic and financial consulting with expertise ~~on complex issues of~~in antitrust, regulatory, policy, and litigation matters. ~~He~~He became a Senior Managing Director of Compass Lexecon and eventually was responsible for day-to-day management of that firm, including maintaining relationships with FTI's and Compass Lexecon's current and previous clients, and with securing new business.

~~21.    Mr. Orszag's first employment agreement with FTI was entered into as of January 1, 2006, under which he agreed to serve as a Senior Managing Director, report to the practice leader of FTI's economic consulting practice group, and have joint responsibility for the day-to-day operations of COMPASS.~~

~~22.    COMPASS and another economic consulting firm owned by FTI, Lexecon LLC ("Lexecon"), operated as separate units under FTI's economic consulting business segment until November 2007.  At that time, FTI combined the COMPASS and Lexecon businesses under the name "Compass Lexecon" for marketing and promotional purposes and to join the units' operational and financial management via a Joint Operations Agreement (the "JOA"), which was entered into on November 28, 2007.~~

23.    After the formation of Compass Lexecon in 2007, Mr. Orszag gradually became responsible for the day-to-day management of the combined firm.

24.30.  By virtue of his position within Compass Lexecon, Mr. Orszag had extensive access to FTI's and Compass Lexecon's confidential information, including information about Compass Lexecon's financial performance, revenue generation, client lists, billing rates, employee compensation, overhead expenses, operations, and business strategies and plans.

25.    Nonetheless, Mr. Orszag's ambition was to become—as he claims that he is now—"the most important person in economic consulting."

26.    In 2013, Mr. Orszag entered into a third amendment to his employment agreement under which FTI agreed to continue to employ Mr. Orszag as a Senior Managing Director of FTI and Compass Lexecon through January 1, 2024 (the "2013 Employment Agreement"). Concurrently, the parties agreed to an amended JOA (the "Second JOA"), which, subject to certain letter agreement amendments thereafter, was the operative JOA until January 2023.

27.    Between 2011 and the date of his termination in 2023, Mr. Orszag's compensation increased nearly four-fold.  The net effect was that Mr. Orszag became one of the most highly-paid professionals in the consulting industry.

28.31.  Although Mr. Orszag's compensation became drastically skewed, FTI's senior management always insisted that Mr. Orszag—given his role at Compass Lexecon—be bound by robust post-employment restrictions to protect Compass Lexecon should he ever decide to leave the firm.

29.32.  Each time that he agreed to a new employment contract, Mr. Orszag agreed to be bound by such restrictions.  In his employment agreement entered into in 2012, FTI requested, and Mr. Orszag agreed to, a series of robust noncompetition and nonsolicitation protections.  These

~~included a contractual provision that, if Mr. Orszag left FTI, he agreed not to compete with FTI or Compass Lexecon for a period of one to two years, depending on how his employment was terminated and his post-termination compensation.   The same restriction carried over into the 2013 Employment Agreement.~~As the expiration of his employment agreement drew near in 2022, however, Mr. Orszag had his eyes set on an "outside option"—starting a new firm—that, in his words, would make him and Dr. Israel even more "wildly rich."

~~30.    As the expiration of his 2013 Employment Agreement drew near, beginning in or around April 2021, Mr. Orszag made repeated demands to perpetuate his control over and compensation from FTI stemming from the Compass Lexecon business.  For its part, FTI believed it was important to rebalance Mr. Orszag's compensation and power in order to retain talent and continue the long-term growth of the Compass Lexecon business.~~

~~31.    After extensive negotiations, in 2023, the parties agreed to a new employment arrangement.  Mr. Orszag reluctantly agreed to enter into a new Employment Agreement and other governance changes that gave him less personal compensation and management authority over Compass Lexecon than he would have liked.  Nonetheless, FTI paid him substantial compensation but only on the condition that Mr. Orszag recommit to restrictions and his duty of loyalty to FTI and Compass Lexecon in order to preclude him from undermining the Compass Lexecon business.~~

~~32.    As described in more detail below, and as is now clear in hindsight from his negotiations, Mr. Orszag had no intention of living up to his duties to FTI and Compass Lexecon and the restrictions to which he explicitly agreed earlier this year.~~

~~D.    During 2022 Employment Negotiations, Mr. Orszag Threatened to Leave Compass Lexecon to Start a Competing Firm and Take Senior Professionals with Him~~

C.    ~~In or around June 2022, while Mr. Orszag and FTI were in heated negotiations to extend Mr. Orszag's employment, Mr.~~**In 2022, Mr. Orszag, Assisted by Dr. Israel, Hatched His Plan by Threatening to Start a New Firm**

33.    During negotiations in 2022 over his compensation and the governance of Compass Lexecon, Mr. Orszag explicitly set out his intention to incite a mass resignation of key staff that would collapse Compass Lexecon if FTI refused to give in to his demands for greater compensation and control.

34.    ~~Mr. Orszag presented~~In a June 2022 presentation to FTI's Board of Directors ~~in or around June 2022 a PowerPoint slide deck titled, "A Going-Forward Compensation Proposal" (the "June 2022 Presentation").~~

~~35.    In the part of the June 2022 Presentation authored by Mr. Orszag, he presented his supposed best~~ , Mr. Orszag and ~~final offer for a new management and payment structure for Compass Lexecon and~~ Dr. Israel threatened ~~why FTI must accept his offer.  He also threatened significant consequences for not accepting his offer.  Certain of Mr. Orszag's explicit threats, made as part of the June 2022 Presentation (and at other times) are described below.~~

~~1.    By the Summer of 2022, Mr. Orszag Made Clear he would Solicit Compass Lexecon Senior Professionals and Employees in Anticipation of Competing with FTI Post-Employment~~

~~36.~~34.  ~~At least as early as 2022, if not long before, Mr. Orszag made clear~~ that ~~he was intent on soliciting Compass Lexecon senior professionals to leave with him upon his departure from Compass Lexecon.   These senior professionals represent Compass Lexecon's highest performers in light of their specialized knowledge in the industry and provision of services to some of FTI's most highly-valued clients.  Mr. Orszag asserted in the June 2022 Presentation that, in the~~

~~event there was~~ if "no deal" ~~between him and FTI, he~~were reached, they and other senior professionals would leave FTI together~~, which he said would~~. Mr. Orszag and Dr. Israel warned that this mass departure would significantly reduce ~~any profit margins from the~~ Compass ~~Lexecon business.~~Lexecon's profitability.

~~37.~~35.  The ~~June 2022 Presentation~~presentation further ~~stated~~warned that Mr. Orszag, Dr. Israel, and ~~other senior professionals~~their allies would ~~"be~~ end up "competing in the market~~," and"~~ against Compass Lexecon, such that "FTI should expect key staff to depart with [~~senior professionals~~them] or to competitors – or FTI will have to pay existing staff substantially more to retain them, thus lowering margins further."

~~38.~~36.  Mr. Orszag ~~stated in the June 2022 Presentation that Compass Lexecon's senior professionals "are each recognized in the marketplace as among the top few economic consultants in the world," and "[a]ny of them could support an entire consulting firm." As a result, Mr. Orszag~~ Dr. Israel also threatened~~, "There~~ that "[t]here [would be] no reasonable chance that FTI could recreate earnings . . . without [~~him~~them and ~~the~~other Compass Lexecon senior professionals] – especially with some of those leaders competing in the marketplace."

~~39.    The~~ **Mr.** Orszag further predicted that the day he and other senior professionals ~~"open a new firm they will be viewed by the industry as the #1 economic consulting firm in the world." He described his~~ plan ~~that they could "fund any start-up with their own money and would likely be able to create a firm with a market cap of $2-$3 billion." With this earning potential in hand, Mr. Orszag stated, the senior professionals could then "recruit critical staff."~~

~~**2.    Mr. Orszag Explicitly Threatened FTI with Substantial Harm**~~

~~40.    Mr. Orszag's plan to steal Compass Lexecon's senior professionals to join his own firm is~~was not intended merely to compete with Compass Lexecon~~,~~ but ~~represents his intention to~~

cause substantial harm to represented their goal to destroy or damage FTI's economic consulting business.

41.    In the June 2022 Presentation, Mr. Orszag explicitly threatened that, unless FTI agreed to a new deal that was to Mr. Orszag's liking, FTI's revenues and profits from its Compass Lexecon business may decline significantly.  Moreover, Mr. Orszag threatened, the departure of senior professionals could "create uncertainty about the future of the business, which will mean [Compass Lexecon] will be unable to recruit and retain critical staff."

42.37.  Mr. Orszag expected that the departure of Compass Lexecon's senior professionals may further cause FTI's earnings from its Compass Lexecon business to be "substantially lower" in the and take it for themselves.  Over the next two years that followed.  Mr. Orszag further expected the long-term revenue impact to FTI from its Compass Lexecon business to be impacted, since he and other senior professionals "will be competing in the market.", Mr. Orszag would bring this plot to fruition, with the crucial assistance of Dr. Israel.

43.    In addition, Mr. Orszag predicted that Compass Lexecon may face issues involving the collection of substantial accounts receivable because of the uncertainty that Mr. Orszag could create around Compass Lexecon's future.

**E.D.    Mr. Orszag Mr. Orszag and Dr. Israel Pretended to Change Course and Recommitted to his Duty of Loyalty to FTI and Compass Lexecon by Entering into the Employment Agreement Agreements and a Governance Agreement**

44.38.  After months of heated negotiations, toward the end of 2022, FTI and, Mr. Orszag finally, and Dr. Israel reached a resolution, at least on paper, on the terms of Mr. Orszag's their employment and the governance structure of Compass Lexecon.  Mr. Orszag and Dr. Israel, however, soon showed they lacked a genuine intent to live up to their fiduciary and contractual commitments to FTI.

39.    Mr. ~~Orszag's~~Orszag entered into the operative Employment Agreement ~~was entered into between Mr. Orszag,~~with Compass Lexecon~~,~~ and FTI ~~on January 15, 2023,~~ effective as of January 1, 2023.  *See* Ex. A.  The Employment Agreement was part of a larger ~~deal~~set of contracts under which Mr. Orszag, ~~FTI~~Dr. Israel, and others agreed to accept a new internal governance structure for Compass Lexecon ~~.~~, effective on January 1, 2023.

~~45.~~40.  Dr. Israel also entered into a new employment agreement with Compass Lexecon and FTI on January 14, 2023, and made effective as of January 1, 2023, ~~pursuant to an agreement (the "Governance Agreement"), which replaced~~ and which was later amended as of December 22, 2023.  Exs. C, D (filed under seal).   Mr. Orszag and ~~superseded the Second JOA.~~ Dr. Israel communicated about the negotiations and their agreements.

~~46.    Mr. Orszag was represented by sophisticated legal counsel during the negotiation and drafting of~~ Under his Employment Agreement ~~and Governance Agreement.~~

~~47.    Under the Governance Agreement, Mr. Orszag continued to serve on the executive committee of Compass Lexecon (the "Executive Committee"), but this time with three other members.  FTI maintains exclusive management authority and control over Compass Lexecon but has delegated to the Executive Committee responsibility for managing certain day-to-day internal operations of Compass Lexecon.  By entering into the Governance Agreement, the parties appeared to agree to redistribute some of Mr. Orszag's power to other senior members of Compass Lexecon.~~

~~48.~~41.  ~~Under the Employment Agreement,~~ Mr. Orszag continued to be employed as a Senior Managing Director of Compass Lexecon~~,~~ and ~~Mr. Orszag~~ was still projected to receive ~~substantial~~significant annual personal compensation.

16

42.    ~~In order~~Mr. Orszag further agreed to the application of Maryland governing law, jurisdiction, and venue provisions.  Ex. A § 24.

~~49.~~43.  To protect ~~the~~its significant investment ~~it made~~ by retaining Mr. Orszag as an employee, FTI ~~again had Mr. Orszag promise in return~~negotiated for ~~this significant compensation to abide by the Restrictive Covenants~~restrictive covenants, including a non-competition covenant in the event of his termination for cause (the "Non-Compete ~~Covenant~~Provisions") and a non-solicitation covenant (the "Non-Solicit ~~Covenant").~~ Provisions").  As Mr. Orszag knew, the Non-Compete and Non-Solicit Provisions he agreed to, in exchange for substantial compensation and benefits from FTI, were fully valid and enforceable.

### ~~1.    *Non-Compete Covenant*~~

44.    ~~The~~Yet, soon after this litigation started, Mr. Orszag abandoned his contractual commitments to FTI by arguing that his restrictive covenants were unenforceable under California law. In multiple opinions and a partial declaratory judgment, this Court rejected those arguments, holding that Maryland law applies and that Mr. Orszag's restrictive covenants are facially valid under Maryland law. ECF Nos. 49, 80, 112.

### 1.    *Non-Compete* ~~Covenant~~*Provisions*

~~50.~~45.  Mr. Orszag's Non-Compete Provisions, customary in the consulting industry, ~~is~~are detailed and narrow.

~~51.~~    Under Section 9 of ~~the~~his Employment Agreement ~~(the "Non-Competition Provisions"),~~, Mr. Orszag agreed~~:~~

> ~~. . .~~ that~~,~~ during ~~the Non-Compete Period (as defined below), Employee will~~his employment and for a one-year restricted period after his employment (if he were terminated for cause), he would not~~,~~  (without ~~Company's prior written consent, directly or indirectly on Employee's own behalf or on behalf of any other person, firm or entity other than the FTI Group (A)~~Compass

Lexecon's permission, which was not provided) undertake a defined set of actions, including to: engage in; (B), own or control any interest in, a competing business (except as a passive investor of less than five percent (5%) of thein a publicly traded stock of a publicly held company); (C) act as aan officer, director, officer,or manager, member, employee, trustee, agent, partner, joint venture, participant, consultant of or be obligated to, or be connected in any advisory, business or ownership capacity (except as a passive investor of less than five percent (5%) of the publicly traded stock of a publicly held company) with; (D) lend credit or money for the purpose of the establishing or operating; or (E) of such a venture; provide financing for its establishment; or allow Employee'shis name or reputation to be used for it. Ex. by, any firm, corporation, partnership, trust or other business enterprise directly or indirectly engaged in, any Competing Business in the Market Area . . . .

46.    Employment AgreementA § 9(a).

52.    Section 9, however, also included the following carveout:

The parties agree that the foregoing shall not prevent Employee from working for or performing services on behalf of a Competing Business if such Competing Business is also engaged in other lines of business and if Employee's employment or services are restricted to such other lines of business, and Employee will not be providing direct or indirect support, advice, instruction, direction or other guidance in a Comparable Position to lines of business that constitute the Competing Business.

Id.

53.    "Competing Business" as defined in the Employment Agreement means:

(i) economic, financial, regulatory, corporate and litigation consulting services, including those provided to law firms, corporations and governmental bodies in connection with legal or regulatory proceedings, strategic decision making and/or public policy debates or matters (collectively, "Consulting Services"), and (ii) any other business which is competitive with any business of the FTI Group that (A) involves Employee, (B) is conducted during the term of this Agreement, and (C) Employee was actively involved with or had knowledge of during his employment with the Company.

18

47.    The Non-Compete Provisions are limited in scope and duration, as approved by the Court earlier in these proceedings through "blue-penciling."  *See* ECF No. 80, at 12-16.

48.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

### 2.    *Non-Solicit Provisions*

Mr. Orszag's Non-Solicit Provisions, also customary in the consulting industry, are ~~*Id*. § 17(a).~~

~~54.    "Market Area" is defined in the Employment Agreement in the following provision:~~

> ~~The parties acknowledge and agree that the Company's business is national in scope and character and that, as a result, it is reasonable and appropriate that the term "Market Area" for purposes of this Agreement means (i) the United States of America, the United Kingdom, continental Europe (including, without limitation, the Scandinavian peninsula), Israel, China, Singapore, Chile and Argentina, and (ii) any other location in which the FTI Group has an office or in which the FTI Group offers or provides Consulting Services to clients in the ordinary course of its business.~~

~~*Id*. § 17(b).~~

~~55.    The Non-Compete Covenant is limited in scope and duration.  By the terms of his Employment Agreement, Mr. Orszag has agreed not to compete with FTI for one year after his termination.  *Id*. § 17(c).  Mr. Orszag agreed that the rights and obligations set forth in the Non-Compete Provisions would survive termination of the Employment Agreement and Mr. Orszag's employment with Compass Lexecon.  *Id*. § 9(f).  Mr. Orszag further specifically acknowledged "that every effort has been made to limit the restrictions placed upon [Mr. Orszag] to those that are reasonable and necessary to protect the FTI Group's legitimate interests," and that the Non-Compete Provisions would not prevent him from earning a livelihood.  *Id*. § 9(b).~~

2.    ~~*Non-Solicit Covenant*~~

~~56.~~49.  ~~The Non-Solicit Covenant, also customary in the consulting industry, is~~ detailed, narrow, and contained in a specific "Non-Solicitation Covenants" section of the Employment Agreement.

~~57.~~50.  Under Section 11 of the Employment Agreement ~~(the "Non-Solicitation Provisions"),~~, Mr. Orszag agreed not to, "directly or indirectly, whether for Employee or for any other individual or entity (other than Company)," ~~take any of the following actions during a defined restricted period:~~ solicit Company clients or employees subject to specific terms and conditions. *See* Ex. A § 11(a).

> ~~(i) solicit business regarding any case or matter upon which Employee worked on behalf of Company;~~

> ~~(ii) solicit any person or entity (A) who is or was a client of the business of FTI Group and (B) which Employee directly or indirectly provided any services for (including, without limitation, in a management, supervisory or oversight role), solicited business from, or otherwise had contact with (either directly or through any direct or indirect reports) during the term of his employment with the Company (1) to terminate, reduce or otherwise modify their business with the FTI Group or (2) otherwise for the purposes of Employee directly or indirectly engaging in any Competing Business in the Market Area; or~~

> ~~(iii) solicit, induce or otherwise attempt to influence any person whom the FTI Group employs or otherwise engages to perform services (including, but not limited to, any independent consultants, engineers or sales representatives) or any contractor, subcontractor, supplier, or vendor of the FTI Group, to leave the employ of or engagement with, or discontinue providing services to, the FTI Group, or reduce the amounts or level of service they provide to the FTI Group, or otherwise interfere with or disrupt the FTI Group's relationship with these individuals or entities, provided, however, that this restriction will not apply in the case of any clerical employee of the FTI Group or in the case of any other employee whose employment with the FTI Group has been terminated for at least one year.~~

~~*Id.* § 11(a).~~

~~58.    The Non-Solicit Covenant is limited in scope and duration.  Mr. Orszag agreed to abide by the Non-Solicit Covenant during the "Non-Solicit Period," defined as "the period beginning on the Effective Date and ending on the first anniversary of the Termination Date." *Id.* §§ 11(a), 17(d).  Mr. Orszag agreed that the rights and obligations set forth in the Non-Solicit Provisions would survive termination of the Employment Agreement and Mr. Orszag's employment with Compass Lexecon.   *Id.* § 11(e).   Mr. Orszag further specifically "acknowledge[d] that every effort has been made to limit the restrictions placed upon [Mr. Orszag] under this Section to those that are reasonable and necessary to protect the legitimate interests of the FTI Group." *Id.* § 11(b).~~

51.    The Non-Solicit Provisions are limited in scope and duration, as approved by the Court earlier in these proceedings through "blue-penciling."   *See* ECF No. 80, at 12-16.  For example, the blue-penciled restriction found acceptable by the Court was limited to the solicitation of FTI's individual employees and independent contractors involved in economic consulting. *Id.* at 14.

~~59.~~   The Non-Solicit ~~Covenant was~~Provisions were further reasonably limited to "affirmative solicitation~~." That is,~~," allowing Mr. Orszag ~~was not precluded from:~~

> ~~(i) responding~~ to ~~and acting upon any communication that is~~respond to communications initiated solely by ~~any client or employee (and without any prior breach of this Agreement by Employee) or~~
>
> ~~(ii)~~others or to announce generally ~~announcing through a communication (including without limitation to clients and employees), upon termination of employment,~~ his future plans ~~following such termination (as long as such announcement does not invite or otherwise solicit any client of the business of FTI Group or person whom the FTI Group employs or otherwise engages to perform services or any contractor, subcontractor, supplier, or vendor of the FTI Group to join, provide services to, or otherwise~~

~~become engaged by Employee, whether directly or indirectly, in any new business endeavor) . . . .~~

~~*Id.* § 11(b).~~

60.52.   ~~But Mr. Orszag agreed he could do so~~, "provided that no such response, action or announcement is permitted to the extent it otherwise violates (or would reasonably be expected to result in violation of) Section 9, 11 or 12, as applicable."   ~~*Id.*~~*See* Ex. A § 11(b).

53.    ~~Under the terms of the~~ Mr. Orszag was bound by the Non-Solicit Provisions through November 20, 2024, the one-year anniversary of his termination.

54.    Dr. Israel's most recent Employment Agreement contains Non-Solicit Provisions that are similarly limited in scope and direction, subject to the Court's blue-penciling ruling.

55.    Dr. Israel continues to remain bound by his Non-Solicit Provisions up through the one-year anniversary of his resignation from Compass Lexecon—through March 31, 2026. Ex. E.

**3.    *Confidentiality Agreements***

56.    Under Section 12 of the Employment Agreement ("Confidentiality Agreement"), and in related employment policies governing his access to and use of FTI technology resources and information, Mr. Orszag agreed that his access to Confidential Information, defined to include trade secrets of Compass Lexecon and FTI, "is for the sole and exclusive purpose of performing work for the benefit of the Company." Ex. A §§ 12(a), (b).

57.    Mr. Orszag therefore agreed to maintain such information "in strictest confidence" (except as required by legal process), and "not disclose [it] to any individual or business enterprise of any nature, or use for his own personal use or financial gain." *Id.* § 12(b).

58.    The Confidentiality Agreement, also customary in the consulting industry, is detailed and narrow in scope.

59. ████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████

61.60.  Under his employment agreement, Mr. Orszag agreed that any breach or threatened breach of the Non-Compete ~~Covenant or the Non-Solicit Covenant~~Provisions, the Non-Solicit Provisions, the Confidentiality Agreement, or any other restrictions contained in §§ 9-16 of the agreement would cause substantial and ~~irrevocable~~irreparable harm to FTI and Compass Lexecon and that FTI and Compass Lexecon would ~~accordingly be~~become entitled to injunctive relief to ~~enforce~~secure their rights under the ~~Employment Agreement.~~agreement.  *See Id.*Ex. A §§ 9(d), 11(d), 12(b), 19. ████████████████████████████████████████████

██

62.    ~~As stated above, Mr. Orszag further agreed under Section 24 of the Employment Agreement that the "internal laws of the State of Maryland (other than its conflict of laws provisions) shall exclusively govern" the Employment Agreement, and he agreed to submit to the jurisdiction of the state and federal courts in Maryland with respect to the present dispute.  *Id.* § 24.~~

F.    ~~**When Entering into the Employment Agreement, Mr. Orszag Never Intended to Comply with his Fiduciary Duties or Obligations to FTI and Compass Lexecon**~~

63.    ~~Prior to entering into the 2023 Employment Agreement, Mr. Orszag made it clear that he had no intention of honoring any duty or obligation that would prevent him from stealing Compass Lexecon's business.  For example, in the June 2022 Presentation, Mr. Orszag clearly stated his intention to seek to invalidate the non-compete and non-solicit covenants applicable under his 2013 Employment Agreement (the "2013 Restrictive Covenants") in California.~~

64.    ~~In other words, despite agreeing to a robust set of post-employment restrictions since his employment with FTI began, Mr. Orszag admitted that he intended to breach those obligations and compete against Compass Lexecon the moment that he left the firm.~~

**E.**    ~~In addition,~~ **In 2023, Mr. Orszag, Joined By Dr. Israel, Began to Execute the Takeover Plan by Sowing Dissension Within Compass Lexecon**

61.    The new employment agreements did not stop Mr. Orszag from pursuing his takeover plan with Dr. Israel.

65.    Mr. ~~Mr.~~ Orszag's own personal counsel stated, if there came a point at which FTI ~~decided the restrictive covenants were enforceable against Mr.~~ Orszag, ~~Mr. Orszag intended to file a declaratory relief action in California to invalidate the restrictive covenants.  Mr. Orszag repeatedly made it clear~~ knew that ~~at any time he could bring such an action~~ they needed significant capital investment and ~~that a California court would invalidate any restrictive covenants.~~

66.    ~~In entering into the 2023 Employment Agreement, the parties appeared to have resolved these issues by Mr. Orszag agreeing not only to his Non-Compete and Non-Solicit Covenants but also to Maryland governing law, jurisdiction, and venue provisions.  As Mr. Orszag knows, the Non-Compete and Non-Solicit Covenants Mr. Orszag agreed to, in exchange for substantial compensation and benefits from FTI, and his fiduciary duties, are fully valid and enforceable.~~

62.    ~~Virtually immediately after entering into the 2023 Employment Agreement, however, Mr. Orszag made clear that he would not abide by the terms to which he agreed.  Over the course~~ a defection of ~~2023, Mr. Orszag continued to threaten to incite a mass resignation~~ large number of Compass Lexecon employees ~~and~~ to start ~~a competing~~ the new firm he had threatened to create.

24

63. ████████████████████████████████████████

████████████████████████████████████████████

███████████

64. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

65. ████████████████████████████████████████

████████████ Mr. Orszag openly fomented dissension by seizing upon certain internal issues, including challenges with a new firmwide billing system and FTI's decision to decline, due to conflicts, two client matters originated by Compass Lexecon.

66.    Mr. Orszag aligned with Dr. Israel, who told him in May 2023 that, if the conflicts issues were not resolved, they should "separate" themselves "from these conflicts."

67.    In advance of a June 2023 meeting among senior Compass Lexecon professionals and FTI management regarding the conflicts issues, Mr. Orszag urged Compass Lexecon professionals to question why they should stay with the firm since, he claimed, many were not bound by non-competition covenants.  Reflecting consciousness of his disloyalty, Mr. Orszag asked these colleagues not to identify him as the source for their questions.

~~67.~~ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ ~~if~~

~~things did not go his way.~~

68. ████████████████████████████████████████

~~68.~~69.  In July 2023, ~~for example,~~ Mr. Orszag ~~approached~~announced to FTI senior leadership ~~and announced~~ his plan to call a meeting of Compass Lexecon senior staff ~~so that~~, during which he ~~could describe~~would recount supposed "negative synergies" between FTI and Compass Lexecon.  ~~Of note,~~ Mr. Orszag ~~presented~~showed FTI his draft "scripts" ~~to FTI~~ of the speech he planned to give to Compass Lexecon's senior staff.  His intent in these scripts was clear—to sow seeds of discontent ~~toward FTI~~ among Compass Lexecon staff ~~in order~~ to create a fault line, from which Mr. Orszag could engineer a ~~clean split~~separation of Compass Lexecon from FTI.

~~69.~~    ~~In the draft speech,~~ Mr. Orszag~~, for instance, planned to tell the staff that there had been "~~ would warn of a ~~more "~~significant rift~~"~~ between FTI and ~~[~~Compass Lexecon~~]."  He cited various~~ and identify a set of ~~"~~negative synergies~~" that,~~" which, he ~~believed~~contended, were causing "trust issues.~~"~~

~~70.    Mr. Orszag also wrote in one such draft that he planned to tell~~"~~ between the ~~staff, "I personally took a worse deal for myself in the last negotiation last year to get the larger deal done and ensure we stayed together."~~

~~71.    Further, to entice Compass Lexecon staff to depart FTI with him, Mr. Orszag planned to say:~~

70.    ~~Let me end by saying this in the strongest possible way.  The future for us is bright~~parent ~~and~~ ~~strong and solid.  The best strategy for each of you is to focus on your work and let the negotiations with FTI play themselves out.  There is most certainly no need to 'polish' your CV—indeed, you should have no concerns about your futures at all.~~ its subsidiary.

72.71.  Mr. Orszag threatened on a call with FTI leadership and directors around the same time that if FTI were to terminate Mr. Orszag for delivering his planned speech, 800 employees would leave the next day, causing significant harm to Compass Lexecon within a week or two.

73.72. Thus, just six months after Mr. Orszag entered into theMr. Orszag's new Employment Agreement with FTI and Compass Lexecon, with an ongoing duty of loyalty, Mr. Orszag reneged on his agreement.duties by threatening his own employer's corporate existence. His plan to compete with FTI and his threats to orchestrate a mass resignation remainremained locked and loaded.

74.73.  It was only as a result of extensive efforts by FTI's senior management that Mr. Orszag agreed to give a less bombastic speech.  Nonetheless, in the speech Mr. Orszag ultimately gavedelivered to Compass Lexecon staff, he made clear that his demands to FTI must be met or resignations of the senior leadership of Compass Lexecon would follow.

**F.**    ███████████████████████████████████
        ███████████████████████████████

74.   Mr. Orszag's conduct in the spring and summer of 2023 went well beyond internally amplifying internal dissent regarding conflicts issues.  At the same time, Mr. Orszag—with Dr. Israel's knowledge—was talking with outside investors ███████████████████ ████████████████

75.   To conceal his true intentions, in June 2023, Mr. Orszag suggested to FTI that he begin discussions to explore a small-scale divestiture of a few professionals from Compass Lexecon, for the limited purpose to avoid future conflicts of interest that might prevent one or both firms from accepting new business matters.

75.   But Mr. During the same time period, Mr. Orszag undertook a series of actions in furtherance of his plans and threats to compete against FTI, including but not limited to the

following.  Mr. Orszag began formulating plans to establish a new company ("NewCo") to
compete against FTI by taking all or substantially all of Compass Lexecon's then-existing business

---

3 At all relevant times, FTI's Policy on Acceptable Use of Technology Resources—which Mr. Orszag
explicitly acknowledged in January 2023—forbade employees from using their work email "to conduct
outside business" or in any manner that "could otherwise harm [FTI]."  The Policy also emphasized the
need for employees to "safeguard confidential Company and client information at all times."



78.    To implement his plan to appropriate the business of Compass Lexecon from FTI, Mr. Orszag used his ongoing negotiations with FTI to hide his true intention of leaving to start NewCo in March 2024.  In retrospect, it is now clear that Mr. Orszag's negotiating positions up through his termination did not reflect good faith efforts to reach a long-term resolution with FTI, but rather were designed to buy time as he prepared to take Compass Lexecon's business away from FTI and set up his own company.  This course of bad faith negotiating included making FTI an offer to acquire the Compass Lexecon business that was vastly lower ▮▮▮▮▮▮▮▮▮▮▮▮

76.    In planningOrszag's suggestion was intentionally misleading because he neglected to inform FTI that he had already been reaching out to outside investors for weeks, to discuss a massive restructuring that would separate the whole of Compass Lexecon from FTI.

77.    On June 17, 2023, FTI's general counsel warned Mr. Orszag that it was premature for Mr. Orszag or others to engage with third parties on any potential restructuring options.

78.    Rather than adhering to that directive, as a loyal fiduciary should have done, Mr. Orszag instead deepened his engagement with potential investors, including Goldman Sachs, for the outcome he personally favored—an act of corporate theft to create a ~~competing company, Mr. Orszag used FTI's and Compass Lexecon's~~"NewCo" venture, which would absorb all or most of Compass Lexecon's business and put it under the control of Mr. Orszag and his hand-picked allies.

79.    ███████████████████████████████████████
██████████████████████████████████████ ██
███████████████████████████████████████████

80.    During the same time period in which he was meeting with investors, Mr. Orszag sought out confidential information from within Compass Lexecon, including the amount of experts' outstanding forgivable loans (which would need to be repaid if Mr. Orszag were to attract those employees to his new firm) and revenue originated by experts.

~~79.~~81.    ███████████████████████████████████████
██████████████████████████████████ ██
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████

~~80.    In June 2023, in advance of a meeting among senior Compass Lexecon professionals and FTI management, Mr. Orszag suggested that Compass Lexecon employees should raise questions why Compass Lexecon employees should stay with the firm since many of~~

---

~~[4] FTI publicly reports revenue from its Economic Consulting segment, which includes Compass Lexecon, but not from Compass Lexecon alone.~~

~~them were, in Mr. Orszag's view, not bound by non-competition covenants.  Mr. Orszag asked~~

~~that he not be identified as the source for these questions.~~

82.   **Mr.** ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████

83.   ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████

84.   FTI never authorized Mr. Orszag to disclose the confidential information of Compass Lexecon and FTI to any outside investors or other third parties, let alone for purposes of appropriating Compass Lexecon's business. ███████████████████████████

████████████████████████████████████████████████████████████

███████████████

85.   ███████████████████████████████████████████████

██████████████████████████████████████████████████████

86.   ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████

87.    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

**G.    As He Sought Outside Investment, Mr. Orszag Improperly Primed Compass Lexecon Professionals for His New Firm**

88.    ██████████████████████████████████████████████████

██████████████████████████████ Mr. Orszag began undisclosed efforts to attract Compass Lexecon professionals toward his new venture.

89.    A critical element in raiding Compass Lexecon's professional ranks was Mr. Orszag's plan to offer equity, backed by Goldman Sachs' valuation and its expected investment.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████

90.    Without the anticipated large investment from Goldman Sachs, Mr. Orszag would not have been able to attract the large number of Compass Lexecon employees needed to start his new firm, which necessitated making significant up-front payments to lure them to join the new firm. In conversations with Compass Lexecon employees, Mr. Orszag profiled the financial support of Goldman Sachs as a key reason for them to join his new firm.

91.    At various times and places, both before and after his restricted period ended, Mr. Orszag conveyed to certain Compass Lexecon professionals his plans to offer equity to selected partners in his new venture.

92.    For example, on June 25, 2023, a senior Compass Lexecon professional recounted an earlier conversation in which Mr. Orszag promised to "make sure that I get my current deal

(with the new conditions as per my prior email) plus some equity share so that I would be no worse off than my new current deal [with Compass Lexecon]," when Mr. Orszag would start a new firm.

93.    In October 2023, Mr. Orszag held a dinner meeting in Milan, Italy, with the leaders of Compass Lexecon's European group. Mr. Orszag conveyed that, if the senior managing directors of that group moved to Mr. Orszag's new firm, they would become equity partners. He provided illustrative values for one unit (1%) of equity in the new venture.

94.    At multiple meetings of Compass Lexecon's Chicago-based management committee in 2023, Mr. Orszag openly discussed the idea of separating Compass Lexecon from FTI. He complained of an "FTI tax" that could be redistributed among partners in a new separate venture and argued that Compass Lexecon should not remain affiliated with FTI.  Mr. Orszag freely recounted his dealings with Goldman Sachs about investing in his planned venture.

### ~~G.~~H.   Mr. Orszag's Unreasonable Threats and Demands to FTI Escalate in October and November 2023

~~81.~~95.  The tipping point with Mr. Orszag came in October and November 2023, when Mr. Orszag ~~expressed a total lack~~revealed that he had no intention of ~~commitment to live~~living up to ~~his end of~~ the ~~bargains~~commitments he had made under his Employment Agreement, and ~~Governance Agreement~~this fiduciary duties to Compass Lexecon and FTI.

96.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

97.  Mr. Orszag referenced the two paths in discussions with Compass Lexecon professionals in the fall of 2023. In the "amicable separation," FTI would retain only a small ownership interest in its own Compass Lexecon subsidiary, while FTI would get nothing in the "unamicable separation." This was a Hobson's choice amounting to no choice at all.

82.98.  In October 2023, Mr. Orszag met with ~~an executive~~the Chief Executive Officer of FTI.  During that meeting and in email correspondence that followed, Mr. Orszag presented ~~yet another~~a plan to overhaul the Compass Lexecon business ~~in order~~ to reapportion ~~wealth~~shareholder value and control to himself.  ~~Apparently not having intended to live up to his Employment Agreement or the new structure under the Governance Agreement at all, Mr. Orszag proposed a "new arrangement" to address his perceived issues with the relationship between FTI and Compass Lexecon.~~  Mr. Orszag proposed that there be "significant changes to the control and governance of Compass Lexecon" and stated, "control changes are necessary to chart a path forward."

83.99.  In conveying his plans, Mr. Orszag ~~further~~ demanded that FTI sell the Compass Lexecon business to him for a fraction of its true value.

84.100.      This time, Mr. Orszag made clear that the only "resolution" he would accept was ~~as follows, which he presented as a~~the following "choice" for FTI:  Either (1) cede control of Compass Lexecon, or (2) he will "depart and start a new firm."

101.  ~~Just~~ No responsible board of directors for a ~~few weeks later~~public company charged with safeguarding shareholder value could accept such a major corporate restructuring, based on threats and phantom terms like those put forward by Mr. Orszag.

85.102.      After considerable efforts by FTI's executive management team and board members to dissuade Mr. Orszag from pursuing this extreme course, events reached a breaking

point in November, 2023, when Mr. Orszag had another meeting withissued an ultimatum: FTI executives, during which he reiteratedcould either accept his demands.  He gave FTI untilproposed restructuring in principle—with the most critical economic and other terms left to be negotiated—by November 27, 2023 to decide which option it, or else Mr. Orszag would choose.make good on his threats and leave with Compass Lexecon's personnel and business following him in a mass departure.

103.  FTI regarded Mr. Orszag's threats as a more immediate and extreme version of the similar threats he and Dr. Israel had made the year before.

104.  Coupled with that history and his steady erosion of goodwill and trust throughout 2022 and 2023, Mr. Orszag's November 2023 ultimatum signaled that he was irredeemably placing his personal ambitions and benefits above the interests of FTI and Compass Lexecon, and that he did not care about the damage he might inflict on either company.

105.  Faced with this evidence of Mr. Orszag's intentional disloyalty, FTI's board of directors met on November 17, 2023, and voted unanimously to terminate Mr. Orszag for cause.

**H.I.    Mr. Orszag's Termination for Cause**

86.106.        FTI terminated Mr. Orszag's employment was terminated for cause on November 20, 2023.  That day, FTI transmitted to Mr. Orszag a Notice of Termination for Cause that specified the acts that formed the basis for FTI's decision to terminate him and the provisions of the Employment Agreement under which Cause for termination existed.  Ex. B.  The Notice of Termination for Cause also advised Mr. Orszag of FTI's determination that the Cause for termination was uncurablenot curable, explaining the grounds for that determination.  *Id. Id.*  Mr. Orszag's termination was effective immediately.   Mr. Orszag's termination was effective immediately. FTI initiated this litigation that same day, filing suit against Mr. Orszag in the Circuit

Court for Montgomery County, Maryland. ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████

### I.    Mr. Orszag's Post-Termination Consulting Agreement

87.107.        On November 22, 2023, in order to avoid or minimize any interruption in services to its clients with pending matters, Compass Lexecon entered into a consulting agreement with Mr. Orszag, effective as of November 20, 2023 (the "Consulting Agreement").   The Consulting Agreement enablesenabled Mr. Orszag to continue to provide consulting services to then-current Compass Lexecon clients, including serving as an expert, and providesprovided that Mr. Orszag willwould receive significant compensation for these services.

108.    Given the terms of the Consulting Agreement, Mr. Mr. Orszag will have the opportunity over the coming year to earn substantial compensation; he will not be precluded from earning a living remained bound by the restrictive covenants in his Employment Agreement during the one-year period of his agreement notConsulting Agreement, through and including November 20, 2024.

88.109.        At no time did Mr. Orszag move for a preliminary or permanent injunction to stop FTI's efforts to compete withenforce his restrictive covenants while they were in force. While foregoing any of those legal actions, Mr. Orszag instead consciously preferred to keep working as a consultant for FTI and Compass Lexecon for the full period of his restrictive covenants.

110.    During this one-year period, Mr. Orszag worked with Dr. Israel to implement their shared plan to take over Compass Lexecon's business.

111.    Mr. Orszag received all the compensation he bargained for under his Consulting Agreement with Compass Lexecon, amounting to tens of millions of dollars of compensation paid to him under the terms of the Consulting Agreement.

112.    Compass Lexecon fully performed all its obligations to Mr. Orszag under the Consulting Agreement and Mr. Orszag never claimed otherwise.

113.    By entering into the Consulting Agreement and forgoing any timely motion to enjoin FTI's enforcement of his restrictive covenants, Mr. Orszag waived or forfeited any claim to amounts above those actually paid by Compass Lexecon for the consulting services that he provided to Compass Lexecon's clients under the Consulting Agreement.

**J.    Mr. Orszag's Refusal to Repay Loans from FTI**

89.    In ~~the~~his Employment Agreement, Mr. Orszag acknowledged that FTI had made him an interest-bearing loan pursuant to ~~a~~two promissory ~~note~~notes, which ~~was~~were attached as ~~Exhibit~~Exhibits B and C to the Employment Agreement.  *See* ~~Employment Agreement~~Ex. A § 4(c)(i) (referencing the "2013 Loan" and the "2013 Promissory Note~~"~~).

~~90.~~114.~~Mr. Orszag also acknowledged that FTI had made him another interest-bearing loan pursuant to a second promissory note, which was attached as Exhibit C to the Employment Agreement.  *See* Employment Agreement~~"); *id.* § 4(c)(ii) (referencing the "2015 Loan" and the "2015 Promissory Note").

~~91.~~115.In the Employment Agreement, Mr. Orszag agreed to abide by the terms of the 2013 Promissory Note and the 2015 Promissory Note.

~~92.~~116.Under the terms of each promissory note, if the Employment Agreement were to be terminated by FTI for Cause, then all unpaid principal and accrued interest, not including amounts previously forgiven, would become due and payable immediately, and Mr. Orszag would

be required to make full payment within 10 days (in the case of the 2013 Loan) or 10 business days (in the case of the 2015 Loan).[5]

93.117. Under the terms of each promissory note, the entire amount of unpaid principal and accrued interest on the 2013 Loan and the 2015 Loan became due and payable on November 20, 2023, when Mr. Orszag was terminated for Cause.

94.118. On December 12, 2023, FTI wrote to Mr. Orszag specifying these amounts and advising him of his obligation to pay them pursuant to the terms of the 2013 Promissory Note and 2015 Promissory Note.  FTI requested that Mr. Orszag make these payments immediately and advised him that he would be in default if he did not do so.

95.119. On December 20, 2023, Mr. Orszag replied to FTI, expressly refusing to pay the outstanding principal and accrued interest on the 2013 and 2015 Promissory Notes.

**COUNT I: DECLARATORY JUDGMENT THAT THE NON-COMPETE PROVISIONS ARE VALID AND ENFORCEABLE**

96.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as if set forth herein.

97.    **Dr. Israel Works To Benefit** Mr. Orszag, FTI, and **Orszag's New Venture, Econic, By Undermining** Compass Lexecon executed the Employment Agreement effective as of January 1, 2023.

98.**K.**    The Non-Compete Provisions explicitly prohibit Mr. Orszag **from** competing with the Compass Lexecon business for one year following Mr. Orszag's termination of employment with Compass Lexecon.**Within**

---

[5] The 2013 and 2015 Promissory Notes are included as Exhibits B and C to the unredacted version of the Employment Agreement, which has beenwas previously filed under seal at Mr. Orszag's request.

120.    ~~Rather than complying with the terms of his Employment Agreement, Mr.~~ In this Third Amended Complaint, FTI presents claims against Mr. Orszag ~~has taken steps~~and Dr. Israel based on newly discovered evidence.

121.    At least from May 2024 through March 2025, if not earlier, Mr. Orszag and Dr. Israel acted in ~~anticipation of competing with the Compass Lexecon~~ concert as part of a coordinated, tortious effort to take over, weaken, or destroy Compass Lexecon's business ~~on~~by raiding its professionals and clients, all to benefit their own personal financial interests and the financial interests of their new firm, Econic. ███████████

███████████████████████

███████████████

122.    From the time of its formation and continuing through March 31, 2025, and thereafter, Econic—acting through Mr. Orszag—was aware of, and benefitted from Dr. Israel's acts of corporate perfidy.  Econic and Mr. Orszag consciously ratified Dr. Israel's misconduct and, upon information and belief, ~~in blatant breach of~~never directed Dr. Israel to refrain from taking actions designed to harm Compass Lexecon and benefit Econic, while Dr. Israel was still employed by FTI and Compass Lexecon.

123.    It was a critical priority for FTI and Compass Lexecon to have a conflict-free President to defend Compass Lexecon's interests from the threats posed by Econic.  Had Dr. Israel informed FTI and Compass Lexecon's senior leaders that he had committed to join Econic and accept an undisclosed financial interest in Econic, they would have immediately terminated his service as Compass Lexecon's President.

**1.** *Dr. Israel Shares FTI and Compass Lexecon Trade Secrets with Mr. Orszag After His Termination for Cause*

124. On at least four occasions in 2024, Dr. Israel shared highly sensitive revenue reports with Mr. Orszag, against the interests of Compass Lexecon and FTI and without authorization. Dr. Israel did so knowing that Mr. Orszag was in active litigation against FTI for his ~~obligations~~ plans and was continuing to execute their shared plans to take over the business of Compass Lexecon.

125. The materials accessed, shared, used, or disclosed by Dr. Israel without permission were trade secrets of FTI and Compass Lexecon. They included extensive aggregations of data about FTI and Compass Lexecon's professionals, clients, finances, and operations, which derive independent economic value from not being generally known or readily reproducible outside the firm, as more particularly described in Count VI below.

126. The materials accessed, shared, used, or disclosed by Dr. Israel without permission also included commercially sensitive, inside information about FTI and Compass Lexecon. Dr. Israel and Mr. Orszag had no legitimate business purpose to advance the interests of FTI and Compass Lexecon under the circumstances and during the times when they accessed, shared, used, or disclosed those materials.

127. Through their unauthorized conduct, Mr. Orszag and Dr. Israel misappropriated trade secrets belonging to Plaintiffs ███████████████████████████████████ ███████████████████████████████ all to benefit their personal interests.

**2.** *Dr. Israel Conceals His Agreement to Accept a Significant Equity Stake in Econic While Serving As Compass Lexecon President*

128. Unknown to senior leaders of FTI and Compass Lexecon, while Dr. Israel was serving as President of Compass Lexecon, he agreed to take an eight-figure equity stake in their

direct competitor, Econic.  On November 21, 2024, Dr. Israel wrote to his financial advisor that he would "serve on the board of Jon O's new firm, and own 2% of that firm."

129.    Dr. Israel later told his advisors, in December 2024, that his equity stake in Econic was valued at approximately $20 million and that they should further discuss his "role" in the new firm. ████████████████████████████████████████████

████████████████████████

130.    Without disclosing this vital information to FTI or Compass Lexecon, Dr. Israel signed a new employment agreement on December 13, 2024, with FTI and Compass Lexecon, in which he agreed to continue in his role as Compass Lexecon's President through March 31, 2025.

99.131. ███████████████████ this agreement contained Non-Solicit and Non-Compete Provisions—, as well as a Confidentiality Agreement. The Non-Compete Provisions were in effect through March 31, 2025; the Non-Solicit Provisions continue through at least March 31, 2026; and the Confidentiality Agreement does not have an expiration date. Ex. E § 9, 11, 12.

100.    The Non-Compete Provisions were executed for a simple reason: to ensure that FTI's business was protected from precisely the conduct in which Mr. Orszag has engaged.  Under applicable law, the Non-Compete Provisions are more than reasonable in geographic scope, duration, and content.

101.    FTI has a legally protected interest in its clients' goodwill and its relationships with its clients and employees.

102.    FTI and Compass Lexecon performed all material terms and conditions of the Employment Agreement, except to the extent that their performance was waived, prevented, or excused by the acts, conduct, or omissions of Mr. Orszag.

103. Enforcing the Non-Compete Provisions will not cause undue hardship for Mr. Orszag because FTI has paid him significantly, including compensation due upon his termination, and the parameters of his Non-Compete Provisions still permit him to earn a livelihood, subject to the restrictions therein.

104. The Non-Compete Provisions do not violate public policy.

105. As the facts above illustrate, Mr. Orszag is intent on stealing the Compass Lexecon business in order to preserve the compensation and control that he lost when he agreed to the new Employment Agreement in 2023.

106. The injuries to FTI resulting from Mr. Orszag's breaches of his Restrictive Covenants and duty of loyalty may be substantial.

107. In light of Mr. Orszag's open and continuing violation of the Non-Compete Provisions, his assertion that he would seek to invalidate the Restrictive Covenants in California and thereafter compete with FTI and Compass Lexecon upon his departure, and given his terminated employment with Compass Lexecon, there now exists an actual, justiciable controversy between the Parties over their respective rights and obligations under the Employment Agreement, which controversy may be determined by a judgment of this Court.

108. WHEREFORE, Plaintiff requests that this Court:

　　　　a. Declare that the Non-Compete Provisions are valid and enforceable against Mr. Orszag as a matter of law;

　　　　b. Declare that, pursuant to the Non-Compete Provisions, Mr. Orszag may not compete with FTI or Compass Lexecon for a period of one year from the date of his termination, thus until November 20, 2024; and

　　　　c. Award all further relief the Court deems just and appropriate.

109.   A judicial declaration to terminate this controversy is necessary and appropriate so that the Parties may ascertain their respective rights with regard to the matters alleged above.

**COUNT II: DECLARATORY JUDGMENT THAT THE NON-SOLICIT PROVISIONS ARE VALID AND ENFORCEABLE**

110.   Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as if set forth herein.

111.   Mr. Orszag, FTI, and Compass Lexecon executed the Employment Agreement effective as of January 1, 2023.

112.   The Non-Solicit Provisions explicitly prohibit Mr. Orszag from soliciting FTI or Compass Lexecon clients or employees under certain circumstances for one year following Mr. Orszag's termination of employment with Compass Lexecon.

113.   Rather than complying with the terms of his Employment Agreement, Mr. Orszag has engaged in a deliberate scheme to solicit FTI's and Compass Lexecon's employees, in blatant breach of his obligations under the Non-Solicit Provisions.

114.   The Non-Solicit Provisions were executed for a simple reason:  to ensure that FTI's business was protected from precisely the conduct in which Mr. Orszag has engaged.   Under applicable law, the Non-Solicit Provisions are more than reasonable in geographic scope, duration, and content.

115.   FTI has a legally protected interest in its clients' goodwill and in its relationships with its clients and key employees.

116.   FTI and Compass Lexecon performed all material terms and conditions of the Employment Agreement, except to the extent that their performance was waived, prevented, or excused by the acts, conduct, or omissions of Mr. Orszag.

117.   Enforcing the Non-Solicit Provisions will not cause undue hardship for Mr. Orszag.

43

118.    The Non-Solicit Provisions do not violate public policy.

119.    As the facts above illustrate, Mr. Orszag is intent on soliciting Compass Lexecon senior professionals and employees to a business intended to compete with FTI and Compass Lexecon.

120.    The injuries to FTI resulting from Mr. Orszag's breaches of his Restrictive Covenants and duty of loyalty may be substantial.

121.    In light of Mr. Orszag's open and continuing violation of the Non-Solicit Provisions, his assertion that he would seek to invalidate the Restrictive Covenants in California and thereafter compete with FTI and Compass Lexecon upon his departure, given his terminated employment with Compass Lexecon, there now exists an actual, justiciable controversy between the Parties over their respective rights and obligations under the Employment Agreement, which controversy may be determined by a judgment of this Court.

122.    WHEREFORE, Plaintiff requests that this Court:

        a.    Declare that the Non-Solicit Provisions are valid and enforceable against Mr. Orszag as a matter of law;

        b.    Declare that, pursuant to the Non-Solicit Provisions, Mr. Orszag may not solicit FTI or Compass Lexecon employees or clients for a period of one year from the date of his termination, thus until November 20, 2024; and

        c.    Award all further relief the Court deems just and appropriate.

123.    A judicial declaration to terminate this controversy is necessary and appropriate so that the Parties may ascertain their respective rights with regard to the matters alleged above.

44

132.    At no point during the negotiations of this agreement or during its term did Dr. Israel inform the senior leaders of FTI or Compass Lexecon of his arrangements with Mr. Orszag, his significant financial interest in Econic, or his plans to join Econic.

133.    To the contrary, in multiple conversations with FTI's CEO and Compass Lexecon's Chairman, and with others, in late 2024 through March 2025, Dr. Israel led his colleagues to believe that he was planning to scale back his consulting practice, engage in teaching, or become an independent contractor after his term as President ended.

134.    On December 16, 2024—soon after signing his lucrative new Employment Agreement with Compass Lexecon and FTI—Dr. Israel emailed all Compass Lexecon North America employees to announce that he would remain "as Compass Lexecon President through Q1, 2025." He emphasized that "my plans remain unchanged . . . I will move into an independent contractor expert position as of April 1, 2025."

135.    Dr. Israel did not disclose his conflict even as he sought greater responsibility over Compass Lexecon's affairs. After the leader of Compass Lexecon's East Coast Competition group announced her departure for Econic, Dr. Israel wrote to FTI's CEO and Compass Lexecon's Chairman, on January 8, 2025, that his "recommendation" was that "I act as the head of the ECC [East Coast Competition group at Compass Lexecon], at least until things settle down some. Part of why I stayed on for this quarter is to help smooth issues like this that come up."

136.    Throughout his dishonest course of dealings, Dr. Israel abused his colleagues' trust by failing to reveal his plans to the leaders of FTI and Compass Lexecon until March 31, 2025, when he sent an email announcing his resignation as Compass Lexecon's President, with immediate effect, and his decision to join Econic "as a Founding Partner and Member of the Board of Managers," the next day.

137.    In his email, Dr. Israel admitted that he withheld the truth from his former colleagues "to avoid making such an announcement while still serving as Compass Lexecon President."

### 3.    *Dr. Israel Steers Clients and Professionals to Econic, While Still Serving as Compass Lexecon's President*

138.    Worst yet, while concealing his interest in Econic from senior leaders at FTI and Compass Lexecon, Dr. Israel actively worked with Mr. Orszag to undermine Compass Lexecon's business interests, further abusing his position of trust, while advancing his personal interests and Econic's business interests after its public launch in February 2025.

139.    In his role as President and as one of Compass Lexecon's top revenue generators in 2023 and 2024, Dr. Israel had a unique ability to impact Compass Lexecon's business interests for good or for ill.

140.    For his part, Mr. Orszag sought to lure Compass Lexecon employees to Econic with offers of equity backed by the Goldman Sachs investment Mr. Orszag had improperly obtained.

141.    And, as Dr. Israel confided in Mr. Orszag in early February 2025, Dr. Israel viewed his "job" at Compass Lexecon as helping Compass Lexecon employees leave for Econic.  As part of that "job" of hollowing out his employer's business interests, Dr. Israel suggested that a Compass Lexecon professional (Colleague 1) should withhold billings for his time working for Compass Lexecon and instead bill the services to the client after joining Econic. Dr. Israel remarked that Colleague 1 should leave Compass Lexecon soon so all the time could be included on a February bill sent by Econic.

142.    Dr. Israel also aggressively steered business from Compass Lexecon to Econic on various occasions in February and March 2025, when he was working from Maryland, including:

a.    Dr. Israel encouraged Client A to move its business to Econic, telling the client, "we can certainly move as much of the work as possible to Econic." Underlining his dishonesty, Dr. Israel asked that Client A "not mention [to Compass Lexecon's Chairman] what you know of my plans vis-à-vis Econic."

b.    Dr. Israel asked if Colleague 2, whom Dr. Israel knew was heading to Econic, wanted to run a new matter for Client B. Dr. Israel suggested that Colleague 2 propose four potential experts at Econic—including Mr. Orszag—to Client B. When Colleague 2 expressed ethical concerns about this while still employed by Compass Lexecon, Dr. Israel volunteered to call Client B himself. Dr. Israel never presented this matter to Compass Lexecon or submitted a conflicts check.

c.    When Client C asked for help on a new matter, Dr. Israel explained he was slowing down and proposed a specific colleague he knew would soon be leaving Compass Lexecon to join Econic. That colleague and another Econic professional led the matter at Econic, with Dr. Israel subcontracting through Econic until he resigned from Compass Lexecon.

d.    After declining another matter with a potential new client ("Client D"), Dr. Israel promptly emailed Mr. Orszag and another Econic professional to ask if either would be interested. Ultimately, Dr. Israel proposed two professionals to Client D who both joined Econic as "Founding Partners."

e.    Dr. Israel contacted other former and current Compass Lexecon professionals, who either had joined, or were planning to join, Econic, about reaching out to Compass Lexecon clients to discuss Econic with those clients.

143.    Even when a client preferred not moving its business from Compass Lexecon to Econic, Dr. Israel reacted with frustration: Dr. Israel complained to a colleague who was heading for Econic that the client was "being difficult" because the client "wants everything at CL [Compass Lexecon]," rather than Econic. Dr. Israel told the colleague that he might stop serving as an expert if the client would not move to Econic.

### 4.    *Dr. Israel Violates His Non-Solicit Provisions After Joining Econic*

144.  FTI and Compass Lexecon recently learned that Dr. Israel has continued violating his ongoing non-solicit obligations after leaving Compass Lexecon. Dr. Israel remains subject to his Non-Solicit Provisions through March 31, 2026, because he is working at, and has an interest in, a competing business. Ex. E.

145.  After joining Econic, in April 2025, Dr. Israel solicited another Compass Lexecon client to move its business from Compass Lexecon to Econic.

146.  As Dr. Israel told the client, with Mr. Orszag copied on the email, "I would LOVE it if some arrangement can be reached where I could work on this using an Econic team[.]"

147.  That direct solicitation violates Dr. Israel's Non-Solicit Provisions.

**J. Defendants' Tortious Acts Have Substantially Damaged FTI and Compass Lexecon**

148.    Defendants' campaign of misconduct has resulted in severe economic consequences for FTI and Compass Lexecon. Compass Lexecon has experienced a significant net loss in revenues from its top fifty clients, including multi-million-dollar losses in revenues from over a dozen of its largest clients since Econic's launch. Compass Lexecon has lost well over a hundred of its professionals to Econic, and also has incurred higher expenses through retention costs and increased salaries as a result of Defendants' actions. All these losses, which amount to hundreds of millions of dollars, if not more, were caused in significant part by the tortious actions

and breaches of contract and fiduciary duty committed by Mr. Orszag and Dr. Israel, actions which improperly benefited them both financially and improperly benefited their new firm, Econic.

149. These significant harms are the intended consequences of Mr. Orszag's and Dr. Israel's plans beginning from 2022—to take over Compass Lexecon, poach its clients, and raid its employees. ████████████████████████████████████████

████████████████████████████████████████████ Using the draw of that Goldman Sachs investment, Mr. Orszag touted the promise of equity to Compass Lexecon employees to lure them to his new firm, Econic. Meanwhile, Dr. Israel—entrusted by the leaders of FTI and Compass Lexecon to be the President of Compass Lexecon—sabotaged it from within. With Econic's and Mr. Orszag's blessing, Dr. Israel steered clients and employees to Econic, having secretly agreed to accept an ownership stake worth tens of millions of dollars. This coordinated and tortious attack on FTI and Compass Lexecon violated Defendants' statutory, contractual, and common law duties as described below.

## COUNT ~~III~~I: BREACH OF CONTRACT (NON-SOLICIT PROVISIONS) (AGAINST MR. ORSZAG)

~~124.~~150.    Plaintiff FTI realleges and incorporates by reference the above allegations ~~in paragraphs 1 through 95~~ as if set forth herein.

~~125.~~151.    Mr. Orszag entered into a binding contract with FTI and Compass Lexecon effective January 1, 2023, when he executed the Employment Agreement. Under the Employment Agreement, Mr. Orszag agreed to be bound by the Non-Solicit Provisions, which explicitly ~~prohibit~~prohibited Mr. Orszag from soliciting FTI and Compass Lexecon clients or employees under certain circumstances during his employment and for one year following his termination from Compass Lexecon.

126.152.        Mr. Orszag breached the Non-Solicit Provisions by soliciting, inducing, or attempting to influence senior professionals, consultants, and other employees at Compass Lexecon to leave FTI in the event he leavesleft.  Mr. Orszag has specifically sought to coordinate thea mass departure of Compass Lexecon's highest performing and top-ranking employees.  Mr. Orszag has also threatened FTI and Compass Lexecon with the departure of other key staff members in the event he leavesleft Compass Lexecon.  By these and other actions set forth herein, at a minimum, Mr. Orszag has disrupted or attempted to disrupt the relationships between FTI and Compass Lexecon and their clients, prospective clients, and key employees.

153.    During the contractual non-solicitation period, Mr. Orszag initiated contact with FTI and Compass Lexecon employees for some or all of the following purposes: to review the status of his ongoing efforts to form a new competing venture; to summarize his efforts to raise financing for that venture; to describe the estimated value of that new venture; and to estimate the value of units of equity participation in his new venture for those employees whom he would offer equity participation in the event they would join that venture, including as more particularly set forth above. *See, e.g.*, *supra* ¶¶ 91-94.

154.    At least some of the individual employees of FTI or Compass Lexecon who received such communications from Mr. Orszag during his contractual non-solicitation period understood that his communications were implied or express forms of solicitation for them to join Mr. Orszag's new venture upon terms to be defined in a future offer.

155.    At least one individual employee of FTI or Compass Lexecon who heard such communications from Mr. Orszag during the contractual non-solicitation period later accepted such an offer and left Compass Lexecon to join Econic.

156.    In June 2023, Mr. Orszag told a Compass Lexecon professional that the professional would receive equity in any new company Mr. Orszag started.

157.    In October 2023, Mr. Orszag conveyed to European leaders of Compass Lexecon that if those individuals moved to Mr. Orszag's new firm they would become equity partners.

158.    Upon information and belief, Mr. Orszag arranged for Dr. Israel's board seat and equity interest before November 21, 2024.

~~127.~~159.    FTI and Compass Lexecon have fully performed their obligations under the Employment Agreement.

~~128.~~160.    As a direct result of Mr. Orszag's ~~breach~~breaches of his Non-~~Solicitation~~Solicit Provisions, Plaintiff ~~FTI~~ ~~may suffer~~has suffered substantial damages, ~~including lost revenues and employees.~~ as described in paragraph 148.

~~129.    WHEREFORE, Plaintiff requests that this Court:~~

> ~~a.    Order permanent injunctive relief, pursuant to the Non-Solicit Provisions, prohibiting Mr. Orszag from soliciting FTI and Compass Lexecon employees and clients for one year from the date of his termination, thus until November 20, 2024;~~

> ~~b.    Enter judgment in favor of FTI and against Mr. Orszag for damages in excess of $75,000;~~

> ~~c.    Award to FTI all of its reasonable attorneys' fees, plus costs and interest; and~~

> ~~d.    Award all further relief the Court deems just and appropriate.~~

## COUNT ~~IV~~II: BREACH ~~OR ANTICIPATORY BREACH~~ OF CONTRACT (NON-COMPETE PROVISIONS)
## (AGAINST MR. ORSZAG)

~~130.~~161.        Plaintiff FTI realleges and incorporates by reference the above allegations ~~in paragraphs 1 through 95~~ as if set forth ~~therein~~herein.

~~131.~~162.        Mr. Orszag entered into a binding contract with FTI and Compass Lexecon effective January 1, 2023~~.~~ when he executed the Employment Agreement.  Under the Employment Agreement, Mr. Orszag agreed to be bound by the Non-Compete Provisions, which explicitly ~~prohibit~~prohibited Mr. Orszag from competing with ~~the~~ Compass Lexecon ~~business~~ for one year following Mr. Orszag's termination ~~from Compass Lexecon~~for cause.

~~132.~~163.        The Non-Compete Provisions are valid and enforceable, and ~~apply~~applied in full force ~~even if~~during the period prior to and for one year following Mr. ~~Orszag is no longer employed by~~Orszag's termination from Compass Lexecon and FTI.

~~133.~~164.        By the actions described above, namely Mr. Orszag's plan to invalidate his ~~Restrictive Covenants~~restrictive covenants in California, his intent to continue soliciting FTI and Compass Lexecon employees upon his departure from FTI, his ~~plan~~ plans and actions to set up his own competing firm post-employment, and his ~~various actions~~ steps taken in furtherance of those plans during and after his employment, Mr. Orszag has breached ~~or~~and unequivocally repudiated ~~or~~and renounced his obligations under the Non-Compete Provisions ~~and anticipates taking action to breach them~~.

~~134.~~        As a result of Mr. Orszag's ~~breach or anticipatory breach, FTI may be substantially damaged and harmed by the impending loss of some of Compass Lexecon's senior professionals and key staff,~~breaches as ~~well as clients, and may further endure damage to its business, goodwill, and reputation.~~

135.165.        WHEREFOREdefined in this Count, Plaintiff requests that this Court:FTI has suffered substantial damages as described in paragraph 148.

>    a.   Order permanent injunctive relief, pursuant to the Non-Compete Provisions, prohibiting Mr. Orszag from competing with FTI and Compass Lexecon for one year from the date of his termination, thus until November 20, 2024;

>    b.   Enter judgment in favor of FTI and award compensatory damages in an amount to be determined at trial;

>    c.   Award to FTI its attorneys' fees, plus costs and interest; and

>    d.   Award all further relief the Court deems just and appropriate.

### COUNT V: ANTICIPATORY BREACH OF CONTRACT (NON-SOLICIT PROVISIONS)

### COUNT III: BREACH OF FIDUCIARY DUTY OF LOYALTY (AGAINST MR. ORSZAG)

136.   Plaintiff FTI realleges and incorporates by reference the above allegations in paragraphs 1 through 95 as set forth therein.

137.   Mr. Orszag entered into a binding contract with FTI and Compass Lexecon effective January 1, 2023 when he executed the Employment Agreement.  Under the Employment Agreement, Mr. Orszag agreed to be bound by the Non-Solicit Provisions, which explicitly prohibit Mr. Orszag from soliciting FTI and Compass Lexecon employees and clients for one year following Mr. Orszag's termination from Compass Lexecon.

138.   The Non-Solicit Provisions are valid and enforceable, and apply in full force even if Mr. Orszag is no longer employed by FTI.

139.   By the actions described above, namely Mr. Orszag's plan to invalidate his Restrictive Covenants in California, his intent to continue soliciting FTI and Compass Lexecon employees upon his departure from FTI, and his plan to set up his own firm post-employment, Mr. Orszag has unequivocally repudiated or renounced the Non-Solicit Provisions and anticipates taking action to breach them.

140.   As a result of Mr. Orszag's anticipatory breach, FTI may be substantially damaged and harmed by the impending loss of some of Compass Lexecon's senior professionals and key staff and may further endure damage to its business, goodwill, and reputation.

141.   WHEREFORE, Plaintiff requests that this Court:

a.   Order permanent injunctive relief, pursuant to the Non-Solicit Provisions, prohibiting Mr. Orszag from soliciting FTI and Compass Lexecon employees and clients for one year from the date of his termination, thus until November 20, 2024;

b.   Enter judgment in favor of FTI and award compensatory damages in an amount to be determined at trial;

c.   Award to FTI its attorneys' fees, plus costs and interest; and

d.   Award all further relief the Court deems just and appropriate.

**COUNT VI: BREACH OF FIDUCIARY DUTY OF LOYALTY**

142.166.   Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 95 as if set forth herein.

143.167.   Mr. Orszag, as a Senior Managing Director of Compass Lexecon and subject to his Employment Agreement with FTI and Compass Lexecon, owed a fiduciary duty of loyalty to FTI and Compass Lexecon.  This duty required Mr. Orszag to, among other things, act

solely for the benefit of FTI and Compass Lexecon in all matters within the scope of his employment and to avoid all conflicts between his ~~duty~~duties of loyalty to FTI and Compass Lexecon and his self-interest.

~~144.~~168.        By the course of conduct alleged herein, Mr. Orszag breached or willfully breached his fiduciary obligations to FTI and Compass Lexecon.  While employed by FTI and Compass Lexecon, Mr. Orszag acted self-interestedly and in breach of his duties to FTI and Compass Lexecon, which obligated him to deliver his best efforts to FTI and Compass Lexecon and avoid disruption to FTI's and Compass Lexecon's business ~~during his employment.~~.  Mr. Orszag's actions in breach of his duty of loyalty included: (i) soliciting Compass Lexecon's senior professionals and employees and otherwise seeking to organize a mass resignation from FTI; (ii) threatening to create a competing business and to appropriate the Compass Lexecon business; (iii) taking advanced steps toward creating a competing business with the aspiration of ~~taking~~appropriating the entire Compass Lexecon business; and (iv) ███████████

████████████████████████████████████████████████████████

███████████████████████

~~145.~~As a direct result of Mr. Orszag's breach of his fiduciary obligations, ~~FTI may suffer~~Plaintiffs have suffered substantial ~~financial~~ damages ~~and other losses.~~

~~146.    WHEREFORE, Plaintiff requests that this Court:~~

~~a.    Order permanent injunctive relief, consistent with the Non-Compete Provisions, prohibiting Mr. Orszag from competing with FTI and Compass Lexecon for one year from the date of his termination, thus until November 20, 2024;~~

> b.   ~~Order permanent injunctive relief, consistent with the Non-Solicit~~
>
> ~~Provisions, prohibiting Mr. Orszag from soliciting FTI and Compass~~
>
> ~~Lexecon employees and clients for one year from the date of his~~
>
> ~~termination, thus until November 20, 2024;~~
>
> c.   ~~Enter judgment~~ <u>as described</u> in ~~favor of FTI and against Mr. Orszag~~
>
> ~~for damages in excess of $75,000;~~
>
> d.   ~~Award to FTI all of its reasonable attorneys' fees, plus costs and~~
>
> ~~interest; and~~

~~e.~~169.   ~~Award all further relief the Court deems just and appropriate.~~<u>paragraph 148.</u>

## COUNT ~~VIII~~<u>IV</u>: BREACH OF CONTRACT (2013 PROMISSORY NOTE)
### <u>(AGAINST MR. ORSZAG)</u>

~~147.~~<u>170.</u>        Plaintiff <u>FTI</u> realleges and incorporates by reference the <u>above</u> allegations ~~in paragraphs 1 through 95~~ as if set forth herein.

~~148.~~<u>171.</u>        Mr. Orszag entered into a binding contract with ~~FTI~~<u>Plaintiff</u> when he agreed to the 2013 Promissory Note.  Under the terms of the 2013 Promissory Note, in the event that Mr. Orszag's Employment Agreement was terminated for Cause prior to January 1, 2024, any unpaid principal and accrued interest, not including amounts previously forgiven, would become due and payable immediately, and Mr. Orszag would be required to make full payment within 10 days.

~~149.~~<u>172.</u>        Mr. Orszag breached his repayment obligation under the 2013 Promissory Note when he failed to repay the outstanding principal and accrued interest within 10 days of his termination for Cause on November 20, 2023.  On December 20, 2023, in response to FTI's request after the deadline had passed that Mr. Orszag make full payment immediately or be in default, Mr. Orszag explicitly disavowed any payment obligation under the 2013 Promissory Note.

150.173.    As a direct result of Mr. Orszag's breach of his repayment obligation under the 2013 Promissory Note, ~~Plaintiff~~ FTI has suffered damages—specifically, loss of the unpaid principal and accrued interest that Mr. Orszag was obligated to repay.

151.    WHEREFORE, Plaintiff requests that this Court:

a.    Enter judgment in favor of FTI and against Mr. Orszag for damages in an amount to be proven at trial;

b.    Award to FTI all of its reasonable attorneys' fees, plus costs and interest; and

c.    Award all further relief the Court deems just and appropriate.

## COUNT ~~VIII~~V: BREACH OF CONTRACT (2015 PROMISSORY NOTE)
## (AGAINST MR. ORSZAG)

152.174.    Plaintiff FTI realleges and incorporates by reference the above allegations ~~in paragraphs 1 through 95~~ as if set forth herein.

153.175.    Mr. Orszag entered into a binding contract with ~~FTI~~Plaintiff when he agreed to the 2015 Promissory Note. Under the terms of the 2015 Promissory Note, in the event that Mr. Orszag's Employment Agreement was terminated for Cause prior to January 1, 2024, any unpaid principal and accrued interest, not including amounts previously forgiven, would become due and payable immediately, and Mr. Orszag would be required to make full payment within 10 business days.

154.176.    Mr. Orszag breached his repayment obligation under the 2015 Promissory Note when he failed to repay the outstanding principal and accrued interest within 10 business days of his termination for Cause on November 20, 2023.  On December 20, 2023, in response to FTI's request after the deadline had passed that Mr. Orszag make full payment immediately or be

57

in default, Mr. Orszag explicitly disavowed any payment obligation under the 2015 Promissory Note.

155.177.    As a direct result of Mr. Orszag's breach of his repayment obligation under the 2015 Promissory Note, Plaintiff FTI has suffered damages—specifically, loss of the unpaid principal and accrued interest that Mr. Orszag was obligated to repay.

### COUNT VI: MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 (AGAINST MR. ORSZAG AND DR. ISRAEL)

178.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

179.    In implementing his plans to take over Compass Lexecon, Mr. Orszag received significant assistance from Dr. Israel, including by his accessing, sharing, using, and disclosing to Mr. Orszag sensitive confidential information of FTI and Compass Lexecon.

180.    These materials included trade secrets of Plaintiffs that derive independent economic value from not being generally known or readily ascertainable outside FTI and Compass Lexecon.

181.    Up through at least December 2024, Mr. Orszag and Dr. Israel improperly accessed, shared, used, or disclosed, without permission, data aggregations showing extensive, detailed information about Compass Lexecon's financial performance, personnel performance, and client-matters, including, by way of example and not limitation, the following trade secrets:

      a.  a revenue origination report that Dr. Israel disclosed on May 17, 2024, to Mr. Orszag (who was then an independent contractor no longer serving in a management role for Compass Lexecon, and actively planning to form a competing venture), organized in three separate worksheets showing (among

other things) aggregate fees earned by Compass Lexecon for the year-to-date up through April 2024, detailed fee income by originator, and fee generation details about dozens of specific client-matters, many or most of which did not concern Mr. Orszag;

b.  a revenue report that Dr. Israel disclosed on August 30, 2024, to Mr. Orszag, organized at Dr. Israel's request in three separate worksheets that showed a summary of revenues by each expert who worked on client-matters, detailed information about revenues earned by experts on dozens of client-matters, and revenues by client-matters for the year-to-date up through July 2024;

c.  a consolidated revenue report that Dr. Israel disclosed on September 18, 2024, to Mr. Orszag, organized in seven separate worksheets that showed similar detailed information about Compass Lexecon revenues earned through August 2024, fees by originator, details about revenues for specific client-matters, and revenues earned by each expert who worked on particular client-matters; and

d.  a consolidated revenue report that Dr. Israel disclosed on October 17, 2024, to Mr. Orszag, organized in seven separate worksheets showing similar detailed information about Compass Lexecon revenues earned through September 2024.

182.    The reports identified in the preceding paragraph were transmitted in interstate commerce. They were generated by Compass Lexecon from databases owned, controlled, and maintained by FTI and distributed on a monthly basis only to a few of the highest-level executives of Compass Lexecon and FTI.

183.    After Mr. Orszag was terminated in November 2023, he was removed as a recipient of reports like those in this Count because he had been terminated from his management role, he

had made clear his intention to set up a competing firm, and he was in active litigation against FTI for (among other things) breach of his fiduciary duties owed to Compass Lexecon and FTI.

184.    The data contained in these subject reports, which were accessed, shared, used, or disclosed by Dr. Israel and Mr. Orszag without permission, were so extensive that they could not feasibly have been memorized or recreated from sources outside of FTI or Compass Lexecon.

185.    FTI and Compass Lexecon invested significant time, money, expertise, and resources over a period of years to procure, develop, maintain, and populate the databases used to generate the specific data reports identified herein, which are specific examples of trade secrets misappropriated by Mr. Orszag and Dr. Israel.

186.    The revenue reports identified in this Count had independent economic value based on their secrecy, by showing monthly business trends allowing FTI and Compass Lexecon to identify important and emerging clients, client-matters, revenue originators, and experts working on client-matters.

187.    FTI and Compass Lexecon's senior executive management use the reports described in this Count to identify trends in revenue generations from clients and professionals over time, which is essential information used in retention and business development efforts and in making compensation decisions.

188.    In the hands of a competitor or would-be competitor like Mr. Orszag and Dr. Israel, the reports would allow them to target recruitment and business development efforts based on extensive real-time information about the business opportunities from clients and professionals Mr. Orszag was planning to raid from Compass Lexecon, and in fact did raid once he established Econic. For example, they could use the reports to decide what employment terms to present to specific professionals and what engagement terms to offer specific clients.

189.    FTI and Compass Lexecon use and have used commercially reasonable measures to maintain the secrecy and confidentiality of the foregoing materials, including through the following contractual, policy, technological, and physical means: (1) by requiring FTI and Compass Lexecon personnel, including each individual Defendant while they were employed by Compass Lexecon, to enter into confidentiality agreements to safeguard company confidential information; (2) by requiring FTI and Compass Lexecon personnel, including each individual Defendant, to comply with policies governing the acceptable use of FTI and Compass Lexecon technology resources; (3) by imposing access controls on FTI and Compass Lexecon technology resources, such as password protection, multi-factor authentication, and data encryption; and (4) by imposing extensive physical security measures to restrict access to FTI and Compass Lexecon offices and facilities only to authorized personnel, clients, and other approved visitors.

190.    On information and belief, Mr. Orszag's and Dr. Israel's purposes for accessing, sharing, using, and disclosing Plaintiffs' trade secrets were to advance their personal financial interests and Econic's interests over the interests of FTI and Compass Lexecon, through some or all of the following means: (1) to facilitate efforts to recruit FTI and Compass Lexecon personnel to join Econic; (2) to improve their financial models based on Compass Lexecon's financial performance, personnel levels, structure, and operations, to seek and secure third-party investment for Econic, as though it was substantially equivalent in value to Compass Lexecon; and (3) to seek and originate business for Econic from existing or former clients of Compass Lexecon. Through these means, Mr. Orszag and Dr. Israel were able to avoid significant time and cost in attempting to build a rival startup firm to take over Compass Lexecon, an established company with hundreds of personnel operating worldwide for decades.

191.    Mr. Orszag and Dr. Israel's conduct in misappropriating Plaintiffs' trade secrets was active and willful, in view of the overall context of their actions taken over a substantial time-period, as set out throughout this Complaint.

192.    As a direct and proximate result of Mr. Orszag's and Dr. Israel's misappropriation of trade secrets, FTI and Compass Lexecon have suffered significant economic injury, as described in paragraph 148.

193.    In turn, Mr. Orszag and Dr. Israel have been unjustly enriched by receiving significant economic and reputational benefits that stemmed from their acts of misappropriation of Plaintiffs' trade secrets.

194.    Mr. Orszag and Dr. Israel have never accounted to Plaintiffs for their unauthorized acts of misappropriation; nor have they assured Plaintiffs that their trade secrets are no longer being used and are no longer within Defendants' possession, custody, or control.

195.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████

**COUNT VII: BREACH OF CONTRACT (CONFIDENTIALITY AGREEMENTS)
(AGAINST MR. ORSZAG AND DR. ISRAEL)**

196.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

197.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

198.    [REDACTED]

[REDACTED]

[REDACTED]

199.    From at least 2023 through present, including as more particularly set forth above, Mr. Orszag and Dr. Israel breached and continue to breach their respective Confidentiality Agreements by accessing, sharing, using, or disclosing to third parties, extensive volumes of confidential information of FTI or Compass Lexecon, or materials prepared based on confidential information of FTI or Compass Lexecon, for unauthorized competitive purposes of Mr. Orszag and the business he intended to launch, and contrary to FTI's or Compass Lexecon's business interests.

200.    Mr. Orszag's and Dr. Israel's purposes for accessing, sharing, using, and disclosing FTI's and Compass Lexecon's trade secrets and other confidential information were to advance Econic's interests, for their own improper personal benefits, over the interests of FTI and Compass Lexecon, as described above.

201.    As a direct and proximate result of Mr. Orszag and Dr. Israel's breaches of their Confidentiality Agreements, FTI and Compass Lexecon have suffered significant economic injury, as described in paragraph 148.

202.    In turn, Mr. Orszag and Dr. Israel have been unjustly enriched by receiving improper significant economic and reputational benefits that stemmed from their breaches of the Confidentiality Agreements.

203.    Mr. Orszag and Dr. Israel have never accounted to Compass Lexecon or FTI for their unauthorized acts of misappropriation, much less assured Plaintiffs that their trade secrets and other confidential information are no longer being used and are no longer within Defendants' possession, custody, or control.

204.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

## COUNT VIII: BREACH OF FIDUCIARY DUTY OF LOYALTY
## (AGAINST DR. ISRAEL)

205.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

206.    Dr. Israel, as a senior manager and President of Compass Lexecon, owed employment and fiduciary duties to Compass Lexecon and FTI. These duties required Dr. Israel, among other things, to act solely for the benefit of FTI and Compass Lexecon in all matters within the scope of his employment and to avoid all conflicts between his duties and his self-interest or the interests of Econic.

207.    By the course of conduct alleged herein, Dr. Israel breached or willfully breached his fiduciary obligations to FTI and Compass Lexecon. While still employed by Compass Lexecon but having already—and secretly—agreed to join Econic, Dr. Israel steered lucrative business opportunities away from Compass Lexecon to Econic. Dr. Israel also encouraged employees of Compass Lexecon to resign from the firm and join Econic, including by attempting to steer business toward those departing employees. He engaged in deception by taking active and specific

steps to conceal his actions from the senior leadership of Compass Lexecon and FTI, evidencing his consciousness of disloyalty and a pattern of disregard for the truth.

208.    Dr. Israel had a duty to disclose, as of November 21, 2024, if not earlier, that he had agreed to accept a 2% equity position in Econic and a seat on Econic's board. He breached that duty by consciously withholding these material facts from Compass Lexecon and FTI.

209.    Dr. Israel's additional actions in breach of his duties of loyalty included, without authorization, accessing, sharing, using, or disclosing FTI's and Compass Lexecon's trade secrets and other confidential information and resources to facilitate Mr. Orszag's efforts to establish a competing business to take over Compass Lexecon.

210.    As a direct and proximate result of Dr. Israel's gross breaches of his duty of loyalty, Plaintiffs have suffered substantial damages, as described in paragraph 148.

## COUNT IX: BREACH OF CONTRACT (NON-SOLICIT PROVISIONS) (AGAINST DR. ISRAEL)

211.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

212.    Dr. Israel breached and, on information and belief, continues to breach his Non-Solicit Provisions.

213.    Dr. Israel entered into a binding contract with FTI and Compass Lexecon effective January 1, 2025, which contained Non-Solicit Provisions that prohibited Dr. Israel from soliciting FTI or Compass Lexecon business and clients under certain circumstances during his employment.

214.    Dr. Israel breached his Non-Solicit Provisions while President of Compass Lexecon by steering clients and business of FTI and Compass Lexecon to Econic, including as more particularly set forth in paragraphs 141-147 above.

215.    Dr. Israel remains subject to his non-solicitation obligations through March 31, 2026. In April 2025, he breached that restrictive covenant by reaching out to a client of Compass Lexecon and seeking to obtain their business for Econic.  On information and belief, Dr. Israel's breaches of his Non-Solicit Provisions are ongoing.

216.    FTI and Compass Lexecon have fully performed their obligations under Dr. Israel's employment agreements.

217.    As a direct and proximate result of Dr. Israel's breaches of his Non-Solicit Provisions, Plaintiffs have suffered substantial damages, as described in paragraph 148.

218.    Because Dr. Israel's breaches of his Non-Solicit Provisions have deprived Plaintiffs of the benefit of their bargain, Plaintiffs seek an order extending the non-solicit period by the full period of his non-compliance.

### COUNT X: BREACH OF CONTRACT (NON-COMPETE PROVISIONS) (AGAINST DR. ISRAEL)

219.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

220.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

221.    By the actions described above, including his agreement to accept equity in, and a board seat with, Econic, his misappropriation and disclosure of trade secrets to Mr. Orszag for competitive purposes, his coordination with Mr. Orszag on their shared interest in developing the business of Econic, his steering of business opportunities to Econic, and his acts of disloyalty and dishonesty at times when he was serving as Compass Lexecon's President and was charged to

defend the company against Mr. Orszag's competitive threats, Dr. Israel violated his Non-Compete Provisions.

222.    As a result of Dr. Israel's breaches as defined in this Count, Plaintiffs suffered substantial damages, as described in paragraph 148.

**COUNT XI: FRAUD**
**(AGAINST DR. ISRAEL)**

223.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

224.    Dr. Israel owed a duty to FTI and Compass Lexecon to disclose material information that FTI and Compass Lexecon would reasonably want to know.

225.    As part of his duty, Dr. Israel should have disclosed in November 2024, if not earlier, that he had already agreed to accept a 2% equity stake, worth tens of millions of dollars, in Econic and a board seat.

226.    As part of his duty, Dr. Israel should have disclosed his acceptance of an offer of employment with Econic prior to his resignation from Compass Lexecon on March 31, 2025.

227.    In failing to disclose these material facts and through his steering of Compass Lexecon clients and employees to Econic, Dr. Israel intended to defraud and deceive FTI and Compass Lexecon.

228.    FTI and Compass Lexecon relied on the absence of such truthful disclosures in allowing Dr. Israel to serve as Compass Lexecon's President while Mr. Orszag and Econic were seeking to poach Compass Lexecon's employees.

229.    FTI and Compass Lexecon relied on the absence of Dr. Israel's disclosures to their detriment and, as a result, suffered substantial damages, as described in paragraph 148.

## COUNT XII: UNJUST ENRICHMENT
## (AGAINST ECONIC)

230.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

231.    As a result of the foregoing alleged misconduct by the individual Defendants, including their misappropriation of FTI's trade secrets, misuse of their confidential information, breaches of fiduciary and employment duties owed to them, soliciting their personnel and clients in violation of restrictive covenants, and steering their clients and business opportunities to Econic, Econic has received significant economic benefits. Those benefits include the receipt of lucrative business opportunities, valuable trade secrets and confidential information of FTI and Compass Lexecon, valuable intangible assets developed based on those trade secrets and confidential information, █████████████████████████████████████████ ███████████████████████████████████████████████████ ████████, and Econic's ability to employ talented economic consulting professionals who were recruited based at least in part on the misappropriation and disclosure of those trade secrets and confidential information and/or in violation of the individual Defendants' Non-Solicitation obligations.

232.    Because Mr. Orszag and Dr. Israel—both "Founding Partners" of Econic—knew and intended that their actions enriched Econic at the expense of FTI and Compass Lexecon, Econic gained actual or imputed knowledge that it was receiving these benefits under circumstances that make it inequitable for Econic to retain those benefits.

233.    To avoid a manifest inequity, under the facts and circumstances more particularly alleged throughout this Complaint, the Court should establish a constructive trust over all profits earned by Econic that are fairly traceable to the Defendants' inequitable conduct.

## COUNT XIII (TORTIOUS INTERFERENCE)
## (AGAINST MR. ORSZAG AND ECONIC)

234.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

235.    Beginning on November 20, 2024, Mr. Orszag was the principal and founder of Econic, and his acts alleged in this Complaint on and after that date were taken within the scope of his employment with Econic and to benefit Econic.

236.    Mr. Orszag and Econic were aware at all times that Dr. Israel owed fiduciary and employment duties to Compass Lexecon, ████████████████████████████████ ████████████████████████ while serving as its President through March 31, 2025.

237.    Mr. Orszag and Econic used that knowledge intentionally to undermine Compass Lexecon's interests from within, for Econic's benefit.

238.    Despite their knowledge of Dr. Israel's duties to FTI and Compass Lexecon, Mr. Orszag and Econic induced Dr. Israel to breach those fiduciary and contractual duties owed to Plaintiffs, by offering him a 2% equity stake in Econic, estimated to be worth tens of millions of dollars, and a board seat, while Dr. Israel was the President of Compass Lexecon.

239.    Upon information and belief, Mr. Orszag and Dr. Israel reached this agreement in principle while Mr. Orszag was still subject to his non-solicit restrictive covenant, which extended through November 20, 2024.

240.    Econic ratified Mr. Orszag's offer—and Dr. Israel's agreement to accept the offer—as shown by Dr. Israel's repeated references to his offer with his financial advisors and others in late 2024 and early 2025, after Econic's formation.  In early March 2025, Dr. Israel sent a copy of his Econic offer letter to his financial advisor.

241.    Mr. Orszag and Econic understood that Dr. Israel would continue outwardly to serve as Compass Lexecon's President for over four months, while having a significant undisclosed financial interest in Econic, which was Compass Lexecon's direct competitor.

242.    Mr. Orszag and Econic benefited from Dr. Israel's conflict, as he took steps to advance the interests of Econic between, at least, November 20, 2024, and March 31, 2025, rather than serving the interests of Compass Lexecon, the company to which he owed fiduciary and employment duties in his role as President.

243.    The actions taken by Mr. Orszag and Econic, without justification, intentionally interfered with Plaintiffs' contractual relationship with Dr. Israel.

244.    As a direct and proximate result of Mr. Orszag's and Econic's improper interference with Dr. Israel's fiduciary and contractual duties to Plaintiffs, Plaintiffs have suffered substantial damages, as described in paragraph 148.

## COUNT XIV (UNFAIR COMPETITION)
### (AGAINST ALL DEFENDANTS)

245.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

246.    All Defendants engaged in unfair competition against Plaintiffs through their improper and tortious acts, as further set forth above.

247.    Those tortious and improper acts of both individual Defendants include, among others, misappropriation of Plaintiffs' trade secrets, misuse of their confidential information, breaches of fiduciary and employment duties owed to them, soliciting their personnel and clients in violation of restrictive covenants, steering their clients and business opportunities to Econic, and Mr. Orszag's tortious interference with Dr. Israel's relationship with FTI.

248.    During the times that each individual Defendant was acting as an agent of Econic, Econic was liable for their tortious acts under principles of agency and *respondeat superior*.

249.    As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered substantial damages, as described in paragraph 148.

### COUNT XV: CIVIL CONSPIRACY
### (AGAINST ALL DEFENDANTS)

250.    Plaintiffs reallege and incorporate by reference the above allegations as if set forth herein.

251.    Mr. Orszag and Dr. Israel committed themselves to pursue a new competing venture that would come to include each of the forms of actionable misconduct described in this Complaint, including misappropriation of FTI's and Compass Lexecon's trade secrets, misuse of their confidential information, breaches of fiduciary and employment duties owed to Plaintiffs, soliciting their personnel and clients in violation of restrictive covenants, and steering their clients and business opportunities to Econic, all of which constituted unfair competition.

252.    Mr. Orszag and Dr. Israel had a meeting of the minds to engage in these forms of misconduct from at least May 2024, and continuing through Dr. Israel's departure from Compass Lexecon, starting with Dr. Israel's unauthorized disclosures of sensitive information to Mr. Orszag.

253.    From Econic's formation through Dr. Israel's departure from Compass Lexecon, Econic, through Mr. Orszag, joined the civil conspiracy with Dr. Israel.

254.    Defendants' means and methods, as more particularly described above, included acts of deceit and concealment, as they subverted the interests of Compass Lexecon in favor of their new venture, including during times when Dr. Israel served as an FTI and Compass Lexecon fiduciary.

71

255.    Mr. Orszag—whose acts are imputed to Econic after its formation—and Dr. Israel had extensive direct interactions through which they formed an agreement to compete against FTI and Compass Lexecon that came to include unlawful, tortious, inequitable, and dishonest means, and they persisted in refining and deepening that course of actionable conduct by involving other individuals and entities – including Compass Lexecon employees and clients – in their dishonest scheme.

256.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have suffered substantial damages, as described in paragraph 148.

## PRAYER FOR RELIEF

156. WHEREFORE, ~~Plaintiff requests~~Plaintiffs respectfully request that this Court:

a.(a)  Enter judgment in favor of ~~FTI~~Plaintiffs and against ~~Mr. Orszag~~Defendants for compensatory damages in ~~an amount to be proven at trial;~~ excess of $75,000;

(b)    Award to ~~FTI all of its~~Plaintiffs damages pursuant to the statutory multiplier under the Defend Trade Secrets Act;

b.(c) Award to Plaintiffs their reasonable attorneys' fees, plus costs and pre-judgment and post-judgment interest; ~~and~~

(d)    Order Defendants to disgorge their profits stemming from their acts of misappropriation and tortious acts;

(e) Establish a constructive trust in favor of Plaintiffs, under the Court's jurisdiction, to hold any and all profits stemming from the inequitable or unlawful conduct of the Defendants alleged herein that was taken for the benefit of Econic;

72

(f)    Hold Defendants jointly and severally liable for all damages resulting from their unlawful conduct;

(g)    Award Plaintiffs punitive damages against Dr. Israel and Mr. Orszag;

(h)    Enjoin Mr. Orszag and Dr. Israel from further ongoing access to, or possession, use, disclosure, or sharing of, FTI's and Compass Lexecon's trade secrets and confidential information; and enjoin Dr. Israel from further ongoing breaches of his restrictive covenant not to solicit Compass Lexecon clients, business, and professionals;

(i)    Enter an order extending the period of Dr. Israel's Non-Solicit Provisions to account for his periods of noncompliance following his departure from Compass Lexecon;

(j)    Award all additional civil remedies available in law and fact based on Defendants' foregoing actionable conduct proven at trial; and

e.(k)  Award all further relief the Court deems just and appropriate.

ZUCKERMAN SPAEDER LLP

/s/ William J. Murphy
William J. Murphy (Fed. Bar No. 00497)
Daniel P. Moylan (Fed. Bar No. 26476)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202-1031
(410) 949-1146 (office)
(410) 659-0436 (fax)
wmurphy@zuckerman.com
dmoylan@zuckerman.com

Caroline Judge Mehta (admitted *pro hac vice*)
Ezra B. Marcus (admitted *pro hac vice*)
1800 M Street NW, Suite 1000
Washington, DC 20036

(202) 778-1800 (office)
(202) 822-8106 (fax)
cmehta@zuckerman.com
emarcus@zuckerman.com

**WILKINSON STEKLOFF LLP**

*/s/ Brian L. Stekloff*

Brian L. Stekloff (Fed. Bar No. 26835)
2001 M Street NW, 10th Floor
Washington, DC 20036
(202) 847-4000 (office)
(202) 847-4005 (fax)
bstekloff@wilkinsonstekloff.com

*Counsel for Plaintiff*

\*      \*      \*      \*

**ZUCKERMAN SPAEDER LLP**

*/s/ William J. Murphy*
William J. Murphy (Fed. Bar No. 00497)
Daniel P. Moylan (Fed. Bar No. 26476)
Sara L. Alpert Lawson (Fed. Bar No. 31011)
Kirk E. MacKinnon Morrow (Fed. Bar No. 31703)
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
(410) 949-1146 (office)
(410) 659-0436 (fax)
wmurphy@zuckerman.com
dmoylan@zuckerman.com
slawson@zuckerman.com
kmackinnonmorrow@zuckerman.com

Ivano Ventresca (Fed. Bar No. 30763)

74

2100 L Street NW, Suite 400
Washington, DC 20037
(202) 778-1800 (office)
(202) 822-8106 (fax)
iventresca@zuckerman.com

Amy E. Philip (*pro hac vice* pending)
485 Madison Avenue, 19th Floor
New York, NY 10022
(212) 704-9600 (office)
(212) 704-4256 (fax)
aphilip@zuckerman.com

*Counsel for Plaintiffs*